IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| SHARON BOST, individually and as personal representative of the ESTATE OF FATIMA NEAL, <br> *Plaintiff*, <br><br> v. <br><br> WEXFORD HEALTH SOURCES, INC., et al. <br> *Defendants.* | Civil Action No. ELH-15-3278 |

**MEMORANDUM OPINION**

This action arises from the unfortunate death of Fatima Neal ("Neal" or "Decedent") in 2012, who suffered a stroke while she was detained at the Baltimore City Detention Center ("BCDC").[1]

In the First Amended Complaint (ECF 56) ("Amended Complaint"), plaintiff Sharon Bost, individually as Neal's mother and as the personal representative of the Estate of Fatima Neal, filed suit against a host of defendants: Wexford Health Sources, Inc. ("Wexford"); the State of Maryland ("State"); BCDC; medical staff employed by Wexford, including Anike Ajayi, R.N.; Elizabeth Obadina, R.N.; Ebre Ohaneje, R.N.; Najma Jamal, R.N.; Karen McNulty, R.N.; Andrea Wiggins, P.A.; Getachew Afre, M.D.; Jocelyn El-Sayed, M.D.; Obby Atta, C.R.N.P.; twenty-five unnamed medical service providers; various BCDC employees, including Shavella Miles, Carol McKnight, Valerie Alves, Cierra Ladson, Gwendolyn Oliver, Carolyn Atkins, Rickey Foxwell, Carol Harmon, and twenty-five unnamed "custody officers" at BCDC. *Id.*

---

[1] The Amended Complaint does not reveal Neal's age at the time of death, her medical history, how long she had been at BCDC, or whether she was a pretrial detainee or was, instead, serving a sentence. *See* ECF 56.

¶¶ 40-48.[2]  I shall refer collectively to the individual health care providers as the "Medical Defendants."  And, I shall refer to the BCDC employees collectively as the "Custody Defendants."

In the Amended Complaint, Bost asserted several claims for relief.  The "First Claim for Relief," lodged against all defendants, is brought under 42 U.S.C. § 1983 for the denial of medical care, in violation of the Eighth and Fourteenth Amendments.  ECF 56, ¶¶ 153-68.  The Second Claim for Relief is brought only against Wexford under 42 U.S.C. § 1983, alleging an unconstitutional policy and practice of denial of medical care (the "*Monell* Claim").  *Id.* ¶¶ 169-86.[3]  The Third Claim for Relief, against all defendants, alleged a claim under Article 24 of the Maryland Declaration of Rights.  *Id.* ¶¶ 187-206.  Further, in her fourth claim, Bost alleged a claim against Wexford and the Medical Defendants for medical malpractice.  *Id.* ¶¶ 207-17.  The fifth claim asserted negligence against the State, BCDC, and the Custody Defendants.  *Id.* ¶¶ 218-25.  In addition, as to all defendants, Bost asserted a sixth claim for intentional infliction of emotional distress (*id.* ¶¶ 226-37) and a seventh claim for wrongful death.  *Id.* ¶¶ 238-43.

Wexford and the Medical Defendants have filed a joint Motion to Bifurcate and Stay Discovery as to the *Monell* Claim.  ECF 130.  The motion is supported by a memorandum of law (ECF 130-1, collectively, "Medical Defendants' Motion") and seven exhibits.  ECF 130-3 through ECF 130-9.  Bost  opposes the Motion (ECF 134, "Opposition"), and Wexford and the Medical Defendants have replied.  ECF 149 ("Reply").

---

[2] There are discrepancies in the ways that plaintiff and defendants spell the defendants' names, as well as internal discrepancies in defendants' submissions.  For example, Foxwell spells the first name as "Ricky."  *See, e.g.*, ECF 90; ECF 135. And, Wiggins spells her first name as "Andria."  *See, .e.g.*, ECF 49; ECF 130-6.

[3] *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Also pending is the Motion to Bifurcate and Stay Discovery as to the *Monell* Claim, filed by the Custody Defendants. ECF 135 ("Custody Defendants' Motion"). Bost opposes the Custody Defendants' Motion (ECF 147) and the Custody Defendants have replied. ECF 153.

Both motions are fully briefed and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that follow, I shall grant the motions.[4]

## I.     Factual Background[5]

At the relevant time, Neal was "a detainee at BCDC . . . ." ECF 56, ¶ 20. She was scheduled to be released on November 5, 2012. *Id.* ¶ 9.[6]

On the morning of October 30, 2012, Neal awoke with "an excruciatingly painful headache and blurred vision." *Id.* ¶ 51. She reported to her "bunkmates" later that day that her headache was getting worse and that it was becoming difficult for her to see or to concentrate. *Id.* ¶ 52. "She stayed in bed all day . . . ." *Id.* ¶ 51. Bost alleges, on information and belief, that Neal's headache, loss of vision, and other symptoms were the result of a stroke. *Id.* ¶ 53.

---

[4] Several discovery motions are also pending before Magistrate Judge David Copperthite. *See* ECF 128; ECF 131; ECF 136; ECF 150; ECF 152; ECF 154. This Memorandum Opinion does not resolve the discovery disputes.

[5] Given the procedural posture of the case, I shall assume the truth of the facts alleged in the Amended Complaint.

[6] Ordinarily, in the context of prison litigation, "detainee" refers to an individual awaiting trial, rather than one who is serving a sentence. Here, plaintiff states that Neal was a detainee, but the reference to the release date suggests she was serving a sentence.

The distinction is not immaterial. In a claim of deprivation of constitutional rights, the inmate's status, either as a pretrial detainee or as a person serving a sentence, affects the applicability of particular constitutional amendments. *See, e.g.*, *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988).

On October 31, 2012, Neal continued to complain to custody officers and other detainees of disorientation and a headache. *Id.* ¶ 54. However, the BCDC employees "did not alert any medical personnel . . . ." *Id.*

In the early morning hours of November 1, 2012, Neal's bunkmate "awoke to find Neal stumbling around the room . . . ." *Id.* ¶ 55. At that time, Neal complained that her headache had worsened and that "she could not see at all." *Id.* Neal asked her bunkmate to call for help. *Id.* ¶ 56. Before help arrived, Neal collapsed and broke into a cold sweat. *Id.* ¶ 57. "Nurse Rachel" arrived and saw Neal "sprawled out on the floor . . . ." *Id.* ¶ 59. Neal's bunkmate informed Nurse Rachel that Neal had spent most of the prior 24 hours in bed due to a severe headache. *Id.* ¶ 58. The nurse pulled Neal up and walked her to the infirmary, but did not call for other medical assistance. *Id.* ¶ 60; *see also id.* ¶ 61.

Several medical staff members saw Neal in the infirmary during the morning of November 1, 2012. *Id.* ¶¶ 63-78. Nurse Ajayi, who first saw Neal, recorded that Neal was "'ambulatory but weak.'" *Id.* ¶ 64. She also noted that Neal had a "'pounding'" headache and "felt 'cold.'" However, Ajayi did not contact an emergency medical provider. *Id.* ¶ 65.

Neal was then seen by Nurse Obadina, who recorded that Neal had "'walked to the infirmary'" and that she was "'a bit weak.'" *Id.* ¶¶ 67-69. Obadina also recorded that Neal "refused to have her vital signs read." *Id.* ¶ 69. But, plaintiff asserts, on information and belief, that Neal had not refused to have her vital signs read. *Id.* ¶ 70. Rather, Obadina "simply did not take them." *Id.*

Neal was then seen by Physician's Assistant Wiggins. *Id.* ¶ 72. However, Wiggins "took no action to contact emergency medical services . . . ." *Id.*

At approximately 9:53 a.m. on November 1, 2012, Neal was seen by Dr. Afre, who prescribed Acetaminophen.[7]  *Id.* ¶ 76.  Neal remained in the infirmary on November 1, 2012, complaining of a severe headache.  *Id.* ¶ 80.  But, according to Bost, Neal's condition went untreated.  *Id.* ¶¶ 76, 78.  Neal's bunkmate in the infirmary twice inquired about Neal's condition, but her inquiries were "ignored."  *Id.*

The Amended Complaint asserts, on information and belief, that Neal suffered a second stroke between the night of November 1, 2012 and the morning of November 2, 2012.  *Id.* ¶ 81.  Nurse Ohaneje saw Neal in the early morning of November 2, 2012, and recorded that Neal's condition was "'stable.'"  *Id.* ¶ 82.  That observation was allegedly false.  *Id.* ¶ 83.

Nurse Obadina also visited Neal in the early morning of November 2, 2012.  *Id.* ¶ 85.  She recorded that Neal had "'no complaints.'"  *Id.*  That assertion was also allegedly false.  *Id.* ¶ 86.

By the morning of November 2, 2012, "medical personnel, custody officers and detainees in the BCDC infirmary began noticing that Fatima's entire right side of her body began to slump and that she was dragging her right leg while walking."  *Id.* ¶ 88.  Fellow inmates expressed concern about Neal but were told that "'nothing was wrong'" with her.  *Id.* ¶ 89.  And, despite requests from inmates, Obadina and Ohaneje refused to check Neal's vital signs.  *Id.* ¶ 90.

Dr. Afre "visited" Neal on the morning of November 2, 2012, and recorded that she still complained of a severe headache.  *Id.* ¶ 92.  Dr. Afre prescribed Tylenol with codeine.  *Id.*  Neal spent the rest of the day in bed.  *Id.* ¶ 95.

---

[7] Plaintiff erroneously asserts that Acetaminophen is commonly known as Motrin.  ECF 56, ¶ 76.  However, the active drug in Motrin is Ibuprofen.  Acetaminophen is an analgesic commonly sold under the brand name of Tylenol.

Nurse Jamal visited Neal during the evening of November 2, 2012, and recorded that Neal was in "'stable' condition." *Id.* ¶ 96. Nurse Jamal made a second visit in the early morning hours of November 3, 2012, and recorded that there was no change in Neal's condition. *Id.* ¶ 98. Around that time, Neal's bunkmates "began to notice that her ribs were protruding from her chest." *Id.* ¶ 101. Neal's bunkmates were "particularly troubled by the fact that Fatima had stopped responding to their questions." *Id.*

During the morning of November 3, 2012, Dr. El-Sayed "visited" Neal and gave her a dose of Tylenol with codeine. *Id.* ¶ 103. Dr. El-Sayed "took no other actions to provide Fatima relief from her intense pain." *Id.* In the eight hours following Dr. El-Sayed's visit, Neal received no additional medical attention. *Id.* ¶ 110.

Neal experienced severe pain in her head, lapsed in and out of consciousness, was unable to walk, had involuntary bowel movements, "and was left to lay in her own feces." *Id.* ¶ 104. According to plaintiff, Neal was experiencing "multiple intra-cerebral hemorrhages . . . ." *Id.*

One of Neal's bunkmates sat with her for four hours on November 3. *Id.* ¶ 106. Neal continued to complain of a severe headache and was unable to move. *Id.* That bunkmate "attempted to convince medical staff on duty that Fatima needed immediate and emergency medical attention." *Id.* A nurse told the fellow inmate that Neal "was fine, and that she just needed to eat." *Id.* ¶107.

Notably, one of Neal's bunkmates "[s]pecifically informed [a] particular nurse that she believed Fatima was having a stroke." *Id.* ¶ 108. Neal "told [a] bunkmate that she was going to die if she did not receive medical treatment." *Id.* ¶ 109. During this time, Neal "lay in her bed in a near vegetative state, was unable to speak clearly, began making incoherent and delusional statements and her skin began to feel cold and clammy." *Id.* ¶ 111.

During the afternoon of November 3, 2012, Nurse McNulty checked Neal and recorded that there was "'no distress present,'" yet Neal was "'visually impaired,'" "'had trouble ambulating,'" and complained of a headache with "a degree of pain" registering ten out of ten. *Id.* ¶¶ 112-113.  McNulty also recorded that Neal had a "'decreased appetite,' and experienced 'lethargy' and 'weakness.'" *Id.* ¶ 114.  However, McNulty did not alert a physician. *Id.* ¶ 115.

Neal was next visited by Nurse Jamal during the evening of November 3, 2012. *Id.* ¶ 119.  Nurse Jamal provided Neal with Tylenol with codeine and recorded that Neal "experienced 'no vision changes or headaches.'" *Id.* ¶¶ 120-21.  Neal continued to complain of severe and intense pain. *Id.* ¶ 123.

At 2:25 a.m. on November 4, 2012, Neal "violently awoke and began involuntarily foaming at the mouth." *Id.* ¶ 125.  At this time, Neal was completely non-responsive. *Id.* ¶ 126.  Detainees in the infirmary attempted to alert medical staff, but the nurse on duty, Nurse Obadina, "was sleeping and could not be woken up . . . ." *Id.* ¶ 127.  The detainees were able to get the attention of Officer Ladson, and informed him that Neal was foaming at the mouth and struggling to breathe. *Id.* ¶ 128.

Officer Ladson contacted Nurse Obadina, who began assessing Neal at approximately 3:30 a.m, more than one hour after Neal first began foaming at the mouth. *Id.* ¶ 129.  As a result of Nurse Obadina's assessment, "a triage nurse was rushed to Fatima's bedside." *Id.* ¶ 130.  But, there was no doctor available to respond. *Id.* ¶ 131.

The triage nurse attached an oxygen mask to Neal's mouth and attempted to suction the foam out of Neal's mouth. *Id.* ¶ 133.  Wexford records indicate that, at that time, Neal had no pulse. *Id.* ¶ 134.  Medical staff then called emergency services, reporting to the 9-1-1 dispatcher that Neal was unresponsive. *Id.* ¶¶ 135, 136.

At approximately 3:45 a.m., the medical staff on duty began to perform CPR and gave an order for Neal to be transported to the Johns Hopkins Hospital ("Hospital" or "Johns Hopkins"). *Id.* ¶ 137-138. Neal was transported to the Hospital at approximately 4:25 a.m, two hours after the report that she was foaming at the mouth. *Id.* ¶ 139.

Neal arrived at the Hospital at 4:31 a.m. on November 4, 2012. *Id.* ¶ 143. Although Neal had "displayed clear symptoms of a stroke" for several days (*id.* ¶ 141), the BCDC medical staff on duty reported that Neal was suffering from "'cardiopulmonary arrest/arrhythmia.'" *Id.* ¶ 140. Seven minutes later, Neal was pronounced dead by Dr. Latoya Hendricks of Johns Hopkins. *Id.* Plaintiff asserts in the Amended Complaint, on information and belief, that Neal had died at BCDC. *Id.* ¶ 144. Neal was scheduled to be released from BCDC the next day. *Id.* ¶ 9.

On November 4, 2012, Dr. Theodore King, Jr. of Johns Hopkins conducted an autopsy on Neal. *Id.* ¶ 147. Dr. King concluded that Neal had died as a result of an "intracerebral hemorrhage," *i.e.*, a stroke, and its accompanying complications. *Id.*

## II.    Procedural History

As indicated, Sharon Bost, individually and as the personal representative of the Estate of Fatima Neal, filed suit on October 27, 2015. ECF 1. On December 21, 2015, BCDC, Wexford, the State, and several of the Custody Defendants moved to dismiss and/or for summary judgment. ECF 16.[8] Based on his availability, Judge J. Frederick Motz considered the motion. By Memorandum (ECF 28) and Order (ECF 29) of March 8, 2016, he granted the motion, in part, dismissing the claims against the State and the Custody Defendants, in their official capacities. ECF 29. Moreover, Judge Motz dismissed the negligence claims against the Custody Defendants in their individual capacities. *Id.*

---

[8] The Custody Defendants who joined ECF 16 were Oliver, Miles, Alves, and McKnight.

Bost filed an Amended Complaint on May 26, 2016.  ECF 56.  Wexford and the Medical Defendants answered the Amended Complaint on June 6, 2016.  ECF 59.  However, the State, BCDC, and several of the Custody Defendants filed a second motion to dismiss and/or for summary judgment on June 6, 2016.  ECF 57.[9]  Atkins filed her own motion to dismiss and/or for summary judgment on July 11, 2016.  ECF 74.

Again, due to Judge Motz's availability, he resolved the motions.  On August 31, 2016, he granted ECF 57 and ECF 74 in part, dismissing the claims against the State, BCDC, and the Custody Defendants in their official capacities, based on Eleventh Amendment immunity.  ECF 89.  Judge Motz also dismissed Bost's claims for negligence against the Custody Defendants in their individual capacities.  *Id.*  The individual Custody Defendants answered the Amended Complaint on September 5, 2016.  ECF 90.

The Court issued a Scheduling Order on April 19, 2016, while the first motion to dismiss and/or for summary judgment was pending.  ECF 44.  The Scheduling Order set June 30, 2017, as the deadline for discovery.  *Id.* at 2.  During discovery, Magistrate Judge Beth Gesner resolved some discovery disputes.  *See* ECF 106; ECF 108; *see also* ECF 87 (referral).  Other discovery disputes are now pending before Magistrate Judge Copperthite.  *See* docket.

### III.    The Contentions

In her Amended Complaint, Bost articulates several policies and practices of Wexford that, in her view, amount to constitutional violations that led to Neal's death.  They include, in pertinent part:

> 1) "Wexford employees are informally instructed to deliberately ignore detainees' medical complaints, and to act as though detainees are only

---

[9] The Custody Defendants who joined ECF 57 were Oliver, Foxwell, Harmon, Miles, Alves, and McKnight.

'faking' their injuries. This practice is particularly pronounced when a detainee's release date is scheduled for the near future." ECF 56, ¶ 172.

2) "Wexford medical staff working in BCDC are trained to ignore or under-report symptoms of stroke and similar emergencies, amounting to deliberate indifference to the serious medical needs of detainees presenting symptoms of a stroke, including Ms. Neal." *Id.* ¶ 173.

3) "Wexford supervises its employees to ignore or under-report symptoms of stroke and similar emergencies, amounting to deliberate indifference to the serious medical needs of detainees presenting symptoms of a stroke, including Ms. Neal." *Id.* ¶ 174.

4) "Wexford ratifies the conduct of its employees who ignore or under-report symptoms of a stroke and similar medical emergencies through review and approval of these employees' performance, and through the decision to continue the employment of individuals who ignore and under-report medical emergencies of BCDC detainees, amounting to deliberate indifference to the serious medical needs of detainees presenting symptoms of a stroke, including Ms. Neal." *Id.* ¶ 175.

5) "Specifically, there existed at BCDC a widespread practice under which employees and agents of Wexford and the BCDC and/or Maryland, including correctional officers and medical personnel, commonly failed or refused to: (1) properly examine detainees with serious medical conditions; (2) provide proper medications to detainees with serious medical conditions; (3) respond to detainees who request medical attention or medical attention; (4) communicate medical needs of detainees among correctional officers and medical staff; (5) respond to detainees who exhibits obvious signs of medical need or illness; or (6) refer detainees for outside medication attention." *Id.* ¶ 176.

In their motion, Wexford and the Medical Defendants raise two principal arguments in support of bifurcation of the *Monell* Claim and a stay of discovery as to that claim. First, they argue that bifurcation will promote judicial economy and conserve the parties' resources. ECF 130-1 at 8-13. Wexford and the Medical Defendants also insist that bifurcation might enable the parties to "avoid expending significant time and money on discovery and trial of the *Monell* claim . . . ." *Id.* ¶ 8. They posit, *id.*: "Wexford can be found liable on Bost's *Monell* claim only

if a jury finds that the individual Medical Defendants caused Decedent's injury and death by violating Decedent's constitutional rights."

Second, Wexford and the Medical Defendants maintain that bifurcation is necessary to ensure that the Medical Defendants receive a fair trial. In their view, "if the *Monell* claim is tried alongside Bost's § 1983 claims against the individual Medical Defendants, evidence related to policy, practice, and custom would be admitted on the *Monell* issues that would need to be disregarded by the jury as to the individual claims." *Id.* at 13. Wexford and the Medical Defendants point out that, "in the absence of an explicit and facially unconstitutional policy statement, proving a *Monell* claim generally requires a plaintiff to submit a large amount of evidence in order to establish the defendant's practices and customs," including "evidence of prior instances of unconstitutional conduct . . . ." *Id.* at 13-14. Further, they argue, *id.* at 15:

> Presenting such evidence (e.g., bad acts of other providers, systemic failure to train or investigate such conduct, etc.,) would only serve to inflame the jury against the individual Medical Defendants. Even with the best limiting instructions the Court could devise, the risk of confusing the jury and tainting its verdict would remain too great.

The Custody Defendants advance arguments similar to those of Wexford and the Medical Defendants. ECF 135. In particular, the Custody Defendants contend that failure to bifurcate would result in needless expenditure of time and money for the Custody Defendants, "as they and their counsel would not be excused from trial during presentation of the *Monell* Claim, even though that theory of recovery is inapplicable to the State and its employees regardless of any act of deliberate indifference." ECF 135-1 at 5. Moreover, the Custody Defendants contend that they would be prejudiced at trial by the introduction of the *Monell* evidence, because it would require the jury to "make and retain a legal distinction between the Custody Defendants and the

[Department of Public Safety and Correctional Services'] contractor, Wexford, even though all case defendants maintain a presence at the jail." *Id.* at 7.

Although the Custody Defendants were not sued under *Monell*, they argue that they will "be tainted by evidence of policies and practices" that pertain only to Wexford. *Id.* They add that allowing *Monell* discovery to proceed along with fact discovery "will place a significantly greater strain upon the Custody Defendants . . . ." *Id.* at 6.

On a variety of grounds, plaintiff opposes the motions to bifurcate and to stay discovery. ECF 134; ECF 147. Bost asserts that a finding that the Medical Defendants violated Neal's constitutional rights is not a prerequisite to a finding of liability against Wexford under *Monell*. ECF 134 at 5-8. She points out that various courts of appeals, including the Fourth Circuit, have determined that "an entity defendant may be found liable for maintaining an unconstitutional policy or practice even if none of the individual defendants in the case is found liable." *Id.* at 5-6 (citing, *inter alia*, *Int'l Ground Transp., Inc. v. Mayor and City Council of Ocean Cty., Md.*, 475 F.3d 214, 219 (4th Cir. 2007), and *Santos v. Frederick City Bd. of Comms.*, 725 F.3d 451, 469-70 (4th Cir. 2013)). Although Bost concedes that courts in the Fourth Circuit often bifurcate *Monell* claims, she argues that the specific facts and allegations here are distinguishable from those cases. *Id.* at 8.

Moreover, Bost contends that bifurcation would "impose a great burden on the Court and parties, increase the cost of litigation, and inconvenience the witnesses." *Id.* In Bost's view, the only way that bifurcation would enhance judicial efficiency is if the *Monell* Claim need not be litigated. *Id.* at 8-9. But, given the specific facts and allegations in this case, Bost posits that the *Monell* Claim must be litigated regardless of the outcome of trial of the Medical Defendants. *Id.* at 9. Furthermore, Bost points out that bifurcation of discovery would result in duplication of

effort because the same witnesses are pertinent to the claims against the individual defendants and against Wexford. *Id.* at 10.

In addition, Bost argues that bifurcation would violate her right to trial by jury under the Seventh Amendment, because two juries would consider the same factual issues. *Id.* at 13-15. In particular, Bost contends that a jury considering the *Monell* issue would necessarily have to make findings as to the Medical Defendants' compliance with Wexford's policies, an issue that would also be considered by the first jury. *Id.* According to Bost, "it would be difficult, to say the least, to draft a verdict form that captured the first jury's findings on exactly how Ms. Neal's rights were violated." *Id.*

Finally, as to the arguments in both motions that the Medical Defendants and the Custody Defendants would be prejudiced by the simultaneous litigation of the *Monell* Claim, Bost posits that the mere possibility of prejudice does not warrant bifurcation. *Id.* at 12. She asserts: "The question whether discovery should be bifurcated should not turn on potential prejudice at an ultimate trial." *Id.*

In their Reply, Wexford and the Medical Defendants maintain that a finding of liability as to the Medical Defendants would have to precede any finding of liability for Wexford under *Monell*. ECF 149 at 2. Further, they assert that the cases cited by Bost are distinguishable, particularly given that the Medical Defendants have not alleged qualified immunity as a defense; plaintiff has not alleged understaffing as a policy that led to Neal's death; and plaintiff has failed to produce any evidence tending to show the existence of any unidentified Wexford staff who came into contact with Neal at the relevant time. *Id.* at 6-7.

As to Bost's argument that bifurcation would increase and multiply proceedings, Wexford and the Medical Defendants contend that bifurcation would simply separate

proceedings and would "potentially eliminate expenditure of significant time and resources." *Id.* at 7-8. They argue: "The only persons who might need to be deposed twice are Wexford's 30(b)(6) designees; however the subjects that would be covered at those separate depositions would necessarily be different.[1]" *Id.* at 8.

And, with respect to Bost's Seventh Amendment argument, Wexford and the Medical Defendants observe that bifurcation of *Monell* claims is routinely carried out by courts without affecting plaintiffs' rights under the Seventh Amendment. *Id.* at 12. They posit that, under their bifurcation plan, if the first jury finds that some or all of the Medical Defendants violated Neal's constitutional rights, the second jury would be instructed not to review that issue. *Id.* at 12-13.

In their Reply, the Custody Defendants reassert many of the arguments made in their motion and emphasize the arguments of the Medical Defendants. *See* ECF 153. They point out that Bost failed to address the "legitimate fear" of the Custody Defendants that "they will be tainted unfairly by evidence produced at a joint trial, but relevant solely to the *Monell* claim against Wexford." *Id.* at 3. The Custody Defendants also posit that Bost "has not identified any legal mechanisms capable of protecting the Custody Defendants from such extensive and prejudicial exposure, other than the superficial suggestion that 'concerns about prejudice should be dealt with at trial and not through bifurcation.'" *Id.* (quoting ECF 147 at 2).

## IV. Discussion

### A.

Defendants seek to bifurcate Bost's *Monell* Claim against Wexford, pursuant to Fed. R. Civ. P. 42(b). Fed. R. Civ. P. 42(b) provides: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Notably, "[o]nly one of these criteria

need be met to justify bifurcation." *Saxion v. Titan-C-Mfg., Inc.,* 86 F.3d 553, 556 (6th Cir. 1996) (citations omitted).

Defendants also seek to stay discovery relating to the *Monell* Claim until after the resolution of the § 1983 claim against the Medical Defendants. ECF 130; ECF 135. They rely on Fed. R. Civ. P. 26(d), which provides, in pertinent part: "A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, **or by court order.**" (Emphasis added).

District courts have "broad discretion in deciding whether to bifurcate claims for trial, and the exercise of that discretion will be set aside only if clearly abused." *Beasley v. Kelly*, DKC-10-0049, 2010 WL 3221848, at *3 (D. Md. Aug. 13, 2010) (citing *Dixon v. CSX Transp., Inc.*, 990 F.2d 1440, 1443 (4th Cir. 1993), *cert. denied*, 510 U.S. 915 (1993)); *see also Brown v. Bailey*, RDB-11-1901, 2012 WL 2188338, at *4 (D. Md. June 13, 2010) (same); *Dawson v. Prince George's Cnty.*, 896 F. Supp. 537, 539 (D. Md. 1995) (same); 9A C. WRIGHT & A. MILLER, FED. PRACTICE AND PROCEDURE, § 2388 ("Wright & Miller"), at 113-14 ("It is well-established by a wealth of case law that ultimately the question of whether to conduct separate trials under Rule 42(b) should be, and is, a matter left to the sound discretion of the trial court on the basis of the circumstances of the litigation before it.").

## B.

Resolution of the bifurcation motions requires a brief review of 42 U.S.C. § 1983, on which many of plaintiff's claims are based. Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of

any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012). However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To state a claim under § 1983, "a plaintiff must aver that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States." *Wahi v. Charleston Area Medical Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *see Filarsky*, 566 U.S. at 392; *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

In the seminal case of *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court determined that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. *Id.* at 690-91; *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 384 (1989) (emphasis in original).

As the *Monell* Court said, 436 U.S. at 694, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights."

*Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001).

Of import here, *Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 49 (1988); *Polk Cty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999); *Shields v. Prince George's Cty.*, No. GJH-15-1736, 2016 WL 4581327, at *7 (D. Md. Sept. 1, 2016). Standards applicable to municipalities are also applicable to private corporations acting under color of state law. *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "'apply equally to a private corporation'" acting under color of state law) (citation omitted).

Bifurcation is particularly common in § 1983 cases in which claims are asserted against individual defendants and their municipal employers. Courts have consistently found that "bifurcation of . . . *Monell* supervisory claims from the individual claims is appropriate and often desirable." *Brown*, RDB-11-1901, 2012 WL 2188338, at *4; *see also, e.g., Humbert v. O'Malley*, WDQ-11-0440, 2012 WL 1066478, at *2 (D. Md. Mar. 27, 2012); *James v. Frederick Cnty. Pub. Schs.*, 441 F. Supp. 2d 755, 762 (D. Md. 2006); *Robertson v. Prince George's Cnty.*, 215 F. Supp. 2d 664, 665 (D. Md. 2002); *Dawson*, 896 F. Supp. at 540. In the ordinary course, before determining whether a plaintiff has established a claim for municipal liability under *Monell*, the Court must first "determine whether the complaint states a claim for a predicate constitutional violation." *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

Notably, a "Court may not impose vicarious liability under a § 1983 action." *Dawson*, 896 F. Supp. at 540. Therefore, in most cases, a plaintiff's § 1983 claims against a municipality or a supervisor "hinge on his ability to show that [individual defendants] violated his constitutional rights." *Id.*; *see also Young*, 238 F.3d at 579 (recognizing that a municipality can only be liable under § 1983 if the plaintiff establishes that a municipal employee violated his constitutional rights); *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991) ("A claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised."), *cert. denied*, 502 U.S. 1095 (1992); *Burgess v. Balt. Police Dep't*, RDB-15-0834, 2016 WL 1159200, at *1 (D. Md. Mar. 23, 2016) ("Under 42 U.S.C. § 1983, a municipality or employer cannot be held vicariously liable based solely on an agency relationship."); *Williamson v. Prince George's Cnty.*, DKC-10-1100, 2011 WL 1065780, at *2 (D. Md. Mar. 21, 2011) ("A municipality can only be held liable under § 1983 if the plaintiff first establishes that some county employee violated his constitutional rights."); *Marryshow v. Town of Bladensburg*, 139 F.R.D. 318, 319 (D. Md. 1991) ("Under Section 1983, to hold the [supervisor and municipal] Defendants liable, Plaintiff must first establish that at least one [individual] Defendant violated his constitutional rights.").

Thus, *Monell* claims "are good candidates for bifurcation because when no governmental employees are found liable, no subsequent trial of the municipality is necessary." *Beasley*, DKC-10-0049, 2010 WL 3221848, at *3. Put another way, "[b]ecause of the secondary nature of a municipality on potential liability under § 1983, courts have frequently bifurcated discovery and or trial so that cases proceed first with a trial against the individual defendant(s) alleged to be primarily liable." *Taylor v. Maryland*, DKC-10-2167, 2010 WL 5247903, at *2 (D. Md. Dec.

16, 2010); *see Burgess*, RDB-15-0834, 2016 WL 1159200, at *1 (finding bifurcation appropriate "[g]iven the derivative nature of [the Baltimore Police Department's] potential liability"). Notably, "[n]ot only does bifurcation in such situations streamline the issues for trial, it prevents prejudice to the individual defendants that would otherwise arise from the introduction of evidence of prior incidents of police brutality in order to make a case against the municipality." *Taylor*, DKC-10-2167, 2010 WL 5247903, at *2.

To be sure, "*Monell* . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on [a] local government." *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985). There are some narrow circumstances in which "a finding of no liability on the part of the individual municipal actors can co-exist with a finding of liability on the part of the municipality." *Int'l Ground Transp., Inc.*, 475 F.3d at 219; *see also, e.g.*, *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 305 (7th Cir. 2010). But, in such cases, municipal liability under *Monell* is limited to situations in which "such a finding would not create an *inconsistent* verdict" as to the individual defendants. *Thomas*, 604 F.3d at 305 (emphasis in *Thomas*).

For example, in *Thomas*, the Seventh Circuit determined that a municipality could be held liable under *Monell* for a prisoner's death even though none of the private prison health care employees were found to have violated the decedent's constitutional rights. The *Thomas* Court noted that a critical fact supporting the jury's finding of *Monell* liability was that the individual defendants were physically unable to access prisoners' medical requests as a result of the county's policy. Thus, the Court concluded that liability on the part of the county was not inconsistent with the jury's finding in favor of the individual defendants. *Id.*

Moreover, "the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights," even if the conduct of "no one employee may violate" those rights. *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985); *see Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 986 (8th Cir. 2002) ("[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation."). But, these situations most often arise in cases where a plaintiff alleges understaffing by the municipality. Notably, no such allegation is made here.

In *Garcia*, 768 F.2d 303, plaintiffs brought suit against Salt Lake County and its officers, asserting claims under § 1983 following the death of a prisoner. *Id.* at 305-06. Plaintiffs asserted that the County was liable under *Monell* because that there was no physician present at the jail most of the time, including when the decedent had stopped breathing. *Id.* at 308. At trial, although the jury found none of the individual officers responsible under § 1983, the jury concluded that Salt Lake County was liable under *Monell*. *Id.* at 306. The County appealed, claiming that a municipality can only be liable under § 1983 if individual officers are found to have violated the decedent's civil rights. *Id.* The Tenth Circuit agreed with the plaintiffs, concluding that a finding of liability against the County was not inconsistent with the finding that the individual officers were not liable. *Id.* at 308.

Similarly, in *Anderson*, 778 F.2d 678, plaintiffs brought suit, *inter alia*, against, the City of Atlanta and individual police officers who were working at the city's Pre-Trial Detention Center as a result of the death of a detainee. *Id.* at 680. The jury found none of the individual officers liable under § 1983, but determined that the city was liable because of understaffing. *Id.*

at 686. The district court then granted defendants' motion for judgment notwithstanding the verdict, on the ground that the city could not be liable under *Monell* if the individual officers were found not to have violated the decedent's constitutional rights. *Id.*

In reversing the District Court, the Eleventh Circuit stated: "[I]f the jury were to find, as it did, that the deprivation of [the decedent's] constitutional rights was a result of understaffing, then it would logically find no fault on the part of the individual arresting officers." *Id.* Nevertheless, the court reasoned, *id.*: "The jury could reasonably find that a policy of understaffing resulted in the unavailability of medical personnel and prevented individual officers from being able to do their tasks properly. . . . We see no inconsistency in the jury verdict holding the City liable and the individual officers not liable."

Courts have also determined that municipal liability under *Monell* is appropriate in the absence of liability for individual officers where "the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cnty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). Such a theory is appropriate, for example, where there are unknown defendants. Moreover, courts have determined that municipal liability is appropriate in the absence of a finding of individual officer liability under § 1983 where the individual officers are entitled to qualified immunity. *Int'l Ground Transp., Inc.*, 475 F.3d at 219; *accord Awalt v. Marketti*, No. 11 C 6142, 2012 WL 1161500, at *12 (N.D. Ill. Apr. 9, 2012). Here, the defense of qualified immunity has not been asserted by the Medical Defendants.

In light of the foregoing, I agree with plaintiff that, even if a jury were to exonerate the individual Medical Defendants, she would be entitled to proceed on her *Monell* Claim. In other words, resolution of the § 1983 claims in favor of the individual Medical Defendants would not

*necessarily* dispose of the *Monell* Claim.  However, this conclusion does not resolve the bifurcation/stay motions.

**C.**

In my view, bifurcation is appropriate because it will promote judicial economy, conserve the parties' resources, prevent prejudice to the individual defendants, and will not prejudice the plaintiff.

As indicated, I have recognized that this is not a case in which plaintiff *must* succeed in her § 1983 claims against the individual Medical Defendants in order to pursue her *Monell* Claim again Wexford.  But, based on the allegations, the claims go hand in hand.  This is because the allegations advanced by Bost as to the unconstitutional policies and practices of Wexford correspond to the alleged inadequate medical care provided by the individual Medical Defendants.  Put another way, the alleged policies of Wexford and the inadequate medical care allegedly provided by the Medical Defendants are two sides of the same coin.

To illustrate, plaintiff alleges: "Wexford employees are informally instructed to deliberately ignore medical complaints . . . ."  ECF 56, ¶ 172.  Bost also alleges: "Wexford medical staff working in BCDC are trained to ignore or under-report symptoms of stroke and similar emergencies, amounting to deliberate indifference to the serious medical needs of detainees presenting symptoms of a stroke . . . ."  *Id.* ¶ 173.  Each of these assertions corresponds to the alleged conduct of the individual Medical Defendants.  For example, plaintiff contends that the individual defendants blatantly ignored the Decedent's symptoms.

On the other hand, Bost has not alleged that Wexford had policies of inadequate staffing at the relevant time.  *See*, *e.g.*, *Thomas*, 604 F.3d at 305; *cf. Anderson*, 778 F.2d at 686; *Garcia*, 769 F.2d at 308.  Moreover, the individual Medical Defendants have not asserted qualified

immunity.  *See* ECF 149 at 2 n. 1; ECF 59 (answer of Wexford and Medical Defendants); *cf Int'l Ground Transp., Inc.*, 475 F.3d at 219.  And, Bost has not identified "any acts or omissions that allegedly violated Decedent's constitutional rights, other than those committed by the Individual Medical Defendants."  ECF 149 at 7; *cf. Thomas*, 604 F.3d at 305 (stating that the municipality could be liable under *Monell* without a finding of liability on the part of individual defendants if "the plaintiff here had only sued the County, or didn't know, because of some breakdown in recording shifts, who the [medical staff] on duty were").  Moreover, Bost does not argue that Wexford's records are inadequate, such that she cannot identify the employees who came into contact with Neal during the relevant period.

Therefore, as a practical matter, it would save time and resources, and promote judicial economy, to defer consideration of the *Monell* Claim until after a determination of the liability of the Medical Defendants.  If the claims are bifurcated, Bost may ultimately choose not to proceed with the *Monell* Claim if she does not succeed on the individual claims.  Conversely, if she does succeed in the claims against the individual Medical Defendants, Wexford might consider a resolution of the *Monell* Claim, without the need for a trial.  Either way, it would spare the Court and the parties of the burdens and challenges of litigating the *Monell* Claim, which might well involve admission of complicated medical evidence involving unrelated matters, as discussed below.

To establish a *Monell* Claim against Wexford, Bost will undoubtedly seek to rely on previous incidents where Wexford employees allegedly ignored patients' known medical needs.  As Wexford and the Medical Defendants point out in their Reply, Bost included in her Rule 30(b)(6) deposition notice that she seeks information regarding "all audits related to Wexford's provision of medical care at Maryland correctional facilities between 2007 and 2013[] and of all

instances nationwide between 2007 and 2012 in which prisoners suffered deaths not resulting from suicide or brain damage."  ECF 149 at 11.[10]  As other courts have found, "conflicts are obvious" in this scenario.  *See Dawson*, 896 F. Supp. at 540.

Notably, evidence of any prior failures of Wexford to provide adequate care to inmates in unrelated situations may be admissible against Wexford in regard to the *Monell* Claim.  But, such evidence is not likely to be admissible against the individual Medical Defendants.  Nor would such evidence be relevant to the Custody Defendants.  Such evidence might stir undue sympathy; it would be hard for a jury to ignore such evidence as it attempts to assess the conduct of the individual Medical Defendants.  It takes no stretch of the imagination to understand the Medical Defendants' concerns that they would be prejudiced by the admission of such evidence at a joint trial.

Of course, the jury would be told to consider such evidence only as to Wexford.  But, such evidence would prolong the trial; it would inject an issue not relevant to the many individual  defendants; it is potentially inflammatory; and the reality is that it would be difficult for the jury to compartmentalize such evidence.  *See Veal v. Kachiroubas*, No. 12 C 8342, 2014 WL 321708, at *6 (N.D. Ill. Jan. 29, 2014) ("Presenting evidence to the jury regarding a village-wide policy, practice or custom involving multiple improper police actions poses a danger of undue prejudice to the defendant officers by creating the perception that the police department routinely acts improperly, even if the officers acted properly in this case."); *Humbert*, 2012 WL 1066478, at *2 (noting that a plaintiff's submission of "evidence of prior misconduct by police officers" to demonstrate "deliberate indifference, or a custom or policy of constitutional violations . . . . would unduly prejudice" the individual defendants); *Taylor*, 2010 WL 5247903,

---

[10] Wexford and the Medical Defendants did not include Bost's Rule 30(b)(6) deposition notice as an exhibit.

at *2 ("[W]hile a jury instruction could limit the harm to Defendant Moritz from prejudicial evidence, no instruction is likely to remove entirely the potential for prejudice."); *Beasley*, 2010 WL 3221848, at *3 (finding that such evidence against a municipality "would be highly prejudicial to the individual government employees").

Bifurcation of the *Monell* Claim will allow the Court to separate issues and evidence as necessary to avoid prejudice. Moreover, it will facilitate an expeditious trial as to the individual defendants, avoiding the delay inherent in the discovery that would be required for the *Monell* Claim. This could lead to a reduction of costs, without any real prejudice to plaintiff. As Judge Chasanow has said: "Streamlining the issues and limiting discovery . . . will curb rather than increase costs. . . ." *Taylor*, 2010 WL 5247903, at *2; *see also Beasley*, 2010 WL 3221848, at *3 (stating that "bifurcation allows the court to isolate evidence regarding municipal policies and customs . . . ."); *Dawson*, 896 F. Supp. at 540 (discussing, in the context of a *Monell* Claim, coupled with allegations against individual officers, that "[t]he best way to avoid the conflicts resulting in trying the two claims together is to bifurcate them"); *Marryshow*, 139 F.R.D. at 320 (finding that "[b]ifurcation facilitates a trial in which the Court can allow in evidence only that portion, if any, of the Plaintiff's custom, practice or policy evidence that is relevant and admissible . . . .").

If the *Monell* Claim goes forward, it is possible that some witnesses may be required to attend a second deposition or appear at a second trial. But, as Wexford and the Medical Defendants argue, few witnesses would be required to testify twice should plaintiff pursue her *Monell* Claim. ECF 149 at 8. And, inconvenience to the witnesses is outweighed by the potential savings of time and expenses in the first instance.

Moreover, I am not persuaded by plaintiff's argument that bifurcation would infringe on her Seventh Amendment right to a jury trial. The Seventh Amendment provides: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law."

The Court of Appeals for the Fifth Circuit has explained: "The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues.[] Thus, [the] Constitution allows bifurcation of issues that are so separable that the second jury will not be called upon to reconsider findings of fact by the first." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996); a*ccord Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir.) ("The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact."), *cert. denied*, 516 U.S. 867 (1995).

Contrary to Bost's argument, bifurcation of the *Monell* Claim against Wexford will not abridge plaintiff's Seventh Amendment rights. As Wexford and the Medical Defendants point out, the bifurcation plan under consideration would ensure that the first jury's decision is not reexamined by the second jury. ECF 149 at 12-13. In particular, the first jury would consider whether one or more of the Medical Defendants violated Neal's constitutional rights, while the second jury would be asked to determine whether Wexford's policies, procedures, and customs were the moving force behind the provision of allegedly inadequate medical care. *Id.* If some or all of the Medical Defendants are found to have violated Neal's constitutional rights, the second jury will be instructed accordingly and informed that it may not reconsider that issue. As Judge

Quarles stated in *Newsome v. Up-to-Date Laundry, Inc.*, 219 F.R.D. 356, 364 (D. Md. 2004): "[I]n a bifurcated trial, the Court would avoid conflicts with the reexamination clause of the Seventh Amendment by using a detailed verdict form to record the first phase jury's factual findings." I am confident that the Court and the parties can draft jury instructions and a verdict form that protects plaintiff's Seventh Amendment rights.

In sum, I am satisfied that the Court can avoid any risk of infringing on plaintiff's Seventh Amendment rights through the careful crafting of jury instructions and verdict forms. By exercising caution, as judges in this District have done many times under similar circumstances, the Court will ensure that any issues considered by the first jury are not reconsidered by the second jury.

## V.    Conclusion

In view of the foregoing, I shall GRANT both the Medical Defendants' Motion and the Custody Defendants' Motion, because bifurcation of the *Monell* Claim, and the stay of discovery as to the *Monell* Claim, will serve to conserve resources, promote judicial efficiency, and avoid a significant risk of prejudice to the individual defendants, without any real prejudice to Bost.

The first trial in this case shall resolve all of plaintiff's remaining claims against the individual defendants. After resolution of the claims against the individual defendants, the Court will issue a scheduling order that includes a reasonable period of time for discovery on issues pertinent to the *Monell* Claim and for the filing of dispositive motions.

An Order follows, consistent with this Memorandum Opinion.


Date:   May 8, 2017                                             /s/
                                                    Ellen Lipton Hollander
                                                    United States District Judge