## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SHARON BOST, in her individual capacity    *
and as personal representative of the
ESTATE OF FATIMA NEAL,                      *

               *           Case No. 1:15-cv-03278-ELH

       *Plaintiff*,    *

               *           Hon. Ellen L. Hollander,

       *v.*    *           District Judge

WEXFORD HEALTH SOURCES, *et al.*,    *           Hon. A. David Copperthite,

       *Defendants*.    *           Magistrate Judge

               *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE
## JUDGE'S ORDER DENYING IN PART PLAINTIFF'S MOTION FOR AN
## <u>EXTENSION OF DISCOVERY DEADLINES AND ALOTTED DEPOSITION HOURS</u>

Arthur Loevy
Michael Kanovitz
Anand Swaminathan
Steven Art
Sarah Grady
Tony Balkissoon
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
Phone No.: (312) 243-5900
Fax No.: (312) 243-5902
tony@loevy.com

Masai D. McDougall
Fareed Nassor Hayat
Norrinda Hayat
THE PEOPLE'S LAW FIRM
14908 Notley Avenue
Silver Spring, Maryland 20905
Phone No.: (301) 384-2198

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

ORDER OBJECTED TO AND STANDARD OF REVIEW......................................3

DISCUSSION .....................................................................................................7

    I.      PLAINTIFF'S DILIGENCE IN PROSECUTING THE CASE IS THE MOST IMPORTANT FACTOR, AND IT IS UNDISPUTED THAT SHE HAS BEEN VERY DILIGENT ....................................................................................8

    II.     THIS CASE IS BROAD AND COMPLEX, BUT DISCOVERY SO FAR HAS REVEALED A STUNNING DENIAL OF CARE......................................9

         A.  Fatima's Obvious Symptoms of Stroke ................................10

         B.  Defendants' Notice of Fatima's Serious Medical Need ...........12

         C.  Defendants' Denial of Medical Care to Fatima .....................14

         D.  Fatima Died of Untreated Strokes.......................................16

         E.  Defendants' Own Investigations Concluded That Fatima Was Neglected.............................................16

    III.    PLAINTIFF HAS BEEN DILIGENT AND EFFICIENT, BUT DEFENDANTS HAVE PURPOSEFULLY OBSTRUCTED DISCOVERY ..................... 20

    IV.    THIS COURT SHOULD GRANT A MODEST ENLARGEMENT OF DEPOSITION TIME, AND MODEST EXTENSION OF DISCOVERY IN ORDER TO COMPLETE THE REQUIRED DEPOSITIONS......................... 25

CONCLUSION ................................................................................................. 27

Plaintiff Sharon Bost, in her individual capacity and as personal representative of the Estate of Fatima Neal, pursuant to 28 U.S.C. § 636(b), Fed. R. Civ. P. 72(a) and Local Rule 301.5.a, hereby respectfully objects to Magistrate Judge Copperthite's order (ECF 171, 176) denying Plaintiff's motion for additional deposition hours and an extension of the discovery deadlines (ECF 154). In support, Plaintiff states as follows.

## INTRODUCTION

This is an important case, brought under 42 U.S.C. § 1983, seeking redress for egregious violations of constitutional rights. In short, Plaintiff's daughter, Fatima Neal, was jailed at the Baltimore City Detention Center for allegedly having one marijuana joint. Two months later, just before she was set to be released, she suffered a series of strokes. Instead of calling 911 and trying to save Fatima's life, Defendants tried to run out the clock—giving her Tylenol and Motrin and hoping she would be released before she died, so she'd have to take care of her own medical bills. That callousness caused Plaintiff to lose her daughter prematurely, at the age of 42.

In its most basic form, then, the case can be stated simply. But developing the evidence necessary to properly try the case to a jury verdict is more challenging. For starters, the events at issue unfolded behind the closed and dead-bolted doors of a notoriously mismanaged jail, meaning that Defendants have near unilateral access to the evidence. Compounding that problem, the large number of defendants involved, and the code of silence that informally but powerfully governs the correctional and medical staff of the jail, makes it difficult to develop the evidence needed to show a jury exactly what Defendants did—and did not do—as Fatima lay dying.

Plaintiff asks for her day in court. She wants this important case decided on its merits. Defendants, on the other hand, having first run out the clock on Fatima's life, now seek to avoid

1

scrutiny by running out the clock on discovery, hoping to leave Plaintiff with an evidentiary record insufficient to hold Defendants responsible at a jury trial. Such tactics should not be tolerated in any case, much less an important Constitutional case.

Plaintiff has used her allotted discovery time carefully, she has pursued the evidence aggressively, she has taken nearly all of the absolutely necessary depositions, and she has raised discovery issues with the Court promptly throughout the litigation. Defendants, in contrast, have taken exceedingly few depositions, have refused to respond to discovery, have refused to answer questions at their depositions, and have categorically rejected reasonable discovery compromises.

Recently, this Court granted Defendants' motion to bifurcate. Citing that decision—but saying nothing more—the Magistrate Judge denied Plaintiff's pending motions regarding discovery. One of the denied motions sought to compel Defendants to produce information they had withheld on baseless assertions of privilege, and another sought additional discovery time and 30 additional deposition hours in light of the complexity of the case, Plaintiff's diligence, and Defendants' obstructionism. The Magistrate Judge's perfunctory denial of those pending motions was clearly erroneous for many reasons, most notably that this Court's bifurcation opinion explicitly stated that it did not resolve the pending discovery disputes. After Plaintiff objected, the Magistrate Judge withdrew his prior order and issued a new one. On the issue of baseless assertions of privilege, the Magistrate Judge thoroughly explained why he agreed with Plaintiff's analysis of the privilege issues and he compelled Defendants to produce the information they had improperly withheld. ECF 171 at 4–7. Because Defendants had used improper privilege objections to shut down lines of inquiry during certain depositions, the

Magistrate Judge ordered certain deponents to sit for further questioning—for a total of six more deposition hours. *Id*. at 7.

On the issue of the additional 30 deposition hours, however, the Magistrate Judge said nothing, though he apparently silently denied Plaintiff's request. In a later order clarifying his decision, the Magistrate Judge gave a one-sentence explanation that did not address any of the salient issues (the complexity of the case, Plaintiff's diligence, and Defendants' obstructionism). Plaintiff therefore raises his objections and asks this Court to grant a reasonable extension of discovery deadlines and deposition hours, which will ensure that this case is ultimately tried to a jury on the merits.

## ORDER OBJECTED TO AND STANDARD OF REVIEW

Courts have discretion to manage the timing of discovery, *Ardrey v. United Parcel Service*, 798 F.2d 679, 682 (4th Cir. 1986), "and the only formal limitation on this discretion with respect to consideration of motions to amend scheduling orders is that the moving party demonstrate good cause," *Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 382 (D. Md. 2014); *Brey Corp. v. LQ Mgmt., L.L.C.*, 2012 WL 3127023, at *2 (D. Md. July 26, 2012) ("[T]he "primary consideration is the diligence of the moving party."); Fed. R. Civ. P. 16(b). "'Good cause' is shown when the moving party demonstrates that the scheduling order deadlines cannot be met despite its diligent efforts." *Innovative Therapies*, 302 F.R.D. at 382 (citing *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375 (D. Md. 1999)).

To develop the merits of the case, Plaintiff filed a motion seeking a modest discovery extension and additional deposition hours. ECF 154. Plaintiff's motion papers demonstrated that this case easily meets the "good cause" standard that applies to requests for discovery extensions. First, Plaintiff described the scope of the case: in addition to the 17 party Defendants, Wexford

3

alone disclosed no less than two dozen other witnesses, including seven Wexford employees, every person identified in Fatima's medical, paramedic, emergency room, and autopsy records, and all detainees, correctional officers, and other third parties identified in the State of Maryland's investigation of Fatima's death. Second, Plaintiff explained that relief was necessary due to Defendants' strategic and significant obstruction of discovery. *Id.* at 14–22.

**The Magistrate Judge's First Order**

Magistrate Judge Copperthite denied Plaintiff's motion. ECF 166. That decision was clearly erroneous—the applicable standard under 28 U.S.C. § 636(b), Fed. R. Civ. P. 72(a) and Local Rule 301.5.a. The "clearly erroneous" standard is, under typical circumstances, reasonably deferential, precluding the "wholesale relitigation" of issues considered and decided by the Magistrate Judge. *Metro Media Entm't, LLC v. Steinruck*, 2013 WL 1833266, at *2 (D. Md. Apr. 30, 2013). But importantly, an order cannot be stamped as "not clearly erroneous" unless the reviewing court can gain some "insight into the [earlier decision maker's] reasoning." *Troxler Elecs. Labs., Inc. v. Solitron Devices*, Inc., 722 F.2d 81, 85 (4th Cir. 1983). In other words, the legal standard does not operate to formalistically insulate a decision that was given with "no explanation" at all. *Id.*; *see also United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010) (review "under the clearly erroneous standard" not possible where "district court did not provide … anything close to a sufficient explanation of its rationale").

But Magistrate Judge Copperthite's docket-text-only order said merely that Plaintiff's motion was denied "in light of" this Court's bifurcation of the *Monell* claims. ECF 166. That was obviously wrong and insufficient, because this Court explicitly stated that its ruling on bifurcation *did not* resolve Plaintiff's motion for additional discovery. ECF 159 at 3 n.4. Nor did Defendants even argue otherwise. Nearly the entirety of the parties' briefs regarding an extension

4

of time—combined, nearly 70 pages of argument—concerned the necessity of additional discovery *even if* this Court decided to bifurcate the *Monell* claims.

Furthermore, Defendants actually conceded that additional deposition time was necessary because they improperly objected and instructed witnesses not to answer questions that should have been answered. ECF 156 at 28 ("Defense counsel has offered to re-open Dr. Tessema's deposition so that Plaintiff's counsel may ask Dr. Tessema the expert questions he was instructed not to answer."). And they conceded that more deposition time would be necessary if the Court found—as it now has—that Defendants improperly blocked discovery by making improper assertions of privilege. ECF 156 at 27–28 (stating Defendants were willing to "re-open depositions" if they lost the dispute concerning "the asserted privileges for Board of Nursing and peer review proceedings").

Given Defendants' concessions, and this Court's explicit instruction that its bifurcation ruling did not resolve the motion for additional deposition hours, it was clearly erroneous for the Magistrate Judge to deny Plaintiff's motion with no explanation other than to reference the bifurcation order. Accordingly, Plaintiff objected to the Magistrate Judge's order. ECF 167. Three days later, the Magistrate Judge withdrew his order, causing this Court to deny Plaintiff's objections as moot. ECF 170.

**The Magistrate Judge's Second Order**

Eleven days after withdrawing his first order, Magistrate Judge Copperthite issued another order, purportedly addressing both (1) Plaintiff's motion to compel, concerning Defendants' improper assertions of privilege, and (2) Plaintiff's motion for additional deposition hours and a discovery extension. ECF 171 at 1 ("This Order responds to both motions collectively."). But while the order explicitly resolved Plaintiff's motion to compel, *id*.

("Plaintiff's motion to compel testimony and documents (ECF No. 128) is GRANTED in part and DENIED in part."), it did not explicitly resolve Plaintiff's request for additional deposition hours and a discovery extension. The order contains no explicit conclusion concerning additional deposition hours, and the substance of the eight-page order is entirely directed at issues concerning the motion to compel—that is, whether Defendants' assertions of privilege were proper. Nowhere does the order discuss the issues salient to additional deposition hours and an extension of discovery—namely, the complexity of the case, Plaintiff's diligence in pursuing discovery, and Defendants' strategic and improper obstructionism.

Given the disconnect between, on the one hand, what the order purported to do, and on the other hand, what it actually discussed and concluded, Plaintiff requested a status conference with the Magistrate Judge to seek clarification. ECF 172.

**The Magistrate Judge's Third Order**

The Magistrate Judge did not hold the requested status conference, nor did he issue an order addressing in depth the issues salient to additional deposition hours and a discovery extension. Instead, in a single sentence, the Magistrate Judge explained that the additional hours were denied because the witnesses who have not yet been deposed "were known to Plaintiff and Plaintiff chose not to depose them in the somewhat generous 100 hours total deposition time allotted to Plaintiff." ECF 176. Like the Magistrate Judge's first two orders, this one said nothing about the complexity of the case, the discovery developed so far, Plaintiff's diligence in pursuing discovery, or Defendants' strategic obstruction of discovery.[1]

---

[1] As an example of Defendants' strategic obstruction and gamesmanship, Defendants would not even agree to allow Plaintiff to re-allot the 6 hours that Magistrate Judge Copperthite granted, even though a re-allotment would not burden Defendants in any way. As set forth in these objections, Plaintiff respectfully requests 30 hours of deposition time, and believes that relief is well warranted. If the Court disagrees, however, Plaintiff asks that she be permitted to re-allocate the 6 hours that Magistrate Judge

In short, the Magistrate Judge's orders are clearly erroneous and do not provide "anything close to a sufficient explanation of [his] rationale." *Wilkinson*, 590 F.3d at 269. For these reasons, and the reasons discussed below, the Court should sustain Plaintiff's objections and grant her motion. Because time in discovery is running short, Plaintiff respectfully renews her request for a status conference, ECF 158, which was first filed two months ago and remains pending.

## DISCUSSION

This Constitutional civil rights case is brought by Sharon Bost, whose daughter Fatima Neal died in the custody of the Baltimore City Detention Center (BCDC) when medical and correctional staff there utterly ignored a series of strokes that Fatima suffered in October and November 2012. Fatima suffered in agony for days from debilitating brain injuries, she urinated and defecated on herself, and she was unable to control one side of her body, she was unable to walk or eat, and she was unable to see or speak coherently. In response, the medical and correctional staff did nothing. To be clear, the contention in this case is not simply that the medical attention paid to Fatima was inadequate; it is that no medical attention was paid to her at all. ECF 56 (Amended Complaint). Defendants are the medical and correctional staff of the BCDC who ignored Fatima, as well as Wexford Health Sources, the private corporation that contracted to provide medical services to detainees of the BCDC. The BCDC, of course, is a correctional institution that has been under a 24-year consent decree related to health and safety concerns caused by remarkable levels of corruption, underfunding, and neglect.

Plaintiff's claims are not unsubstantiated allegations. The discovery so far has revealed hard evidence supporting Plaintiff's claims, described below. Defendants' tactic in response to

Copperthite granted in the most effective and efficient manner, so that the case can best be evaluated on its substance.

the mounting evidence has been an uncommon level of obstruction. With minor and self-serving exceptions, each Wexford employee working in the jail's infirmary at the time Fatima was there has testified that he or she has absolutely no memory of Fatima, her symptoms, or the circumstances surrounding her illness and death. Moreover, defense counsel have improperly coached witnesses at depositions, instructed witnesses not to answer questions that should have been answered, and refused to produce documents that are centrally relevant to the case— meaning the case against Individual Defendants, not just the *Monell* claims.

Defendants' professed lack of any memory about Fatima—despite lacking credibility— deprives Defendants of any evidence that they might use to rebut the strong evidence supporting Plaintiff's version of events. As a result, this case is certain to go to trial. Having litigated many jail-death cases, Plaintiff's counsel have a very good idea of how well the evidence must be developed to present the case to a jury. Defendants apparently understand this, too, because they have improperly obstructed Plaintiff's efforts to get there. Discovery has thus far borne fruit, but the Defendants' obstruction is depriving Plaintiff of her right to prepare her case for trial. Plaintiff therefore seeks additional deposition hours and an extension of discovery deadlines.

I.    **PLAINTIFF'S DILIGENCE IN PROSECUTING THE CASE IS THE MOST IMPORTANT FACTOR, AND IT IS UNDISPUTED THAT SHE HAS BEEN VERY DILIGENT**

In determining whether a plaintiff has shown good cause for a discovery extension, "the primary consideration is the diligence of the moving party." *See, e.g.*, *Brey Corp. v. LQ Mgmt., LLC*, 2012 WL 3127023, at *2 (D. Md. July 26, 2012). In her motion, Plaintiff explained, and Defendants did not even attempt to rebut, how she has diligently prosecuted this case: Plaintiff has taken numerous depositions, performed an on-site visit of the jail, briefed 12 motions, conducted extensive third-party discovery, and timely disclosed opening expert reports. There

can be no genuine argument whatsoever that Plaintiff has let this case languish. Recognizing the importance, scope, and complexity of her case, she has expended great effort to move the case forward diligently. That evidence and argument was unrebutted. Given that diligence is the primary consideration, the Court should grant Plaintiff additional deposition hours and time for discovery so that this case can be tried on its substantial merits.

## II.    THIS CASE IS BROAD AND COMPLEX, BUT DISCOVERY SO FAR HAS REVEALED A STUNNING DENIAL OF CARE

Plaintiff is not on a fishing expedition based on unsubstantiated allegations. To the contrary, through her diligent efforts she has already developed substantial evidence relevant to the Constitutional violations that killed her daughter. A modest extension of time and additional deposition hours are required because the case is particularly broad and complex. To illustrate the breadth and complexity, and to confirm that there is no fishing expedition, Plaintiff summarizes the evidence developed so far.

Fatima Neal was 42 years old when she was booked at the Women's Detention Center of the BCDC at the beginning of September 2012. Ex. 1 (Booking Documents) at 00031. She was arrested on charges that she had possessed a marijuana joint, and after being detained for multiple court dates, a court found Fatima guilty, sentenced her to time served, and ordered her released on October 26, 2012. Ex. 2 (Criminal Case Records) at NEAL 000559. Fatima was not released on that date. Instead, the BCDC continued to detain her, scheduling her release for Monday, November 5, 2012. Ex. 27 (Sharon Bost Dep.) at 230–38. Fatima died at the BCDC in the early morning hours of November 4, 2012. Ex. 3 (Fire Department Report) at WEXDISC 003960 (EMS Report stating "[v]itals were taken at 4:00:00. The pulse rate was 0. The respiratory rate was 0. Blood pressure was 0/0."); Ex. 23 (Medical Records) at 030 ("Charge nurse was informed at 3:50 am, pt stopped breathing, no pulse, and CPR was started.").

A.    **Fatima's Obvious Symptoms of Stroke**

Fatima's death was caused by untreated strokes and was the result of abject neglect by Defendants. Early in the morning of November 1, 2012, Fatima was transferred from the general population to the BCDC infirmary, complaining of severe and persistent headaches and problems with her vision. Ex. 21 (Infirmary Admission Note); Ex. 34 (Natalie Saracino Dep.) at 41:21–42:4. In the three days between Fatima's transfer to the infirmary and her death, Fatima exhibited the following symptoms:

- **Fatima suffered from one-sided weakness and was unable to move her leg and arm on one side of her body**, Ex. 23 (Medical Records) at 003 (admission note that Fatima was weak); *id.* at 001 (Defendant Ajayi Nov. 1 intake note reporting weakness); *id.* at 012 (Defendant Obadina Nov. 2 record stating that Fatima "still weak"); *id.* at 024 (Defendant McNulty Nov. 3 health assessment stating that Fatima was "[p]ositive for decreased appetite, lethargy and weakness"); Ex. 4 (Kelly Frye Declaration) at NEAL 000897 ("[She] saw Fatima struggling to walk. She was dragging one side of her body and appeared to have weakness on one side of her body."); Ex. 5 (Kiearra Blair Declaration) at NEAL 000903 ("[Fatima] was sluggish on one side of her body and was having trouble walking . . . she was having trouble moving one side of her body."); Ex. 6 (Natalie Saracino Declaration) at NEAL 000900 ("[Fatima] could not move one side of her body and her foot was dragging and her arm was hanging."); Ex. 10 (BCDC Email Among Administrators) at 00190 ("They indicated that [Fatima] . . . began walking with her right side slumped and dragging her right leg, since Friday (11/2/2012)."); Ex. 34 (Natalie Saracino Dep.) at 42:14–15 ("[B]y the second or third day [Fatima's] leg was dragging and her arm was hanging"); *id.* at 43:18–19 ("She was weak. She seemed really, really weak."); Ex. 11 (Medical Examiner's Report) at 00217 ("[D]etainees[] reported that [Fatima] walked with her right side slumped and dragging her right leg since 11/2/12");

- **Fatima was unable to walk by herself, could not maintain her balance, and fell repeatedly, hitting her head**, Ex. 23 (Medical Records) at 024 (Defendant McNulty Nov. 3 health assessment stating that "[Fatima] states that she has had trouble ambulating"); Ex. 5 (Kiearra Blair Declaration) at NEAL 000903 ("Fatima would try to get up and walk, but she repeatedly fell and hit her head."); Ex. 6 (Natalie Saracino Declaration) at NEAL 000900 ("I witnessed Fatima struggling to walk"); Ex. 30 (McNulty Dep.) at 316:19–317:18 (nursing notes reflect that Fatima had trouble ambulating or walking because of weakness);

- **Fatima suffered impaired vision, confusion, and hallucinations**, Ex. 23 (Medical Records) at 007 (Defendant Afre Nov. 1 report that "[a]ccording to PA's note . . . patient was behaving erratically"); *id.* at 023 (Defendant McNulty health assessment that "[Fatima] reports that she is visually impaired"); Ex. 6 (Natalie Saracino Declaration) at

NEAL 000900 ("Fatima also had trouble seeing and understanding what was going on. She did not seem to know where she was at all times."); Ex. 7 (Letters from Detainees) at NEAL 000607–08 (Sexton letter stating that "[Fatima] couldn't walk, talk, see, basically she was so out of it she didn't even know she was here."); Ex. 9 (BCDC Logbook) at 00232 (Fatima "was having trouble breathing and that she seem[ed] dizzy. When I asked [Fatima] what was wrong, she replied she don't know. I noticed that she was breathing rapidly and looked to be in distress.");

- **Fatima had problems speaking, was incoherent, and slurred her speech**, Ex. 23 (Medical Records) at 007 (Afre Nov. 1 report that he "[t]ried to talk to patient but her answer was only 'I don't know'"); Ex. 4 (Kelly Frye Declaration) at NEAL 000897 ("[Fatima] was incoherent and looked to me as if she was in a vegetative state."); Ex. 13 (Murray Investigative Report) at 00008 ("Detainee Brown advised that Detainee Faller would talk incoherently...[and] what Detainee Faller was saying did not make sense."; Ex. 34 (Natalie Saracino Dep) at 43:16–18 ("She was just laying there…She could barely talk.");

- **Fatima's persistent headaches continued, did not respond to pain medication, and were repeatedly reported as severe or 10 out of 10 in strength**, Ex. 23 (Medical Records) at 001 (Defendant Ajayi Nov. 1 note that "head is pounding . . . took 2 motrins and it is not helping"); *id.* at 004 (Defendant Wiggins report that "[h]eadache started 30 mins ago . . . Motrin does not [relieve] the pain"); *id.* at 007 (Afre note from Nov. 1 reflecting "patient complains of severe headache"); *id.* at 014, 016 (Defendant Afre Nov. 2 note, stating, "Patient said she still has the headache . . . will discontinue Motrin and will start Tylenol #3"); *id.* at 024 (Defendant McNulty Nov. 3 health assessment noting "Pt c/o headache 10/10 this am"); Ex. 4 (Kelly Frye Declaration) at NEAL 000897 ("I saw Fatima Neal exhibit numerous symptoms, including very bad headaches, vomiting, diarrhea blurry vision, impaired vision, and difficulty walking"); Ex. 7 (Letters from Detainees) at NEAL 000607 (Sexton letter reporting that "[o]n the morning of Oct. 30, 2012 Fatima woke with a really bad headache and her vision was blurred."); Ex. 25 (Ajayi Dep.) at 40–42 ("[Fatima] told me she had a headache, that's been ongoing, I'm not sure, several hours or several days, but she said she had a bad headache.");

- **Fatima was not eating, could not dress or bathe herself, and could not get out of bed**, Ex. 23 (Medical Records) at 017 (notes of Defendant Jamal's Nov. 2 visit, stating, "Patient remained in bed all evening"); *id.* at 023 (Defendant McNulty health assessment that "[Fatima] has been lying in bed throughout the day . . . . [Fatima] needs encouragement/assistance with getting up to eat and getting cleaned up . . . . [Fatima] is not eating"); *id.* at 026 (notes of Defendant Jamal Nov. 3 visit, describing that "[Fatima] lied down all shift"); Ex. 8 (Detainee Statements) at 00148 (detainee Donnetta Bennett states that "Ms. Fatima Neal was in bed sick and unconscious for 3 ½ days"); Ex. 4 (Kelly Frye Declaration) at NEAL 000897 ("I saw that detainees had to help Fatima get dressed because she physically could not do so on her own"); Ex. 5 (Kiearra Blair Declaration) at NEAL 000903 (Eventually, Fatima could not get out of bed and could not eat."); Ex. 7 (Letters from Detainees) at NEAL 000607 (Sexton letter explaining that

"[Fatima] didn't eat very much all day."); Ex. 10 (BCDC Email Among Administrators) at 00190 (reporting that detainees "indicated that Detainee Faller [Fatima was also known as Tammy Faller] remained in the bed, would not eat or drink"); Ex. 14 (Report for Internal Investigative Unit); Ex. 34 (Natalie Saracino Dep.) at 42:8–9 ("She was just laying there, and when she sat up she needed help."); and

- **Fatima was incontinent—she urinated and defecated on herself**, Ex. 6 (Natalie Saracino Declaration) at NEAL 000900 ("Fatima drooled, urinated, and defecated on herself"); Ex. 34 (Natalie Saracino Dep.) at 42:9–10 ("You could see her pants were all wet"); *id.* at 43:3–5 ("Drooling. She had drooled on herself…She was laying on her side, she was just drooling."); Ex. 4 (Kelly Frye Declaration) at NEAL 000897 ("I also saw Fatima on the day she died. That day, I saw Fatima Neal lying in her own feces, drooling, and foaming at the mouth."); Ex. 13 at 00008 ("Detainee Brown advised that Detainee Faller urinated in her bed approximately three times.").

Fatima's symptoms worsened over the days that she spent in the infirmary. Ex. 34 (Natalie Saracino Dep.) at 16:19–17:1; *id.* at 42:10–13. Fatima knew she was in trouble, and she told other detainees that she loved them before she died. Ex. 7 (Letters from Detainees) at NEAL 000607 (Sexton letter stating that "[Fatima] said 'please tell [Sharon] I'm sick and I love her'. . . tell my mother and Cathy I love them."); Ex. 34 (Natalie Saracino Dep.) at 43:18–20 ("She seemed really, really weak. She told me she loved me, and then I ran out.").

## B.  Defendants' Notice of Fatima's Serious Medical Need

The individual Defendants had notice of Fatima's symptoms and notice of her serious medical needs. For starters, they worked on shifts in the infirmary between November 1, 2012, when Fatima arrived, and her death on November 4, 2012. Ex. 12 (Wexford Time Records); Ex. 26B (Atta Dep.) at 8:9–19; Ex. 33 (Ohaneje Dep.) at 203:8–204:7; Ex. 30 (McNulty Dep.) at 163:11–168:16; Ex. 35 (Wiggins Dep.) at 163; Ex. 24 (Afre Dep.) at 137–38. As Defendants testified, it was their job and responsibility to observe and assess the health of detainees in the infirmary. Ex. 32 (Obadina Dep.) at 193–94; Ex. 24 (Afre Dep.) at 107–08; Ex. 33 (Ohaneje Dep.) at 159–60; Ex. 35 (Wiggins Dep.) at 122; Ex. 29A (Jamal Dep.) at 97, 106–07; Ex. 30 (McNulty Dep.) at 119. Indeed, Fatima was only transferred to the infirmary in the first place

12

because Defendants were aware of her serious condition. Ex. 21 (Infirmary Admission Note); Ex. 25 (Ajayi Dep.) at 40–41. In addition, Defendants signed medical records demonstrating that they had contact with Fatima while she was in the infirmary. Ex. 22 (Medical Administration Records). Defendants therefore observed the symptoms discussed above, which were constant and obvious even to lay people.

There is more evidence that Defendants had notice of Fatima's serious medical condition at the time she was transferred to the infirmary and during the time she was there before dying. Fatima's symptoms are reflected in their medical records. *See supra* Part I(A) (citing Ex. 23 (Medical Records) at 001, 003, 004, 007, 012, 014, 016, 017, 023, 024, 026). And some of the Defendants themselves testified at their depositions that they were aware of the symptoms described above. *E.g.*, Ex. 25 (Ajayi Dep.) at 40–41; Ex. 30 (McNulty Dep.) at 243:2–244:9.

Notice of Fatima's need for urgent medical treatment was not limited to Defendants' own observations of obvious symptoms. They also received notice from other detainees at the BCDC, who in the days while Fatima was in the infirmary repeatedly alerted Defendants to Fatima's symptoms and suffering, urged them to provide Fatima immediate medical attention, asked them to call an ambulance, and told them that Fatima was going to die if she did not get help. *See*, *e.g.*, Ex. 4 (Kelly Frye Declaration) at NEAL 000897 ("From what [Fatima] was saying and doing, it was obvious that she badly needed medical help. I and the other detainees repeatedly called out to the staff to get Fatima help and to take her to the hospital."); Ex. 5 (Kiearra Blair Declaration) NEAL 000903 ("Every day, on every shift, I and many other women in the infirmary would tell nurses, guards, and other individuals that Fatima needed emergency medical help and needed to go to the hospital. I informed every nurse who came in to pass medications that Fatima needed emergency medical help and needed to go to the hospital. . . . We told the staff these things for

days before Fatima died."); Ex. 6 (Natalie Saracino Declaration) at NEAL 000900 ("It was obvious that Fatima needed to go to the hospital. I tried to get the nurses to help Fatima, and I observed many of the other detainees do the same."); Ex. 7 (Letters from Detainees) at NEAL 000607–09 (Sexton Letter); *id.* at 000612–13 (Saracino Letter).

So severe were Fatima's symptoms, particularly her inability to move one whole side of her body, that many of the detainees—laypeople without medical training—concluded that Fatima was suffering from strokes. Ex. 13 & 14 (Murray Investigative Reports); Ex. 4 (Kelly Frye Declaration) at NEAL 000897 ("It looked to me as through she had had a stroke"); Ex. 5 (Kiearra Blair Declaration) at NEAL 000903 ("[I]t looked like she had suffered from a stroke"); Ex. 10 (BCDC Email Among Administrators) at 00190 ("Three of the detainees advised me that they believed Detainee Faller had a stroke"); Ex. 34 (Natalie Saracino Dep.) at 42:16–17 ("I mean, I'm not a doctor, but I do know you can tell when someone had a stroke.").

Last but not least, Fatima herself told the medical and correctional staff that she needed medical attention. Ex. 5 (Kiearra Blair Declaration) at NEAL 000903 ("Fatima repeatedly told nurses and guards that she needed to go to the hospital.").

## C.    Defendants' Denial of Medical Care to Fatima

In most civil rights cases in which there is such a pronounced, serious medical need, of which the staff of a correctional facility has notice, the defense of the case turns on some assertion by the defendants that they provided medical care intended to treat the problem. Not so here. In fact, most of the Defendants who interacted with Fatima disclaim any independent recollection of her. *E.g.*, Ex. 30 (McNulty Dep.) at 31:17–35:5; Ex. 24 (Afre Dep.) at 20–22; Ex.

14

32 (Obadina Dep.) at 12–15; Ex. 33 (Ohaneje Dep.) at 10–15; Ex. 35 (Wiggins Dep.) at 10–13; Ex. 29A (Jamal Dep.) at 61–62; Ex. 28 (El-Sayed Dep.) at 164:16–18.[2]

To explain their treatment of Fatima, Defendants rely instead on their medical records. The problem for them is that the medical records reflect an almost total denial of care. In fact, in the three days during which Fatima suffered symptoms of stroke so serious that other detainees begged the medical staff to help her, Defendants only provided her Tylenol and Motrin. *See* Ex. 23 (Medical Records). They even recorded in their medical records that these painkillers had no effect on Fatima's symptoms. *See id.* at 001, 004, 014, 016.

At no time did Defendants diagnose Fatima's medical condition based on the symptoms she displayed. At no time did they assess Fatima's neurological condition. At no time did they implement stroke protocols. At no time did they refer her for specialized or outside evaluation or care. At no time before she died did they approve an emergency medical transfer.

When detainees found Fatima unresponsive and foaming at the mouth in the middle of the night on November 3–4, 2012, they tried to get Defendant Obadina, the nurse on duty, to help, but she was asleep. Ex. 12 (Wexford Time Records); Ex. 8 (Detainee Statements) at 00145 ("I observed Dorm 3 women trying to get the nurse attention bus she was sleeping."); Ex. 4

---

[2] This is an audacious position, given that the Defendants testified almost uniformly that deaths were rare in their experience at the BCDC and likely the type of event that they would remember. Ex. 24 (Afre Dep.) at 294:19–295:12 (saying Fatima is the only detainee he's aware of who died in his care); Ex. 28 (El-Sayed Dep.) at 364:5–11 (same); Ex. 30 (McNulty Dep.) at 382:10–16 (same); Ex. 29B (Jamal Dep.) at 335:14–336:1 (same). But Defendants were steadfast in denying that they remembered Fatima, even testifying that they recalled no conversations with one another or with anyone else regarding Fatima's death because they never bothered to follow up during their subsequent shifts after Fatima died. Ex. 35 (Wiggins Dep.) at 22:1–8, 23:5–17 ("That's not my job to find out why the patient died"); Ex. 32 (Obadina Dep.) at 21:4–14 (testifying that she did not ask anyone whether Fatima had died or remark upon her absence from the infirmary); Ex. 24 (Afre Dep.) at 298:2–21 (saying that he does not recall ever learning about Fatima's death, even though he attended a death review meeting shortly after); Ex. 28 (El-Sayed Dep.) at 19:19–20:4 (testifying that she never spoke with anyone at Wexford about Fatima's death); Ex. 30 (McNulty Dep.) at 383–85 (stating she has no recollection of any conversations about Fatima and what happened to her).

(Kelly Frye Declaration) at NEAL 000897 ("I banged on the nurses' station to get help for Fatima, but the nurse on duty was asleep with her feet propped up on a chair.").[3] Defendants first responded to Fatima at 12:25 a.m. on November 4, Ex. 31 (Murray Dep.) at 51:19–53:6; Ex. 13 (Murray Investigative Report) at 00002, but she did not leave the BCDC in an ambulance until 4:23 a.m., Ex. 3 (Baltimore City Fire Department Report) at WEXDISC 3959. By the time Fatima arrived at the Johns Hopkins Emergency Department, she was dead. Ex. 15 (Johns Hopkins Medical Record).

### D.    Fatima Died of Untreated Strokes

It is not open to dispute that Fatima died of multiple, untreated strokes that she suffered at the Baltimore City Detention Center. Those strokes were evident at autopsy, where the medical examiner noted that the cause of death was "intracerebral hemorrhage with complications," Ex. 11 (Medical Examiner Report) at 00202, and that Fatima's brain revealed "a large, fresh hematoma," which displaced her brain structures, *id.* at 00211, as well as numerous other brain injuries, *id.* at 00215. The investigation conducted by the State of Maryland concluded that Fatima died of strokes. Ex. 13 (Murray Investigative Report) at 00011; Ex. 16 (Wexford Death Summary) at 00302. Of course, Fatima's official death certificate lists stroke as the cause of her death. Ex. 17 (Death Certificate).

### E.    Defendants' Own Investigations Concluded That Fatima Was Neglected

After Fatima died, the Defendants conducted investigations of her death. Carolyn Murray, an investigator with the State of Maryland's internal investigations unit, interviewed

---

[3] There is evidence that multiple Defendants slept on duty during their shifts. Ex. 34 (Saracino Dep.) at 78:3–12. To the extent that Defendants claim not to have been on notice of Fatima's symptoms because they were asleep, of course that would not be a defense to a constitutional claim of deliberate indifference. *See, e.g.*, *Kartman v. Markle*, 582 F. App'x 151, 155 (4th Cir. 2014) (deliberate indifference can be shown by actual knowledge or willful blindness of serious risk) (citing *Bowen v. Manchester*, 966 F.2d 13, 17 (1st Cir. 1992)).

personnel and detainees who had been in close contact with Fatima in the days leading to her

death. Ex. 31 (Murray Dep.) at 21:16–35:5. She made factual findings and issued reports of her

findings. Ex. 13 (Murray Investigative Report); Ex. 14 (Report for Internal Investigative Unit).

Among other things, investigator Murray found:

- Mary Betch had been housed in the infirmary with Fatima and slept two beds away from her. Ex. 13 (Murray Investigative Report) at 00006. Fatima had arrived, reporting to Betch that something was wrong with her head. *Id.* Betch saw that Fatima could not move one side of her body, could not get out of bed, did not eat during her time in the infirmary, and was projectile vomiting. *Id.* at 00006–7.

- Kiearra Blair, another detainee who interacted with Fatima in the infirmary, saw that Fatima could not balance, kept falling and hitting her head, urinated on herself, and had suffered a stroke. *Id.* at 00007.

- Monica Brown had been housed in the infirmary during the time Fatima was there, saw that Fatima could not get out of bed, talked incoherently when she could speak, was incontinent on multiple occasions, and had hot and cold sweats for days. *Id.* at 00008.

- Dr. King, the forensic pathologist from the Office of the Chief Medical Examiner who performed the post-mortem examination of Fatima, discovered a large clot in the left side of her brain and reported that Fatima had a stroke. *Id.* at 00008.

Investigator Murray testified that the statements from detainees about Fatima were particularly

notable—usually detainees refuse to cooperate in investigations, but in this case they were so

bothered by what happened that they wanted to provide statements. Ex. 31 (Murray Dep) at

49:19–51:10, 53:16–54:10. At the same time, Bonnie Plimack, a supervising nurse, conducted an

administrative review of Fatima's treatment and concluded, "Perhaps the patient should have

been re-evaluated and sent out to the hospital earlier." Ex. 19 (Plimack Administrative Death

Review). Investigation confirmed also that Fatima had received no medical treatment apart from

the Tylenol and Motrin discussed above. Ex. 20 (Death Reporting Form) at 00305.[4]

---

[4] These investigations reflect the State of Maryland's investigations into the cause and circumstances of Fatima's death. Wexford has suppressed its own investigations in this civil case with a frivolous assertion of privilege, and Wexford's employees have been instructed at their depositions not to

The Baltimore City Detention Center also had detainees write statements reflecting their observations of Fatima before she died. Among other things, those statements recount: That Fatima "was very sick and wasn't taken good care of by the medical staff. . . . Only the inmates in the dorm really tried to help her. Medical staff seemed not to care at all." Ex. 8 (Detainee Statements) at 00146. That "[f]rom the time that . . . Fatima Neal was admitted to the infirmary, she received little to no attention from medical staff even though they were alerted many times to her condition by the other inmates with her. . . . If proper care would have been given maybe this tragedy could have been avoided." *Id.* at 00147. And that "Fatima Neal was in bed sick and unconscious for 3 ½ days without no blood work or staff attention that was needed. Staff was told on numerous occasion of her condition when there was little or no response." *Id.* at 00148.

In addition to the above investigations and accounts of Fatima's serious medical condition and the neglect she suffered at the hands of the Defendants, a correctional officer on duty at the BCDC after Fatima died urged detainees who had seen Fatima mistreated to write letters to Fatima's mother, explaining what had happened. Ex. 6 (Natalie Saracino Declaration) at NEAL 000901; Ex. 34 (Natalie Saracino Dep.) at 65:11–67:17. This correctional officer, disturbed by the neglect she had observed, took measures to ensure that the real cause of Fatima's death would not be covered up. *Id.* The letters sent to Fatima's mom (Plaintiff here) provide yet another account of the mistreatment that Fatima suffered:

- Christina Sexton wrote to Plaintiff "to let [her] know what was really going on inside these walls with your daughter Fatima." Ex. 7 (Letters from Detainees) at NEAL 000607. She reported that Fatima suffered symptoms among those discussed above starting on October 30, including impaired vision. *Id.* at NEAL 000608 (Fatima was walking into objects in her dorm). After Fatima was transferred to the infirmary, staff repeatedly told Christina that Fatima was "fine," even though the detainees could see that "something

answer questions about Wexford's investigation or an investigation by the Maryland Board of Nursing. That issues was previously fully briefed, ECF 128, 133, 146, it was denied by the Magistrate Judge with no explanation other than that the denial was "in light of" bifurcation,  ECF 161, and Plaintiff is filing objections to that order separately today.

was really wrong with her." *Id.* at NEAL 000608–09. Christina further recounted that on the morning of November 1 she saw Fatima, who could not walk, talk, or see, being carried in the infirmary. *Id.* at NEAL 000608. Christina "yelled to [Fatima] 'was she okay?' She replied, 'no call my mother and tell her something is really wrong.'" *Id.* The infirmary staff, however, just told Christina "'nothing's wrong with her she just needs to eat," and "we don't know what's wrong her vitals are all normal." *Id.* The nurses told Christina that they could "only do what they are told no more or no less they can't make the call to send her out to a hospital." *Id.* Christina told the nurses that Fatima was going to die if she wasn't taken to a hospital. *Id.* at NEAL 000609.

- Monica Brown wrote that she had slept next to Fatima in the infirmary and that she "told the medical staff that [Fatima] kept on saying that her headache [was] so bad and that she didn't feel right but they did nothing for her medical attention and [Monica] helped her to the bathroom and back to the bed[.]" Ex. 7 (Letters from Detainees) at NEAL 000611. Monica added, "They treated us like animal[s] but we are human like them[.]" *Id.*

- Natalie Saracino told Plaintiff, "I want you to all to know that this jail did not help [Fatima] or do anything for her. . . . They let her die." Ex. 7 (Letters from Detainees) at NEAL 000612. Natalie continued, "She talked about her head hurting so bad. . . . Fatima was really sick and the doctors and lawyers need to know nothing was being done. She wasn't eating, nor getting up to shower. . . . She was a vegetable. It was sad. We all spoke up and said something to the nurses that she wasn't okay and she needed to go to the hospital. The jail did nothing." *Id.* at NEAL 000612–13. Natalie confirmed that Fatima couldn't walk, and that she "had no movement on the one side of her body. Her foot was dragging and her arm was hanging. She was d[roo]ling from her mouth, she started going to the bathroom on herself." *Id.* at NEAL 000613. Natalie also recounted the BCDC staff's neglect of Fatima, writing that she repeatedly informed them of Fatima's dire condition and received responses that "her vitals were fine," and that "[she] wasn't a doctor." *Id.* at NEAL 000613. "The dorm [Fatima] was in, which was called medical[,] had a window that the officers and nurses could see her and they watched her for days just go downhill and they did nothing." *Id.* at NEAL 000613.

Detainees have submitted declarations, which are attached as Exhibits 4, 5, and 6. Natalie Saracino's complete deposition, detailing the mistreatment of Fatima is attached as Exhibit 34.

Finally, the Defendants have acknowledged in their depositions that Fatima was denied the medical care that she needed. *See*, *e.g.*, Ex. 30 (McNulty Dep.) at 420:7–15 ("Q. If a patient walked into your hospital today with these symptoms . . . , would you think that that patient needed to see a doctor? A. Well, first, they would be in the ER. Going through the ER and triage. And immediately, they—it's just standard down in the ED, they would do a CAT scan.").

19

Fatima's death was caused by the policies and practices of Defendant Wexford, the medical contractor that ran medical care at the BCDC. For one, every Wexford Defendant deposed to date has admitted to receiving no training from Wexford, including in particular with regard to neurological conditions. The *Monell* claims are now bifurcated, but Plaintiff will ultimately be able to prove that the express policies, customs, actions of policymakers in the BCDC infirmary, and failure to train and supervise medical and correctional staff prevented Fatima from receiving care and caused her death.

## III.    PLAINTIFF HAS BEEN DILIGENT AND EFFICIENT, BUT DEFENDANTS HAVE PURPOSEFULLY OBSTRUCTED DISCOVERY

As Plaintiff explained in her original motion, Defendants' response to the evidence summarized above has been to engage in an obstruction of discovery that is antithetical to the letter and spirit of the liberal discovery policy of the Federal Rules. *See*, *e.g.*, *United Oil Co., Inc. v. Parts Associated, Inc.*, 227 F.R.D. 404, 411 (D. Md. Mar. 4, 2005) ("Generally, the burden is on the party resisting discovery to clarify and explain precisely why its objections are proper given the broad and liberal construction of the federal discovery rules."). Defendants' obstruction has severely restricted document and oral discovery. And, to be clear, Defendants' obstruction was not limited to *Monell* discovery—they improperly blocked discovery of evidence that is central to the case against the Individual Defendants, too.

For a full discussion of Defendants' obstruction, Plaintiff refers to her original motion papers. ECF 154, 157. Illustrative examples are discussed here. First, the Wexford Defendants are withholding documents related to Wexford's post-incident review of Fatima's death, such as investigation reports, correspondence between Wexford staff and the Maryland Board of Nursing

about Fatima's death, and incident review reports from the month and year of Fatima's death.[5]

These documents are unquestionably relevant accounts of the circumstances of Fatima's

treatment and death, yet Wexford steadfastly refused to produce them based on inapplicable

state-law statutory privileges. There is, of course, no genuine argument that these documents—

concerning the cause of Fatima's death and problems with the care she received—are relevant

only to the now-bifurcated *Monell* claims.[6]

      The Wexford Defendants have also obstructed discovery at depositions. Indeed, Wexford

has already admitted that its counsel's improper instruction to a witness not to answer a proper

question requires additional deposition time. ECF 156 at 28. And Wexford conceded that if the

Court rejected its assertion of state-law privilege—as the Magistrate Judge has now done—even

more deposition time would be necessary. ECF 156 at 28.

      But Defendants' obstructionism goes beyond those two issues. Wexford's counsel has

made outrageous objections intended to thwart discovery of relevant evidence. And defense

counsel have coached witnesses—through speaking objections—on how to evade questions and

feign a lack of memory. In both party *and non-party* depositions, Wexford's counsel has

instructed witnesses not to answer questions, without any legitimate basis for doing so—indeed

without even claiming to have had a legitimate basis, such as attorney-client privilege.

---

[5] In addition to refusing to turn these documents over, Wexford attempted to stop Plaintiff from even learning about their existence. It was not until Dr. Tessema was deposed that Plaintiff learned of certain mortality review documents that exist, but which Wexford did not turn over or even include on its privilege log. Ex. 18 (Tessema Dep.) at 80.

[6] Wexford also refused to produce audit records describing the medical care that was provided at the BCDC during the thirteen-month period leading up to Fatima's death. As Plaintiff has argued previously, those records, too, are relevant to the claims against the Individual Defendants. *See* ECF 150-2 at 4.

In one category of improper objections, Wexford's counsel has instructed witnesses not to answer questions that he unilaterally determines call for "expert testimony." Here is one example:

| | |
|---|---|
| MS. GRADY. | You would agree with me that a doctor or a provider who is encountering a patient should perform a differential diagnosis to assess the patient's complaint; is that correct? |
| MR. SLONEKER: | Objection. He's not here as an expert. |
| MS. GRADY: | You can answer. |
| MR. SLONEKER: | You're not actually required to give opinion answers that call for expert testimony. |
| | * * * |
| Q. | I'm not asking about whether a doctor is a required to write a differential diagnosis. I'm asking whether a doctor, in responding to a patient's complaints, should perform a differential diagnosis? |
| MR. SLONEKER: | Objection. Doctor, I'm advising you not to answer the question. |
| Q. | Are you taking your attorney's advice not to answer? |
| A. | Yes. |

Ex. 18 (Tessema Dep.) at 85–88. There is no such objection in the Rules. There are Rules related to the disclosure of experts, Fed. R. Civ. P. 26(a)(2); and there are Federal Rules of Evidence related to the admissibility of expert testimony at trial, Fed. R. Evid. 701–06. But there is no rule that bars questioning of witnesses at deposition on subjects that might ultimately be the subject of such disclosure and admissibility rules. *Ralston Purina Co. v. McFarland*, 550 F.2d 967, 973 (4th Cir. 1977) (directing a witness not to answer questions based on a view that evidence would be inadmissible is "indefensible and utterly at variance with the discovery provisions of the Federal Rules of Civil Procedure"). Wexford's counsel, who gave these instructions not to answer, is an experienced litigator who knows the Rules.

When Plaintiff filed her motion and Defendants were called to justify the improper instructions, Defendants acknowledged—albeit reluctantly—that no justification existed. ECF 156 at 28. But instead of merely admitting fault and consenting to the appropriate remedy—

22

additional deposition hours and an extension of discovery—Defendants came up with a weak, *post-hoc* argument that the questioning, while not improper, was an inefficient use of Plaintiff's deposition hours. ECF 156 at 19–20. But that's far from true. Defendants well know that, in context, the testimony sought will be quite important at trial. Dr. Tessema is Wexford's Regional Medical Director, overseeing medical care at the BCDC and supervising the medical staff. Ex. 18 (Tessema Dep.) at 12–13. Because the Wexford witnesses almost uniformly disclaim any memory of Fatima, they cannot testify to what they *did do* to care for her. Plaintiff anticipates that instead they will testify about what they *would do*—filling in their memory with policies, practices, and a type of "common sense" that all doctors have as a result of their education and training. As a result, questions to their supervisors about what they *would do* or *should do* are highly relevant.

As a second category, defense counsel repeatedly instructed witnesses not to answer questions on the plainly improper basis that a more general question, or a related question had already been asked. *E.g.*, Ex. 32 (Obadina Dep.) at 12–18, 136, 140–43.[7] In Defendants' view, if a party defendant states *generally* that he or she remembers nothing, the deposition should end and everyone should go home. In this case, when Plaintiff's counsel asked a *specific* question to follow up, defense counsel took the position that doing so was improper. Defendants have once again backpedaled on the propriety of the questions, but hope to avoid the consequences of their improper conduct by convincing the Court that the questioning was inefficient. ECF 156 at 6–8. Again, far from it.

---

[7] There are many other examples of defense counsel's improper speaking objections, *see*, *e.g.*, Ex. 32 (Obadina Dep.) at 92–93, 140–43, 168–69, 220–24; Ex. 18 (Tessema Dep.) at 14, 101, and, in some cases, even bullying, *see id.* at 47–48. These tactics have no place in a federal deposition.

There are well-known, practical, and important reasons why questioners follow general questions with specific ones. The most obvious is that a specific question can jog a witness's memory or clarify what was meant by an earlier question. It is incredibly common to get a negative answer to a general question like, "did Fatima complain to you about any medical condition?" but then get a positive answer to a more specific question like, "did she complain to you that she had a severe headache?" Especially with lay witnesses not accustomed to testifying in depositions or at trials, this type of questioning is not only proper, but nearly indispensable. A lawyer who did not probe a very general blanket denial would not be fulfilling his or her professional responsibilities. Moreover, when a witness' answer to the specific question is the same as to the general question, the testimony goes incredibly quickly. So this technique only takes time precisely when it is useful—that is the opposite of inefficient.

Aside from refreshing the witness's recollection, or clarifying the scope of an earlier question, there is yet another reason to follow a general question with a specific one. That is, witnesses, especially ones with a personal stake in the matter, are occasionally not truthful. Defendants would like Plaintiff to simply ignore this fact, but as the Supreme Court recently reaffirmed, it's a fact that litigators and courts must take into account. *See Cooper v. Harris*, ---S. Ct. ---, 2017 WL 2216930, at *15 n.6 (U.S. May 22, 2017) (stating that the testimony of one side's "star witness" was not automatically "fact of the matter," but was, as all testimony, merely "one side of a thoroughly two-sided case"). In other words, Plaintiff is not required to simply take the word of the people who callously watched as her daughter died over a period of several days. Instead, Plaintiff is entitled to develop the evidence necessary to convince a jury that the Defendants are lying. That evidence includes deposition testimony that is patently incredible, such as none of the medical staff noticing that Fatima had repeatedly defecated on herself. At

trial, Defendants will either be impeached, or will be forced to repeat that ludicrous testimony in front of the jury. Either way, it was plainly not inefficient for Plaintiff to ask questions to develop this evidence.[8]

Finally, Defendants argue that it was inefficient for Plaintiff to ask Defendants about the criteria for admitting detainees to the jail's infirmary. ECF 156 at 17. Respectfully, Defendants have either missed, or purposefully obscured, the point. Now that Fatima Neal is dead, Defendants want to pretend that she had no signs of a severe condition until she suddenly began foaming at the mouth just minutes before she died. That story flies in the face of all available evidence. The fact that Fatima was admitted to the infirmary days earlier, and that every Wexford and BCDC employee knows that the infirmary is only for detainees with serious medical conditions, disproves Defendants' self-serving story. It was in no way inefficient for Plaintiff to develop this evidence.

Plaintiff requires additional deposition hours because of the case's scope and complexity, and because of Defendants' obstruction, not because she has in any way used her time inefficiently. Indeed, though the Federal Rules contemplate 7-hour depositions, Plaintiff has used less than four hours on average, and less than *two* hours when the deponent was a non-party.

## IV.  THIS COURT SHOULD GRANT A MODEST ENLARGEMENT OF DEPOSITION TIME, AND MODEST EXTENSION OF DISCOVERY IN ORDER TO COMPLETE THE REQUIRED DEPOSITIONS

As set forth above, the relief Plaintiff seeks here—addition deposition hours and time to complete those depositions—is warranted by the scope and complexity of the case and by Defendants' significant obstruction of discovery thus far. Without an extension, Plaintiff will

---

[8] Defense counsel argues that if a witness answers the general question, Plaintiff has all she needs to impeach that witness at trial if the witness suddenly remembers something specific. ECF 156 at 7. With respect, Plaintiff's counsel's experience has been different—specific impeachment is more likely to be admitted, and more likely to affect the jury's view of the witness's credibility.

suffer substantial prejudice. The Defendants categorically refuse to agree to additional deposition time, and thus Plaintiff's only recourse is an extension from this Court.[9] Without an extension, Plaintiff's ability to prove, to a jury's satisfaction, facts that are central to the liability of specific individual defendants, will be severely constrained. And Plaintiff will be unable to develop the impeachment evidence that, in Plaintiff's counsel's experience, is crucial to effectively cross-examine witnesses at trial.

Indeed, Plaintiff has already been prejudiced, because her experts were required to disclose their opening reports on a factual record that Defendants' obstruction rendered incomplete. For example, Defendants have refused to let Plaintiff take the deposition of personnel from the medical examiner's office with essential information regarding Fatima Neal's autopsy on which the parties' experts must rely. It is quite possible that new evidence on central claims will impact expert opinions. Requiring experts to disclose and continually supplement has been and will be inefficient and expensive. Plaintiff should not continue to suffer such prejudice because Defendants managed to improperly withhold evidence and run out the clock.

Indeed, denying Plaintiff's request would merely reward the discovery conduct by the Wexford Defendants described above, which is in conflict with the letter and spirit of the Federal Rules. Plaintiff is not asking for sanctions—though they may indeed be appropriate. Instead, Plaintiff seeks only the deposition time necessary to develop and present her important claims, so they can be decided on the merits by a jury. Plaintiff has been diligent in pursuing her claims, but

---

[9] The absolutely necessary depositions that remain to be taken are: the completion of the deposition of Defendant Obadina, additional depositions of Defendants who substantively changed their answers via errata sheets after their depositions had completed, the deposition of the medical examiner and his staff who examined Fatima Neal following her death and made certain neuropathological findings, Rule 30(b)(6) depositions of witnesses from Wexford and the BCDC with knowledge of issues relevant solely to the case against the individual defendants, the remaining detainee witnesses who were in the infirmary with Fatima, and Wexford supervisors with responsibility for the BCDC. Plaintiff requests leave for 30 hours of deposition time so that she can complete these and other depositions.

has been obstructed for improper strategic purposes. In these circumstances, there is good cause for more deposition hours and a modest extension of time in which to complete the required depositions.

Finally, given that the current discovery deadline in this case is August 15, 2017—just over a month away—and given that Plaintiff first filed her motion for additional deposition hours on March 13, 2017—nearly four months ago—Plaintiff respectfully renews her request for a status conference with the Court to discuss these objections and related issues. *See* ECF 158.

## CONCLUSION

For all of these reasons, Plaintiff Sharon Bost respectfully requests that this Court grant her an additional 30 hours of deposition time, and an additional 60 days to complete the required depositions, starting on the date that the Court resolves this motion.[10]

RESPECTFULLY SUBMITTED,

**SHARON BOST**

By:     /s/ Tony Balkissoon
        *One of Plaintiff's Attorneys*

Arthur Loevy
Michael Kanovitz
Anand Swaminathan
Steven Art
Sarah Grady
Tony Balkissoon
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
Phone No.: (312) 243-5900
Fax No.: (312) 243-5902
tony@loevy.com

Masai D. McDougall

---

[10] If the Court declines to grant the requested relief, Plaintiff respectfully asks in the alternative that she be permitted to re-allocate the 6 hours of deposition time that Magistrate Judge Copperthite granted, so that Plaintiff can use them in the most effective and efficient manner to ensure that the case is best evaluated on its substance.

Fareed Nassor Hayat
Norrinda Hayat
THE PEOPLE'S LAW FIRM
14908 Notley Avenue
Silver Spring, Maryland 20905
Phone No.: (301) 384-2198

## <u>CERTIFICATE OF SERVICE</u>

I, Tony Balkissoon, an attorney, hereby certify that, on July 7, 2017, I filed the foregoing Objections using the Court's CM-ECF system, which effected service on all counsel of record listed below.  I further certify that within one (1) business day of this filing, I will cause the same to be served on Defendant Cierra Ladson at the address she provided the Court (Doc. No. 60).


/s/ Tony Balkissoon
Tony Balkissoon
One of Plaintiff's Attorneys


Laura Mullally
Beverly F. Hughes
OFFICE OF THE MARYLAND ATTORNEY GENERAL
300 East Joppa Rd., Ste. 1000
Towson, Maryland 21286
Phone No.: (410) 339-7339
Fax No.: (410) 339-4243


Michael Sloneker
Megan McGinnis
ANDERSON, COE & KING
7 Saint Paul St., Ste. 1600
Baltimore, Maryland 21202
Phone No.: (410) 752-1630
Fax. No.: (410) 752-0085