IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SHARON BOST, individually and as the personal representative of the ESTATE OF FATIMA NEAL, | | |
| *Plaintiff,* | | |
| *v.* | | Civil Action No. ELH-15-3278 |
| WEXFORD HEALTH SOURCES, INC. *et al.*, | | |
| *Defendants.* | | |

## MEMORANDUM OPINION

This case arises from the tragic death of Fatima Neal ("Ms. Neal" or the "Decedent") on November 4, 2012, at the age of 42.[1] Ms. Neal suffered multiple strokes while detained at the Women's Detention Center ("WDC"), which is part of the Baltimore City Detention Center ("BCDC"). She died one day before she was due to have a probation violation hearing. ECF 212-2 (Declaration of Angel Maes, Assistant Manager, Clerk's Office, Circuit Court for Baltimore City) at 4, ¶ 6; *see also* ECF 233-5 (Autopsy Report, signed by Doctor Theodore King, Jr., Assistant Medical Examiner, Office of the Chief Medical Examiner, dated January 25, 2013) at 10. At the relevant time, Ms. Neal was receiving medical care from employees of Wexford Health Sources, Inc. ("Wexford") at the WDC infirmary (the "Infirmary").

In the First Amended Complaint (ECF 56) ("Amended Complaint"), plaintiff Sharon Bost, the Decedent's mother, individually and as the personal representative of the Estate of Fatima Neal, filed suit against Wexford and numerous individuals: Anike Ajayi, R.N.; Elizabeth

---

[1] According to the Medical Defendants, Ms. Neal also used the names "Tammy Faller" and "Michelle Keys." ECF 213-1 at 1 n.2; *see* ECF 213-8 (Post 83 Logbook) at 3.

Obadina, R.N.; Ebere Ohaneje, R.N.; Najma Jamal, R.N.; Karen McNulty, R.N.; Andria Wiggins, P.A.; Getachew Afre, M.D.; Jocelyn El-Sayed, M.D.; Oby Atta, C.R.N.P.; and twenty-five unnamed medical service providers (collectively, the "Medical Defendants"). ECF 56, ¶¶ 29-39.[2]

Plaintiff also sued the State of Maryland ("State"); BCDC; and various State employees: Shavella Miles, Security Chief; Captain Carol McKnight; Lieutenant Valerie Alves; Officer Cierra Ladson;[3] Gwendolyn Oliver, Assistant Warden of BCDC; Ricky Foxwell, Assistant Warden of BCDC; Carolyn Atkins, Assistant Commissioner, Department of Pretrial Detention and Services; Carol Harmon, Facility Administrator; and twenty-five unnamed "custody officers" (collectively, the "Custody Defendants"). *Id.* ¶¶ 40-48. All individual defendants were sued in their personal and official capacities. *Id.* ¶¶ 39, 49.[4]

Plaintiff has asserted multiple claims. As to all defendants, plaintiff asserts a claim of denial of adequate medical care, pursuant to 42 U.S.C. § 1983, based on alleged violations of the Eighth and Fourteenth Amendments (ECF 56, ¶¶ 153-68); denial of adequate medical care under Article 24 of the Maryland Declaration of Rights (*id.* ¶¶ 187-206);[5] intentional infliction of

---

[2] The spellings of the individual Medical Defendants' names "are those provided by each Individual Medical Defendant in his or her deposition." *See* ECF 213-1 at 2 n.1.

[3] Ladson was served on November 2, 2015. *See* ECF 21. By Order of March 4, 2016 (ECF 27), I directed Ladson to file a response to the Complaint by April 8, 2016. On June 13, 2016, the Court received correspondence from Ladson (ECF 60), stating that she was "baffled as to why [she is] a party to the above case" and "seeking clarification and understanding to why [she is] connected to this case." *Id.* at 1. The Custody Defendants state that "Ladson has not sought the representation of the Attorney General's Office," she is "unrepresented, and has not participated in the defense of this case." ECF 212 at 1 n.1; *see also* ECF 212-1 at 9 n.1.

[4] The Court dismissed all claims against the State and the individual Custody Defendants in their official capacities, pursuant to the Eleventh Amendment. *See* ECF 89.

[5] Article 24 is construed *in pari materia* with the Fourteenth Amendment. Plaintiff did not bring a claim under Article 25 of the Maryland Declaration of Rights, which is construed *in*

emotional distress ("IIED") (*id.* ¶¶ 226-37); and wrongful death, pursuant to Md. Code (2013 Repl. Vol., 2017 Supp.), §§ 3-901 through 3-904 of the Courts and Judicial Proceedings Article ("C.J."). *Id.* ¶¶ 238-43.[6] As to the Medical Defendants, plaintiff also alleges medical malpractice. *Id.* ¶¶ 207-17.[7] Moreover, plaintiff alleges that Wexford is liable for the actions of its employees pursuant to the doctrine of respondeat superior. *Id.* ¶¶ 244-46. Further, plaintiff seeks indemnification from Wexford, BCDC, and the State for the actions of their employees. *See id.* ¶¶ 247-50.

The Custody Defendants have moved for summary judgment (ECF 212), supported by a memorandum of law (ECF 212-1) (collectively "Custody Defendants' Motion"), and a host of exhibits. *See* ECF 212-2 through ECF 212-23. The Medical Defendants have also moved for summary judgment (ECF 213), supported by a memorandum of law (ECF 213-1) (collectively "Medical Defendants' Motion"), and many exhibits. *See* ECF 213-3 through ECF 213-30; *see*

---

*pari materia* with the Eighth Amendment. *See Walker v. State*, 53 Md. App. 171, 183, 452 A.2d 1234, 1240 (1982).

[6] Plaintiff also lodged a *Monell* claim against Wexford, under 42 U.S.C. § 1983, alleging an unconstitutional policy and practice of denying medical care to BCDC detainees. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); ECF 56, ¶¶ 169-86. *Monell* liability is applicable to private entities operating under color of state law, including private prison health care providers. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 49 (1988); *Polk Cty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999); *Shields v. Prince George's Cty.*, GJH-15-1736, 2016 WL 4581327, at *7 (D. Md. Sept. 1, 2016). By Memorandum Opinion (ECF 159) and Order (ECF 160) of May 8, 2017, I granted the defendants' motions to bifurcate and stay, stating: "After the disposition of all claims against the individual defendants, the Court will issue a scheduling order governing discovery and the filing of dispositive motions as to the *Monell* Claim." ECF 160.

Additionally, plaintiff asserted a claim of negligence against the State and the individual Custody Defendants. *Id.* ¶¶ 218-25. That claim was dismissed by Order of August 31, 2016. *See* ECF 89.

[7] As the Amended Complaint states, this Court has "supplemental jurisdiction of the state-law claims", pursuant to 28 U.S.C. § 1367. ECF 56, ¶ 11.

*also* ECF 214 through ECF 214-3 (exhibits filed under seal by the Medical Defendants). Plaintiff has filed a consolidated response in opposition to the motions (ECF 228, "Opposition"). It is accompanied by more than 150 exhibits, some of which are redacted and some of which are filed under seal. *See* ECF 225-1 through ECF 225-159.[8] Both groups of defendants replied and submitted additional exhibits. *See* ECF 241 ("Custody Defendants' Reply"); ECF 241-1 through ECF 241-23 (additional Custody Defendant exhibits); ECF 245 ("Medical Defendants' Reply"); ECF 245-1 and ECF 245-2 (additional Medical Defendant exhibits).[9] In sum, the parties have filed more than 7,200 pages of motions, memoranda, and exhibits. *See* ECF 212; ECF 213; ECF 214; ECF 225; ECF 228; ECF 233; ECF 235; ECF 241; ECF 245.[10]

No hearing is necessary to resolve the summary judgment motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Custody Defendants' Motion (ECF 212) as to all claims and all Custody Defendants, *i.e.*, Miles, McKnight, Alves, Oliver, Atkins, Foxwell, Harmon, and the twenty-five unnamed custody officers. Additionally, I shall dismiss the case as to Ladson, although she has not appeared. Further, I shall grant the Medical Defendants' Motion

---

[8] Unredacted versions of sealed exhibits, as well as exhibits filed entirely under seal, are docketed at ECF 233-1 through ECF 233-52.

[9] The Custody Defendants' Motion, the Medical Defendants' Motion, and plaintiff's Opposition all appear to use different sized text. *See* ECF 212; ECF 212-2; ECF 213; ECF 213-1; ECF 228. Notably, the text in plaintiff's Opposition is so small that it is difficult to read. *See* ECF 228. The parties are reminded that Local Rule 102.2.b states, in part, that the text in "[a]ll documents filed with the Court . . . shall appear only on the front side of any page in at least 12-point font size."

[10] Previously, the parties also filed forty-one motions in limine. *See* ECF 216; ECF 246; ECF 247; ECF 248; ECF 256; ECF 257; ECF 258; ECF 259; ECF 260; ECF 261; ECF 265; ECF 266; ECF 267; ECF 268; ECF 269; ECF 270; ECF 271; ECF 272; ECF 273; ECF 274; ECF 275; ECF 276; ECF 277; ECF 278; ECF 279; ECF 280; ECF 281; ECF 282; ECF 283; ECF 284; ECF 285; ECF 286; ECF 287; ECF 298; ECF 299; ECF 300; ECF 301; ECF 302; ECF 304; ECF 306; ECF 308. The motions in limine exceeded 8,000 pages of briefs and exhibits. By Order of April 20, 2018 (ECF 422), I denied the motions in limine, without prejudice to the right of the parties to renew a limited number of those motions after disposition of the summary judgment motions.

(ECF 213) as to all claims against Atta and the twenty-five unnamed medical care providers. And, I shall grant the Medical Defendants' Motion as to the IIED claim.

However, I shall deny the Medical Defendants' Motion as to the deliberate indifference claim predicated on the Eighth Amendment, the Fourteenth Amendment, and Article 24 of the Maryland Declaration of Rights, as to Ajayi, Obadina, Ohaneje, Jamal, McNulty, Wiggins, Afre, and El-Sayed. I shall also deny the Medical Defendants' Motion as to the medical malpractice and wrongful death claims lodged against Ajayi, Obadina, Ohaneje, Jamal, McNulty, Wiggins, Afre, and El-Sayed. Further, I shall deny the Medical Defendants' Motion as to plaintiff's assertion of respondeat superior liability as to Wexford. Because the claim for indemnification is premature, I shall not resolve that contention in the context of this Memorandum Opinion.

## I. Factual Background[11]

The BCDC is a State correctional facility located in Baltimore City, operated by the Department of Public Safety and Correctional Services ("DPSCS"). *See* Md. Code (2017 Repl. Vol.), §§ 5-401(a), (b) of the Correctional Services Article ("C.S."); *see also* ECF 212-1 at 17. BCDC consists of multiple buildings, one of which is the WDC. ECF 212-1 at 17. The Commissioner of DPSCS is the appointing authority for BCDC employees, who are paid by the State. *See* C.S. § 5-202(c)(4); *see also* Md. Code (2014 Repl. Vol., 2017 Supp.), § 12-101(a)(1) of the State Government Article ("S.G."). *See* ECF 212-1 at 17.

Wexford is a medical care provider "contracted by the State to provide around-the-clock care" at BCDC. ECF 228 at 14; *see also* ECF 212-1 at 10. In November 2012, registered nurses ("R.N.") Ajayi, Obadina, Ohaneje, Jamal, and McNulty were employed by Wexford and worked

---

[11] To the extent feasible, I have organized the events described in the factual background chronologically and/or topically. I cite to the electronic pagination as it appears on CM/ECF, which does not necessarily correspond to the page numbers on the parties' submissions.

at BCDC. *See id.* at 52-57. At that time, Certified Registered Nurse Practitioner ("C.R.N.P.") Atta, Physician Assistant ("P.A.") Wiggins, and physicians ("M.D.") Afre and El-Sayed were also employed by Wexford and worked at BCDC. *Id.*

Stacey Shumway, a Wexford Charge Nurse, is identified in the Medical Defendants' Motion as an "R.N. Deposition Expert." ECF 213-20 at 2-3. Shumway testified at her deposition (ECF 213-20) that in the fall of 2012, there were three shifts for Wexford staff working in the Infirmary. ECF 213-20 at 4. The day shift started at 8:00 a.m. and ended at 4:30 p.m. *Id.* The evening shift ran from 4:00 p.m. to 12:00 a.m. or 12:30 a.m. *Id.* And, the night shift began at 12:00 a.m. and ended at 8:00 a.m. or 8:30 a.m. *Id.*; *see also* ECF 213-26 (McNulty Deposition) at 3-4. According to Shumway, the Infirmary was "always staffed" by Wexford employees. ECF 213-20 at 3.

Nurse McNulty testified at her deposition that during the day shift, the Infirmary was staffed by a doctor and either "two RNs" or an R.N. and a Licensed Practical Nurse ("L.P.N."). ECF 213-26 at 3. According to McNulty, the nurses reported to the doctor on duty during the day shift. *Id.* at 4. During the evening and night shifts, the Infirmary was staffed either by "two RNs" or "one RN and one LPN." *Id.* at 4. McNulty stated that doctors were "not typically" in the Infirmary during the evening shift and were never at the Infirmary during the night shift. *Id.* Additionally, McNulty averred that physician assistants and nurse practitioners were never staffed at the Infirmary during the evening and night shifts. *Id.*

During the evening and night shifts, nurses working in the Infirmary reported either to a "PA or nurse practitioner" stationed in the BCDC "general population." *Id.* And, during evening and night shifts, an "on-call" physician could be reached by telephone. *See* ECF 213-28 (Deposition of Getachew Afre, M.D.) at 4. According to Doctor Afre, the on call physician shift

"starts around 4:30 p.m." and lasts "until the morning, until 8 o'clock in the morning" the following day. *See* ECF 225-49 (Afre Deposition) at 29.

**A.**

Ms. Neal was arrested on September 7, 2012 (ECF 212-4 at 4, Trial Summary), and charged on September 8, 2012, with possession of marijuana, pursuant to Md. Code (2012 Repl. Vol., 2017 Supp.), § 5-601(a)(1) of the Criminal Law Article. *See* ECF 225-4 at 14 (Commitment Pending Hearing, dated September 8, 2012). As to the possession of marijuana charge, bond for Ms. Neal was set at $5,000. *See* ECF 225-4 at 4.

However, the Circuit Court for Baltimore City lodged a Detainer, ordering no bail for Ms. Neal as to "Bench Warrant No. 208149026." *See* ECF 212-4 at 2 (Detainer of September 8, 2012); ECF 212-2 (Declaration of Maes) at 3, ¶ 7; ECF 212-3 at 2 (Circuit Court for Baltimore City Criminal Docket, listing "208149026" as the "Case Number" for Ms. Neal's criminal proceedings). The "CHARGE" for which Ms. Neal was to be detained was specified as "viol narc laws (FTA)." ECF 212-4 (capitals in original). The Detainer pertained to a Bench Warrant issued for Ms. Neal (ECF 212-4 at 12) after she failed to appear for a probation violation hearing on August 8, 2011. *See id.*; *see also* ECF 212-2 at 3, ¶ 5.

Pursuant to the Detainer, Ms. Neal was held at WDC. *See* ECF 212-4 at 8 (Commitment Pending Hearing, dated September 10, 2012). She was housed in the "Post 83 dormitory." *See* ECF 212-2 at 17; *see also* ECF 225-25 (Post 83 Logbook) at 9.

As to the possession of marijuana charge of September 8, 2012, Ms. Neal was found guilty on October 26, 2012, and sentenced to time served. ECF 212-4 at 4 (Trial Summary). However, because of the Detainer (ECF 212-4 at 2), Ms. Neal was not released. *See* ECF 212-2 at 4, ¶ 6. With regard to Ms. Neal's alleged violation of probation, a hearing was set for

November 5, 2012. ECF 212-2 at 4, ¶ 6.

**B.**

At the relevant time, Christina Sexton was Ms. Neal's bunkmate in the Post 83 dormitory

of the WDC. *See* ECF 228 at 19; *see also* ECF 212-2 at 17; ECF 225-25 at 9. In a letter from

Sexton to Bost, dated November 16, 2012 (ECF 225-1), Sexton recounted that on the "morning

of" October 30, 2012, Ms. Neal "woke with a really bad headache and her vision was blurred."

*Id.* at 1. According to Sexton, Ms. Neal remained in bed "the whole day" and was "in pain." *Id.*

Natalie Saracino was also an inmate at WDC at the relevant time. At her deposition

(ECF 225-8), Saracino stated that on October 31, 2012, she and Ms. Neal "were supposed to do

Bible study" together, but Ms. Neal "kept complaining that her head was hurting and she

couldn't read the book." ECF 225-8 at 11. According to Saracino, Ms. Neal "kept saying her

head was pounding." *Id.*

Sexton recalled that at approximately 2:00 a.m. on November 1, 2012,[12] Sexton awoke to

Ms. Neal

> walking into things . . . . She kept saying something[']s really wrong get the
> officer. She say [sic] her head hurt so bad and she couldn't see. I then dressed
> her and walked her to the door where we waited on medical. While waiting she
> fell out in my arms[.] I placed her on the floor [and] she started sweating really
> bad and saying she was so cold so I wraped [sic] her in a blanket until Nurse
> Rachel[13] from medical came downstairs and took Fatima to medical[.]

ECF 225-11 at 1; *see also* ECF 228-8 at 11.

Officer Tanaya Collins, a BCDC employee working in the Post 83 dormitory during the

---

[12] Sexton stated that Ms. Neal awoke in the early morning of October 31, 2012.
However, it is undisputed that Ms. Neal awoke in the early morning of November 1, 2012, and
was brought to the Infirmary shortly thereafter. *See* ECF 228 at 19-20.

[13] Nurse Ajayi is also referred to as "Nurse Rachel." *See* ECF 213-1 at 37; *see also id.* at
7 (stating that Nurse Ajayi "was commonly known to the detainees at WDC as 'Nurse Rachel'").

early morning hours of November 1, 2012 (*see* ECF 212-1 at 17), wrote in the Post 83 Logbook, ECF 213-8: "0220 . . . Christina Sexton . . . advised me of issues being had by . . . Tammy Fallen [sic][14] . . . . She advised that Ms. Fallen [sic] was having trouble breathing and that she seem[ed] dizzy. When I asked Ms. Fallen [sic] what was wrong she replied she don't know. I noticed that she was breathing rapidly and looked to be in distress. Supervisor and medical staff was notified 0232 medical staff (Nurse Rachel) arrived on post 83 to escort Ms. Fallen [sic] to the clinic." ECF 213-8 at 3; *see also* ECF 225-26 (Deposition of Ajayi) at 7.

Ajayi testified at her deposition (ECF 225-26; ECF 213-23; ECF 212-1) that on November 1, 2012, she was working as a triage nurse at the WDC. ECF 213-23 at 22; *see also* ECF 213-1 at 7. In the "early morning hours" on that date, she responded to "a call" and went "to a dorm where [she] saw" Ms. Neal sitting down, wrapped in a blanket. ECF 213-23 at 2, 5. Ms. Neal appeared to be "weak" (ECF 225-26 at 17) and told Ajayi that "she had a headache." ECF 213-23 at 6.

Ajayi took Ms. Neal's "vital signs" and listened to Ms. Neal's lungs. *Id.* at 7. Ajayi then helped Ms. Neal walk to a wheelchair. *Id.* As Ms. Neal walked to the wheelchair, Ajayi noticed that Ms. Neal's face "showed pain" and she was "frowning." ECF 213-23 at 20. However, Ajayi claimed that Ms. Neal's "gait was normal" with "no one-sided weakness." *Id.* at 12. Ajayi did not recall Ms. Neal, or anyone else, reporting that Ms. Neal had been walking into walls, had blurred vision, had been confused or disoriented, had fallen into Sexton's arms, had been sweating, had lost consciousness, or that Ms. Neal had stayed in bed for most of the previous day. ECF 225-26 at 17-18. Ajayi escorted Ms. Neal to the Infirmary "triage area." ECF 213-23 at 9; ECF 225-26 at 7; ECF 212-1 at 3.

---

[14] As noted, while housed in the WDC in 2012, Ms. Neal was also known as Tammy Faller. ECF 213-1 at 1 n.2.

Plaintiff and the Medical Defendants provided the Court with Ms. Neal's medical records during the time she was housed in the Infirmary. *See* ECF 233-6; *see also* ECF 214.[15]

---

[15] Plaintiff identifies various inconsistencies in the medical records, claiming that they are false, unreliable, and incomplete. ECF 228 at 33. Yet, according to plaintiff, they "still contain admissions" that establish that the Medical Defendants were aware of Ms. Neal's strokes. *Id.* at 33-35.

Moreover, plaintiff contends that "the vast majority of medical records pertaining to [Ms. Neal's] time in the infirmary were generated by a computer" and that the computer "entries are automatically populated by the electronic record system at the BCDC." ECF 228 at 34. In other words, plaintiff contends that most of the text contained in Ms. Neal's medical records was not actually written by a nurse, a physician assistant, or a medical doctor. *Id.*

At the deposition of Nurse Jamal (ECF 225-114), Jamal was given copies of three different medical records she created for Ms. Neal while Ms. Neal was in the Infirmary. *See* ECF 233-33 (highlighted medical records) at 1-6. Jamal was asked to "highlight the portions of the document[s] that are auto filled in [by the computer system]. That is to say, the parts where you don't specifically type something in yourself." ECF 225-114 at 57 (bold omitted). Plaintiff submitted copies of the highlighted medical records. *See* ECF 233-33. Large swaths of those records are highlighted, indicting they those portions of Ms. Neal's medical records were generated by a computer system, rather than Jamal. *See id.*; *see also* ECF 225-59 (Atta Deposition) at 72 (stating that Wexford's computer system auto populated results for medical examinations that were never actually performed on Ms. Neal).

However, Jamal stated at her deposition that she directed the computer system to auto populate information in Ms. Neal's medical records by selecting the relevant information from a list provided by the computer system. *See* ECF 225-114 at 57-58. For example, Jamal stated that "[i]f [she] did [an] assessment on lungs," and determined that the "lungs were clear", she would select that option from a list in the computer system. *Id.* at 59. Thereafter, the computer system would auto populate a description of Ms. Neal's lungs being "clear" in the medical record. *Id.*; *see also* ECF 225-59 (Atta Deposition) at 65 ("Q. Okay. So you press a button to indicate that you did an eye exam? A. Yeah. Q. And then you have to press a button to indicate whether it was all within normal limits . . . or something was not within normal limits? A. Exactly. Q. And . . . if you push the . . . button that says it was all within normal limits, then [the computer system] auto-populates all of these fields that detail exactly what was within normal limits, is that correct? A. Yes.") (bold omitted).

As discussed, *infra*, at summary judgment, it is not the province of the Court to determine the weight of the evidence or the credibility of witnesses. *See Anderson v. Liberty Lobby, Inc.*, 977 U.S. 242, 249 (1986); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). These are issues for the factfinder. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

According to the medical record "generated" by Ajayi at 2:51 a.m. on November 1, 2012, Ajayi assessed Ms. Neal at 2:42 a.m. on that date. *See* ECF 233-6 (Medical Record of November 1, 2012, 2:51 a.m.) at 1-2.[16] Ajayi reported that Ms. Neal told her: "'[M]y head is pounding and I feel cold. i took 2 motrins and it is not helping.'" *Id.* at 1. Ajayi also stated that the cause of Ms. Neal's headache was unknown, and that Ms. Neal had a "knowledge deficit." *Id*. Additionally, Ajayi stated Ms. Neal was "ambulatory but weak," "move[d] all extremities," and "follow[ed] command." *Id.*

Ajayi also wrote that she contacted a physician "for treatment and orders," and "notified pa wiggins for further eval." ECF 233-6 at 2. However, Ajayi failed to identify the physician she claimed to have contacted. Nor is there any indication that Ms. Neal was examined by a doctor until later during the morning of November 1, 2012.

The Medical Defendants submitted Wexford's "November 2012 Provider On-Call Schedule", which lists the physicians who were on call the nights of November 1-2, 2012, November 2-3, 2012, and November 3-4, 2012. *See* ECF 213-9 (the "On-Call Schedule"). But, the On-Call Schedule fails to identify the physician who was on call between 4:30 p.m. on October 31, 2012, through 8:00 a.m. on November 1, 2012, the shift during which Ms. Neal arrived at the Infirmary. *Id.*; *see also* ECF 233-6 at 1-3; ECF 213-20 at 4; ECF 213-26 at 3-4; ECF 225-49 at 29.[17]

---

[16] Each medical record contains two time stamps. *See, e.g.*, ECF 233-6 at 1-2. The time stamp on the first page of a medical record indicates when a Wexford employee started writing the record. *See* ECF 225-114 (Jamal Deposition) at 57. The time stamp on the final page of a medical record shows when the Wexford employee finished writing, or "generated", the record. *See id.*; *see also* ECF 233-6 at 2; *see also* ECF 225-59 (Atta Deposition) at 65.

[17] According to the On-Call Schedule, "Dr. ElBedawi" was the on call physician during the night of November 1-2, 2012; "Dr. Chhunchha" was on call November 2-3, 2012; and "Dr. Kulam" was on call November 3-4, 2012. *See* ECF 213-9.

In the medical record created by Ajayi at 2:51 a.m. on November 1, 2012, she further stated that "after report given to infirmary rn and officers pt transferred to infirmary in a stable condition." ECF 233-6 at 2. Additionally, Ajayi wrote, *id.*: "Referred to provider – condition not responding to protocol." *See also* ECF 225-26 (Ajayi Deposition) at 27. Ajayi also noted that "pa wiggins arrived to clinic." ECF 233-6 at 2.

In addition, Ajayi noted in the medical record that Wiggins decided "to admit [Ms. Neal] for 24 hr obserbation [sic]." ECF 233-6 at 2; *see also* ECF 225-26 at 27. Wiggins indicated she was "concerned about -- you know, wanted to see what was going on with [Ms. Neal's] headache." ECF 225-26 at 27.

Ajayi testified at her deposition that when P.A. Wiggins arrived, Ajayi "presented [her] assessment" of Ms. Neal, including vital signs. ECF 225-26 at 24. In particular, Ajayi stated that she informed Wiggins that Ms. Neal had "an ongoing headache", that Ms. Neal was "cold", and that Ms. Neal "was a little weak[.]" *Id.* According to Ajayi, Wiggins "did the further assessing and questioning" of Ms. Neal. *Id.*

Jamal explained that an inmate is admitted to the Infirmary for observation so that Wexford staff can monitor the inmate's medical condition. *See* ECF 225-47 (Jamal Deposition) at 56. According to Isaias Tessema, M.D., Wexford's Regional Medical Director, "only the sickest [inmates] go to the infirmary." ECF 225-53 (Tessema Deposition) at 45.

Wiggins stated at her deposition that she did not remember communicating with Ajayi about Ms. Neal. *See* ECF 225-43 (Wiggins Deposition) at 5. Indeed, she did not recall Ms. Neal. *Id.* The following portion of Wiggins's deposition transcript is pertinent, *id.* (bold in original):

**Q Do you have any independent recollection of any of your encounters with Fatima Neal as a patient at the WDC?**

A No, ma'am.

**Q Fair to say that you have no independent recollection of how she appeared physically during your encounters?**

A That is fair to say.

**Q And you have no independent recollection of any treatment that you — treatment or medications that you prescribed; correct?**

A That is correct.

Nurse Obadina "generated" a medical record for Ms. Neal at 3:34 a.m. on November 1, 2012. *See* ECF 233-6 at 3. The "VISIT TYPE" was described as "Admission Note." *Id.* Doctor Afre was listed as Ms. Neal's "Provider." *Id.* There is no indication that Doctor Afre was called to the Infirmary when Ms. Neal was first admitted. Rather, Obadina stated that Ms. Neal was "to be seen by MD in am." *Id.*

In the medical record (ECF 233-6 at 3), Obadina stated that Ms. Neal "was admitted from TRIAGE AT 3.00AM with C/O of HEADACHE." *Id.* Obadina also stated that Ms. Neal "walked from Triage to infirmary"; that Ms. Neal "refused vitals on admission"; and that Obadina would "continue to monitor pt for safety and comfort." *Id.* Additionally, Obadina wrote that Ms. Neal was admitted "in stable condition although [she] was a bit weak. No further complaints noted." *Id.* Obadina also wrote, *id.*: "**Musculoskeletal:** . . . . No weakness." (Bold in original).

At 6:59 a.m. on November 1, 2012, Obadina "generated" another medical record for Ms. Neal. ECF 233-6 at 6. The "VISIT TYPE" was listed as "Skilled care" and Doctor Afre was identified as Ms. Neal's "Provider." *Id.* Obadina stated that Ms. Neal "continued to be restless" and that an unidentified "PA came to see" Ms. Neal. *Id.* According to Obadina, Ms. Neal "refused vital signs." *Id.* Obadina stated that she would "continue to monitor pt for safety and

comfort." *Id.*

P.A. Wiggins "generated" a medical record for Ms. Neal at 7:32 a.m. on November 1, 2012 (ECF 233-6 at 4-5), in which Wiggins was identified as Ms. Neal's "Provider." *Id.* at 5. Wiggins stated: "**Reason(s) for visit** . . . Pt states that her head ache [sic] started 30 minutes ago." *Id.* at 4 (bold in original). Yet, Wiggins also wrote: "No . . . headaches." *Id.* at 5. Additionally, Wiggins wrote: "Pt reports that she took 2 tablest [sic] that she received for [sic] another inmates [sic] in the dorm whic [sic] she thinks is motrin. Pt denies any othe [sic] nausea, vomnitngm [sic] dizziness." *Id.* at 4. According to Wiggins, Ms. Neal had no "vision changes" and was "[a]lert and oriented." *Id.* at 5.

At 10:06 a.m. on November 1, 2012, Doctor Afre "generated" a medical record for Ms. Neal. *See* ECF 233-6 at 7-9. The "VISIT TYPE" was for "Skilled Care" (*id.* at 7), and Afre was listed as Ms. Neal's "Provider." *Id.* at 9 (capitals in original). Afre wrote, *inter alia*, *id.* at 7: "According to the PA's note, the patient complaines [sic] of severe headache of about 30 minutes duration and was behaving irraticaly [sic]. However, after admission patient took her [medication] and slept quietly." Doctor Afre stated that he "tried to talk to the patient but her answer was only 'I don't know.' She did not want to be disturbed and wanted to continue sleeping." He also wrote, *id.* at 9: "Patient at this time look[s] drawzy [sic] which is probably due to the [medication]. Her vital signs are within normal limits." Additionally, Afre prescribed "motrin 600 mg" every "8 hrs. . . . for the headache" and stated that he would "continue to observe patient." *Id.* No medical tests were ordered.

Nurse Ohaneje "generated" a "HEALTH ASSESSMENT" for Ms. Neal at 12:30 a.m. on November 2, 2012. *See* ECF 233-6 at 10-11 (capitals in original). In that assessment, Doctor Afre was listed as Ms. Neal's "Provider." *Id.* at 11. Ohaneje stated, *inter alia*, that Ms. Neal was

"stable no issue to report." *Id.* at 10. She also said, *id.* at 10-11: "No vision changes or headaches. No hearing loss. . . . No dizziness, no emotional disturbances."

At 6:56 a.m. on November 2, 2012, Nurse Obadina "generated" another medical record for Ms. Neal. *See* ECF 233-6 at 12-13. The "VISIT TYPE" was for "Skilled Care" (*id.* at 12), and Doctor Afre was listed as Ms. Neal's "Provider." *Id.* at 13 (capitals in original). Obadina stated that Ms. Neal "ate breakfast" and that "no complaint [was] noted." *Id.* at 12. However, Obadina also wrote, *id.*: "pt still weak. MD to be notified." Additionally, Obadina stated "**Musculoskeletal:** . . . . No weakness." *Id.* (bold in original). In the medical record, Obadina indicated that Ms. Neal was not experiencing dizziness, and that Obadina would "continue to monitor pt for safety and comfort." *Id.*

About 24 hours after Doctor Afre first saw Ms. Neal, he saw her again. Doctor Afre "generated" a medical record for Ms. Neal at 10:20 a.m. on November 2, 2012. *See* ECF 233-6 at 14-16. The "VISIT TYPE" was for "Skilled Care" and he was listed as Ms. Neal's "Provider." *Id.* at 14, 16. Doctor Afre wrote that Ms. Neal "was admitted by the PA because of severe headache" and that Ms. Neal told Afre "she still has the headache." *Id.* at 14. He also stated that Ms. Neal "denies nausea, vomiting, or blurring of vision. She denies dysphagia, diarrhea or cough." *Id.* Further, Afre wrote that Ms. Neal was "awake & alert, irritable but consolable, no acute distress." *Id.* Notably, Afre discontinued the prescription of "motrin 600 mg" and prescribed "Tylenol-codeine No. 3." *Id.* at 16.

At 9:34 p.m. on November 2, 2012, Nurse Jamal "generated" a medical record for Ms. Neal. *See* ECF 233-6 at 17-18. The "VISIT TYPE" was "Skilled Care" (*id.* at 17) and Doctor Afre was listed as Ms. Neal's "Provider." *Id.* at 18 (capitals in original). Jamal wrote, *inter alia*, *id.* at 17: "Patient remained in bed all evening. She did not get up for vital signs. V[ital] S[igns]

were stable.  No new complaints voiced.  No nausea or vomiting this shift.  No medications due. Patient in stable condition.  She did get up around 9:00pm [sic] and was interacting with other peers in the dorm.  Will continue to monitor patient."  Jamal also wrote that Ms. Neal had "No vision changes or headaches.  No hearing loss. . . . No dizziness, no emotional disturbances."  *Id.* Further, Jamal wrote, *id.* at 18: "**Neurological:** Alert and oriented."  (Bold in original).

Nurse Jamal "generated" a medical record for Ms. Neal at 5:18 a.m. on November 3, 2012.  *See* ECF 233-6 at 19-20.  The "VISIT TYPE" was for "Skilled Care" (*id.* at 19) and Doctor Afre was listed as Ms. Neal's "Provider."  *Id.* at 20.  Jamal wrote, *id.* at 19: "No changes in condition reported.  Patient slept well.  No episodes of diarrhea or nausea.  V[ital] S[igns] were stable.  Patient did not have any night shift medications.  Will continue to monitor patient." Jamal also wrote: "No vision changes or headaches.  No hearing loss. . . .  No dizziness, no emotional disturbances. . . .  No weakness."  *Id.* at 19.  Further, Jamal wrote, *id.* at 20: "**Neurological:** Alert and oriented."  (Bold in original).

At 7:27 a.m. on November 3, 2012, Doctor El-Sayed "generated" a medical record for Ms. Neal.  *See* ECF 233-6 at 21-22.  The "VISIT TYPE" was for "Skilled Care" and El-Sayed was listed as Ms. Neal's "Provider."  *Id.*  El-Sayed wrote, *id.* at 21: "Patient was admitted because of severe headache.  No complaints of headache this AM.  No nausea, no lightheadedness."  Additionally, El-Sayed wrote: "**Constitutional:** No apparent distress" and "Pain management: On Tylenol # 3."  *Id.* (bold in original).

At 3:02 p.m. on November 3, 2012, Nurse McNulty started writing a "HEALTH ASSESSMENT" for Ms. Neal, listing Doctor Afre as Ms. Neal's "Provider."  *See* ECF 233-6 at 23-25.  McNulty completed the assessment of Ms. Neal at 3:17 p.m.  *Id.* at 25.[18]  Notably,

---

[18] According to plaintiff, the Medical Defendants "produced metadata that reveals that

[four] medical records were altered after [Ms. Neal's] death." ECF 228 at 49. Plaintiff explains that the "metadata is a collection of information . . . stored in a database, and exported into a Microsoft Excel file for viewing." *Id.* The "metadata identifies the [Wexford] users who created and modified [Ms. Neal's medical] records." *Id.* at 50. Plaintiff provides a portion of the Excel file containing the metadata. *Id.* at 50. It indicates, in part, *id.*:

| created_by | create_timestamp | modified_by | modify_timestamp |
|---|---|---|---|
| 3506 | 11/3/12 3:03 PM | 4583 | 11/4/12 9:54 AM |
| 3300 | 11/3/12 9:10 PM | 3506 | 11/4/12 2:13 PM |
| 3666 | 11/4/12 4:42 AM | 4583 | 11/4/12 9:53 AM |
| 356 | 11/4/12 5:29 AM | 3506 | 11/4/12 2:13 PM |

| User ID | Last Name | First Name | Credential |
|---|---|---|---|
| 356 | OBADINA | ELIZABETH | RN |
| 3300 | JAMAL | NAJMA | RN |
| 3506 | MCNULTY | KAREN | RN |
| 3666 | ATTA | OBY | CRNP |
| 4583 | GILL | SHERRY | MRC |

Plaintiff avers that the "HEALTH ASSESSMENT" created by McNulty at approximately 3:03 p.m. on November 3, 2012 (ECF 233-6 at 23-25) was altered by Sherry Gill at 9:54 a.m. on November 4, 2012. *See* ECF 228 at 50-51. Neither plaintiff nor the Medical Defendants identify Sherry Gill. *See* ECF 213; ECF 228; ECF 245. However, plaintiff states that the "HEALTH ASSESSMENT" was "altered under highly suspicious circumstances— . . . hours after [Ms. Neal's] death, and by . . . [a] user other than the person who created the record in the first place."

The Medical Defendants contend, *inter alia*, that "even if the 'modify timestamps' at issue do represent substantive changes to the information in the electronic medical records system made after Ms. Neal's death, those changes are not reflected in the medical records." ECF 245 at 18. In other words, the Medical Defendants claim that no medical record provided to the Court contains "substantive changes" made after Ms. Neal's death. *Id.*

Additionally, the Medical Defendants point to the deposition testimony of William Miller, a Rule 30(b)(6) deposition witness. *See* ECF 245 at 18; *see also* ECF 245-2 (Deposition of William Miller, dated December 7, 2017) at 12. Miller stated, *inter alia*, that metadata may indicate a medical record was "modified" even when the original medical record was not altered, deleted, or supplemented. *See* ECF 245-2 at 12.

As noted, questions of credibility are properly resolved at trial by the finder of fact. *See Jacobs*, 780 F.3d at 569; *Black & Decker Corp.*, 436 F.3d at 442; *Dennis*, 290 F.3d at 644-45. However, tampering with evidence is a serious matter. Moreover, the recent opinion of the Fourth Circuit in *Six v. Generations Fed. Credit Union*, __ F.3d __, 2018 WL 2435430, at **1, 11 (4th Cir. May 31, 2018), is noteworthy. There, the Court concluded that "the district court did not abuse its discretion in imposing sanctions" on attorneys who "challenged the authenticity of a [document] for two years before revealing that they possessed an identical copy, obtained from

McNulty wrote, *id.* at 23: "**Risk for Injury R/T hx of Falls, Impaired Health Maintenance, Altered Nutritional Intake**." (Bold in original). But, McNulty did not elaborate on the meaning of that statement. McNulty also said, *id.*: "Pt has been lying in bed throughout the day mostly sleeping and no distress is present. Pt needs encouragement/assistance with getting up to eat and getting cleaned up. Pt reports that she is visually impaired and is not wearing any glasses, will continue to monitor closely." Additionally, McNulty wrote, *id.* at 24: "Comments for eyes: Pt c/o headache 10/10 this am and is ordered for Ibuprofen and Tylenol #3. . . . **Gastrointestinal:** Comments: Pt is not eating, however, is drinking water with meds and recently drank some juice and ate some crackers with the assistance [of] other inmates in her dorm. . . . **Musculoskeletal:** Comments: Pt has no complaints of musculoskeletal pain, however, states that she has had trouble ambulating but has not fallen since she has been here in the infirmary." (Bold in original). According to McNulty, Ms. Neal's "Pain Score" was "10/10." *Id.* (underlining in original). McNulty wrote that she had "continued MD orders" as to Ms. Neal's treatment. *Id.* at 25. She did not describe those orders.

At 9:09 p.m. on November 3, 2012, Jamal began to write a medical record for Ms. Neal, indicating that Jamal's "VISIT TYPE" was to provide "Skilled Care" and that Doctor Afre was Ms. Neal's "Provider." *See* ECF 233-6 at 26-27. Jamal completed the medical record at 9:18 p.m. on that same date. *Id.* at 27.[19] In the medical record, Jamal wrote, *id.* at 26: "Patient lied

---

their client, before filing the complaint."

[19] Plaintiff claims that the medical record created by Jamal at approximately 9:09 p.m. on November 3, 2012 (ECF 233-6 at 26-27) was altered by McNulty at 2:13 p.m. on November 4, 2012. *See* ECF 228 at 50-51. According to plaintiff, the relevant metadata indicate, ECF 228 at 50:

| created_by | create_timestamp | modified_by | modify_timestamp |
|---|---|---|---|
| 3300 | 11/3/12 9:10 PM | 3506 | 11/4/12 2:13 PM |

down all shift." Jamal also wrote, *id.* at 27:

| Status | Order |
|--------|-------|
| Completed | Increase activity level |

According to Jamal, Ms. Neal "was able to ate [sic] some food as she was encouraged by her room mates [sic]. No nausea or vomiting. Patient did get her Tylenol #3 which she took without difficulty. V[ital] S[igns] were stable. Will continue to monitor patient." Moreover, Jamal stated that Ms. Neal's "**Condition**" was "**Unchanged**." *Id.* (bold in original). Jamal also wrote, *id.* at 26: "No vision changes or headaches. No hearing loss. . . . No dizziness, no emotional disturbances. . . . No weakness." And, Jamal wrote, *id.* at 27: "**Constitutional:** No apparent distress. Well nourished and well developed. . . . **Neurological:** Alert and oriented." (Bold in original).

## C.

The Infirmary contained three inmate dormitories, which Ajayi referred to as "Dorms 1, 2, and 3." ECF 225-26 at 32. Ms. Neal was in "Dorm 3," which was an "open dorm" that housed multiple detainees. *Id.* According to a document signed by Officer Ladson (ECF 225-55), Dorm 3 contained eight inmate beds.

Photographs of Dorm 3 were submitted as exhibits to the Opposition. *See* ECF 225-56 (photographs taken by Sergeant Carolyn Murray, dated November 4, 2012); ECF 233-4 at 14 (same). The photographs indicate that Dorm 3 consisted of a single room containing multiple

---

| User ID | Last Name | First Name | Credential |
|---------|-----------|------------|------------|
| 3300 | JAMAL | NAJMA | RN |
| 3506 | MCNULTY | KAREN | RN |

As indicated, the Medical Defendants contend, *inter alia*, that any "substantive changes" that may have been made to the medical records after Ms. Neal's death "are not reflected in the medical records" that have been provided to the Court. ECF 245 at 18.

beds, a table located in the center of the room, and a communal shower located in a corner of the room. ECF 225-56.[20] Dorm 3 was flanked by two rooms: the "Officer's Control Center" and the "Nurse's Station." *Id.* Glass windows provided a view into Dorm 3 from the "Officer's Control Center" and the "Nurse's Station." *Id.*

The glass windows allowed medical staff and BCDC officers to see the inmates in Dorm 3, according to Ajayi. ECF 225-26 at 32. However, Alves testified at her deposition that "basically the nursing window, it's like you can't see out of that window. You can't really see out of it. They have stuff, papers and cabinets and all kinds of stuff in there . . . partially" obstructing the view into Dorm 3. ECF 212-20 at 8. BCDC correctional officers and Wexford medical staff could enter Dorm 3 "through [a] little doorway." ECF 212-20 at 9.

Inmate Saracino testified that a hallway adjoined Dorm 3, and passersby could see into Dorm 3. *See* ECF 225-8 at 9-10. Saracino also stated that the lights in Dorm 3 were "always on", even in the middle of the night. *Id.* at 43.

Kiearra Blair, a WDC inmate, was in the Infirmary when Ms. Neal "arrived" at Dorm 3 during the early morning hours of November 1, 2012. *See* ECF 225-29 (Declaration of Blair) ¶ 5. And, Blair remained in the Infirmary with Ms. Neal "for days after she arrived." *Id.* During that period of time, Blair "was able to see and hear what was happening" to Ms. Neal in the Infirmary. *Id.* Blair averred, *id.* ¶ 6:

> When [Ms. Neal] arrived at the infirmary, it looked like she had suffered from a stroke. She was sluggish on one side of her body and was having trouble walking. During the entire time that [Ms. Neal] was in the infirmary . . . she was

---

[20] The photographs are annotated so as to identify certain pictured items, such as "Detainee Fatima Bernadette Neal's Bunk", the Dorm 3 "shower stall", the window to the "Officer's Control Center", and the window to the "Nurses Station." *Id.* At her deposition, Murray stated that she took the photographs as part of her investigation of Ms. Neal's death (ECF 225-15 (Murray Deposition) at 7), and they were attached to her report. *Id.* at 8. It appears that Murray wrote the annotations, although she was not asked that question at her deposition.

having trouble moving one side of her body. She was in lots of pain. It was obvious that she needed medical help badly the entire time that she was in the infirmary.

Blair also recalled that on an unspecified date, Ms. Neal "would try to get up and walk, but she repeatedly fell and hit her head." ECF 225-29, ¶ 7. She added, *id.* ¶ 10: "Eventually, [Ms. Neal] could not get out of bed and could not eat."

Moreover, Blair averred in her Declaration, *id.* ¶ 8: "Every day, on every shift, I and many other women in the infirmary would tell nurses, guards, and other individuals that [Ms. Neal] needed emergency medical help and needed to go to the hospital." Blair claimed that she personally "informed every nurse who came in to pass medications that [Ms. Neal] needed emergency medical help and needed to go to the hospital." *Id.* Additionally, Blair stated that Ms. Neal "repeatedly told nurses and guards that she needed to go to the hospital. We told the staff these things for days before [Ms. Neal] died." *Id.* According to Blair, the "staff" said Ms. Neal "was faking her problems to get medication." *Id.* ¶ 9.

Mary Betch, a WDC inmate housed in the Infirmary with Ms. Neal, stated in her Declaration (ECF 225-38) that on November 2, 2012, Ms. Neal was "dragging the right side of her body . . . she was also incontinent, and she could not get up to use the bathroom[.]" *Id.* ¶ 6. Betch averred: "Numerous times I told the nurses that [Ms. Neal] needed help." *Id.* ¶¶ 7-8. According to Betch, unidentified medical staff "kept saying that [Ms. Neal's] vitals were fine and that [Ms. Neal] just wanted attention. They also said that she was supposed to be released very soon, and said a number of times that she was not going to be there much longer." *Id.* ¶ 8.

Moreover, Betch averred, *id.* ¶ 7: "Pretty much the whole time that [Ms. Neal] was in the infirmary, it was obvious that something was really wrong and that she badly needed medical help." Betch also stated: "When the nurses came in, [Ms. Neal] kept telling them that her head

felt like it was going to explode, and she would have tears in her eyes." ECF 225-38, ¶ 7.

In Sexton's letter to Bost (ECF 225-11), Sexton stated that on November 3, 2012, she was in the Infirmary working as an "Observation Aid." *Id.* at 2-3. Sexton claimed that on that date Ms. Neal "looked so sickly. . . . She had no idea what was going on . . . . She kept saying 'her head'" and "'something[']s really wrong.'" *Id.* at 2. Additionally, Sexton stated that "nurse Ms. M– (Indin lady)[21] only checked on Fatima one time and said . . . that [Ms. Neal was] fine because her vitals [were] normal she just need[ed] to eat. Then [Sexton] told that [nurse] that if they didn't do something to send [Ms. Neal] to the hospital she was going to die." *Id.* at 3 (internal quotation marks omitted).

Further, Sexton asserted that she spoke with Nurse Ajayi on November 3, 2012. *Id.* According to Sexton, Ajayi and "Nurse Ms. M –" told her that they did not "know what[']s wrong" with Ms. Neal. *Id.* Additionally, Sexton stated that "Nurse Ms. M –" said that "nurses can only do what they are told no more or no less they can't make the call to send [Ms. Neal] out to a hospital." *Id.* (internal quotations omitted). Additionally, Sexton stated: "To [her] and everyone other then [sic] the medical staff . . . at WDC we could see that Fatima was not here self [sic] something was really wrong with her." *Id.* at 1.

Inmate Kelly Frye was housed with Ms. Neal in the Post 83 dormitory. *See* ECF 225-24 (Declaration of Kelly Frye, dated January 18, 2017) ¶ 3. Frye continued to see Ms. Neal when she went to the Infirmary to "pick up medication" and when she worked in the Infirmary "on suicide watch." *Id.* ¶ 4. Frye stated that when Ms. Neal was in the Infirmary, she "exhibit[ed] . . . very bad headaches, vomiting, diarrhea, blurry vision, impaired vision, and difficulty walking. From what [Ms. Neal] was saying and doing, it was obvious to [Frye] that [Ms. Neal]

---

[21] The identity of "Nurse Ms. M–" is not known.

badly needed medical help. [Frye] and the other detainees repeatedly called out to the staff to get [Ms. Neal] help and to take her to the hospital." ECF 225-24, ¶ 5. According to Frye, "detainees had to help [Ms. Neal] get dressed, because she physically could not do so on her own." *Id.* ¶ 8. Further, Frye stated that she "saw [Ms. Neal] struggling to walk. She was dragging one side of her body and appeared to have weakness on one side of her body. It looked to me as though she had had a stroke. [Frye] could see that just by looking at her." *Id.*

Inmate Saracino testified at her deposition (ECF 225-8) that she was in the Infirmary "every morning" to receive medications and that she also worked in the Infirmary when Ms. Neal was there. *Id.* at 3-4. According to Saracino, Ms. Neal needed help from an unidentified nurse to walk, because she "couldn't move her leg and arm on one side of her body[.]" *Id.* at 14.[22] And, she never saw Ms. Neal receive any medical care while in the Infirmary. *Id.*

Notably, Saracino wrote a letter to Bost on November 4, 2012. ECF 225-10; ECF 233-3. She recalled, ECF 225-10 at 1-2; ECF 233-3 at 3-4:

> [Ms. Neal] talked about her head hurting so bad[.] She had trouble seeing out her eyes, didn't know much of what was going on. She thought she was home sometimes & other times thought she was on her way home . . . . [Ms. Neal] was really sick . . . . She wasn't eating, nor getting up to shower. The few ladies that were with her in her dorm had to help her go to the rest room[,] wash up, drink, walk . . . . We watched her just go down hill in a matter of days. She was a vegetable. . . . We all spoke up & said something to the nurses that she wasn't OK and she needed to go to the hospital. The jail did nothing. Everytime [sic] I spoke to a nurse they said "her vitals were fine." That was Nurse Rachel . . . . I observed the nurses on duty sleeping[.] When I seen how [Ms. Neal] couldn't walk I said to the nurse "see she getting worse." Nurse told me I wasn't a doctor. Fatima had no movement on the one side of her body. Her foot was dragging & her arm was hanging. She was drewling [sic] from her mouth, she started going to the bathroom on herself, wouldn't eat & was just gone. . . . The dorm . . . had a window that the officers & nurses could see her [through] and they watched her for days just go down hill & they did nothing. [Ms. Neal] kept saying over &

_____

[22] Saracino was not asked at her deposition to state the date on which she saw the nurse helping Ms. Neal to walk. Nor did she specify the date in her Declaration. However, based on the record, it appears that Saracino was referring to events of November 2 or November 3, 2012.

over "my head hurts bad, my head hurts bad" . . . . [T]he nurses or doctors anybody, no body listened to her. She cried out for help best way she knew how.

In Saracino's Declaration of February 15, 2017 (ECF 225-30; ECF 233-3), she stated,

ECF 225-30, ¶¶ 6-12:

> [Ms. Neal] kept crying out for help every day in the infirmary, but the nurses, doctors, and officers did not help her. Fatima talked about her head being in extreme pain. She kept saying, over and over, that her head hurt bad.

> While she was in the infirmary Fatima also had trouble seeing and understanding what was going on. She did not seem to know where she was at all times.

> Fatima drooled, urinated, and defecated on herself. But, she was not physically able to get up to take a shower.

> Fatima was not able to eat properly. She could not walk around, or get a drink without getting help from me and the other detainees.

>         *      *      *

> The nurses and officers could see Fatima being helped by me and the other detainees.

>         *      *      *

> I witnessed Fatima struggling to walk. She could not move one side of her body, and her foot was dragging and her arm was hanging. These things were easy to see just from looking at her. I also pointed this out to the nurse on duty, but the nurse did not take any action to help Fatima.

>         *      *      *

> I tried to get the nurses to help Fatima, and I observed many of the other detainees do the same. But the nurses did not. One of the nurses that I talked to about . . . Fatima . . . was Nurse Rachel.

> The Infirmary had a window, through which the nurses and officers could see Fatima and the other detainees in the infirmary at all times. But the medical staff and officers did nothing to help her.

Inmate Monica Brown provided a statement on November 4, 2012. ECF 233-4 at 26. She claimed that Ms. Neal "received little to no attention from medical staff even though they were alerted many times to . . . her condition by the other inmates[.]" Brown also wrote a letter

to Bost on November 5, 2012. ECF 225-12. She said, in part, that she "told the medical staff" that Ms. Neal "kept on saying that her headache [was] so bad . . . but they did nothing for her . . . and the inmates was . . . the[] only ones that help . . . her."

Other inmates also provided statements at the relevant time. *See* ECF 233-4 at 22 (Inmate Statement of Ernestine Williams, dated November 4, 2012) ("Medical staff seemed not to care at all."); ECF 233-4 at 24 (Inmate Statement of Donnetta Bennett, dated November 4, 2012) ("Staff was told on numerous occasions of [Ms. Neal's] condition [but] there was little or no response.").

According to an undated report written by Sergeant Murray for the Internal Investigative Unit ("IIU") of the DPSCS (ECF 225-37) (hereinafter, the "Initial IIU Report"),[23] detainees who were in the Infirmary with Ms. Neal provided statements to the effect that Ms. Neal "remained in the bed, would not eat or drink, and began walking with her right side slumped and dragging her right leg, since Friday (11/2/2012)." Additionally, Sergeant Murray reported that three of the detainees stated that "they believed [Ms. Neal] had a stroke." *Id.*

### D.

On November 4, 2012, "Staff discovered [Ms. Neal] unresponsive at 0025 Hrs.", *i.e.*, 12:25 a.m. ECF 225-14 at 12-13 (IIU Duty Officer's Checklist) at 12 (hereinafter, "Duty Officer's Checklist"); *see also* ECF 225-14 at 5, 10. The Duty Officer's Checklist does not identify the "staff" member who discovered Ms. Neal. More than three hours passed before Ms. Neal was transported to Johns Hopkins Hospital ("JHH" or the "Hospital"). *See* ECF 233-6 at 28, 30.

Based on a document signed by Officer Ladson on November 4, 2012, six of the eight

---

[23] The IIU is referred to as the "Internal Investigation Unit" (ECF 212-18 at 9) and the "Internal Investigative Unit." *See, e.g.*, ECF 225-14 at 1-11.

beds in Dorm 3 were occupied by inmates during the early morning hours on that date. *See* ECF 225-55. Lieutenant Alves stated at her deposition (ECF 212-20) that on November 4, 2012, she was the supervisor responsible for BCDC correctional officers stationed in the WDC, and Captain McKnight was the Shift Commander to whom Alves reported. *Id.* at 3.

According to a "Serious Incident Report" created by Alves at approximately 3:22 a.m. on November 4, 2012 (ECF 233-4 at 17-20), Ladson informed Alves that she (Ladson) "had just completed a security round when she returned to the security office [where] she was alerted by several detainees in [the Infirmary] by tapping on the window that [Ms. Neal] was gasping for air. Officer Ladson immediately notified Nurse Elizabeth Obagine[24] and the two went into the dorm area to assist [Ms. Neal] who was experiencing difficulty breathing." ECF 233-4 at 17; *see also* ECF 212-24 (Post 93 Logbook, C-Shift) at 3 (entries made by Ladson between 3:22 a.m. through 4:00 a.m. on November 4, 2012).

Alves stated at her deposition (ECF 212-20) that in the early morning hours of November 4, 2012, she was in the Correctional Officers' room adjacent to Dorm 3 (*id.* at 7-8) when inmates housed in Dorm 3 "[k]nocked on the officer's window." *Id.* at 8. She explained that the inmates knocked on the officer's window because, *inter alia*, "the officer is the one who is supposed to respond to incidents," not the nursing staff. *Id.* She added that the inmates "know they would have got a response quicker" by knocking on the "officer's window." *Id.* Alves also stated that the "medical staff . . . ain't expedient." *Id.*[25]

Alves looked through the "officer's window" into Dorm 3, where she saw Ms. Neal "tossing and turning and looking like she couldn't breathe." ECF 212-20 at 7. Alves then

---

[24] Presumably, Alves's reference to "Nurse Elizabeth Obagine" is actually Nurse Elizabeth Obadina.

[25] Inmate Betch averred: "[W]hen [Infirmary inmates] banged on the nurses window [for help], they would just ignore us." ECF 225-38, ¶ 9.

walked to the nurses' station. The nurse "was awake" and Alves "told the nurse, let's go, something is wrong." *Id.* at 8.

At 4:00 a.m. on November 4, 2012, BCDC Assistant Warden Oliver called Officer Ladson. She asked Ladson to "report the situation to" Oliver. ECF 212-24 at 3.

Inmate Kelly Frye saw Ms. Neal on November 4, 2012. ECF 225-24 (Declaration of Frye) ¶ 10. According to Frye, Ms. Neal was "lying in her own feces, drooling, and foaming at the mouth. She was incoherent and looked . . . as if she was in a vegetative state." *Id.* Frye claimed that she "banged on the nurses' station to get help for [Ms. Neal], but the nurse on duty was asleep with her feet propped up on a chair. Despite [Frye's] banging, [the nurse] did not get up right away." *Id.* ¶ 11; *see also* ECF 233-4 at 21 (Inmate Statement of Vanessa Dow, dated November 4, 2012) ("I observed Dorm 3 women trying to get the nurse['s] attention but she was sleeping so I nock [sic] on the window[.]"). According to Frye, "[w]hen the nurse finally got up, she acted as if she did not want to touch [Ms. Neal]. She then made multiple phone calls. The detainees in the infirmary were told to leave the room." ECF 225-24, ¶ 12.

Nurse Oby Atta worked with the "general population" of inmates on the fourth floor of BCDC. ECF 225-59 (Oby Atta Deposition) at 4. At 4:42 a.m. on November 4, 2012, Nurse Atta began to write a medical record for Ms. Neal, which she completed at 8:54 a.m. *See* ECF 233-6 at 28-29; *see also* ECF 225-59 at 65; ECF 225-114 (Jamal Deposition) at 57; ECF 245-2 (Miller Deposition) at 12. In the medical record, Atta was listed as Ms. Neal's "Provider." *See* ECF 233-6 at 28-29.[26] Nurse Atta wrote, *id.* at 28:

---

[26] Plaintiff contends that metadata provided by the Medical Defendants show that the medical record created by Atta between 4:42 a.m. and 8:54 a.m. on November 4, 2012 (ECF 233-6 at 28-29) was altered by Sherry Gill at 9:53 a.m. on November 4, 2012. *See* ECF 228 at 51. The relevant metadata indicate, ECF 228 at 50:

Called by Nurse at about 3:22 am to evaluate a 42 year old AA Female with a history of . . . Headaches . . . . [S]he was found unresponsive. Patient was admitted to the Infirmary because of severe headache.On [sic] arrival Pt was unresponsive to stimuli but was breathing and secretions from her mouth. Per report her appetite was poor.He [sic] Oxygen SAT room air was 30%, heart rate 120's and breathing 12 - 14/min. She was started on Oxygen therapy face mask, suctionedl [sic], 911 activated.O2 [sic] SAT increased to 90%,hr [sic] 70's the Infirmary Nurse called the MD on call Dr. Kulam but no response, Dr[.] Tewede was called and she left messages for return call.She [sic] also called the Nurse Supervisor Ms[.] Stacey who was notified of the plan to sent [sic] the Pt to ER for evaluation and she agreed with the plan. Dr[.] Tewede called back and agreed with the plan to sent [sic] the Pt to ER.At [sic] about 3:50 AM the Pt stopped breathing and no pulse and CPR was started HR 50.911 [sic] came at about 3:53AM and left 3:55AM.

*See also* ECF 233-4 at 29 (Progress Note written by Atta at 3:22 a.m. on November 4, 2012); ECF 233-35 (same).

At 5:29 a.m. on November 4, 2012, Nurse Obadina "generated" a medical record for Ms. Neal, indicating that the "VISIT TYPE" was for "Skilled care/Ermergency [sic] sent out by 911", and that Doctor Afre was Ms. Neal's "Provider." *See* ECF 233-6 at 30.[27] Obadina wrote, *id.*:

---

| created_by | create_timestamp | modified_by | modify_timestamp |
|---|---|---|---|
| 3666 | 11/4/12 4:42 AM | 4583 | 11/4/12 9:53 AM |

| User ID | Last Name | First Name | Credential |
|---|---|---|---|
| 3666 | ATTA | OBY | CRNP |
| 4583 | GILL | SHERRY | MRC |

As noted, the Medical Defendants dispute the claim that the medical records submitted to the Court contain "substantive changes" made after Ms. Neal's death. ECF 245 at 18.

[27] According to plaintiff, metadata provided by the Medical Defendants show that the medical record created by Obadina at approximately 5:29 a.m. on November 4, 2012 (ECF 233-6 at 30), was altered by McNulty after Ms. Neal's death. *See* ECF 228 at 51. The relevant metadata indicate, ECF 228 at 50:

| created_by | create_timestamp | modified_by | modify_timestamp |
|---|---|---|---|
| 356 | 11/4/12 5:29 AM | 3506 | 11/4/12 2:13 PM |

| User ID | Last Name | First Name | Credential |
|---|---|---|---|
|  |  |  |  |

> At 3.22am, [sic] pt was found to by [sic] inresponsive [sic] to stimuli. The Nurse Practitioner was called. pt [sic] was breathing, B/p 80/60 ..unresponsive [sic] to stimuli, with secretions from her mouth.oxygen [sic] SAT was 30%, heart rate was 120, and breathing was 12-14/min.she [sic] was started on oxygen therapy by face mask, sunctioed [sic], 911 activated.O2 [sic] increased to90%.HR [sic] was 70. all [sic] efforts to get on call doctor failed. Dr. Tewede was contacted. he [sic] eventually responded. Charge nurse was informed. at [sic] 3.50am, [sic] pt stopped breathing.no [sic] pulse and CPR was started.HR [sic] was 50. . . .

*See also* ECF 233-4 at 27 (Progress Note written by Obadina at 7:30 a.m. on November 4, 2012).

Nurse Jamal wrote and signed a document on November 4, 2012 (ECF 233-4 at 28) at an unspecified time. She recounted that she "was called by c/o to help . . . a patient in dorm three." Jamal stated that she "placed $0_2$ on the patient."

According to the Initial IIU Report (ECF 225-37), the "On-Call doctor" whom Atta, Obadina, and Jamal attempted to contact "never answered the call or called the nurse[s] back." ECF 225-37. The medical record created by Nurse Atta indicated that "Dr. Kulam" was the on call doctor. ECF 233-6 at 28. Because Doctor Kulam could not be reached, the "nursing staff" subsequently called the regional nursing manager, "who gave permission to send [Ms. Neal] out to the hospital (via ambulance – 911)." ECF 225-37; *see also* ECF 225-15 (Murray Deposition) at 11; ECF 233-6 (medical records) at 30.

A 911 crew arrived at the Infirmary at 3:53 a.m. on November 4, 2012. ECF 233-6 at 28, 30. According to Frye, when "paramedics and emergency medical technicians arrived[, o]ne of them assessed [Ms. Neal] and said that [she] had been dead for a while." ECF 225-24 (Declaration of Frye) ¶ 13.

| 356 | OBADINA | ELIZABETH | RN |
| 3506 | MCNULTY | KAREN | RN |

The Medical Defendants maintain, *inter alia*, that any "substantive changes" that may have been made to the medical records after Ms. Neal's death "are not reflected in the medical records" that have been provided to the Court. ECF 245 at 18.

Alves stated at her deposition that when the 911 crew arrived, she "went into the office" and called Captain McKnight, asking McKnight to provide "two . . . weapons qualified officers" to accompany Ms. Neal from the Infirmary to the Hospital. ECF 212-20 at 12. McKnight followed "protocol" by calling the IIU, alerting Detective Mark Forrest as to Ms. Neal's situation. ECF 212-18 at 9; *see also* ECF 225-14 at 5.

According to the medical records "generated" by Atta (ECF 233-6 at 28) and Obadina (*id.* at 30), the 911 crew left the Infirmary with Ms. Neal at 3:55 a.m. on November 4, 2012. Ms. Neal was transported to JHH. *See* ECF 233-5 (Autopsy Report) at 10. When Ms. Neal arrived at the Hospital, she had "[n]o pulse" and "[n]o respiration." ECF 233-11 (JHH medical record) at 2. The Hospital medical record further noted, *id.* at 3: "Cardiopulmonary arrest with long down time." Ms. Neal was pronounced dead at 4:31 a.m. on November 4, 2012. *See* ECF 225-14 at 9; *see also* ECF 233-5 at 10.

In Saracino's handwritten letter to Bost of November 4, 2012 (ECF 225-10), Saracino wrote, *id.* at 1; *see also* ECF 233-3 at 3 (same): "[T]his jail did not help [Ms. Neal] or do anything for her. . . . They let her die."

### E.

Sergeant Murray wrote a Criminal Investigation Report for the IIU, dated June 5, 2013. *See* ECF 225-14 at 1-11 (hereinafter, the "Final IIU Report"). Murray interviewed various health care providers and WDC detainees. I need not restate the information obtained from parties or witnesses whose statements were obtained through other means, and already recounted. However, Monica Brown's statement to Ms. Murray was more detailed than the information previously recounted.

Brown told Murray that Ms. Neal "stayed in the bed, kept sleeping", "barely spoke", and

"would talk incoherently . . . about a book and a girl, and was also asking [other detainees] to close the door." ECF 225-14 at 8. According to Brown, "what [Ms. Neal] was saying did not make sense." *Id.* Further, Brown stated that Ms. Neal "was walking like something was wrong with her right side," "urinated in her bed approximately three (3) times," "began sweating approximately two (2) days prior and was hot and cold at the same time." *Id.*

Brown related that on the morning of November 4, 2012, she saw "Acid white" bubbles coming out of [Ms. Neal's] mouth" and that Ms. Neal "was breathing hard, gasping for air." *Id.* According to Brown, Ms. Neal "sat up on the side of her bed and was talking out of her head." *Id.* At that point, Brown "banged on the nurses' station window and observed the nurse asleep." *Id.* Brown "continued banging on the window until the nurse woke up." *Id.* Brown "told the nurse that they needed her help" and the "nurse came into the infirmary and began treating" Ms. Neal. *Id.*

The Final IIU Report concluded, *inter alia*, that the "*interviews with the detainees housed in the infirmary established that the detainees were familiar with [Ms. Neal] and their statements that they were concerned for and helping [Ms. Neal] were consistent.*" ECF 225-14 at 8 (emphasis in original).

The following portions of Murray's deposition are pertinent, ECF 225-15 at 20-22 (bold in original):

> **Q. In addition, did you ever raise any concerns with anybody about the quality of medical care that Fatima Neal received at the BCDC?**
>
> A. Yes, sir.
>
> **Q. And who did you raise those concerns with?**
>
> A. My supervisor, Director Ballard. Lieutenant Daniel Morrow and Director Jesse Ballard, III.

*     *     *

**Q. And so my question is, generally speaking, to the best of your memory, what concern did you raise with Mr. Morrow?**

A. That there were medical issues that I believe our department needed to ensure were appropriate, as far as the care certain inmates were receiving.

*     *     *

**Q. Do you remember in general terms what you raised with Director Ballard?**

A. Just the fact that I observed that there were some questionable issues regarding medical care inmates received and someone needed to ensure that it was properly looked into.

*     *     *

**Q. Was your general take-away that [Obadina] was not showing enough concern for Fatima Neal?**

A. Yes.

**F.**

Doctor Theodore King, Jr., the Assistant Medical Examiner for the Office of the Chief Medical Examiner for the State of Maryland, conducted a postmortem examination on November 4, 2012, and wrote an Autopsy Report as to his findings. *See* ECF 233-5 (Autopsy Report). He concluded that the cause of Ms. Neal's death was "intracerebral hemorrhage (stroke) with complications." *Id.* at 10; *see also id.* at 1.

The Autopsy Report contained a "Pathologic Diagnosis", which stated, *inter alia*, *id.* at 9:

I.     [I]ntracerebral hemorrhage with complications
- A. Admission to institution infirmary with complaints of headache (11/1/12)
- B. In infirmary with institutional personnel supervision and detainees who reported that she walked with her right side slumped and dragging her right leg since 11/2/12
- C. [R]eceived acetaminophen for headache, at 0900 hrs. and 2100 hrs. 11/3/12
- D. [A]dditional complaints of headache at 0200 hrs. 11/4/12

32

E. "[F]oaming from the mouth" and unresponsive with no pulse 0225 hrs. 11/4/12
F. Emergency medical personnel transport to local Maryland hospital
G. Additional care and pronounced dead approximately 0431 hrs. 11/4/12
H. [A]ccute hemorrhage of the left parietal white matter
I. [S]econdary infarct of the left occipital, and temporal cortices . . . .

The Autopsy Report also included a "Neuropathology Report." *See* ECF 233-5 at 6-8. It revealed a 3/8 inch hemorrhage on Ms. Neal's medial right frontal subgaleal scalp, and a 3/8 inch hemorrhage on her lateral right frontal subgaleal scalp. *Id.* at 3. An "opening" was "noted in the left posterior parietal region" of the brain, "through which it [was] possible to identify an intracerebral hematoma." *Id.* at 6. Additionally, a "4.5 x 3.0 x 3.0 cm" hematoma was observed in the "white matter of the left parietal lobe." *Id.* The "significant mass" of the second hematoma had caused "left uncal herniation." *Id.* The report also noted an "[a]cute hemorrhagic infarct . . . in the left occipital lobe and mesial temporal lobe." *Id.* The ventricular system of the brain "appear[ed] collapsed." *Id.* The "midbrain show[ed] marked compression on the left side and the aqueduct [was] collapsed." *Id.* Additionally, there was swelling of the left cerebral hemisphere, causing asymmetry between the cerebral hemispheres. *Id.*; *see also* ECF 225-18 (Affidavit of Doctor King, dated July 24, 2017).

Plaintiff submitted the Expert Report of Laura Pedelty, M.D., Ph.D., a board-certified neurologist with subspecialty certifications in vascular neurology, neurosonology, and behavioral neurology. *See* ECF 225-20 (Pedelty Report of March 14, 2017) at 1. She also holds a Ph.D. in Cognition and Communication from the University of Chicago. *See id.* at 8. Notably, Doctor Pedelty explained some of the terms used in the Autopsy Report. *See* ECF 225-20 (Pedelty Report of March 14, 2017). Doctor Pedelty stated, *id.* at 3: "Intracerebral hemorrhage . . . occurs when a blood vessel leaks, resulting in bleeding into a region of the brain." An "Ischemic stroke

occurs when an artery supplying blood to a region of the brain is occluded (blocked) and that region of the brain is deprived of nutrients and oxygen." ECF 225-20 at 3. Further, Doctor Pedelty explained, *id.*: "Both ischemic and hemorrhagic strokes can cause swelling of the brain in areas around the immediate damage. Brain swelling (edema) usually develops over several days following a stroke . . . . The swelling can block large and small blood vessels, leading to further strokes. If the swelling is severe, it can force regions of the brain out of its firm covering (the dura mater) or even out of the cranial vault (skull), a phenomenon known as herniation." She added, *id.*: "Herniation of the brain hemispheres onto the brainstem ('uncal herniation') can damage crucial brain structures supporting vital functions and is rapidly fatal if not treated."

Doctor Pedelty also stated, *id.*: "Fatima came to medical attention on the night of October 31-November 1, complaining of . . . severe headache and impaired vision, and as having difficulty walking. This is consistent with the initial left parietal hematoma, resulting in right-sided weakness and difficulty seeing or attending to the right" side of her body. (Citations omitted). According to Doctor Pedelty, the Autopsy Report "is explained by a sequence of events starting with a hemorrhagic stroke of the left brain hemisphere, followed by brain swelling leading to blockage of blood vessels supplying structures in the back of the brain resulting in ischemic strokes, and by ongoing swelling ultimately leading to brain herniation and death." *Id.* at 3-4.

Plaintiff's expert, Nathaniel R. Evans, II, M.D., a board certified internist and certified Correctional Health Care Provider (ECF 233-44), submitted a report dated June 19, 2017. ECF 225-19. He opined, *id.* at 5: "By all clinical indications (sudden onset severe headache, drowsiness, weakness, confusion), a first stroke — a significant, serious neurological event — occurred no later than 11/01/2012 . . . . and the progressive effect of the bleed was to cause death

34

of other parts of her brain (left occipital and left parietal) leading to her death."

Peter Pytel, M.D., another plaintiff's expert, is a board certified neuropathologist. He stated in a report dated June 19, 2017, ECF 225-22: "[T]he available clinical information also suggests that the decedent suffered from asymmetric neurologic deficits that can potentially be localized to the left side of the brain starting on 11/1/12 or 11/2/12. This history and the early histologic changes including macrophage infiltration would both be consistent with or suggest that the decedent developed ischemic changes before the events of 11/4/12." *Id.* at 2. At his deposition (ECF 225-35), Doctor Pytel said, *id.* at 22: "Based on the literature and teachings, people typically say that macrophages show up after two, three — some people say after five days of the injury," *i.e.*, stroke.

Doctors Pedelty and Evans agree that, given the symptoms presented by Ms. Neal during the early morning hours of November 1, 2012, she required urgent transfer to a hospital where she could receive appropriate medical care. *See* ECF 225-19; ECF 225-20.

Doctor Evans opined that a "severe sudden onset of headache, . . . associated with weakness and confusion should signal [to] a medical provider that the patient may have an intracranial bleed and may need to be evaluated with brain imaging. . . . If a stroke or neurological crisis cannot be ruled out, the standard of care requires prompt . . . transfer to a hospital for evaluation." ECF 225-19 at 3; *see also* ECF 225-20 at 5.

Moreover, Doctor Pedelty opined that "Fatima Neal's progression to cardiopulmonary arrest and death was due to a failure to consider, investigate, and obtain appropriate medical care for a diagnosis of stroke . . . ." ECF 225-20 at 6. She also opined, *id.*:

> For patients with stroke, appropriate early and aggressive intervention is crucial, and can substantially reduce the likelihood of poor outcomes of severe disability and death. Immediate brain imaging (CT or MRI scan) is necessary to determine the type of stroke (ischemic or intracerebral hemorrhage) sustained. When

intracerebral hemorrhage is identified, urgent measures including blood pressure control, correction of bleeding disorders, and medication or surgical intervention can help prevent or minimize expansion of the bleed and swelling of the surrounding brain tissue that can lead to disability or death from tissue damage, additional strokes, or herniation.

Additional facts are included in the Discussion.

## II. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Formica v. Aylor*, ___ F. App'x ___, 2018 WL 3120790, at *7 (4th Cir. June 25, 2018); *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199,

2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is

not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

## III. Discussion

### A. The Constitutional Claims

#### 1. 42 U.S.C. § 1983

Plaintiff argues that the Custody Defendants and the Medical Defendants denied medical care to Ms. Neal, in violation of Eighth Amendment or the Fourteenth Amendment. *See* ECF 56, ¶¶ 153-68. Plaintiff lodges these claims pursuant to 42 U.S.C. § 1983. *See id.* ¶¶ 153-68.

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, ___ U.S. ___, 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere

conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).  The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical."  *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)).

Section 1983 also requires a showing of personal fault based upon a defendant's own conduct.  *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights).  Thus, there is no respondeat superior liability under § 1983.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials in § 1983 claims "is premised on 'a recognition that

supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

## 2.   The Eighth and Fourteenth Amendments

### a.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).  It protects the rights of postconviction detainees.  *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977)).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *DeLonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  The protection conferred by the

Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor*, 817 F.3d at 127.

For a plaintiff to prevail in an Eighth Amendment suit as to the denial of adequate medical care, the defendant's actions or inaction must amount to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

The Due Process Clause of the Fourteenth Amendment protects the rights of pretrial detainees to receive adequate medical care. *Hill v. Nicodemus*, 979 F.2d 987, 990-91 (4th Cir. 1992); *see also Brown*, 240 F.3d at 388 (stating, *inter alia*, that if the decedent "was a pretrial detainee rather than a convicted prisoner, then the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care to *detainees* who require it") (emphasis in *Brown*) (internal quotation marks omitted; citation omitted) (citing, *inter alia*, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); and *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)).

Notably, pretrial detainees "retain at least those constitutional rights [held] by convicted prisoners." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see also Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001). And, a prison official violates a detainee's Fourteenth Amendment rights when the official is deliberately indifferent to the detainee's serious medical needs. *See Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause."); *see also Hill,* 979 F.2d at 991 (adopting the standard of "deliberate indifference" with respect to the level of care

owed to a pretrial detainee under the Fourteenth Amendment); *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) ("Pretrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs.") (emphasis added).

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate" violates the Eighth Amendment and the Fourteenth Amendment. *Farmer*, 511 U.S. at 828; *see Hill*, 979 F.2d at 991. Therefore, a constitutional claim of denial of adequate medical care, whether lodged under the Eighth Amendment or the Fourteenth Amendment, requires a court to analyze the same issue: whether there was deliberate indifference to a serious medical need. *See Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee.") (citing *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988)).

In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). "The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica*, ___ F. App'x ___, 2018 WL 3120790, at *7 (emphasis in *Formica*).

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must

know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38).

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. at 837; *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment *or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention*.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)) (emphasis added); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must also show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

The subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Put another way, "it is not enough that the defendant *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*). The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young*, 238 F.3d at 575-76 ("Deliberate indifference requires a showing that the defendants

actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

Yet, the Supreme Court concluded in *Farmer* that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844; *accord Brown*, 240 F.3d at 390-91. The Constitution requires prison officials to ensure "reasonable safety," a standard that acknowledges prison officials' "unenviable task of keeping [sometimes] dangerous [people] in safe custody under humane conditions[.]" *Id.* at 845 (citations and quotation marks omitted). Accordingly, "prison officials who act reasonably cannot be found liable" under the deliberate indifference standard. *Id.*; *see also Short v. Smoot*, 436 F.3d 422, 428 (4th Cir. 2006) (finding that an officer who responds reasonably to a danger facing an inmate is not liable under the deliberate indifference standard, even when further precautions could have been taken but were not); *Stritehoff v. Green*, CCB-09-3003, 2010 WL 4941990, at *3 (D. Md. Nov. 30, 2010) ("An officer who responds reasonably to 'the risk of which he actually knew' is not liable for deliberate indifference.") (quoting *Brown*, 240 F.3d at 390-91).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). In *Estelle*, 429 U.S. at 106, the Supreme Court said: "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the

victim is a prisoner." What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied,* 529 U.S. 1067, (2000), is also pertinent: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ." *See also Young*, 238 F.3d at 576 (stating that a Fourteenth Amendment deliberate inference claim requires more than a showing of "mere negligence"); *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference.").

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the

inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012); *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at * 2 (D. Md. June 3, 2012); *Robinson v. W. Md. Health Sys. Corp.*, DKC-10-3223, 2011 WL 2713462, at *4 (D. Md. July 8, 2011). And, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

### b.

As the parties recognize, the Fourteenth Amendment protects the rights of pretrial detainees, while the Eighth Amendment applies to postconviction detainees. The defendants contend that, at the time of Ms. Neal's death, she was a postconviction detainee, not a pretrial detainee. ECF 212-1 at 31; ECF 213-1 at 29 n.5. Therefore, they argue that plaintiff's Fourteenth Amendment claim is subject to dismissal, as a matter of law. ECF 212-1 at 31; *see also* ECF 213-1 at 29 n.5.

Plaintiff disagrees. *See* ECF 228 at 43. She suggests that the Decedent was a pretrial detainee in regard to the pending violation of probation charge. But, Bost also argues that because the Fourteenth Amendment and the Eighth Amendment both apply the deliberate indifference standard, the "issue of what constitutional provision governs Plaintiff's claims need not be resolved in order to dispose of Defendants' motions for summary judgment." ECF 228 at 56; *see id.* at 58 n.19 (citing *Brown*, 240 F.3d 383).[28]

_____

[28] According to plaintiff, based on the Supreme Court case of *Kingsley v. Hendrickson*, ___ U.S. ___, 135 S. Ct. 2466, 2470 (2015), there is also a "substantial legal question" as to "whether a claimed denial of care to a pretrial detainee is governed by a subjective deliberate

The deliberate indifference standards under the Eighth Amendment and the Fourteenth Amendment are largely the same. Therefore, I need not resolve whether Ms. Neal was a pretrial detainee or a convicted prisoner, and thus whether the claims arise under the Eighth Amendment or the Fourteenth Amendment. I am satisfied that, for purposes of summary judgment, the distinction is academic with regard to federal law. Therefore, I shall address the issues under the Eighth Amendment.

As to the Eighth Amendment claim, plaintiff contends that the individual Custody Defendants and Medical Defendants were aware of Ms. Neal's serious medical needs and chose to withhold necessary medical care from Ms. Neal. *See* ECF 228 at 12-34. The Custody Defendants argue, *inter alia*, that the provision of medical care to Ms. Neal was the exclusive responsibility of the Medical Defendants. *See* ECF 212-1 at 17-29. Further, they contend that "they were not aware of, or deliberately indifferent to any serious medical need of Ms. Neal." *Id.* at 35; *see also id.* at 35-43. The Custody Defendants also assert protection under qualified immunity. *See* ECF 212-1 at 31-35. The Medical Defendants aver, *inter alia*, that they lacked subjective knowledge of Ms. Neal's serious medical needs. ECF 213-1 at 30-40. Additionally, they contend that the Eighth Amendment claim alleges negligence, not deliberate indifference as

---

indifference standard or by an objective standard under the Due Process Clause" of the Fourteenth Amendment. ECF 228 at 44 n.17.

The plaintiff in *Kingsley* was a pretrial detainee who lodged a § 1983 excessive force claim predicated on the Fourteenth Amendment. He argued that "the correct standard for judging a pretrial detainee's excessive force claim is objective unreasonableness." *Id.* at 2471-72. In other words, the plaintiff argued that he was not required to satisfy a "subjective standard" as to a defendant's state of mind. *Id.* The Supreme Court agreed, concluding that "the relevant standard is objective not subjective." *Id.* at 2472. The Court concluded that "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473.

Plaintiff states that she intends to raise this argument "prior to trial" if her Fourteenth Amendment claim proceeds beyond summary judgment. ECF 228 at 57 n.18; *see also id.* at 44.

to a serious medical need.  ECF 213-1 at 30-40.

## B.  The Individual Defendants: § 1983

The question is whether there is a dispute of material fact as to the conduct of each Custody Defendant and each Medical Defendant in regard to deliberate indifference to a serious medical need.  *See Iqbal*, 556 U.S. at 676; *Wilcox*, 877 F.3d at 170.  The proverbial guilt by association does not apply; the conduct of each party must be considered separately.  *Odom v. S.C. Dep't. of Corr.*, 349 F.3d 765, 771-72  (4th Cir. 2003) (considering whether the individual conduct of each defendant amounted to deliberate indifference).  Moreover, I must construe the facts in the light most favorable to plaintiff.

In *Brown*, 240 F.3d at 390, the Fourth Circuit explained: "In determining the substantiality of the risk that [one defendant officer, among several] knew, and the reasonableness of his response to it, we must consider everything that he was told and observed." Similarly, in *Bishop v. Hackel*, 636 F.3d 757, 768 (6th Cir. 2011), the court said: "[W]e must focus on whether each individual Deputy had the personal involvement necessary to permit a finding of subjective knowledge."  *See also Dale v. Poston*, 548 F.3d 563, 570 (7th Cir. 2008) (stating that a court must examine "what the officer knew and how he responded"); *Grieveson v. Anderson*, 538 F.3d 763, 777-78 (7th Cir. 2008) ("Vague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants.").

### 1.  The Individual Medical Defendants

At the risk of lengthening an already lengthy opinion, I will restate a few of the many salient facts that are pertinent to several defendants.  In making this review, the Court is mindful that a headache is an amorphous and common symptom, often not serious.  Moreover, when a

medical provider hears the proverbial hoof beats, it is arguably reasonable, at least initially, to think horses, not zebras, particularly given Ms. Neal's age. But, if the jury credits the testimony of plaintiff's witnesses, it could conclude that Ms. Neal immediately presented with multiple, significant symptoms — not a mere headache — and that a trained medical professional should have recognized the possibility of a stroke and responded by calling 911 or transporting Ms. Neal to a hospital.[29]

At approximately 2:00 a.m. on November 1, 2012, inmate Sexton awoke to Ms. Neal "walking into things", saying that "something[']s really wrong" and that "her head hurt so bad and she couldn't see." ECF 225-11 at 1; *see also* ECF 228-8 at 11. The WDC Post 83 Logbook (ECF 213-8) reflects that at 2:00 a.m. on that same date, Sexton told Officer Collins that Ms. Neal "was having trouble breathing and that she seem[ed] dizzy." *Id.* at 3. At 2:32 a.m., Collins "notified" medical staff of Ms. Neal's situation. *Id.* As they waited for medical staff to arrive, Ms. Neal "started sweating really bad and saying she was so cold." ECF 225-22 at 1.

Multiple inmates reported that Ms. Neal's serious medical condition was obvious. Inmate Blair averred that when Ms. Neal arrived at the Infirmary on November 1, 2012, Ms. Neal appeared as if she "had suffered from a stroke" because she was "sluggish on one side of her body and was having trouble walking." ECF 225-29, ¶ 6; *see also* ECF 225-38 (Betch Declaration) ¶ 7 (stating Ms. Neal's symptoms were obvious the entire time she was housed in the Infirmary); ECF 225-30 (Saracino Declaration) ¶¶ 6-10 (stating that "[when] Fatima was in the infirmary, it was obvious from what she was saying and doing that she badly needed medical

---

[29] This Memorandum Opinion does not address the serious question of whether prompt medical care would have made a difference in saving Ms. Neal's life, or in securing quality of life. In other words, I do not address the question of how much time was available for the Medical Defendants to provide care before it was too late. These issues were not squarely raised in the Medical Defendants' Motion, although the issues were pertinent to earlier motions in limine.

help"); ECF 225-11 (Sexton's letter to Bost) at 1, 3 (stating that on November 3, 2012, Ms. Neal "looked so sickly" that it was obvious "something was really wrong[.]").

Moreover, several detainees reported that on November 2, 2012, Ms. Neal was "walking with her right side slumped and dragging her right leg." ECF 225-37 (Initial IIU Report); *see also* ECF 225-38 (Declaration of Betch) ¶ 6. Betch claimed that on November 2, 2012, Ms. Neal was "incontinent" and "could not get up to use the bathroom[.]" ECF 225-38, ¶ 6. Similarly, the Initial IIU Report (ECF 225-37) indicated that on November 2, 2012, Ms. Neal remained in bed, was unable to eat or drink, and walked "with her right side slumped and dragging her right leg[.]" *See also* ECF 233-5 (Autopsy Report) at 9.

Windows between the nurses' station and Dorm 3 allowed the Medical Defendants to observe Ms. Neal "at all times" when she was housed at the Infirmary. ECF 225-30 (Declaration of Saracino) ¶ 12; *see* ECF 225-10 (Saracino's letter to Bost) at 2 (stating that Dorm 3 "had a window that the officers & nurses could [use to] see [Ms. Neal] and they watched her for days just go down hill & they did nothing"); ECF 225-26 (Ajayi Deposition) at 32 (acknowledging there was a window nurses and officers used to observe inmates housed in Dorm 3); ECF 225-56 (annotated photographs depicting the windows in Dorm 3). It is reasonable to infer that on November 1, 2012, November 2, 2012, and November 3, 2012, the nurses and other health care providers on duty (Ajayi, Obadina, Ohaneje, Jamal, McNulty, and Wiggins) observed Ms. Neal as she complained of severe head pain, dragged her right leg, experienced incontinence, did not eat, and was unable to get out of bed.

Additionally, multiple inmates asserted that they informed the nurses on duty in the Infirmary that Ms. Neal needed emergency medical attention. *See* ECF 225-29 (Declaration of Blair) ¶ 8 ("Every day, on every shift, I and many other women in the infirmary would tell

nurses, guards, and other individuals that Fatima needed emergency medical help and needed to go to the hospital."); ECF 233-4 at 24 (Inmate Statement of Bennett) (stating that Infirmary staff were "told on numerous occasions of [Ms. Neal's] condition [but] there was little or no response"); ECF 225-10 (Saracino's letter to Bost) at 1-2 (stating that on an unspecified date, Saracino spoke with Ajayi about Ms. Neal's condition, and on another unspecified date, Saracino spoke with an unidentified nurse because Ms. Neal's condition was "getting worse . . . her foot was dragging & her arm was hanging"). Betch asserted that on "numerous" occasions between November 1, 2012, and the early morning hours November 4, 2012, she "told the nurses" on duty that Ms. Neal "needed help." According to Betch, the unidentified nurses said that Ms. Neal's "vital signs were fine" and that Ms. Neal "just wanted attention." *Id.* ¶ 8. The unidentified nurses "also said" that Ms. Neal "was supposed to be released very soon, and said a number of times that she was not going to be there much longer." *Id.*

Moreover, Blair and Betch both averred that Ms. Neal herself repeatedly said that she needed to go to a hospital. ECF 225-29 (Declaration of Blair) ¶ 8 (stating that on unspecified dates Ms. Neal "repeatedly told nurses and guards that she needed to go to the hospital"); ECF 225-38 (Declaration of Betch) ¶¶ 7-8 (stating that "[p]retty much the whole time that Fatima was in the Infirmary . . . [she] kept telling the[ nurses] that her head felt like it was going to explode, and she would have tears in her eyes").

From these facts, it is reasonable to infer that on November 1, 2012, November 2, 2012, and November 3, 2012, the individual Medical Defendants who were present in the Infirmary (Ajayi, Obadina, Ohaneje, Jamal, McNulty, Wiggins, Afre, and El-Sayed) were informed of and/or aware of Ms. Neal's medical symptoms and her condition. Notably, Doctor Evans opined that as early as November 1, 2012, Ms. Neal's symptoms indicated that she likely suffered a

stroke on that date.  ECF 225-19 at 5.

### a.  Anike Ajayi, R.N.

Nurse Ajayi encountered Ms. Neal on at least two dates: November 1, 2012, and November 3, 2012.  ECF 233-6 at 1-2; ECF 225-30, ¶ 12; ECF 225-10.  Ajayi proceeded to the Post 83 dormitory "in the early morning hours" of November 1, 2012, in response to a call made by Officer Collins at 2:32 a.m.  ECF 213-23 at 2, 5; *see* ECF 213-8 at 3.  She found Ms. Neal wrapped in a blanket.  ECF 213-23 at 2-5.  Ajayi expressly noted that Ms. Neal appeared "weak", had a "headache", and her face "showed pain."  ECF 213-23 at 2-5.

Ajayi "generated" a medical record at 2:51 a.m. on November 1, 2012 (ECF 233-6 at 1-2), stating that Ms. Neal's head was "pounding," Motrin was not helping, and Ms. Neal felt "cold."  *Id.*  Ajayi observed that the cause of Ms. Neal's headache was unknown and, significantly, that Ms. Neal had a "knowledge deficit."  *Id.* at 1.  Ajayi also wrote that Ms. Neal was weak and that her "condition [was] not responding to protocol."  *Id.*  Therefore, Ajayi claims to have "contacted" an unidentified "[p]hysician" for "treatment and orders."  *Id.* at 2.  Ajayi also informed Wiggins about Ms. Neal's symptoms.  ECF 225-26 at 24.

At Ajayi's deposition, she acknowledged that glass windows in the nurses' station allowed her and other medical staff to observe Ms. Neal in Dorm 3.  ECF 225-26 at 32.  Accordingly, after Ajayi's initial assessment of Ms. Neal, she was able to continue observing Ms. Neal.

There is no indication Ajayi saw Ms. Neal on November 2, 2012.  But, she again encountered Ms. Neal on November 3, 2012.

Sexton claims that she spoke with Ajayi about Ms. Neal on November 3, 2012.  ECF 225-11 at 2-3. According to Sexton, the conversation occurred in the Infirmary, when it was

clear "something was really wrong with" Ms. Neal.  *Id.* at 1, 3.  On that date, Ms. Neal "looked so sickly. . . . She had no idea what was going on . . . . She kept saying 'her head'" and "'something[']s really wrong.'"  *Id.* at 2.

Additionally, Saracino declared that on an unspecified date she asked Ajayi to help Ms. Neal.  ECF 225-30, ¶ 12.  According to Saracino, Ajayi merely told Saracino that Ms. Neal's "vitals were fine."  ECF 225-10 at 2.

On November 1, 2012, and again on November 3, 2012, Ajayi was aware of Neal's symptoms and her condition.  *See* ECF 213-23 at 2-5; ECF 225-26 at 32; ECF 233-6 at 1-2.  Several inmates advised Ajayi of Ms. Neal's distress.  ECF 225-11 at 2; ECF 225-30, ¶ 12; ECF 225-10.

Viewing the facts in the light most favorable to plaintiff, and drawing all reasonable inferences in favor of plaintiff, as I must, a reasonable jury could conclude that, subjectively, Ajayi was aware of Ms. Neal's serious medical needs but ignored them, and failed to make adequate medical care available to Ms. Neal.  Accordingly, I shall deny the Medical Defendants' Motion as to plaintiff's deliberate indifference claim against Ajayi.

### b.  Elizabeth Obadina, R.N.

Nurse Obadina interacted with Ms. Neal on at least three days: November 1, 2012, November 2, 2012, and November 3, 2012.  *See* ECF 233-6 at 3, 6, 12-13, 30.  According to a medical record created by Obadina at 3:34 a.m. on November 1, 2012 (ECF 233-6 at 3), Ms. Neal "walked from Triage to infirmary" but "was a bit weak."  *Id.*  Blair averred that Ms. Neal "was sluggish on one side of her body and was having trouble walking" when she arrived at the Infirmary.  ECF 225-29, ¶ 6.

Obadina indicated that Ms. Neal was "to be seen by MD in" the morning, and Doctor

Afre was listed as Ms. Neal's "Provider." ECF 233-6 at 3. But, there is no indication Obadina contacted the on call physician. Nor is there any indication that, upon Ms. Neal's arrival, Obadina reported to any physician that Ms. Neal was having trouble walking and was "sluggish on one side of her body."

At 6:59 a.m. on November 1, 2012, Obadina "generated" another medical record, stating that Ms. Neal "continued to be restless" and that a P.A. "came to see" her. ECF 233-6 at 6. She also stated, *inter alia*, that Ms. Neal was "still weak. MD to be notified." *Id.* at 12. In both medical records of November 1, 2012, Obadina stated that should would "continue to monitor" Ms. Neal. *Id.* at 3, 6.

Almost 24 hours later, at 6:56 a.m. on November 2, 2012, Obadina "generated" another medical record for Ms. Neal (ECF 233-6 at 12-13), stating that Ms. Neal was "still weak" and again that a physician was "to be notified." *Id.* at 12. Obadina also wrote that she would "continue to monitor" Ms. Neal "for safety and comfort." *Id.* There is no indication that a doctor was immediately notified. Nor is there any indication that Obadina did in fact monitor Ms. Neal's medical condition.

According to Betch, at an unspecified time on November 2, 2012, Ms. Neal was not only "dragging the right side of her body . . . she was also incontinent, and she could not get up to use the bathroom[.]" ECF 225-38, ¶ 6. Betch averred that she notified unidentified nurses "[n]umerous times" that Ms. Neal "needed help", but that those nurses responded that Ms. Neal's "vitals were fine" and she "just wanted attention." *Id.* ¶ 8. According to Betch, the unidentified nurses also said that Ms. Neal "was supposed to be released very soon, and said a number of times that she was not going to be there much longer." *Id.* Although it is not clear whether Obadina was among the nurses with whom Betch spoke on November 2, 2012, it is clear that she

was at work in the Infirmary on that date. At this juncture, I must draw all reasonable inferences in favor of the non-moving party.

As indicated, the Serious Incident Report of November 4, 2012, stated that at approximately 3:22 a.m. Lieutenant Alves "notified" Obadina that Ms. Neal was "experiencing difficulty breathing." ECF 233-4 at 17-20; *see also* ECF 212-24 at 3. According to Alves, Obadina was awake at that time. ECF 212-20 at 8. However, multiple detainees claim to have witnessed Obadina sleeping while Ms. Neal was unresponsive, and to have repeatedly attempted to awaken Obadina, who did not immediately get up. *See* ECF 225-24 (Declaration of Frye) ¶ 11; ECF 233-4 at 21 (Inmate Statement Form of Dow); ECF 225-14 (Final IIU Report testimony of Brown) at 8.

According to inmate Frye, when Obadina "finally got up" and entered the Infirmary on November 4, 2012, "she acted as if she did not want to touch" Ms. Neal. ECF 225-24, ¶ 12. According to a medical record "generated" by Obadina at 5:29 a.m. on November 4, 2012, 911 was alerted as to Ms. Neal's medical emergency. ECF 233-6 at 30; *see also* ECF 233-4 at 27 (Progress Note written by Obadina). According to inmate Frye, when the "paramedics and emergency medical technicians arrived" at the Infirmary, "[o]ne of them assessed [Ms. Neal] and said that [she] had been dead for a while." ECF 225-24 (Declaration of Frye) ¶ 13.

According to the Final IIU Report, Sergeant Murray interviewed Obadina about Ms. Neal's death. ECF 225-14 at 6. Obadina acknowledged that Ms. Neal "had been complaining that something was wrong with her." ECF 225-14 at 6.

In sum, Obadina encountered Ms. Neal twice on November 1, 2012, at least once on November 2, 2012, and during the night shift between November 3 and 4, 2012. *See* ECF 233-6 at 3, 6, 12-13, 30. As early as November 1, 2012, Obadina would have observed that Ms. Neal

was having trouble walking. *See* ECF 225-29, ¶ 6. Her symptoms persisted into November 2, 2012 (ECF 225-37; ECF 233-5), when Obadina again encountered Ms. Neal. *See* ECF 233-6 at 12-13. On that date, Ms. Neal was reportedly incontinent, could not rise from bed, and struggled to walk. *See* ECF 225-38, ¶ 6. Yet, there is no indication Obadina reported the symptoms to a physician, or otherwise took action to ensure Ms. Neal received adequate medical care.

Viewing these facts in the light most favorable to plaintiff, and drawing all reasonable inferences from them in favor of plaintiff, as I must, there are material disputes as to whether, subjectively, Obadina was aware of Ms. Neal's medical needs but failed to provide adequate care or ensure that care was made available. Accordingly, I shall deny the Medical Defendants' Motion as to the deliberate indifference claim against Obadina.

### c. Ebere Ohaneje, R.N.

Nurse Ohaneje met with Ms. Neal on at least one date, November 2, 2012. *See* ECF 233-6 at 10-11. At 12:30 a.m. on that date, Ohaneje "generated" a "HEALTH ASSESSMENT" for Ms. Neal (*id.*), writing, *inter alia*, that Ms. Neal was "stable no issue to report" and that Ms. Neal had experienced "[n]o vision changes or headaches. . . . No dizziness, no emotional disturbances." *Id*. at 10-11. Yet, the previous day, November 1, 2012, Ms. Neal reportedly had trouble walking and was slumped to one side. *See* ECF 225-29, ¶ 6. And, those symptoms allegedly persisted into November 2, 2012 (ECF 225-37; ECF 233-5) when, at an unspecified time, Ms. Neal also became incontinent and was unable to get out of bed without assistance. *See* ECF 225-38, ¶ 6. Moreover, the window between the nurses' station and Dorm 3 allowed Ohaneje to observe Ms. Neal. *See, e.g.*, ECF 225-56.

Assuming the truth of the allegations as posited by plaintiff, and drawing all reasonable inferences in favor of plaintiff, as I must, Ohaneje ignored Ms. Neal's symptoms or failed to

monitor them. Accordingly, at this juncture, I am satisfied that there are disputes of fact as to whether Ohaneje was aware of Ms. Neal's serious medical needs and failed to make adequate medical care available to Ms. Neal. Accordingly, I shall deny the Medical Defendants' Motion as to the deliberate indifference claim against Ohaneje.

### d. Najma Jamal, R.N.

Nurse Jamal encountered Ms. Neal in the Infirmary on multiple occasions, including on the night of November 2, 2012 (ECF 233-6 at 17-18), the morning and night of November 3, 2012 (*id.* at 19-20, 26-27), and in the early morning hours of November 4, 2012, when Ms. Neal became unresponsive. ECF 233-4 at 28.

Jamal "generated" a medical record for Ms. Neal at 9:34 p.m. on November 2, 2012. *See* ECF 233-6 at 17-18. According to that medical record, Jamal provided Ms. Neal with "Skilled Care." *Id.* at 17. Jamal stated that Ms. Neal "remained in bed all evening" and that her vital signs "were stable" but that Ms. Neal "did not get up for vital signs." *Id.* Jamal also wrote "[n]o vision changes or headaches" and stated that Ms. Neal was "[a]lert and oriented." *Id.* at 18. The medical record created by Jamal on November 2, 2012, makes no mention of any treatment provided. *See* ECF 233-6 at 17-18.

Jamal's description of Ms. Neal flies in the face of evidence produced by plaintiff. *See* ECF 225-37; ECF 233-5; ECF 225-38, ¶ 6. On November 2, 2012, according to plaintiff, Ms. Neal was incontinent and could not get out of bed to use the restroom. *See* ECF 225-37; ECF 233-5; ECF 225-38, ¶ 6. Her complaints of head pain persisted. And, given the evidence of the cause of death, it calls into question the claim of Jamal that Ms. Neal did not have a headache.

Further, Jamal assessed Ms. Neal at 5:18 a.m. on November 3, 2012. ECF 233-6 at 19-20. Jamal indicated that she provided Ms. Neal with "Skilled Care" at that time. *Id.* at 19.

However, she also stated, *id.*: "No changes in condition reported. . . . No episodes of diarrhea or nausea. V[ital] S[igns] were stable. . . . No vision changes or headaches. . . . No dizziness, no emotional disturbances . . . . No weakness. . . . Alert and oriented." Yet, the content of Jamal's assessment is at odds with a medical record written by Nurse McNulty at 3:02 p.m. on November 3, 2012 (ECF 233-6 at 23-25), indicating that Ms. Neal reported being "visually impaired", "had trouble ambulating", was not eating, and rated the painfulness of her headache as 10 out of 10. *Id.* at 23-24. McNulty also wrote, *id.* at 23: "**Risk of injury . . . of falls, Impaired Health Maintenance, Altered Nutritional Intake**." (Bold in original).

Several hours later, between 9:09 p.m. and 9:18 p.m. on November 3, 2012, Jamal wrote that Ms. Neal's "**Condition**" was "**Unchanged**", that Ms. Neal was "Well nourished", "Alert and oriented", had "No weakness", and that Ms. Neal had experienced "No vision changes or headaches." ECF 233-6 at 26-17 (bold and capitals in original). Jamal indicated that she provided "Skilled Care" to Ms. Neal at that time. *Id.* at 26. Yet, there is no indication that she took any action to address any of the medical needs documented by McNulty. *Id.* at 26-27. And, the description provided by Jamal is inconsistent with Neal's actual condition, as evidenced by the autopsy. *See* ECF 225-37; ECF 233-5; ECF 225-38, ¶ 6. A jury could readily conclude that Jamal did not accurately report Ms. Neal's condition, never examined her, and ignored a serious medical need.

Construing these facts in the light most favorable to plaintiff and drawing all reasonable inferences from them in favor of plaintiff, I am satisfied plaintiff has shown material disputes as to whether on November 1, November 2, and/or November 3, 2012, when Jamal was responsible for Ms. Neal's care, Jamal was aware of Ms. Neal's needs but declined to provide adequate medical assistance. Therefore, the Medical Defendants' Motion shall be denied as to the

deliberate indifference claim lodged against Jamal.

### e.  Karen McNulty, R.N.

As noted, Nurse McNulty evaluated Ms. Neal on November 3, 2012.  *See* ECF 233-6 at 23-25.  Between 3:02 p.m. and 3:17 p.m. on that date, McNulty wrote a "HEALTH ASSESSMENT" for Ms. Neal, stating that Ms. Neal was at "**Risk for Injury . . . of Falls, Impaired Health Maintenance, Altered Nutritional Intake**."  *Id.* at 23 (bold in original). McNulty acknowledged that Ms. Neal had "been lying in bed throughout the day", had reported being "visually impaired", and had rated the level of pain caused by her headache as 10 out of 10.  *Id.* at 23-24.  McNulty also acknowledged that Ms. Neal was "not eating" and "had trouble ambulating."  *Id* at 24.

Notably, McNulty stated that she had "continued MD orders" as to Ms. Neal's medical care.  *Id.* at 25.  But, McNulty did not explain what those orders were, beyond "Ibuprofen and Tylenol #3" to alleviate her headache.  *Id.* at 24.

From these facts, a reasonable juror could conclude that when McNulty assessed Ms. Neal on November 3, 2012, McNulty was aware of a serious medical need but did not provide adequate care.  Accordingly, I shall deny the Medical Defendants' Motion as to the deliberate indifference claim against McNulty.

### f.  Andria Wiggins, P.A.

Physician Assistant Wiggins met with Ms. Neal at least two times during the morning of November 1, 2012.  *See* ECF 225-26 at 24; ECF 233-6 at 1-2, 4-5.  According to the medical record "generated" by Ajayi at 2:51 a.m. on that date, she "notified pa wiggins" to seek "further eval" of Ms. Neal's medical needs.  *See* ECF 233-6 at 2.  Ajayi wrote that Ms. Neal's "condition [was] not responding to protocol."  *Id.*  When Wiggins arrived, she made the decision to admit

Ms. Neal to Dorm 3, where she could be observed from the nurses' station. *Id.*; ECF 225-26 at 32; *see also* ECF 225-56. According to Ajayi, Wiggins was "concerned about" Ms. Neal's "headache." ECF 225-26 at 24.

Wiggins knew early on that Ms. Neal had reported that her head was "pounding", that "motrins" were "not helping" with the pain, that Ms. Neal had a "knowledge deficit", and that she felt "cold." ECF 233-6 at 2; ECF 225-26 at 24. Additionally, when Ms. Neal arrived at the Infirmary on November 1, 2012, after being assessed by Wiggins, she was reportedly experiencing difficulty walking and was noticeably sluggish on one side of her body. ECF 225-29, ¶ 6. Yet, there is no indication Wiggins notified the on call physician or took any steps to secure immediate medical care.

At 7:32 a.m. on November 1, 2012, Wiggins "generated" a medical record (ECF 233-6 at 4-5) in which she was identified as Ms. Neal's "Provider." In that same medical record, Wiggins wrote both that Ms. Neal complained about her headache and that Ms. Neal had "[n]o headache." *Id.* at 4-5. According to Wiggins, Ms. Neal was "[a]lert and oriented" and had no "vision changes" or "dizziness." *Id.* But, a jury could credit the testimony of plaintiff's expert witnesses and the autopsy, which are arguably at odds with Wiggins' description of Ms. Neal's condition.

Drawing all reasonable inferences from these facts, and construing the facts in the light most favorable to plaintiff, I am satisfied that there are disputes of facts as to the deliberate indifference claim against Wiggins. A reasonable jury could conclude that Wiggins was aware of the serious medical need but did not provide adequate medical care. Therefore, I shall deny the Medical Defendants' Motion as to the claim of deliberate indifference against Wiggins.

### g. Getachew Afre, M.D.

Doctor Afre was listed as Ms. Neal's medical "Provider" on nearly every medical record

generated by the various individual Medical Defendants. *See* ECF 233-6 at 1-30. Several records also refer to an unidentified medical doctor. *See id.*

As noted, McNulty stated at her deposition that physicians are never present in the Infirmary during the night shift (ECF 213-26 at 4), which is when Ms. Neal was admitted. *See* ECF 233-6 at 1-3. Afre stated that a Wexford physician is "on-call" during night shifts. ECF 213-28 at 4. However, the parties have failed to identify the physician who was on call when Ms. Neal arrived at the Infirmary. *See, e.g.*, ECF 213-9 (On-Call Schedule); ECF 213-28 at 4. Therefore, there is no indication that Afre was the on call physician when Ms. Neal arrived at the Infirmary during the early morning hours of November 1, 2012. Nor is there any indication that he was notified of Ms. Neal's condition but failed to report to the Infirmary.

Nevertheless, it is clear that Doctor Afre examined Ms. Neal on the morning of November 1, 2012, at 10:06 a.m. *See* ECF 233-6 at 1-3, 7-9. Afre would have known from the records that Ms. Neal had complained that her head was "pounding", that Motrin was ineffective for the pain, that she was experiencing a "knowledge deficit", and that she felt "cold" (ECF 233-6 at 2), because these symptoms were documented by Ajayi. Additionally, at 3:34 a.m. on November 1, 2012, Obadina documented that Ms. Neal felt "weak."

Afre "generated" a medical record for Ms. Neal at 10:06 a.m. on November 1, 2012 (ECF 233-6 at 7-9), stating that Ms. Neal was "behaving irraticaly [sic]" and that she had complained of a "severe headache." *Id.* at 7. Yet, he merely prescribed "motrin 600 mg" to be taken every "8 hrs. . . . for the headache" and stated that Ms. Neal "did not want to be disturbed[.]" *Id.* at 9. Afre did not address the claim that Ms. Neal was experiencing a "knowledge deficit." *See* ECF 233-6 at 1-3. Nor did he address her difficulty in walking. Indeed, he did not order a single medical test.

At 10:20 a.m. the following day, November 2, 2012, Afre "generated" a medical record for Ms. Neal (ECF 233-6 at 14-16), stating, *inter alia*, that Ms. Neal told Afre "she still has the headache." *Id.* at 14. However, Afre also wrote that Ms. Neal "denies nausea, vomiting, or blurring of vision. She denies dysphagia, diarrhea or cough." *Id.* Additionally, Afre stated that Ms. Neal was "awake & alert" and that she was experiencing "no acute distress." *Id.* Afre discontinued the prescription of "motrin 600 mg" and instead prescribed "Tylenol-codeine No. 3." *Id.* at 16.

A reasonable jury could conclude that Afre's description of Ms. Neal as "alert" was wide of the mark. The jury need not disregard the medical evidence that demonstrates Ms. Neal suffered a stroke early on November 1, 2012. And, given Ms. Neal's complaints and symptoms, the jury could find deliberate indifference based on Doctor Afre's failure to order even a single medical test in an attempt to determine the cause of Ms. Neal's condition.

Multiple inmates reported that at unspecified times on November 2, 2012, Ms. Neal was dragging her right leg. ECF 225-37; *see also* ECF 225-38, ¶ 6. On that same day, Ms. Neal basically remained in bed, would not eat or drink (ECF 225-37), and was incontinent. ECF 225-38, ¶ 6. But, Afre never addressed these issues.

From these facts, a reasonably jury could conclude that when Afre encountered Ms. Neal on November 1, 2012, November 2, 2012, and was designated as her "Provider" on November 3, 2012, Ms. Neal presented with a severe headache for which pain relievers were ineffective, was not eating, was incontinent, was visually impaired, had cognitive issues, and dragged her right leg. Afre met with Ms. Neal on at least two occasions, and appears to have been informed by other health care providers of her condition. Yet, he did little more than prescribe pain relievers. Therefore, I shall deny the Medical Defendants' Motion as to the deliberate indifference claim

lodged against Doctor Afre.

### h. Jocelyn El-Sayed, M.D.

Doctor El-Sayed "generated" a medical record for Ms. Neal at 7:27 a.m. on November 3, 2012, as Ms. Neal's "Provider." *See* ECF 233-6 at 21-22. She provided "Skilled Care." *Id.* at 21. In the medical record, El-Sayed wrote, *id.*: "Patient was admitted because of severe headache. No complaints of headache this AM. No nausea, no lightheadedness." El-Sayed also wrote: "**Constitutional:** No apparent distress" and "Pain management: On Tylenol # 3." *Id.* (bold in original). Yet, as the record indicates, Ms. Neal presented many additional health concerns prior to and on November 3, 2012.

For example, on November 3, 2012, Sexton said Ms. Neal "looked so sickly." ECF 225-11 at 2. And, Sexton averred that it was obvious that "something was really wrong with" Ms. Neal. *Id.* at 1. Moreover, Ms. Neal "had no idea what was going on" and "kept saying 'her head'" and "'something[']s really wrong.'" *Id.* And, when McNulty assessed Ms. Neal between 3:02 p.m. and 3:17 p.m. on November 3, 2012 (ECF 233-6 at 23-25), McNulty acknowledged that Ms. Neal was "visually impaired", was "not eating", had "trouble ambulating", and had a headache with a "Pain Score" of "10/10." ECF 233-6 at 23-24. A jury could reasonably infer that Ms. Neal presented with these symptoms when El-Sayed evaluated her on November 3, 2012. And, based on the autopsy, a jury could reasonably conclude that Ms. Neal had significant head pain at the precise time Doctor El-Sayed claimed Ms. Neal had no complaint of a headache.

When an inmate's serious medical need is open and obvious, a medical provider may not hide behind his or her ignorance of that need. *See Makdessi*, 789 F.3d at 133; *Iko*, 535 F.3d at 241; *Brice*, 58 F.3d at 101. If plaintiff's witnesses are credited, El-Sayed failed to address any of Ms. Neal's symptoms on November 3, 2012. *See* ECF 233-6 at 21-22. She did not order any

tests for Ms. Neal, or attempt to diagnose Ms. Neal's medical condition.

From these facts, reasonable jurors may determine that El-Sayed turned a blind eye to Ms. Neal's serious medical needs. Therefore, I shall deny the Medical Defendants' Motion as to the claim of deliberate indifference lodged against El-Sayed.

### i. Oby Atta, C.R.N.P.

The only time Nurse Atta appears to have encountered Ms. Neal was in the early morning hours of November 4, 2012. By that time, Ms. Neal was unresponsive. *See* ECF 233-6 at 28-29.

Atta was working a "double shift" that began at approximately 4:00 p.m. on November 3, 2012, and ended at approximately 9:00 a.m. on November 4, 2012. *See* ECF 225-59 (Atta Deposition) at 3-4. During those shifts, Atta worked with the "general population" on the fourth floor of BCDC. *Id.* at 4. The Infirmary is located on the third floor of the WDC. ECF 225-75 (Alves Deposition) at 56.

According to the medical record written by Nurse Atta between 4:42 a.m. and 8:54 a.m. on November 4, 2012 (ECF 233-6 at 28-29), at 3:22 a.m. on that same date, Atta received a call from Obadina "to evaluate" Ms. Neal, who had been "found unresponsive." *Id.* at 28; *see also* ECF 225-59 at 8. Atta made her way from the fourth floor of BCDC to the Infirmary, arriving at Dorm 3 "within minutes" of Obadina's call. *See* ECF 225-59 at 8, 13. When Atta arrived, "it was obvious to [her] that something seriously wrong was happening to Fatima Neal." *Id.* at 9. Atta "immediately" ordered Obadina and Jamal to call 911. *Id.* at 8. Atta then assisted in the provision of emergency care to Ms. Neal. ECF 233-6 at 28. It also appears that Atta attempted to contact the "on-call" doctor, Doctor Kulam, but Doctor Kulam did not respond to the call. *Id.* According to Atta, "Dr. Tewede was called" and "agreed with the plan" to send Ms. Neal to the "ER for evaluation." *Id.*

At 3:50 a.m., Ms. Neal stopped breathing. *Id.* The 911 crew arrived at 3:53 a.m. and left with Ms. Neal at 3:55 a.m. ECF 233-6 at 28; *see also* ECF 233-4 at 29 (Atta's Progress Note); ECF 233-35 (same); ECF 233-6 at 30 (medical record generated by Obadina on November 4, 2012).

Based on the factual record, it does not appear that Atta worked in the Infirmary or was present in the Infirmary prior to 3:22 a.m. on November 4, 2012. ECF 255-59 at 4. Nor do the facts indicate that Atta was otherwise aware of Ms. Neal's medical condition prior to that time. She worked with the BCDC "general population", which was located in a different area of the BCDC complex than the Infirmary. *See id.* at 4, 19. And, there is no indication that Atta, as a supervisor, was aware of the conduct of the other individual Medical Defendants as to Ms. Neal's treatment prior to November 4, 2012.

In my view, these facts do not support an inference that, subjectively, Nurse Atta was aware of Ms. Neal's serious medical needs prior to the early morning hours of November 4, 2012. When Atta did become aware of Ms. Neal's medical needs, she immediately ordered Obadina and Jamal to call 911, attempted to contact the "on-call" physician, and provided emergency medical care to Ms. Neal. *See* ECF 233-6 at 28; ECF 225-59 at 8. Accordingly, I shall grant the Medical Defendants' Motion as to the deliberate indifference claim lodged against Atta.

### j. The Twenty-Five Unnamed Medical Service Providers

As noted, plaintiff lodged suit against twenty-five unnamed medical service providers. *See* ECF 56. However, plaintiff has identified no additional individual medical defendants. Accordingly, I shall grant the Medical Defendants' Motion as to the claim of deliberate indifference asserted against the twenty-five unnamed medical service providers.

## 2. The Individual Custody Defendants

The Custody Defendants contend that they are entitled to summary judgment "because the undisputed evidence demonstrates that no Custody Defendant was deliberately indifferent to the serious medical needs of Ms. Neal." ECF 212-1 at 10-11. To the contrary, they claim that the Custody Defendants promptly "facilitated the provision of care to Ms. Neal as soon as any risk to her health was evident to them." *Id.* at 11. And, they contend that from the moment "Ms. Neal was housed in the WDC infirmary" she was "directly under the care and observation of the Medical Defendants," not the Custody Defendants. ECF 212-1 at 17-18.

Plaintiff counters that the individual Custody Defendants "had a duty to ensure that detainees were safe and received adequate medical care." ECF 228 at 40. Further, plaintiff contends that the Custody Defendants were aware of Ms. Neal's serious medical needs, and "had a duty to monitor detainees in the infirmary and notify someone if the detainees were not receiving appropriate care." *Id.* According to plaintiff "Defendants could not turn a blind eye to detainees experiencing medical issues." *Id.*

Additionally, plaintiff contends the Custody Defendants were deliberately indifferent to Ms. Neal's serious medical needs by virtue of "the chain of command" linking "correctional officers like Ladson" to other BCDC employees, such as Alves, McKnight, Oliver, Foxwell, Atkins, Miles, and Harmon. *Id.* at 40-41. Notably, plaintiff insists that the Custody Defendants "had a duty to notify their supervisors up the chain of command . . . if they saw medical staff ignoring a detainee who needed medical care." *Id.* at 41. Moreover, plaintiff claims that the Custody Defendants were slow to respond to Ms. Neal's medical emergency after Ms. Neal was discovered unresponsive. *Id.* at 47.

Plaintiff directs the Court to a spreadsheet that appears to have been created by counsel

for plaintiff. *See* ECF 228-1 (Appendix: All Defendants' Work Schedules, except Defendant Atkins) at 1. The spreadsheet provides information, *inter alia*, as to the days and hours individual Custody Defendants were scheduled to work at BCDC. *Id.* However, the spreadsheet provides no indication as to whether the individual Custody Defendants were scheduled to work in the Infirmary or another part of the BCDC complex. *Id.* And, BCDC consists of multiple buildings and divisions. *See* ECF 212-1 at 17.

For example, according to plaintiff's spreadsheet, Captain McKnight was scheduled to work from 11:00 p.m. to 6:30 a.m. on October 31, 2012, through November 4, 2012. *See* ECF 228-1 at 1. But, the spreadsheet provides no information as to whether McKnight was stationed in the Infirmary or elsewhere in the BCDC complex. And, McKnight averred at her deposition (ECF 212-18) that she worked in the "BCDC building" not the "WDC building." *Id.* at 3.

In any event, disposition does not turn on when or where the Custody Defendants worked. As the undisputed facts show, this is not a case in which custody personnel ignored health complaints of a prisoner and failed to refer a prisoner for treatment, or interfered with the provision of medical treatment.

At approximately 2:00 a.m. on November 1, 2012, Officer Collins responded to concerns of inmate Sexton regarding Ms. Neal. *See* ECF 213-8. There is no contention of a dilatory response by Collins. Indeed, Collins has not been named as a defendant. Nurse Ajayi responded to the scene and escorted Ms. Neal to the Infirmary triage area. *See* ECF 213-23 at 9; ECF 225-26 at 7; ECF 212-1 at 3. From that point until 911 arrived on November 4, 2012, Ms. Neal was in the care of the Medical Defendants.

Assistant Warden Foxwell testified at his deposition (ECF 212-7) that no BCDC employee was "in charge of medical care" provided to inmates housed at the Infirmary. ECF

212-7 at 10. Nor did any correctional officer have "any role in making medical decisions" at the Infirmary. *Id.* at 10. Consistent with the obvious, Foxwell stated that BCDC correctional officers "don't provide medical attention, [or] medical treatment" because "[t]hey're not trained" to do so. *Id.*

Assistant Warden Oliver testified at her deposition (ECF 212-19) that in October and November 2012, the Infirmary was "run entirely by Wexford employees." ECF 212-19 at 12. Further, Oliver stated that she did not have access to inmates' medical records. *Id.* at 25. Nor was she permitted to make medical decisions for any inmate. *Id.* Moreover, at the deposition of Captain McKnight (ECF 212-18), McKnight stated that only Wexford medical staff were authorized to conduct medical examinations of inmates. ECF 212-18 at 23.

To be sure, Oliver stated that in the fall of 2012, BCDC correctional officers were always present in the Infirmary. ECF 212-19 at 12. But, they were stationed there to provide security; maintain order among the inmates; keep "logbooks" as to visits to the Infirmary by inmates or as to other "activities of the day"; "notify supervisors whenever any problems, issues, or questions" arose; and make "rounds" to ensure the safety of staff and inmates. *Id.* at 12-13.

According to Foxwell, if a "correctional officer saw Wexford medical staff ignoring a detainee who needed medical treatment", BCDC policy required the correctional officer to "[r]eport it to the supervisor." ECF 212-7 at 10. Similarly, Alves testified at her deposition (ECF 212-20) that if a detainee's medical condition was "life threatening", BCDC correctional officers were authorized to "call a medical emergency", which appears to include calling 911 to seek emergency medical assistance. ECF 212-20 at 15; *see also id.* at 12. However, Assistant Commissioner Atkins testified (ECF 212-22) that only medical staff were authorized to determine whether a detainee "needs to go out to the hospital." ECF 212-22 at 7; *see also* ECF

212-18 (McKnight Deposition) at 19 (stating that only Wexford medical staff were "permitted to make the decision to send a detainee to an outside medical provider").

Notably, there is no evidence that any Custody Defendant appreciated the extent of Ms. Neal's serious medical condition. Nor is there evidence that any Custody Defendant had reason to question the medical care that Ms. Neal was receiving.

### a. Officer Cierra Ladson, Lieutenant Valerie Alves, and Captain Carol McKnight

During the night shift between November 3, 2012, and November 4, 2012, Ladson was the Medical Unit Officer, Lieutenant Alves was the supervisor responsible for all WDC correctional officers, and Captain McKnight was the Shift Commander to whom Alves reported. *See* ECF 212-20 (Alves Deposition) at 3; ECF 233-4 at 17-20 (Serious Incident Report).[30]

According to an IIU Duty Officer's Checklist created by IIU Detective Forrest on November 4, 2012 (ECF 225-14 at 12), "Staff discovered [Ms. Neal] unresponsive at 0025 Hrs" on November 4, 2012, in the Infirmary. However, the Duty Officer's Checklist does not identify the "Staff" member who apparently discovered Ms. Neal at that time. Therefore, it is not clear whether the "Staff" member was a BCDC employee or a Wexford employee.

The Post 93 Logbook (ECF 212-24) reflects that at 3:00 a.m. on November 4, 2012, Ladson conducted a "security round" but discovered "no problems to report." *Id.* at 3. At 3:22 a.m., when Ladson returned to the Infirmary after conducting the security round, "[r]esidents in Dorm III alerted [Ladson] that something was severely wrong with" Ms. Neal. ECF 212-24 at 3. Ladson wrote: "Nurses were advise[d] and rushed to Tammy Faller's aid." *Id.* Ladson also wrote, *id.*:

---

[30] As noted, Officer "Ladson has not sought the representation of the Attorney General's Office," is "unrepresented, and has not participated in the defense of this case." ECF 212 at 1 n.1; *see also* ECF 212-1 at 9 n.1. Therefore, no motion for summary judgment was filed on her behalf.

[0]330    Supervisor notified (Lt. Alves), advised Lt. Alves that Medical wants to send [Ms. Neal] out 911. Transport order given to me at 0345. Waiting for escort for 911 run.

0351    Nurses began to give CPR (Lt. Alves on post).

0353    Paramedic[s] arrive[d] to assist nursing staff. . . .

0355    Paramedic[s] removed resident 402 — Tammy Faller . . . .

0400    AW Oliver called and asked me to report the situation to her. . . .

The Serious Incident Report (ECF 233-4 at 17-20) stated that at 3:22 a.m. on November 4, 2012, Ladson informed Alves that she "had just completed a security round when she . . . was alerted by several detainees . . . that [Ms. Neal] was gasping for air." *Id.* at 17. According to the Serious Incident Report, "Ladson immediately notified" Nurse Obadina that Ms. Neal was unresponsive. ECF 233-4 at 20; *see also* ECF 212-24 at 3. The Post 93 Logbook also stated that Ladson notified the "Nurses." ECF 212-24 at 3.

Alves stated at her deposition that *she* "told the nurse, let's go, something is wrong." ECF 212-20 at 8. Although it is not clear whether Ladson, Alves, or both notified the Wexford nurses about Ms. Neal's condition on November 4, 2012, it is clear that the Custody Defendants alerted the Medical Defendants to Ms. Neal's medical emergency at approximately 3:22 a.m. on November 4, 2012. It is also clear that Ladson entered Dorm 3 to assist Ms. Neal (ECF 233-4 at 20), and that Wexford medical staff contacted 911. *Id.*

According to Alves, the 911 crew arrived at the Infirmary at approximately 3:53 a.m. on November 4, 2012. ECF 212-20 at 12; *see also* ECF 233-6 at 28, 30. At that time, Alves called McKnight, asking that two "weapons qualified" BCDC officers be made available to travel to the Hospital with Ms. Neal. ECF 212-20 at 12. After speaking with Alves, McKnight alerted IIU Detective Forrest as to Ms. Neal's situation. ECF 212-18 at 9; *see also* ECF 225-14 at 5, 12.

As indicated, Ms. Neal was transported to the Hospital at 3:55 a.m. on November 4, 2012. ECF 233-6 at 28, 30. At 4:00 a.m. on that same date, Assistant Warden Oliver called

Ladson, asking Ladson to "report the situation to" Oliver. ECF 212-24 at 3. Then, at "approximately" 4:35 a.m., Alves contacted "Regional IIU" to report the incident. ECF 233-4 at 20.

The facts demonstrate that Ladson became aware of Ms. Neal's medical needs at about 3:22 a.m. on November 4, 2012. There is no indication that Ladson was aware of Ms. Neal's medical needs before that time. Moreover, when Ladson learned of Ms. Neal's medical needs, she promptly notified Nurse Obadina and Lieutenant Alves. *See* ECF 233-4 at 20; ECF 212-24 at 3. She also reported the incident to Assistant Warden Oliver soon after Ms. Neal was transported to the Hospital. ECF 212-24 at 3. There is no indication of deliberate indifference on the part of Ladson.

The facts also show that Alves became aware of Ms. Neal's medical needs between 3:22 a.m. and 3:30 a.m. on November 4, 2012. ECF 233-4 at 17-20; ECF 212-24 at 3. There is no indication that Alves was aware of Ms. Neal's medical condition before that time. Indeed, the facts indicate that when Alves learned of Ms. Neal's medical needs, she alerted the Wexford nurses and contacted McKnight to facilitate Ms. Neal's transfer to the Hospital. ECF 212-20 at 12; ECF 233-4 at 17-20.

McKnight became aware of Ms. Neal's medical needs at approximately 3:53 a.m. on November 4, 2012, minutes before Ms. Neal was transported to the Hospital. *See* ECF 212-20 at 12. There is no indication that McKnight was aware of Ms. Neal's medical needs prior to that time. Nor is there any indication McKnight prevented Ms. Neal from receiving medical care. Further, there is no evidence that, as a supervisor, McKnight was aware of wrongful conduct by a subordinate in relation to Ms. Neal's medical needs.

To be sure, inmate Saracino declared that "officers did not help" Ms. Neal when she was

in the Infirmary. ECF 225-30, ¶ 6. And, inmate Blair declared that when Ms. Neal was in the Infirmary, Blair told "guards . . . that Fatima needed emergency medical help." ECF 225-29, ¶ 8. But, these non-specific declarations of unidentified correctional officers do not indicate that Ladson, Alves, or McKnight were aware of the acute nature of Ms. Neal's medical needs.

Accordingly, there is no indication that Alves or McKnight rendered inadequate medical care to Ms. Neal or impeded the delivery of proper care. Therefore, I shall grant the Custody Defendants' Motion as to the deliberate indifference claim as to Alves and McKnight.

As noted, Ladson has not moved for summary judgment. Yet, "district courts may enter summary judgment *sua sponte* 'so long as the losing party was on notice that she had to come forward with all of her evidence.'" *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 661 (4th Cir. 2017) (quoting *Celotex*, 477 U.S. at 326). The Fourth Circuit recently said:

> The notice must be sufficient to provide the losing party with an adequate opportunity to demonstrate a genuine issue of material fact . . . [a]nd it must, in view of the procedural, legal, and factual complexities of the case, allow the party a reasonable opportunity to present all material pertinent to the claims under consideration.

*Velasquez v. Salsas and Beer Restaurant, Inc.*, ___ F. App'x ___, 2018 WL 2411431, at *2 (4th Cir. May 29, 2018) (quoting *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir. 1989)) (alterations in *Velasquez*).

Plaintiff contends in her Opposition that Ladson was aware Ms. Neal had suffered a stroke (ECF 228 at 25), and that Ladson "interacted with Fatima while she suffered strokes[.]" *Id.* at 29. Plaintiff submitted a spreadsheet indicating Ladson worked the night shift between November 3, and 4, 2012. *See* ECF 228-1. The spreadsheet lists no shift for Ladson prior to that night shift. ECF 228-1. Yet, plaintiff argues the spreadsheet "alone justifies denying summary judgment to . . . Ladson . . . ." ECF 228 at 30. Further, plaintiff contends Ladson was made

aware of Ms. Neal's medical needs when Ms. Neal became unresponsive on November 4, 2012 (*id.* at 36), and by virtue of the "chain of command" among BCDC employees. *Id.* at 40-41. Moreover, plaintiff contends Ladson "failed to promptly send Fatima to the hospital" on November 4, 2012. *Id.* at 47.[31]

Although plaintiff contends, in a footnote, that she has "not set out the complete factual record relating to Defendant Ladson" (*id.* at 55 n.15), plaintiff has submitted more than 6,100 pages of memoranda and exhibits in support of her Opposition to the summary judgment motions. *See* ECF 225; ECF 228; ECF 233; ECF 235. And, the Opposition raises numerous arguments as to Ladson. *See* ECF 228 at 25, 29-30, 36, 40-41, 47, 55-56, 60, 63-65, 70-73, 81-82, 102. Indeed, plaintiff dedicates a section of the Opposition to "Custody Defendant Ladson." *Id.* at 72-73.

In my view, plaintiff had a reasonable opportunity to demonstrate a genuine dispute of material fact as to Ladson. Because no such dispute exists, I shall grant summary judgment in favor of Ladson.

### b. Assistant Wardens Gwendolyn Oliver and Ricky Foxwell, Assistant Commissioner Carolyn Atkins, Security Chief Shavella Miles, and Facility Administrator Carol Harmon

At 4:00 a.m. on November 4, 2012, shortly after Ms. Neal was transported to the Hospital, Assistant Warden Oliver called Ladson, asking for a "report" as to what had occurred. *See* ECF 212-24 at 3. Plaintiff has provided no evidence that Oliver knew about Ms. Neal's serious medical needs prior to the phone call with Ladson at 4:00 a.m. on November 4, 2012. Nor has plaintiff shown that Oliver had any knowledge that Wexford failed to provide adequate medical care, or otherwise personally acted in any way to prevent Ms. Neal from receiving

---

[31] Even assuming that Ladson failed to respond promptly on November 4, 2012, it would seem that by that point in time, it was clearly too late to save Ms. Neal.

adequate medical care.

Further, plaintiff has provided no evidence showing Assistant Warden Foxwell, Assistant Commissioner Atkins, Security Chief Miles, or Facility Administrator Harmon ever became aware of Ms. Neal's serious medical needs. Nor is there any indication that Foxwell, Atkins, Miles, or Harmon had knowledge that Wexford employees were not providing adequate medical care. And, there is no evidence that they personally failed to make adequate medical care available to Ms. Neal, or impeded the provision of such care. Moreover, there is no evidence showing that they were aware of wrongful conduct by a subordinate as to Ms. Neal's medical needs.

Therefore, I shall grant the Custody Defendants' Motion as to the deliberate indifference claim lodged against Oliver, Foxwell, Atkins, Miles, and Harmon.

### c. The Twenty-Five Unnamed Custody Officers

As indicated, plaintiff lodged deliberate indifference claims against twenty-five unnamed custody officers. ECF 56. However, plaintiff has identified no additional individual Custody Defendant. Accordingly, I shall grant the Custody Defendants' Motion as to the twenty-five unnamed custody officers.

### C. Qualified Immunity as to the Custody Defendants

Even assuming, *arguendo*, that plaintiff had shown a dispute of material fact as to whether the individual Custody Defendants knew of Ms. Neal's serious medical needs and failed to secure adequate medical care for her, plaintiff would not prevail. This is because, in my view, the Custody Defendants would be entitled to qualified immunity.

"Qualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were

lawful." *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto*, 841 F.3d at 235. In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Saucier v. Katz*, 533 U.S. 194, 206 (2001), overruled in part by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Wilson v. Prince George's Cty., Md.*, ___ F.3d ___, 2018 WL 3015045, at *3 (4th Cir. June 18, 2018); *O'Neal v. Rollyson*, ___ F. App'x ___, 2018 WL 1975049, at *1 (4th Cir. Apr. 26, 2018) (per curiam); *Spivey v. Norris*, ___ F. App'x ___, 2018 WL 1768248, at *3 (4th Cir. Apr. 12, 2018); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012). Thus, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.

Notably, qualified immunity is an "'immunity from suit rather than a mere defense to liability' . . . ." *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting Mitchell, 472 U.S. at 526).

As the Supreme Court has explained, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform

their duties reasonably." *Pearson*, 555 U.S. at 231. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam). Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow*, 457 U.S. at 818, and so an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. The doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). In other words, qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, ___ U.S. ___, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (en banc), *cert. denied*, 565 U.S. 1062 (2011) (citation omitted).

The Fourth Circuit has explained: "In determining whether defendant government

officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of Bald Head Island, NC*, 891 F.3d 489, 497 (4th Cir. 2018). Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," *Saucier,* 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Owens,* 767 F.3d at 395-96. The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct.[] Accordingly, even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, ___ F.3d ___, 2018 WL 3015045, at *3 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)) (other citation omitted); *see also Greene v. Feaster*, ___ F. App'x ___, 2018 WL 2059516, at *2 (4th Cir. May 2, 2018) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'")

(quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 170 (4th Cir. 2016)).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818; *see also Wilson*, ___ F.3d ___, 2018 WL 3015045, at *5. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue. *Scinto*, 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, ___U.S. ___, 135 S. Ct. 348, 350 (2014) (quoting *Creighton*, 483 U.S. at 640). Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself." *Owens*, 767 F.3d at 399.

Generally, to "determine whether a right is clearly established", courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[l] the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, ___ F.3d ___, 2018 WL 3015045, at *5 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)) (hereinafter, "*Layne*") (other

citation omitted); *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir. 2010) (citations omitted), *cert. denied*, 562 U.S. 890 (2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 135 S. Ct. at 350 (quoting *al-Kidd*, 563 U.S. at 741); *see Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1152 (2018); *White v. Pauly,* ___ U.S. ___, 137 S. Ct. 548, 551 (2017) (per curiam); *San Francisco v. Sheehan*, ___U.S. ___, 135 S. Ct. 1765, 1774 (2015) (hereinafter, "*Sheehan*"); *Plumhoff v. Rickard*, ___ U.S. ___, 134 S. Ct. 2012, 2023 (2014); *see also Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012) ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'") (citation and some quotation marks omitted).

Notably, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, ___ F.3d ___, 2018 WL 3015045, at *5 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Indeed, the Supreme Court has never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d, at 582-83. But, "courts are 'not to define clearly established law at a high level of generality.'" *Wilson*, ___ F.3d ___, 2018 WL 3015045, at *5 (quoting *Kisela*, 138 S. Ct. at 1152); *see also Sheehan*, 135 S. Ct. at 1775-76. Therefore, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015)) (per curiam).

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Layne*, 141 F.3d at 114); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

The Custody Defendants argue it was the Medical Defendants who "retained and exercised independent medical judgment while caring for Ms. Neal." ECF 212-1 at 34. And, the Custody Defendants maintain that they lacked "any medical training, licensure, or knowledge of Fatima Neal's medical condition," and had no "constitutional duty to step into the shoes of the Medical Defendants." *Id.*

Bost insists that "Fourth Circuit precedent forecloses that position." ECF 228 at 89. She points to *Iko v. Shreve*, 535 F.3d 225, arguing that after *Iko* was decided in 2008, "correctional officers who are themselves deliberately indifferent to a serious medical condition cannot claim that they are entitled to immunity because they defer to the judgment of medical personnel, particularly where the medical personnel have provided no treatment at all." ECF 228 at 90.

*Iko* is factually inapposite. In *Iko*, 535 F.3d at 230-33, correctional officers repeatedly pepper sprayed the inmate. After Iko was sprayed the first time, he experienced difficulty communicating verbally. *Id.* at 231. Over the next two days, Iko's behavior became "erratic." *Id.* And, when correctional officers attempted to transfer Iko from one cell to another, he became verbally nonresponsive and "lay passively on the floor of his cell." *Id.* "To effectuate the transfer, prison authorities utilized a procedure called a 'cell extraction'", which was

recorded on video.  *Id.*  To remove Iko from the cell, the officers twice deployed a "pepper spray 'fogger.'"  *Id.*  Iko eventually rose to his feet, but he failed to follow the officers' command to turn so that his arms were behind his back.  *Id.*  Therefore, the officers deployed the pepper spray fogger in Iko's cell again, causing him to "again lay down on the floor of his cell."  *Id.* at 232.  The officers deployed pepper spray into the cell two additional times.  535 F.3d at 232.  Iko was "lying still on the floor when the extraction team entered his cell."  *Id.*  The officers shackled Iko and placed a "spit mask" over his head, to prevent him from spitting on an officer.  *Id.*  The officers then brought Iko to a "medical room" to be examined by a nurse.  *Id.*  Although the nurse met with Iko, she provided no medical care.  *Id.*  Iko then collapsed, and the officers used a wheelchair to transport him to a new cell.  *Id.*  They did not remove the spit mask from Iko's head, nor did they remove Iko's clothing, which was contaminated with pepper spray.  *Id.*  Instead, they placed him "face down on the floor" of the cell and "continued to restrain [him] by kneeling and otherwise exerting downward pressure on . . . his head, neck, shoulders, stomach, waist and legs."  *Id.*  After changing Iko's handcuffs, the officers left him "face down, arms restrained behind his back, and spit mask still on."  *Id.*  When the officers reentered Iko's cell later that same day, he was dead.  *Id.* at 233.  A state medical examiner concluded that Iko died of asphyxia caused by the pepper spray.  *Id.*

Members of Iko's family brought suit pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, deliberate indifference under the Eighth Amendment.  *Id.* at 229-30.  The officers moved for summary judgment based on qualified immunity.  *Id.* at 230.  The district court denied the motion as to the deliberate indifference claim.  *Id.* at 233.  On appeal, the officers argued "they were entitled to defer to the actions and medical decisions of the nurse" who met with Iko but provided no medical care.  *Id.* at 242.

The Fourth Circuit disagreed, stating, *inter alia*: "This case does not . . . present a situation in which prison officials might be held liable for the actions or inactions of a medical professional. The officers face liability for *their own* decisions, made while Iko was in their charge." *Id.* at 242 (emphasis in *Iko*). The Court also noted it was "undisputed that Iko received *no* medical treatment whatsoever." *Id.* (emphasis in *Iko*). Accordingly, the Court concluded, *id.* at 243: "[T]he officers' actions—namely, shuttling Iko into a wheelchair upon his collapse without seeking any medical evaluation or even decontamination—were an insufficient response to Iko's serious medical needs. Because those needs were objectively serious and the officers were subjectively aware of that seriousness and chose to do nothing, the officers' actions on these facts violated Iko's Eighth Amendment right to adequate medical care." Therefore, the Court denied qualified immunity to the officers. *Id.*

This case is altogether unlike *Iko*. There, the correctional officers applied excessive force to the inmate. And, they made their own decisions while the inmate "was in their charge," for which they were responsible. *Iko*, 535 F.3d at 242.

Plaintiff does not allege that, when Ms. Neal first took ill, the correctional officials responded inadequately. To the contrary, in the early morning hours of November 1, 2012, Officer Collins contacted Nurse Ajayi to report Ms. Neal's medical condition. ECF 213-8. From the point in time when Ajayi arrived at the dorm in the early hours of November 1, 2012, until Ms. Neal's removal from the Infirmary on November 4, 2012, Ms. Neal was in the care of Wexford personnel; she was never in the charge of the Custody Defendants.

Bost seeks to hold the Custody Defendants responsible for what she regards as an informed decision by them not to intervene on behalf of Ms. Neal. But, at the relevant time, Ms. Neal was not in the charge of the Custody Defendants. *Iko*, 535 F.3d at 242. As I see it, Bost

seeks to hold the Custody Defendants liable for the conduct of the Medical Defendants while Ms. Neal was in the care of the Medical Defendants. And, unlike in *Iko*, the individual Custody Defendants here did not precipitate Ms. Neal's need for medical care with the use of force. *See Iko*, 535 F.3d at 232-33.

Further, plaintiff has provided no facts indicating the individual Custody Defendants were aware of the alleged inadequate medical care. Even if the inmates complained to the guards about the lack of adequate medical care provided to Ms. Neal, the Custody Defendants are not trained health care providers; it is not apparent why they would have had a reason to question or challenge the decisions of trained health care providers. *Cf. Adams*, 884 F.3d at 227 ("In *Iko*, we . . . concluded that where an inmate collapsed and did not respond after officers covered the inmate's face and mouth with a 'spit mask' and sprayed him with significant amounts of pepper spray, 'even a lay person' would have known that the inmate required medical attention."). In any event, when Ladson learned of an urgent problem on November 4, 2012, she quickly alerted the Medical Defendants. Further, Alves and McKnight took action to transport Ms. Neal to the Hospital. *See* ECF 212-20 at 12.

In the context of this case, I am satisfied that it would not have been clear to a reasonable correctional officer, untrained in medical matters, and unfamiliar with the particulars of an inmate's illness, that he or she had a duty to monitor the quality of health care administered by trained health care professionals and to challenge the adequacy of that care. Plaintiff has not cited a single case that supports such a legal proposition. Therefore, in the absence of any clearly established law creating such a duty under the facts of this case, the individual Custody Defendants would be entitled to qualified immunity.

## D. Article 24 of the Maryland Declaration of Rights

As noted, plaintiff has alleged a claim against all defendants pursuant to Article 24 of the Maryland Declaration of Rights. ECF 56, ¶¶ 187-206. Article 24 of provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Article 24 is the State's constitutional guarantee of due process and equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 41 n.11, 838 A.2d 1225, 1237 n.11 (2003). Moreover, it "is the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett,* 955 F. Supp. 2d 474 (D. Md. 2013) (quotation marks omitted). And, Article 24 is ordinarily interpreted *in pari materia* with its federal analog. *See, e.g.*, *Littleton v. Swonger*, 502 F. App'x 271, 274 (4th Cir. 2012) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[]"); *Dent v. Montgomery Cty. Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[]"); *Tyler v. City of College Park,* 415 Md. 475, 499-500, 3 A.3d 421, 435 (2010) (recognizing that Maryland courts "interpret Article 24 *in pari materia* with the Fourteenth Amendment to the United States Constitution."); *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (same).

In other words, Article 24 "has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.'" *Frey v. Comptroller of Treasury*, 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Attorney Gen. of Md. v. Waldron*, 289 Md. 683, 704, 426 A.2d 929, 941 (1981)). "Therefore, the analysis

under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Hawkins*, 955 F. Supp. 2d 474.

To the extent that plaintiff lodges a claim under the Fourteenth Amendment, Article 24 is relevant. As discussed, *supra*, the Fourteenth Amendment protects the rights of pretrial detainees. In their motions, however, the defendants contend that, at the relevant time, Ms. Neal was not a pretrial detainee. *See* ECF 213-1 at 46; ECF 212-1 at 43. If Ms. Neal was in postconviction status, as defendants argue, her federal claims would be rooted in the Eighth Amendment, and Article 24 would not apply. *See* ECF 213-1 at 46; ECF 212-1 at 43.

The Maryland Court of Appeals has consistently construed Article 25 of the Maryland Declaration of Rights as being *in pari materia* with the Eighth Amendment. *See Evans v. State*, 396 Md. 256, 327, 914 A.2d 25, 67 (2006). Article 25 provides: "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law." But, plaintiff did not lodge a claim under Article 25. However, as discussed, *supra*, in the context of the federal deliberate indifference claims, I need not determine at this juncture whether, at the time of Ms. Neal's death, she was a pretrial detainee or a postconviction detainee.

Qualified immunity is not a defense to a claim brought under Article 24 of the Maryland Declaration of Rights. *See Littleton*, 502 F. App'x at 274 & n.2 (citing *Okwa v. Harper*, 360 Md. 161, 757 A.2d 118, 140 (2000)); *see also Wallace v. Poulos*, DKC-8-261, 2009 WL 3216622, at *15 (D. Md. Sept. 29, 2009) (qualified immunity is not a defense to an Article 24 claim). Unlike a federal constitutional claim, a Maryland constitutional claim under Article 24 is not subject to an analysis that considers whether the right in question "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in

which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (citation omitted). Instead, a court may consider potentially applicable state law immunities, if raised as defenses.

The Custody Defendants contend, *inter alia*, that as State employees, they are "shielded" from plaintiff's Article 24 claim by the Maryland Tort Claims Act ("MTCA"), the relevant portions of which are codified at S.G. § 12-104 and C.J. §§ 5-522(a)(4), (b). The Medical Defendants do not claim protection under the MTCA.

The MTCA offers "a limited waiver of sovereign immunity and 'is the sole means by which the State of Maryland may be sued in tort.'" *Paulone v. City of Frederick*, 718 F. Supp. 2d 626, 637 (D. Md. 2010) (citation omitted); *see Condon v. Md.-Univ. of Md.*, 332 Md. 481, 492, 632 A.2d 753, 758 (1993); *Mitchell v. Housing Auth. of Balt. City*, 200 Md. App. 176, 201-202, 26 A.3d 1012, 1027-28 (2011). It grants State personnel immunity from liability "for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." C.J. § 5-522(b); *see also* C.J. § 5-522(a)(4) ("Immunity of the State is not waived . . . for . . . Any tortious act or omission of State personnel that: (i) Is not within the scope of the public duties of the State personnel; or (ii) Is made with malice or gross negligence[.]"); S.G. § 12-105 ("State personnel shall have the immunity from liability described under § 5–522(b) of the Courts and Judicial Proceedings Article.").

Additionally, S.G. § 12-104 states, in part:

(a)(1) Subject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this subsection.

(2) The liability of the State and its units may not exceed $400,000 to a single claimant for injuries arising from a single incident or occurrence.

(b) Immunity is not waived under this section as described under § 5-522(a) of the Courts and Judicial Proceedings Article.

*See also Cooper v. Rodriguez*, 443 Md. 680, 707, 118 A.3d 829, 845 (2015).

The "MTCA does not distinguish between constitutional torts and common law torts. Accordingly, the same standards of malice and gross negligence govern" state common-law tort claims and violations of state constitutional rights. *Newell v. Runnels*, 407 Md. 578, 640 n.28, 967 A.2d 729, 766 n.28 (2009). Moreover, statutory immunity under the MTCA applies to both negligence and intentional torts. *See Lee v. Cline*, 384 Md. 245, 266, 863 A.2d 297, 310 (2004); *see also Espina v. Jackson*, 442 Md. 311, 325, 112 A.3d 442, 450 (2015).[32]

The Maryland Court of Appeals has made clear that, when State personnel act within the scope of their employment, MTCA immunity applies, unless the defendants exhibited actual malice, *i.e.*, "'heinous conduct, characterized by fraud, ill will, spite, evil motive, conscious wrongdoing, or intent to injure,'" *DiPino v. Davis,* 354 Md. 18, 56, 729 A.2d 354, 374 (1999) (citation omitted), or gross negligence, which occurs when the defendants act "'in reckless disregard of the consequences as affecting the life or property of another . . . without the exertion of any effort to avoid them . . . or [are] so utterly indifferent to the rights of others that [they] act[ ] as if such rights did not exist.'" *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007) (citation omitted).

For purposes of MTCA immunity, "malice" refers to so-called "actual malice," *i.e.*, "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Lee*, 384 Md. at 268, 863 A.3d at 311 (citation omitted). Gross

---

[32] Statutory immunity under the MTCA is distinct from Maryland's common law doctrine of public official immunity, which "is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct." *Lee*, 384 Md. at 258, 863 A.2d at 305.

negligence means "'an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Newell,* 407 Md. at 638, 967 A.2d at 764 (citation and internal footnote omitted); *see also Cooper*, 443 Md. at 686, 118 A.3d at 832-33. Put another way, gross negligence is found when a State employee is so "'utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Newell,* 407 Md. at 638, 967 A.2d at 764-65 (citation omitted).

"[S]tate personnel are not immune from suit and liability in tort when the plaintiff's complaint *sufficiently* alleges malice or gross negligence." *Barbre,* 402 Md. at 181-82, 935 A.2d at 714 (2007) (emphasis in original). And, "[o]rdinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Taylor v. Harford Cty. Dep't of Social Servs.,* 384 Md. 213, 229, 862 A.2d 1026, 1034 (2004) (citation and internal quotation marks omitted); *see Cooper*, 443 Md. at 709, 118 A.3d at 846 (stating that determination of whether the actions of a defendant constitute gross negligence is ordinarily left to the trier of fact); *Romanesk v. Rose*, 248 Md. 420, 423, 237 A.2d 12, 14 (1968) ("Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case[,]" and "is usually a question for the jury and is a question of law only when reasonable [people] could not differ as to the rational conclusion to be reached.") (citations omitted).

Therefore, I shall deny, without prejudice, the Medical Defendants' Motion as to the Article 24 claim lodged against Ajayi, Obadina, Ohaneje, Jamal, McNulty, Wiggins, Afre, and El-Sayed. But, I shall grant the Medical Defendants' Motion as to the Article 24 claim against Atta and the twenty-five unnamed medical service providers.

Moreover, because I shall grant the Custody Defendants' Motion as to the deliberate indifference claim, I shall also grant their Motion as to the Article 24 claim lodged against Miles, McKnight, Alves, Oliver, Atkins, Foxwell, Harmon, and the twenty-five unnamed custody officers. And, because plaintiff had a reasonable opportunity to establish a dispute of material fact as to Ladson, but failed to do so, I shall also grant summary judgment in favor of Ladson as to the Article 24 claim. *See Penley*, 876 F.3d at 661; *Velasquez*, 2018 WL 2411431, at *2.

### E. Intentional Infliction of Emotional Distress

As indicated, plaintiff has lodged a claim of IIED against all defendants. *See* ECF 56, ¶¶ 226-37. A claim for intentional infliction of emotional distress is disfavored in Maryland, difficult to establish, and is "rarely viable." *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011).

In order to prevail on a claim for IIED in Maryland, a plaintiff must show that (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there is a causal connection between the defendant's wrongful conduct and the emotional distress; and (4) the emotional distress was severe. *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977); *accord, e.g.*, *Manikhi v. MTA*, 360 Md. 333, 758 A.2d 95, 112, 113 (2000); *Mixter v. Farmer*, 215 Md. App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann*, 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010); *see also Veney v. Prince George's Cty.*, No. 1313, Sept. Term 2016, 2018 WL 1778644, at *6 (Md. Ct. Spec. App. Apr. 13, 2018).

Notably, the "extreme and outrageous" standard is quite high. *See generally Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995) (stating that the tort of intentional infliction of emotional distress is "difficult to satisfy"), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996). The defendant's conduct must be "'so extreme in degree as to go

beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Arsham v. Mayor & City Council of Baltimore*, 85 F. Supp. 3d 841, 850 (D. Md. 2015) (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614). Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59-60, 502 A.2d 1057, 1064, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986)), *aff'd*, 166 F.3d 1208 (4th Cir. 1998). Moreover, since the Maryland Court of Appeals first recognized the tort of IIED in 1977, *Harris*, 281 Md. 560, 380 A.2d 611, it has repeatedly advised that "recovery" for IIED "will be meted out sparingly[.]" *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653, 584 A.2d 69, 75 (1991); *see Batson v. Shiflett*, 325 Md. 684, 733, 602 A.2d 1191, 1216 (1992); *Caldor, Inc. v. Bowden*, 330 Md. 632, 642, 625 A.2d 959, 963 (1993).

In her Opposition (ECF 228), plaintiff argues, *inter alia*, that the defendants "left Fatima's strokes untreated," which constituted "extreme and outrageous" conduct. ECF 228 at 97-99. Plaintiff also asserts that the "Defendants behaved with abandon toward Fatima because they thought she was about to be released" from confinement at BCDC. *Id.* at 97. And, plaintiff avers that Ms. Neal "suffered emotional distress as a result of her untreated strokes in the days before she died." *Id.* at 99.

## 1.

In their Motion (ECF 212), the Custody Defendants contend that none of the individual Custody Defendants "knew that Ms. Neal had a serious medical need prior to the time Lt. Alves and Captain McKnight were informed on the morning of November 4 that Ms. Neal was going to be taken to the hospital, and no Custody Defendant acted in any way to prevent the

administration of medical treatment to Ms. Neal." ECF 212-1 at 49. Therefore, they argue that "[t]here is no extreme, outrageous, atrocious or intolerable conduct in the record on the part of the Custody Defendants." *Id.* Additionally, the Custody Defendants state: "[G]iven that the Custody Defendants enjoy the protection of the [MTCA], Plaintiff must also show that the alleged conduct was malicious or grossly negligent." *Id.* at 47-48.

Plaintiff does not dispute that the individual Custody Defendants are State personnel or that BCDC is an entity of the State. *See* ECF 228-1 at 101-02. Rather, plaintiff contends that her IIED claim "depend[s] upon evidence showing more than gross negligence," and so is "not barred by the MTCA." *Id.* at 102.

I need not repeat the evidence previously summarized. In my view, there is no evidence of malice or gross negligence on the part of any Custody Defendant.

Plaintiff has not established that, under the facts of this case, the Custody Defendants, untrained in the medical profession, were required to intervene in matters of medical care and usurp the authority of the health care providers. I am satisfied that there is no dispute of fact as to whether the conduct of the individual Custody Defendants was so extreme and outrageous as to amount to IIED. Nor is there a dispute of fact as to whether the Custody Defendants' conduct was intentionally or recklessly indifferent to the well-being of Ms. Neal.

Therefore, I shall grant the Custody Defendants' Motion as to the IIED claim lodged against Miles, McKnight, Alves, Oliver, Atkins, Foxwell, Harmon, and the twenty-five unnamed custody officers. Although Ladson has not moved for summary judgment, plaintiff had a reasonable opportunity to establish a dispute of material fact as to her, but failed do so. *See* ECF 228 at 25, 29-30, 36, 40-41, 47, 55-56, 60, 63-65, 70-73, 81-82, 102; *see also* ECF 225; ECF 233; ECF 235. Accordingly, I shall grant summary judgment in favor of Ladson as to the IIED

claim.  *See Penley*, 876 F.3d at 661; *Velasquez*, 2018 WL 2411431, at *2.

**2.**

In their Motion (ECF 213), the Medical Defendants argue that "Plaintiff cannot identify evidence that would allow a jury to find in her favor on a single element of her intentional infliction of emotional distress claim against any individual medical defendant."  ECF 213-1 at 40; *see also id.* at 41-44.  Plaintiff counters that Ms. Neal suffered emotional distress when the Medical Defendants failed to provide her adequate medical treatment.  *See* ECF 228 at 97-99.

It is worth emphasizing that the tort of IIED "clearly requires '*intentional infliction*' of emotional distress."  *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 671, 607 A.2d 8, 12 (1992) (emphasis added).  In my view, cases in which IIED is properly alleged differ in kind from the suit *sub judice*.

For example, in *Young v. Hartford Acc. & Indem. Co*., 303 Md. 182, 197-99, 492 A.2d 1270, 1277-78 (1985), the Maryland Court of Appeals concluded that the plaintiff alleged facts sufficient to state a claim of IIED.  There, the plaintiff claimed to have warned the defendant that a medical examination would cause her emotional distress, yet the defendant "nevertheless proceeded" with the examination for the "'sole purpose of . . . harass[ing] the Plaintiff into abandoning her claim, or into committing suicide.'"  *Id.* at 198, 492 A.2d at 1277 (citation omitted).

In *Figueiredo-Torres*, 321 Md. 642, 646-55, 584 A.2d 69, 71-76 (1991), the plaintiff alleged his marriage counselor, a psychologist, knew he was "particularly susceptible to emotional upset" but nevertheless "engaged in conduct destructive to his ego."  *Id.* at 646, 584 A.2d at 71.  In particular, the psychologist allegedly advised the plaintiff "to be distant from his wife, not to engage in intimate and/or sexual contact with her, and ultimately to separate from

her", while the psychologist "commenced a romantic relationship" with the wife, including "'repeated sexual intercourse' with her." *Id.* at 646, 584 A.2d at 71 (citation omitted). Based on these allegations, the Maryland Court of Appeals concluded the plaintiff had stated a claim for IIED. *Id.* at 658, 584 A.2d at 77.

Viewing the facts in the light most favorable to plaintiff, and drawing all reasonable inferences in her favor, I am satisfied that the conduct of the Medical Defendants does not amount to the tort of IIED. Even assuming the Medical Defendants were deliberately indifferent to Ms. Neal's serious medical needs, their ostensible failure to provide adequate medical care does not establish grounds for IIED. There are no facts from which a reasonable juror could conclude that the Medical Defendants acted with the intent to cause Ms. Neal severe emotional distress, or that their conduct was extreme and outrageous within the meaning of the tort of IIED.

Accordingly, I shall grant the Medical Defendants' Motion as to the IIED claim lodged against the Medical Defendants.

### F. Medical Malpractice

Plaintiff asserts a claim of medical malpractice under Maryland law as to the Medical Defendants. ECF 56, ¶¶ 207-17.[33] The Maryland Court of Appeals has said, *Dingle v. Belin*,

---

[33] In order to bring a medical malpractice claim under Maryland law, a plaintiff must comply with the requirements of Maryland's Health Care Malpractice Claims Act (the "Act"). *See* C.J. §§ 3-2A-01 *et seq*. Prior to bringing suit under Maryland law, a plaintiff must pursue arbitration with the Health Care Alternative Dispute Resolution Office ("HCADRO"), C.J. § 3-2A-04(a)(1)(i), or waive arbitration. *See* C.J. § 3-2A-06B(a). A party who waives arbitration "shall file a complaint and a copy of the election to waive arbitration in the appropriate circuit court or the United States District Court." C.J. § 3-2A-06B(f)(1); *see also Rowland v. Patterson*, 882 F.2d 97, 99 (4th Cir. 1989) ("Most critically, the precondition itself must be enforced by [federal] courts."); *Alvarez v. Md. Dept. Of Corr.*, PX-17-141, 2018 WL 1211533, at *8 (D. Md. Mar. 8, 2018) (stating that arbitration is a condition precedent to filing a medical malpractice suit).

Plaintiff did not submit a copy of the election to waive arbitration with her Complaint

358 Md. 354, 368, 749 A.2d 157, 164 (2000): "The traditional [medical malpractice] action has been for negligence in the performance (or non-performance) of a course of therapy or a medical procedure."

In Maryland, a "*prima facie* case of medical malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of." *Weimer v. Hetrick,* 309 Md. 536, 553, 525 A.2d 643, 651 (1987) (citation omitted); *see Dehn v. Edgecombe*, 384 Md. 606, 610, 865 A.2d 603, 618 (2005) ("Medical malpractice 'is predicated upon the failure to exercise requisite medical skill and, being tortious in nature, general rules of negligence usually apply in determining liability.'") (quoting *Benson v. Mays,* 245 Md. 632, 636, 227 A.2d 220, 223 (1967)); *see also Univ. of Md. Med. Sys. Corp. v. Gholston,* 203 Md. App. 321, 330, 37 A.3d 1074, 1078 (2012) ("The elements of the tort [of medical malpractice] are duty (standard of care); breach of the standard of care; causation of injury; and damages.").

This standard applies in federal court. *Ford v. United States*, 165 F. Supp. 3d 400, 422-23 (D. Md. 2016) (stating that the elements of a medical malpractice claim include: "(1) the applicable standard of care; (2) that this standard has been breached; and (3) a causal relationship between the violation and the injury"); *see Lawson v. United States,* 454 F. Supp. 2d 373, 416 (D. Md. 2006) (same). In a medical malpractice suit, if proof of any of the elements is lacking, "'the court may rule, in its general power to pass upon the sufficiency of the evidence, that there is not sufficient evidence to go [to] the jury.'" *Rodriguez v. Clark*, 400 Md. 39, 71, 926 A.2d 736, 755 (2007) (quoting *Fink v. Steele,* 166 Md. 354, 361, 171 A. 49, 52 (1934)).

(ECF 1) or with her Amended Complaint (ECF 56). However, she separately filed a copy of the waiver of arbitration with this Court. *See* ECF 19-1.

As a general rule, recovery for medical malpractice is allowed only "where there is a relationship between the doctor and patient." *Dehn*, 384 Md. at 620, 865 A.2d at 611; *see Eid v. Duke,* 373 Md. 2, 16, 816 A.2d 844, 852 (2003); *Dingle,* 358 Md. at 367, 749 A.2d at 164; *Hoover v. Williamson,* 236 Md. 250, 253, 203 A.2d 861, 863 (1964). Such a relationship "may be established by contract, express or implied, although creation of the relationship does not require the formalities of a contract, and the fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship." *Dehn*, 384 Md. at 620, 865 A.2d at 611. Fundamentally, the relationship must be "a consensual one, and when no prior relationship exists, the physician must take some action to treat the person before the physician-patient relationship can be established." *Id.*

As to the standard of care, a physician must "'use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which [the physician] belongs, acting in the same or similar circumstances.'" *Dingle*, 358 Md. at 368, 749 A.2d at 164 (quoting *Shilkret v. Annapolis Emergency Hosp.,* 276 Md. 187, 200, 349 A.2d 245, 252 (1975)) (alteration in *Dingle*) (internal footnote omitted); *see Upper Chesapeake Health Ctr., Inc. v. Gargiulo,* 223 Md. App. 772, 2015 WL 6112393, at *5 (June 22, 2015, Md. Ct. Spec. App.), *cert. denied,* 445 Md. 22, 123 A.3d 1007 (2015); *see also Ford*, 165 F. Supp. 3d at 423. Put differently, the "care given or withheld" must be "in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the act (or omission) giving rise to the cause of action." *Dingle*, 358 Md. at 368, 749 A.2d at 164 (citation omitted). Moreover, "'advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are

to be taken into account.'" *Ford*, 165 F. Supp. 3d at 423 (quoting *Shilkret,* 276 Md. at 200-01, 349 A.2d at 253). And, a claim for medical malpractice "necessarily focuses on the manner in which the physician diagnosed and treated the patient's medical problem and . . . not so much on what was told to the patient or what the patient's expectations may have been." *Dingle*, 358 Md. at 368, 749 A.2d at 164; *see also Gargiulo*, 223 Md. App. 772, 2015 WL 6112393, at *5.

"Expert witnesses play a pivotal role in medical malpractice actions." *Rodriguez*, 400 Md. at 71, 926 A.2d at 755. In a case alleging negligence by a professional, expert testimony is ordinarily required to establish the standard of care, breach of the standard of care, and causation. *Jones v. State of Maryland*, 425 Md. 1, 26, 38 A.3d 333, 347 (2012) (citations omitted). The Maryland Court of Appeals has said: "The rule . . . is that experts are usually necessary to explain professional standards because such standards require specialized knowledge within the professional's field that are generally 'beyond the ken of the average layman[.]'" *Id.*, 38 A.2d at 347-48 (citations omitted); *see Rodriguez*, 400 Md. at 71, 926 A.2d at 755 (stating that the court "has repeatedly recognized that 'expert testimony is required to establish negligence and causation.'") (quoting *Holzhauer v. Saks & Co.,* 346 Md. 328, 339, 697 A.2d 89, 94 (1997)); *Ford*, 165 F. Supp. 3d at 423 (stating that a medical malpractice "'defendant's use of suitable professional skill is generally a topic calling for expert testimony'") (quoting *Johns Hopkins Hosp. v. Genda,* 255 Md. 616, 623, 258 A.2d 595, 599 (1969)). "If the plaintiff presents no expert when one is needed, then the trial court 'may rule . . . that there is not sufficient evidence to go [to] the jury.'" *Jones*, 425 Md. at 26, 38 A.3d at 348 (citation omitted).

The case of *Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 408-09, 914 A.2d 113, 115 (2007), is instructive as to the testimony of an expert witness regarding causation. There, the parents of a minor brought a medical malpractice claim, alleging that the minor's "autism

spectrum disorder was caused by thimerosal, a mercury-containing preservative used in pediatric vaccines" administered to the minor when he was an infant. *Id.* at 409, 914 A.2d at 115. However, the plaintiffs were unable to produce expert testimony as to causation. The defendants moved for summary judgment, arguing that the plaintiffs had failed to show any evidence as to causation. *Id.* at 442, 914 A.2d at 135. The circuit court granted the motion, noting that the plaintiffs had "conceded [their] inability to produce an expert witness on the area of specific causation[.]" *Id.* at 409, 914 A.2d at 115.

The Maryland Court of Appeals affirmed. *Id.* at 443, 914 A.2d at 136. The court stated, *id.* at 441-42, 914 A.2d at 135:

> [T]here are, unquestionably, many occasions where the causal connection between a defendant's negligence and a disability claimed by a plaintiff does not need to be established by expert testimony. Particularly is this true when . . . the cause of the injury relates to matters of common experience, knowledge, or observation of laymen. . . . However, where the cause of an injury claimed to have resulted from a negligent act is a complicated medical question involving fact finding which properly falls within the province of medical experts (especially when the symptoms of the injury are purely subjective in nature, or where disability does not develop until some time after the negligent act), proof of the cause must be made by such witnesses.

The court observed that the plaintiffs' medical malpractice suit "would require the trial court to determine whether vaccines administered to [the] eight-year-old [minor] as an infant caused his autism." *Id.* at 442, 914 A.2d at 135. It stated, *id.*: "For such a complex medical question, a medical expert would be necessary to prove specific causation within a reasonable degree of scientific certainty." Therefore, the court concluded that "[t]he trial court was correct in [its] legal conclusion that summary judgment was appropriate under the circumstances." *Id.* at 443, 914 A.2d at 135.

Conversely, an expert is not needed "when 'the alleged negligence is so obvious that the trier of fact could easily recognize that such actions would violate the applicable standard of

care.'" *Jones*, 425 Md. at 26, 38 A.3d at 348 (citation omitted). In particular, "[i]f a jury can use its 'common knowledge or experience' to recognize a breach of a duty, then expert testimony is unnecessary to calibrate the exact standard of care owed by the defendant." *Id.* 27, 38 A.3d at 348 (citation omitted); *see Shultz v. Bank of Am., N.A.*, 413 Md. 15, 29, 990 A.2d 1078, 1086 (2010) ("[W]e have explained that sometimes the alleged negligence, if proven, would be so obviously shown that the trier of fact could recognize it without expert testimony."); *Bean v. Dept. of Health & Mental Hygiene*, 406 Md. 419, 432, 959 A.2d 778, 786 (2008) ("[E]xpert medical opinion is required only 'when the subject of the inference [presented to the jury] is so particularly related to some science or profession that it is beyond the ken of the average layman' and is not required 'on matters of which the jurors would be aware by virtue of common knowledge[.]'") (citations omitted) (some alterations in *Bean*); *Carter v. Shoppers Food Warehouse MD Corp.*, 126 Md. App. 147, 158, 727 A.2d 958, 964 (1999) ("Expert testimony is not necessary when it relates to 'matters of which the jurors would be aware by virtue of common knowledge.'") (citation omitted); *see also Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md. App. 217, 257, 674 A.2d 106, 125-26 (1996) ("Expert testimony is not required . . . on matters of which the jurors would be aware by virtue of common knowledge."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

Similarly, under federal law, a properly qualified expert witness may testify regarding technical, scientific, or other specialized knowledge in a given field if the testimony would assist the trier of fact in understanding the evidence or to determine a fact in issue. *See* Fed. R. Evid. 702. However, expert testimony is inadmissible if it is directed towards matters "within the common knowledge of jurors." *Persinger v. Norfolk & Western Ry. Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990); *see Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). In

*Scinto v. Stansberry*, 841 F.3d at 230, the Court said: "When laypersons are just 'as capable of comprehending the primary facts and of drawing correct conclusions from them' as are experts, expert testimony may properly be excluded." (Citation omitted).

The case of *Thomas v. Corso*, 265 Md. 84, 288 A.2d 379 (1972), is instructive. There, Faust Corso, who had been standing next to his car on the side of a road, was struck by a car traveling approximately "35 or 40 miles per hour", knocking Corso unconscious. *Id.* at 87-88, 288 A.2d at 382. Corso vomited, bled from his mouth and head, and complained of pain in his right hip and numbness in his right thigh. *Id.* at 87-88, 288 A.2d at 382-83. He was brought to a hospital emergency room. *Id.* at 88, 288 A.2d at 382-83. Doctor Robert Thomas was "on-call" that evening and received several calls from nurses as to their medical assessments of Corso. *Id.* at 89-91, 288 A.2d at 383-84. However, Doctor Thomas did not make the "10 minute[]" journey from his home to attend to Corso at the hospital. Instead, Corso was prescribed "100 milligrams of Demerol", a pain reliever, because he "appeared to be unsettled." *Id.* at 93, 288 A.2d at 385. Yet, Corso continued to complain to the nurses of pain in his right thigh. *Id.* at 90, 288 A.2d at 384. Several hours after arriving at the hospital, Corso experienced depressed blood pressure, had trouble breathing, and was pronounced dead shortly thereafter. *Id.*

The surviving spouse and children of Mr. Corso sued, *inter alia*, the doctor and the hospital, alleging malpractice. 265 Md. at 86, 97, 288 A.2d at 381-82, 387. The circuit court entered judgment against the doctor and the hospital. *Id.*; 288 A.2d at 381-822. Before the Maryland Court of Appeals, the defendants argued that the trial court had erred because, *inter alia*, the plaintiffs had "failed to establish by expert evidence the standard of    care . . . and the violation of such a standard of care" by the defendants. *Id.* at 97, 288 A.2d at 387.

The Maryland Court of Appeals stated, *id.* at 97, 288 A.2d at 387: "Although in many

medical malpractice cases expert testimony is required to be introduced by the plaintiff to establish the standard of care . . . it is well recognized by the Maryland cases that there may be cases in which no expert testimony is required to establish the standard of care or its breach by the physician." (Citations omitted). Further, the court said, *id.* at 98, 288 A.2d at 388: "'There is a limitation on the rule that expert testimony is essential to support a cause of action for malpractice where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts.'" (Citation omitted).[34] In particular, the court said, *id.*: "'It requires no expert evidence . . . to show that failure altogether to attend [to] a patient, when common sense indicates that without attention the consequences may be serious, is not reasonable care.'" (Citation omitted).

The court observed that a nurse told Doctor Thomas that Corso had been struck by a car, had an abrasion on his forehead, and had complained of numbness in his right thigh. *Id.* at 99, 288 A.2d at 388. The court found that the "size, weight and force inherent in the operation of an automobile are generally understood by laymen[.]" *Id.* And, the court noted that a layperson generally understands "the probability of serious internal injury and fracture of bones likely to result from a collision of an automobile with a human body." *Id.* Therefore, it concluded that the doctor's failure to be present at the hospital, and his failure to attend to Corso, constituted facts from which a "layman c[ould], without expert assistance, reasonably conclude" negligence on the part of the doctor. *Id.*

The Medical Defendants argue they are entitled to summary judgment because plaintiff's expert witnesses failed to opine that any individual Medical Defendant breached the standard of

---

[34] To illustrate, the court noted that expert testimony is not required in cases where a dentist removes "the wrong tooth", or when a surgeon amputates "the wrong arm" or negligently leaves "a sponge in a patient's body." *Thomas*, 265 Md. at 97-98, 288 A.2d at 387 (citations omitted).

care owed to Ms. Neal or that the alleged negligence of any individual Medical Defendant caused Ms. Neal's death. ECF 213-1 at 9-10, 28. Plaintiff counters that the expert reports submitted with her Opposition establish a dispute of fact as to whether the individual Medical Defendants breached the standard of care owed to Ms. Neal, thereby causing Ms. Neal's death. *Id.* In the alternative, plaintiff contends, pursuant to *Thomas*, 265 Md. 84, 288 A.2d 379, that expert testimony is not needed in order for a jury to understand that the individual Medical Defendants were negligent in their provision of medical care to Ms. Neal. *See* ECF 288 at 92-96.

In particular, plaintiff argues: "A jury will understand that it is objectively unreasonable for medical providers to ignore a patient suffering from strokes and displaying numerous obvious symptoms of that condition." *Id.* at 93-94. In the Medical Defendants' Reply (ECF 245), they rehash the same arguments advanced in their Motion, *i.e.*, that the expert reports of Doctor Evans and Doctor Pedelty fail to establish breach of the standard of care and causation as to each individual Medical Defendant. *See id.* at 11-16.

As noted, Doctor Evans is trained in internal medicine. *See* ECF 233-44 at 17-20 (curriculum vitae of Doctor Evans). In his Expert Report (ECF 225-19), Doctor Evans reviewed the now familiar symptoms that Ms. Neal exhibited on November 1, 2012. Ajayi, Wiggins, and Afre observed Ms. Neal's symptoms on that date. And, Afre noted that Ms. Neal was exhibiting erratic behavior. *Id.* at 2-3. Doctor Evans opined, *id.* at 3:

> [A] severe sudden onset of headache, especially when associated with weakness and confusion should signal [to] a medical provider that the patient may have an intracranial bleed and may need to be evaluated with brain imaging. Indeed, when presented with that combination of symptoms, the assumption must be a stroke or other neurological crisis until proven otherwise. If a stroke or neurological crisis cannot be ruled out, the standard of care requires prompt action. In a jail setting, that means transfer to a hospital for evaluation.

Doctor Pedelty is a board-certified neurologist with certifications in vascular neurology,

neurosonology, and behavioral neurology. *See* ECF 225-20 at 1 (Pedelty Report). She also holds a Ph.D. in Cognition and Communication. *See* ECF 225-20 at 8. Doctor Pedelty stated in her report that, in light of Ms. Neal's symptoms on November 1, 2012, "a minimally appropriate standard of care entails rapid diagnosis, stabilization of vital functions (airway, breathing, heartbeat) as needed, and urgent transport to a facility where further testing and intervention can be undertaken." *Id.* at 5. Further, she opined, *id.*:

> Based on the signs and symptoms reported in medical records and by other detainees, any failure by doctors, physician assistants and nurses attending to Fatima Neal from the night of October 31-November 1[, 2012] through the early morning hours of November 4[, 2012] to rule out and initiate treatment for serious conditions such as stroke, none of which could be done without urgent transfer to a hospital, falls below the standard of care.

In Doctor Pedelty's supplemental report (ECF 225-33), she opined: "Urgent medical and neurological evaluation and neuroimaging (CT or MRI) would diagnose the initial stroke, whether it was ischemic or hemorrhagic. In both scenarios, early diagnosis and treatment are important, and thus medical providers are trained to be alert to signs and symptoms of stroke, and to err on the side of caution in seeking urgent neurological evaluation and neuroimaging." *Id.* at 2.

In my view, a jury could credit the opinions of plaintiff's experts and conclude that, given the symptoms presented by Ms. Neal during the early morning hours of November 1, 2012, the standard of care called for the urgent transfer of Ms. Neal to a hospital where she could be evaluated and receive appropriate medical care. *See* ECF 225-19; ECF 225-20. On that same date, Ms. Neal was evaluated by Ajayi (ECF 223-6 at 1-2; ECF 213-8 at 3; ECF 225-26 at 7; ECF 213-23 at 2, 5, 12, 20, 22); Obadina (ECF 233-6 at 3, 6); Wiggins (ECF 233-6 at 1-2, 4-5; ECF 225-26 at 24, 32); and Afre. *See* ECF 233-6 at 7-9. She was merely prescribed Motrin. *See* ECF 233-6 at 7-9.

Ms. Neal's symptoms did not abate after November 1, 2012. Doctor Evans noted that on November 2 and November 3 of 2012, Ms. Neal exhibited right-sided weakness and an inability to care for herself. *See* ECF 225-19 at 4. Her headache persisted, she reported being visually impaired, and had trouble walking. *Id.* at 5. On November 2 and November 3, 2012, Ms. Neal was evaluated by Ohaneje (ECF 233-6 at 10-11); Obadina (*id.* at 12-13); Jamal (*id.* at 17-20, 26-27); Ajayi (ECF 225-11 at 2); McNulty (ECF 233-6 at 23-25); Afre (*id.* at 14-16); and El-Sayed. *Id.* at 21-22. Yet, at no point on those dates did any of those Medical Defendants take any action to transport Ms. Neal to a hospital for treatment. Rather, Doctor Afre prescribed Tylenol No. 3. *See* ECF 233-6 at 16. As to that prescription, Doctor Evans stated: "Treating [a] headache with a narcotic without clear and documented performance of a differentiated diagnosis to rule out stroke is inappropriate, it is dangerous, and it is below the standard of care." ECF 225-19 at 6.

As to causation, a critical issue, Doctor Evans opined that Ms. Neal's "sentinel event was on 11/01/2012" and that "[i]t was not medically addressed." ECF 225-19 at 5. Further, Doctor Evans stated that Ms. Neal's "medical treatment was substandard and assured that the bleed that occurred [o]n 11/01/2012 would in fact lead to the death of Fatima Neal." *Id.* at 7.

Additionally, Doctor Pedelty opined "that Fatima Neal's progression to cardiopulmonary arrest and death was due to a failure to consider, investigate, and obtain appropriate medical care for a diagnosis of stroke over the course of her initial evaluation on admission to and throughout her stay in the BCDC infirmary." ECF 225-20 at 6. In her supplemental report (ECF 225-33), Doctor Pedelty pointed to "[a] widely-used algorithm for predicting outcomes following intracerebral hemorrhage[]." *Id.* at 2. According to Pedelty, the algorithm "suggests that in Ms. Neal's case, given her age of <70, hematoma volume of <30cc (using the ABC/2 method of calculating volume: 4.5 cm x 3 cm x 3 cm diameters/2 = 20.25cc), lobar (rather than deep) bleed

location, estimated Glasgow coma score >9, and absence of prior cognitive impairment, she would have been expected to have an 81 − 100% probability of functional independence at 90 days. Even allowing for a worse Glasgow Coma score, [the] predicted likelihood of functional independence at 90 days is 61 − 80%." *Id.*

Moreover, Doctor Pedelty opined that an "[a]cute ischemic stroke, if diagnosed early, also has a high likelihood of positive outcomes." ECF 225-33 at 2. In particular, Doctor Pedelty opined, *id.*: "It can be treated with tissue plasminogen activator (t-PA) to open the occluded (blocked) arteries. Close monitoring and management of complications including edema (swelling) would be undertaken. Decompressive hemicraniectomy for malignant edema (swelling) is of proven benefit in ischemic stroke."

Based on the foregoing, I am satisfied there is a dispute of material fact as to whether Ajayi, Obadina, Ohaneje, Jamal, McNulty, Wiggins, Afre, and El-Sayed breached the standard of care and whether the breach was the proximate cause of Ms. Neal's death.

On November 4, 2012, Ms. Neal's symptoms became even more dire. Atta was alerted to Ms. Neal's medical needs (ECF 233-6 at 28-29; *id.* at 30), and she contacted Doctor Kulam, Doctor Tewede, and the Nurse Supervisor. The "plan" was to send Ms. Neal to the hospital to receive emergency medical care. *Id.* at 28. There is no indication Atta knew of Ms. Neal's medical condition prior to the early morning hours of November 4, 2012. Put differently, when Atta became aware of Ms. Neal's medical needs, she promptly acted to transfer Ms. Neal to an outside hospital.

As noted, plaintiff has failed to identify the twenty-five unnamed medical care providers sued in the Amended Complaint. *See* ECF 56. Accordingly, I am satisfied that there is no dispute of fact as to the claim of medical malpractice lodged against the twenty-five unnamed

Medical Defendants.

For the foregoing reasons, I shall deny the Medical Defendants' Motion as to the medical malpractice claim against Ajayi, Obadina, Ohaneje, Jamal, McNulty, Wiggins, Afre, and El-Sayed. But, I shall grant the Medical Defendants' Motion as to the claim of medical malpractice lodged against Atta and the twenty-five "Doe" medical care providers.

### G. Wrongful Death

As indicated, plaintiff has lodged a claim of wrongful death under Maryland law against all defendants. *See* ECF 56, ¶¶ 238-43. Maryland's wrongful death statute is found in C.J. §§ 3-901 through 3-904. Section 3-902 of the C.J. Article, titled "Liability notwithstanding death," provides that wrongful death actions "may be maintained against a person whose wrongful act causes the death of another." C.J. § 3-902(a). And, § 3-904(a)(1) states, in part: "[A]n action under this subtitle shall be for the benefit of the wife, husband, parent, and child of the deceased person."

"[A] wrongful death action is brought by the relatives of the decedent, seeking recovery for their loss as a result of the victim's death." *Jones v. Prince George's Cty.*, 541 F. Supp. 2d 761, 764 (D. Md. 2008) (citation omitted). Such an action "is brought in the name of a person entitled to recover . . . ." *Walker v. Essex*, 318 Md. 516, 523, 569 A.2d 645, 648 (1990); *see Spangler v. McQuitty*, 449 Md. 33, 47-48, 141 A.3d 156, 165 (2016) ("[R]elatives by blood or marriage who substantially relied upon the decedent, are also eligible claimants.") (citing C.J. § 3-904(b)); *Carter v. Wallace & Gale Asbestos Settlement Trust*, 439 Md. 333, 362, 96 A.3d 147, 164 (2014) ("[U]nder the Maryland [wrongful death] statute, suit is brought in the name of a person entitled to recover, and to the use of all such parties who may have an interest.") (internal quotation marks omitted; citation omitted); *Eagan v. Calhoun*, 347 Md. 72, 82, 698 A.2d 1097,

1102 (1997) (a wrongful death action "is brought by a spouse, parent, or child, or a secondary beneficiary who was wholly dependent on the decedent, to recover damages for his or her own loss accruing from the decedent's death"); *United States v. Streidel*, 329 Md. 533, 536, 620 A.2d 905, 907 (1993); C.J. § 3-904(d) ("damages awarded . . . are not limited or restricted by the 'pecuniary loss' or 'pecuniary benefit' rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable for the death of . . . (1) A spouse . . . (3) A parent of a minor child . . . .").

Of import, nonmoving parties must "'produce competent evidence on each element of [their] claim' to survive the motion for partial summary judgment." *Osunde v. Lewis*, 281 F.R.D. 250, 260 (D. Md. 2012) (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)) (modification in *Osunde*). And, with minor exceptions, the Survival Act permits the personal representative of the decedent to bring any claims that the decedent could have brought had she lived. *See* Md. Code (2017 Repl. Vol.), § 7-401(y)(1) of the Estate and Trusts Article ("E.T.").

For a beneficiary to maintain a wrongful death action, there must have been a "[w]rongful act," defined as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." C.J. § 3-901(e). In *Benjamin v. Union Carbide Corp.*, 162 Md. App. 173, 188-89, 873 A.2d 463, 472 (2005), *aff'd sub nom. Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 904 A.2d 511 (2006), the Maryland Court of Special Appeals explained: "We interpret the definition as meaning that the decedent must have been able to maintain a compensable action *as of the time of death.* In other words, in order for an act to be wrongful, the decedent must have had a

compensable action as of death." (Emphasis in original); *cf. Mummert v. Alizadeh,* 435 Md. 207, 210, 77 A.3d 1049, 1051 (2013) (stating that in enacting the wrongful death statute, the Maryland General Assembly "did not intend to define 'wrongful act' so as to render a wrongful death claim contingent on the decedent's ability to file timely a tort claim prior to death"). However, "if a defense existed to the decedent's action prior to death, there was no viable action to abate and, similarly, no wrongful act for wrongful death purposes." *Id.* at 189, 873 A.2d at 472.

Regarding proof of causation in the context of a wrongful death claim, then-Magistrate Judge Grimm explained in *Osunde*, 281 F.R.D. at 260:

> To succeed on a wrongful death claim under Maryland law, a plaintiff who qualifies as a beneficiary under the wrongful death statute "must show . . . that the conduct of [the] defendant was negligent and that such negligence was a proximate cause of the death of the decedent." *Weimer* [*v. Hetrick*, 309 Md. 536, 554, 525 A.2d 643, 652 (1987)]; *United Elec. Light & Power Co. v. State*, 100 Md. 634, 60 A. 248, 248-49 (1905); *see also* [Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* 396 (4th ed. 2008)] (listing four elements that a plaintiff must prove to succeed on a wrongful death claim: (1) the victim's death; (2) that the victim's death was proximately caused by the negligence of the defendant; (3) that the victim's death resulted in injury to the plaintiff, who falls within the category of beneficiaries defined by the statute; and (4) that the claim is brought within the applicable statutory period) . . . .

In the Amended Complaint (ECF 56), plaintiff averred that "[e]ach of the Defendants' unconstitutional and deliberately indifferent acts [and] omissions . . . were wrongful acts within the meaning of Maryland Courts and Judicial Proceedings [Article] § 3-902, and w[ere] the proximate cause of Ms. Neal's untimely and wrongful death." *Id.* In her Opposition (ECF 228), plaintiff provides little explanation as to her wrongful death claim. She merely states, *id.* at 101: "For all of the reasons discussed above, Defendants' argument that they committed no wrongful act fails. *See supra* at Sect. I.C."

Notably, plaintiff argues in Section I.C of her Opposition that the "Defendants Were

Deliberately Indifferent to Fatima's Serious Medical Condition", pursuant to the Eighth Amendment, the Fourteenth Amendment, and Article 24 of the Maryland Declaration of Rights. *Id.* at 4 (capitals in original); *see id.* 60-83. Accordingly, the wrongful death claim is predicated on the facts and arguments pertinent to the claim of deliberate indifference. Yet, in her Opposition, plaintiff also contends that the "state torts at issue are also wrongful acts under the [Maryland] wrongful death statute." *Id.* at 101 n.34. Moreover, the wrongful death claim asserted in the Amended Complaint "incorporate[d] and re-allege[d] each and every preceding paragraph" of the Amended Complaint (*id.* ¶ 238), which included the IIED claim (*id.* ¶¶ 226-37) and the medical malpractice claim. *Id.* ¶¶ 207-17.[35]

## 1.

In the context of plaintiff's wrongful death claim, the Custody Defendants reassert the defenses they raised as to the claims of deliberate indifference and IIED. *See* ECF 212-1 at 49-51. In particular, the Custody Defendants contend they "did not violate Ms. Neal's rights under the Fourteenth and Eighth Amendments and Article 24 because they individually lacked at a minimum, a sufficiently culpable state of mind." *Id.* at 50 (internal quotation marks omitted; citation omitted). Additionally, the Custody Defendants reassert their defense under the MTCA as to claims of wrongful death predicated on IIED or a violation of Article 24 of the Maryland Declaration of Rights. *Id.*

For the reasons explained, *supra*, I shall grant the Custody Defendants' Motion as to the wrongful death claim predicated on deliberate indifference pursuant to the Eighth and Fourteenth Amendments. Further, because Article 24 of the Maryland Declaration of Rights is construed *in*

---

[35] Understandably, the parties do not address Ms. Bost's grief and loss of services due to the death of her daughter. But, the record is replete with such evidence. *See* ECF 225-3 ("Plaintiff's Updated Response to Wexford Health Sources, Inc.'s First Set of Interrogatories . . .") at 8-11.

*pari materia* with the Fourteenth Amendment, I shall also grant the Custody Defendants' Motion as to plaintiff's claim of wrongful death predicated on Article 24. To the extent plaintiff also predicates wrongful death on IIED, I shall grant the Custody Defendants' Motion, for the reasons explained, *supra*.

Additionally, plaintiff had a reasonable opportunity to establish a dispute of material fact as to the wrongful death claim against Ladson. *See* ECF 228 at 25, 29-30, 36, 40-41, 47, 55-56, 60, 63-65, 70-73, 81-82, 102; *see also* ECF 225; ECF 233; ECF 235. In my view, no such dispute exists. Therefore, I shall grant summary judgment in favor of Ladson as to the wrongful death claim. *See Penley*, 876 F.3d at 661; *Velasquez*, 2018 WL 2411431, at *2.

**2.**

As to plaintiff's wrongful death claim predicated on deliberate indifference, the Medical Defendants contend, ECF 213-1 at 46: "As set forth above, no reasonable jury could return a verdict in Plaintiff's favor on those claims[.]" Further, the Medical Defendants argue, *id.* at 47: "[E]ven if Plaintiff's wrongful death claim were predicated on a wrongful act other than a defendant's alleged constitutional violations, . . . no reasonable jury could determine that a 'wrongful act' committed by any of the individual defendants, such as their alleged medical malpractice, caused Ms. Neal's death."

Because plaintiff has predicated the wrongful death claim, *inter alia*, on the Medical Defendants' alleged deliberate indifference to Ms. Neal's objectively serious medical needs and/or medical malpractice, I shall deny the Medical Defendants' Motion as to Ajayi, Obadina, Ohaneje, Jamal, McNulty, Wiggins, Afre, and El-Sayed. But, I shall grant the Medical Defendants' Motion as to the wrongful death claim as to Atta and the twenty-five unnamed medical service providers. Further, I shall grant the Medical Defendants' Motion as to the

wrongful death claim predicated on IIED.

## H. Respondeat Superior

In the Amended Complaint, plaintiff alleged respondeat superior liability as to Wexford for "all torts committed" by the its "agents" (ECF 56 ¶¶ 244-46) arguing, *inter alia*, that the individual Medical Defendants "were employees, members, and agents of Wexford, acting at all relevant times within the scope of their employment." *Id.* ¶ 245. The Medical Defendants argue in their Motion, ECF 213-1 at 47: "Because summary judgment is appropriate on all of Plaintiff's underlying tort claims against Wexford's employees, summary judgment is also appropriate on her *respondeat superior* claim against Wexford, which is dependent on the viability of an underlying tort claim."

In Maryland, "[l]itigants may invoke the doctrine of respondeat superior as a means of holding an employer, corporate or otherwise, vicariously liable for the tortious conduct of an employee, where it has been shown that the employee was acting within the scope of the employment relationship at that time." *S. Mgmt. Corp. v. Taha*, 378 Md. 461, 480-81, 836 A.2d 627, 638 (2003). Under the doctrine of respondeat superior, "'an employer is ordinarily responsible for the tortious conduct of his employee committed while the servant was acting within the scope of the employment relationship.'" *Barclay v. Briscoe*, 427 Md. 270, 282, 47 A.3d 560, 567 (2012) (quoting *Embrey v. Holly*, 293 Md. 128, 134, 442 A.2d 966, 969 (1982)). The doctrine embodies the principle that, "[b]ecause 'the master holds out his servant as competent and fit to be trusted, . . . he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment.'" *Oaks v. Connors*, 339 Md. 24, 30, 660 A.2d 423, 426 (1995) (quoting *Globe Indem. Co. v. Victill Corp.*, 208 Md. 573, 580, 119 A.2d 423, 427 (1956)).

"Ordinarily, the issue of whether a particular act is within the scope of employment is properly decided by a jury. . . ." *Barclay*, 427 Md. at 283, 47 A.3d at 568. It is only where there is "'no conflict in the evidence relating to the question and but one inference can be drawn therefrom'" that the issue becomes a "'question . . . of law for the court.'" *Id.* (citation omitted). Moreover, "there are few, if any, absolutes" in assessing whether an employee's act is within the scope of employment. *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467, 471 (1991).

The general rule is that, "[f]or an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer." *Taha*, 378 Md. at 481, 836 A.2d at 638. However, this general benchmark is not susceptible of mechanical application. "By 'authorized' is not meant authority expressly conferred [by the employer], but whether the act was such as was incident to the performance of the duties entrusted to [the employee by the employer], *even though in opposition to his express and positive orders.*" *Sawyer*, 322 Md. at 255, 587 A.2d at 470 (emphasis added) (citations and some internal quotation marks omitted). "Accordingly, 'an act may be within the scope of employment, even though forbidden or done in a forbidden manner, or consciously criminal or tortious[.]'" *Tall v. Bd. of Sch. Comm'rs of Baltimore City*, 120 Md. App. 236, 252, 706 A.2d 659, 667 (1998) (quoting *Great Atl. & Pac. Tea Co. v. Noppenberger*, 171 Md. 378, 391, 189 A. 434, 440 (1937)).

"Another factor is whether the employee's conduct was expectable or foreseeable." *Sage Title Grp., LLC v. Roman*, 455 Md. 188, 213, 166 A.3d 1026, 1040 (2017) (citation and quotation marks omitted), *reconsideration denied* (Sept. 21, 2017). In *Sage Title Group*, the Maryland Court of Appeals found sufficient evidence for a trier of fact to conclude that an employee's illegal acts were committed within the scope of his employment. *Id.* at 213-15, 166

A.3d at 1040-41. The court based its conclusion on three findings: (1) the employee was authorized to perform activities very similar to the tortious ones in question (*id.* at 213-14, 166 A.3d at 1040-41); (2) there was "no question that [the employee] was acting 'in furtherance of the employer's business and authorized by the employer'" (*id.* at 214, 166 A.3d at 1041); and (3) the tortious acts were foreseeable to his employer because the employer had knowledge that the employee had previously violated a related company policy. *Id.* at 214-15, 166 A.3d at 1041.

Nevertheless, "where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests," the actions will ordinarily be considered outside the scope of employment, even if they occur "during normal duty hours and at an authorized locality." *Sawyer*, 322 Md. at 256-57, 587 A.2d at 471. And, "'[w]here the conduct of the servant is unprovoked, highly unusual, and quite outrageous,' courts tend to hold 'that this in itself is sufficient to indicate that the motive was a purely personal one' and the conduct outside the scope of employment." *Id.* at 257, 587 A.2d at 471 (quoting PROSSER & KEETON ON THE LAW OF TORTS § 70, at 506 (5th ed. 1984)).

The Medical Defendants provide no argument as to why the actions of the individual Medical Defendants were not within the scope of their employment. *See* ECF 213-1 at 47. I shall deny the Medical Defendants' Motion as to respondeat superior liability predicated on the remaining state law claims.[36]

---

[36] As indicated, respondeat superior liability does not apply to a § 1983 action, such as the deliberate indifference claim lodged by plaintiff under the Eighth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983. *See, e.g.*, *Wilcox*, 877 F.3d at 170. With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege: "(1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to

## I.    Indemnification

In the Amended Complaint, plaintiff seeks indemnification from Wexford, BCDC, and the State as to any tort judgment for which their employees are found to be "liable within the scope of their employment." ECF 56 ¶ 248. The Medical Defendants argue, *inter alia*, that a claim for indemnification is "not ripe until a judgment has been obtained and satisfied." ECF 213-1 at 48. In my view, plaintiff's request for indemnification is premature. Accordingly, I shall not decide it in the context of this Memorandum Opinion.

## IV.    Conclusion

For the forgoing reasons, I shall grant the Custody Defendants' Motion (ECF 212) as to all claims and all Custody Defendants. Further, I shall grant the Medical Defendants' Motion (ECF 213) as to all claims against Atta and the twenty-five "Doe" medical care providers. And, I shall grant the Medical Defendants' motion as to the IIED claim.

However, I shall deny the Medical Defendants' Motion as to the deliberate indifference claim predicated on the Eighth Amendment, the Fourteenth Amendment, and Article 24 of the Maryland Declaration of Rights, as to Ajayi, Obadina, Ohaneje, Jamal, McNulty, Wiggins, Afre, and El-Sayed. I shall also deny the Medical Defendants' Motion as to the claim of medical malpractice, and the claim of wrongful death predicated on deliberate indifference and/or medical malpractice, as to Ajayi, Obadina, Ohaneje, Jamal, McNulty, Wiggins, Afre, and El-Sayed. Moreover, I shall deny the Medical Defendants' Motion as to plaintiff's claim of respondeat superior against Wexford, lodged under Maryland law only. And, because any question of indemnification is, at this juncture, premature, I decline to reach that issue in the

---

or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799.

context of this Memorandum Opinion.

An Order follows.

Date:  July 23, 2018

                                    _____/s/_____
                                    Ellen L. Hollander
                                    United States District Judge