IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHARON BOST, individually and as
the personal representative of the
ESTATE OF FATIMA NEAL,

    *Plaintiff,*

    *v.*

WEXFORD HEALTH SOURCES,
INC. *et al.,*

    *Defendants.*

Civil Action No. ELH-15-3278

## MEMORANDUM OPINION

This Memorandum Opinion resolves the latest discovery disputes in connection with ongoing litigation arising from the tragic death of Fatima Neal in November 2012, at the age of 42. At the time of Ms. Neal's death, she was detained at the Baltimore City Detention Center ("BCDC"). Wexford Health Services, Inc. ("Wexford"), the health care provider at BCDC at the relevant time, is the sole remaining defendant. The claim against Wexford is founded on 42 U.S.C. § 1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

Plaintiff Sharon Bost, the mother of Neal, filed suit individually and as Personal Representative of the Estate of Fatima Neal. She has lodged an Objection (ECF 482) to an Order issued by U.S. Magistrate Judge A. David Copperthite on December 10, 2019 (ECF 480), granting in part and denying in part Bost's "Motion to Compel the Production of Relevant and Responsive Documents and Responses to Interrogatories." ECF 477. Wexford opposes the Objection (ECF 485), and plaintiff has replied. ECF 490.

No hearing is necessary to resolve the Objection. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Objection.

## I.     Background

The facts giving rise to this suit were recounted in prior memorandum opinions.  *See* ECF 159; ECF 430.  Those facts are incorporated here.  Therefore, the facts set forth below are limited to those pertinent to the Objection.

BCDC is a State correctional facility located in Baltimore City, operated by the Maryland Department of Public Safety and Correctional Services ("DPSCS").  *See* ECF 430 at 5.  Medical care at BCDC is divided into two contractual components: direct patient care and utilization management services ("UM services").  ECF 477-27 (Affidavit of Joe Ebbitt), ¶¶ 4, 5.  Between 2006 and July 2012, another company, Corizon Correctional Healthcare, held the contract for direct patient care, and Wexford held the contract for UM services.  *Id.*; *see* ECF 477-6 at 11.

In regard to UM services, Wexford reviewed requests by Corizon's medical staff to refer detainees for non-emergent off-site care, such as to visit a medical specialist.  ECF 477-27, ¶ 5.  Wexford's authorization was necessary before the detainee could receive the treatment.  *Id.*  However, a different procedure governed emergency care.  *See* ECF 477-27 (6/11/2009 Wexford Utilization Management Policies and Procedures) at 8.  Specifically, Wexford's procedures provided that "emergent referrals are automatic approval as to not delay any care" and were instead "reviewed on a retrospective basis for quality improvement purposes."  *Id.*  Wexford defined emergency care as "those situations in which a service is needed immediately, or within 48 hours of a request, as the inmates health and well-being would be affected with a delay in care."  *Id.*[1]

---

[1] The parties cite to different versions of Wexford's UM policies.  *See* ECF 477-16 (Bost); ECF 477-27 (Wexford).  However, plaintiff's version of the emergency policies appears consonant with the guidelines cited by defendant.  In particular, the version of Wexford's UM policies cited by Bost provides that a patient should be transferred to the hospital as deemed necessary by the "Site Medical Director or designee," who should notify Wexford "AS SOON AS POSSIBLE but no later than 24 hours after the occurrence."  ECF 477-16 at 5 (emphasis in original).

In July 2012, Wexford assumed the direct patient care contract for DPSCS, at which point it was responsible for all medical care at the BCDC and other DPSCS facilities. ECF 477-27, ¶ 6; *see* EF 477-27 (Inmate Medical Health Care and Utilization Services Contract) at 4-6. In its contract with the State, Wexford agreed that "[e]very effort will be made to render appropriate care to Inmates onsite for emergency events, so long as the onsite efforts are not contrary to the health and well being of the Inmate." ECF 477-27 at 6. Further, the contract provided that Wexford was "fiscally responsible for emergency room services provided to Inmates." *Id.*

Beginning on November 1, 2012, Neal suffered a series strokes while detained at BCDC. ECF 430 at 30, 32-36. According to plaintiff, over the following three days, while Neal was in the infirmary, she displayed acute stroke symptoms, yet Wexford's medical staff did not seek emergency medical assistance. *See id.* at 8-25. Neal was found unresponsive at 12:35 a.m. on November 4, 2012. *Id.* at 25. Nonetheless, a 911 crew did not arrive until 3:53 a.m. ECF 233-6 at 28. Ms. Neal was transported to the hospital, where she was pronounced dead. ECF 430 at 29-30.[2]

This suit followed on October 27, 2015. ECF 1. In a First Amended Complaint (ECF 56) ("Amended Complaint"), Bost sued Wexford, the State of Maryland, BCDC, members of the medical staff employed by Wexford (the "Medical Defendants"), and various BCDC correctional officers (the "Custody Defendants"). *Id.* ¶¶ 40-48. The Amended Complaint asserted nine claims for relief, including, *inter alia*, denial of adequate medical care, in violation of the Eighth and Fourteenth Amendments; medical malpractice; negligence; and intentional infliction of emotional

---

[2] In earlier submissions, not relevant here, the defense asserted that, even if there had been earlier hospitalization, Ms. Neal had a very poor prognosis. The parties filed numerous motions in limine concerning their respective experts.

distress.  Of import here, the "Second Claim for Relief" lodged a "*Monell*" claim against Wexford under 42 U.S.C. § 1983, alleging an unconstitutional policy and practice of denying adequate medical care.  *Id.* ¶¶ 169-86; *see Monell*, *supra*, 436 U.S. 658.[3]

The Court issued a Scheduling Order on April 19, 2016, setting, *inter alia*, a deadline of June 30, 2017, to complete discovery.  ECF 44.  During the first three months of 2017, the parties submitted a flurry of discovery motions.  *See* ECF 128 (plaintiff's motion to compel); ECF 131 (Wexford's motion for protective order); ECF 136 (Custody Defendants' motion for protective order); ECF 150 (plaintiff's motion to compel); ECF 154 (plaintiff's motion for extension of time to complete discovery).  Plaintiff's motion for extension of time to complete discovery and additional deposition hours (ECF 154) alone contained nearly 5,000 pages of exhibits.  I referred all discovery matters to Judge Copperthite on December 16, 2016.  *See* Docket.

While the various discovery motions were pending, Wexford and the Medical Defendants, (ECF 130), as well as the Custody Defendants (ECF 135), moved to bifurcate plaintiff's *Monell* claim, and to stay discovery as to that claim.  By Memorandum Opinion (ECF 159) and Order (ECF 160) of May 8, 2017, I granted ECF 130 and ECF 135.  In my Memorandum Opinion, I concluded that bifurcation of the *Monell* claim was appropriate in order to conserve resources, promote judicial efficiency, and to avoid a significant risk of prejudice to the individual defendants.  ECF 159 at 27.  Further, I explained that the Court would issue a scheduling order concerning the *Monell* claim following the resolution of the claims against the individual defendants.  *Id.*

---

[3] On August 31, 2016, Judge J. Frederick Motz dismissed Bost's claims against the State, BCDC, and the Custody Defendants, in their official capacities, based on Eleventh Amendment immunity.  ECF 89.  Judge Motz also dismissed Bost's claim for negligence against the Custody Defendants in their individual capacities.  *Id.*

Shortly after I resolved the motions to bifurcate and stay discovery, Judge Copperthite issued several orders resolving the pending discovery disputes.  In particular, in ECF 161, Judge Copperthite denied plaintiff's motion to compel (ECF 128), "without prejudice in light of [the] Court's Ruling [in] ECF 159."   In ECF 162, Judge Copperthite denied Wexford's motion for protective order (ECF 131), without prejudice.  In ECF 163, Judge Copperthite denied the Custody Defendants' motion for protective order (ECF 136), without prejudice.   In ECF 164, Judge Copperthite denied plaintiff's second motion to compel (ECF 150), "without prejudice in light of Court's Ruling [in] ECF 159."   And, in ECF 166, Judge Copperthite denied the motion for extension (ECF 154), without prejudice, "in light of the Court's Ruling [in] ECF 159-60."

On June 5, 2017, plaintiff filed an objection (ECF 167) to Judge Copperthite's ruling (ECF 166) denying the Motion for Extension (ECF 154).  Plaintiff also filed an objection (ECF 168) to Judge Copperthite's ruling (ECF 161) denying plaintiff's motion to compel (ECF 128).  By Order of June 8, 2017 (ECF 169), Judge Copperthite rescinded his rulings (ECF 161; ECF 166) underlying the objections.  In view of Judge Copperthite's Order rescinding ECF 161 and ECF 166, I denied the two objections (ECF 167; ECF 168) as moot, without prejudice, by Order of June 8, 2017.  ECF 170.  The following week, Judge Copperthite issued an order concerning the motion to compel (ECF 128) and the motion for extension (ECF 154).  *See* ECF 171.

Then, on June 26, 2017, Bost filed a request for a status conference, seeking "clarification of the Court's June 19, 2017 decision granting in part and denying in part Plaintiff's motion to compel and motion for an extension of discovery deadlines and deposition hours."  ECF 172.  By Order of June 28, 2017, Judge Copperthite clarified his previous ruling concerning the motion for extension.  ECF 176.

5

Thereafter, Bost objected to Judge Copperthite's Order concerning the motion for extension (ECF 178), supported by many exhibits.  ECF 178-1 through ECF 178-35.  Wexford and the Medical Defendants opposed the objection (ECF 180), as did the Custody Defendants. ECF 185.  By Order of August 16, 2017, I denied the objection.  ECF 193.

After the close of discovery, the Custody Defendants (ECF 212) and the Medical Defendants (ECF 213) moved for summary judgment.  Amplitudinous briefing followed.  *See* ECF 212; ECF 213; ECF 214; ECF 225; ECF 228; ECF 233; ECF 235; ECF 241; ECF 245.[4]  In a Memorandum Opinion (ECF 430) and Order (ECF 431) of July 31, 2018, I entered summary judgment in favor of the Custody Defendants on all claims, dismissing them from the suit.  *See* ECF 431.  In addition, I granted the Medical Defendants' motion in part, dismissing Bost's claim for intentional infliction of emotional distress.  But, I denied the motion as to Bost's § 1983 claim for inadequate medical care/deliberate indifference, as well as for the claims of medical malpractice and wrongful death.  *Id.*

The claims against the Medical Defendants were set for trial, to begin on December 3, 2018.  However, on November 6, 2018, Bost and the Medical Defendants entered into a settlement agreement.  ECF 443.  As a result, Bost's *Monell* claim against Wexford is the only remaining issue in the case.

On January 17, 2019, counsel advised the Court that the parties required "at least six months of additional fact discovery" regarding Bost's *Monell* claim.  ECF 448, ¶ 5.  Accordingly, by Order of February 1, 2019 (ECF 453), I directed the parties to commence written discovery as to the *Monell* claim.  I also directed the parties to submit, by April 30, 2019, a proposed schedule

---

[4] In total, the parties' submissions spanned over 7,200 pages.  ECF 430 at 4.

6

concerning discovery including as to experts, a discovery deadline, and a deadline for filing dispositive motions. *Id.*

The parties submitted a joint motion on April 19, 2019, seeking to extend the deadline to file a proposed scheduling order until May 31, 2019.  ECF 463.  In the motion, the parties represented that extending the deadline would advance the interests of efficiency and judicial economy because "document production is still ongoing and discovery responses have yet to be fully exchanged."  *Id.* at 1.  The Court granted the motion the same day.  ECF 464.  The parties requested another extension of time on May 30, 2019 (ECF 467), which the Court granted, setting a deadline of July 31, 2019, to file a proposed scheduling order.  ECF 468.

The parties submitted a Status Report on July 31, 2019, seeking a discovery deadline of May 30, 2020.  ECF 470.  However, in a Scheduling Order of August 7, 2019, I set a discovery deadline of March 27, 2020.  ECF 471.

On November 15, 2019, Bost filed a "Motion to Compel the Production of Relevant and Responsive Documents and Responses to Interrogatories."  ECF 477-1.  The motion was supported by a memorandum (ECF 477-2) (collectively, the "Motion") and numerous exhibits.  ECF 477-3 to ECF 477-31.  In addition, Bost submitted a certificate, pursuant to Local Rule 104.7, detailing her efforts to obtain Wexford's compliance with her interrogatories and requests for production. ECF 477.  In the Motion, Bost asserted that she had issued "discovery requests tailored to developing the evidence necessary to meet *Monell*'s high bar," but that Wexford "has so far produced scant discovery and is further refusing to produce a broad range of documents, thus depriving [her] of discovery necessary to prove her claims."  ECF 477-2 at 1-2.

According to Bost, her discovery requests are carefully tailored to her effort to prove that Neal's death "was not an accident, but the result of unconstitutional policies and practices"

promoted by Wexford. *Id.* at 9; *see* ECF 477-4 (First Set of Interrogatories); ECF 477-5 (First Set of Requests for Production).  Plaintiff stressed that documents pertaining to Wexford's UM services support her *Monell* theories "about requiring nurses to obtain physician approval before sending patients to the emergency room, and about delaying emergency room visits to reduce costs." *Id.* at 11.  And, she posited that documents concerning denials of medical treatment at BCDC, audits of Wexford's services, and lawsuits complaining of inadequate medical care at BCDC are "centrally relevant" to Wexford's policy or custom of denying detainees proper medical cared. *Id.*

Further, plaintiff contended that Wexford had responded to her requests "with delay and stonewalling." *Id.* at 13.  Bost maintained that between February 2019, when *Monell* discovery commenced, and November 2019, Wexford had produced just ten documents. *Id.* at 14-15.  In addition, she claimed that Wexford's responses to her interrogatories "consisted only of objections . . . along with vague promises to produce more documents." *Id.* at 13.

In particular, plaintiff charged Wexford with "drastically narrow[ing] discovery" in two respects. ECF 477-2 at 17.  First, Bost asserted that Wexford insisted on limiting discovery to its provision of emergency care at BCDC. *Id.*  In contrast, Bost sought documents "related to onsite or offsite medical care, utilization management, and denials of medical care based on utilization management." *Id.*  According to Bost, these documents are relevant to her *Monell* claim, because Wexford's UM policies dictated procedures for emergency care and, at any rate, the requested records may reveal that Wexford informally discouraged BCDC medical staff from seeking off-site medical care or failed to train its employees to recognize stroke symptoms. *See id.* at 17-19.

Second, Bost observed that the parties were at an impasse as to the appropriate period of time that would be subject to discovery. *Id.* at 20.  Wexford advocated for limiting *Monell*

discovery to the years 2010 through 2014; plaintiff sought discovery spanning 2006 to 2014. *See id.* at 20, 21. Bost averred that she tried to "reach a compromise" with Wexford by agreeing to limit discovery to 2008 through 2014 "*if* Wexford is willing to stipulate that it will not argue that time period is insufficient to establish Wexford's policies and practice, and notice." *Id.* at 22 (emphasis in original). However, Wexford did not accept plaintiff's offer. *Id.*

Further, Bost complained that Wexford had allowed certain electronically-stored information ("ESI") to spoil. *Id.* at 24. She explained that during discovery, Wexford had refused to produce certain documents on the ground that they were located on a network drive called SharePoint that Wexford once shared with Maryland but to which it lost access in 2018, when its contract with DPSCS facilities expired. According to Bost, Wexford knew that it would lose access to SharePoint, but took no steps to preserve relevant records. *Id.* Beyond charging Wexford with spoliation, Bost argued that Wexford's position concerning the unavailability of this ESI was untenable because it could locate original versions of the requested documents in emails, hard drives, and electronic servers. ECF 477-2 at 24.

In addition to these global disagreements, plaintiff identified specific requests for production that were in dispute. These included, *id.* at 26-36:

- Request for Production No. 4: Documents created in the course of litigation involving claims of inadequate medical care, denial of medical care, or denial of medication at the BCDC in the five years before and after the Neal Detention and Death.

- Request for Production No. 5-7: Documents pertaining to "any requests for proposal, contracts, bids, or other agreements or attempts to obtain contracts related to the provision of medical services" between Wexford and Maryland, as well as analyses of Wexford's performance under such contracts.

- Request for Production No. 8: Documents "related to discipline imposed on Wexford staff at the BCDC or at other State of Maryland facilities in the five years before and after the Neal Detention and Death."

- Request for Production No. 9: Documents "relating to utilization management at the BCDC or at other State of Maryland facilities created in the five years before and after the Neal Detention and Death."

- Request for Production No. 16-17: Financial documents relating to Wexford's contract to provide medical care at BCDC and other State facilities for the five years before and after Neal's death.

- Request for Production No. 18: All documents pertaining to Wexford's "financial net worth."

Plaintiff averred that she had repeatedly conferred with Wexford concerning its discovery obligations, to no avail.  The parties held a telephone conference on June 21, 2019.  *Id.* at 14; *see* ECF 477-12 (Letter of 6/28/2019).  They conferred again on July 29, 2019.  ECF 477-2 at 15; *see* ECF 477-13 (Letter of 8/22/2019).  After the parties spoke on September 4, 2019, Wexford agreed to produce documents between 2010 and 2014, but it reiterated its position that discovery should be limited to BCDC's policies and practices surrounding emergency care.  ECF 477-2 at 15; *see* ECF 477-15 (Letter of 9/4/2019).  Plaintiff sent a follow-up letter explaining her position on September 12, 2019, but Wexford did not respond.  ECF 477-2 at 15; *see* ECF 477-15 (Letter of 9/12/2019).  Accordingly, Bost asked the Court to compel Wexford to provide supplemental responses to her discovery requests. ECF 477-2 at 36.

Wexford filed an opposition to the Motion (ECF 477-26), and submitted 151 pages of exhibits.  ECF 477-27.  Bost replied.  ECF 477-28.

On December 10, 2019, Judge Copperthite issued a three-page letter order granting the Motion in part and denying it in part.  ECF 480.  Noting that "docket entries [were] fast approaching the '500' mark," Judge Copperthite correctly observed that "this litigation has been aggressively pursued and vigorously defended."  *Id.* at 1.  And, he acknowledged that prevailing on a *Monell* claim requires substantial evidence.  *Id.*  However, Judge Copperthite was "unpersuaded by Plaintiff's argument that a *Monell* claim entitles her to relief beyond Rule 26 and

particularly the inference that courts *must* permit her the relief of such broad discovery." *Id.* (emphasis in original) (citing ECF 477-2 at 7).   Instead, he found that Bost "has requested information that is far outside of the scope of discovery and is far beyond being proportional to the remaining claims in her litigation." *Id.* at 2.

Judge Copperthite agreed with the parties that there were "two basic areas of complaint": the scope of discovery and the relevant time frame. *Id.*  On the first issue, Judge Copperthite ruled that discovery should be limited to documents concerning emergency care, reasoning that this case concerned "emergency care and the failure of Defendant to provide emergency care to Ms. Neal. . . . not . . . policies and procedures regarding other medical care." *Id.*

As for the proper time frame of discovery, Judge Copperthite stated, *id.*:

> The death of Fatima Neal occurred on November 4, 2012.  Wexford began providing emergency care to inmates at the detention center on July 1, 2012.  Prior to that date, Wexford provide utilization management services to the State of Maryland and did not make decisions regarding emergency medical care.  These facts are not in dispute.  The Court recognizes that utilization management could have some crossover into the deployment of emergent medical care, but it is not disputed that Wexford did not play the role of decision maker prior to July 1, 2012, four months prior to Ms. Neal's death. Plaintiff has asked for information dating back to 2006 or more.  Defendant Wexford has offered to limit the time frame to 2010 through 2014.  While Wexford may not have raised a burdensome argument, it matters little — the requests are not proportional to the remaining *Monell* claims. In opposition, Wexford states that it has already produced "every known policy/procedure/guideline that was in place from 2005-2018." ECF 477-26, p.20. The Court  agrees with Wexford that the time period should include 2010 through 2014, the relevant period for discovery.  The court also accepts that Wexford has provided documentation beyond that period as claimed.

Therefore, Judge Copperthite directed Wexford to respond to Bost's discovery request. But, the response was "limited to the time period and subject matter," as set forth in the Order. *Id.* at 3.

With respect to the provision of ESI, Judge Copperthite observed that Wexford had retained a vendor to estimate the time and cost involved in conducting a search  of Bost's requested

terms. *Id.* at 2.  Therefore, Judge Copperthite "defer[red] any decisions regarding the motion to compel ESI until that information becomes available to Wexford." *Id.* However, given Wexford's admission that it retained some of the documents stored on Sharepoint, he ordered Wexford "to ensure that all documents from the Sharepoint server that are in Wexford's possession and are responsive to Plaintiff's consistent with the limits set by this Letter Order are turned over to Plaintiff." *Id.*

Bost's Objection to Magistrate Judge Copperthite's Order followed on December 24, 2019. ECF 482.  Wexford has filed an opposition (ECF 485), and Bost replied.  ECF 490.[5]

## II.    Standard of Review

### A.

Under Rule 72(a) of the Federal Rules of Civil Procedure,  a "pretrial matter not dispositive of a party's claim or defense" may be referred to a magistrate judge for resolution.  *See* 28 U.S.C. § 636(b)(1)(A); Local Rule 301.5(a); *Mvuri v. Am. Airlines, Inc.*, 776 F. App'x 810, 810 (4th Cir. 2019) (per curiam).  Rule 72(a) also provides for the review of the magistrate judge's ruling.  A party who opposes the magistrate judge's order must "file objections to the order within 14 days

---

[5] By Order of January 21, 2020 (ECF 487), the Court granted the parties' joint motion to stay discovery (ECF 486) until Bost reviewed Wexford's ESI results, which the parties anticipated would occur no later than the end of February 2020.  In a joint Status Report filed on February 28, 2020, the parties averred that they were making swift headway on the production of ESI and would submit another Status Report on April 13, 2020.  ECF 492.

Further, on February 20, 2020, DPSCS moved for a protective order under Fed. R. Civ. P. 26(e) and 45(e)(2) as to Bost's subpoena request for documents created in connection with the case of *Duvall v. Hogan*, No. 94-cv-2541 (D. Md.).  ECF 491.  Plaintiff responded in opposition to the motion on March 5, 2019.  ECF 494.  But, due to the COVID-19 pandemic, the time to reply has not yet expired. *See In re: Court Operations Under the Exigent Circumstances Created by COVID-19*, Case 1:00-mc-00308, Standing Order 2020-05 (D. Md. Apr. 10, 2020).

after being served with a copy." Fed. R. Civ. P. 72(a).  In such a case, the district court "shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." *Id.*; *see Stone v. Trump*, 356 F. Supp. 3d 505, 511 (D. Md. 2019); *United Bank v. Buckingham*, 301 F. Supp. 3d 547, 551 (D. Md. 2018); *Stonecrest Partners, LLC v. Bank of Hampton Roads*, 770 F. Supp. 2d 778, 782 (E.D.N.C. 2011).  In performing this review, the court may "receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636.

Clear error review is "deferential" but "not toothless."  *Butts v. United States*, 930 F.3d 234, 238 (4th Cir. 2019).  The clearly erroneous standard does not permit the reviewing court to ask whether the magistrate judge's ruling "is the best or only conclusion permissible based on the evidence" or to "substitute its own conclusions for that of the magistrate judge." *Huggins v. Prince George's Cty.*, 750 F. Supp. 2d 549, 559 (D. Md. 2010); *see Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (observing that the clearly erroneous standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently").  Rather, a "finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *Butts*, 930 F.3d at 238 (quoting *Anderson*, 470 U.S. at 573).  An order is contrary to law if it "'fails to apply or misapplies relevant statutes, case law, or rules of procedure.'"  *Sandoval v. Starwest Servs., LLC*, 1:17-cv-01053 (AJT/TCB), 2018 WL 2426269, at  *1 (E.D. Va. Feb. 16, 2018) (citation omitted).

A magistrate judge's resolution of a discovery dispute is ordinarily accorded substantial deference.  *See Stone*, 356 F. Supp. 3d at 511; *In re Outsidewall Tire Litig.*, 267 F.R.D. 466, 470 n.5 (E.D. Va. 2010) (collecting cases).  Therefore, the objecting party carries a heavy burden in

persuading a district court to disturb a magistrate judge's ruling on a discovery matter. *See Stone*, 356 F. Supp. 3d at 511; *see also* 12 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE CIVIL § 3069 (3d ed. 2019) (noting that review of a magistrate's discovery ruling "might better be characterized as suitable for an abuse-of-discretion analysis"). Put simply, an objection is not a vehicle to nit-pick the magistrate judge's ruling. *See Buchanan v. Consol. Stores Corp.*, 206 F.R.D. 123, 124 (D. Md. 2002); 12 FEDERAL PRACTICE AND PROCEDURE CIVIL § 3069 (describing setting aside a magistrate judge's ruling as "extremely difficult to justify").

In undertaking review of the Objection, Rule 26 of the Federal Rules of Civil Procedure is also relevant. Rule 26(b)(1) was amended in 2015, regarding the scope of discovery in civil cases, in an effort to curb widespread abuse in discovery. *See generally Symposium*, *The Future of Discovery*, 71 VAND. L. REV. (Nov. 2018). The Rule provides that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense *and proportional to the needs of the case . . . .*" (Emphasis added). The party seeking discovery has the burden to establish its relevancy and proportionality, at which point the burden shifts to the party resisting discovery to demonstrate why the discovery should not be permitted. *Mach. Sols., Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522, 526 (D.S.C. 2018); *United Oil Co. v. Parts Ass'n*, 227 F.R.D. 404, 411 (D. Md. 2005).

Although Rule 26 does not define relevancy, it has been "'broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party.'" *Revak v. Miller*, 7:18-CV-206-FL, 2020 WL 1164920, at *2 (E.D.N.C. Mar. 9, 2020) (citation omitted); *see Fish v. Air & Liquid Sys. Corp.*, GLR-16-496, 2017 WL 697663, at *2 (D. Md. Feb. 21, 2017) (Copperthite, M.J.); *see also Herbert v. Lando*, 441 U.S. 153, 177 (1979); *Carr v. Double*

*T Diner*, 272 F.R.D. 431, 433 (D. Md. 2010).   Nonetheless, a party is not entitled to limitless discovery.  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (noting that "'discovery, like all matters of procedure, has ultimate and necessary boundaries'") (citation omitted).   Indeed, discovery "'must be measured against the yardstick of proportionality.'"  *Fish*, 2017 WL 697663, at *3 (citation omitted); *see Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 355 (D. Md. 2012).   Whether a discovery request is proportional is determined by "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."   Fed. R. Civ. P. 26(b)(1).

Moreover, pursuant to Rule 26(b)(2)(C), a court may limit discovery *sua sponte* or at a party's request for any one of three reasons: "the discovery sought is unreasonably cumulative or duplicative"; it is "obtainable from some other source that is more convenient, less burdensome, or less expensive"; or "the burden or expense of the proposed discovery outweighs the likely benefit."  *See Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004) ("The simple fact that requested information is discoverable . . . does not mean that discovery must be had.").

Notably, the Fourth Circuit has given district courts a wide berth to control discovery.  *See United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 323 (4th Cir. 2018); *see Hinkle v. City of Clarksburg*, 81 F.3d 416, 426 (4th Cir. 1996) ("District courts enjoy nearly unfettered discretion to control the timing and scope of discovery . . . .").  As a result, "discovery ruling are generally not overturned on appeal 'absent a showing of clear abuse of discretion," which "will only be identified where discovery restrictions prevent a litigant from 'pursuing a litigation theory.'"  *Ancient Coin Collectors Guild*, 899 F.3d at 323 (alteration and citation omitted).

**B.**

Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, deprives her "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.  To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Loftus v. Bobzien*, 848 F.3d 278, 284-85 (4th Cir. 2017); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that " 'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made

possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freh*, 275 F.3d 391, 402 (4th Cir. 2001).

## C.

In the case of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that local governmental entities may be liable under § 1983 based on the unconstitutional actions of individual defendants where those defendants were executing an official policy or custom of the local government that violated the plaintiff's rights. *Id.* at 690-91. The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official

policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane*, 355 F.3d at 782.

Of import here, *Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers. *See, e.g.*, *West*, 487 U.S. at 49; *Polk*, 454 U.S. at 320; *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). Thus, those standards applicable to municipalities apply with full force to Wexford. *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "'apply equally to a private corporation'" acting under color of state law) (citation omitted).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Indeed, "[i]t is well established that in a § 1983

case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___ U.S. ___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (stating that liability attaches "only where the municipality *itself* causes the constitutional violation at issue") (emphasis in original).  In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation."  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Davison*, 912 F.3d at 689.

A plaintiff may demonstrate the existence of an official policy in three ways: (1) an express policy; (2) certain affirmative decisions of policymaking officials; and (3) a widespread practice that is so engrained it constitutes a custom, including omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).  "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Brown*, 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'"  *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted).  Thus, an entity can be held liable under § 1983 for an unconstitutional action that stems from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 36 (2010).

A plaintiff may also establish *Monell* liability through the acts of a person employed by the entity, who has final policymaking authority.  To qualify as a "final policymaker" for *Monell* purposes, the individual must have final authority to establish policy on behalf of the entity with respect to the conduct at issue.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 139-40 (1988); *Lane v. Anderson*, 660 F. App'x 185, 197 (4th Cir. 2016).  The Fourth Circuit has admonished that "there is a marked difference between 'the authority to make final *policy* [and] the authority to make final implementing *decisions*.'"  *Hunter v. Town of Mocksville*, 897 F.3d 538, 555 (4th Cir. 2018) (emphasis and alteration in original, citation omitted).  To discern whether a policymaker has "final policymaking authority," courts consider "'(1) whether an individual is constrained by policies of other officials or bodies; (2) whether the individual's decision on the issue is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.'"  *Hunter*, 897 F.3d at 557 (quoting *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009)).

Moreover, "outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a custom or usage with the force of law.'"  *Carter*, 164 F.3d at 218 (cleaned up) (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003).  In such a case, the custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees."  *Spell*, 824 F.2d at 1387; *see Holloman v. Markowski*, 661 Fed. App'x 797, 799 (4th Cir. 2016).  In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow

circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that to establish a *Monell* claim the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

Beyond an unconstitutional practice or custom, an entity may also be liable under *Monell* for its inaction, where its omissions constitute deliberate indifference to constitutional injuries. For instance, the failure to train, supervise, or discipline officers can support liability under *Monell*. *See Connick*, 563 U.S. at 61; *Canton*, 489 U.S. at 389. However, for an entity's failure to train its employees to rise to a constitutional violation, the failure "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick*, 563 U.S. at 61 (alteration in *Connick*); *see Canton*, 489 U.S. at 389 ("Only where a municipality's failure to train its employees . . . evidences a 'deliberate indifference' to the rights of its inhabitants can such a such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.").

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230; *see Owens*, 767 F.3d at 403 ("Sporadic or isolated violations of rights will not give rise to *Monell* liability . . . ."). Rather, only "'widespread or flagrant'" misconduct suffices. *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387); *see Holloman*, 661 F. App'x at 799.

## III.   Discussion

On appeal, Bost asserts that Judge Copperthite committed clear error by "misconstruing the scope of discovery appropriate under Rule 26 on a *Monell* claim," an error she maintains "infects the entire decision." ECF 482 at 16.  In plaintiff's view, Judge Copperthite clearly erred in limiting discovery to emergency care, because her *Monell* claim is "not specific to the delay or denial of emergency care alone" and, regardless, documents related to non-emergency care are "plainly relevant" to how Wexford handled emergencies.  *Id.* at 19; *see id.* at 18-22.  Moreover, Bost asserts that Judge Copperthite's decision to cabin discovery to a four-year period is clearly erroneous because such a narrow slice of time precludes her from establishing an unconstitutional policy or custom, as well as Wexford's awareness of its deficiencies in its procedures, training, or supervision.  *Id.* at 23-28.  In addition, Bost attacks Judge Copperthite for failing to compel Wexford to furnish specific categories of documents identified in the Motion, arguing that Wexford waived any objection by not addressing the issue in its opposition.  *Id.* at 17.

In response, Wexford accuses Bost of fishing for documents that it posits are irrelevant, disproportionate to the needs of the case, and unduly burdensome to produce.  *See* ECF 485 at 9. Regarding the scope of discovery, Wexford contends that Bost's demand that it produce documents pertaining to the "general 'denial of medical care'" is unreasonably broad because "it

could encompass any disagreement a patient has with a treatment modality utilized by a medical provider." *Id.* at 10.  Nor are such records relevant, Wexford insists, because "this case clearly concerns the provision of emergent medical care . . . ." *Id.*

In addition, Wexford defends Judge Copperthite's ruling limiting discovery to the period from 2010 to 2014, emphasizing that it has already turned over "every known policy/procedure/guideline that was in place from 2005-2018." *Id.* at 11.  Further, Wexford rejects the contention that it waived the right to contest plaintiff's discovery requests, suggests that these issues are moot, and posits that Judge Copperthite's rulings impliedly address these granular disputes. *Id.* at 12-13.

I shall take each of Bost's contentions in turn.

## A.

To begin, I find no error in Judge Copperthite's ruling that discovery should be tailored to emergency care.  To the contrary, he could hardly be more correct in his observation that Bost's "claim [is] about emergency care and the failure of Defendant to provide emergency care to Ms. Neal." ECF 480 at 1.

Since the inception of this litigation nearly five years ago, plaintiff has steadfastly pressed the claim that Neal died due to defendants' failure to obtain timely emergency medical care. Plaintiff's Amended Complaint is replete with references to emergency care; the word "emergency" or one of its derivates appears 60 times—more than once per page.  The Amended Complaint also alleges that Wexford staff should have sought emergency medical care for Neal when she *first* presented to the BCDC infirmary on November 1, 2012. *See* ECF 56, ¶ 61 (alleging that "Nurse Rachel did not contact an emergency medial services provider to examine Fatima for a possible stroke").  Indeed, plaintiff characterizes Neal's first visit to the BCDC infirmary as the

"**First Failure to Provide Emergency Care**." *Id.* ¶ 62 (emphasis in original).  Each of Neal's

subsequent interactions with Wexford medical staff is also described as a "Failure to Provide

Emergency Care."  *See id.* ¶¶ 66, 71, 73, 75, 79, 84, 87, 94, 97, 99, 105, 116, 122, 142.

Moreover, the Amended Complaint proceeds on the theory that defendants "were

deliberately indifferent to the legitimate and serious *emergency* medical needs of individuals in

BCDC custody, including Ms. Neal."  ECF 56, ¶ 27 (emphasis added); *see also id.* ¶¶ 16, 21.

Plaintiff's *Monell* claim is no exception.  She alleges that Wexford maintained a policy or custom

"regarding treatment of detainees displaying symptoms of serious medical emergencies that

includes under-reporting the severity of these emergencies," *id.* ¶ 172; trained its staff to "ignore

or under-report symptoms of stroke and similar emergencies," *id.* ¶ 173; and condoned "the

conduct of its employees who ignore or under-report symptoms of a stroke and similar medical

emergencies."  *Id.* ¶ 175.

At the summary judgment stage, plaintiff marshalled the reports of multiple medical

experts to argue that Neal should have been transferred to a hospital on November 1, 2012.  *See*

ECF 430 at 35-36.  Plaintiff offered the report of Peter Pytel, M.D., a board-certified

neuropathologist, who opined, ECF 225-10 at 6: "For patients with stroke, appropriate early and

aggressive intervention is crucial, and can substantially reduce the likelihood of poor outcomes

of severe disability and death."  Likewise, plaintiff relied on a report by Nathaniel R. Evans, II,

M.D., a board-certified internist and certified Correctional Health Care Provider, who opined that

the "standard of care" for someone displaying Neal's symptoms is the "prompt . . . transfer to a

hospital for evaluation."  ECF 225-19 at 3.[6]

_____

[6] To be sure, defendants marshalled experts who found no fault with the medical care that
was provided.

24

The short of it is that this case is about emergency care.  Neal's death was not caused by a lapse in routine medical care that, for example, allowed a hidden malignancy to spread undetected, such as a melanoma that masqueraded as a freckle.  Rather, according to plaintiff, Ms. Neal died because, despite presenting allegedly obvious symptoms of a stroke—an acute, life-threatening condition—she languished in the infirmary for days and was not transported to the hospital.

To be sure, Bost is correct that courts "must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case."  Fed. R. Civ. P. 26 advisory committee note.  But, discovery relating to non-emergency care is neither relevant nor proportional to plaintiff's case.  It is not relevant because the manner in which Wexford rendered medical care to a detainee who, for example, needed an x-ray for a swollen ankle, or needed to be seen by a specialist to manage arthritis, would shed little light on Wexford's approach to detainees with medical emergencies, such as strokes, heart attacks, sepsis, anaphylactic shock, or other urgent conditions.  And, such discovery is not proportional because compelling Wexford to turn over "all Documents relating to Complaints alleging . . . denial of medical care," ECC 477-5 at 5, or "all Documents relating to utilization management," *id.* at 6, is not reasonably tailored to the issue of how Wexford treated detainees experiencing medical emergencies.  *See, e.g.*, *Estate of Najera-Aguirre v. Cty. of Riverside*, ED CV 18-762-DMG (SPx), 2019 WL 6898944 (C.D. Cal. Aug. 22, 2019) (concluding that magistrate judge did not err in denying plaintiff's motion to compel a police officer's personnel file where the officer's incident of misconduct had "little similarity" to the facts underlying the *Monell* claim); *Williams v. Connick*, No. 12-1274, 2014 WL 1246771, at *3 (E.D. La. Mar. 25, 2014) (limiting *Monell* discovery to "documents that relate to *Brady* violations similar to those alleged" by the plaintiff);

*Wright v. City of Chicago*, No. 09 C 3489, 2010 WL 4875580, at \*2 (N.D. Ill. Nov. 23, 2010) (plaintiff was not entitled to five years of records pertaining to all police misconduct for a *Monell* claim alleging unlawful vehicle impoundment).

Accordingly, Judge Copperthite did not clearly err in denying plaintiff's request for documents unrelated to Wexford's involvement in emergency medical care.[7]

## B.

With respect to the time frame of discovery, Judge Copperthite limited discovery to four years, from 2010 to 2014. I must consider whether that period is too truncated, given the quantum of evidence necessary to establish a *Monell* violation.

As an initial matter, plaintiff's threat that Judge Copperthite's ruling "all but assures that there will be an appeal issue," ECF 482 at 23, carries little force. To support this contention, plaintiff relies on a trio of cases: *Santos ex rel. Santos v. City of Culver City*, 228 F. App'x 655 (9th Cir. 2007), *Fields v. City of Chicago*, No. 19 C 1168, 2015 WL 13578989 (N.D. Ill. Apr. 7, 2015), and *Padilla v. City of Chicago*, No. 06 C 5462, 2011 WL 3651273 (N.D. Ill. Aug. 18, 2011). ECF 482 at 14-15. I am not bound by these out-of-circuit decisions. *See United States v. Stephens*, 764 F.3d 327, 342 (4th Cir. 2014). And, even so, these cases hardly compel the conclusion that a *Monell* claim per se necessitates discovery covering decades.

---

[7] In his Order, Judge Copperthite stated that "it is not disputed that Wexford did not play the role of decision maker [regarding emergency care] prior to 2012," as Wexford only provided UM services until 2012. ECF 480 at 2. As the briefing on the Order illustrates, the parties fiercely contest whether Wexford exerted control, through formal or informal channels, over the utilization of emergency services at BCDC between 2006 and 2012. *See* ECF 482 at 20-22; ECF 485 at 6-7. But, to the extent of any error in characterizing Wexford's role prior to 2012, this error is completely harmless.

The cases of *Padilla* and *Fields* are readily distinguishable.  *Padilla* involved the appeal of a magistrate judge's ruling rejecting the plaintiff's request for misconduct reports from the Chicago Police Department in furtherance of his *Monell* claim.  2011 WL 3651273, at *1.  The district court found that the magistrate judge committed clear error because "Department-wide statistics" were "necessary" to establish a practice or custom of unconstitutional conduct.  *Id.* at *2.  In *Fields*, the district court granted the plaintiff's motion for a new trial on his *Monell* claim, concluding that a prior discovery ruling denying the plaintiff access to police files for other homicide investigations "rendered it impossible for [the plaintiff] to attempt to show that the Chicago Police Department's practice of file maintenance and disclosure affected anyone other than him," which "in turn, made it virtually impossible for him to establish that the City had a 'policy' of concealing exculpatory evidence," as required by *Monell*.  2015 WL 13578989, at *5.

*Padilla* and *Field* merely illustrate the unremarkable proposition that a plaintiff pursuing a *Monell* claim is entitled to discovery beyond the circumstances of his or her own case.  That is not at issue here; everyone agrees that Bost should receive documents concerning instances of inadequate medical care for persons other than Neal.  In contrast, *Padilla* and *Field* say nothing about the appropriate time frame of such discovery, which is the issue presented here.

Plaintiff's reliance on *Santos* is also mislaid.  According to Bost, the Ninth Circuit in *Santos* "reverse[d] [a] grant of summary judgment on [a] *Monell* claim where the district judge denied five years of *Monell* discovery."  ECF 482 at 24.  She has the holding backwards.  In *Santos*, the panel majority held that "the district court did not err when it granted summary judgment to the City on the *Monell* claim" because the plaintiff "did not present evidence to create a triable question of fact regarding a causal link between the City's policies and the officer's acts."  228 F. App'x at 659.  Separately, Judge Reinhardt, who concurred in part and dissented in part,

explained that he would have reversed the district court's ruling on the plaintiff's *Monell* claim because the district court denied the plaintiff's request to seek discovery concerning police officers other than those who arrested the plaintiff. *Id.* at 660. Thus, *Santos* cuts against plaintiff, and offers no guidance as to the appropriate temporal scope of *Monell* discovery.

Bost is correct that proving a *Monell* claim requires far more than a handful of constitutional violations. *See Owens*, 767 F.3d at 403. The plaintiff must demonstrate a "persistent and widespread pattern of practice" to establish a policy or custom. *Owens*, 767 F.3d at 402 (internal quotation marks and citation omitted). Moreover, "widespread and recurrent" conduct is necessary to prove a defendant's "deliberate indifference." *Id.* For instance, the Fourth Circuit has rejected a *Monell* claim at the *pleading* stage where the plaintiff alleged only four instances of allegedly unlawful conduct. *Holloman*, 661 F. App'x at 799-800.

Wexford played a role in the provision of medical care at BCDC for twelve years, but its role shifted in July 2012, from UM services to providing actual medical care. Judge Copperthite constrained plaintiff to four years of discovery, from 2010 through 2014. ECF 480 at 2. In my view, this period, while hardly expansive, is sufficient to enable plaintiff to scour for evidence to support a *Monell* claim.

In any event, Wexford has already produced documents well beyond the 2010-2014 time frame. Specifically, in opposition to the Objection, Wexford contends that it has turned over to plaintiff the result of "the retrospective reviews of all emergency department visits for all correction facilities in Maryland from 2007-2017 for which Wexford provided services." ECF 485 at 7. If true, Bost has received relevant emergency-related discovery for as long as Wexford provided healthcare services to DPSCS facilities.

Thus, I shall not disturb Judge Copperthite's ruling on the temporal scope of discovery.

**C.**

Finally, plaintiff contends that Judge Copperthite erred in denying her certain categories of documents, despite Wexford having forfeited any objection.  This contention is without merit.

For starters, Wexford did not ignore plaintiff's discovery requests; it placed its objections squarely before Judge Copperthite.  In Wexford's opposition to the Motion, it directed Judge Copperthite to its responses to plaintiff's request for production.  *See* ECF 477-26 at 7, 23.  And, Wexford vigorously argued that plaintiff's discovery requests were "not relevant to her claim in this case, not proportional to the needs of the case, and would result in an incredible burden and expense for Wexford to review."  *Id.* at 10.

Nor did Judge Copperthite overlook Bost's request to compel various categories of documents outlined in the Motion.  Rather, Judge Copperthite directed Wexford to produce information "limited to the time period and the subject matter consistent with this Letter Order."  ECF 480 at 3.  In other words, Judge Copperthite's resolution of the parties' broad discovery disputes obviated the need to parse plaintiff's request for production with a fine-tooth comb.

In essence, plaintiff seeks to vacate the Order because Judge Copperthite did not meticulously examine each of Wexford's responses to the nine requests for production that plaintiff highlighted in her Motion.  Bost pressed this same argument in her first objection.  *See* ECF 178 at 6-7.  And, I rejected it, explaining, ECF 193 at 14: "I am unaware of any rule requiring a judge to write a detailed exposition on every discovery issue in every case.  Such a rule would prevent federal courts from functioning effectively and efficiently, and would multiply the time for cases to reach resolution."  So too here; Judge Copperthite was not required to pen a dissertation as to each category of disputed documents.

Furthermore, it appears that these disputes have since dissipated because Wexford has complied with many (though not all) of plaintiff's discovery requests.  With respect to Request for Production No. 4, Wexford avers that it disclosed a list of all lawsuits related to the provision of medical care at BCDC and advised Bost that it does not possess inmate grievances.  ECF 485 at 12 n.12.  As for Request for Production Nos. 5, 6, and 7, Wexford provided Bost with copies of its State contracts.  *Id.*  Although Wexford did not produce discipline records for all Wexford staff as sought in Request for Production No. 8, Wexford did furnish the employee files of those involved in Neal's care.  *Id.*  In response to Request for Production No. 9, which sought "[a]ll Documents relating to utilization management," Wexford produced all retrospective reviews for all emergency department visits for all Maryland facilities that Wexford serviced between 2007 and 2017.  *Id.* at 7.  Wexford advised plaintiff that it would provide financial documents concerning the provision of emergency care at BCDC, satisfying Request for Production Nos. 9, 16, 17, as qualified by Judge Copperthite's Order.  *Id.* at 12 n.12.  Regarding Request for Production No. 18, Wexford refused to produce financial documents for the purpose of assessing punitive damages, *see id.*, pursuant to an earlier discovery ruling by Chief Magistrate Judge Beth Gesner.  *See* ECF 112.

In sum, Judge Copperthite's consideration of plaintiff's motion to compel specific documents was neither clearly erroneous nor contrary to law.

## IV.    Conclusion

For the reasons set forth above, I shall affirm Judge Copperthite's Order (ECF 480). Therefore, I shall deny the Objection (ECF 482).

An Order follows, consistent with this Memorandum Opinion.

Date:  April 15, 2020                                                      _____/s/_____
                                                                                          Ellen Lipton Hollander
                                                                                          United States District Judge