**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SHARON BOST, in her individual capacity | * | |
| and as personal representative of the ESTATE | * | |
| OF FATIMA NEAL, | * | Case No. 1:15-cv-03278-ELH |
|     *Plaintiff*, | * | |
|     *v.* | * | Hon. Ellen L. Hollander, |
| WEXFORD HEALTH SOURCES, *et al.*, | * | District Judge |
|     *Defendants*. | * | |
| | | JURY TRIAL DEMANDED |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*


**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


Arthur Loevy
Michael Kanovitz
Anand Swaminathan
Steven Art
Sarah Grady
Rachel Brady
LOEVY & LOEVY
311 North Aberdeen St
Chicago, Illinois 60607
(312) 243-5900

Masai D. McDougall
Fareed Nassor Hayat
Norrinda Hayat
THE PEOPLE'S LAW FIRM
14908 Notley Avenue
Silver Spring, Maryland 20905
(301) 384-2198

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

FACTS ............................................................................................................................................ 2

    I.    Wexford Had a Financial Incentive to Reduce Emergency Room Visits to Increase Profits ................ 2

        A.    Upon Taking Over Direct Patient Care in July 2012, Wexford Immediately Implemented Reckless Policies to Reduce ER Visits and Increase Profits ........................... 3

        B.    Express UM Policy Requiring Approval Before Sending to the ER ................ 5

        C.    Wexford Sought Across-the-Board Reduction in ER Trips ............................. 7

            1.    Wexford guaranteed a 10% reduction in offsite medical care before taking over patient care ....... 7

            2.    Wexford sought across-the-board cuts in ER trips that far exceeded its own assessment of how many ER trips were preventable ................................. 7

            3.    Wexford sought across-the-board cuts in ER trips across all sites, unconnected to any specific categories of care ....................................... 8

            4.    Wexford's across-the-board cuts in ER trips across all sites were not based on any expansion in services onsite that would justify such a drastic reduction ................ 10

            5.    Wexford implemented additional processes and practices designed to incentivize medical staff to delay and deny ER visits ......................... 11

        D.    Predictably, Wexford's Cost-Cutting Efforts Resulted in Increased Deaths ....................... 13

            1.    ER trips plummeted and deaths skyrocketed once Wexford took over ................ 13

            2.    Wexford's ER reduction efforts led to delay and denial of necessary emergency care in dozens of cases, resulting in deaths ....................... 14

            3.    Wexford's own expert admitted that there were failures in at least 6 of the 19 cases Dr. Herrington identified ............................. 18

            4.    Wexford admitted in its own CAPs that patients should have gone out sooner ............. 18

            5.    Wexford's CQIs contain staggering admissions ............................. 21

        E.    The Problems Identified through Death Reviews, CAPs, CQIs and Other Records Were Recurring Issues Well Known to Wexford's Senior Leaders ............................. 21

        F.    Wexford's Contention That the Sole Evidence of ER Reductions Was a Corizon-Only Policy Is Belied By the Record ............................. 22

        G.    Wexford Had Ample Notice That Its UM Policies and ER Reduction Efforts Would Produce Negative Patient Outcomes ............................. 24

            1.    Wexford's UM role prior to July 2012 gave it unlimited access to information about patient outcomes in Maryland facilities ............................. 24

            2.    Wexford's aggressive ER reduction efforts in other states also produced troubling results ......... 26

    II.    Ms. Neal's Own Case Reflects the Recklessness of Wexford's Reckless Cost-Cutting Efforts ............ 27

i

A.   Ms. Neal was Suffering Obvious Stroke Symptoms over Three Days, with the Knowledge of Wexford's Medical Staff ................................................................................................. 27

B.   Ms. Neal Likely Would Have Survived if She Had Been Sent to the ER at any Point in the Days Before She Died ................................................................................................................. 32

ARGUMENT ................................................................................................................................. 33

I.    Legal Standard ................................................................................................................... 33

II.   A Jury Could Reasonably Conclude That Wexford Had a Widespread Practice of Denying Necessary Emergency Care that Caused Ms. Neal's Death ................................................. 36

A.   Wexford Had a Widespread Practice of Denying Necessary ER Care ............................... 37

1.    Wexford denied necessary ER care to numerous other patients similar to Ms. Neal ................. 37

2.    Wexford's own documents and emails betray its widespread practice of intentionally denying ER care, despite the known and obvious risk ................................................................. 38

B.   Plaintiff's Evidence Establishes that Wexford Knew the Obvious Risks to Patient Welfare Posed by its Widespread Practice ......................................................................................... 40

C.   Wexford Was Deliberately Indifferent to the Known and Obvious Risks of its Widespread Practice ............................................................................................................. 41

D.   Wexford Does Not Meaningfully Address Plaintiff's Substantial Evidence Plaintiff of a Widespread Practice ............................................................................................................ 43

III.  A Jury Could Reasonably Conclude that Wexford's Express Policies Caused Ms. Neal's Death ........ 47

A.   Wexford's Utilization Management Policies Caused a Fatal Delay in Sending Ms. Neal to the Emergency Room ................................................................................................................ 48

B.   Wexford's Policy to Reduce ER Trips Across the Board Caused a Violation of Fatima Neal's Constitutional Rights .......................................................................................................... 49

IV.   Wexford Failed to Train or Supervise Its Medical Staff Despite Knowing that Such Training and Discipline Was Necessary to Protect Patient Health ........................................................... 54

V.    Plaintiff's Experts, Drs. Keller and Herrington, Have Disclosed Reliable Expert Opinions That Are Amply Supported by the Factual Record ..................................................................... 56

A.   Wexford's Attacks on Dr. Keller's Expert Report Are No Basis to Exclude His Opinions ........... 59

B.   Wexford's Attacks on Dr. Herrington's Expert Report Are No Basis to Exclude His Opinions .... 62

CONCLUSION ............................................................................................................................... 65

# TABLE OF AUTHORITIES

**CASES**

*A Helping Hand, LLC v. Baltimore Cty.*, 515 F.3d 356 (4th Cir. 2008) ................................. 43, 47

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 33, 34

*Awalt v. Marketti*, 74 F. Supp. 3d 909 (N.D. Ill. 2014) ..............................................38, 43, 50, 64

*Bost v. Wexford*, 2018 WL 3539819 (D. Md. July 23, 2018)...........................................34, 35, 50

*Brawner v. Scott Cty.*, 14 F.4th 585 (6th Cir. 2021) .............................................................35

*Bresler v. Wilmington Trust Co.*, 855 F.3d 178 (4th Cir. 2017) ..............................57, 58, 59, 64

*Brightview Grp., LP v. Teeters*, 2021 WL 2627960 (D. Md. Feb. 8, 2021) ...............................57

*Brown v. Mitchell*, 308 F. Supp. 2d 682 (E.D. Va. 2004) .............................................. 53, 54

*Burns v. Anderson*, 123 F. App'x 543 (4th Cir. 2004) ................................................ 59, 65

*Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999) ................................................................36

*Castro v. McCord*, 259 F. App'x 664 (5th Cir. 2007) .........................................................37

*Cavallo v. Star Enter.*, 100 F.3d 1150 (4th Cir. 1996) .......................................................56

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................33

*Charles v. Orange Cty.*, 925 F.3d 73 (2d Cir. 2019)...........................................................35

*Cipolloni v. City of New York*, 758 F. App'x 76 (2d Cir. 2018) ...................................... 36, 37

*City of Canton v. Harris*, 489 U.S. 378 (1989) ....................................................... 43, 53, 54

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)........................................................47

*Clark v. Alexander*, 85 F.3d 146 (4th Cir. 1996)..............................................................33

*Daniel v. Cook Cty.*, 833 F.3d 728 (7th Cir. 2016) ...........................................................37

*Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013)..........................................................33

*Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579 (1993) ...............................................56

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) ..........................34

*Eriline Co. v. Johnson*, 440 F.3d 648 (4th Cir. 2006) ........................................................47

*Glass v. Anne Arundel City.*, 38 F. Supp. 3d 705 (D. Md. 2014) ................................... 59, 65

*Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372 (7th Cir. 2017) ............................................52

*Gordon v. Cty. of Orange,* 888 F.3d 1118 (9th Cir. 2018) ............................................................35

*Hodge v. Wal-Mart Stores, Inc.,* 360 F.3d 446 (4th Cir. 2004).........................................44, 45, 62

*Howell v. Wexford Health Sources, Inc.,* 987 F.3d 647 (7th Cir. 2021) ........................................46

*Hunter v. Cnty. of Sacramento,* 652 F.3d 1225 (9th Cir. 2011) ...................................................64

*Hunter v. Town of Mocksville,* 897 F.3d 538 (4th Cir. 2018) ......................................................52

*Jackson v. City of Cleveland,* 925 F.3d 793 (6th Cir. 2019) ...................................................48, 50

*Jacobs v. N.C. Admin. Office of the Courts,* 780 F.3d 562 (4th Cir. 2015) ........................33, 34, 60

*King v. Kramer,* 680 F.3d 1013 (7th Cir. 2012) ..........................................................................50

*Kingsley v. Hendrickson,* 576 U.S. 389 (2015)......................................................................34, 35

*Kopf v. Wing,* 942 F.2d 265 (4th Cir. 1991).........................................................................37, 45

*Kovari v. Brevard Extraditions,* 461 F. Supp. 3d 353 (W.D. Va. 2020) .......................................50

*Lytle v. Doyle,* 326 F.3d 463 (4th Cir. 2003).................................................................36, 37, 38

*Magill v. Gulf & W. Indus., Inc.,* 736 F.2d 976 (4th Cir. 1984) ...................................................34

*Maryland Shall Issue, Inc. v. Hogan,* 2021 WL 3172273 (D. Md. July 27, 2021) ........................57

*Mays v. Sprinkle,* 992 F.3d 295 (4th Cir. 2021)..........................................................................35

*McCoy v. Biomet Orthopedics, LLC,* 2021 WL 252556 (D. Md. Jan. 25, 2021) ...........................60

*McDonald v. Dunning,* 760 F. Supp. 1156 (E.D. Va. 1991) .......................................................52

*Michelson v. Coon,* 2021 WL 2981501 (4th Cir. July 15, 2021).................................................35

*Miranda v. Cty. of Lake,* 900 F.3d 335 (7th Cir. 2018).............................................................35

*Monell v. Department of Social Services of New York,* 436 U.S. 658 (1978)...............................*passim*

*Montano v. Orange Cty.,* 842 F.3d 865. (5th Cir. 2016).............................................................37

*New Hampshire v. Maine,* 532 U.S. 742 (2001) .......................................................................59

*Owens v. Baltimore City State's Attorney's Office,* 767 F.3d 379 (4th Cir. 2014) ..............36, 37, 40, 52

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986)......................................................47, 48, 53

*Powell v. Shopco Laurel Co.,* 678 F.2d 504 (4th Cir. 1982) ......................................................35

*Randall v. Prince George's Cty.,* 302 F.3d 188 (4th Cir. 2002) ....................................36, 40, 41, 45

*Rodriguez v. Smithfield Packing Co.,* 338 F.3d 348 (4th Cir. 2003)..............................................35

*Ruark v. BMW of N. Am., LLC*, 2014 WL 351640 (D. Md. Jan. 30, 2014) ..................................... 56, 63

*Russell v. Absolute Collection Servs., Inc.,* 763 F.3d 385 (4th Cir. 2014) ........................................47

*Saltz v. City of Frederick*, ___ F. Supp. 3d ___, 2021 WL 1856636  (D. Md. May 10, 2021) .......... 37, 45

*Santos v. Frederick Cty. Bd. of Comm'rs*, 346 F. Supp. 3d 785 (D. Md. 2018)  ...............................53

*Scinto v. Stansberry*, 841 F.3d 219 (4th Cir. 2016) ........................................................................34

*Semple v. City of Moundsville,* 195 F.3d 708 (4th Cir. 1999) ....................................................... 47, 53

*Shehee v. Saginaw Cty., 2015 WL 58674* (E.D. Mich. Jan. 5, 2015) ............................................35

*Shields v. Ill. Dep't of Corr.*, 746 F.3d 782 (7th Cir. 2014) ...........................................................35

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987) .................................................................*passim*

*Sprint Nextel Corp. v. Simple Cell, Inc.*, 2016 WL 524279 (D. Md. Feb. 10, 2016) ...................61

*Thomas v. Cook Cty. Sheriff's Dep't,* 604 F.3d 293 (7th Cir. 2010) ...............................................36

*Tolan v. Cotton,* 572 U.S. 650 (2014) ...................................................................................... 34, 51

*United States v. Landersman*, 886 F.3d 393 (4th Cir. 2018)............................................................56

*Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*, 2021 WL 3883597
(D. Md. Aug. 12, 2021) .....................................................................................57, 61, 65

*Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520 (D. Md. 2020) ................................53

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) .......................................... 56, 61

## STATUTES AND OTHER AUTHORITIES

42 U.S.C. § 1983..............................................................................................34, 35, 36, 52

## INTRODUCTION

On November 4, 2012, after approximately three days in the Wexford-run infirmary of the Baltimore City Detention Center ("BCDC"), Fatima Neal died from untreated strokes. Wexford's own medical records reflect that Ms. Neal was supposed to be released the next day.

During the non-*Monell* phase of this case, Wexford vehemently argued—with the support of two neurology experts—that Fatima Neal died of a sudden, massive stroke on November 4, 2012 that was catastrophic and rendered it impossible for Wexford doctors and nurses to save her. But in the *Monell* phase of the case, Wexford has reversed course. It has instead retained a new neurologist who admits Ms. Neal had suffered her first stroke two to three days before her death, while under 24-hour care in the Wexford infirmary. The overwhelming evidence from other detainees, Maryland's death investigators, and Wexford's own medical records, is that Wexford's infirmary medical staff knew Ms. Neal was suffering obvious symptoms of stroke but failed to send her out.

The question is why Wexford's doctors and nurses failed to send an obvious stroke patient to the ER. Plaintiff is the only party in this litigation that offers any explanation: because Wexford implemented policies and practices that pressured medical staff to avoid costly ER visits. If Ms. Neal had just survived for one more day, she would have been released from the BCDC, without a hit to Wexford's profits, and her care would have been at someone else's cost. As explained below, Plaintiff's explanation is supported by a mountain of evidence that Wexford promulgated express policies to force huge, across-the-board reductions in ER visits, and that it perpetuated a widespread practice of delaying and denying ER visits to achieve its goal. By contrast, Wexford offers no explanation whatsoever for why its medical staff failed to send Ms. Neal to the ER for more than 48 hours after she suffered her first stroke. Yet, Wexford asks this Court to grant summary judgment on Plaintiff's *Monell* claim and preclude a jury from ever considering this evidence.

In Plaintiff's experience, Wexford's litigation practice is to file summary judgment motions in every case, regardless of whether the evidence in a particular case supports it. Indeed, during the individual phase of this case, Wexford filed a summary judgment motion despite a mountain of evidence that created, at minimum, material disputes of fact. In denying Wexford's first summary judgment motion, this Court recognized that nearly every material fact was hotly disputed by the parties. And it properly held that in such a case, the proper venue to resolve those disputes was not at summary judgment but at trial, before a jury empowered to resolve factual disputes.

The evidentiary record in the *Monell* phase demands the same result. Wexford has filed a baseless summary judgment motion on Plaintiff's *Monell* claims. Like the previous one, its current motion presents a vastly distorted picture of the evidentiary record. It relies on a cherry-picked set of facts, deliberately ignoring ample evidence that directly contradicts its claims. Remarkably, Wexford notes that the parties produced more than 150,000 pages of documents, but attaches just four of those documents (along with three expert reports) in support of its motion. This highlights the obvious: Wexford is, once again, asking this Court to ignore almost all of the evidence, including all facts supporting Plaintiff, and instead accept its facts as true and draw all inferences in its favor. But Wexford's invitation makes a mockery of the summary judgment standard. Plaintiff has amassed a vast quantity and quality of evidence reflecting Wexford's direct role in Ms. Neal's death, and a jury could reasonably find for Plaintiff based on that evidence. Summary judgment must be denied.

## FACTS

### I. Wexford Had a Financial Incentive to Reduce Emergency Room Visits to Increase Profits

When Wexford began performing direct patient care in July 2012, its financial incentives were simple: the less Wexford spent on emergency room ("ER") trips and other offsite care, the more profit it made on the contract, and vice versa. Ex. 48 at 23-24. More specifically, Wexford was paid a fixed amount per prisoner, multiplied by the average monthly prisoner population. *Id.*; Ex. 30

at 36-37. It was then responsible for the vast majority of variable patient care costs. Ex. 48 at 23-24; Ex. 30 at 25-28. This included 100% of all costs for trips to the ER (and all other offsite care). Ex. 48 at 23-24; Ex. 30 at 21-22. Wexford was also responsible for 100% of ambulance costs, up to a cap. Ex. 48 at 23-24; Ex. 30 at 27-28. Thus, if Wexford reduced ER trips and other offsite care, it saved money. Ex. 48 at 23-24; Ex. 30 at 46-47. This was a change in practice; prior to July 2012, when Corizon was responsible for direct patient care, the cost of offsite and emergency care was borne by the State of Maryland. Ex. 15 at 73-74, 128.

### A.  Upon Taking Over Direct Patient Care in July 2012, Wexford Immediately Implemented Reckless Policies to Reduce ER Visits and Increase Profits

Upon taking over the direct patient care contract in July 2012, Wexford made a major change to the organizational structure used by the prior contractor, Corizon: it combined the Utilization Management ("UM") and Continuous Quality Improvement ("CQI") departments, putting UM staff in charge and subordinating CQI. Ex. 49 at 7; Ex. 21 at 18, 32-33, 40-41; Ex. 24 at 48-49. The separation of UM and CQI is critical, and Wexford's decision to have UM subsume CQI was contrary to accepted practice in the correctional healthcare industry. Ex. 49 at 5-6, 7-8; Ex. 48 at 24; Ex. 21 at 42-44. In effect, Wexford chose cost-cutting over quality. Ex. 49 at 7; Ex. 48 at 24; Ex. 21 at 32-33, 40-41.

The impact of the decision to place CQI under UM cannot be overstated. CQI is about quality of care; a robust CQI program is a necessary component of any healthcare system and especially a correctional healthcare system. Ex. 49 at 4; Ex. 48 at 24. CQI analyses will uncover issues that are likely to directly impact patient care, and once issues like these are recognized through the CQI process, a thorough action plan must be promptly implemented and its effectiveness closely tracked. *Id.* at 4-5. Because CQI is ultimately about the quality of care to patients, the failure to have a robust and healthy CQI process poses an obvious danger to patient health. *Id.* at 5; Ex. 48 at 24.

3

UM, by contrast, is focused on reducing costs. Ex. 49 at 5; Ex. 48 at 24. The goal is to decrease medical spending. Ex. 49 at 5. UM commonly develops medical formularies, protocols, guidelines, and policies, and then monitors adherence to these written standards. *Id.* UM also typically requires certain high-cost procedures, tests, or medications to be approved in advance. *Id.* Of course, cost savings must not come at the expense of patient care and administrators must be vigilant to assess the impact of any UM cost-saving initiative on patient care. *Id.*

Because CQI and UM are distinct processes with often competing goals, it is critical that they remain separate and independent. Ex. 49 at 5; 48 at 24. Leadership teams responsible for the overall healthcare contract must ensure that the UM system does not take priority over the CQI program so as to ensure that cost considerations do not result in poor patient care. Ex. 49 at 5. The risks to patient well-being posed by UM taking over CQI is obvious and well known. *Id.*

Such risks are particularly obvious in the context of emergency care. It is risky and highly problematic to apply UM efforts to patients who need to go to the ER because of concern about possible life-threatening emergencies. Ex. 49 at 6. In the field of correctional healthcare, it is well-known that there is an obvious danger in trying to contain ER-related costs because any efforts to control "unnecessary" ER transfers will eventually result in true emergencies not being sent. *Id.*; Ex. 15 at 151. It is often impossible to know in advance whether a specific medical complaint is truly an emergency before the ER evaluation is done. *Id.* Failing to send a patient with an emergency (like stroke) to the ER can be fatal, and so inevitably some patients will return after ER doctors have established that stroke can be "ruled out." Ex. 49 at 6-7. But from a UM-only perspective, it is an unwanted cost. This is an example of why it is well known in correctional medicine that the UM priorities must sometimes be rejected in favor of ensuring quality of care and patient safety. *Id.* at 7-8; Ex. 21 at 42-44.

Wexford, however, did the opposite, expressly putting UM and its cost-cutting priorities over CQI and its quality-related priorities. Once UM was in charge, Wexford's decisions related to ER care changed significantly. Cost considerations (instead of quality of care and access) became "front and center," as did efforts to reduce ER visits. Ex. 48 at 24; Ex. 21 at 32-33, 150-151.

**B.    Express UM Policy Requiring Approval Before Sending to the ER**

Effective July 1, 2012, the day Wexford took over direct patient care, Wexford put in place a new policy called the "Utilization Management Policies and Procedure, Region: Maryland." Ex. 81 at WEXDISC 445, 446; Ex. 31 at 57-58. It was a Wexford policy. *Compare* Ex. 81 at WEXDISC 445 (UM policy, with cover page stating it is "Wexford Health Sources Incorporated" policy), *and* 446 ("Corporate Authorization" stating, "This Wexford . . . Maryland Manual has been reviewed and approved by the Corporate Medical Advisory Committee"), *with* Ex. 84 at WEXDISC 486 (policy with cover page stating it is policy of Maryland's "Office of Treatment Services, Office of Inmate Health Services"); Ex. 31 at 57-58. Wexford's UM department wrote the policy, and it was signed by Dr. Thomas Lehman, Wexford's Corporate Medical Director for Clinical Services & UM. Ex. 81 at WEXDISC 446; Ex. 31 at 44, 57-58, 72. The policy does not contain signatures or authorizations from any employees of the State of Maryland. Ex. 81 at WEXDISC 445.

The plain language of the post-July 2012 policy, set forth in policy provisions "UM-001: After-Hours Notification of Emergency/Hospital" and "UM-002: Emergency/Hospital Notification," was clear: a Site Medical Director or designated on-call physician had to first determine that an ER referral was necessary before the patient could be sent out. Ex. 49 at 8; Ex. 48 at 25. The policy states: "After hours notification of emergency room visits prompts the Wexford UM Department to *intervene* and review specific cases for medical necessity and appropriateness in a timely manner. If the patient is *then* admitted, the Wexford UM Department will attempt concurrent utilization review." Ex. 81 at WEXDISC 449 (emphasis added). The first step in the notification

procedure is for the "Site Medical Director or designee" to "determine[] that transport to the emergency room/hospital is necessary," and the policy is clear that the only designees authorized to make such a determination are the Site Medical Director or on-call physician. Ex. 81 at WEXDISC 450. Consistent with UM-001 and UM-002, Wexford's Emergency Room Visit Reduction Program, discussed below, reiterated the requirement of a "gatekeeper"—and backup gatekeepers—to approve "all ER trips." Ex. 80 at WEXDISC 20931; Ex. 49 at 8; Ex. 48 at 25.

Egregiously, Wexford deliberately changed its post-July 2012 UM policy to require physician approval before sending a patient to the ER. Wexford's pre-July 2012 policy, in effect while Wexford held only the UM contract and did not pay for offsite care, stated: "Urgent and emergent referrals are automatic approval as to not delay any care." Ex. 49 at 8; Ex. 82 at WEXDISC 3607; Ex. 31 at 64-65, 66. That language was *removed* from the post-July 2012 UM policy. *Compare* Ex. 81 at WEXDISC 450, *with* Ex. 49 at 8.

When Wexford took over on July 1, 2012, its new UM policy was disseminated to Wexford's doctors and nurses, who were trained on it. Ex. 31 at 58, 59-61, 62-63. And multiple Wexford staff and administrators testified that they would seek approval before sending a patient to the ER. Ex. 23 at 131-133, 226-27; Ex. 21 at 72-73, 153; Ex. 24 at 32; Ex. 22 at 38-39; Ex. 49 at 8; Ex. 48 at 25; Ex. 19 at 39. Medical records from individual cases expressly documented requests for authorization from senior medical staff before sending patients out to the ER. Ex. 43 at WEXDISC 33573; Ex. 79 at 51; *see also* Ex. 55 at NEAL 49859 (Fatima Neal's medical records). Additionally, emails reveal that nursing staff feared getting "in trouble" for sending patients to the ER or authorizing other nurses to send patients to the ER. Ex. 46 at WEXDISC 24227.

Wexford's July 2012 UM policy was an egregious departure from the long-established well-known principle in correctional medicine that medical staff must have the unencumbered ability to call 911 if a patient requires emergency care. Wexford's own supervisors and experts agree that

requiring approval from a gatekeeper before calling 911 is obviously dangerous. Ex. 31 at 21-22; Ex. 34 at 163-164; Ex. 21 at 85; Ex. 16 at 110-113; Ex. 49 at 7-8. Wexford's own expert acknowledged that a medical contractor must ensure that all doctors and nurses understand that they do not need approval before calling 911. Ex. 16 at 114-115. Wexford's express policy required the exact opposite.

### C.    Wexford Sought Across-the-Board Reduction in ER Trips

#### 1.    *Wexford guaranteed a 10% reduction in offsite medical care before taking over patient care*

When it took over direct patient care in July 2012, Wexford had every intention of benefiting from its financial incentive and reducing ER visits. Even in its proposals to win the contract, Wexford guaranteed a 10% reduction in offsite visits, which included ER trips. Ex. 49 at 8; Ex. 59 at WEXDISC 3210. The expressed premise was that Wexford could conduct targeted training and provide additional equipment so it could care for more patients on site. *Id.* But Wexford actually provided no additional training, equipment or other resources to expand the services in the infirmary, while still reducing ER visits far beyond its expressed goal. *See infra* Arg. § IV; Ex. 49 at 8-9; Ex. 48 at 26.

#### 2.    *Wexford sought across-the-board cuts in ER trips that far exceeded its own assessment of how many ER trips were preventable*

In the period from 2010 to July 2012, while Wexford was in the UM role monitoring the rate of offsite care, Wexford had determined that the rate of unnecessary visits was approximately 2 out of every 108 ER runs per month, or slightly less than 2%. Ex. 83 at WEXDISC 3211, 3213; 95 at WEXDISC 5740-51, 5766-76, 5789-97; Ex. 49 at 14. Both of Wexford's senior UM managers overseeing the Maryland contract, Drs. Asresahegn Getachew and Robert Smith, acknowledged that the number of ER trips deemed unnecessary was very low, even before Wexford initiated concerted ER reduction efforts. Ex. 31 at 25-26; Ex. 15 at 62-63.

Wexford's efforts to achieve hard target reductions in ER visits far above its own determination of the number of unnecessary ER trips was thus plainly reckless. Between 2012 and

2013 (when Wexford's ER reduction efforts were in full effect), the average number of ER runs across all Maryland facilities fell from 108 per month to 64 per month—a 40.7% reduction in ER trips well above the promised 10%. Ex. 49 at 14; 95 at WEXDISC 5789-97. At one facility operated by Maryland's Department of Public Safety and Correctional Services ("DPSCS"), ER trips decreased by 80% over a period of three months: 25 in December 2012, 10 in January 2013, and 5 in February 2013. Ex. 58 at WEXDISC 28542, Ex. 68 at 28446; Ex. 49 at 15. Indeed, by January 2013, Wexford commemorated that its ER referrals were "under budget." Ex. 2 at WEXDISC22614.

When Wexford achieved reductions in ER trips far greater than the rate of preventable ER trips and its own more aggressive goals, it did not take any steps to assess whether the reductions in ER runs were sacrificing patient outcomes. Ex. 49 at 14. This was contrary to accepted practice in correctional medicine. Ex. 49 at 13, 15, 19-20. Wexford, through its UM Director and Rule 30(b)(6) corporate designee, Dr. Smith, and its own correctional healthcare expert, Dr. Alfred Joshua, admits that if a medical contractor is attempting to reduce ER visits, it would be dangerous to do so without carefully monitoring the program to ensure patients were not suffering negative outcomes. Ex. 15 at 118; Ex. 16 at 90-93, 97-100, 103-105.

3.   *Wexford sought across-the-board cuts in ER trips across all sites, unconnected to any specific categories of care*

Wexford's across-the-board cuts were not limited to particular sites or categories of care. Wexford's Health Services Administrator admitted that Wexford's post-July 2012 ER reduction efforts were not limited by category of care, and that those efforts remained in effect through 2014, when she left. Ex. 19 at 55. In the Baltimore Pre-Trial Region (where Fatima Neal was housed), in August 2012, Wexford's Regional Director of Nursing for Baltimore Pretrial and Wexford's Regional Administrator for Baltimore Pretrial reported that ER reduction efforts were going well. Ex. 60 at WEXDISC 26092-26093. And in the December 2012 Quarterly Regional Multivendor

CQI Meeting report from the Baltimore Pretrial Region, Wexford noted that ER runs "remain significantly down." Ex. 61 at WEXDISC 24029.

The same was true across other Maryland facilities. Reductions in ER trips were a constant theme in CQI reports from 2012-2014 across Maryland facilities. Ex. 49 at 10-11, 12; Ex. 48 at 24, 26 (cataloging examples).[1] None of those CQIs identified particular categories of care that were appropriate opportunities for reduction; they simply called for reductions in ER trips across the board. *Id.* For example, a January 2013 CQI for Maryland various sites stated the goal in clear terms: "Minimize the number of Er runs for the month. Have emergent cases seen on site." Ex. 7 at WEXDISC 28546. A January 2013 CQI for another Maryland facility, Jessup, stated: "ER runs: doing very well with documenting these runs and preventing ER trips." Ex. 70 at WEXDISC 28554.

In October 2012, Wexford's CQI committee identified several Maryland facilities that had a "time delay in responding to emergencies"; Wexford's solution was to *reduce* ER runs, with a goal of fewer than 20 ER trips per month. Ex. 4 at WEXDISC 25961-65; Ex. 49 at 12. This across-the-board cut to ER trips per month did not come with any stated justification for a reduction in ER runs to 20, what tools had been put in place to permit such a reduction, or what categories of care might be targeted for reduction without sacrificing care. Ex. 4 at WEXDISC 25961-65. This dramatic departure from acceptable practice in correctional medicine is both inherently dangerous to patient well-being and further evidence that Wexford had subordinated the CQI process to UM's cost-cutting goals. Ex. 49 at 12.

Meanwhile, Wexford's statewide leadership continued to reinforce Wexford's efforts to reduce the number of ER trips and celebrate all such reductions. Ex. 71 at WEXDISC 24258-59; Ex. 49 at 13. Wexford staff, including Wexford's Director of Operations for the Maryland contract,

---

[1] *See also, e.g.*, Ex. 61 at WEXDISC 24029; Ex. 62 at WEXDISC 22155; Ex. 63 at WEXDISC 22165; Ex. 64 at WEXDISC 24985; Ex. 65 at WEXDISC 25482, Ex. 6 at WEXDISC 25835; Ex. 66 at WEXDISC 26908; Ex. 67 at WEXDISC at 28437; Ex. 68 at WEXDISC at 28446; Ex. 69 at WEXDISC 28542; Ex. 7 at WEXDISC 28546; Ex. 70 at WEXDISC 28554.

Marianne McKee, and its Regional Medical Director for Baltimore Pre-Trial (where Ms. Neal was),

Dr. Isaias Tessema, emailed staff to celebrate 25 consecutive days that staff made no ER referrals.

Ex. 40 at WEXDISC 24250-52, Ex. 42 at WEXDISC 24338-39; Ex. 43 at WEXDISC 33574-75.

Wexford's Statewide Director of UM, Dr. Getachew, congratulated Dr. Tessema and noted his

"leadership and laser focus on ER runs" was "showing significant reduction in UM" in the

Baltimore Pre-Trial Region Dr. Tessema oversaw. Ex. 42 at WEXDISC 24338.

4.     <em>Wexford's across-the-board cuts in ER trips across all sites were not based on any expansion in services onsite that would justify such a drastic reduction</em>

Of course, if Wexford had invested in additional equipment, personnel, and other resources

to greatly expand the range of services available in its infirmaries, that could have been a responsible

approach to managing the costs of offsite care. Ex. 49 at 6, 13; Ex. 48 at 26. But Wexford did not

provide additional resources, equipment, training, or supplies to expand onsite services in the

infirmary when it took over the contract in 2012. Ex. 29 at 6-11, 59-60, 41-42, 46-47; Ex. 18 at 6-7,

17; Ex. 19 at 28-30, 34-39; Ex. 20 at 257-60, 266-68, 303; Ex. 21 at 68-69; Ex. 22  at 51-53; Ex. 23 at

86-88; Ex. 24 at 6-8; Ex. 25 at 379-80, 384-86; Ex. 14 at 222-27, 314-18, Ex. 27  at 114-116; Ex. 28

at 243, 290; Ex. 31 at 46-50; Ex. 17 at 35-36; Ex. 15 at 125-26 (Wexford 30(b)(6) corporate designee

and UM Director admitting same); *see also* Ex. 49 at 13; Ex. 96 at 16 (interrogatory response failing

to identify any expanded services in Baltimore Pretrial). Without that, its successful efforts to

drastically reduce ER trips were reckless and harmful to patients. Ex. 49 at 16-18, 20-21; Ex. 48 at

27. Indeed, Wexford's own correctional healthcare expert conceded that a medical contractor should

attempt to reduce ER trips only if it also provides a commensurate infusion of resources to

supplement onsite care. Ex. 16 at 90-93, 97-100, 266-67, 270-71, 272-273, 285; Ex. 15 at 120

(Wexford's corporate designee acknowledging same); *see also* Ex. 49 at 13.

5.      *Wexford implemented additional processes and practices designed to incentivize medical staff to delay and deny ER visits*

Wexford's requirement that medical staff call a gatekeeper before sending a patient to the ER, even when the patient was unresponsive and clearly in need of immediate transport, was a strong message that ER trips were discouraged, and was itself a powerful incentive to delay or deny care. Ex. 49 at 15; Ex. 48 at 26-27. But Wexford put in place lots of additional processes to discourage medical staff from referring patients to the ER.

Among other things, Wexford reviewed every ER referral to determine whether it was unnecessary. Ex. 31 at 23-26, 45-46, 47-48; Ex. 36 at 70-71, 73, 75; Ex. 49 at 12. These reviews were overseen by Wexford's UM department, not its CQI department. Ex. 45 at WEXDISC 22723-24; Ex. 21 at 100-01; Ex. 49 at 12. In other words, ER referrals were reviewed from the perspective of cost-cutting rather than quality. Ex. 49 at 4-5. Wexford's senior UM managers had daily calls with regional medical directors (and other administrative staff) where they were required to "explain the validity of ER referrals." Ex. 19 at WEXDISC 22723-24; Ex. 37 at 64-65; Ex. 49 at 12. There were also discussions about how to reduce so-called unwarranted ER runs. Ex. 34 at 119; Ex. 49 at 12. Leaving no doubt that those discussions were about cost—not quality—in advance of those discussions, UM would send the cost of each ER referral. Ex. 45 at WEXDISC 22723-24.

This review process also specifically applied to the Baltimore Region, where Ms. Neal was housed. The daily call for that region was attended by Dr. Tessema and UM staff including the UM Director and UM nurses. Ex. 34 at 117-18. Following the calls, which included discussions about how to reduce ER trips, Dr. Tessema would communicate non-confidential information from those calls to the onsite providers. *Id.* at 117-2l, 182-84.

There are many examples of the pressure to avoid ER trips—even in cases where there was an indisputable need. Dr. Getachew told Dr. Tessema that the onsite doctor should have sent a patient for imaging rather to the ER, where the patient was experiencing sudden and serious

11

neurological symptoms. Ex. 44 at WEXDISC 34167; Ex. 49 at 14. In July 2013 onsite medical

providers were seeking to send a patient to the ER with second-degree burns to his face and chest,

but Dr. Tessema would not authorize it. Ex. HS 24. The patient's condition was bad enough that the

correctional staff refused to take custody of the detainee and insisted he go out to the ER per the

request of medical staff. *Id.* Custody kept sending the patient back to the infirmary, only to be sent

back to custody again based on Dr. Tessema's refusal to authorize the ER trip. *Id.* Dr. Tessema's

correspondence revealed that Wexford's policies had created pressure not to send the patient out. *Id.*

at WEXDISC 23801.

Wexford's leadership also emphasized its ER reduction efforts during evaluations of its

doctors. Ex. 49 at 13. In Wexford's annual performance reviews, doctors' and nurses were evaluated

on their "cost effectiveness." Ex. 3 at WEXDISC 1775; Ex. 1 at WEXDISC 1780; Ex. 49 at 13. And

this was true of Dr. Afre, the primary physician overseeing Ms. Neal: in August of 2013, Dr.

Tessema evaluated Dr. Afre's "cost effectiveness" as exceeding expectations and specifically noted

that Dr. Afre had "very low ER referral and manages complex cases in the infirmary." Ex. 1 at

WEXDISC 1780; Ex. 49 at 13. Wexford's Corporate UM Medical Director, Dr. Robert Smith,

acknowledged that emphasizing reduction of ER referrals to providers poses a risk that the

providers will fail to refer patients to the ER when it is necessary. Ex. 15 at 151; Ex. 49 at 13. Yet,

that is exactly what happened. Practitioners became afraid to call for emergency transport. Ex. 58 at

WEXDISC 24227; Ex. 46 at WEXDISC 24227. All of these processes and pressures Wexford

implemented created a powerful incentive to deny and delay necessary ER trips in favor of a "wait

and see" approach. Ex. 49 at 19; Ex. 48 at 26-27. And this posed obvious risks to patient safety—

particularly for neurological conditions, which can rarely be treated in an onsite infirmary, and for

most of which—like stroke—even a small delay in ER transfer can be catastrophic. Ex. 48 at 26.

**D.       Predictably, Wexford's Cost-Cutting Efforts Resulted in Increased Deaths**

1.       *ER trips plummeted and deaths skyrocketed once Wexford took over*

Beginning in January 2010 until the ER Visit Reduction Program started in September 2011, there were on average 108 ER runs per month (and only two preventable ER runs per month). Ex. 49 at 14; Ex. 95 at WEXDISC 5740-51, 5766-73. Starting in January 2012 through the end of December 2013, however, the average number of ER runs fell to an average of 64 per month. *Id.*

During this same time period, deaths increased dramatically. After Wexford's efforts to reduce ER trips went into effect, patient deaths increased. In the year after Wexford took over direct patient care, deaths increased by an average of nearly 30% statewide and more than 63% in the Baltimore pretrial region. Ex. 49 at 15-16; Ex. 5. In the two years after Wexford took over, deaths increased on average over 28% statewide and over 40% for the Baltimore pretrial region. Ex. 49 at 16; Ex. 5. Even worse, deaths were increasing despite an overall slight decrease in patient population. Ex. 88; 53 at 4-5.

U.S. Department of Justice (DOJ) reporting on mortality rates in jails and prisons reveals equally troubling findings. The number of deaths in Maryland prisons from 2010-2013 were 40, 41, 46 and 58, respectively. Ex. 87 at NEAL 104712; Ex. 53 at 4. In other words, deaths started to increase immediately, even in 2012 when Wexford had been in full control for only half a year, and then increased even more dramatically in Wexford's first full year in charge of direct patient care. *Id.* Indeed, the number of deaths in Maryland prisons in 2013 increased 45% from the 2010-2011 average of 40.5 deaths per year. *Id.* Again, the Maryland prison population was slowly decreasing over the same period. Ex. 88. Accounting for this, per 100,000 inmates, the 2010-2013 Maryland mortality rate was 175, 178, 211, and 267, respectively. Ex. 87 at NEAL 104713. So, the mortality rate increased dramatically in 2013 during Wexford's first full year responsible for direct patient care. Ex. 87 at NEAL 104713; Ex. 53 at 4-5. The rate in 2013 was 51.3% higher in 2013 than the 2010-

2011 average. *Id.* Expanding the number of years does not change the analysis: a comparison of the three full years before Wexford took over (2009-2011) to the three full years after it took over (2013-2015) produces the same staggering results. The Maryland average mortality rate per 1000 for 2009-2011 was 202.33; for 2013-2015, it was 255, a 26% increase. Ex. 49 at 5. Put simply, patient deaths increased dramatically once Wexford took over in July 2012 and implemented its across-the-board ER reduction policy.[2]

2. *Wexford's* ER *reduction efforts led to delay and denial of necessary emergency care in dozens of cases, resulting in deaths*

Dr. Ryan Herrington, Plaintiff's correctional healthcare expert, conducted a review of the available medical records for 24 cases—most involving deaths—that occurred under Wexford's care, and found that in 19 of those cases there were violations of the standard of care directly related to Wexford's ER reduction efforts. Ex. 48 at 5-18. More specifically, in those 19 cases he found that Wexford improperly delayed or denied emergency care. *Id.* Those cases are summarized as follows:

- **R.G.** died in 2010 from a pulmonary embolism. The day he died, he came to the infirmary complaining of dizziness, chest pain, and shortness of breath. He required help from two other inmates to get him to the infirmary. There was a delay in calling 911, and so EMS took 65 minutes to arrive. Wexford's own mortality review notes that his blood pressure was not monitored and the labs that had been ordered were not done; his medical problem was not identified and he was not triaged to chronic care; and his initial evaluation on the day he came to the infirmary was not to standard. Wexford's Corrective Action Plan ("CAP") also notes that nurses failed to document an admission assessment, failed to document his significant change in condition and notify the on-call provider. R.G. should have been evaluated immediately at the infirmary and sent to the emergency room when he experienced a significant status change that signaled a life-threatening emergency, and 911 should have been called right away. *Id.* at 8.

- **C.A.** died in May 2011 from a heart attack. He presented with complaints of chest pain and low oxygen levels, and he was cool and clammy. An EKG suggested coronary

---

[2] Notably, it was Wexford's correctional healthcare expert, Dr. Fowlkes, who originally cited to the DOJ data to suggest that the mortality rate in Maryland was below national averages. Ex. 52 at 40-41. But as he had to concede, he looked only at DOJ mortality rate data for prisons, even though in Maryland Wexford also managed patients in pretrial jail facilities (like the BCDC where Ms. Neal was housed). Ex. 52 at 40. The same DOJ data is available for jails, and it shows that the mortality rate in jails is vastly lower, given the younger patient population and shorter custody periods. Ex. 86 at NEAL 104683. After accounting for the mix of jail and prison population in Maryland, the average mortality rate in Maryland for 2013-2015 was greater than the national average. Ex. 53 at 4.

ischemia—an indicator of a heart attack—but the physician ordered treatment for acid reflux and asked for a call back. Providers returned his call at 4:43 a.m., and called 911 22 minutes later. Ex. 48 at 14-15. A 22-minute delay in calling 911 for a patient who presents with obvious heart-attack symptoms is an unacceptable delay. Given his presentation, treating C.A. with Maalox for gastric acid reflux is inappropriate and profoundly risky; what was needed was immediate transfer to the ER to treat an acute cardiac event. *Id.* at 14-15.

- **E.A.** presented in January 2012 with excruciating headache, left facial and upper extremity numbness, and blurred vision, obvious stroke symptoms. Her symptoms persisted over hours. Medical records reference a previously scheduled MRI. About three hours after that, her left-sided neurological symptoms had worsened; E.A. report, but no ER referral or other intervention was undertaken by the treating physician, Dr. Afre. When her symptoms further worsen and she reports total facial heaviness, numbness, and droop, she is finally sent to the ER. She has suffered a stroke. She should have been sent to the ER at least five hours earlier, when she was displaying obvious stroke symptoms that required immediate ER transfer. *Id.* at 14.

- **S.P.** presented with a worsening headache in May 2009. Over the next two years, he displayed a number of other obvious symptoms of neurological deterioration, including weakness in his arms and legs, difficulty walking, numbness, sensory symptoms, and neurogenic bowel. Providers requested a cervical spine MRI or orthopedic consultation in July 2011, but Wexford's UM intervened twice and redirected him to other therapies. By February 2012, he had weakness in all four extremities and had difficulty walking. He was admitted to the infirmary, and eventually taken to the hospital with progressive quadriparesis, where he was diagnosed with a skull tumor. He was treated and survived, but experienced years of excruciating pain. This was "an appalling case of neglect"; on numerous occasions he should have been sent to the ER and for offsite neurological care. *Id.* at 10-11.

- **C.R.** died in August 2012 from a cerebral embolus, a type of stroke. He had recently been discharged from the hospital for treatment of a heart condition, and presented to the infirmary with an unsteady gait, slurred speech, an elevated blood pressure, and one-sided weakness---obvious signs of a neurological event and a medical emergency. Records indicate that the physician wanted to contact the medical director for authorization to send C.R. to the emergency room. The 911 call went out two and a half hours after nurses called the on-call doctor. Wexford's CAP admitted that C.R.'s death was a failure to timely send him to the ER, and to document and communicate to the doctor changes in symptoms that should have precipitated an immediate ER referral. *Id.* at 11-12.

- **A.S.** was HIV positive, and died in September 2012 from sepsis. He presented with a temperature of 102.8 and heart rate of 112. He was later admitted to the infirmary with a 103.2 degree fever and a heart rate of 120. The next day he had a fever and sore throat, and was prescribed penicillin. The day after that, he had a fever of 103.8 and a heart rate of 122. The day after that, he had a fever of 105.1 and a heart rate of 135. After that, he was coughing up blood. Even then, he was not transferred to the ER until the next day, and died three days later. A patient with HIV and an uncontrolled and extremely high fever, suggestive of sepsis, should have been thoroughly worked up, which required transfer to the ER. Even when he was significantly and obviously unstable, spitting up

blood, there was an additional five hour delay before he was actually sent to the ER. *Id.* at 17-18.

- **F.R.** died in December 2012 of suspected sepsis. He presented with respiratory distress and a marked change in mental status. The physician was notified and ordered vital checks every four hours. Providers should have called 911 immediately, resulting in a delay in sending F.R. to the ER. *Id.* at 12.

- **E.Ha** presented in January 2013 with slurred speech and loss of coordination. He was admitted to the infirmary, and the next day he reported loss of balance and falling. Nurses noted right arm weakness and right facial drooping. These are obvious stroke symptoms and providers should have sent him for emergency care immediately. There is no record that anyone contacted a doctor at that time. A physician saw him nine hours later and noted the same symptoms, but prescribed bed rest in the infirmary. *Id.* at 15.

- **D.J.** died in April 2013 from a cardiac arrhythmia with cardiomegaly. He was a 21-year old with no history of mental illness, but presented with psychosis and confusion. He was referred to the mental health unit even though he had been seen the previous day and had no symptoms. Given no medical history of mental illness and sudden change in status, he should have been sent to the ER. Indeed, Maryland investigator's raised the same concerns in their death review. *Id.* at 16.

- **A.C.B.** died in May 2013 from a brain infarct (stroke). He presented in 2013 with a severe headache, right-sided weakness, and complaints of right-side paralysis. These are clear signs of a possible neurological event. Providers suspected a stroke, but waited over two hours to call 911. He should have been sent to the emergency room immediately. *Id.* at 6.

- **A.D.** died in May 2013 from syncope (which can be caused by heart disease) and diabetes. He had a history of diabetes and high blood pressure, and had been seen for chest pain several years prior. Providers should have sent him out for emergency care to rule out a myocardial infarction, and should also have been risk stratified through a stress test or treadmill test to test for heart disease. *Id.* at 6-7.

- **G.M.** died in June 2013 from hypertensive cardiovascular disease. He was admitted to the BCIBC with a history of high blood pressure and opioid addiction, and was referred to the medical department to coordinate his withdrawal. Medical providers never saw him, or documented his vital signs. He suffered cardiac arrest and died the same day he was admitted. *Id.* at 7.

- **T.Lo** presented to the infirmary in June 2013 with complaints of weakness and lethargy. Her condition deteriorated significantly over the next three days, and by the second day she was unable to lift her head, walk, or eat or drink, her vital signs were erratic, she was vomiting, and she complained of 10/10 pain. She was not sent to the ER until three days after getting to the infirmary, where she died of lung cancer. Wexford's own CAP noted failures to document and communicate serious changes in her condition, like rapidly deteriorating vital signs. She should have been sent to the ER both when she was first admitted to the infirmary, and at numerous points when her condition deteriorated over the next 48 hours; the three-day delay in sending her to the ER was improper. *Id.* at 9-10.

- **J.M.** died in July 2013 after presenting with shortness of breath, lower back pain, abdominal pain, chest pain, 10/10 abdominal tenderness with no bowel movement for

three days. He was observed sweating, restless, and vomiting. He was observed briefly in the infirmary before being sent back to his cell. His records do not indicate that a physician was notified about his change in status. He died the next day. His significant change in status was never communicated to a physician to intervene to assess his medical need, including possible transfer to the ER. *Id.* at 17.

- **R.S.** died in March 2014 from a pulmonary embolism. He had asthma, and presented with wheezing, chest tightness, and low oxygen levels. The next day, he was coughing blood and experiencing pleuritic chest pain. These two symptoms combined indicate the presence of a potentially fatal pulmonary embolism and he should have been immediately sent to the ER. Instead, R.S. remained in the infirmary, and two days later, he went into cardiac arrest. *Id.* at 12-13.

- **R.A.** died in March 2014 from hypertensive cardiovascular disease and pulmonary edema. He had a history of seizures, high blood pressure, and cardiomyopathy. Ten months after he was incarcerated, he had a seizure and died. DPSCS's death review identified a number of medical shortcomings, including failures to follow up on known medical conditions and inappropriately discontinuing blood-pressure medication just a few months before R.A. died. R.A. should have been referred for offsite intervention on multiple occasions, which was necessary to properly and diagnose and treat his conditions. Maryland's investigator conducted a death review and reached the same conclusion. *Id.* at 13.

- **E.Ho** died in April 2014 from a stroke. He presented with high blood pressure and headache—the combination of which indicates a stroke—and should have resulted in immediate transfer to the ER. He was instead given medication and returned to his cell. The next day, he presented with high blood pressure, headache, facial drooping, aphasia, and left-sided weakness. He was sent out at that time, far too late, and he died four days later from an intracerebral hemorrhage. *Id.* at 15-16.

- **T.Le** died in 2016 from a perforated gastric ulcer. She was having difficulty breathing and her oxygen saturation was low. Nursing staff were unable to reach the on-call physician, and records indicate there was up to a 64-minute delay before 911 was called. That delay was improper; rather than attempting to get a hold of the on-call doctor, 911 should have been called immediately. *Id.* at 8-9.

- **D.B.** was admitted to the infirmary twice over three days in 2016 with complaints of vomiting, and sudden and severe headaches—obvious stroke symptoms. Neurological causes were not ruled out, and instead he was given pain medication. Three days later, he was found unresponsive. Medical staff delayed 50 minutes before calling 911. D.B. died of a stroke and large cerebral infarct. D.B. should have gone to the ER for stroke symptoms three days earlier when he went to the infirmary with stroke symptoms, and Wexford's providers should have called 911 immediately when D.B. was found unresponsive. *Id.* at 5-6.

3.      *Wexford's own expert admitted there were failures in at least 6 of the 19 cases*
        *Dr. Herrington identified*

Wexford's own correctional medicine expert, Dr. Thomas Fowlkes, admits that he had

concerns about the delay in ER referral in at least six of the cases above, including D.B., A.C.B.,

T.Le, T.Lo, C.R., and R.S. Ex. 33 at 241, 271-74, 323-25.

- **A.C.B.**: Dr. Fowlkes had concerns about the length of time it took to contact emergency services. *Id.* at 292-94.
- **T.Le**: he concedes there might have been a delay in calling for emergency care. *Id.* at 318-321.
- **T.Lo**: he agrees that she should have been sent to the hospital when she became unable to walk and had 10/10 pain the day before. *Id.* at 321.
- **C.R.**: he agrees that the delay in calling an ambulance after C.R. was found unresponsive was a problem. *Id.* at 323.
- **R.S.**: he agrees that R.S. should have been sent to the hospital when he was treated for respiratory symptoms. *Id.* at 330-331.
- **D.B.**: he agrees that D.B. had concerning symptoms in the week before his death, but concludes only that he does not have sufficient information to affirmatively state that there was a breach of the standard of care. *Id.* at 275-76.

4.      *Wexford admitted in its own CAPs that patients should have gone out sooner*

In addition to the examples above, there were a series of CAPs—including two admitting to

unacceptable delays in sending the patients to the ER—that identified recurring failures in patient

care. CAPs, by definition, were created when failures in its patient care were identified. Ex. 21 at 88,

94-95, 120-21; Ex. 34 at 41-42; Ex. 19 at 10-11.

After C.R.'s death on August 24, 2012, Wexford issued a CAP that contained numerous

areas of concern: that the nurse failed to communicate to the physician when the patient's blood

pressure was critically high and should have been sent out to the ER; the physician ordered Tylenol

rather than sending the patient to the ER; the nurse failed to monitor C.R.'s elevated blood pressure;

multiple documentation failures; a failure to recognize and communicate a change in the patient's

condition, including alteration of mental status; and a three-hour delay in sending to the ER. Ex. 12

at WEXDISC 25275-76. Ultimately, Wexford's UM Director wrote in internal emails: "Based upon my review, there were salient documentation deficiencies and a gross error in communication regarding the patient's vital signs (BP 215/68) that led to what appears to be mismanagement of his emergency status." Ex. 72 at WEXDISC 32542. Put simply, in addition to a series of documentation and communication failures with regard to a patient displaying obvious stroke symptoms, in multiple instances the patient should have been sent to the ER but was not, resulting in an unacceptable delay. Ex. 12 at WEXDISC 25275-76; Ex. 21 at 125-127; Ex. 48 at 19.

The failures in care related to C.R.'s death drew significant attention. The CAP was distributed to Wexford's Statewide Director of Operations Ms. McKee and the UM Directors Drs. Getachew and Smith, and also went to Wexford's corporate head of risk management to review the death from a "risk management perspective." Ex. 73 at WEXDISC 29289. Dr. Sharon Baucom, who oversaw the contract for DPSCS, also learned about the CAP and met with the CQI Director to communicate her "discontent." Ex. 47 at WEXDISC 25469; Ex. 21 at 133-35. That discontent was communicated to Drs. Getachew and Smith, and Ms. McKee. Ex. 47.

The T.Lo CAP involved T.Lo's June 2013 death as a result of undiagnosed metastatic carcinoma in her lungs. Like Ms. Neal, T.Lo was in the infirmary for more than 48 hours, demonstrably deteriorating with obvious symptoms, but without being sent out. The CAP expressly acknowledged numerous failures: "significant change in condition not recognized by nursing staff"; "Vital signs recorded but no communication to MD"; "Changes in condition (weakness, lethargy, altered vital signs not reported to provider)"; and "Patient decompensated rapidly after infirmary admission." Ex. 10 at WEXDISC 22434. The CAP also identified serious documentation failures that contributed to the outcome. *Id.* at WEXDISC 22434-35. Ultimately, Wexford acknowledged that the "Patient should have been transferred to ER via 911 when status changed." *Id.* Like C.R.,

T.Lo's CAP identified critical failures, including the failure to send the patient to the ER far sooner. *Id.*; Ex. 21 at 139-40.

Although both the C.R. and T.Lo CAPs identified a critical failure to timely send patients to the ER, both of whom died, the CAPs themselves were deficient in that they did not contain benchmarks and other components of a proper CQI process designed to ensure improvements that would actually prevent recurring problems. Ex. 21 at 141-143.

There were numerous additional CAPs that reflect similar recurring failures found in Ms. Neal's case. Among them is a November 2012 CAP from the Baltimore Pretrial Region (three days before Ms. Neal's death, in the same region) finding that there was a need to "Update nursing knowledge related to paralysis and neurological findings…." Ex. 13 at WEXDISC 25699. Wexford knew that its nurses had failed to properly respond to a clear neurological emergency after C.R.'s death from stroke several months earlier, and the 2012 CAP again indicates Wexford knew that nurses' knowledge about paralysis and neurological findings was insufficient. Ms. Neal died shortly thereafter, after displaying paralysis and other clear neurological red flags. Ex. 48 at 19.

Wexford also issued a January 2013 CAP stating, "There was is [sic] a continuous failure by nursing to follow through on basic nursing tasks such as obtaining weights, follow up with providers and appropriate documentation. These tasks are an essential part of the inmate's medical care and must be performed on all inmates at every encounter along with appropriate documentation in the EMR." Ex. 8 at WEXDISC 37030. This is a remarkable admission by Wexford that its medical staff were failing to perform even the most basic aspects of responsible medical care. Ex. 48 at 20. In the period from June 2010 through June 2013, there are at least five additional CAPs that relate to failures in meeting even the most basic standards of care, including taking vital signs, documenting infirmary care, and communicating critical patient information to physicians. Ex. 48 at 20-21; Ex. 74 at NEAL 102675-78, 102687, 102685; Ex. 11 at WEXDISC 22438; Ex. 9 at WEXDISC 22431-32.

The natural and foreseeable consequence of such deficiencies, as with Ms. Neal, C.R. and T.Lo, is a failure to timely refer patients to the ER. Ex. 48 at 21.

5.    *Wexford's CQIs contain staggering admissions*

As part of a July 2012 CQI agenda, Wexford's Statewide CQI Director, Donna James, wrote that she is "aware regions/sites are stressed, in a state of turmoil and CQI is not a top priority." Ex. 75. This is another remarkable admission about the state of affairs, and about Wexford's ability to make the sort of changes it knew were necessary. Ex. 48 at 22. Other CQIs over the ensuing months and years show that issues with failures in documentation and communication, as well as the number of  infirmary ER runs, kept coming up, and that in many cases the CQI findings were simply repeated verbatim month after month, indicating that the problems persisted without meaningful corrective action and resolution. Ex. 48 at 21-22; Ex. 76; Ex. 77 at WEXDISC 36043; Ex. 78 at WEXDISC 36003.

**E.    The Problems Identified through Death Reviews, CAPs, CQIs, and Other Records Were Recurring Issues Well Known to Wexford's Senior Leaders**

Ultimately, Wexford's senior leaders knew its aggressive, across-the-board ER reduction effort was causing negative patient outcomes, including deaths. Wexford's Statewide CQI Director testified that failures to identify and document symptoms were recurrent system-wide problems, and most critically, that the failure to timely send patients out for emergency care was also a recurring issue. Ex. 21 at 61-62, 144-145. She further stated that these issues were communicated up the chain at Wexford to people like Ms. McKee, Director of Operations, and Drs. Smith and Getachew, Directors of UM. *Id.* 144-45.

These same senior leaders also saw that these failures were causing increased deaths. In April 2013, Ms. McKee wrote, "It seems to me we have had a lot of deaths." Ex. 41. In an October 2012 email, Ms. McKee widely circulates a congratulatory email for another 20 days without any ER trips, but is chastised by another supervisor who suggests "we hold off a bit sending this congrats to the

client since the investigation of the inmate death . . . includes questioning on why we waited so long to send him out" and "[t]he documentation . . . states that the physician was awaiting the regional medical director to approve sending the patient out." Ex. 43 at WEXDISC 33573-74. Rather than address the root problem—the ER reduction initiative itself—Ms. McKee simply responded that she agreed the congratulatory emails should not go to the client. *Id.*

That these failures resulted from Wexford's financial incentives was apparent. Corporate Wexford staff, including Wexford's CEO, CFO, and Director of UM, and the statewide leadership responsible for overseeing the DPSCS contract, regularly participated in monthly management meetings for the Maryland contract. Ex. 20 at 238, 240-41; Ex. 30 at 55-62; Ex. 35 at 109-10; Ex. 36 at 117-22. During these calls, Wexford's senior leaders routinely discussed offsite trips, including ER runs, trends, CQIs, and CAPs. Ex. 30 at 63-66. Wexford leadership also discussed how Wexford's actual costs compared with its budget and expected profit margin, and what could be done to increase profitability. Ex. 20 at 237-39, 242-43; Ex. 36 at 121-124; Ex. 35 at 112.

### F.   Wexford's Contention That the Sole Evidence of ER Reductions Was a Corizon-Only Policy Is Belied By the Record

Wexford says that any ER reduction policy was solely a Corizon-only policy that began and ended in 2011, and was limited to reducing ER trips for three very narrow types of care. Def. Br. at 10-11. This argument is plainly contradicted by the record.

Putting aside the ample evidence that Wexford presided over an expansive, across-the-board ER reduction program post-2012, Wexford's reliance on the "ER Visit Reduction Program" documented in its 2012 annual report does little to help it. Wexford is right about one thing: in 2011, while Corizon was responsible for direct patient care and Wexford was in charge of UM, there was a so-called "ER Visit Reduction Program" that targeted reductions in ER in the Baltimore region by "increasing onsite capability to address emergency situations" and initially targeted three specific categories of care. Ex. 4 at WEXDISC 20923; Ex. 49 at 9.

But Wexford's argument is wrong in every other sense. First, the ER Visit Reduction Program was clearly a UM policy, put in place by Wexford's UM department. Ex. 21 at 97-98; 100-01; Ex. 19 at 34; Ex. 49 at 10. The Program is contained in *Wexford's* 2012 annual report entitled "Central region Baltimore Annual performance improvement report." Ex. 4 at WEXDISC 20880. Wexford does not explain why, if it was not a Wexford policy, it appeared in its annual report.

Likewise, the policy itself states that the planning phase was August-September 2011, implementation phase was October 1-November 2011, consolidation phase was December 2011, and then *maintenance phase was "January 2012, Onward." Id.* at WEXDISC 20923-25 (emphasis added). By the time the 2012 CQI annual report was published, the policy was already well into its maintenance phase, *id.* at WEXDISC 20889, and nowhere in Exhibit 4 does it state that the policy was no longer in place.

Next, the claim that the program was limited to just three categories of care is belied by the actual policy, which shows that by design, the program would expand. It states that the "*first* group of disorders to be managed on site" would be seizures, orthopedic disorders, and DVT/cellulitis, and that Wexford "will select more disorder[s] through the process." *Id.* at WEXDISC 20923-24. Indeed, in the maintenance period, there are no longer references to the specific category of seizures, but rather neurology-related ER runs generally. *Id.* at 20924-26. Moreover, once the maintenance period began, the plan was to "establish back up gatekeeper on call *for all ER trips*," without any reference to a limitation to particular conditions. *Id.* at WEXDISC 20931. Put simply, even if Wexford's ER reduction efforts had never grown beyond the original incarnation contained in Wexford's 2012 annual report—ignoring all evidence above to the contrary—it would still be deeply problematic, because the policy introduced an additional gatekeeper to approve all ER trips, a policy resulting in known and obvious risks to patient welfare. *See supra* § I.B.

By the time Wexford took over in July 2012—with new financial incentives in place that would allow it to increase profits if it could reduce costly ER visits—the ER Visit Reduction Program documented in the 2012 annual report had morphed into something far more expansive, applying across all sites and all categories of care, and supported by a new UM written policy that reiterated the need for supervisory approval before sending a patient to the ER.

### G.      Wexford Had Ample Notice that Its UM Policies and ER Reduction Efforts Would Produce Negative Patient Outcomes

As set forth above, within the correctional medicine setting, it was obvious and understood that it was unacceptably reckless to implement an across-the-board ER reduction effort without a commensurate infusion of resources to expand onsite care, or without a robust audit program to ensure the ER reduction was not compromising patient health. *See supra* § I.C.2. But Wexford had ample on-the-ground evidence that its ER reduction efforts would be dangerous.

    1.  *Wexford's UM role prior to July 2012 gave it unlimited access to information about patient outcomes in Maryland facilities*

Wexford has held the UM portion of the Maryland contract since June 2005. Ex. 83 at WEXDISC 3207; Ex. 85 at WEXDISC 3336-37. In that role, Wexford had extensive access to information about patient care across Maryland facilities. *See* Ex. 83 at WEXDISC 3208-09. So much so that Wexford produced over 80 monthly reports and 20 daily reports, including information about ER compliance, trends, and infirmary acuity. *See* Ex. 83 at WEXDISC 3208-09 (§ 1.A.2); Ex. 31 at 30-37. In the period prior to July 2012, Wexford senior administrators like Dr. Smith had access to patient records, CAPs, CQIs, and other information about patient outcomes, deaths, and trends in patient care. Ex. 15 at 70-71; Ex. 19 at 10-16, 23; Ex. 31 at 30, 38-43. Indeed, Wexford's UM staff were participating in retrospective reviews of ER trips, monitoring the status of patients who went to the ER, participating in weekly collegial meetings with Corizon providers, and participating in death reviews. Ex. 31 at 23-24, 31-33, 38-41; Ex. 34 at 31-33. Finally, many of

Wexford's senior medical supervisors on the contract—including its UM Director, Statewide Medical Director, and others—simply moved from Corizon to Wexford in July 2012, and brought with them their intimate knowledge about patient care and outcomes, and in this way were also aware of trends in CAPs and areas of deficiency identified in CQIs over time, including when they worked for Corizon prior to July 2012. Ex. 19 at 19-23, 32; Ex. 14 at 172-174; Ex. 34 at 13-14; Ex. 31 at 7-8.

Based on that access, in the years leading up to July 2012, Wexford had notice that the policies and practices in place—including its own UM policies—were producing negative patient outcomes, as documented in CAPs and death reviews. This included the initial incarnation of the ER Visit Reduction Program beginning in 2011, which put Wexford on notice that its ER reduction efforts, even in their narrower form, were dangerous. While the ER Visit Reduction Program was in its pilot and then early maintenance phase in Baltimore in 2012, ER trips per 1,000 detainees dropped almost 80%, far greater than the 10% original target (and further evidence that it was never really limited to three discrete categories of care). Ex. 4 at WEXDISC 20930, 20924; Ex. 49 at 10.

Relatedly, in just the period from 2010 to Ms. Neal's death in November 2012, there were a number of deaths and other negative patient outcomes that put Wexford on notice of the ample failures in the patient care and UM policies in place during that time. That includes the failures in the cases of R.G., C.A., E.A., S.P., C.R., and A.S., discussed *supra* § I.D.2. Notably, all of these cases involved the delay or denial of ER care, and three involved neurological conditions where the standard of care was not met. *Id.* The C.R. case is particularly relevant because it involved a stroke, and because Wexford's own CAP admitted that C.R.'s stroke symptoms required immediate ER referral and his death was caused by a failure to timely send him to the ER. *Id.*

2.       *Wexford's aggressive ER reduction efforts in other states also produced troubling results*

The Maryland contract was not the first time Wexford attempted aggressive reductions in ER and other offsite visits. To the contrary, it has pressed for similarly aggressive cuts in ER visits in other states, with negative outcomes. In its 2006 bid to the Clark County Sheriff's Office in Washington, Wexford touted its ability to save money by dramatically decreasing offsite care. Ex. 90 at NEAL 15229; Ex. 53 at 1. Wexford had previously provided a staggering 81% reduction in the client's financial obligation, in part due to a 50% decrease in ER visits, from 57% of the population to 26% of the population in a single year. *Id.* By 2008, Clark County Juvenile Detention Center staff noted that Wexford's nursing staff was failing to appropriately evaluate patients, document their care, and to provide necessary treatment in a timely fashion. Ex. 91; Ex. 53 at 2. Reports from the Mississippi Department of Corrections indicate that in 2012 Wexford's providers were not accurately documenting patients' medical conditions or care, and causing delays in offsite care. Ex. 93 at NEAL 22262, 22289, NEAL 22296, NEAL 22305, NEAL 22327; Ex. 53 at 2.

In Illinois, court-appointed experts in a class-action lawsuit about Wexford's medical care in Illinois prisons, *Lippert v. Godinez*, No. 10-cv-4603 (N.D. Ill.), found that there was "considerable morbidity and mortality associated with untimely or lack of referral for higher level of care." Ex. 89 at NEAL 103531. The experts reviewed 33 deaths from 2017 and identified 93 episodes of care in which a patient should have been referred to a hospital but was not. *Id.* at NEAL 103531. In many instances, the experts found that the delays or denials of care contributed to deaths themselves. *Id.* at NEAL 103531. The experts described these delays or denials of care as a "cost containment mechanism." *Id.* at 103531. The practices described in the *Lippert* report mirror the policies and practices that Wexford implemented in Maryland, to similarly disastrous effect. Ex. 53 at 2.

And in 2020, the New Mexico Corrections Department reported that Wexford had no meaningful CQI program. Ex. 92 at NEAL 101381. This, too, mirrors Wexford's actions in Maryland, where it subordinated CQI to UM. Ex. 53 at 2.

## II.      Ms. Neal's Case Reflects the Recklessness of Wexford's Cost-Cutting Efforts

During the individual phase of this case, Wexford hired neurologist and neuropathologist experts who opined that Ms. Neal had suffered a sudden (and thus untreatable), catastrophic stroke the morning of November 4, 2012. But Wexford has now dropped those two experts and retained a new neurologist expert, Dr. Schwartz, who makes a critical concession: he agrees with Plaintiff's experts that Fatima Neal had been suffering from strokes for at least 48 hours before her death. Ex. 32 at 31-32, 210; Ex. 50 at 91. In other words, Ms. Neal was suffering the effects of an untreated stroke on at least November 2 and 3, while she was under 24-hour medical observation and care by Wexford's doctors and nurses in its infirmary.

Given that Defendants no longer dispute that Ms. Neal had been suffering from the symptoms of an untreated stroke while in the Wexford infirmary for several days, Plaintiff will not recite the mountain of evidence proving that Ms. Neal was suffering the symptoms of strokes throughout her three days in the Wexford infirmary, and that Wexford medical providers knew it but failed to send her to the ER. That evidence is set forth in detail in Plaintiff's response to Defendants' motion for summary judgment in the individual phase, Dkt. 228 at 12-34, and is incorporated herein. Plaintiff will merely summarize some of the critical evidence below.

### A.      Ms. Neal was Suffering Obvious Stroke Symptoms over Three Days, with the Knowledge of Wexford's Medical Staff

Around 2 a.m. on November 1, 2012, Ms. Neal's cellmate woke up to find her walking into things, screaming that her head hurt and she could not see, and speaking incoherently. Ex. 100 at NEAL 607; Ex. 135 ¶ 6; Ex. 98 at 40-42. Acting on an emergency call from a BCDC correctional officer, former defendant Nurse Ajayi came to Ms. Neal's cell at 2:30 a.m., where Ajayi documented

that Ms. Neal was "weak" and had a "knowledge deficit." Ex. 55 at NEAL 29888; Ex. 26 at 63, 74-75. Ajayi brought Ms. Neal to former defendant Wiggins, the on-duty physician's assistant (PA), who decided Fatima should be admitted to the infirmary for observation. Ex. 26 at 56-57, 62-63, 102-103; Ex. 112 at 382.

There is ample evidence that over the next three days in the infirmary, Ms. Neal suffered numerous, obvious stroke symptoms:

- One-sided weakness that left Fatima unable to move one leg and arm, such that Fatima was dragging one side of her body. Ex. 113 at NEAL 903; Ex. 103 at 7-8; Ex. 110 at NEAL 897; Ex. 114 at NEAL 900; Ex. 98 at 52; 78-79; Ex. 120 at 191; Ex. 124 at NEAL 8.
- Inability to move without assistance, to maintain balance, or to walk without falling down. Ex. 98 at 76; Ex. 121 at NEAL 1170-71; Ex. 26 at NEAL 900; Ex. 21 at NEAL 897; Ex. 101 at NEAL 611; Ex. 113 at NEAL 903; Ex. 103 at 7.
- Impaired vision and blindness, confusion and/or hallucinations, incoherence, and difficulty speaking. Ex. 121 at NEAL 1170; Ex. 100 at NEAL 608; Ex. 114 at NEAL 900; Ex. 98 at 43; Ex. 99 at NEAL 612; Ex. 103 at 7-8; Ex. 111 at 232.
- Persistent and severe headaches that did not respond at all to pain medication and caused Fatima to cry out in pain. Ex. 121 at NEAL 1171; Ex. 114 at NEAL 900; Ex. 103 at 6-7; Ex. 100 at NEAL 608; Ex. 101 at NEAL 611; Ex. 113 at NEAL 903.
- Vomiting coupled with an inability to eat or get out of bed. Ex. 103 at 7; Ex. 121 at NEAL 1170; Ex. 113 at NEAL 903; Ex. 99 at NEAL 613; Ex. 114 at NEAL 900; Ex. 120 at 191.
- Incontinence—urinating and defecating on herself. Ex. 103 at 7; Ex. 98 at 42, 146-148; Ex. 114 at NEAL 900; Ex. 121 at NEAL 1171; Ex. 99 at NEAL 613.

All of these are obvious signs of strokes to any medical practitioner. Ex. 39 at 127, 165, 167-168. Indeed, even lay people commonly understand these to be quintessential signs of stroke. Ex. 106 at ¶¶ 5-10; Ex. 107 at 5; Ex. 108 at 3, 4; Ex. 39 at 154. Not surprisingly, then, the detainees that observed Fatima believed she had suffered a stroke and that "[i]t was obvious that Ms. Neal needed medical help badly the entire time that she was in the infirmary" Ex. 113 at NEAL 903; Ex. 120 at 191; Ex. 110 at NEAL 897; Ex. 121 at NEAL 1171; Ex. 114 at NEAL 900; Ex. 99 at NEAL 613.

Wexford's doctors and nurses knew Ms. Neal was suffering stroke symptoms. Former defendants Ajayi, Obadina, Afre, Ohaneje, Jamal, El-Sayed, and McNulty all interacted with Ms. Neal while she was displaying stroke symptoms. Ex. 109 at 1-3, 6-27, 30; Ex. 27 at WEXDISC 254-56. Multiple detainees reported that they directly and repeatedly informed the nurses about Fatima's serious medical condition. Ex. 25 at NEAL 903 ("[e]very day, on every shift," she and the other detainees told "nurses, guards, and other individuals that Fatima needed emergency medical help and needed to go to the hospital."); Ex. 102 at NEAL 897; Ex. 100 at NEAL 608-609; Ex. 98 at 34, 43-44, 46-47, 49; Ex. 115 at WEXDISC 254-56; Ex. 126 at WEXDISC 4196; Ex. 125 at WEXDISC 2022; Ex. 114 at NEAL 900; Ex. 98 at 46, 17; Ex. 99 at NEAL 613; Ex. 127 at 147; Ex. 122 at 148; Ex. 121at NEAL 1171; Ex. 103 at 7; Ex. 101 at NEAL 611; *see also* Ex. 136 at 150. And Ms. Neal herself repeatedly told the Wexford doctors and nurses about her need for emergency medical treatment. Ex. 114 at NEAL 899; Ex. 113 at NEAL 903; Ex. 121 at NEAL 1171.

Wexford's medical records—although incomplete and full of omissions and contradictions, Dkt. 228 at 20-22, also contain admissions of Ms. Neal's stroke symptoms. In her November 3 record, former defendant Nurse McNulty noted that Ms. Neal had "c/o [complained of] headache 10/10 this am[.]" Ex. 109 at 24. But just hours earlier, former defendant Dr. El-Sayed noted in her medical record that Fatima had "[n]o complaints of headache this AM." Ex. 109 at 21. In his November 1 medical record, former defendant Dr. Afre wrote that PA Wiggins's note documented that Ms. Neal "was behaving [e]rratically." Ex. 20 at 7. Yet there is no mention of erratic behavior anywhere in Wiggins's November 1 medical record. Ex. 109 at 4. Indeed, the vast majority of the "findings" in Ms. Neal's medical records were not findings at all; it was information that was automatically populated by the electronic medical record system at the BCDC. Ex. 128 at 1-6; Ex. 25 at 468-473; Ex. 128 at 1-6; Ex. 38 at 254-261, 284-285. These documentation failures reflect a failure to properly assess and document Ms. Neal's symptoms, and prevented information about Ms. Neal's

29

condition from being communicated among medical staff, and most importantly, to the Wexford physicians responsible for Ms. Neal's care. Ex. 48 at 27.

The undisputed evidence demonstrates that during her more than three days in the infirmary, Ms. Neal received no treatment at all for strokes. Ex. 109 at 9, 16. And so, after three days without any treatment for her strokes, Ms. Neal was found unresponsive at 12:25 a.m. on November 4, 2012.[3] Ex. 103 at 12 ("Staff discovered her unresponsive at 0025 Hrs."); *id.* at 2, 5, 10. Detainees banged on the window to try to get former defendant Nurse Obadina's attention, but she was sleeping. Ex. 12 at 7, 8; *see also* Ex. 102 at NEAL 605; Ex. 110 at NEAL 897; Ex. 103 at 7; Ex. 98 at 78; Ex.8. Former defendants Nurses Atta and Jamal were called to help and came to the infirmary. Ex. 103 at 6; Ex. 129 at 152; Ex. 130 at 153.

Yet, Wexford's medical staff waited until 3:43 a.m.—more than three hours later—to finally call the paramedics. Ex. 131 at WEXDISC 003958. Why? Because Wexford's nurses made a series of phone calls to get permission to send Ms. Neal to the ER, but Wexford's on-call and backup doctors did not answer their phones. Ex. 120; at 191; Ex. 55 at NEAL 49859. It was only after a supervising physician called back and approved the ER trip that 911 was called. Ex. 55 at NEAL 49859. Because of the enormous delay in sending her to the ER, the doctors there could not save Ms. Neal and she was pronounced dead at 4:31 a.m. Ex. 56 at WEXDISC001163. The hospital record noted that there had been a "long down time." *Id.*

Ms. Neal was set to be released from the BCDC on Monday, November 5, 2012, a fact Wexford's medical staff knew as documented in their own medical records. Ex. 137 at 137, 235-236; Ex. 97 at 57. She died the day before her release.

 Dr. King, the medical examiner for the state of Maryland, conducted an autopsy and found that Ms. Neal had suffered an initial stroke around the early morning hours of November 1. Ex. 106

---

[3] Defendants contend that Ms. Neal was found unresponsive later in the morning, but their view is plainly contradicted by the record.

at ¶¶ 5-10. Plaintiff's experts—and now Defendants' expert—agree that Ms. Neal had suffered an initial stroke and was displaying the symptoms of that stroke over several days in the infirmary. Ex. 105 at 217; Ex. 107 at 3, 5; Ex. 116 at 1, 2; Ex. 108 at 4; Ex. 117 at 1-2; Ex. 51 at 2; Ex. 118 at 2. Over the following three days, Ms. Neal suffered effects from that initial stroke, including symptoms, subsequent strokes, and swelling that culminated in fatal brain herniation. Ex. 105 at 211; Ex. 106 at ¶¶ 5-7, 9-10; Ex. 117 at 1; Ex. 108 at 3.

In addition to the findings at autopsy, additional microscopic testing of Fatima's brain tissue revealed the presence of a cellular abnormality called macrophages, which confirms that Fatima suffered an initial stroke at least 72 hours before her death. Ex. 119 at 97-98, 101-102; *see also* Ex. 119 at 79-81; Ex. 51 at 2, 6-8; Ex. 118 at 1-2, Ex. 57 at NEAL 013129, 13132-33. This objective finding by Plaintiff's neuropathologist expert is not disputed by Defendant's expert. Ex. 32 at 29.

After Ms. Neal's death, DPSCS sent out a nurse named Bonnie Plimack to conduct a morbidity and mortality review of the patient care provided to Ms. Neal. Ex. 132 at 5-6, 7-8. Based on her review, Plimack concluded that Ms. Neal "should have been re-evaluated and sent out to the hospital earlier." Ex. 133 at 301. Carolyn Murray, an investigator from DPSCS's Internal Investigation Unit, interviewed a number of detainees on the morning of November 4 who reported to her that Ms. Neal had been complaining about severe headaches, was projectile vomiting, dragging one side of her body, urinating on herself, unbalanced and hitting her head, and was saying things that indicated she was incoherent, disoriented and confused. Ex. 120 at 191; Ex. 104 at 8-9, 21. Murray believed that the detainees were telling the truth. Ex. 104 at 45-46. Ms. Murray had concerns about Ms. Neal's care and voiced her concerns to her supervisors. *Id.* at 77-78, 79, 81.

The failure of Wexford's doctors and nurses to send Ms. Neal to the emergency room at numerous points between November 1 and November 4, 2012 was an egregious departure from the standard of care. Ex. 107 at 3, 6; Ex. 116 at 2; Ex. 108 at 5; Ex. 48 at 27; Ex. 49 at 18-19.

31

The question is: why didn't Wexford medical staff send to the ER a patient they knew was displaying obvious symptoms of a stroke? The obvious answer is Wexford's concerted campaign to reduce ER trips. Ex. 48 at 27-28; 49 at 19. The failures in Ms. Neal's case are consistent with the policies and practices discussed above, and mirror the problems in many of the other deaths, CAPs, and other findings discussed above. *Id.* Indeed, Wexford failed to send Ms. Neal to the ER even though that was the only place where she could have been treated for her strokes. Ex. 48 at 27; Ex. 49 at 18-19. And even after Ms. Neal was found completely unresponsive, Wexford's medical staff still delayed sending Ms. Neal to the ER for hours while they waited for authorization from a supervisor. *Id.*

**B.** **Ms. Neal Likely Would Have Survived if She Had Been Sent to the ER at any Point In the Days Before She Died**

After suffering an initial stroke in the early morning hours of November 1, Ms. Neal survived for an additional three days despite receiving no treatment whatsoever. She survived, despite the fact that early and aggressive intervention is crucial to avoiding poor outcomes, and for that reason medical providers are trained to be on the lookout for stroke signs and symptoms (and to err on the side of seeking urgent neurological evaluation). Ex. 108 at 6; Ex. 54 at 2. Logic dictates that if Ms. Neal had been diagnosed and treated promptly, or at any point in the three days before her condition deteriorated to the point that she was unconscious, she would have survived.

The scientific evidence confirms this: applying a widely used algorithm for predicting outcomes following intracerebral hemorrhage based on a patient's age, size, and location of the hemorrhage (among other factors), Ms. Neal had an 81-100% probability of functional independence in 90 days. Ex. 54 at 2.[4] Even after three days of neglect, Ms. Neal could have been

---

[4] It should be noted that this likelihood of a positive outcome is based on the size and other characteristics of the hemorrhage *after going untreated for three full days*; the likelihood of a positive outcome, given that early intervention improves outcomes, would likely have been even greater if her stroke had been treated earlier. Ex. 39 at 163.

saved if medical staff had acted promptly after she was found unresponsive at 12:25 a.m. In fact, at 3:22 a.m., even after a three-hour delay, Ms. Neal was still breathing and had a heart rate of 70, blood pressure of 80/60, and with assistance her oxygen saturation was 90%. Ex. 109 at 30. But by the time paramedics were finally called and arrived 30 minutes later, she had no vital signs: her pulse, respiratory rate, blood pressure, and oxygen saturation were all reported as zero. Ex. 131 at WEXDISC 003960.

Strokes like the one Ms. Neal experienced can be treated in the hospital and people usually survive. Ex. 108 at 5-6; Ex. 54 at 2; Ex. 39 at 163. The treatment for such strokes includes blood pressure control, correction of bleeding disorders, and medication or surgical intervention to prevent or minimize the expansion of the bleed and any related swelling. Ex. 108 at 5-6; Ex. 54 at 2. As Wexford's experts acknowledged, these treatment options work: people routinely survive hemorrhagic strokes. Ex. 134 at 146–174 (withdrawn expert); Ex. 32 at 132-33 (current expert). Indeed, Wexford's current expert, Dr. Schwartz, admits that the survival rate for any of the potential sequences of strokes Ms. Neal suffered are greater than 50%. Ex. 32 at 94-95, 97-98 (ischemic stroke first, survival rates 70-97%), 100 (for someone under age 50 like Ms. Neal, if ischemic stroke first survival rate greater than 90%), 122, 123 (hemorrhagic stroke first, survival rate 60%), 128 (hemorrhagic stroke first, survival rate greater than 60% given her young age), 138. And, he was clear that he was *not* willing to opine based on the evidence that her chance of survival was less than 50% if she had been sent to the ER between three hours and three days earlier. *Id.* at 69, 131, 145.

## ARGUMENT

## I.   Legal Standard

"Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving

party is entitled to judgment as a matter of law." *Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)). The burden is on the moving party to make such a showing. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Conflicting inferences are always resolved in the non-movant's favor, *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015), and the Court draws inferences from "not only depositions but also documentary materials in the light most favorable to the party opposing the motion," *Magill v. Gulf & W. Indus., Inc.*, 736 F.2d 976, 979 (4th Cir. 1984). "Even if there is no dispute as to the evidentiary facts, summary judgment is inappropriate if there is a dispute as to the conclusions to be drawn from such facts." *Id.* at 979. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255; *see also Tolan v. Cotton*, 572 U.S. 650, 660 (2014). Plaintiff's "version of any disputed issue of fact thus is presumed correct[.]" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). At this stage the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

Plaintiff brings a 42 U.S.C. § 1983 claim against Wexford for denying Ms. Neal adequate medical care at the BCDC, in violation of her constitutional rights. Plaintiff has brought § 1983 claim under both the Fourteenth Amendment, which protects the rights of pretrial detainees, and the Eighth Amendment, which applies to post-conviction detainees, because there is a dispute of fact regarding Ms. Neal's status at the time of her death. *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). This Court previously noted the dispute in its earlier decision adjudicating summary

judgment on Plaintiff's claims against the individual defendants. *Bost v. Wexford*, 2018 WL 3539819, at *4, 23-24, Dkt. 430 at 7, 46-47 (D. Md. July 23, 2018).

The standard for claims brought under the Eighth Amendment is well settled: a plaintiff must establish that she had an objectively serious medical need, and that the defendant was deliberately indifferent to that need. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). But the standard for claims brought under the Fourteenth Amendment is less clear. Courts used to apply the same deliberate indifference standard to claims brought by pretrial detainees. But in *Kingsley*, the Supreme Court held that use-of-force claims brought by pretrial detainees were governed by an objective standard, requiring the plaintiff to show only that the use of force was objectively unreasonable. 576 U.S. at 396-97. Several circuits have applied *Kingsley* to require an objective standard on denial of medical care claims by pretrial detainees. *See, e.g., Brawner v. Scott Cty.*, 14 F.4th 585, 592 (6th Cir. 2021); *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

The Fourth Circuit has not yet definitively weighed in on *Kingsley*'s impact on the standard. *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021); *see also Michelson v. Coon*, 2021 WL 2981501, at *3 (4th Cir. July 15, 2021). This Court need not resolve the issue here either because Wexford's motion for summary judgment should be denied under either standard. Indeed, this Court previously determined that a reasonable jury could determine that Ms. Neal's death was the result of deliberate indifference to her serious medical need. *Bost*, 2018 WL 3539819, at *57, Dkt. 430 at 113.

The Fourth Circuit has held that to hold Wexford liable under § 1983, Plaintiff must satisfy the standards set forth by the Supreme Court in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003); *Powell v. Shopco*

*Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).[5] Under *Monell* Plaintiff can prevail on her claim against Wexford if she proves that Ms. Neal's constitutional deprivation was caused by one of four things: (1) the implementation or execution of an express policy; (2) a widespread practice that, although not expressly authorized by policy, is so permanent and well settled as to constitute a custom; (3) the actions of a person within the corporation with final policymaking authority; or (4) an omission, like the failure to enact policies or train staff, that "manifest[s] deliberate indifference" to prisoners' constitutional rights. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003); *see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *Spell v. McDaniel*, 824 F.2d 1380, 1385-86 (4th Cir. 1987). A reasonable jury could find that Plaintiff has established Wexford's liability on each of the four *Monell* theories. Summary judgment should accordingly be denied.

## II. A Jury Could Reasonably Conclude that Wexford Had a Widespread Practice of Denying Necessary Emergency Care that Caused Ms. Neal's Death

Corporate liability may be established under § 1983 for a constitutional violation that is caused by a persistent and widespread practice that "has not received formal approval through the corporation's official decisionmaking channels" but is sufficiently permanent and well settled as to constitute a "custom or usage with the force of law." *Monell*, 436 U.S. at 690-91 (cleaned up); *Spell*, 824 F.2d at 1390 (widespread practice theory permits imposition of liability for practice that is widespread even though it is "not sufficiently traceable *in origin* to any fault of municipal policymakers"). To prevail, a plaintiff must present evidence of a "persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir.

---

[5] Federal courts have recently expressed skepticism about the application of *Monell* to a § 1983 claim against a corporation. *See, e.g., Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790-96 (7th Cir. 2014); *Shehee v. Saginaw Cty.*, 2015 WL 58674, at *7 (E.D. Mich. Jan. 5, 2015). Notably, the Supreme Court has never weighed in on the applicability of *Monell* in this context. *Shields*, 746 F.3d at 794. But given Fourth Circuit precedent, Plaintiff concedes that this Court is currently bound to apply *Monell*.

2014) (cleaned up) (citing *Spell*, 1386-91). "[C]onstructive knowledge of such a custom and usage may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." *Randall v. Prince George's Cty.*, 302 F.3d 188, 210 (4th Cir. 2002); *Owens*, 767 F.3d at 402-03.

### A. Wexford Had a Widespread Practice of Denying Necessary ER Care

There is no bright-line rule as to how many other incidents of misconduct will suffice to establish a widespread practice, although courts appear to agree that three or four other incidents are insufficient. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010); *Cipolloni v. City of New York*, 758 F. App'x 76, 79 (2d Cir. 2018); *Castro v. McCord*, 259 F. App'x 664, 669 (5th Cir. 2007); *see also Saltz v. City of Frederick*, 2021 WL 1856636, at *32 (D. Md. May 10, 2021) (collecting cases). The Fourth Circuit has held that while isolated incidents are not sufficient, summary judgment should be denied if there are "numerous particular incidents" of other constitutional violations. *Lytle*, 326 F.3d at 473 (citing *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991); *see also Owens*, 767 F.3d at 403. And other evidence—including testimony from the corporation's employees, expert opinion testimony, and documentary evidence that wrongdoing is not taken seriously—may also be used to help establish a widespread practice. *See, e.g., Kopf*, 942 F.2d at 269; *J.F. v. Correct Care Solutions, LLC*, 2019 WL 1057401, at *12 (D. Md. Mar. 6, 2019); *see also Daniel v. Cook Cty.*, 833 F.3d 728, 736 (7th Cir. 2016); *Montano v. Orange Cty.*, 842 F.3d 865., 875-76 (5th Cir. 2016).

#### 1. *Wexford denied necessary ER care to numerous other patients similar to Ms. Neal*

Plaintiff has adduced a wealth of evidence that would permit a reasonable jury to conclude that Wexford maintained a widespread practice of denying and delaying necessary and emergency offsite care. Plaintiff's expert, Dr. Herrington, reviewed medical records or administrative records reflecting medical treatment of 24 other patients incarcerated within DPSCS between 2010 and

2016,[6] and found 19 separate cases (in addition to Ms. Neal's case) in which the patients' care was woefully inadequate. Plaintiff has set forth a discussion of each of those cases above. *See supra* at § I.D.2. In his report, Dr. Herrington thoroughly discussed the relevant medical history in each case and identified inadequacies similar to Ms. Neal's case: unacceptable denials and delays in sending patients to the ER, a failure to document and communicate changes in the patient's condition, or a failure to diagnose and/or treat signs of a possible neurological event. Ex. 48 at 5-18. In his report, Dr. Herrington opined that the 19 cases reflect repeated failures to timely send patients to the ER and other offsite care, and offsite neurological care in particular. Ex. 48 at 18.

Dr. Herrington's opinions regarding those 19 incidents, and the widespread practice they reflect, is itself sufficient to meet Plaintiff's burden at summary judgment. *Lytle*, 326 F.3d at 473 ("numerous particular instances" can establish a custom or practice); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 938-39 (N.D. Ill. 2014) (denying summary judgment on widespread practice claim based on evidence that nine other detainees were denied adequate medical care, including three with issues similar to plaintiff). Plaintiff has adduced far greater evidence of the widespread practice of delaying and denying necessary offsite care, including Wexford's own affirmative efforts to foster and encourage the practice.

2.     *Wexford's own documents and emails betray its widespread practice of intentionally denying ER care, despite the known and obvious risk*

When Wexford took over the direct patient care contract in July 2012, it immediately subordinated CQI to UM, and thus subordinated quality to cost-cutting goals. *See supra* § I.A.1.[7] Wexford then immediately sought large, across-the-board cuts in ER referrals across all sites. *See*

---

[6] The 24 cases provided to Dr. Herrington primarily concerned deaths that occurred between 2010-2014, although Plaintiff was able to obtain a handful of additional records outside of that limitation based on incidental production of records.

[7] Wexford's policy to reduce ER visits across the board is also an express policy that is an independent basis to impose liability against it, as discussed in detail below. *See infra* Arg. § III. But it is also relevant to Plaintiff's widespread practice claim.

*supra* § I.C. At the time, Wexford was already highly knowledgeable about the medical care operations in DPSCS facilities because it had been operating as UM contractor since June 2005. In that role, Wexford created an ER Visit Reduction Program for the Baltimore region to reduce ER visits.[8] Ex. 4 at WEXDISC 20923-31. As discussed above, Wexford quickly expanded the program into a widespread effort to reduce ER visits across the board statewide. *See supra* § I.C.

Indeed, once Wexford took over as the sole medical contractor, the financial arrangement for treating DPSCS detainees changed dramatically. Unlike the prior contract where DPSCS bore the cost of offsite care, Wexford was now responsible for the full cost of ER trips. *See supra* § I. The scope and scale of Wexford's ER reduction efforts grew commensurately with its immense financial incentive to cut ER costs. *See supra* § I.C.

Upon becoming the sole medical contractor, Wexford issued a new UM policy that required nursing staff to obtain approval from a physician prior to referring patients to the ER for emergency care.[9] *See supra* § I.B. Wexford disseminated its new UM policy to its employees and trained them on it. Ex. 31 at 60-61. As described in detail above, the policy was acting as intended: extensive documents and correspondence reveal a constant drumbeat to reduce ER trips. *See supra* §§ I.C.3, I.C.5.

Wexford's corporate designee, Dr. Smith, and its correctional healthcare expert, Dr. Joshua, both admitted that efforts like those described above to reduce ER visits across the board would present a known risk to patient health and safety, especially if not accompanied by a meaningful influx of resources and services to facilitate adequate treatment of patients on site, and robust quality

---

[8] Wexford disputes that it created the ER Visit Reduction Program. Plaintiff has elsewhere discussed the wealth of evidence that undercuts Wexford's denial of involvement in the program, including the fact that it appears in an annual report *authored by Wexford* and discusses a UM initiative during Wexford's tenure as UM contractor. *See supra* §§ I.B, I.F; *see infra* Arg. § III.B. It is for a jury to resolve these disputes, and not this Court on summary judgment, which must credit Plaintiff's evidence and facts.

[9] This written policy is also an independent basis upon which Plaintiff may hold Wexford liable, as discussed in detail below. *See infra* Arg. § III. It, too, remains relevant to Plaintiff's widespread practice claim.

control measures to ensure the quality of care was not compromised. Plaintiff's expert, Dr. Keller, further explained that any such efforts to reduce ER trips was inherently dangerous if not narrowly focused on those ER trips that were not for true or suspected emergencies. But Wexford's efforts to reduce ER trips across the board was not limited in any such way, and Wexford provided *no* additional resources or services to increase the ability or capacity for its employees to provide adequate services on site. *See supra* § I.C.2.

**B.  Plaintiff's Evidence Establishes That Wexford Knew the Obvious Risks to Patient Welfare Posed by its Widespread Practice**

Wexford knew that its widespread practice put patients' lives at risk. The widespread nature of the practice, discussed above, itself establishes constructive notice. *See Randall*, 302 F.3d at 210; *Owens*, 767 F.3d at 402-03. Wexford's internal correspondence reveals it had also had actual notice, and moreover, the risk was both known and obvious. *See supra* §§ I.C, I.D, I.E, I.G.

Perhaps most egregiously, Wexford knew when it took over the contract in July 2012 that there were very few ER trips (less than 2%) that could be safely eliminated. *See supra* § I.C.2. Wexford also knew that ER visits in the Baltimore region had already been reduced significantly in the months before Wexford took over the contract, and its own data reflected a trendline reduction in ER trips of 80% between April 2011 and March 2012. *See supra* § I.C.2. Yet without making any efforts to determine what, if any, harm patients had already suffered from Wexford's ER reduction efforts and without addressing the known and obvious risk of harm that patients would face from further efforts, Wexford simply expanded the program. *See supra* § I.C.2.

Indeed, Wexford was already on notice that its ER reduction efforts had resulted in adverse patient outcomes. During its tenure as UM contractor prior to July 2012, Wexford had full access to patient data and participated in the oversight of patient care and offsite usage, including retrospective reviews of ER trips, death reviews, CQIs, and CAPs. *See supra* at §§ I.E, I.G. Wexford was thus aware of numerous deaths and other adverse medical events that occurred as a result of

delays or failures in sending the patient to the ER, even before it took over the contract in July 2012. *Id.* (discussing pre-July 2012 examples of delays and denials of ER care).

Dr. Herrington has detailed examples of the deaths and adverse medical events made known to Wexford as its policy to reduce ER visits was being implemented. *See supra* § I.D.2; Ex. 49 at 5-18. Based on his review, Dr. Herrington believes there were an even greater number of adverse medical events that were not produced to Plaintiff in this case. Ex. 49 at 18. (Wexford did not produce any clinical medical records). When Wexford took over direct patient care, deaths increased dramatically, based on multiple metrics, even as the total number of individuals in DPSCS custody decreased. Wexford's own Director of Operations noted the sharp increase in deaths after Wexford implemented its aggressive ER reduction efforts. *See supra* § I.E; Ex. 41.

Wexford was also notified of the dangers its policies and practices were presenting to patient health and safety in Maryland through CAPs. *Randall*, 302 F.3d at 210. Following the death of C.R., for example, Wexford admitted in a CAP specifically addressing C.R.'s death that C.R.'s stroke symptoms should have caused an immediate ER referral, and that his death had been caused by a substantial delay in sending the patient to the ER. Dr. Herrington discusses multiple other CAPs that raised similar and related issues before Ms. Neal's death. *See supra* § I.D.4.

Notably, Wexford's contract with DPSCS was not the first time Wexford had attempted to aggressively reduce ER and other offsite visits. It took similar actions in numerous other states and counties, with harmful effects that were—again—known and obvious. *See supra* § I.G.2.

Plaintiff has presented ample evidence of actual and constructive notice to Wexford of a widespread practice with deadly consequences.

### C.   Wexford Was Deliberately Indifferent to the Known and Obvious Risks of its Widespread Practice

A jury could easily conclude that Wexford's response to the known risks posed by its practices evinced deliberate indifference. At no point did Wexford take action to mitigate the

increase in patient deaths or other negative patient outcomes. Instead, Despite Wexford's own finding that there were very few unnecessary ER trips, Wexford persisted in its efforts to reduce ER visits across the board without modification, and far beyond its stated goals—an obvious and known danger to patient health and safety, by Wexford's own admission. Its processes and practices placed relentless pressure on medical staff to reduce ER visits. Among other things, Wexford senior management convened daily calls in which each ER referral had to be justified, and costs regarding each referral were circulated in advance; and evaluated medical staff, including Ms. Neal's primary physician, on their "cost effectiveness," including their ability to reduce ER trips. *See supra* at § I.C.

Wexford leadership also celebrated with sitewide emails when there were long stretches without any ER trips, even when those periods were so long it raised obvious questions about negative patient outcomes. *See supra* §§ I.C.3, I.E. As one example, in August and October of 2012, Dr. Tessema emailed Wexford staff, celebrating a long period without any ER trips. Dr. Getachew attributed this to regional management's "laser focus on ER runs," which was "showing significant reduction in UM" in the Baltimore pretrial region. Ex. 42 at WEXDISC 24338. Remarkably, this message was sent just days after Wexford determined that C.R.'s death had been caused by a delay in sending him to the ER. *Id.* Wexford's Director of Operations openly observed that had been a noticeable increase in deaths. *See supra* § I.E. Dr. Herrington identified numerous cases where Wexford's efforts to reduce ER visits had fatal consequences; Wexford's expert and Wexford's own CAPs agreed with Dr. Herrington's conclusion that there were denials and delays in ER care. *See supra* §§ I.D.2-I.D.5. Yet, there was no training based on these known failures, and Wexford's ER reduction efforts continued unabated. *See infra* Arg. §§ IV.

Ultimately, Wexford made no efforts to ensure that its widespread practice of reducing ER runs—with known and obvious risks—was not causing negative consequences.[10] To the contrary, it continued to subordinate CQI to UM goals, co-opting employees like Donna James, who was supposed to be overseeing quality control efforts. Ex. 21 at 15-16, 17-19. And even when Wexford achieved ER reductions far beyond its stated goals, it did nothing to ensure that they were not compromising patient safety, a course of actions the parties' experts agree is wildly reckless. *See supra* §§ I.C.2-1.C.4. Wexford's deliberate indifference is well established by the record.

Finally, there is also ample evidence from which a jury could conclude that Wexford's widespread practices were the moving force behind the violation of Ms. Neal's constitutional rights. The Fourth Circuit has held that a plaintiff has met her burden to establish causation on a widespread practice claim "if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom[,]" *Spell*, 824 F.2d at 1391, and the Supreme Court has made clear that causation is an issue for the jury. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). Wexford's widespread practice of denying and delaying offsite and emergency care shares a close factual relationship with what happened in Ms. Neal's own case, and a jury could easily find that the widespread practice was the moving force of Ms. Neal's death. *See supra* § II.

## D.      Wexford Does Not Meaningfully Address Plaintiff's Substantial Evidence of a Widespread Practice

For the thousands of pages of documents produced in this case, Wexford cites a total of four documents in its motion. In other words, it ignores the reams of widespread practice evidence produced in this case, and then asks the Court to conclude that there are no disputes of fact. That is

---

[10] Wexford contends that Plaintiff's assertion that it did not implement the safeguards it knew were necessary to protect patient health and safety is "without evidence." Def. Br. at 17. But as detailed in Plaintiff's statement of facts, there is a wealth of evidence to this effect, including testimony from Wexford's senior management, email correspondence between Wexford employees, and other documentary evidence showing that Wexford cared solely about reducing ER visits, even when problems were identified. The opinions of Plaintiff's experts are thus reliable and amply supported by the record, as discussed in more detail below. *See infra* Arg. § V.

not appropriate at summary judgment.[11] Wexford instead simply states in conclusory fashion that the 19 other incidents identified and discussed by Dr. Herrington is "hardly sufficient" to establish a widespread practice. Def. Br. at 23. Notably, Wexford does not argue that 19 other incidents is insufficient as a matter of law, nor could it. *See Awalt*, 74 F. Supp. 3d at 938-39; *Kopf*, 942 F.2d at 269. They have thus forfeited that point. *A Helping Hand, LLC v. Baltimore Cty.*, 515 F.3d 356, 369 (4th Cir. 2008). Wexford instead argues that the 19 other incidents are insufficient because there were lots of detainees in Maryland. But the numbers that Wexford cites are misleading.

Because of the limitations that this Court set regarding the temporal and topical scope of discovery in this case, Plaintiff was given access to case-related documents for only 193 patients (the majority of which were not medical records, but death reviews and other investigatory documents). Ex. 53 at 3.[12] Of those 193 patients, Plaintiff received medical records for just 47 patients. Ex. 53 at 3; Ex. 94. Dr. Herrington reviewed medical records for more than half of those patients and found significant problems in 19 of them, *i.e.* 79% of cases, nearly all relating to failing to recognize neurological conditions or timely send patients to the emergency room. *See supra* § I.D.2; Ex. 48 at 5-18. Dr. Herrington's identification of significant lapses in care in 19 out of 24 cases he reviewed thus represents 40.5% of the total number of patients whose medical records were produced in discovery (47) and nearly 10% of the total number of cases for which some form of documentation (however

---

[11] Notably, Wexford successfully sought strict limits on the scope of discovery in this case, permitting Plaintiff to obtain discovery *only* on the provision of emergency care between 2010-2014. Dkt. 499 at 26. The meaningful limitation on Plaintiff's discovery placed at Wexford's request defeats any assertion by it that Plaintiff's evidence is merely scattershot accusations of unrelated conduct.

[12] This access came exclusively from the DPSCS, as Wexford had relinquished custody of all records without notifying Plaintiff or otherwise taking steps to fulfill its obligations to retain documents in its possession, custody, or control during the pendency of civil litigation. Dkts. 477-2, 477-12. This is particularly troubling given that Wexford had previously sought and obtained a stay of Plaintiff's federal claims against it via bifurcation of the case, Dkt. 159 at 27, and yet still said nothing despite knowing that it was losing custody of documents centrally relevant to those claims. *See Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004) (discussing spoliation of evidence).

limited)[13] was available. Ex. 53 at 3. Dr. Keller opined that every one of these figures is unacceptably high; thus, even if one were to assume that Dr. Herrington reviewed the records for all 193 patients and concluded the care was perfect in every case other than the 19, the resulting 10% rate of substandard care is itself disturbingly high. Ex. 53 at 3.

Wexford also cites statistics about the total number of encounters between patients and medical staff. But as Dr. Keller further explained, the reference to gross totals of infirmary admissions, specialty referrals, and ER referrals is meaningless because Plaintiff did not have access to information about the *quality* of care provided to those individuals and Wexford took no effort to obtain any such information, even while it had possession of all such information. Ex. 53 at 3; *Hodge*, 360 F.3d at 450. Indeed, Wexford successfully argued for an order prohibiting discovery on these topics. Dkt. 480 at 2; Dkt. 499 at 26. It would be highly prejudicial to permit Wexford to use at summary judgment information and statistics about medical care that Plaintiff was never entitled to discover. *See Saltz*, 2021 WL 1856636, at *11.

Additionally, both Plaintiff's and Wexford's experts agree that a review of 24 cases is a sufficient sample in the field of correctional healthcare from which to reach an opinion about whether or not Wexford maintained a problematic pattern or practice. Dr. Fowlkes admitted that a review of 24 cases was an adequate sampling, Ex. 33 at 214, although he differed from Dr. Herrington as to his conclusion. Yet even then, he admitted that in at least 6 of the 24 cases, he too concluded there was a meaningful delay in referring the patient to the ER. *See supra* § I.D.3.

Wexford's remaining arguments on Plaintiff's widespread practice claim focus on attacking Plaintiff's experts and arguing about factual differences between Ms. Neal's case and the 19 other

---

[13] The records, for example, included death summaries of individuals who died by homicide following an attack, without any indication of the adequacy of their medical care either before or after the attack.

incidents that Dr. Herrington discusses. Wexford's attacks on Plaintiff's experts should be rejected for the reasons set out in Section IV below.

Wexford also argues that any cases that occurred before July 2012 cannot be attributable to Wexford as part of Plaintiff's widespread practice claim. Def. Br. at 24. But a reasonable jury could disagree. Wexford had nearly complete access to information about patient care and quality of care. *See supra* §§ I.E, I.G; *Randall*, 302 F.3d at 210. Despite that notice, when Wexford took over as the sole medical provider in July 2012, it simply rehired nearly all of the same staff who had previously worked for Corizon for the same positions. Ex. 31 at 44-45; Ex. 34 at 76, 89. Wexford made no changes to the daily practices that medical staff followed once Wexford took over; their jobs stayed basically the same. Ex. 31 at 46-50; Ex. 29 at 6-9. Indeed, throughout the period Wexford had the direct patient care contract, the policies and practices remained virtually the same (except for the gatekeeper requirement added to Wexford's UM policy). Ex. 29 at 7-9; Ex. 31 at 48. A reasonable jury could thus fairly attribute pre-July 2012 incidents to a known and ongoing practice that Wexford was deliberately indifferent in failing to address. *Spell*, 824 F.2d at 1390.

Wexford's remaining quibbles about various factual differences between Ms. Neal's case and the other cases discussed by Dr. Herrington are no basis to grant summary judgment.[14] For example, Wexford notes that some of the cases involved emergent medical needs due to cardiac issues rather than stroke. And for one of the stroke cases, E. Ho., Wexford notes that he (unlike Ms. Neal) had a history of elevated blood pressure, although Wexford offers no explanation as to why this renders E.

---

[14] Wexford argues that four of Dr. Herrington's cases may not be considered either because the patient was primarily under the care of mental health providers (F.R.) or because Dr. Herrington did not expressly cite a delay/denial of referral to an ER as an issue in his report (M.G., R.A., and J.M.). As to F.R., the issues that Dr. Herrington identified related to *medical* care provided by Wexford nurses and not mental health care. Ex. 146 at NEAL 44455 (noting that nurse and physician in the *medical* clinic were notified of obvious signs of medical emergency but directed mental health staff to simply continue monitoring patient without referral to the ER). As to M.G., R.A., and J.M., as discussed above, *see supra* § I.D.2, Dr. Herrington explained how the issues he identified in those cases led to delays and denials in offsite and emergency care. A reasonable jury could credit that explanation and find that the cases support Plaintiff's claim.

Ho.'s case so vastly dissimilar that it may not be considered as a matter of law. Simply put, these differences are at best an argument for Wexford to make to the jury and not a basis for summary judgment. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 656-57 (7th Cir. 2021) (noting that when providing evidence of other incidents in support of a *Monell* widespread practice claim, "the comparator need not be perfect[,]" and analogizing to employment discrimination claims). Plaintiff has provided sufficient evidence of a widespread practice maintained and encouraged by Wexford, and certainly known by it to have dangerous consequences for patient health and safety.

*        *        *

In sum, Plaintiff has amassed ample evidence establishing that the elements of a widespread practice claim have been met, and that summary judgment on this claim should be denied.

## III.   A Jury Could Reasonably Conclude that Wexford's Express Policies Caused Ms. Neal's Death

A corporation or municipality may also commit a constitutional violation through an express policy. As the name suggests, the express policy theory permits a plaintiff to hold a corporation liable for a constitutional violation that is caused by one of the corporation's "formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999). Under this type of claim, a single application of the policy that causes a constitutional violation is sufficient to establish liability. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985); *Monell*, 436 U.S. at 690. Wexford maintained two express policies that played a causal role in the violation of Ms. Neal's constitutional rights: (1) its UM policies, UM-001 and UM-002, which governed ER referrals after hours; and (2) its across-the-board reduction in ER trips.

A.      **Wexford's Utilization Management Policies Caused a Fatal Delay in Sending Ms. Neal to the Emergency Room**

As discussed in detail above, when Wexford took over direct care in July 2012, it issued a new UM policy. The plain language of that policy (provisions UM-001 and UM-002) required nursing staff to obtain approval from a supervising physician prior to referring patients to the ER for emergency care.[15] A critical change in the policy's language is especially telling: the clear direction in the old UM policy that "[u]rgent and emergent referrals are automatic approval as to not delay any care" *was removed. See supra* § I.B. Furthermore., multiple Wexford employees testified that the policy of requiring physician approval before calling 911 for a patient to be taken to the ER was, in fact, in effect during the relevant time frame. *See supra* § I.B; *see also Jackson v. City of Cleveland*, 925 F.3d 793, 830-34 (6th Cir. 2019).

There is no dispute that UM-001's and UM-002's requirement for nursing staff to obtain physician approval before calling 911 was dangerous and posed an obvious risk of substantial harm to detainees like Ms. Neal; Wexford's corporate designees, supervisors, and experts all agree. *See supra* § I.B. And there can be no dispute that the policy is attributable to Wexford. *See supra* § I.B. Similarly, there can be little dispute that a reasonable jury could find that the policy caused a fatal delay in referring Ms. Neal to the ER. Because of Wexford's express policy requiring physician authorization before calling 911, the nurses who discovered Ms. Neal unresponsive nevertheless waited for more than three hours to call 911 because they were initially unable to get in touch with the physician who was designated as being the on-call gatekeeper. *See supra* § II. Plaintiff has further adduced sufficient evidence, including from Wexford's own experts, to permit a jury to conclude

---

[15] In its brief, Wexford makes no mention of UM-001 and UM-002, acting as if they do not exist. Wexford has thus forfeited any argument that it might have made on this claim. *See Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 n.* (4th Cir. 2014) (citing *Eriline Co. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006)). It will be too late to raise any argument on this theory for the first time in reply. *A Helping Hand, LLC*, 515 F.3d at 369.

that Ms. Neal would have likely survived but for this three-hour delay, which was thus a cause of her death. *See supra* § II.B. Summary judgment should therefore be denied.

> **B.    Wexford's Policy to Reduce ER Trips Across the Board Caused a Violation of Fatima Neal's Constitutional Rights**

Independently, Wexford also implemented a policy to reduce ER trips across the board, across all sites (including the BCDC) and without limitation to particular medical conditions. *Pembaur*, 475 U.S. at 480-81 (official policy refers to rules, "often but not always committed to writing" intended to "establish fixed plans of action"). Wexford argues in its brief that it did not promulgate such a policy, and that to the extent it did DPSCS is responsible—an argument that contradicts the law and requires the Court to draw factual inferences in Wexford's favor. Plaintiff discusses the policy at issue before turning to Wexford's arguments below.

Wexford articulated its policy initially in its proposal to the State of Maryland, guaranteeing a 10% reduction in all offsite visits, including ER visits. It made this guarantee despite its awareness, through its role as UM contractor for several years before taking over all medical care, that less than 2% of ER trips were unnecessary. *See supra* §§ I.C.1, I.C.2.

When Wexford took over all medical care in July 2012, it immediately began to implement its policy to reduce ER trips across the board. The policy applied across all sites, to all categories of conditions, and was not supported by any commensurate expansion of on-site capabilities or auditing to ensure the policy was not producing negative patient outcomes. *See supra* §§ I.C.3, I.C.4.

Wexford administrators, in both the Baltimore Pretrial Region and throughout the state, routinely reported that the ER reduction policy was proving successful, and that ER trips remained low. *See supra* § I.C.2; Ex. 60 at WEXDISC 26092-93. Those reports continued throughout the 2012-2014 timeframe, and none of those reports indicated the policy was limited to discrete medical issues. *See supra* § I.C. To the contrary, at least one CQI report made clear that Wexford's policy was

49

designed to "[m]inimize the number of ER runs for the month" and to instead "[h]ave emergent cases seen on site." Ex. 7 at WEXDISC 28546.

As discussed above, the policy remained in effect even as there were known delays in ER referrals. *See supra* § I.C.3; Ex. 139 at WEXDISC 25963 (response to concern of "time delay in responding to emergencies" with goal of lowering ER runs to "less than 20 monthly"). Wexford's policy was obviously dangerous, and indeed both Wexford and its expert agreed that such efforts were highly dangerous if not accompanied by a commensurate increase of resources to provide adequate treatment onsite, as well as robust quality control oversight. *See supra* § I.C.4. Despite this knowledge, Wexford persisted in the policy, and a jury could reasonably conclude it was thus deliberately indifferent to the well-being of patients under its care.

A jury could also reasonably conclude that Wexford's policy to reduce ER visits across the board caused the denial and delay of an ER referral in Ms. Neal's own case. Indeed, the causal connection between Wexford's policy and the facts of Ms. Neal's case could not be closer. As this Court previously noted, a jury could conclude that Ms. Neal required referral to an ER on November 1, when she was instead admitted to the infirmary for observation with a noted release date of November 5. *Bost*, 2018 WL 3539819, at *26-27, Dkt. 430 at 53. On the whole, the jury could thus reasonably conclude that the failure was the reasonably probable result of Wexford's policy to reduce ER visits across the board.[16] *Spell*, 824 F.2d at 1390.

In its motion, Wexford attempts to confine its policy to a single document—the "ER Visit Reduction Program"—that it contends was written by Corizon, was limited to three unrelated medical conditions, and ended more than a year before Ms. Neal's death. Def. Br. at 10. But as

---

[16] Wexford argues that Plaintiff has failed to establish causation because some of its employees denied the existence of a policy to delay or deny emergency care. But such denials nearly always exist in cases where the facts are as hotly disputed as this one. The relevant question for this Court is whether, crediting all of Plaintiff's evidence and taking all reasonable inferences in her favor, a jury could reasonably conclude that Wexford's policy did exist and caused Ms. Neal's death. *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353 371-72 (W.D. Va. 2020). The answer is yes.

discussed in detail above, Wexford's factual contentions about the policy are plainly disputed by the evidence in the record. *See supra* §§ I.B, I.C.2, I.C.3; Ex. 4 at WEXDISC 20923-30.

Even if Corizon had initially drafted the policy—and Wexford has presented no evidence that it did— the ER Visit Reduction Program was promulgated and published in a CQI annual report *after* Wexford replaced Corizon as the sole medical care contractor in July 2012, and thus the policy is fairly attributable to Wexford. Notably, this would be the case even if Wexford had not altered a single word in the policy. *See Awalt*, 74 F. Supp. 3d at 940-41; *King v. Kramer*, 680 F.3d 1013, 1020-21 (7th Cir. 2012). Of course, Plaintiff's claim is not limited to the text contained within Exhibit 4. Instead, Plaintiff's express policy claim is based on Wexford's policy to reduce ER visits across the board throughout DPSCS sites when it took over the contract in July 2012—a policy repeated over and over in CQIs, emails and other documents. *See supra* § I.C; *see also Jackson*, 925 F.3d at 830-34 (jury was required to decide whether a city's express policy caused plaintiff's constitutional violation, in light of the context and testimony regarding the policy). And the evidence clearly establishes that that policy was promulgated and implemented by Wexford.

Wexford argues generally that it had no authority to make policy on any subject, no matter the context, because of its contractual relationship with the DPSCS and thus had *no* policies in place in the State of Maryland during any point. Def. Br. at 12-14. But the evidentiary record, which Wexford all but ignores, would easily permit a reasonable jury to find that Wexford was not only able but affirmatively required to promulgate and implement policies for its employees to follow.

Wexford's contract with the DPSCS presumed that Wexford would promulgate and implement policies, providing for a procedure in the event that Wexford's policies "conflict[ed]" with the policies of DPSCS. Ex. 138 at WEXDISC 333-34. Wexford's Rule 30(b)(6) designee, Dr. Neil Fisher, admitted that the UM policies (which contain UM-001 and UM-002) comprised "Wexford's policies and procedures [that] were related to [UM]" in Maryland, Ex. 36 at 33-34, and

Dr. Baucom noted that Wexford had an emergency care policy that was separate and distinct from an emergency care policy promulgated by the DPSCS. Dr. Baucom's view was that DPSCS's role was to set broad guidelines based on community standards of care, while Wexford was responsible for creating specific policies related to medical care in DPSCS facilities, without any need for DPSCS approval. *See* Ex. 14 at 42-44, 46, 72-74, 77, 127-28, 142-43, 163-170; Ex. 20 at 32, 80; Ex. 19 at 8-9, 27-28.

The contrary testimony cited by Wexford is just that—other testimony—that at best creates a dispute of fact that a jury must resolve at trial. *See Tolan*, 572 U.S. at 660. For example, Wexford cites to the provision of the contract that appears to require DPSCS approval of Wexford's policies and procedures prior to implementation. Def. Br. at 12. But there is no evidence in the record of DPSCS ever being provided or approving UM-001 and UM-002 (or the policy manual in which they were located) or the ER Visit Reduction Program. In fact, the contract appears to have permitted Wexford to promulgate and modify policies *without* DPSCS approval because there was a policy regarding emergency care already in existence. *See generally* Ex. 82; Ex. 138 at WEXDISC 332-34 (no requirement for contractor to submit modified policies for approval or review); *see also supra* § I.B. Finally, Wexford cites nothing indicating DPSCS even knew of its ER reduction policies, let alone approved them.

Ultimately, Wexford requests a blanket rule of immunity, irrespective of facts. Wexford is asserting that its conduct is wholly immune from suit because it contracted with the State of Maryland, which oversaw the contract. Wexford cites no authority for this remarkably expansive proposition. For good reason: courts have held that for-profit corporations that contract with a state to provide medical care have no immunity by virtue of the contract. *See, e.g., Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 379-80 (7th Cir. 2017) (en banc); *McDonald v. Dunning*, 760 F. Supp. 1156, 1171 (E.D. Va. 1991) (rejecting attempt by one municipal corporation to blame another for a policy

because it "ignores the [corporation's] independent duty" to protect the constitutional rights of individuals under its control).

As discussed above, the factual record easily permits a jury to conclude that Wexford itself maintained a policy to reduce ER trips across the board, and that the policy was neither one promulgated by the DPSCS nor simply errant conduct by employees that could not fairly be attributed to Wexford itself. This is precisely the sort of action that the Supreme Court and the Fourth Circuit have recognized give rise to a suit against the municipal corporation. *Monell*, 536 U.S. at 669 (municipal corporations are amenable to suit under § 1983 for their own conduct); *Owens*, 767 F.3d at 402; *Glisson*, 849 F.3d at 379.

Wexford argues that *Hunter v. Town of Mocksville*, 897 F.3d 538 (4th Cir. 2018), requires immunity, but *Hunter* establishes the opposite proposition: that the evidentiary record matters. 897 F.3d at 555-58 (noting that a decision to the contrary would "insulate the [municipal corporation] from liability in virtually every case—a result contrary to the principles underlying Section 1983"); *see also Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520, 541 (D. Md. 2020) (noting that entities may properly be deemed as joint final policymakers); *Santos v. Frederick Cty. Bd. of Comm'rs*, 346 F. Supp. 3d 785, 795 (D. Md. 2018).

Wexford's policy to reduce ER visits across the board was clearly a policy, and not just a decision that merely implemented DPSCS's policies. The policy was created by Wexford without any evidence of input or oversight from DPSCS, served Wexford's goal of maximizing its profits, and clearly reflected a formal understanding intended to establish a fixed plan of action for its employees to follow under similar circumstances consistently over time. *See Pembaur*, 475 U.S. at 480-81; *Semple*, 195 F.3d at 712. An individual or entity has final policymaking authority when it has "authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." *Spell*, 824 F.2d at 1386. The

factual record permits a reasonable jury to conclude that Wexford had precisely that authority with regard to the ER reduction policy.

**IV.    Wexford Failed to Train or Supervise Its Medical Staff Despite Knowing that Such Training and Discipline Was Necessary to Protect Patient Health**

Failing to train or supervise individuals can similarly support liability under *Monell* if that failure "manifest[s] deliberate indifference to the rights of citizens[.]" *Canton*, 489 U.S. at 388-89. An entity is deliberately indifferent if it is actually aware that its employees are regularly violating constitutional or statutory rights, and fails to implement a training program to put a stop to this pattern. *See, e.g., id.* at 388-90; *see also id.* at 397 (O'Connor, J., concurring in part and dissenting in part); *Spell*, 824 F.2d at 1390. And while a generalized policy of failing to train can establish *Monell* liability, as Defendants assert, an entity can also be liable for failing to train based on a single event if the need for training was obvious and employees were certain to encounter a situation in which they would rely on that training. *Brown v. Mitchell*, 308 F. Supp. 2d 682, 704 (E.D. Va. 2004) (citing *Canton*, 489 U.S. at 390). To establish causation, the failure must also be "closely related to the ultimate injury." *Canton,* 489 U.S. at 390-91. Here, there is evidence from which a reasonable jury could conclude that Wexford failed to train its providers to recognize neurological emergencies and send those patients to the emergency room, both as a matter of practice and based on the obviousness of the need for training. *See id.* at 390.

Wexford was aware that going back to 2010, medical providers were failing to recognize neurological symptoms and timely send patients to the ER. *See supra* §§ 1.D.2-5 (delays with sending patients to the ER from cases like R.G., C.A., E.A., and S.P.; CQIs regarding nurses' inability to identify neurological symptoms; and additional CQIs and CAPs). But Wexford took no steps to address these failures of care when it took over the contract. Ex. 140 at 55, 136, 338-39; Ex. 38 at 349-50; Ex. 141 at 56-57, 78, 300; Ex. 21 at 179; Ex. 20 at 266-68; Ex. 25 at 379-80, 382, 385, 508;

Ex. 17 at 35, 39; Ex. 142 at 49, 129; Ex. 25 at 344-45; Ex. 28 at 228; Ex. 26 at 218-220; Ex. 38 at 84-85.

Within weeks of Wexford's takeover, C.R. had died from a stroke at a Baltimore jail. Wexford's own CAP admitted that C.R. should have been immediately sent to the ER given his stroke symptoms, and that his death resulted from a failure to timely send him to the ER. *See supra* § I.D.4. But even though Wexford was aware of these failures and Dr. Baucom voiced her discontent with Wexford's response to C.R.'s death, *see supra* § I.D.4, Wexford did not conduct any training related to C.R.'s death, Ex. 19 at 34. Wexford was consciously aware of a problem with its providers failing to recognize neurological symptoms and to timely send patients to the emergency room, but did nothing about it, despite the obvious associated risks. *See Spell*, 824 F.2d at 1390; *Brown*, 308 F. Supp. 2d at 705 (quoting *Canton*, 489 U.S. at 389).

Four months later, Fatima Neal died at the BCDC for the same reasons—Wexford staff failed to recognize her obvious stroke systems and refused to timely send her to the ER—and Wexford declined to write a CAP, train, or discipline a single provider involved in her death. *See* Ex. 140 at 55; Ex. 142 at 49, 129; Ex. 25 at 344-45; Ex. 28 at 228; Ex. 140 at 136; Ex. 26 at 218-220; Ex. 38 at 84-85. Seven months after that, T.Lo died after being denied similar offsite care, despite displaying obvious symptoms requiring emergency care. *See supra* § I.D.2, I.D.4; Ex. 33 at 321. As it did with C.R., Wexford admitted to failures in documenting and communicating changes in T.Lo's condition, like deteriorating vital signs, weakness, and vomiting; and acknowledged that she should have been sent to the ER earlier. Ex. 48 at 19; Ex. 10 at WEXDISC 22434. Wexford also acknowledged that the problems with T.Lo's care were "repeat issues." Ex. 148 at WEXDISC 23861. Yet Wexford did not train or discipline anyone in relation to her death. Ex. 19 at 34.

As for the relationship between the failure to train and Fatima Neal's injury, Plaintiff has presented evidence that the failure to recognize Ms. Neal's neurological symptoms and timely send

her to the ER caused her death. *See supra* § II.A, II.B. A reasonable jury could thus conclude that Ms. Neal's death was caused by Wexford's unconstitutional failure to train its employees.

Wexford asserts, without citation, that the four months between when it took over the contract and when Ms. Neal died was not enough time for it to understand its providers' current levels of training and then implement new training. This argument is flawed for several reasons. First, Wexford was well aware, through CAPs, CQIs, and death reviews, of the quality of care Corizon was providing before July 2012 and, through cases like R.G., C.A., E.A., and S.P., of the delays with sending patients to the ER; a jury could find it accordingly knew of the obvious need for additional training. *See supra* § I.G. Indeed, a November 2012 CAP before Ms. Neal's death identified a clear need to train nursing staff on neurological issues. *Id.* Additionally, Wexford's own expert admitted that four months is more than enough time to implement necessary changes *if* the company considers them a high enough priority. Ex. 16 at 104-05. Even though Wexford knew of delays and denials of ER care to neurological patients and others experiencing medical emergencies before Ms. Neal's death, it simply did not make reform a priority. *See supra* §§ I.D.2, I.D.4, I.G. A reasonable jury could conclude Wexford is thus liable.

## V.   Plaintiff's Experts, Drs. Keller and Herrington, Have Disclosed Reliable Expert Opinions That Are Amply Supported by the Factual Record

Unable to challenge Plaintiff's ample evidentiary records, Wexford tries for a moonshot. It asks this Court to entirely disregard the expert opinions from Drs. Keller and Herrington. But Plaintiff's experts have produced thorough reports detailing the voluminous materials they reviewed, the relevance of those materials based on their experience and training in correctional healthcare, and the opinions that they ultimately reached. Wexford's arguments should be rejected.

Expert opinion testimony is governed by Rule 702 of the Federal Rules of Evidence. Fed. R. Evid. 702. Such testimony is admissible if the expert is qualified, and the testimony "both rests on a reliable foundation and is relevant to the task at hand." *United States v. Landersman*, 886 F.3d 393, 412

56

(4th Cir. 2018); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Rule 702 was "intended to liberalize the introduction of relevant expert evidence" and the Court accordingly "need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citing *Cavallo v. Star Enter.*, 100 F.3d 1150, 1158-59 (4th Cir. 1996)). Rule 702 instead provides a "gatekeeping role" for the district court to ensure that the proffered testimony is sufficiently relevant and reliable so that it is not more likely to mislead the jury than to enlighten it. *Westberry*, 178 F.3d at 261. But "[t]he trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Production Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018); *see also Ruark v. BMW of N. Am., LLC*, 2014 WL 351640, at *6 (D. Md. Jan. 30, 2014).

Bearing these principles in mind, this Court and the Fourth Circuit have previously held that although opinions that are wholly unsupported by the record may be excluded, "questions regarding the factual underpinnings of the expert witness's opinion affect the weight and credibility of the witness' assessment, not its admissibility." *Maryland Shall Issue, Inc. v. Hogan*, 2021 WL 3172273, at *4 (D. Md. July 27, 2021) (cleaned up) (citing *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017)). As the Federal Rules advisory committee noted, "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts," and district courts should not "exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, advisory committee's note to 2000 amendment. Courts in this District thus distinguish between expert opinions based on wholly fabricated or unsupported facts—which are inadmissible under Rule 702—and expert opinions based on facts that are in dispute but find support in the record—which are admissible. *E.g., Vertellus Holdings LLC v. W.R.*

*Grace & Co.-Conn.*, 2021 WL 3883597, at *10 (D. Md. Aug. 12, 2021); *Brightview Grp., LP v. Teeters*, 2021 WL 2627960, at *4 (D. Md. Feb. 8, 2021).

Dr. Keller and Dr. Herrington offer opinions about the policies and practices of Wexford, and the harm that those policies and practices posed to patients under Wexford's care. Ex. 48 at 4-5, 22-23; Ex. 49 at 19-21. To reach his opinions, Dr. Keller reviewed 20 deposition transcripts of Wexford and DPSCS employees; hundreds of pages of CQI reports, CAPs, and UM policies and reports; scores of meeting minutes and reports; email correspondence between and amongst Wexford and DPSCS employees; and numerous contract documents reflecting the various contracts between Wexford and the State of Maryland and associated bidding documents, as well as extensive documentation and expert reports regarding Ms. Neal's treatment at the BCDC. Ex. 49 at 2-4. Dr. Herrington reviewed nearly all the same documents that Dr. Keller reviewed, as well as records relating to the treatment of a number of DPSCS detainees. Ex. 48 at 2-4.

Wexford does not dispute that Drs. Keller and Herrington are qualified to offer the opinions set forth in their report. Nor could it. Dr. Herrington's more than two decades in correctional healthcare include leadership positions within correctional healthcare systems in Ohio, Maine, Vermont, and Washington. Ex. 48 at 29-31. Dr. Herrington has consistently provided direct patient care to incarcerated individuals within the correctional setting. *Id.* Dr. Keller has also worked extensively in correctional healthcare, including serving as Chief Medical Officer for a medical contractor that, like Wexford, contracted with departments of corrections to provide healthcare. Ex. 49 at 22. Dr. Keller has been responsible for both the policies and practices of a corporation like Wexford, and has provided direct patient care in the carceral setting. In short, both Drs. Keller and Herrington are eminently qualified to opine on Wexford's policies and practices. *Id.* at 22-24.

Wexford also does not dispute the relevance of Dr. Keller's and Dr. Herrington's opinions. Instead, Wexford contends that each expert's opinion testimony is inadmissible because it lacks a

sufficient factual basis and is therefore unreliable. But upon closer examination, Wexford's dispute is not at all about whether Drs. Keller's and Herrington's opinions find support in the evidentiary record. Instead, it is about whether *other* evidence in the record, with the added benefit of inferences made in Wexford's favor, would support a contrary opinion—espoused by the experts retained by Wexford—that Wexford's conduct is exemplary and beyond reproach. In other words, Wexford's dispute is not with the methodology or reliability of the opinions of Drs. Keller and Herrington, but is instead a claim that on contested facts, the Court should side with Wexford. This is not only inappropriate at summary judgment, the Fourth Circuit has held that such challenges to "the factual underpinnings of the [expert witness'] opinion[s]" are not a basis to bar expert opinions. *Bresler*, 855 F.3d at 195. Wexford's *Daubert* challenge should accordingly be rejected.

### A. Wexford's Attacks on Dr. Keller's Expert Report Are No Basis to Exclude His Opinions

Wexford complains about Dr. Keller's finding in his report that patient deaths increased by 28% statewide and 40% regionally in the two years after Wexford took over direct patient care in DPSCS facilities, as compared to the two years before Wexford took over direct patient care. Def. Br. at 20; Ex. 49 at 15-16. Wexford does not dispute that calculation or attack the data upon which it is based. Instead, it contends that Dr. Keller should have used *different* data so that the trends would not be so inculpatory. Wexford argues, without explanation or citation to any authority, that Rule 702's reliability requirement mandated Dr. Keller to use the years Wexford prefers. But this Court previously held, at Wexford's urging, that 2010-2014 (the timeframe used by Dr. Keller) was the "relevant time period for discovery." Dkt. 480 at 2; *see also* Dkt. 500. Having obtained a benefit from arguing that 2010-2014 was the relevant timeframe, estoppel precludes Wexford from now advancing a directly contrary position to gain a different advantage. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Even if estoppel did not apply, Wexford's quibbles with the various statistics and their impact on Dr. Keller's opinions would at best be a matter for cross-examination. *See, e.g., Burns*

*v. Anderson*, 123 F. App'x 543, 549 (4th Cir. 2004); *Glass v. Anne Arundel City.*, 38 F. Supp. 3d 705, 716 (D. Md. 2014) (party's objection about the expert's "failure to take other data into account" goes to the "weight of the report, not its admissibility, and may be challenged on cross-examination").

Wexford also argues that Dr. Keller's opinions are unreliable because they do not credit Wexford's contention that it "sought to raise the quality of the in-house care" and "that cost was not a consideration" for Wexford or its employees. Def. Br. at 21-22. But those contentions are at the heart of the parties' dispute. Wexford is effectively asking this Court to rule that Dr. Keller's opinions are unreliable merely because they contradict Wexford's position in the litigation—a request that the Fourth Circuit has repeatedly held is off limits in the context of both summary judgment and a *Daubert* inquiry. *Bresler*, 855 F.3d at 195 (when conducting *Daubert* inquiry, "courts may not evaluate the expert witness'[s] conclusion itself, but only the opinion's underlying methodology"); *Jacobs*, 780 F.3d at 568-69.

Moreover, Dr. Keller did consider and address the contentions asserted by Wexford in its motion. In his report, Dr. Keller thoroughly discussed how a private healthcare company properly balances appropriate cost-saving initiatives with critical quality control metrics. Ex. 49 at 4-8. Dr. Keller further discussed the proper scope of a legitimate initiative to reduce ER referrals. *Id.* at 5-6. Dr. Keller simply concluded the wealth of evidence in the record revealed that Wexford was not applying cost-saving initiatives with appropriate safeguards, or properly limiting the scope of its ER reduction efforts. *Id.* at 8-21. Wexford is entitled to disagree with those conclusions, but the proper arbiter of that disagreement is a jury—not this Court at summary judgment. *McCoy v. Biomet Orthopedics, LLC*, 2021 WL 252556, at *11 (D. Md. Jan. 25, 2021).

Wexford's remaining quibbles with Dr. Keller's opinions similarly fall well short of any basis to exclude them under Rule 702. For example, Dr. Keller opines that when Wexford took over direct patient care, it subordinated CQI to UM, and that as a result CQI began to focus on cost-

cutting initiatives like reducing ER trips. Ex. 49 at 7. Wexford claims this is wholly unsupported by the record, but it is just wrong: the emails and documents cited by Dr. Keller clearly support the statements contained in his report. For example, one of the documents cited by Dr. Keller, an email sent from Donna James to UM Directors Drs. Smith and Getachew, communicates that one of the actions Ms. James was taking in her role as CQI director was to conduct regional studies about ER referrals for individuals with cardiac issues "based on UM data," Ex. 143, which Ms. James testified expressly was one of the ways "in which [she was] being essentially asked to incorporate UM's work into your CQI work" and that Wexford was "merging CQI and UM together[.]" Ex. 21 at 165-66; *see also id.* at 163-64. The documents cited in Dr. Keller's report further establish that one of the prominent CQI "action plans" was in fact a UM initiative to reduce ER referrals, thereby reducing Wexford's out-of-pocket expenses and increasing its profits under the contract. *See supra* § I.C.3; *see also, e.g.,* Ex. 145 at WEXDISC 25482; Ex. 6 at WEXDISC 25838.

As Dr. Keller notes, Ms. James confirmed at her deposition that discussions in CQI documents about ER runs came from the UM department and "there was a lot of discussions having to do with ER runs." Ex. 21 at 150-52. And Dr. Keller explained in detail that UM is inherently a cost-cutting focused function, Ex. 49 at 5—an opinion that is hardly controversial. *See, e.g.,* Ex. 21 at 32-33, 150-151; Ex. 31 at 13; Ex. 30 at 17-18; Ex. 36 at 71-72. Indeed, it is undisputed that a reduction of ER referrals increased Wexford's profits. Ex. 96 at 3. Dr. Keller's opinions are thus amply supported. *See Vertellus Holdings LLC*, 2021 WL 3883597, at *11.

Finally, Wexford quibbles with Dr. Keller's conclusion about the ER trend analysis included in Wexford's 2012 CQI report. Def. Br. at 19; Ex. 80 at WEXDISC 20930. To be clear, Dr. Keller correctly notes that the referenced chart itself reflects a trendline that plummets from just over 10 ER referrals per 1,000 prisoners to just over 2 ER referrals per 1,000 prisoners—a reduction of 80%. *Id.* Wexford's insistence that certain other data points within the set are more accurate is

clearly a matter for cross-examination and not grounds for exclusion. *See Westberry*, 178 F.3d at 261.

Similarly, Wexford's argument about the relevance of this data is meritless. Dr. Keller clearly

explained that the reduction was relevant because it should have immediately caused Wexford to

conduct an inquiry into whether the efforts to reduce ER referrals were endangering patients. Ex. 49

at 15. Wexford does not explain how this opinion is not relevant or is not reliable given the wealth

of data upon which it is based. *See, e.g., Sprint Nextel Corp. v. Simple Cell, Inc.*, 2016 WL 524279, at *3

(D. Md. Feb. 10, 2016). Wexford's attacks on Dr. Keller's opinions should accordingly be rejected.[17]

### B.    Wexford's Attacks on Dr. Herrington's Expert Report Are No Basis to Exclude His Opinions

Wexford's complaints about Dr. Herrington's opinions fare no better. Wexford's primary

argument for exclusion of Dr. Herrington's opinions centers on his review and thorough analysis of

records reflecting treatment of two dozen other individuals incarcerated by the DPSCS. Wexford

first argues that the 19 other examples of inadequate care identified by Dr. Herrington in his report

cannot establish a pattern or practice for purposes of *Monell*. As discussed above, however, that

argument is incorrect as a legal matter. *See supra* Arg. §§ I.A, I.D. It is also incorrect as it applies to

the reliability and admissibility of Dr. Herrington's report.

---

[17] In an "appendix" attached to its motion for summary judgment, Wexford also contends that Dr. Keller misrepresented the record when he stated that "[d]uring [monthly budget meetings], Wexford leadership discussed how Wexford's actual costs compared with its budget and expected profit margin, and what could be done to increase profitability." Dkt. 537-4 at 1-2; Ex. 49 at 12. But a review of the deposition testimony cited by Dr. Keller—a task that neither of Wexford's experts bothered to undertake— demonstrates that the record amply supports the statement. Director of Operations McKee testified that during these budget meetings, the conversations "are always the same" and included asking "is there anything that we can do to increase our, our profitability?" Ex. 20 at 239. McKee further testified that the trending margin of profit would be discussed, as well as expenditures, including "the amount of money spent on off-site care" which was discussed "every month[.]" *Id.* at 242-43. Ms. Scott confirmed that the monthly budget meetings involved discussion of the "budget versus actual expenses for sending people off site for care" and would discuss how to reduce expenditures that Wexford could control, including reduction of the number of ER visits. Ex. 35 at 110-12. Dr. Fisher likewise confirmed that Wexford's actual off-site care expenses, and the comparison to Wexford's budgeted figures, were discussed in every meeting. Ex. 36 at 122-23.

As discussed above, Plaintiff received medical records for just 47 patients; Dr. Herrington found significant lapses in care in 19 of those 24 cases (79.2%).[18] *See supra* Arg. § II.D. As Dr. Keller explained in his rebuttal report, the reference to gross totals of infirmary admissions, special referrals, and ER referrals is meaningless because Plaintiff did not have access to information about the *quality* of care provided to those individuals and Wexford took no effort to obtain any such information. Ex. 53 at 3 (noting that applying even the most conservative 10% lapse rate would yield potentially thousands of cases with meaningful lapses in care); *Hodge*, 360 F.3d at 450.

Wexford cannot claim that the 24 sets of records that Dr. Herrington reviewed were insufficient or unreliable, because Dr. Fowlkes, Wexford's expert responding to Dr. Herrington, admitted that the 24 cases both he and Dr. Herrington reviewed "was an adequate sampling." Ex. 33 at 214. Dr. Fowlkes further admitted to employing the same methodology as Dr. Herrington. Ex. 33 at 185-86. The two men differed only in their conclusion: Dr. Fowlkes opined that these 24 cases did not reflect any pattern or practice on the part of Wexford, while Dr. Herrington opined that these 24 cases, in conjunction with the wealth of other evidence he reviewed, reflected a widespread practice of delaying emergency care, maintaining woefully inadequate documentation, and generally putting patients' lives at risk. *Compare* Ex. 48 at 18, 23-27, *with* Ex. 52 at 49. These dueling conclusions must be resolved by a jury. *Ruark,* 2014 WL 351640, at *6.

Wexford next argues that the 19 cases Dr. Herrington identified are distinguishable from Ms. Neal's case. In support of its argument, Wexford identified every possible factual difference between Ms. Neal's case and the cases identified by Dr. Herrington. Def. Br. at 23-26. As Plaintiff has addressed above, these differences are insufficient as a legal matter to entitle Wexford to summary judgment. *See supra* Arg. §§ I.A, I.D. Because a reasonable jury could conclude that these 19 cases,

---

[18] As noted above, this access came exclusively from the DPSCS directly, as Wexford had relinquished its possession of all records.

especially when considered in conjunction with the wealth of other evidence Plaintiff adduced, reflect a practice by Wexford to delay and deny necessary ER trips, summary judgment must be denied. Wexford's Rule 702 challenge similarly fails.

Notably, Wexford offers absolutely no explanation for why the purported factual differences render Dr. Herrington's opinions unreliable. Almost all of the 19 cases contain the critical similarity to Ms. Neal's: they involve cases in which Wexford's doctors and nurses delayed far too long in sending a patient from the infirmary to the ER; and of those, 8 of them specifically involve the failure to send out patients experiencing symptoms of obvious, and serious, neurological conditions. *See supra* § I.D.2. At best, the factual differences that Wexford identifies are matters for cross examination. They certainly do not undermine the reliability of Dr. Herrington's opinions, particularly given Dr. Herrington's thorough discussion of each case, and Wexford does not meaningfully contend otherwise. Wexford's own expert employed the same methodology, albeit reaching a different conclusion than Dr. Herrington, as is routine in federal litigation. The doctors' methodology has been recognized as reliable by district courts throughout the country in policy and practice cases like this one. *See, e.g., Awalt*, 74 F. Supp. 3d at 926-27; *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1234-35 (9th Cir. 2011); *cf. Bresler*, 855 F.3d at 195. Dr. Herrington's analysis of the 19 cases involving substantial lapses in care, and the conclusion that he reaches regarding Wexford's patterns and practices as a result, are reliable and therefore admissible.

Wexford challenges Dr. Herrington's opinion regarding Wexford's policy of requiring prior approval for an ER referral. Def. Br. at 26. Dr. Herrington notes that multiple Wexford employees testified that "they understood [Wexford's] policy to require them to get approval before sending patients out to 911." Ex. 48 at 25. Ignoring the express policy saying exactly that, *see supra* § I.B, Wexford argues that this statement is not supported by the record, and that there is also evidence that supports Wexford's contrary contention that no such policy existed. Again, Wexford is just

wrong that Dr. Herrington's statement lacks support in the factual record. *See supra* § I.B; *see, e.g.*, Ex. 23 at 133 (Wexford nurse admitting that "when there's a need to send someone outside" she "would have to have the approval of either a doctor or a physician's assistant").[19] Wexford's argument is a perfect example of the factual disputes that are clearly present, revealing why this summary judgment motion should have never been brought.

Ultimately, Wexford has offered no plausible argument for why its claims about the weight of the evidentiary record would render Dr. Herrington's entire report unreliable and inadmissible. To the contrary, this Court has repeatedly held that Wexford's arguments are a matter for cross-examination and not exclusion. *See, e.g., Burns*, 123 F. App'x at 549; *Vertellus Holdings LLC*, 2021 WL 38853597, at *10; *Glass*, 38 F. Supp. 3d at 716; *see also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment. The Court should reject Wexford's request to exclude Dr. Herrington because he did not center disputed evidence that supported Wexford's version of the facts.[20]

## CONCLUSION

For all of the reasons above, Wexford's motion for summary judgment should be denied.

---

[19] Wexford claims that these statements from its staff and administrators should be interpreted merely as claims that physician *notification* was required, not *authorization*. Def. Br. at 26. Of course, this is simply a request that this Court take an inference in Wexford's favor that is not permissible at summary judgment. And, in any event, it is not supported by the record. Former defendant McNulty was asked, "Were registered nurses working at the BCDC allowed to send a patient to the hospital without any *approval*?" Her answer was, "No, we were not allowed to send inmates out on our own." Ex. 23 at 131-33; *id.* at 226; *see also* Ex. 21 at 72-73 ("Q So was the expectation that they were to contact the doctor for *approval*? A That is true. Q Okay. And was it typically the case that nurses would get a doctor's *approval* before they sent somebody outside? A Yes. Generally.").

[20] In another "appendix," Wexford contends that Dr. Herrington misrepresented the record when he stated that there was "evidence that the trainings Wexford committed to doing in response to those deaths, CQIs, and CAPs never happened, as testimony from several Wexford witnesses suggests they did not receive such trainings." Ex. 48 at 23; Dkt. 537-5 at 1-2. Although some of the pincites that appear directly after the cited sentence appear to be incorrect (referring instead to Wexford's ER referral authorization policy), Dr. Herrington's statement finds ample support in the materials he reviewed. Ex. 22 at 43:5-16; Ex. 18 at 8-11; Ex. 19 at 34; Ex. 23 at 456:11-14; *see also* Ex. 21 at 194-95 (testimony from Donna James that her ability to identifying needed training diminished as Wexford prioritized UM over quality metrics). Although the typographical mistake is regrettable—perhaps Dr. Herrington should have instead provided no citations to any record evidence to support his opinions, like Wexford's experts did—it is no basis to exclude Dr. Herrington's opinions.

RESPECTFULLY SUBMITTED,


/s/ Anand Swaminathan
*Attorneys for Plaintiff*


/s/ Sarah Grady
*Attorneys for Plaintiff*


/s/ Rachel Brady
*Attorneys for Plaintiff*


Michael Kanovitz
Anand Swaminathan
Steven Art
Sarah Grady
Rachel Brady
LOEVY & LOEVY
311 North Aberdeen St.
Chicago, IL 60607
(312) 243-5900




Masai D. McDougall
Fareed Nassor Hayat
Norrinda Hayat
THE PEOPLE'S LAW FIRM
14908 Notley Avenue
Silver Spring, MD 20905

66

## <u>CERTIFICATE OF SERVICE</u>

I, Sarah Grady, an attorney, certify that on November 24, 2021, I caused the foregoing Response to Defendant's Motion for Summary Judgment to be filed via the Court's CM/ECF electronic filing system, which effected service on all counsel of record.


<u>/s/ Sarah Grady</u>
*Attorney for Plaintiff*

67