**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SHARON BOST, in her individual capacity and as Personal Representative of the ESTATE OF FATIMA NEAL, | ) ) ) ) | |
| | ) | Case No. 1:15-cv-03278-ELH |
| Plaintiff, | ) | |
| v. | ) | Judge Ellen L. Hollander |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., *et al.*, | ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 48

12 March 2021

Ryan D. Herrington, MD, MPH
4280 Martin Way E
Suite 105, PMB 125
Olympia, WA  98516

Mr. Anand Swaminathan Esq., Ms. Sarah Grady Esq. and Ms. Rachel Brady Esq.
Loevy & Loevy
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607

RE:  Sharon Bost, in her individual capacity and as personal representative of the estate of Fatima Neal v. Wexford Health Sources, et al. Case: 1:15-cv-03278-ELH

 Dear Mr. Swaminathan, Ms. Grady and Ms. Brady,

I understand you represent the plaintiff in the above referenced matter. Your office recently forwarded to me multiple sets of medical records for patients incarcerated by the Maryland Department of Public Safety and Corrections Services (DPSCS) who suffered adverse health related outcomes while under the care of Wexford Health Sources (Wexford). You have specifically asked me to perform an analysis of these and other records. I understand that prior to 07/01/12, Wexford provided utilization management services for DPSCS and after 07/01/2012, Wexford provided direct care and utilization management services to patients incarcerated by DPSCS.

By way of training and experience, I believe I am qualified to perform this analysis and formulate the opinions below. I am first and foremost a physician in active correctional practice. I am dual board certified by the American Board of Preventive Medicine in both Public Health/Preventive Medicine and Addiction Medicine. I have worked as a primary care physician and as a medical director/administrator in correctional settings. I also have a Master level degree in Public Health so I have a professional appreciation for population based health care administration. I am currently employed by the Washington State Department of Corrections as a Facility Medical Director. My resume is attached. Also attached is documentation regarding legal cases in which I have served as an expert witness. My fee for this report is $350/hour.

I have completed my review of the medical records you sent to me. My most significant and worrisome concern is Wexford's management of emergency department referrals. My review has left me professionally shocked and personally saddened. It is my opinion that Wexford as a corporate entity bears responsibility. My rationale for this opinion is below.

**Documents Reviewed**

- Clinical, administrative, and/or investigative records for:
  - Fatima Neal, WEXDISC 1160-1165; NEAL 28908-29024, 49854-49889, 102508-102530
  - S███ P██, Neal 67829-68961, Neal 10381-103296, Neal 102990-103296, Neal 103041-103043, Neal 103044-103049, Neal 103051-103067, Neal 103068-106083, Neal 103084-103094, Neal 103095-103111, Neal 103112-103124, Neal 103125-103156, Neal 103172-103180, Neal 103342
  - J██ P██: Neal 28717-28798, 102081-102119
  - C███ R███, WEXDISC 030290, WEXDISC 032542, WEXDISC 032543, WEXDISC 032548, WEXDISC 028857, WEXDISC 029307 WEXDISC 029310, Death Review, Medical records
  - T██ L██, Neal 30489-30535, WEXDISC 23697, Neal 46182-46712, Neal 50570-51074, Death review - no bates stamps; Copy of medical records - no bates stamps
  - T██ L██: WEXDISC 13298-13315, Neal 35722-35963
  - D█████ B███: Neal 31952-32023
  - R███ S███, Neal 031845-31885 and Medical Records
  - A██ D███: Neal 95129-95669, Neal 33003-330018
  - H███ R███, Neal 102010-102042, Neal 044455-44815, Neal 046726-46846
  - A███ C███-B██ WEXDIC 22438, Neal 61655-64021
  - R███ G██: Neal 102671-102683, Neal 102312-102331, Neal 45322-45356, Neal 49754-49778
  - M████ G██: WEXDISC 22431, Neal 102232-102250, Neal 29310-29396
  - R████ A███ (death review only)
  - H████ A█
  - C████ A█
  - S███ F█
  - T███ G██ (death review only)
  - H████ H█
  - E███ H█
  - D████ J█
  - G████ J█
  - J████ M█
  - W████ P█ (death review only)
  - A███ S█
- Deposition transcripts of: Nicholas Little, Donna James, Asresaghen Getachew, Sonja Wilson, Oby Atta, Jocelyn El-Sayed, Anike Ajayi, Karen McNulty, Dr. Robert Smith, Stacey Scott, Dr. Isaias Tessema, Kara Hope, Odunze Adaora, Neil Fisher, Getachew Afre, Windy Riccitelli, Andria Graham, Christy Somner
- Wexford Discipline Interview of Asresahegn Getachew
- Expert Reports in *Bost v. Wexford*
  - Dr. Laura Pedelty MD PhD (report and supplement)
  - Dr. Nathaniel Evans MD (report and supplement)
  - Dr. Peter Pytel MD (report and supplement)

- o Dr. Winer
- o Dr. Mathis
- o Dr. Fowlkes
- Wexford Health Sources Utilization Management Policies and Procedures, Maryland Region, UM-002, and Supplement (pre- and post-2012 policies)
- UM Process Improvement Project
- Email correspondence among Wexford staff, as detailed below (WEXDISC 21789, 23801-02, 22788-89, 24250, 24338-39, 25961-65, 32542, 33573-75)
- Wexford CQI Documents, including:
  - o Documents dated between 08/2012 through 06/2014 entitled CQI Minutes
  - o Regional Total Health Care Operation Trend Report
  - o Quarterly CQI Meeting minutes
  - o Specifically: Damon (Oct. 2012); Baltimore Detention (Jan.-Sept. 2014); Baltimore Pretrial (Aug. 2014); Baltimore Pretrial (June-July 2013); Baltimore Pretrial (June 2013) Quarterly Multivendor; Baltimore Pretrial (Dec. 2012) Wexford Multivendor; Baltimore Pretrial (Oct. 2012); Baltimore Pretrial (Sept. 2012) Quarterly Multivendor; Baltimore Pretrial (Aug. 2012); Cumberland (Nov. 2012); Baltimore Pretrial (Jan.-Apr. 2013); Baltimore Detention (Nov. 2012); Hagerstown (October 2012); Baltimore Region (October 2012); Baltimore Pretrial (Oct-Nov 2012); Baltimore Region (April 2013); March 2013 CQI Minutes (Unlabeled) WEXDISC 24985-88; Baltimore Region (Oct.-Nov. 2012); Jessup (Aug. 2012); Baltimore Detention (Aug. 2012); Cumberland (Aug. 2012); Baltimore Pretrial (April 2013); Jessup (april 2013); Hagerstown (Apr. 2013); Hagerstown (February 2013); ECI Feb. 2013; Cumberland (Feb. 2013); Jessup (Feb. 2013); MCIJ-JPRU-CMCF (Dec. 2012, Jan-Feb. 2013); Hagerstown (Jan. 2013); Jessup (Jan. 2013); Cumberland (Jan. 2013); Jessup (Dec. 2012); MCIW-EPRU-SMPRU (Aug., Dec. 2012); ECI (Nov. 2012); PATX-BCF (Nov. 2012); Hagerstown (Nov. 2012); Hagerstown (Aug. 2012)
- Wexford Annual Report, CQI Baltimore 2012 (including ER Visit Reduction Program)
- Wexford Corrective Action Plans, as referenced below
  - o WEXDISC 26012
  - o WEXDISC 25980-81
  - o WEXDISC 26018
  - o WEXDISC 24951
  - o WEXDISC 23300-01
  - o WEXDISC 94959
  - o WEXDISC 25249-25274
  - o WEXDISC 22431-32
  - o WEXDISC 22434-36
  - o WEXDISC 22438
  - o WEXDISC 23697-700
  - o WEXDISC 25698-99
  - o WEXDISC 25814-16
  - o WEXDISC 25275-90
  - o WEXDISC 25819-20
  - o WEXDISC 25828-31

- o   WEXDISC 26009-11
- o   WEXDISC 29285-87
- o   WEXDISC 23697-701
- o   WEXDISC 25698-99
- o   WEXDISC 25814-16
- o   WEXDISC 256009-11
- o   WEXDISC 29285-87
- o   NEAL 102671-102694
- o   NEAL 102685-86
- o   NEAL 102687-94
- o   NEAL 102696-98
- o   NEAL 102699-760
- Wexford Answers to 2nd Interrogatories and Deposition of Nicholas Little, Wexford Corporate Designee.
- 08/07/13 Performance Appraisal for Dr. Afre
- Maryland Business Performance Action Meeting December 2013
- 2012 Central Region Baltimore Annual Performance Improvement Report
- Access to Care Minutes (Oct. 8, 2013)
- Regional Medical Director Meeting Minutes (4/12/13; 4/26/13; 6/28/13)
- MAC Minutes (9/18/14; 6/19/2014; 6/20/2013; 5/16/2013; 8/16/2012)
- Expert Report of Dr. Jeff Keller

## Opinions

I begin my report with a few preliminary comments relevant to my overall opinions. First, emergency department providers are specialists not unlike orthopedic surgeons and ophthalmologists. Accordingly, the appropriate terminology is emergency department referrals rather than ED runs.

Second, in the healthcare setting regardless of incarceration status, all patients are entitled to care that meets the prevailing standard of care, standard of care being what a reasonably prudent medical provider with similar training would do under similar circumstances. The US Supreme Court has ruled that incarcerated individuals are entitled to healthcare that is free of deliberate indifference. Correctional medical providers, as opposed to community providers, have the additional obligation of practicing in a manner that meets this standard.

I.   **Wexford had a pattern and practice of failing to meet the standard of care in treating patients in the infirmary, including by denying and delaying necessary ER and offsite care**.

Based on my review of numerous patients' medical records, Corrective Action Plans ("CAPs"), Continuous Quality Improvement audits ("CQIs"), Monthly Utilization Management Reports, and many other documents and deposition transcripts identified in my list of Documents Reviewed, it is my opinion that Wexford had a recurring pattern and practice of denying and

delaying necessary emergency department and other offsite care, to the serious detriment of numerous detainees in Maryland correctional facilities.

This widespread pattern of denying constitutionally adequate medical care by timely sending patients for emergency department and other offsite care is reflected in Wexford's records in myriad ways. This includes, but is not limited to, the following:

- Patient medical records, and associated death reviews, demonstrate a repeated pattern of failing to send patients to the emergency department even though such care was obviously needed and appropriate. And, they further reflect repeated deficiencies in medical documentation, a failure that inevitably results in the delay and denial of necessary care.
- CAPs reveal that Wexford supervisors identified and acknowledged deficiencies in patient care, in several cases based on other deaths. Some of the CAPs expressly find that medical staff failed to timely refer patients to the ED, and failed to document and communicate changes in patient status that resulted in delays and denials of ED care.
- CQI documents reveal that Wexford had persistent problems with the medical documentation created by its nurses and doctors. These failures in documentation have an obvious impact on patient care, and further perpetuated the delay and denial of ED and other offsite care.

### A. Individual Case Studies

As examples, the cases below reflect a failure to meet the standard of care, which in each case required sending the patient out for ED or offsite care, and which either did not happen or happened far too late. In all instances, the patient experienced a negative health outcome. In most cases, the patients died.

**B, D**

Date of Death:  06/22/16

Cause of Death:  Extensive cerebral infarct of the right hemisphere (autopsy report)

Summary:  Mr. B▇ was a black male aged 53 at the time of death. Redacted documentation which remains legible indicates that Mr. B▇ was admitted to his facility's infirmary multiple times (6/14/16, 6/17/16) with complaints of vomiting and severe headache prior to expiring on 6/22/16 as a result of a stroke and large cerebral infarct. Documentation indicates that Mr. B▇ was given Tylenol #3, which is an opiate medication, for his headache on 06/16/16. Per a 6/20/16 DPSCS Memorandum, Mr. B▇ was found unresponsive at approximately 0840 on 06/20/16. Mr. B▇ was taken to the medical clinic area for further evaluation and assessment by a physician. The physician then gave a verbal order to call 911, which was called at 0930 hours.

Comment:  Mr. B████'s case is disturbingly similar to Ms. Neal's, in that he was suffering stroke symptoms for a number of days before his death without being sent to the emergency department, and instead received an opiate to dull his symptoms. Administering an opiate for a headache without having done a proper diagnostic work up to rule out a potentially life-threatening condition such as cerebral infarct (ultimately what killed Mr. B████) is not appropriate practice and falls below the standard of care. Notation made here that a proper diagnostic work-up to meet standard of care would have required the use of off-site diagnostic services. In addition, Mr. B████ is documented to have been found unresponsive on 06/20/16. This a medical emergency necessitating immediate referral to a local emergency department. The 50 minutes during which Mr. B████ was taken to the correctional facility's medical clinic area for further evaluation by a physician is an unnecessary and irresponsible delay in providing emergency medical treatment.

Failure to use offsite services

Failure to send to ED

Failure to diagnose and treat warning signs of possible neurological event

C████-B██, A████ 

Date of Death:  5/9/13

Cause of Death: Basal Ganglia infarct

Summary:  47-year-old male with a history of high blood pressure, end-stage kidney disease requiring dialysis and diabetes who presented at 1138 hours on 05/07/13 with headache and right hand/feet weakness, stating "I feel like my whole right side is paralyzed."  Reviewed documentation indicates he was monitored in the clinic area of the facility. Documentation references increased headache and right arm/leg numbness. 911 called at 1345 hours, documented diagnosis is rule out stroke.

Comment: A stroke is a life-threatening condition and a true medical emergency. The patient presented with symptoms that are a red flag for stroke, and required immediate transport to the emergency department. The two hours between initial presentation and 911 contact is an irresponsible delay in provided emergency medical treatment.

Failure to send to ED

Failure to diagnose and treat warning signs of possible neurological event

D███, A██████ 

Date of Death:  05/13/13

Cause of Death: Syncope and diabetes (Death Certificate)

Summary:  Mr. D███ was a black male with diabetes and high blood pressure aged 53 when he died on 5/13/13. He arrested suddenly upon return to his facility after a stay at Bon Secours Hospital for a panic attack.

Comment: Death certificate indicates syncope (fainting) as the cause of death for Mr. D███. Cardiac causes of syncope are common and well documented. Mr. D███ was at risk for cardiac disease given his age and his history of diabetes and high blood pressure. Medical record review indicates Mr. D███ was seen in clinic for chest pain on 12/12/10 when he was 50 years of age. Oxygen at 4L/min was administered at that time but breathing difficulties continued with a respiratory rate of 24. He was placed on a stretcher, monitored on-site and eventually taken back to his cell in a wheelchair. He was seen by a provider in follow-up on 12/28/10. No reference is made to episode of chest pain on 12/12/10. No risk stratification is ordered or considered.

Mr. D███ should have been sent to the emergency department on 12/12/10 to be ruled out for myocardial infarction. He also should have been risk stratified for the presence of heart disease and this was not done. Notation made here that risk stratification typically in the form of treadmill test or a stress echocardiogram would have required use of off-site services.

<u>Failure to use offsite services</u>

<u>Failure to send to ED</u>



Date of Death:  06/22/13

Cause of Death: Hypertensive cardiovascular disease (autopsy report)

Summary:  45-year-old black male who entered BCBIC with history of high blood pressure and opioid addiction, referred to medical for continuity of treatment for his hypertension. He was not seen by medical, and then was found unresponsive and suffered cardiac arrest on 06/22/13.

Comment:  An attached corrective action plan notes no vital signs taken during incarceration, no opiate withdrawal treatment/monitoring initiated, and no intake documentation (including missing blood pressure and vital signs) in the medical record. The failure to take the most basic steps like conducting and documenting vital signs, especially in a patient with a history of high blood pressure, falls well below the standard of care.

<u>Failures in medical documentation relevant to patient care</u>

**G, R**

Date of Death: 01/08/2010

Cause of Death: pulmonary embolism (autopsy report)

Summary:  50-year-old black male with an apparent history of high blood pressure who presented on 01/08/10 for complaints of dizziness, chest pain and shortness of breath. Time of presentation is 2130 hrs. He required assistance to the infirmary by two other detainees. A mortality review document indicates EMS personnel arrived at 2235hrs and indicates a possible delay in calling 911.

Comment:  A pulmonary embolism is a dangerous and potentially lethal diagnosis. A provided mortality review notes that the time 911 was called was not documented in the medical record. Time of presentation was 2130 hours and time of EMS arrival is approximately one hour later at 2235 hours. This is an excessive period of time for EMS arrival for a medical emergency and is potentially explained by a delay in calling 911. The mortality review also identifies a number of other problems, including "BP monitoring and ordered labs not done"; "Medical problem not identified and patient was not Triaged to the chronic care FU system"; "Initial evaluation at 9:30 PM on 1/8/2010 not satisfactory or not to standard"; "Proper history not taken (what happened, when, how) Orthostatic BP and pulse not done, EKG not done, cardiac and respiratory examinations not done, Oxygen saturation not recorded"; "Documentation of the incident/event short, vague and inadequate." Last recorded blood pressure for patient is 8/28/09, despite history of high blood pressure. Wexford CAP notes multiple failures, including "Evening shift nurse failed to obtain and document admission assessment; Night Shift nurse failed to document inmate condition upon shift change/report; Night shift failed to notify on-call provider of inmate's Change of status"; and failures in identifying signs and symptoms of DVT and pulmonary embolism, and failure to do blood pressure monitoring. These are remarkable failures in basic patient care. Here, there was a failure to take basic steps to evaluate the patient and identify his condition, and then to document that condition as part of an overall assessment of the patient and his needs, and then finally a failure to communicate changes in the patient's status that could - and in this case did - signify a life-threatening emergency that required immediate emergency department referral.

Failure to use offsite services

Failure to send to ED

Failures in medical documentation and communication of changes in condition

**L, T**

Date of Death:  4/10/16

Cause of Death: perforated gastric ulcer (autopsy report)

Summary:  55-year-old black female with high blood pressure, asthma, substance abuse and thyroid disease who arrested and expired on 04/10/16. Reviewed records indicate Ms. L█ had was having difficulty with breathing at 0540hrs on 04/10/16. Oxygen saturation of 80-88% is noted. Documentation indicates that nursing staff on site was unable to reach the physician on call. Conflicting documentation in regards to when 911 was called is seen with reference made to both 0615hrs and 0644hrs.

Comment: The provided records indicate difficulty making contact with the on-call physician. In situations like this, diligent and proper practice allows empowerment of nursing staff on site to call 911 without. In this set of circumstances, shortness of breath accompanied by low oxygenation is a medical emergency and warrants prompt transport the local emergency department which did not happen in this case.

Failure to send to ED

Failure in communication of changes in condition


**L█, T█████**

Date of Death:  06/13/13

Cause of Death: lung cancer with metastasis to the heart, specifically hemopericardium and hemothorax

Summary:  39-year-old black female with a history of depression and substance abuse. Reviewed records indicate Ms. L█ was admitted to her facility infirmary on 06/10/13 for complaints of weakness. Infirmary course is remarkable for syncope and lethargy. On 6/11/13, Ms. L███ was unable to walk or get out of bed. On 6/12/13, Ms. L███ was noted to be unable to lift her head, walk or tolerate any oral intake. Ms. L██ was sent to the hospital by 911 late on 06/12/13 and expired shortly thereafter. Her records reflect erratic vital signs, and a number of red flags including weakness, vomiting, lightheadedness, loss of appetite, and 10/10 pain.

As discussed below, Wexford initiated a CAP acknowledging numerous failures in her care, including documentation deficiencies and the failure to communicate to the doctor a number of changes in condition including rapidly deteriorating vital signs, and weakness and vomiting. The CAP correctly concluded that "Patient should have been transferred to ER via 911 when status changed."

Comment: Reviewed records document a significant deterioration of status that indicated a need for immediate offsite services to perform requisite diagnostics and testing and provide treatment.

Failure to use offsite services

9

Failure to send to ED

Failures in medical documentation and communication of changes in condition


**P█████, S█████**

Date of Death:  n/a

Cause of Death: n/a

Summary:  44-year-old while male with high blood pressure, hepatitis C with neck pain beginning on 02/2011 associated with left arm weakness. Trials of multiple medications are noted for analgesia purposes. Cervical spine MRI or orthopedic consultation was requested on 7/25/11, documentation dated 08/25/11 references a utilization management interaction on 08/24/11 and an alternative treatment plan to refer to physical therapy rather than neurology. Physiatry consult request submitted on 11/01/11. Cervical spine MRI is requested on 12/07/11. Epidural steroid injections are also requested on 12/07/11. Documentation dated 12/20/11 referencing collegial discussion on 12/14/11 and an alternative treatment plan consisting of PT with traction is noted. MRI of the brain is requested on 2/14/12 due to focal neurological findings described as upper and lower extremity weakness. MRI of the brain approved by utilization management on 2/22/12.

Documentation dated 2/25/12 references weakness of all four extremities and difficulty ambulating. He is admitted to the infirmary and his condition does not improve. He is eventually directly admitted to Bon Secours hospital with progressive quadriparesis.

An MRI of the brain and cervical spine was finally conducted and a large eccentric mass lesion at the craniocervical junction was found. He was diagnosed with a foramen magnum meningioma which was treated by craniectomy and resection on 3/7/12.

Comment:  Mr. P█████ first presented with a worsening headache in May 2009, and continuously worsening headache with a constellation of additional neurological symptoms over the ensuing two and a half-plus years until he was finally taken for an MRI in late February 2012. His tumor should have been discovered far earlier, but imaging studies that would have identified his tumor were not allowed to proceed by utilization management on at least two occasions. Over more than two years, he presented with ample symptoms of neurological deterioration which simply went undiagnosed and was never worked up or evaluated. His medical records reveal a clear history of undiagnosed and untreated brain tumor, including worsening headache, progressive worsening neck pain and numbness, spreading of pain to other parts of the body, numbness and other sensory symptoms, progressing left-sided weakness and then eventually right-sided weakness, neurogenic bowel, and finally quadriparesis. It is frankly an appalling case of neglect. Records I reviewed indicate that Mr. P█████ wrote: "I feel like I am dying from this. I will end up

dead or in the Hospital over this, I just wanted to make sure that you and Warden Sowers both
are fully aware of my condition and how much pain I am in, once I am diagnosed everyone will
know exactly how much pain I have been in." Mr. P████ wrote that to the MCI clinic Medical
Director and Warden on 1/13/12. On 1/20/12, he wrote that he needed to see a neurologist, and
described "progressively worse, pain excruciating at times can hardly walk. Left arm and hand
working at 20% hurts whole left side." He knew the obvious source of his problems was
neurological, yet after two and a half years of suffering Wexford had yet to approve offsite care
to diagnosis his condition. It would be another month and a half before Wexford finally
authorized a brain MRI, which finally revealed his tumor. Put simply, on numerous occasions
over many years, Mr. P████ should have been sent for offsite care, including neurologist
referral, brain MRI, and ED care. Even when action was finally taken on 2/25, he should have
been sent to the ED rather than being admitted first to the infirmary. It is also noteworthy that
Mr. P████ was a direct admit, a strategy to avoid emergency department costs.

<u>Failure to use offsite services</u>

<u>Failure to send to ED</u>

<u>Failure to diagnose and treat warning signs of possible neurological event</u>


**R████, C████**

Date of Death:  8/24/12

Cause of Death: septic cerebral embolus

Summary:  63-year-old black male with history of stroke, high blood pressure, aortic valvular
disease, chronic obstructive pulmonary disease, hepatitis C and substance abuse. Reviewed
records indicate Mr. Ransom presented on 08/22/12 with an unsteady gait, slurred speech and
left sided weakness. He had been recently hospitalized for treatment of endocarditis and
cerebrovascular accident. Documentation notes a blood pressure of 223/86 with a call to the
physician at 0500 hrs. Follow-up blood pressures noted to be 215/68 and 222/82. Reference is
also made to the patient being unresponsive. The physician ordered blood pressure medications
to be given early and continued monitoring at the facility. A subsequent provider assessment is
noted to be incomplete as the patient was "sleeping."  Documentation notes that the physician
wanted to contact the medical director for authorization to send to the ED. Call made to 911 at
0726 hrs.

As discussed below, Wexford generated a CAP related to Mr. R████'s death that
acknowledges several failures in patient care, including a failure to timely refer the patient to the
ED, and a failure to document and communicate to the doctor changes in symptoms that should
have precipitated immediate referral.

Comment:  A blood pressure of 215/68 is a medical emergency that requires immediate referral to the ED. The available records indicate a delay in contacting 911 that is over two hours in duration. Authorization from a medical director for an ED referral in the context of an obvious emergency is a barrier and a significant deviation from the standard of care.

<u>Failure to send to ED</u>

<u>Failure to diagnose and treat warning signs of possible neurological event</u>

<u>Failures in medical documentation and communication of changes in condition</u>

**R, F**

Date of Death:  12/13/12

Cause of Death:  suspected sepsis

Summary:  31-year-old native american male with an extensive history of mental illness and substance abuse who developed respiratory distress on 12/13/12 at approximately 0100hrs with respiratory efforts described as shallow and noisy. Reference is also made to a "marked" change in mental status. Recent history of agitation and inappropriate behavior is noted. Physician was notified, vital sign checks every 4 hours is ordered. Consideration is given to ED referral for mental health reasons. Call made to 911 at 0150hrs.

Comment:  Reviewed records indicate a delay in referring to the emergency department. The ordering of vital sign checks rather than referral to the ED for a definitive evaluation is inappropriate in the setting of respiratory distress and "marked" changes in mental status.

<u>Failure to send to ED</u>

**S, R**

Date of Death:  03/14/14

Cause of Death: pulmonary embolism due to deep venous thrombus of lower extremities (autopsy report)

Summary:  29-year-old black male with a history of asthma who presented on 3/11/14 with complaints of chest tightness and low pulse oximetry readings. Provider documentation on 3/11/14 notes wheezing on physical examination. Impression documented is chronic asthma. Provider visit at 3/12/14 documents hemoptysis (coughing blood) and pleuritic chest pain. No wheezing on physical examination. Impression is asthma and chest pain. Mr. S

subsequently arrested on 03/14/14 and CPR protocol is documented to have been started at 1440hrs.

Comment:  Pleuritic chest pain in the presence of hemoptysis and compromised oxygenation warrants an evaluation for pulmonary embolism which was not done. As pulmonary embolism is a potentially fatal condition, and this work-up should be done immediately. A proper work-up for a PE would have required off-site diagnostic services and this patient should have been immediately referred for offsite care.

<u>Failure to send to ED</u>

<u>Failure to use offsite services</u>

**A, R**

Date of Death:  03/12/14

Cause of Death: hypertensive cardiovascular disease with reference made to cardiomegaly and 4 chamber dilatation, arterionephroscleroisis and pulmonary edema (autopsy report). Additional medical examiner documentation notes non-ischemic cardiomyopathy as a final diagnosis for Mr. A███.

Summary:  29-year-old black male with a history of seizures, high blood pressure, cardiomyopathy and mental illness who was incarcerated on 5/22/13. On 03/12/14 while at court, he developed seizure like activity and arrested.

Referencing Mr. A████'s underlying medical records, the DPSCS investigator's death review summary identified a number of shortcomings including failures to follow up on known medical conditions, failure in discontinuing medication related to hypertension treatment several months before death, and ultimately concludes that while the patient's mental health issues were considered, "pt's medical issues were not addressed." This comports with my assessment.

Comment:  The presence of cardiomyopathy would have been optimally managed by a community cardiologist and access to community diagnostic services including but not limited to echocardiography. Despite repeated instances in which offsite intervention was necessary and appropriate for diagnostic and treatment purposes, Wexford failed to make these referrals.

<u>Failure to use offsite services</u>

**A███, E██████**

Date of Death:  N/A

Cause of Death: N/A

Summary:  The most recent medical records for Ms. A███ are dated 07/06/12 at which point she was 45 years of age and in the hospital for treatment of acute lymphocytic leukemia. Reviewed records document multiple conditions for Ms. A███ including hypotension NOS, hepatitis C, epilepsy, diabetes, cerebral aneurysm and asthma. Records on several occasions note extremely low blood pressure readings including 71/52 on 1/27/12 and 67/52 on 1/25/12. Complaints of headache and left facial and upper extremity numbness/tingling are documented on 01/20/12. In addition to excruciating headache, complaints of blurred vision, left side numbness and left arm/hand numbness are reported at first visit on 1/20/12, at 1342hrs. BP is 84/60 at that time. At 1600hrs she is seen again and continues to have the same symptoms. At that time reference is made to an already scheduled MRI, otherwise no intervention is undertaken by the physician, Dr. Afre. Left sided neurological symptoms persist necessitating a follow-up visit at 1845hrs on 01/20/12, when patient reports total facial heaviness and numbness, and droop. Ms. Ahmed is then sent to the emergency department. Clinical impression is transient ischemic attack vs evolving stroke.

Comment:  Reviewed records indicate that endocrine related causes for Ms. A███'s low blood pressure were considered. Cardiac causes should have been considered and would have required off site diagnostic studies but are not seen in the available medical records. In addition, Mr. A███'s treatment on 1/20/12 fell woefully below the standard of care in treating obvious warning signs for stroke. At her first visit she presented with left arm and face numbness and tingling in the setting of low blood pressure - these are concerning for possible stroke. Ms. A███ should have been referred to the emergency department at this first provider visit on 01/20/12 around 1:45pm. The five hours of additional delay are unacceptable.

Failure to use offsite services

Failure to send to ED

Failure to diagnose and treat warning signs of possible neurological event


A███, C███

Date of Death:  05/09/11

Cause of Death: acute myocardial infarction

Summary:  70-year-old male with a history of peripheral vascular disease, high blood pressure and recent stroke who presented on 05/09/11 with complaints of chest pain and low oxygen saturation. Reference is made to a cool, clammy, pale appearance. Nitroglycerin is given and oxygen is administered. EKG findings of ST elevation (evidence of coronary ischemia) are noted. The physician ordered a treatment for gastric acid reflux and asked for a call back.

Records indicate the physician was called at 0443 hours and 911 was called at 0505hrs. Mr. A███ arrested en route to the hospital and expired.

Comment: This patient who presented with chest pain was at an extraordinarily high risk for myocardial infarction. The difference between when the physician was called (0443hrs) and when 911 was called (0505hrs) is 22 minutes. While this may appear to be a time interval of short duration, minutes mean everything in the setting of an acute cardiac event. Accordingly, the 22 minutes is an unacceptable delay. The administration of Maalox to treat gastric acid reflux in this set of circumstances is inappropriate, ineffective, and profoundly risky. What was needed in this situation was a call to 911 at 0444 hrs rather than administration of Maalox.

<u>Failure to timely send to ED</u>


**H███, E███**

Date of Death:  n/a

Cause of Death: n/a

Summary:  61-year-old male with hepatitis C presented with complaints of slurred speech and loss of coordination on 1/17/13. Nursing assessment was unremarkable and Mr. H███ was admitted to the facility infirmary. On 01/18/13 at 0030hrs, Mr. H███ reported losing his balance and falling. Nursing assessment references right arm weakness and drooping of the right side of the mouth. No documentation is seen to indicate the physician was contacted. At 0956hrs, Mr. H███ is seen by the physician who documents facial droop, slurred speech, loss of balance, and slight right sided facial weakness. The plan is to continue bed rest in the infirmary.

Comment:  Clinical presentation on 01/18/13 is worrisome for an evolving stroke and should have resulted in an emergency department referral. The provided medical records in addition are not seen to be reflective of an appropriate subsequent work-up for stroke which would have required the use of off-site services.

<u>Failure to refer to ED</u>

<u>Failure to use off-site services</u>


**H███, E███**

Date of Death:  04/25/14

Cause of Death: intracerebral hemorrhage

Summary:  Mr. H████ was a 71-year-old black male with history of high blood pressure which was measured at 196/96 on 4/20/14. Records indicate that he was seen at dispensary for one week prior with high blood pressure. He presented to his provider the following day, 04/21/14, with complaints of headache "since Friday." Records indicate that he was seen, given medications and sent back to his cell. Blood pressure was measured at 160/86. Follow-up documentation also dated 4/21/14 references facial drooping and aphasia as well as left sided weakness at 7pm, prompting referral to the emergency department. At the hospital, Mr. H████ was intubated and CT imaging showed cerebral hemorrhage. Mr. H████ expired on 04/25/14.

Comment:  Mr. H████'s blood pressure of 196/96 on 4/20, which is documented to have been accompanied by headache, was a clear warning sign for stroke, and should have been treated as an emergency warranting referral to the emergency department for evaluation and treatment. The delay in sending Mr. H████ until after 7pm on 4/21 was a severe delay in treatment for stroke.

Failure to refer to ED

Failure to diagnose and treat warning signs of possible neurological event

J████, D████

Date of Death:  04/01/13

Cause of Death: cardiac arrhythmia associated with cardiomegaly

Summary:  21-year-old black male with a history of sickle cell disease with no history of mental illness demonstrated bizarre behavior on 3/30/13 consistent with psychosis (hallucinations, delusions, paranoia, confusion). Intake documentation indicates possible influence of alcohol or drugs. Provider documentation on 3/30/13 indicates that Mr. J████ appears to be confused. Recent hospitalization for sickle cell crisis is noted. Mr. J████ arrested and expired on 04/01/13.

Death review conducted by DPSCS investigator notes significant change in status on 3/30 after being seen on 3/29 with no mental health history. Concern identified that patient referred to mental health unit, without ruling out medical issues, noting "pt should have been sent to the hospital; or at the very least placed in the infirmary." Medication and documentation issues also noted.

Comment:  It is doubtful that the medical clearance evaluation that was done for Mr. J████ on 03/30/13 could have been done in a manner that was sufficiently reliable given his mental state. And because at intake no mental health history was noted, standard of care would have required referral to an emergency department for a more thorough assessment to evaluate possible medical causes for change in status to psychosis and confusion.

<u>Failure to refer to ED</u>

**M████, J███**

Date of Death:  07/25/13

Cause of Death:  presumed drug overdose

Summary:  24-year-old white male with a history of shoulder dislocations who presented with several complaints on 07/24/13 including shortness of breath, lower back pain, abdominal pain, chest pain, and then abdominal tenderness, upper and lower quadrant, with 10/10 per nursing exam; no bowel movement in three days. Assessment findings are seen to include sweating and restlessness, speech described as fast, observed vomiting. On 7/24/13 Mr. M████ was evaluated twice for acute sick call, and briefly observed in infirmary before being sent back to cell without further work-up. Mr. M████ arrested on 07/25/13 and was pronounced dead at the facility.

Comment: Review of the provided records are not seen to include involvement of a physician in Mr. M████ evaluation despite change in status.

<u>Failure in communication of changes in condition</u>

**S███, A███**

Date of Death:  09/08/12

Cause of Death: sepsis

Summary:  48-year-old black male with HIV who was admitted to his facility's infirmary on 8/30/12 with a fever of 103.2 and a heart rate of 120. An earlier provider encounter also on 08/30/12 noted a temperature of 102.8 and a heart rate of 112 with a treatment plan including chext x-ray, laboratory studies, blood cultures and infectious disease consultation. Fever and sore throat are documented on 08/31/12 with oral penicillin prescribed. On 09/01/12, a fever of 103.7 is noted as is a heart rate of 122. On 09/02/12, a fever of 105.1 is noted as is a heart rate of 136. Complaints of hemoptysis are documented on 9/04/12 with blood pressure of 90/62 and heart rate of 134. Intravenous fluids are initiated. Mr. Smith was transferred to the ED some time between 1100hrs and 1225hrs where he was admitted. Mr. Smith expired on 09/08/12.

Comment:  An HIV patient such as Mr. S███ with fever who has been off viral suppression should have a timely and thorough work up. Timeliness of work-up is important because fever and tachycardia are suggestive of sepsis which is ultimately what caused Mr. S███ to expire. Thoroughness of work-up is equally essential and would have exceeded what could have

reasonably been performed in an infirmary setting. Lastly, it bears noting that Mr. S███ was significantly unstable as of at least 0630hrs on 09/04/12 but was not transferred out until some time between 1100hrs and 1225hrs. Mr. S███ would have had a better opportunity to survive his infection had he been transported to the hospital prior to 09/04/12.

Failure to refer to ED

*     *     *

The cases discussed above reflect an unacceptable and repeated pattern of failing to meet the standard of care, with grave consequences.[1] The cases reflect repeated failures to timely send patients for emergency department and other offsite care, including specifically with regard to neurological care; and basic failures in documentation and communication among medical staff that contribute to the failure to properly diagnose and treat patients.

In addition, it should also be noted that I observed a recurring pattern in which differential diagnoses were not conducted. A differential diagnosis is a process of identifying the cause of a patient's symptoms, and importantly, ruling out the most severe possible sources of the symptoms presented. Where more severe or urgent causes cannot be ruled out in the infirmary, emergency department or other offsite care becomes necessary to ensure potentially life-threatening conditions do not go untreated. Documentation and communication play critical roles in the process of performing differential diagnosis. In the many neurological or vascular related cases identified above where the appropriate care was not given, the consistent pattern is a failure to conduct the necessary differential diagnosis to rule out acute neurological or vascular causes. This is a particularly egregious failure because conditions of this nature are so frequently severe or otherwise life-threatening. In turn, it is my opinion with a reasonable degree of medical certainty that the failure to perform appropriate differential diagnoses in many of the cases above almost resulted in worse patient outcomes, including death.

## B. Corrective Action Plans

Corrective Action Plans, or CAPs, are internal acknowledgement by leadership of a correctional healthcare practice of an identified problem or failure that occurred that requires a formalized solution to address. CAPs are part and parcel of a quality improvement program and are utilized when significant improvement is required.

---

[1]   My review of medical records focused almost entirely on cases involving deaths; if I had been able to review a large pool of cases that resulted in outcomes short of death, I suspect I would have found many more failures that further support my findings. That is certainly what my extensive review of multiple categories of documents indicates. It is my understanding that Plaintiff was not provided with a broad set of medical records by Wexford or the State of Maryland, and that the documents Plaintiff received, and then shared with me, were focused on cases resulting in deaths.

My review of Wexford's CAPs further confirms my opinion that Wexford had a pattern and practice of failing to promptly send out patients for emergency department and offsite care when needed.

Two CAPs stood out in particular, and in fact expressly concede the failure to promptly send patients to the emergency department.

- The C███ R███ CAP concerns his August 2012 death as the result of an intracranial bleed. He experienced a number of red flag neurological symptoms similar to Fatima Neal, including weakness, dizziness, altered mental status, and one-sided weakness. The CAP expressly states that at 5am when the patient was given Tylenol, "the patient should have been sent out to the hospital." (WEXDISC 28857.) The CAP also finds that the "nurse failed to take a repeat BP from 0500 to 0645 when it was 222/82." The State of Maryland's investigator also identified concerns in R███'s care, including the delay in sending him out to the hospital and in checking his blood pressure, concerns that Wexford ultimately acknowledged. (WEXDISC 29310, 30290.) Overall, the R███ CAP contains multiple areas of concern: it notes that the nurse failed to communicate to the physician when the patient's blood pressure was critically high and should have been sent out to the hospital; that the physician ordered Tylenol and a change in blood-pressure medication rather than sending the patient out; that the nurse failed to monitor Mr. R███'s blood pressure, and that there is no PA assessment in the medical record; that there was a three hour delay until the patient left the facility after the health emergency; that there were documentation failures; and that there was a failure to recognize and communicate a change in the patient's condition, and in particular, alteration of mental status. (WEXDISC 25819, 25828.) Ultimately, Wexford's Director of Utilization Management wrote in internal emails: "Based upon my review, there were salient documentation deficiencies and a gross error in communication regarding the patient's vital signs (BP 215/68) that led to what appears to be mismanagement of his emergency status" (WEXDISC 32542.)

- The T███ L███ CAP concerns her June 2013 death as a result of undiagnosed metastatic carcinoma in her lungs. Like Fatima Neal, she was in the infirmary for more than 48 hours, demonstrably deteriorating over that period with obvious symptoms, without being sent out. The CAP expressly acknowledged numerous failures, including the following: "significant change in condition not recognized by nursing staff"; "Vital signs recorded but no communication to MD"; "Changes in condition (weakness, lethargy, altered vital signs not reported to provider"; "Patient decompensated rapidly after infirmary admission." (WEXDISC 22435.) Ultimately, Wexford acknowledged that "Patient should have been transferred to ER via 911 when status changed." Again, like Ransom, the CAP identified critical failures including the failure to identify and communicate changes in the patient's condition, and the failure to send the patient to the ED. And finally, the CAP again identified serious documentation failures that contributed

to the outcome, including inadequate documentation; missing nursing notes; and the failure to complete a head-to-toe assessment. (WEXDISC 22434-35.)

These two cases alone identify several common themes I saw present and persistent throughout the evidence that I reviewed: a failure to identify and communicate changes in condition necessitating further action, documentation failures, and ultimately substandard care resulting from the failure to send patients to the ED when they needed to be sent out. As with the medical records, these themes repeat throughout the CAPs that I reviewed, going all the way back to 2010 and continuing through 2014 and beyond without resolution. Some examples include the following:

- The CAP for R█████ G████ from August 20, 2010, notes the need for a protocol to track and monitor treatments and vital signs, and also notes that the night shift nurse failed to "document inmate condition upon shift change/report" and that the night shift "failed to notify on-call provider of inmate's change of status. (NEAL 102675-78.)
- The CAP for R████ P█████, from June 2010, likewise notes nursing staff's failure to document critical information about a diabetic patient's food intake while he was in the infirmary. (NEAL 102687.)
- Another 2010 CAP lists as a problem/issue: "Improve effective communication on day to day nursing findings & care to infirmary providers," and lists the action: "Educate nursing staff on daily coordinated infirmary patient rounds with providers, effective tools of communication regarding day to day patients['] well being…". (NEAL 102685.)
- The CAP Response Form from the Baltimore Pretrial Region, dated November 1, 2012, states that an action step had been to "Update nursing knowledge related to paralysis and neurological findings…." (WEXDISC 25699.) Wexford knew that its nurses had failed to properly respond to a clear neurological emergency after C█████ R█████'s death from stroke several months earlier, and the CAP Response Form again indicates they knew that nurses' knowledge about paralysis and neurological findings was insufficient. Fatima Neal died just days later, after displaying paralysis and other clear neurological red flags.
- There is a January 2013 CAP which stated, "There was is [sic] a *continuous failure by nursing to follow through on basic nursing tasks* such as obtaining weights, follow up with providers and appropriate documentation. These tasks are an essential part of the inmate's medical care and must be performed on all inmates at every encounter along with appropriate documentation in the EMR." The CAP called for education and training for *all* medical staff. This is a remarkable admission by Wexford that its medical staff were failing to perform even the most basic aspects of responsible medical care—actions that are essential steps to providing adequate care to patients. It is an explicit acknowledgement that, despite all of the previous deaths, CAPs, CQIs and other indicators, Wexford knew its treatment at various Maryland facilities was continuing to fall far below the standard of care.

- The CAP for A█████ C█████-B██, from June 7, 2013, notes that the physician's assistant failed to communicate with the physician in treating the patient's pain. (WEXDISC 22438.)
- The CAP for M█████ G█████ on June 26, 2013, notes that his vital signs were not taken and his file was missing documentation. (WEXDISC 22431-32.)

Again, many of the CAPs I reviewed note deficiencies in documentation and communication. The failure to timely refer patients to the ED and for offsite care is a natural and foreseeable consequence of such deficiencies. Indeed, proper documentation is critical to identifying and tracking changes in a patient's condition; and medical documentation is not only a historical record of a patient's course of symptoms and treatment, but also one of the primary means of communicating between and among doctors and nurses. C█████ R█████'s case is a perfect example of this interplay: the nurses failed to document critical changes in R████'s blood pressure, and the doctor in turn made decisions about Mr. R█████'s care without knowledge of this critical red flag. The result is exactly as expected: a patient who should have been immediately referred to the ED was not sent out, and then died. Likewise, in T█████ L███'s case, the nurses did not document the changes in her mental condition, the doctors acted without knowledge of those changes, and the need to send a patient out for immediate outside care was missed.

### C.  Continuous Quality Improvement

Continuous quality improvement (CQI) is important in healthcare because delivering care the right way matters. Delivery of healthcare is complicated in the best of circumstances. When delivery of care becomes additionally challenging, like in a secure environment for example, there are more avenues for quality to become compromised. That is why a robust CQI for a jail or prison is not just important but essential, no matter how big or how established a system or company is. CQI professionals would in addition say that a good CQI program is also good for business.

Wexford's CQI audits further corroborate my finding of a persistent pattern and practice of denying and delaying offsite care. Like the CAPs, the CQI documents reflect repeated findings of improper documentation and communication, failure to monitor changes in patients' conditions, and delays in sending patients out for offsite care. As discussed below, these findings not only affirm the presence of the pattern and practice discussed above that I have identified, but reflect Wexford's full awareness of these persistent problems and perpetual failure to meaningfully address them. Examples include the following:

- The CQI from Baltimore Pretrial for 1/28/13, notes that the staff had to be educated about proper documentation of medical emergency notes and proper use of equipment, and that Wexford would continue to monitor issues regarding delays in documentation of medical emergencies. (WEXDISC 36325.)

- The CQI from Baltimore Detention from July 2014 notes that "staff still needs to be more accurate w/ documentation," and that staff was educated on proper documentation of medical emergency notes. It further noted that "Infirmary ER Runs and care still needs improvement." (WEXDISC 36043.)
- A 09/29/14 CQI from the Baltimore Detention Center suggests improvements never happened. The September CQI relating to ER runs is nearly identical to the one from July 2014. It notes staff still were not creating accurate documentation; that they still required training about proper documentation of medical emergency notes, and that infirmary ER runs and care still needed improvement. (WEXDISC 36003.) Such persistent problems with providing adequate care for medical emergencies are simply unacceptable.

Finally, in the cover email for the July 2012 CQI agenda, the Statewide CQI Director makes a remarkable admission about the state of affairs among nurses and providers in Maryland facilities, and their ability to make the sort of changes that Wexford was well aware were necessary. She wrote that she is "aware regions/sites are stressed, in a state of turmoil and CQI is not a top priority." (WEXDISC 36795.)

### D. **The problematic pattern and practice discussed above was systemic, persistent, and well-known by Wexford senior leaders on the Maryland contract**

The pattern and practice on which I opine above is not a revelation; in its own CAPs, CQIs and other documents prior to Fatima Neal's death, Wexford repeatedly acknowledged its failures. In the examples above, I observe the same issues recurring within a single facility, and the same issues recurring across multiple facilities. In other words, the problems were systemic and persistent, and meaningful corrective action was not occurring. Indeed, from my review of the materials provided to me, it is apparent that Wexford's leadership - Site and Regional Medical Directors, CQI and UM Directors, and its Director of Operations overseeing the Maryland contract - were all on notice of widespread policies and practices of delaying necessary ED and other offsite care, and failing to document and communicate patients' symptoms in order to ensure adequate and timely treatment.

By way of example, Wexford's Director of CQI, Donna James, said in her deposition that the failure to identify and document symptoms was a recurrent system-wide problem (James Dep. 61-62, 144-145), and that the failure to timely send patients out for emergency care was a recurring issue. (James Dep. 61-62, 144-145.) She stated that these issues were communicated up the chain at Wexford to people like Mariann Forkgen, Director of Operations, and Drs. Smith and Getachew, Directors of Utilization Management. (James Dep. 144-45.)

### E. **Wexford's purported corrective action efforts either did not occur, or were woefully ineffectual**

The other trend I see consistently in Wexford's CAPs and CQIs is a single, recurring proposal for addressing deficiencies: training. But such training either never occurred, or was wholly

inadequate. First, there is evidence that the trainings Wexford committed to doing in response to deaths, CQIs and CAPs never happened, as testimony from several Wexford witnesses suggests they did not receive such trainings. (*E.g.*, James Dep. 72-73, 153; Hope Dep. 32, 38-40; McNulty Dep. 132-133; Sayed Dep. 38, 41.) And to the extent any training was ever done, it was obviously inadequate. As set forth above, the same set of problems kept recurring, without abatement or meaningful improvement.

Based on my extensive experience in correctional healthcare, it is deeply concerning to see recurring and persistent problems in areas as critical as ensuring timely ED care, and communicating critical information to and among providers. Failures in these areas can and did lead to serious injuries and deaths. And Wexford, like any other correctional healthcare organization, would have known that these persistent problems are dangerous precisely because they put patients at risk for the types of severe negative outcomes that I saw throughout my record review. For me, the question then is why Wexford was unable to address such basic issues. The inescapable conclusion is that Wexford's priority was not to solve these problems: despite these ongoing issues with denying necessary emergency care, Wexford management appears to have been engaged in an active and explicit campaign to *reduce* ED care. My opinions on this policy of reducing referrals to the ED are set forth below.

## II.   **Wexford perpetuated a policy initiative to significantly reduce ER and other offsite trips, which likely contributed to its pattern and practice of delaying and denying emergency department and other offsite care**

Health system management, correctional systems included, are necessarily challenged with finding the right balance between cost, quality and access. A balance is needed because these parameters are not in alignment. Higher quality healthcare often costs more. Greater access to care costs more as well. Lower quality healthcare is, generally speaking, cheaper. Reduced access to healthcare is cheaper as well. Prioritizing the reduction of costs is simply not an option because of the high value society places on life and living. This is equally true in the correctional healthcare setting.

The documents I reviewed essentially constitute a case series. What is clear from my review is that Wexford did not maintain an acceptable balance between cost, quality and access. The inescapable conclusion from my review is that cost became the priority, at the expense of quality and access. The result was a persistent pattern of egregious delayed referral of patients to the emergency department.

### A.   **Financial incentives to prioritize cost over quality and access**

Based on my review of Wexford's interrogatory responses and the deposition of Wexford employee Nick Little, the financial structure of Wexford's contract with the State of Maryland becomes apparent: Wexford was paid a fixed amount based on the average monthly inmate population, and then it was responsible for the vast majority of variable patient care costs,

including nearly all costs for referrals to the ED and other offsite care. Put simply, the more Wexford spent on ED and offsite care, the less profit it made on the contract, and vice versa.

The existence of this financial incentive is a challenge but not, by itself, improper. But given these incentives, extra care must be taken - especially in the correctional setting, where the patient population has few advocates and no other options - to ensure the proper balance of quality, access and care.

### B. The take over of the CQI process by Utilization Management Department reflects prioritization of cost considerations

A clear signal that cost considerations had taken primacy over quality and access was the Utilization Management group's take over, in effect, of Continuous Quality Improvement. As stated above, CQI is an essential component of a correctional health system as it ensures that the care being delivered is of sufficient quality. Providers appreciate a good CQI program because it provides a platform for clinically sound and safe decision making. It is well understood that UM, by contrast, is focused on cost of care. For this reason, the separation of these two functions is critical, so that cost considerations do not upset the balance between cost, quality and care.

On this score, the testimony of Donna James, the Statewide CQI Director, is extremely disturbing. Ms. James testified that when Wexford took over the direct patient care contract in July 2012, Wexford's UM department in effect subsumed the CQI function. (James Dep. 32-33, 40-41, Hope Dep. 49.) Not surprisingly, financial considerations (instead of considerations about quality of care and access) became "front and center." (James Dep. 32-33.) And in particular, discussions about ED referrals took "front and center." (James Dep. 151.) Further evidence of this is contained in CQI reports I reviewed that repeatedly referenced efforts to reduce ED referrals. (E.g., WEXDISC 24029, 25482, 25835, 25963.)

### C. Wexford's strategic initiative to reduce ED and other offsite care to reduce costs at the expense of care and access

The CQI reports discussing efforts to reduce ED trips are reflective of the fact that Wexford had a strategic initiative to substantially reduce Emergency Department utilization. Indeed, given the frequency with which reduced ED referrals appears as a goal in reviewed CQI reports, it is clear that Wexford valued, encouraged and expected lower ED utilization. This ER reduction initiative was clearly a financially motivated endeavor.

The evidence that Wexford had a systemic, strategic initiative to dramatically reduce ED referrals is overwhelming. It includes the following:

- The CQI reports, discussed above, referencing efforts to reduce ED trips repeatedly, and across Maryland facilities. (E.g., WEXDISC 24029, 25482, 25835, 25963.)
- Internal emails celebrating long periods without any ER runs, a finding that should have warranted concern rather than congratulations. (E.g., WEXDISC 24250, 33573.)

24

- August 2012 email from the Maryland Director of UM, Dr. Getachew, to the Baltimore Pretrial Regional Medical Director, Dr. Tessema, congratulating him on no ER trips for 15 days (a record), and noting his "leadership and laser focus on ER runs and offsite visits is showing significant reduction in UM, in pre-trial region." (WEXDISC 24338.)
- In its 2012 Annual Performance Improvement report for the central Baltimore region, Wexford listed as one of the active projects an "Emergency Room Visit Reduction Program," whose goal was to reduce ED trips by 10 percent. The program includes putting in place a "backup gatekeeper on call for all ER trips," and indicates that ER trips did in fact decrease in 2011 once the program was put in place, and then decreased even more once Wexford took over direct care in July 2012. (WEXDISC 20880-20965.)
- Wexford's annual performance appraisal form asked Wexford supervisors to assess the medical provider's "cost effectiveness." In August of 2013, Dr. Tessema evaluated Dr. Afre's (the provider responsible for Ms. Neal) cost effectiveness as exceeding expectations, and specifically noted that Dr. Afre had "very low ER referral and manages complex cases in the infirmary." (WEXDISC 1780.)

The evidence also includes changes to Wexford's UM Policy. The applicable policy beginning in July 2012 expressly stated that nurses had to call gatekeepers - the Site Medical Director or on-call provider - before referring patients to the ED. Notably, the UM policy prior to July 2012 contained express language indicating that nurses could call 911 for send-out without awaiting doctor approval in life-threatening cases, but that language was conspicuously removed from the UM policy that went into effect in July 2012. (WEXDISC 3605-08, WEXDISC 449-450.) Consistent with the "second gatekeeper" requirement of the ER Reduction Initiative and the ample other efforts to reduce ED referrals, not surprisingly a number of Wexford doctors and nurses affirmed in their depositions that they understood the policy to require them to get approval before sending patients out to 911. (James Dep. 72-73, 153. Hope Dep. 32; McNulty Dep. at 132-133, 225-226; Sayed Dep. 38, 41.) And, as discussed above, my individual case review contains multiple instances of this policy in practice, including in Ms. Neal's case, all to detrimental effect for patients. This "gatekeeper" policy, standing alone, is deeply problematic. It is in and of itself, a violation of the standard of care for medical practice in the correctional setting (and any setting). And notably, Wexford administrators admit that such a policy would be irresponsible. (Getachew Dep. 21-22, James Dep. 85.)

Put simply, there was unquestionably a concerted campaign to reduce ED trips across Maryland facilities, and especially Baltimore, in order to reduce costs. This goal was effective: the records I reviewed universally indicate that Wexford was in fact reducing ED trips, in many instances far beyond its goals.

As a correctional healthcare provider, I find Wexford's ED reduction efforts deeply concerning.

First, there is no indication that there was any opportunity to responsibly reduce ED referrals, and certainly not on the scale that Wexford did. I am not aware of any documentation that contains an analysis finding that 10% or more of ED referrals were unnecessary and could have been handled onsite. To the contrary, the records I have seen indicate that Wexford's own conclusion month after month, after retrospectively reviewing ED trips, was that very few ED referrals had not been necessary. (E.g., Smith Dep. 62-63, Getachew Dep. 25-26.)

Second, there is no indication that an alternative means of providing care in the infirmary was provided in order to reduce ED trips. An expansion of services in the infirmary would be a potentially reasonable way to reduce ED trips, and thus costs, while still appropriately balancing the need for access and quality. But almost universally Wexford providers and administrators testified that they could not identify any expansion of services available in the infirmaries, either in the form of equipment or personnel. They could not identify anything when Wexford took over in July 2012, or at any time in the ensuing 2-3 years. (Somner Dep. 35-36, Afre Dep. 6-11, 59-60, 41-42, 46-47, Wiggins Dep. 6-7, 17; Riccitelli Dep. 28-30, 34-39; Getachew Dep. 46-50; McKee Dep. 258-60, 266-67, 303; James Dep. 68-69, Sayed Dep. 51-53, McNulty pg. 86-88, Hope Dep. 6-8; Jamal Dep. 379-80, 384-86, Ajayi Dep. 222-27, 314-18, Atta Dep. 1 114-116, El-Sayed Dep. 1 243, 290, El-Sayed Dep. 2 51, Forkgen Dep. 257-258, 266-268.).

All of this is consistent with the records related to Wexford's overall ED reduction efforts, which generally show that Wexford's proposed ED reduction goals were constant and continuous regardless of the reductions to date, and were not specific to a single type of care or an analysis of why that type of care could be handled on-site. Indeed, numerous CQIs reference ED reduction efforts, but none of them reference a category of unnecessary ED trips or an expansion of onsite care. (E.g., WEXDISC 22155, 22165, 24985, 25835, 26908, 28437, 28446, 28542, 28546, 28554). The CQIs for January and February 2013, at MCIJ, are telling: in January there was a 63% reduction in ED utilization to 10 trips, followed by a 50% reduction in February to 5 trips, amounting to a massive reduction from approximately 25 trips to 5 trips, without any indication of a justification for such a large decrease. This is the sort of astronomical reduction that is not only concerning but should have triggered an immediate qualitative analysis to determine whether there was an unacceptable drop in quality and access to care.

I also note that there is a particularly acute risk of reducing ED trips in the context of neurological care. There are very few treatments for neurological conditions that can be treated in a typical infirmary, and for many conditions such as stroke, even small delays in diagnosis and treatment can be catastrophic. There was no indication in any of the documents and depositions I reviewed that there was ever an expansion of neurological services available in the infirmaries. (E.g., Afre Dep. 46-47.)

Finally, from a provider perspective, Wexford's ED reduction policy initiative placed providers in an impossible position. They were clearly being evaluated on their willingness to meet the

initiative's goals, but they were not given commensurate resources to ensure care and access considerations were given due consideration. To the contrary, the pressure from supervisors was consistently to reduce ED referrals, all the way through retrospective second-guessing by supervisors about each ED referral. Ultimately, the pressure worked: ER referrals were significantly reduced.

But in the process, it is my opinion that Wexford, in its efforts to successfully meet its cost cutting goals, permitted its access and quality goals to substantially deviate from the generally accepted standard of care. As discussed in Part I of my report, there are numerous individuals who were not referred to the ED when they should have been, with negative patient outcomes. Unfortunately, this was entirely predictable. Indeed, Dr. Smith acknowledged that emphasizing reduction of ED referrals to providers poses a risk that the providers will fail to refer patients to the ED when it is appropriate. (Smith Dep. 151.) Donna James stated that reductions in ED trips, without a commensurate increase in services available in the infirmary, was irresponsible and creates pressure that can undermine the quality of care. (James Dep. 45-47.)

I have had an opportunity to review the expert report of Dr. Jeff Keller. Like me, he opines that that Wexford's concerted policy initiative to reduce ED trips was irresponsible and put patients' lives at risk. His findings further support my own conclusions.

**Fatima Neal's Case**

It is my opinion that Fatima Neal's death was a product of Wexford's ED reduction initiative in place at the time, as set forth in Part II of my report, and the related pattern and practice of delaying and denying ED and other offsite care, as set forth in Part I of my report.

Having had a chance to review Ms. Neal's medical records, and the expert reports and various other documents related to her case, I find Ms. Neal's death to be extremely troubling. Ms. Neal should have been sent for an ED referral on numerous occasions in the days before her death, and if that had happened as it should have, her death could have been avoided. The failures in her case are consistent with the pattern and practice I have identified in Part I. Like many of those other cases, her case includes documentation errors and communication failures that prevented the necessary action from being taken, repeated failures to perform the appropriate differential diagnosis that would have warranted an immediate ED referral, failures to recognize obvious symptoms of a possible neurological event that required immediate ED referral, a failure over three days to refer her to the ED for evaluation, and finally documented efforts by the nurses to get physician approval before referring her to the ED that resulted in hours of additional and unacceptable delay.

What is additionally troubling is that the pattern and practice at issue in her case should have been resolved before her death. By the time of her death on 11/4/12, Wexford had ample knowledge of the failures in its policies and practices, and the violations of the standard of care

that routinely resulted. Before Ms. Neal's death, a number of the cases I discussed above in which there was a failure to timely refer patients to the ED for necessary care had already occurred, including R███ G███ S███ P███, C███ R███, B███ A███, C███ A███, and A███ S███. These cases had generated assorted morbidity and mortality reviews, death investigations, and in some cases even CAPs. The cases of Mr. P███, Mr. R███ and Ms. A███ were all cases that involved a specific failure to recognize neurological conditions and to timely refer the patient to the ED. Wexford had already been made aware that the cases of C███ R███ and R███ G███ were so inappropriate that they required CAPs. The Ransom one in particular is from the Baltimore Region and included an internal admission that Wexford had failed to timely refer a patient with a neurological condition to the ED, in part because of failures in communicating changes in the patient's condition. On 11/1/12, just a few days before Ms. Neal's death, an internal CAP response for the Baltimore Pre-Trial region, contained a Wexford acknowledgement of the continued deficiency in "nursing knowledge related to paralysis and neurological findings…." (WEXDISC 25699.) Individually and collectively, these cases provided Wexford with ample knowledge of the very failures that would later result in Ms. Neal's death. Its failure to act on that information to resolve the issues and prevent delays in ED referrals appears to have been the result of a deliberate policy choice to prioritize an overall reduction in ED visits over addressing failures in quality of care and access to care.

## III.   Conclusion

In summary, Wexford was tasked with a socially important purpose: the delivery of healthcare in a difficult environment to a population that is both underserved and marginalized. The delivery of healthcare cannot be inappropriately tilted towards profit to the point where quality and access is compromised, and patient safety is impacted.

I hold these opinions to a reasonable degree of medical and professional certainty, based on my extensive experience in correctional medicine, and my review of thousands of pages of documents related to this case. I reserve the right to modify or supplement any opinion should additional information come to bear.

_____

Ryan D. Herrington, MD, MPH

# Ryan D. Herrington, M.D., M.P.H.

◆ ◆

## Credentials

- ◆ Board Certified, Addiction Medicine, American Board of Preventive Medicine
- ◆ BoardCertified, General Preventive Medicine & Public Health, American Board of Preventive Medicine
- ◆ Medical Licensures: State of Washington, DEA, Buprenorphine waiver (275 limit)

## Professional Experience

### FACILITY MEDICAL DIRECTOR, WASHINGTON DEPARTMENT OF CORRECTIONS
Stafford Creek Corrections Center, Aberdeen, WA; July 2017 to present

- ◆ Supervision of staff physicians and mid-level providers
- ◆ Management of off-site specialist consultations
- ◆ Development of chronic disease management programs
- ◆ Forensic investigations
- ◆ Development and implementation of Medication Assisted Treatment for opiate addiction
- ◆ Special project management including pharmacy workflow, urology consultation and psoriasis treatment.

### ADDICTION MEDICINE PHYSICIAN
Bright Heart Health, San Ramon, CA; May 2017 to present

- ◆ Telemedicine patient encounters for opioid addiction

### MEDICAL DIRECTOR, NORTHWESTERN COMPREHENSIVE PAIN
Northwestern Medical Center, St. Albans, VT; January 2016 to June 2017

- ◆ Staff physician beginning in January 2016, Medical Director beginning in April 2016
- ◆ Managed and developed opioid addiction clinic
- ◆ Managed and developed chronic pain clinic
- ◆ Per diem urgent care coverage
- ◆ Recipient Northwestern Medical Center Horizon Award for "Exemplary Clinical Practice and Leadership"

### PHYSICIAN EXPERT WITNESS AND CONSULTANT
Correctional and addiction medicine expert witness services, 2011 to present

- ◆ Expert witness services for defense and plaintiff attorneys
- ◆ Awarded consulting contract from the Vermont Department of Corrections 2016

### URGENT CARE PHYSICIAN, CLEARCHOICEMD
ClearChoiceMD-South Burlington VT; March 2015 to January 2016

- ◆ Diagnosis and treatment of minor emergencies
- ◆ Physical examinations (US DOT, pre-placement, school/sports)

### SITE MEDICAL DIRECTOR, VERMONT DEPARTMENT OF CORRECTIONS
Correct Care Solutions; December 2012 to January 2015
CenturionVT; February 2015 to March 2015

# Ryan D. Herrington, M.D., M.P.H.

- Direct patient care to inmates at four VTDOC facilities
- Management of outpatient referrals
- Supervision of mid-level providers
- Buprenorphine prescribing
- Statewide Medical Director on per diem/interim basis

## CHIEF MEDICAL OFFICER, OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS
Warren Correctional Institution; July 2011 to November 2012
- Direct patient care to inmates
- Management of outpatient referrals
- Supervision of mid-level providers

## REGIONAL MEDICAL DIRECTOR, VERMONT DEPARTMENT OF CORRECTIONS
Correct Care Solutions; May 2010 to June 2011
- Supervision of medical and mental health services for eight correctional facilities
- Consultative services to the Department of Corrections on relevant healthcare-related issues
- Direction of state-wide Continuous Quality Improvement efforts
- Management, recruitment and mentoring of providers
- Cultivatation and maintenance of relationships with the Vermont Board of Medical Practice as well as the University of Vermont Medical Center and community providers
- Maintenance of facility accreditation by the National Commission on Correctional Health Care
- Pharmaceutical formulary management
- Outpatient referral management
- Direct patient care

## REGIONAL MEDICAL DIRECTOR, MAINE DEPARTMENT OF CORRECTIONS
Correctional Medical Services; April 2009 to April 2010
- Direction and supervision of medical and mental health services at nine correctional facilities
- Consultative services to the Department of Corrections on relevant healthcare-related issues
- Management, recruitment and mentoring of providers
- Clinical guideline development including Hepatitis C and pain management
- Pharmaceutical formulary management
- Outpatient referral management
- Direct patient care

## PRIMARY CARE / OCCUPATIONAL MEDICINE PHYSICIAN
Corporate Health Solutions; February 2003 to March 2009
- Private physician practice with spouse, who is also a physician. Practice supported by 70% business referrals
- Adult primary care including work-related conditions
- US DOT, pre-placement and immigration examinations
- Minor surgical procedures, joint injections, and cardiac stress testing
- Plant Physician for two large corporations
- Medical file reviews and Independent Medical Examinations for the Ohio Bureau of Workers Compensation as well as managed care organizations, third party administrators, and attorney firms

# Ryan D. Herrington, M.D., M.P.H.

URGENT CARE PHYSICIAN
Westar Urgent Care-Westerville OH; 2002 to 2003
- Diagnosis and treatment of minor emergencies
- Physical examinations (US DOT, pre-placement, school/sports)

OCCUPATIONAL MEDICINE PHYSICIAN
OhioHealth/HealthPartners; 2001 to 2002
- Diagnosis and treatment of work-related conditions for employees of Honda of America Mfg., Inc.
- Plant Physician for Honda of America Mfg, East Liberty Plant

PROCEDURALIST AND PRIMARY CARE PHYSICIAN
The Ohio State University Student Health Center; 2001 (Part-Time, as needed)
- Minor surgical procedures including excision of lesions, debridement, wound repair, and wound revision
- Development of relevant treatment guidelines

MEDICAL DIRECTOR (PER DIEM)
Columbus City Health Department-Columbus, OH; 2000 to 2001 (part-time, as needed)
- Oversaw the Columbus City Health Department Sexual Health Clinic, providing vacation coverage for the Medical Director

PRIMARY CARE PHYSICIAN, HILLSBOROUGH COUNTY SHERIFF
Correctional Medical Services Tampa, FL; 1998-1999 (Part-Time)
- Direct patient care
- Sabbatical 5/99 to 6/99 for relocation to begin preventive medicine residency

## Training

THE OHIO STATE UNIVERSITY SCHOOL OF PUBLIC HEALTH Columbus, OH
PGY2 / PGY3 General Preventive Medicine and Public Health, 1999-2001 (Full-Time)
Projects and Rotations:  Occupational Health, OhioHealth; Health Hazard Analysis, Techneglas; Wellness and Executive Physicals, The Ohio State University; Managed Care, United Healthcare; Maternal Mortality, Ohio Department of Health; Domestic Violence, Ohio Department of Health; Fiscal Management, Ohio Department of Health; Legislative Analysis, Ohio Department of Health

ORLANDO REGIONAL MEDICAL CENTER Orlando, FL
PGY3 General Surgery, 1997-1998 (Full-Time)

UNIVERSITY OF VIRGINIA Charlottesville, VA
PGY1 / PGY2 General Surgery, 1995-1997 (Full-Time)

## Education

OHIO STATE UNIVERSITY SCHOOL OF PUBLIC HEALTH Columbus, OH
M.P.H. Public Health, 2001

# Ryan D. Herrington, M.D., M.P.H.

UNIVERSITY OF VIRGINIA Charlottesville, VA
M.D. Medicine, 1995

COLLEGE OF WILLIAM & MARY Williamsburg, VA
B.S. Biology (Minor Chemistry), 1991

## Publications

Medeiros L, Herrington RD, Gonzales CL, Jaffe ES, Cossman J.  "MY-4 Antibody Expression by non-Hodgkin's Lymphomas."  American Journal of Clinical Pathology.

Herrington RD (contributing author).  "Skin, Musculoskeletal System."  ICU Recall, Tribble CG and Cope JT, Eds.  Baltimore: Williams & Wilkins.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SHARON BOST, in her individual capacity and as Personal Representative of the ESTATE OF FATIMA NEAL, | ) ) ) ) | |
| | ) | Case No. 1:15-cv-03278-ELH |
| Plaintiff, | ) | |
| v. | ) | Judge Ellen L. Hollander |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., *et al.*, | ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**PDECLARATION OF DR. RYAN D. HERRINGTON, M.D.**</u>

I, Dr. Ryan D. Herrington, hereby declare as follows:

1.      I have been retained by Plaintiff in this matter to give expert opinion testimony.

2.      Attached to this declaration as Exhibit A is a true and accurate copy of my report, which contains opinions I offer in this case. The contents of this report are true and accurate to the best of my knowledge and belief, and I hold the opinions stated within the report to a reasonable degree of professional certainty. This report contains a list of exhibits I relied upon to form my opinions.

3.      My qualifications for rendering opinions in this case are summarized in my report and my CV, which is attached to this declaration as Exhibit B. My CV is true and accurate as of the date of my report in this case to the best of my knowledge and belief.

4.     If called to trial, I will testify in a manner consistent with the contents of these documents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_ 10/25/2021_____                              /s/_____
Date                                                   Dr. Ryan D. Herrington

2