**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SHARON BOST, in her individual capacity and as Personal Representative of the ESTATE OF FATIMA NEAL, | ) ) ) ) | |
| | ) | Case No. 1:15-cv-03278-ELH |
| Plaintiff, | ) | |
| v. | ) | Judge Ellen L. Hollander |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., *et al.*, | ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Exhibit 49



March 12, 2021

Anand Swaminathan
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607

RE:  Bost v Wexford

Dear Mr. Swaminathan,

You have asked me to conduct an analysis of Wexford's policies and practices related to emergency department and other offsite referrals, including the "Emergency Room Visit Reduction Program" initiated in August of 2011 in the Baltimore Region, and evaluate the reasons for the policies and practices and their effects on correctional medical services in Baltimore and other Maryland Department of Public Safety and Correctional Services (DPSCS) facilities in which Wexford was paid to provide patient care.  You also asked me to render an opinion as to whether this program specifically affected the medical care given to patient Fatima Neal, who expired in custody in November 2012.  My opinions are based on all of the materials that I have reviewed, as well as my education, experience and research. My report includes seven sections:

1.      My Background and Qualifications
2.      Records Reviewed
3.      Continuous Quality Improvement (CQI) and Utilization Management (UM) Programs in Corrections
4.      Wexford's Efforts to Reduce ER Trips
5.      Analysis of the Emergency Room Reduction Program and Wexford's Efforts to Reduce ER Trips
6.      Summary of Medical Care Provided to Fatima Neal
7.      Conclusions

**Qualifications**

I am a Medical Doctor licensed to practice medicine in Idaho and several other states.  I am residency trained and Board Certified in Emergency Medicine.  I have been elected to be a Fellow of the American College of Emergency Physicians (FACEP) and also a Fellow of the American College of Correctional Physicians (FACCP).  I have extensive experience in supervising medical programs in both jails and prisons.  I also continue to practice direct clinical care to jail patients.  Pertinent to this case, I have extensive experience supervising CQI and UM and ER management programs as Chief Medical Officer for Centurion LLC.  My CV is attached, which lists my qualifications and publications in more detail.

My rates for service as an expert witness in this case are as follows:

1.   $250.00/hr
2.   $1,000.00 retainer (covers the first four hours of work)
3.   8 hours per day minimum for deposition or trial testimony
4.   Travel expenses

**Documents Reviewed**

- Clinical, administrative, and investigative records for Fatima Neal
- Baltimore City Fire Department Documents, WEXDISC 3958-63
- Deposition transcripts of: Nicholas Little, Donna James, Asresaghen Getachew, Sonja Wilson, Oby Atta, Jocelyn El-Sayed, Anike Ajayi, Karen McNulty, Dr. Robert Smith, Stacey Scott, Dr. Isaias Tessema, Kara Hope, Adaora Odunze, Neil Fisher, Getachew Afre, Windy Riccitelli, Andria Graham, Christy Somner
- Wexford Discipline Interview of Asresahegn Getachew
- Expert Reports in *Bost v. Wexford*
  - Dr. Laura Pedelty MD PhD (report and supplement)
  - Dr. Nathaniel Evans MD (report and supplement)
  - Dr. Peter Pytel MD (report and supplement)
  - Dr. Winer
  - Dr. Mathis
  - Dr. Fowlkes
- Wexford Health Sources Utilization Management Policies and Procedures, Maryland Region, UM-002
- First Supplement to Wexford Health Sources Utilization Management Policies and Procedures, Maryland Region, UM-002
- UM Process Improvement Project
- Email correspondence among Wexford staff, as detailed below
- Maryland Region Death Logs, NEAL 53459-53469
- Wexford CQI Documents, including:
  - Documents dated between 08/2012 through 06/2014 entitled CQI Minutes
  - Regional Total Health Care Operation Trend Report

- o    Quarterly CQI Meeting minutes
- o    Damon (Oct. 2012); Baltimore Detention (Jan.-Sept. 2014); Baltimore Pretrial (Aug. 2014); Baltimore Pretrial (June-July 2013); Baltimore Pretrial (June 2013) Quarterly Multivendor; Baltimore Pretrial (Dec. 2012) Wexford Multivendor; Baltimore Pretrial (Oct. 2012); Baltimore Pretrial (Sept. 2012) Quarterly Multivendor; Baltimore Pretrial (Aug. 2012); Cumberland (Nov. 2012); Baltimore Pretrial (Jan.-Apr. 2013); Baltimore Detention (Nov. 2012); Hagerstown (October 2012); Baltimore Region (October 2012); Baltimore Pretrial (Oct-Nov 2012); Baltimore Region (April 2013); March 2013 CQI Minutes (Unlabeled) WEXDISC 24985-88; Baltimore Region (Oct.-Nov. 2012); Jessup (Aug. 2012); Baltimore Detention (Aug. 2012); Cumberland (Aug. 2012); Baltimore Pretrial (April 2013) Jessup (april 2013); Hagerstown (Apr. 2013); Hagerstown (February 2013); ECI Feb. 2013; Cumberland (Feb. 2013); Jessup (Feb. 2013); MCIJ-JPRU-CMCF (Dec. 2012, Jan-Feb. 2013); Hagerstown (Jan. 2013); Jessup (Jan. 2013); Cumberland (Jan. 2013); Jessup (Dec. 2012); MCIW-EPRU-SMPRU (Aug., Dec. 2012); ECI (Nov. 2012); PATX-BCF (Nov. 2012); Hagerstown (Nov. 2012); Hagerstown (Aug. 2012)
- 2012 CQI Annual Report, Baltimore
- Wexford Corrective Action Plans:
  - o    WEXDISC 26012
  - o    WEXDISC 25980-81
  - o    WEXDISC 26018
  - o    WEXDISC 24951
  - o    WEXDISC 23300-01
  - o    WEXDISC 94959
  - o    WEXDISC 25249-25274
  - o    WEXDISC 22431-32
  - o    WEXDISC 22434-36
  - o    WEXDISC 22438
  - o    WEXDISC 23697-700
  - o    WEXDISC 25698-99
  - o    WEXDISC 25814-16
  - o    WEXDISC 25275-90
  - o    WEXDISC 25819-20
  - o    WEXDISC 25828-31
  - o    WEXDISC 26009-11
  - o    WEXDISC 29285-87
  - o    WEXDISC 23697-701
  - o    WEXDISC 25698-99
  - o    WEXDISC 25814-16
  - o    WEXDISC 256009-11
  - o    WEXDISC 29285-87
  - o    NEAL 102671-102694
  - o    NEAL 102685-86
  - o    NEAL 102687-94
  - o    NEAL 102696-98

-     o    NEAL 102699-760
- Wexford Answers to Second Set of Interrogatories
- 08/07/13 Performance Appraisal for Dr. Afre
- Maryland Business Performance Action Meeting December 2013
- 2012 Central Region Baltimore Annual Performance Improvement Report
- 10/8/13 Access to Care Minutes
- Regional Medical Director Meeting Minutes and Materials from 8/29/12, 4/12/13, 4/26/13, 6/28/13
- MAC Minutes from 9/18/14; 6/19/2014; 6/20/2013; 5/16/2013; 8/16/2012
- Wexford Utilization Management Monthly Reports from January 2010-July 2014
- Expert report of Dr. Ryan Herrington
- 2004 Contract between Wexford and Maryland, Second Supplement
- 2011 Wexford Proposal to DPSCS

**CQI, UM and Emergency Referrals**

Continuous Quality Improvement (CQI) is a process used in many industries to improve the quality of services the industry provides. In the medical field, including correctional medicine, CQI is done to improve the quality of medical care provided to patients. The medical CQI process typically starts by identifying one particular aspect of medical care that may be problematic and tracking performance over a period of time (usually one to three months). The data is then analyzed, usually by a committee of medical professionals, to identify opportunities for improvement. An action plan to implement these improvements is created and then tracked again to assess effectiveness of the plan. The action plan and reassessment are essential in making Quality Improvement "Continual."

A robust CQI program is a necessary component of any healthcare system and especially a correctional healthcare system. That is because medical care is complicated. Medical practitioners and nurses come into correctional medicine with different training and experience. Nobody knows everything in medicine. Midlevel practitioners like nurse practitioners and physician assistants typically have only a fraction of the training and experience of a physician. Best practice recommendations change and not all practitioners keep up with current recommendations and medical advances. Sometimes, bad practices become ingrained on an institutional level. Whether through lack of training, experience or institutional bad practice, patients can be harmed. CQI is the process developed to find deficiencies in the medical practice of individuals, facilities and even entire systems.

Often, CQI analyses will uncover issues that are likely to directly impact patient care, like an inexperienced practitioner using incorrect types and dosages of insulin for diabetics, a facility with an unusually high number of inmate medical grievances or a corporate policy that fails to conform with published Best Practice guidelines. It is critical that once issues like these are recognized through the CQI process, a thorough action plan be promptly implemented, and the

action plan's effectiveness be closely tracked. Because CQI is ultimately about the quality of care to patients, the failure to have a robust and healthy CQI process would pose an obvious danger to patient health.

By contrast, Utilization Management (UM) is a program designed to reduce costs. A proper UM process in Correctional Medicine is based on similar programs outside of corrections, such as Health Maintenance Organizations (HMOs). The goal of UM is to decrease medical spending, usually by targeting unnecessary medical expenditures. UM commonly develops medical formularies, protocols, guidelines, and policies and then monitors adherence to these written standards. UM also typically requires certain high-cost procedures, tests or medications to be approved in advance. Of course, cost savings must not come at the expense of patient care and administrators must be vigilant to assess the impact of any UM cost saving initiative on patient care.

CQI and UM are distinct processes. CQI is concerned with medical outcomes and improving medical care, as overseen by a committee of medical professionals. Cost considerations must play a minor role. Indeed, proper CQI initiatives may actually increase costs, such as using newly developed medications to treat patients with Hepatitis C who before were untreated.

UM initiatives often focus on controlling costs by using pre-authorization to enforce adherence to UM guidelines and formularies. UM priorities are often set by non-medical personnel who evaluate budgets and revenue. Non-medical corporate committees may set specific budgets and financial goals that are medically unrealistic and yet UM is tasked with enforcing operations within that budget. An area that is "over budget" may become the focus of a UM initiative to lower expenditures even though a CQI study might find that the expenditures are reasonable.

Given these differing priorities, it is very important for UM and CQI to remain independent. Leadership teams responsible for the overall healthcare contract must ensure that the UM system does not take priority over the CQI program in order to ensure that cost considerations do not result in poor patient care. The risk to patient well-being that is posed by permitting the UM system to take priority over the CQI program is obvious and well known.

Referrals from a detention facility to an Emergency Department can be a source of interest to both UM and CQI, although their goals will usually differ. The UM system is interested because Emergency Department visits are expensive and UM wants to reduce expenses. The CQI system is interested in order to make sure that patients are referred to the ER when necessary in an appropriate and timely manner and that patients get proper medical care

once they arrive. The CQI system is also interested in whether the ER referral was caused by inadequate onsite care.

Patients can be sent to the ER for two entirely different reasons.  First, patients are sent to the ER because their signs and/or symptoms indicate that they may be having a life-threatening medical emergency where time is of the essence.  Examples include strokes, heart attacks, abdominal emergencies like appendicitis, severe breathing difficulty, etc.  Anyone sent to the ER by ambulance usually falls into this category.  Second, non-emergency patients are sent to the ER because the facility is not staffed or equipped to deal with their non-emergency problem in a timely manner.  Situations like this arise in detention facilities when no medical practitioner is on site (and perhaps no nurses either).  Examples include lacerations that need to be sutured, abscess that need to be drained, or broken bones that need to be casted.

The second group of non-emergency ER patients can be a legitimate target of UM cost reduction efforts, primarily by increasing resources available on site.  For example, a detention center could hire an on-call practitioner to go onsite during off hours to suture lacerations, apply splints or other simple procedures that otherwise would have gone to the ER.  Site practitioners can also be trained to perform procedures that otherwise might have gone to the ER, such as reducing simple dislocations.  Such efforts must be narrowly focused on specific non-emergency medical issues.

Those efforts must then be the subject of an independent CQI study that ensures that patient care is not impacted as a result of the UM initiative. Ensuring that the CQI study is conducted independent of the UM system ensures a meaningful and objective review of any changes to the quality of care provided as a result of the UM initiative, rather than a results-oriented approach designed to vindicate the cost-saving measures at the expense of patient care.

Applying UM efforts to patients sent to the ER because of concern about possible true life-threatening emergencies is a risky and problematic practice that endangers patient health. In the field of correctional healthcare, it is not, and should not be, the subject of a state-wide or site-wide initiative. The well-known and obvious danger in trying to contain ER related costs is that any efforts you make to control "unnecessary" emergency transfers will result in true emergencies not being sent. It is often impossible to know in advance whether a specific medical complaint is or is not an emergency before the ER evaluation is done. Failing to send a patient with an emergency (like a stroke) to the ER is a much, much bigger problem than sending someone thought to have a stroke who eventually returns, after Emergency Department services have established that stroke can be "ruled out." In the first case, the patient may die or suffer permanent disability.  In the second, no harm was done to the patient even though it was the more expensive option.  Taking the patient's signs and symptoms seriously, and engaging in a meaningful process of differential diagnosis to rule out potentially severe causes, is good

6

medicine and required by the standard of care. From a UM-only perspective, it is an opportunity for cost savings. In this example, consistent with the axiom above, the UM perspective must be rejected in favor of ensuring quality of care and patient safety.

When evaluating emergency ER runs it is important not to assume that those patients who had the suspected emergency condition "ruled out" should never have been sent in the first place. It is rare that these ER runs are actually inappropriate. When on-site personnel are worried that a patient is having a life-threatening emergency and call an ambulance, it is precisely because they don't know the answer in advance and don't want to gamble with the life of their patient. If a nurse sends a patient to the ER because of chest pain and the ER physician monitors the patient for several hours, does x-rays, labs, and serial EKGs and then sends the patient back because these studies ruled out a heart attack, the nurse's original decision to send the patient to the ER was still correct.  The nurse does not have the ability or training to do all of the tests done in the ER. Second guessing these decisions because the outcome is known is almost always wrong.

Along these lines, it is usually inappropriate for a physician to critique an ER run that was called for by someone with less training than the physician.  In a functioning correctional healthcare system, nurses will (and should) send more patents to the ER for emergency evaluations than a physician and untrained correctional officers will (and should) send more patients to the ER than a nurse. The primary objective from a medical perspective must always be to minimize risk and avoid taking chances with people's lives.

But my review indicates that when Wexford took over direct patient care in July 2012, it subordinated the CQI process to UM. Donna James testified that when Wexford took over the direct patient care, Wexford's UM department took over the CQI function. *James Depo. pg. 32-33, 40-41, Hope Depo. pg. 49, Afre Depo. pg. 32-33.* When that happened, cost considerations became the focus. *James Depo. pg. 32-33.* As expected, given the financial focus of UM, CQI quickly began focusing on cost-cutting goals, including reducing ER trips, *WEXDISC 26107-08, James Depo. Pg. 151.* CQI reports I reviewed also routinely discussed cost cutting goals around ER reduction. *WEXDISC 24029, 25482, 25835, 25963.* The merging of CQI and UM, with UM taking primacy, is contrary to accepted practice in correctional healthcare, and by itself creates significant risks to the quality of patient care.

Perhaps the worst mistake that UM administrators can make with respect to assessing emergency ER runs is to require the medical professional on site to talk to a physician or other gatekeeper before calling an ambulance.  First, making a gatekeeper call takes time.  Perhaps the physician is on the phone with someone else, or is in the shower or the call didn't go through as often happens on cellular networks.  If a patient is having a life-threatening emergency, every extra minute of delay increases the risk of a catastrophic outcome that could have been avoided. Second, requiring staff to make a call to a gatekeeper physician naturally creates reluctance to

make such a call. It becomes a source of stress to those who make it, who fear sounding dumb, being challenged or second-guessed, wasting the gatekeeper's time, or even being humiliated.  It is well understood among senior leaders in correctional medicine that if you require on-the-ground medical professionals to call a gatekeeper before they can call an ambulance, they are more likely to gamble that "things will turn out ok." This is why no HMO or other Utilization Management organization requires a gate-keeper call before sending a patient to the emergency room, and why it is impermissible in correctional healthcare to require treating staff—physicians or otherwise—to get authorization before sending a patient to the emergency room. Wexford's leadership has itself acknowledged as much. *Getachew Depo. Pg. 21-22, James Depo. pg. 85.*

But this is exactly what Wexford's UM policy that was in effect in July 2012 states. Pursuant to that policy, a Site Medical Director or designated on-call physician had to first determine that an ER referral was necessary. Notably, the prior policy in place before July 2012 expressly stated that "Urgent and emergent referrals are automatic approval as to not delay any care," but that language was removed from the 2012 UM Policy. The implication is clear. Other Wexford documents also confirmed a policy of requiring approval before sending patients to the ER. As discussed below, this includes the Emergency Room Visit Reduction Program, which included the following: "establish back up gate keeper on call for all ER trips." Consistent with this policy, a number of Wexford staff and administrators testified that their practice was to obtain approval before sending a patient to the emergency room. *James Depo. pg. 72-73, 153, Hope Depo. pg. 32, McNulty Depo. pg. 132-133, 225-226, El-Sayed Depo. pg. 38, 41.* Wexford's UM policy putting in place gatekeepers and requiring authorization to send patients out is risk and irresponsible, and contrary to accepted policy and practice in correctional medicine.

**Wexford's Efforts to Reduce ER Trips**

Prior to July of 2012, Wexford was involved in the provision of medical care to inmates in DPSCS custody in a UM role. In this role, Wexford was responsible for performing retrospective reviews of ER trips and authorizing all other offsite medical care, although they did not bear the cost of these offsite trips. Dr. Robert Smith, Wexford's corporate UM medical director, testified that Wexford had access to patients' medical records as part of the authorization and review process. *Smith Depo. pg. 70-71.* Both Dr. Smith, and Dr. Asresahegn Getachew, who took over as Wexford's statewide UM medical director when Wexford took over direct patient care in July 2012, testified that there were very few ER referrals that were classified as being inappropriate before July 2012. *Smith Depo. pg. 62-63, Getachew Depo. pg. 25-26.*

In its "Second Best and Final Offer" to DPSCS for a contract to provide direct patient care, however, Wexford promised DPSCS that it would "guarantee" a 10% reduction in off-site transports. *WEXDISC 3210.* Wexford told DPSCS that it would achieve this reduction by

conducting targeted training to medical staff working in DPSCS infirmaries to expand their skills, and providing additional equipment and supplies to care for patients on site. *WEXDISC 3211.* But Wexford did not provide medical staff any training or provide any additional resources, equipment, or supplies. *Somner Depo. pg. 35-36, Afre Depo. pg. 6-11, 59-60, 41-42, 46-47, Wiggins Depo. pg. 6-7, 17; Riccitelli Depo. pg. 28-30, 34-39; Getachew Depo. pg. 46-50; McKee Depo. pg. 258-60, 266-67, 303; James Depo. pg. 68-69, Sayed Depo. pg. 51-53, McNulty pg. 86-88, Hope Depo. pg. 6-8; Jamal Depo.pg. 379-80, 384-86, Ajayi Depo. pg. 222-27, 314-18, Atta Depo. 1 pg. 114-116, El-Sayed Depo. 1 pg. 243, 290, El-Sayed Depo. 2 pg. 51, McKee Depo. pg. 257-258, 266-268.*

The evidence that I reviewed demonstrates that Wexford immediately worked to reduce the number of ER trips when it took over direct patient care and assumed financial responsibility for the cost of offsite care in July 2012. *WEXDISC 3217, Little Depo. pg. 21-23.* In its 2012 Annual Performance Improvement report for the central Baltimore region, Wexford listed as one of the active projects an "Emergency Room Visit Reduction Program." WEXDISC 20880-20965.

The stated goal of the Emergency Room Visit Reduction Program was to "reduce utilization of emergency offsite services . . ." This goal was to be accomplished by ". . . increasing onsite capability to address emergency situations."

Two stated methodology goals were 1. Identify the most common reasons for transfers to ERs for conditions that can be managed on site . . ." and 2. "Develop onsite management protocol for selected patients who can be managed on site."

The first three medical conditions "identified from the base data" targeted for reduction of ER referrals were:

1. "Seizure disorders
2. Orthopedic disorders
3. DVT/Cellulitis"

The goal was to reduce total ER runs by 10% compared to January-June of 2011, which averaged 117 ER runs a month.

According to the 2012 report, during the Preparation phase in September of 2011, "Protocols for Management" of DVT/Cellulitis, Orthopedic Emergencies and seizures were developed.  "Implementation" and "Consolidation" occurred in the last months of 2011 and the "Maintenance phase began in January of 2012.

9

The 2012 report further stated that at the end of 2012, the data was analyzed under the headings "Trauma related ER run," "Neurology" and "Cellulitis/DVT." Besides these three target groups, total ER runs as well as the percentage of ER patients admitted to the hospital were analyzed.

The trend analysis in the 2012 report for Baltimore Jails reports that Wexford achieved a much higher reduction in ER referrals than they had originally envisioned. From April 2011 to March of 2012, total "ER referrals—per 1,000 Inmates" fell from 10 runs per 1,000 to 2 runs per thousand, a reduction of 80%. *WEXDISC 20930.*

Although the use of a Gatekeeper was not mentioned in the original program description, the summary of the program recommends to "establish back up **gate keeper** on call for all ER trips." This gatekeeper requirement was not limited to the three categories of cases originally identified.

It does not appear that any analysis was made as to why ER referrals fell to such a remarkable degree—eight times more than their original goal according to the 2012 report. For example, no analysis was made as to how much of the reduction was due to the original three targeted medical conditions: seizure disorders, orthopedic disorders and DVT/cellulitis.

Wexford apparently disputes that it created this program. *Wexford's Answers to Second Set of Interrogatories, pg. 5.* But Donna James testified that it came from Wexford's UM department and Dr. Smith testified that Wexford had an ongoing process to improve utilization in all aspects. *James Depo. pg. 100-01, Smith Depo. pg. 95.* The program was included as part of an annual report promulgated by Wexford, and the program itself is clearly a UM-focused initiative that was created during a time that Wexford was the UM contractor for DPSCS. The program also called for the collection of data that Wexford was contractually obligated to collect and analyze as UM contractor. *WEXDISC 3489.* Even if Wexford did not write the document, the evidence that I reviewed strongly suggests that they were aware of it, supported it, and encouraged it.

The evidence further demonstrates that Wexford maintained and expanded the program after July 2012. In August of 2012, Kara Hope, Wexford's Regional Director of Nursing for the Baltimore Pretrial Region, and Stacey Scott, Wexford's Regional Administrator for the Baltimore Pretrial Region, reported that the ER Reduction initiatives for pretrial were going well. *WEXDISC 26092-26093.* And in the Quarterly Regional Multivendor CQI Meeting report from the Baltimore Pretrial Region from December 2012, Wexford noted that ER runs "remain significantly down." *WEXDISC 24029.* Reductions in ER trips were a constant theme in CQI reports from 2012-2014 that I reviewed, including other Maryland facilities. A January 2013 CQI for sites MCIJ/EPRU/SMPRU could not be clearer about the goal: "Minimize the number of

Er runs for the month. Have emergent cases seen on site"; and a January 2013 CQI for Jessup states "ER runs: doing very well with documenting these runs and preventing ER trips." *WEXDISC 28546, 28554.*

Wexford documented its success in reducing the number of ER trips in other ways as well. Dr. Smith prepared monthly utilization management reports detailing the number of ER trips and offsite inpatient care each month, the trend of how those numbers changed over time, and the cost borne by Wexford as a result. These reports were sent to corporate staff, as well as regional Wexford staff (including regional medical directors like Dr. Isaias Tessema, who was the regional medical director for the Baltimore pretrial region). *Smith Depo. pg. 133.* The reports show that ER referrals and inpatient care began to substantially decrease as Wexford's desire to reduce the number of ER referrals took effect:[1]



Dr. Getachew also noted a significant decrease in the number of ER referrals for the Baltimore City Jails, and a downward trend in ER referrals in the Baltimore region following the implementation of the ER reduction initiative. *WEXDISC 26304-05, Getachew Depo. pg. 119-120.*

---

[1] The charts which appear above were generated using the data reported by Wexford as part of its UM reports. *See UM Reports.* The data was input into a spreadsheet provided to me by Plaintiff's counsel. I conducted random spot checks of the data to ensure its accuracy.

Wexford reviewed every ER referral to determine whether it was unnecessary. *Getachew Depo. pg. 25, Fisher Depo. pg. 73.* These reviews were overseen by Wexford's utilization management department. *WEXDISC 22723-24, James Depo. pg. 100-01.* Wexford's utilization management team, including Dr. Smith and Dr. Getachew, had daily calls with regional medical directors (as well as other Wexford administrative staff) to discuss all ER referrals and patients who were being treated offsite, where regional medical directors were required to "explain the validity of ER referrals" *WEXDISC 22723-24, Tessema 2017 Depo. pg. 64-65.* There were also discussions about how to reduce the number of ER runs deemed unwarranted. *Tessema 2021 Depo. pg. 119.* Before the call, Wexford's utilization management team would circulate particular cases to discuss, along with the cost associated with the ER referral. *WEXDISC 22723-24.*

Wexford also routinely discussed offsite trips, including ER runs, during monthly budget meetings. Corporate Wexford staff, including Wexford's CEO, and the statewide leadership responsible for overseeing the DPSCS contract all regularly participated in these monthly budget meetings. *McKee Depo. pg. 240-41, Fisher Depo. pg. 117-120.* Dr. Fisher and Ms. Scott testified that regional leadership also attended these meetings, although Dr. Tessema testified that he did not participate. *Scott Depo. pg. 109-10, Fisher Depo. pg. 119-20, Tessema 2021 Depo. pg. 96.* During these calls, Wexford leadership discussed how Wexford's actual costs compared with its budget and expected profit margin, and what could be done to increase profitability. *McKee Depo. pg. 237-39, 242-43, Fisher Depo. pg. 121-124, Scott Depo. pg. 112.*

Wexford also used CQI as a vehicle to further track and reduce ER and other offsite visits. As discussed above, CQI became a process focused on perpetuating UM cost-cutting goals, and was specifically utilized to further reduce ER runs across sites and without reference to specific categories of care or treatment for which ER reduction may be appropriate.

The qualitative studies that were conducted by CQI and the CAPs that DPSCS required Wexford to implement showed serious problems in delay and denials of offsite referrals, including ER referrals. But, as noted above, the evidence I reviewed showed that Wexford made no meaningful effort to correct this problem. To the contrary, the focus appears to have remained on reducing ER trips. In October 2012, for example, Wexford's CQI committee identified that several DPSCS facilities had a "time delay in responding to emergencies[,]" but Wexford's outcome evaluation was to lower ER runs, with a goal of less than 20 monthly. *WEXDISC 25961-65.* And notably, the CQI report contains nothing explaining how it was determined that 20 ER runs was the appropriate figure, what tools had put in place to permit such a reduction, or what categories of care might be targeted for reduction without sacrificing care. Most importantly, the problem was failing to timely send patient to the ER; the solution was to send fewer people to the ER. This is unacceptable in correctional medicine, and it is further evidence that the CQI process had merely become a mechanism for pursuing UM cost-cutting goals.

Meanwhile, Wexford's statewide leadership continued to reinforce Wexford's efforts to reduce the number of ER trips and celebrate all such reductions. *WEXDISC 24258-59.* Wexford staff, including Ms. McKee, communicated over email to celebrate days that staff didn't make any ER referrals, a message that regional leadership was expected to communicate to site medical staff. *WEXDISC 24258-59, WEXDISC 33573-75, Hope Dep. p. 42-44.* Within the same 6-month time frame, McKee communicated with other Wexford staff to express a concern about the number of deaths of DPSCS inmates. *WEXDISC 21789.* Yet again, Wexford's leadership failed to take meaningful action to address the widespread delays and denials of ER referrals.

Wexford's leadership also emphasized its ER reduction initiative during evaluations of Wexford's site providers. Wexford's annual performance appraisal form expressly asked Wexford supervisors to assess the medical provider's "cost effectiveness." *WEXDISC 1775, WEXDISC 1780.* In August of 2013, Dr. Tessema evaluated Dr. Afre's cost effectiveness as exceeding expectations and specifically noted that Dr. Afre had "very low ER referral and manages complex cases in the infirmary." *WEXDISC 1780.* Dr. Smith acknowledged that emphasizing reduction of ER referrals to providers poses a risk that the providers will fail to refer patients to the ER when it is appropriate. *Smith Depo. pg. 151.*

In order to achieve the types of decreases in the number of ER and offsite referrals that Wexford sought and achieved through its ER reduction initiative—particularly for patients with neurological needs—they would need to have in influx of resources in the infirmaries or otherwise improve access to resources and the quality of care for the reasons discussed above.

But I have reviewed no evidence or records suggesting that providers got any training or resources that would allow them to better treat patients with urgent, acute medical needs onsite, or identify the patients who needed offsite care versus those who could be treated in the infirmary. In fact, all the evidence shows the opposite. I reviewed deposition transcripts from numerous Wexford staff and administrators who said that there were no new resources or training that would have allowed providers to treat more patients in the infirmaries. *Somner Depo. pg. 35-36, Afre Depo. pg. 6-11, 59-60, 41-42, 46-47, Wiggins Depo. pg. 6-7, 17; Riccitelli Depo. pg. 28-30, 34-39; Getachew Depo. pg. 46-50; McKee Depo. pg. 258-60, 266-67, 303; James Depo. pg. 68-69, El-Sayed Depo. pg. 51-53, McNulty Depo. pg. 86-88.* And there is no evidence that I reviewed indicating that Wexford ever attempted to secure training or resources for third parties.  To the contrary, Dr. Getachew acknowledged in an interview from July 30, 2013, that nursing was missing documentation (which is consistent with trends identified in CAPs and CQIs), and that the CQI process is not fully effective due to the time lapse between the event and the corrective action. *WEXDISC 35561-62.* He also said that he feels that his site doctors need to be "leaders" and "teachers," and that they need to seek education in areas of deficiency in order to help reduce offsite care. *WEXDISC 35561.* The theme here is that the

13

BCDC got no new training or resources that expanded the available services in the infirmaries so that ER trips could be reduced without sacrificing quality of care.

Nonetheless, Wexford continued efforts to discourage ER runs, despite a lack of resources to address serious medical needs onsite. For instance, Dr. Getachew reviewed the ER run of a patient with obvious serious neurological systems (dizziness, gait disturbance, history of epilepsy, sudden change in mental status, and hallucinations). This should indisputably have been sent to the ER immediately, but Dr. Getachew suggested to Dr. Tessema that the provider could have sent the patient for imaging rather than the ER. *WEXDISC 34167.* This is an indication of the constant pressure UM was putting on providers to reduce ER trips.

**Analysis of the Emergency Room Visit Reduction Program and Wexford's Efforts to Reduce ER Trips**

The Emergency Room Visit Reduction Program reportedly chose three medical conditions "based on the base data." I did not see any indication in the materials that I reviewed to indicate what this specific data was. I do, though, have an analysis of "Maryland ER Preventable Cases" beginning in 2007 and continuing through 2017. This lists total ER runs per month as well as an analysis of how many were "Preventable ER Runs." Beginning in January of 2010 until the Emergency Room Visit Reduction Program started in September of 2011, there was an average of 108 ER runs per month and an average of two (2) preventable ER runs per month. Even if the Emergency Room Visit Reduction Program was able to eliminate all of the preventable ER runs (which is not possible or desirable, as sound healthcare practice requires erring on the side of ruling out more serious conditions), that would fall far short of the program's goal of 10% overall ER run reduction. Anything over these two average cases would have to come from ER runs judged not to be preventable.

The Emergency Room Visit Reduction Program quickly achieved reductions in ER runs far in excess of their original goal. This shows in the Maryland ER Preventable Cases Data. Starting in January 2012 through the end of December 2013, the average number of ER runs fell to an average of 64 a month. However, the average number of Preventable ER Runs was unchanged at 2.1 per month. As a percentage of all ER runs, ER runs judged to be preventable actually increased from 2% of all ER runs to 3.2% of all ER runs after the initiation of the program. The Maryland Medical Director for UM, Dr. Getachew, acknowledged in his deposition that ER trips deemed unnecessary were always very low, even before the Emergency Room Visit Reduction Program. *Getachew Depo. pg. 25-26.* So did Dr. Smith. *Smith Depo. pg. 62-63.*

Although the Emergency Room Visit Reduction Program's stated intention was to use "Guidelines for Management" and education of site medical personnel as the primary agents

driving change in ER runs, according to the depositions of several administrators and practitioners, no training actually took place. Also, as discussed above, no improvements were made to the infirmaries to make them better able to handle emergencies. *Somner Depo. pg. 35-36, Afre Depo. pg. 6-11, 59-60, 41-42, 46-47, Wiggins Depo. pg. 6-7, 17; Riccitelli Depo. pg. 28-30, 34-39; Getachew Depo. pg. 46-50; McKee Depo. pg. 258-60, 266-67, 303; James Depo. pg. 68-69, Sayed Depo. pg. 51-53, McNulty pg. 86-88, Hope Depo. pg. 6-8; Jamal Depo.pg. 379-80, 384-86, Ajayi Depo. pg. 222-27, 314-18, Atta Depo. 1 pg. 114-116, El-Sayed Depo. 1 pg. 243, 290, El-Sayed Depo. 2 pg. 51, McKee Depo. pg. 257-258, 266-268.*

The primary tool used by the Emergency Room Visit Reduction Program to reduce ER runs was by using a gatekeeper and a concerted emphasis by Wexford Leadership to criticize high ER run numbers and praise low ER run numbers.  This is acknowledged in the Emergency Room Visit Reduction Program 2012 annual report in which one maintenance goal for the coming year was to "Establish back up gate keeper on call for all ER trips."  Multiple supervisors and employees acknowledged in their depositions that they were not allowed to send someone to the ER without first calling the on-call gatekeeper physician. *James Depo. pg. 72-73, 153, Hope Depo. pg. 32, McNulty Depo. pg. 132-133, 225-226, El-Sayed Depo. pg. 38, 41.* And e-mail communications demonstrate that nursing staff feared getting "in trouble" for sending patients to the ER or authorizing other nurses to send patients to the ER. *WEXDISC 24227.*

There is no question that Wexford's efforts to reduce ER trips was successful.  However, there was no apparent analysis of whether the reduction in ER runs included some (or many) patients with life threatening conditions who should have been sent to the ER but were not because of the program.   This is actually the first question that should have been asked by a functioning CQI program when this initiative far exceeded its original objective of a 10% reduction in ER runs. This was acknowledged by Dr. Smith in his deposition. *Smith Depo. pg. 120-22.* As an example, CQI reports for January and February 2013 at a single site state that in January, there was a 63% reduction in ER trips to 10 (which would mean from approximately 25 runs the month before), which then went down to 5 trips in February 2013. *WEXDISC 28542, 28446.* So, ER trips went from approximately 25 trips to 5 trips in two months, an 80% reduction, without any identification of a justification for such a large decrease. A responsible healthcare organization in any setting, including correctional healthcare, would and should conduct an immediate analysis to understand if there had been negative patient outcomes resulting from such a large decrease; there is no evidence in the CQI documents or elsewhere of such an analysis.

After Wexford's efforts to reduce ER trips went into effect, patient deaths increased. In the year after Wexford took over direct patient care (and began its ER reduction initiative), deaths increased by an average of nearly 30% statewide and more than 63% in the Baltimore

15

pretrial region. For the two years after Wexford took over in July 2012, deaths increased by an average of more than 28% statewide and more than 40% for the Baltimore pretrial region:[2]



This data shows how dangerous Wexford's ER reduction initiative was—a danger Wexford would have known about when it implemented the initiative. In fact, in April 2013, Wexford's Director of Operations wrote, "It seems to me we have had a lot of deaths." *WEXDISC 21789.* And there were multiple CAPs that identified failures in referring patients to the ER when they should have gone, including C███ R████ and T████ L███. Of course, deaths are merely one indicator, admittedly subject to variability (e.g., suicides and homicides can impact such a figure). But the program, its overwhelming "success," and the quantitative and anecdotal indicators of increases discussed above—independently and collectively—should have resulted in a robust CQI process to ensure that Wexford's ER reduction efforts were not resulting in increased deaths.

In addition, Wexford's CAPs, CQIs, and other documents contain other evidence of negative patient outcomes short of death that were likely the result of its concerted effort to reduce ER trips. For example, Wexford's January 2013 CQI for Jessup states that they are "doing very well . . . preventing ER trips," and then in the next paragraph discusses a list of

---

[2] The chart which appears below was generated using the data reported by Wexford's Maryland Region Death Logs. *NEAL 53459-53469.* The data was input into a spreadsheet provided to me by Plaintiff's counsel. I conducted random spot checks of the data to ensure its accuracy.

offsite visits where providers were "having trouble getting the patients seen and treated," including one in which the PA had a patient he could not treat onsite but nevertheless scheduled for an onsite consult that did not happen. The CQI states, "PA is concerned because this patient is waiting much longer than he should in effort to avoid ER trip/offsite visit." *WEXDISC 28558*. This is an example of the sort of negative patient outcome short of death that is highly predictable based on Wexford's ER reduction initiative, and that Wexford should have been evaluating through a robust CQI process to ensure the program was not producing negative outcomes. I have not seen evidence of such a program. And in fact, the January 2013 CQI contains no follow up, corrective action, or resolution, despite the concerning findings contained in the report.

Ultimately, as Wexford received this data in real time, the fact that it did not permit an independent CQI process to conduct an investigation into this sort of trend following its ER reduction initiative demonstrates how its priority was to reduce costs, even at the expense of increased negative patient outcomes.

Wexford's efforts to reduce ER trips were a Utilization Management program rather than a CQI program.  In other words, the goal of these efforts was to reduce costs rather than improve medical care.  Donna James, the director of CQI, specifically states in her deposition that the Emergency Room Visit Reduction Program came out of UM rather than CQI. As discussed above, Ms. James testified that under Wexford CQI was ineffective and inadequate, and that CQI became an extension of UM under Wexford after July of 2012. The Emergency Room Visit Reduction Program, along with the other materials discussed above, are a clear example of this.

> a.    There was general agreement among the Medical Directors that the number of inappropriate ER runs was very low. This means there was no real medical need to reduce ER runs.

> b.    There was, however, a financial incentive.  Wexford was responsible for the costs of ER services directly.  Any savings made by reducing ER runs would directly benefit Wexford.

> c.    The Emergency Room Visit Reduction Program was not run like a typical CQI program.  There was no effort made to evaluate the medical consequences of the program.  No committee reviewed individual cases of patients who were sent or not sent to see if the Program negatively impacted patient health or care.

> d.    Instead, the goal of the Emergency Room Visit Reduction Program was simply to reduce ER runs—period.  The emphasis in program follow-up with individual medical professionals was their number of ER referrals   Practitioners

were praised for having few ER runs and were questioned for having more ER runs. See for example, the email sent from Dr. Tessema on October 10, 2012 celebrating "25 days with no ER runs" which, according to the email, was an "achievement of (an) unbelievable record" and evidence of a "relentless pursuit of perfection." Providers were also evaluated on the number of ER runs they initiated. *WEXDISC 1780.* No one, including the medical doctors, asked the questions of whether no ER runs for 25 days in such a large patient population was really a good thing medically, a result that is all but inconceivable in my experience.

**Summary of Medical Care Provided to Fatima Neal**

Fatima Neal was incarcerated at the Baltimore City Detention Center in September of 2012. She had a complex past medical history that included opioid dependency being actively treated with methadone, and hepatitis C. She presented to medical the night of October 31-November 1, 2012 complaining of a sudden, severe headache associated with difficulty walking and with her vision. She was admitted to the infirmary, where she was documented as becoming progressively worse, with right sided weakness progressing eventually to inability to walk or stand on her own. She also became incontinent of both urine and feces. Early in the morning of November 4th, she became unresponsive with severe respiratory distress at around 12:25 AM but EMS was not called until three hours later at 3:43 AM. She was transported to Johns Hopkins Medical Center, but was pronounced dead soon after arrival. The cause of death was determined to be an acute intracerebral hemorrhage.

Laura Pedelty, MD, PhD and Nathaniel Evans, MD have both provided reports detailing the deficiencies in the medical care provided to Ms. Neal. At issue here is whether the jail medical staff's failure to transport Ms. Neal to the hospital prior to her demise could have been related to the policies and practices discussed above related to Wexford's emergency room reduction efforts, which begun in earnest in 2012.

It is clear from my review of the medical records that the medical staff should have sent Ms. Neal to the hospital for emergent evaluation of her symptoms far sooner than they did. They had several opportunities to do so. The first was on October 31-November 1 when she presented with the complaint of a sudden severe headache that alone indicated the need for a CT of the brain. Instead, she was admitted to the infirmary for observation, where her neurologic deterioration was observed and documented by her fellow inmates and staff. Clinic opportunities to recognized the need to send Ms. Neal to the hospital for emergency evaluation occurred on November 1st, on November 2nd and on November 3rd. However, the medical staff did not even call an ambulance for an emergency transport for over three hours after she was discovered to be moribund and in severe distress on November 4th. Notably, medical records indicate that

some of this delay was caused by nursing staff waiting to call 911 until they reached a gatekeeper—first, the physician on call (who did not answer) and then other Wexford supervisors—before they called 911.

There is ample circumstantial evidence (as noted above) that the Emergency Room Visit Reduction Program more likely than not did play a role in the inadequacy of Ms. Neal's medical treatment.

Wexford's emergency room reduction efforts focused on ER transport numbers only without regard or evaluation of individual cases of patient care. Practitioners were praised for low ER numbers and were criticized for high ER numbers. Providers were afraid to call for an emergency transport for fear of getting negative performance reviews. As we can see from Dr. Afre's 2013 performance review, he was evaluated in the "cost-effectiveness" category on the number of ER runs he prevented by treating patients in the infirmary, without also being evaluated on the quality of care he provided in the infirmary. *WEXDISC 1780.* Both nurses and practitioners were required to call a gatekeeper before sending a patient to the ER, and did so even when the patient was unresponsive and clearly in need of immediate transport. All of these factors were a powerful incentive to habitually not send patients to the ER and instead "wait and see." It is my opinion that this happened in Ms. Neal's case. I believe that had Wexford's concert ER reduction efforts, including the Emergency Room Visit Reduction Program, never existed, Ms. Neal would more likely than not have been sent to the hospital well before she expired on November 4th.

**Conclusions**

1.      Prior to September of 2011, there was a program in place to evaluate whether ER runs were necessary. This program showed that only 2% of ER runs were inappropriate. Based on my experience both as a correctional physician and an ER physician, this rate of inappropriate ER runs means there existed no systemic problem with the number of emergency transports in the Baltimore detention facilities. Therefore, there was no need for a formal program like the Emergency Room Visit Reduction Program, or any of the other efforts the materials I reviewed showed Wexford took to reduce ER trips. Any efforts to reduce the number even further than 2% created a substantial risk of sacrificing patient care to achieve financial goals. In fact, the number of 2 % may have been too low, indicating that too few ER referrals were being made.

2.      Wexford's ER reduction initiative, including its Baltimore Emergency Room Visit Reduction Program, was not a CQI program. It did not arise out of the standing CQI committee, nor was it evaluated after its inception in CQI meetings. It evaluated no individual patient cases to determine if medical care was appropriate, or whether it was resulting in negative patient outcomes, as it would have done had it been a CQI program. Once ER runs were in fact reduced,

no effort was made to find out if any of the ER reduction harmed patients. No meaningful education was done as a CQI program would have required. If it were a CQI program, it would have had these hallmarks.

3.      Wexford initiative was instead a UM program that was designed to reduce the number of ER visits without regard for the consequences to patients' health. The impetus at its inception was the fact that Wexford was responsible for the costs of all emergency services. And the initiative continued as Wexford routinely exceeded its budgeted costs for healthcare services and was forced to narrow its expected profit margin from the contract. After its inception, the program only monitored ER runs and hospital admission rates (and probably emergency costs), and did not evaluate whether patient outcomes were improving or declining as a result.  A gatekeeper system was set up, which is the hallmark of a UM program and this was mandated by formal changes in July of 2012 to the Wexford UM policies.  Practitioners were praised for ordering few emergency transfers and criticized for ordering too many.  Nurses were afraid to call for an ambulance for fear of getting negative performance reviews.  Administrators praised the program's success even when the reduction in ER runs was clearly medically inappropriate, such as no ER runs for 14 days in a region with a substantial patient population. Administrators also praised the program's success even when patients who obviously should have been sent to the emergency room died. *WEXDISC 33573-75.*

4.      Wexford's ER reduction initiative was only one aspect of a larger takeover of CQI by UM.  Quality of patient care in general was de-emphasized below considerations of the financial benefit of medical decisions.

5.      The initiative more likely than not resulted in medical harm to patients. Even though Wexford made no effort to track individual patient outcomes related to the ER reduction initiative, we can see significant evidence that the focus on preventing ER runs caused serious medical harm and death. If only 2% of all ER runs prior to the program were medically inappropriate, and the program reduced total ER runs by 10%, and in many instances far more than that, the program almost certainly prevented many medically necessary ER transfers.  As discussed above, Director of Operations McKee raised concerns about the excess number of deaths after the program commenced; the rate of deaths increased substantially in the two years after Wexford took over, which would have been a red flag; and Wexford's CQIs and other internal communications reflect concerns that the program was creating unacceptable delays and denials of care. In addition, I have had the opportunity to review the report of Dr. Ryan Herrington, who conducted a case review of a number of individual cases. He identifies more than a dozen specific cases in which patients were not sent in a timely manner to the ER, in violation of the standard of care, result in catastrophic patient outcomes including death. He also identifies a pattern and practice of failing to provide adequate care to patients requiring offsite care that is entirely consistent with my opinions.

6.      These negative outcomes are entirely predictable. The policies and practices implemented by Wexford—merging CQI into UM, putting in place a policy requiring medical professionals to get permission from a physician gatekeeper before sending patients to the ER, and implement a concerted initiative to reduce ER runs across Maryland facilities with a particular emphasis on Baltimore Pretrial facilities—are problematic on their face, and outside the bounds of what is considered acceptable practice in correctional healthcare. Based on my experience, Wexford would have been fully aware of the likely outcomes of these policies and practices, and its failure to meaningfully analyze the outcomes of the programs is an indication that it knew its findings would be undesirable. The records and testimony I reviewed contain ample indications that Wexford's senior leaders, from its Directors of Operations and Utilization Management overseeing the contract, as well as more senior officials at its headquarters, were well aware of the policies in place. Despite knowledge of deaths and death reviews, CQIs and CAPs full of warning signs, the policies continued.

7.      Fatima Neal clearly should have been sent emergently to the hospital before she was. This should have been done on November 1st when she had her initial symptoms, November 2nd or 3rd as she deteriorated clinically or even November 4th when she became moribund. But even then, the transfer was delayed until medical personnel at the scene could contact the on-call physician to get approval for the ambulance call. In my opinion, this failure to utilize medically necessary emergency services at any point between November 1 and November 4 was a result of habits and attitudes generated by the Emergency Room Visit Reduction Program.  If Ms. Neal had had the same presentation in 2011 before the program commenced instead of 2012, she much more likely would have been sent to the ER and more likely would have survived.

My opinions are expressed to a reasonable degree of medical and professional certainty. I reserve the right to alter my opinions or form additional opinions in this case based on disclosure of further information or documents.

Please contact me if you have any further questions.

Sincerely,

Jeffrey E. Keller MD, FACEP, FACCP

21

Jeffrey E. Keller MD FACEP



# Curriculum Vitae, Jeffrey E Keller, MD, FACEP, FACCP

## Current Employment

Medical Director and CEO of Badger Correctional Medicine, a jail medicine company providing medical and mental health services to inmates incarcerated in Idaho jails and juvenile facilities.

Medical Director of the Bonneville County (Idaho) Sheriff's office

Medical Director Bonneville County (Idaho) Search and Rescue

Board Member, American College of Correctional Physicians

MedPageToday Editorial Board

Idaho COVID-19 Vaccine Advisory Committee

Legal Expert Witness.  I have served as an expert witness in many court cases, both for plaintiffs and defendants.

Consulting.  My current and former consulting clients include national, regional, state and county entities.  (a detailed list of consultations is available upon request).

## Past Employment

Chief Medical Officer of Centurion LLC from 2013-2018.  As Chief Medical Officer, I supervised medical services for prison inmates in Florida, Massachusetts, Tennessee, Minnesota, Mississippi, New Mexico, Vermont and New Hampshire.

Emergency Medicine Physician with 22 years of experience at a Level II Trauma Center, Eastern Idaho Regional Medical Center, Idaho Falls, Idaho

Medical Director of the Ada County Jail, a 1200 bed facility in Boise, Idaho from 2009-2013

Founded Air Idaho Rescue, a successful air ambulance service

Medical Director of the Idaho Falls Paramedics for 25 years

Medical Director of several volunteer rural ambulance services

## Certifications

Current Medical Licenses: Idaho, Michigan, Tennessee, Mississippi, Florida, New Mexico, Minnesota and Arizona

Board Certified in Emergency Medicine through 2028

Fellow, American College of Emergency Physicians (FACEP)

Fellow, American College of Correctional Physicians (FACCP)

Certified Correctional Health Professional-Physician (CCHP-P)

## Memberships

American College of Emergency Physicians

American College of Correctional Physicians

Idaho Medical Association

Bonneville County (Idaho) Medical Association

American Medical Association

## Education

Brigham Young University 1974-1981.  BS Zoology
*Graduated Summa Cum Laude and with Highest Honors*

University of Utah Medical School 1981-1985

Emergency Medicine Residency, Akron City Hospital, Akron, Ohio 1985-1988
*Chief Resident 1987-1988*

**Publications** I have published extensively in each of the following publications (detailed list of published articles available by request)

### *Blogs*

**JailMedicine** (www.jailmedicine.com/).  I began my personal blog, JailMedicine, in 2012, in order to discuss all aspects of medicine practiced in jails, prisons and juvenile detention facilities.  To date, I have published over 200 articles and have had over two million readers.

**MedPage Today: Doing Time: HealthCare Behind Bars
(https://www.medpagetoday.com/blogs/doing-time/71759)**

**CorrectionsOne.com** (https://www.correctionsone.com/writers/columnists/jeff-keller/)

**Corrections.com**
(http://www.corrections.com/news/result?keyword=&from=06%2F12%2F2000&to=06%2F12%2F2040&name[id]=132)

### *Print publications*

**CorrectCare—a quarterly publication of The National Commission on Correctional Health Care**.

**CorrDocs--the Newsletter of the Society of Correctional Physicians**

**Dose:  A Publication of Correct Rx Pharmacy Services, Inc.**

**Bring 'em All:  Chaos.  Care. Stories from Medicine's Front Line** by Eugene Richards.

## National Lectures and Presentations I have given many lectures and educational presentations at the following national conventions (detailed list of presentations available upon request)

**The National Commission on Correctional Health Care National conference.**

**The American Correctional Association National Conference**

**Essentials of Correctional Medicine National conference**

**American College of Correctional Physicians National Conference**

**Maricopa County (Arizona) Correctional Conference**

**Idaho Peace Officer Standards and Training (POST)**

**Idaho Sheriff's Association Conferences**

**Utah Sheriff's Association Conference**

**Oregon Department of Corrections Medical Conference**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SHARON BOST, in her individual capacity and as Personal Representative of the ESTATE OF FATIMA NEAL, | ) ) ) ) ) | |
| Plaintiff, | ) | Case No. 1:15-cv-03278-ELH |
| v. | ) ) | Judge Ellen L. Hollander |
| WEXFORD HEALTH SOURCES, INC., *et al.*, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

### PDECLARATION OF DR. JEFFREY E. KELLER, M.D.

I, Dr. Jeffrey E. Keller, hereby declare as follows:

1.      I have been retained by Plaintiff in this matter to give expert opinion testimony.

2.      Attached to this declaration as Exhibits A and B are true and accurate copy of my reports, which contains opinions I offer in this case. The contents of these reports are true and accurate to the best of my knowledge and belief, and I hold the opinions stated within the reports to a reasonable degree of professional certainty. These reports contains a list of exhibits I relied upon to form my opinions.

3.      My qualifications for rendering opinions in this case are summarized in my report and my CV, which is attached to this declaration as Exhibit C. My CV is true and accurate as of the date of my report in this case to the best of my knowledge and belief.

4.    If called to trial, I will testify in a manner consistent with the contents of these documents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

 10/26/2021                                                    /s/ Jeffrey E. Keller____
Date                                                          Dr. Jeffrey E. Keller

2