IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHARON BOST, as Personal
Representative of the ESTATE OF
FATIMA NEAL,
　　　*Plaintiff*,

v.

WEXFORD HEALTH SOURCES, INC.,
　　　*Defendant*.

Civil Action No. ELH-15-3278

**MEMORANDUM OPINION**

This long-running civil rights case is rooted in the tragic death of 42-year-old Fatima Neal

on November 4, 2012, while she was in custody at the Baltimore City Detention Center

("BCDC").[1] Ms. Neal suffered an intracerebral hemorrhage, commonly known as a stroke. ECF

56, ¶¶ 63-152. She became quite ill in the early morning hours of November 1, 2012. In the

ensuing days, her symptoms persisted and worsened. Nevertheless, defendant Wexford Health

Sources, Inc. ("Wexford"), the medical provider at BCDC, failed to send Ms. Neal to a hospital

emergency room until November 4, 2012. By then, it was too late to save Ms. Neal. As a result,

plaintiff Sharon Bost, the mother of Ms. Neal, filed suit in her individual capacity and as Personal

Representative of the Estate of Fatima Neal, naming numerous defendants and asserting multiple

claims. ECF 1.

In a First Amended Complaint (ECF 56), Ms. Bost advanced a host of claims against

multiple defendants: the State of Maryland; eight correctional employees of the State who held

---

[1] Ms. Neal also used the name "Tammy Faller" and several of the relevant exhibits refer to
her as such. *See*, *e.g.*, ECF 550-4 at 5; ECF 559-24 at 27 (Tr.at 100). As discussed, *infra*, it is
not entirely clear whether Ms. Neal was a pretrial detainee or a prisoner.

varying positions (collectively, the "Custody Defendants"); Wexford; nine Wexford health care employees (the "Medical Defendants"); BCDC; and 50 "Doe Defendants," some of whom were correctional employees and some of whom worked for Wexford. In particular, Ms. Bost lodged a claim pursuant to 42 U.S.C. § 1983, alleging that Ms. Neal was denied constitutionally adequate medical care, in violation of her rights under the Eighth and/or Fourteenth Amendment to the Constitution (First Claim);[2] a violation of Article 24 of the Maryland Declaration of Rights (Third Claim); medical malpractice (Fourth Claim); negligence (Fifth Claim); intentional infliction of emotional distress (Sixth Claim); wrongful death (Seventh Claim); respondeat superior (Eighth Claim); and indemnification (Ninth Claim).

The Second Claim (the "*Monell* Claim"), asserted only against Wexford, arises under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 650 (1978). Bost alleges *Monell* liability on three grounds: (1) Wexford had an official policy to deny or delay sending inmates to off-site facilities to receive needed emergency care; (2) Wexford had a widespread pattern, practice and custom of the same; and (3) Wexford failed to train its medical staff to send patients off-site to receive emergency care, both generally and also without the need for prior approval. *Id.* For the reasons set forth in my Memorandum Opinion (ECF 159) and Order (160) of May 8, 2017, the *Monell* Claim was bifurcated, pending resolution of the other claims in the case.

This Memorandum Opinion does not address the claim of constitutionally inadequate medical care provided to Ms. Neal, or the claim of medical malpractice under Maryland law, or any of the related claims; those claims have all been resolved. The *Monell* Claim is the only remaining claim.

---

[2] Plaintiff identifies numbered claims for relief, rather than counts.

In particular, on August 31, 2016, the Court dismissed Bost's claims against the State, BCDC, and the Custody Defendants, in their official capacities, based on Eleventh Amendment immunity. ECF 89. After discovery, the Custody Defendants, in their individual capacities, as well as the Medical Defendants and Wexford, moved for summary judgment. ECF 212 (Custody Defendants); ECF 213 (Medical Defendants and Wexford). A deluge of filings followed, exceeding 7,200 pages. *See* ECF 212; ECF 213; ECF 214; ECF 225; ECF 228; ECF 233; ECF 235; ECF 241; ECF 245.

By Memorandum Opinion (ECF 430) and Order (ECF 431) of July 23, 2018, I granted summary judgment in favor of all Custody Defendants; defendant Oby Atta, C.R.N.P.; and the twenty-five unnamed medical care providers. I also granted summary judgment in favor of the Medical Defendants as to the claims of intentional infliction of emotional distress and wrongful death predicated on intentional infliction of emotional distress. But, as to Medical Defendants Anike Ajayi, Elizabeth Obadina, Ebere Ohaneje, Najma Jamal, Karen McNulty, Andria Wiggins, Dr. Getachew Afre, and Dr. Jocelyn El-Sayed, I denied summary judgment as to the deliberate indifference claim under the Eighth Amendment, the Fourteenth Amendment, and Article 24 of the Maryland Declaration of Rights; as to the claim of medical malpractice; and as to the claim of wrongful death predicated on deliberate indifference and/or medical malpractice. And, with respect to Wexford, I denied summary judgment as to liability predicated on respondeat superior, but only under Maryland law.

Accordingly, the claims against the Medical Defendants were set for trial, which was to begin on December 3, 2018. ECF 435. However, on November 6, 2018, Bost and the Medical Defendants entered into a settlement agreement that resolved all but the *Monell* Claim. ECF 443; ECF 444.

Thereafter, on January 17, 2019, counsel advised the Court that the parties required "at least six months of additional fact discovery" as to the *Monell* claim. ECF 446 ¶ 5. The parties later sought a discovery deadline of May 30, 2020. *See* ECF 470 (joint status report of July 31, 2019). By Order of February 1, 2019 (ECF 453), the parties were directed to commence written discovery. *See also* ECF 471. And, in a Scheduling Order of August 7, 2019 (ECF 471), I set a discovery deadline of March 27, 2020.

A hotly contested and extensive period of discovery followed, in which the parties litigated several disputes. ECF 477; ECF 491; ECF 519. They were addressed initially by Magistrate Judge A. David Copperthite. ECF 480; ECF 502; ECF 528. Plaintiff appealed two of Judge Copperthite's rulings (ECF 482; ECF 503), which I subsequently denied by Memorandum Opinion (ECF 499) and Order (ECF 500) of April 15, 2020, and by Order of June 15, 2020. ECF 507.

Discovery eventually closed on January 15, 2021, well past the Court's initial deadline. ECF 517. And, by Memorandum Opinion (ECF 529) and Order (ECF 530) of April 5, 2021, I determined that the *Monell* Claim could proceed to the extent it is lodged by Bost in her capacity as the Personal Representative of the Estate of Fatima Neal.

Now pending is Wexford's motion for summary judgment as to the *Monell* Claim. ECF 536. The motion is supported by a memorandum (ECF 536-2) (collectively, the "Motion") and eleven exhibits. Bost opposes the Motion (ECF 558), accompanied by more than 150 exhibits. Wexford has replied (ECF 564), with an additional nine exhibits. And, Bost has filed a surreply. ECF 569. In sum, the parties have submitted more than 11,000 pages of documents.[3]

The Court held a Motion hearing that consumed three days: August 5, 2022, August 8,

---

[3] There is occasional duplication of exhibits. *See*, *e.g.*, ECF 537 (Report of Ryan Keller, M.D.); ECF 558-50 (same). I generally do not cite to duplicate versions of the relevant exhibits.

2022, and August 10, 2022.[4]  Vigorous argument was presented as to multiple issues. For the reasons that follow, I shall deny the Motion.

## I.     Factual Background[5]

The parties are familiar with the circumstances surrounding Ms. Neal's tragic death; the relevant facts have been recounted at length in several prior opinions. These include the Memorandum Opinion of May 8, 2017 (ECF 159); the Memorandum Opinion of July 23, 2018 (ECF 430); the Memorandum Opinion of April 15, 2020 (ECF 499); and the Memorandum Opinion of April 5, 2021 (ECF 529).

To the extent relevant, the facts recounted in the prior memoranda are incorporated here. Nevertheless, I shall provide a summary of the factual background, for the purpose of contextualizing the parties' disputes.

## A.

BCDC is a State correctional facility located in Baltimore City, operated by the Maryland Department of Public Safety and Correctional Services ("DPSCS"). *See* Md. Code (2018 Repl. Vol.), §§ 5-401(a), (b) of the Correctional Services Article ("C.S.").   The facility consists of multiple buildings, one of which is the Women's Detention Center (the "WDC").  *See* ECF 212-7 (Foxwell Dep.) at 6 (Tr. at 30-31).[6]  As of July 2012, Wexford provided medical care to individuals

---

[4] At the request of plaintiff's counsel, they appeared from Chicago via Zoom.  There is no transcript of the Motion hearings.  To the extent necessary, I have relied on my notes from the hearings.

[5] Throughout the opinion, I cite to the electronic pagination.   But, the electronic pagination does not always correspond to the page numbers that appear on the parties' submissions.

[6] Ricky Foxwell was, at the relevant time, the Assistant Warden of BCDC.  His deposition testimony was submitted as an exhibit in connection with the Custody Defendants' summary judgment motion.  ECF 212; ECF 212-7.  To my knowledge, the exhibit was not resubmitted with the Motion.  But, in accordance with Fed. R. Evid. 201, the Court may "properly take judicial

within the custody of the DPSCS, pursuant to a contract with the State, discussed *infra*. *See* ECF 559-63 at 3-24.

In November 2012, Anike Ajayi, Elizabeth Obadina, Ebere Ohaneje, Najma Jamal, and Karen McNulty, all registered nurses ("R.N."), were employed by Wexford and worked at BCDC. *See* ECF 225-45 (Obadina Dep.) at 3-4 (Tr. at 9-11); ECF 558-24 (McNulty Dep.) at 20-21, 23 (Tr. at 72-74, 83-84); ECF 558-26 (Jamal Dep.) at 26 (Tr. at 337); ECF 558-27 (Ajayi Dep.) at 55-56 (Tr. at 213-14); ECF 559-66 at (Ohaneje Dep.) at 14 (Tr. at 47-49). Certified Registered Nurse Practitioner ("C.R.N.P.") Oby Atta; Physician Assistant ("P.A.") Andria Graham;[7] and physicians Getachew Afre, M.D. and Jocelyn El-Sayed, M.D. were also employed by Wexford and worked at BCDC. ECF 558-28 (Atta Dep.) at 6 (Tr. at 14-16); ECF 559-65 (Graham Dep.) at 15-16 (Tr. at 50, 53-55); ECF 558-23 (El-Sayed Dep.) at 8, 16 (Tr. at 22-23, 55); ECF 558-30 (Afre Dep.) at 2-3 (Tr. at 4-7).

Ms. Neal was an inmate at BCDC. She was arrested on September 7, 2012 (ECF 212-4 at 4, Trial Summary), and charged on September 8, 2012, with possession of marijuana, pursuant to Md. Code (2012 Repl. Vol., 2017 Supp.), § 5-601(a)(1) of the Criminal Law Article. *See* ECF 225-4 at 14 (Commitment Pending Hearing, dated September 8, 2012). As to the possession of marijuana charge, her bond was set at $5,000. *See* ECF 225-4 at 4. However, a Detainer was also lodged against Ms. Neal, ordering no bail as to "Bench Warrant No. 208149026." It was issued by the Circuit Court for Baltimore City after Ms. Neal failed to appear for a probation violation hearing on August 8, 2011. *See* ECF 212-4 at 2, 12 (Detainer of September 8, 2012); ECF 212-2

notice of its own records." *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990); *see Schultz v. Braga*, 290 F. Supp. 2d 637, 651 n. 8 (D. Md. 2003) (taking judicial notice of dockets in state proceedings).

[7] At the time relevant to the suit, Graham's last name was Wiggins. *See* ECF 558-19 at 2 (Tr. at 4).

(Declaration of Angel Maes, Assistant Manager, Clerk's Office, Circuit Court for Baltimore City) at 4, ¶ 7; ECF 212-3 at 2 (Circuit Court for Baltimore City Criminal Docket, listing "208149026" as the "Case Number" for Ms. Neal's criminal proceedings). The "CHARGE" was specified as "viol narc laws (FTA)." ECF 212-4; *id.* at 2 (capitals in original). Pursuant to the Detainer, Ms. Neal was held at the WDC. *Id.* at 8 (Commitment Pending Hearing, dated Sept. 10, 2012).

As to the possession of marijuana charge, Ms. Neal was found guilty on October 26, 2012, and sentenced to time served. *Id.* at 4 (Trial Summary). But, because of the Detainer (*id.* at 2), Ms. Neal was not released. *See* ECF 212-2 at 4, ¶ 6. With regard to Ms. Neal's alleged violation of probation, a hearing was set for November 5, 2012. ECF 212-2 at 4, ¶ 6. But, she died the day before the hearing.

The evidence indicates that at least one medical provider knew of Ms. Neal's impending release. According to a medical record "generated" on October 23, 2012, Ms. Neal had a "Provider Chronic Care Visit" with Sonja Wilson, M.D. ECF 550-4 at 2.[8] In relevant part, Dr. Wilson noted that Ms. Neal "is scheduled for Court on 11/05/12 and states that she will be released at that time." *Id.* (emphasis omitted). And, the medical record indicates that Ms. Neal intended to follow up "with her usual PMD upon release." *Id.* (emphasis omitted).

At the relevant time, Christina Sexton was Ms. Neal's cellmate at the WDC. At approximately 2:00 a.m. on November 1, 2012, Sexton awoke to Ms. Neal "walking into things" and repeatedly "saying something[']s really wrong get the officer," because "her head hurt so bad

---

[8] According to Dr. Wilson's note, Ms. Neal suffered "Chronic Problems," including "Hep C No Coma-chronic"; "Anemia d/t dietary iron deficiency"; "Drub Abuse Nec/nos"; and "Hiv Disease." ECF 550-4 at 2.

and she couldn't see." ECF 559-25 (Sexton letter) at 2.[9]  At that point, Sexton dressed Ms. Neal and "walked her to the door where [they] waited on medical." *Id.*

At approximately 2:30 a.m., Nurse Ajayi arrived at Ms. Neal's cell.  ECF 559-36 at 10.[10] Ajayi observed that Ms. Neal was in a "sitting position with a kind of white blanket wrapped around her" and appeared to be "weak." ECF 558-27 (Ajayi Dep.) at 11, 18 (Tr. at 36, 63).   She then helped Ms. Neal into a wheelchair and noticed that although Ms. Neal's "gait was normal" with "no one-sided weakness," her face "showed pain" and she was "frowning." *Id.* at 21, 23 (Tr. at 75, 85); *see also* ECF 550-6 at 2-3 (Medical record "generated by" Nurse Ajayi on November 1, 2012, at 2:51 a.m.).

Ajayi escorted Ms. Neal to the "triage area" of the WDC infirmary (the "Infirmary").  ECF 536-2 at 22; ECF 558 at 33; *see* ECF 559-37 (Medical record dated November 1, 2012); *see also* ECF 558-27 (Ajayi Dep.) at 8 (Tr. at 23); *id.* at 72 (Tr. at 281).  Ajayi then contacted P.A. Graham, who conducted an assessment of Ms. Neal and determined that she should be admitted to the Infirmary.  *Id.* at 24, 25-26, 27-28, 101-03 (Tr. at 86, 93-94).   Graham "generated" a medical record at 7:32 a.m. on November 1, 2012 (ECF 550-6 at 5-6), in which she observed, among other things, that Ms. Neal had complained of a headache.  Graham wrote, *id.* at 5: "PT reports that she took 2 tablest [sic] that she received for [sic] another inmates [sic] in the dorm which [sic] she thinks is motrin."

At 10:06 a.m., Dr. Afre "generated" a medical record with respect to Ms. Neal.  *Id.* at 8-10.  He indicated that he "tried to talk to the patient but her answer was only 'I don't know.'  She

---

[9] In a letter from Sexton to Bost dated November 16, 2012 (ECF 559-25), Ms. Sexton wrote that this incident occurred on the night of October 31, 2012.  In actuality, events began to unfold soon after midnight on November 1, 2012.

[10] Some exhibits refer to Ajayi as "Nurse Rachel."  ECF 559-25 at 2; ECF 559-36 at 10.

did not want to be disturbed and wanted to continue sleeping." ECF 550-6 at 8. Dr. Afre prescribed "motrin 600 mg" every "8 hrs . . . . for the headache" and stated that he would "continue to observe patient." *Id.* at 10. Dr. Afre did not order any medical tests for Ms. Neal.

During the days following Ms. Neal's admission to the Infirmary, several inmates who saw Ms. Neal became increasingly alarmed by her condition. *See*, *e.g.*, ECF 559-35 (Frye Decl.), ⁋ 8 ("One day, after she had been admitted to the infirmary, I saw Fatima struggling to walk. She was dragging one side of her body and appeared to have weakness on one side of her body."); ECF 559-38 (Blair Decl.) at 3, ⁋⁋ 6-7 (stating that Ms. Neal "looked like she had suffered from a stroke," as "[s]he was sluggish on one side of her body and was having trouble walking"); ECF 559-39 (Saracino Decl.) at 3, ⁋⁋ 7-8 (noting that Neal "had trouble seeing and understanding what was going on" and "drooled, urinated, and defecated on herself"); ECF 559-46 (Betch Decl.) at 2, ⁋⁋ 5-6 (declaring that "[o]ver the three to four days that Fatima was in the infirmary, she kept getting worse" and "was vomiting and she could not eat" and "started to say strange things that did not make sense, like she was confused and did not know where she was").

The inmates claimed that they advised Wexford employees that Ms. Neal needed assistance. *See*, *e.g.*, ECF 559-39 (Saracino Decl.) at 3, ⁋⁋ 10-11. Detainee Kieara Blair averred, ECF 559-38 at 3, ⁋ 8: "Every day, on every shift, I and many other women in the infirmary would tell nurses, guards, and other individuals that Fatima needed emergency medical help and needed to go to the hospital . . . . In addition, Fatima repeatedly told nurses and guards that she needed to go to the hospital." But, according to Blair, "[t]he staff ignored Fatima." *Id.* ⁋ 9.

During this time frame, a number of Wexford employees monitored plaintiff's condition and recorded their observations. For instance, Nurse Ohaneje "generated" a "HEALTH Assessment" at 12:30 a.m. on November 2, 2012, and described Ms. Neal as "stable no issue to

report." ECF 550-6 at 11-12. She also said, *id.* at 11-12: "No vision changes or headaches. No hearing loss"; "No dizziness, no emotional disturbances"; and "No vomiting, diarrhea, constipation, or [gastrointestinal] pain."

About twenty-four hours after Dr. Afre first saw Ms. Neal, he saw her again. Dr. Afre "generated" a medical record for Ms. Neal at 10:20 a.m. on November 2, 2012. *See* ECF 550-6 at 15-17. He wrote that Ms. Neal "was admitted by the PA because of severe headache" and that Ms. Neal told Dr. Afre that "she still has the headache." *Id.* at 15. Dr. Afre also indicated that Ms. Neal was "awake & alert, irritable but consolable, no acute distress." *Id.* Dr. Afre discontinued the prescription of "motrin 600 mg" and prescribed "Tylenol-codeine No. 3." *Id.* at 17.

Other Wexford employees who observed Ms. Neal during this time frame made observations similar to those of Dr. Afre. *See id.* at 13-14 (Nurse Obadina); *id.* at 18-19, 28-29 (Nurse Jamal); *id.* at 22-23 (Dr. El-Sayed). At 3:17 p.m. on November 3, 2012, Nurse McNulty completed a "HEALTH ASSESSMENT" for Ms. Neal. *Id.* at 24-26. She wrote, among other things, ECF 550-6 at 24 (boldface in original): "**Risk for injury R/T hx of Falls, Impaired Health Maintenance, Altered Nutritional Intake.**" She did not elaborate on the meaning of this statement. Additionally, McNulty wrote, *id.* at 24: "Comment for eyes: Pt c/o headache 10/10 this am and is ordered for ibuprofen and Tylenol #3 . . . Gastrointestinal: Comments: Pt is not eating, however, is drinking water with meds and recently drank some juice and ate some crackers . . . ." And, McNulty indicated that she had "continued MD orders" as to Ms. Neal's treatment. *Id.* at 25. McNulty did not offer any further details about the "MD orders."

Inmate Kelly Frye represented that she saw Ms. Neal at an unspecified time on November 4, 2012. ECF 559-27 (Frye letter) at 2-3; ECF 559-35 (Frye Decl.), ¶ 10. According to Frye, Ms. Neal was "lying in her own feces, drooling, and foaming at the mouth." ECF 559-35, ¶ 10. Frye

also averred that Ms. Neal "was incoherent and looked . . . as if she was in a vegetative state." ECF 559-35, ¶ 10. At that juncture, Frye claimed that she "banged on the nurses' station to get help for [Ms. Neal], but the nurse on duty was asleep with her feet propped up on a chair. Despite [Frye's] banging, [the nurse] did not get up right away." *Id.* ⁋ 11. According to Frye, "[w]hen the nurse finally got up, she acted as if she did not want to touch [Ms. Neal]. She then made multiple phone calls. The detainees in the infirmary were told to leave the room." *Id.* ⁋ 12. Other deposition testimony established that Nurse Obadina was working in the Infirmary at this time. *See* ECF 558-26 (Jamal Dep.) at 21 (Tr. at 18); ECF 558-28 (Atta Dep.) at 9, 39 (Tr. at 28, 149-50).

A document titled "Internal Investigative Unit Duty Officer's Checklist" stated: "Staff discovered [Ms. Neal] unresponsive at 0025 Hrs.", *i.e.*, 12:25 a.m. on November 4, 2012. ECF 559-28 at 13. The document does not identify the "staff" member who discovered Ms. Neal.

C.R.N.P. Atta worked with the "general population" of inmates on the fourth floor of BCDC. ECF 558-28 (Atta Dep.) at 17 (Tr. at 61). According to a medical record generated by Atta at 8:54 a.m. on the morning of November 4, 2012, she was "[c]alled by Nurse at about 3:22 am to evaluate a 42 year old AA Female with a history of . . . Headaches" who had been "found unresponsive." ECF 550-6 at 29. Atta wrote that Ms. Neal "was started on Oxygen therapy face mask." *Id.*

Nurse Obadina "generated" a medical record at 5:29 a.m. on November 4, 2022. It said, *id.* at 31:

> At 3.22am, [sic] pt was found to by [sic] inresponsive [sic] to stimuli. The Nurse Practitioner was called. pt [sic] was breathing, B/p 80/60 ... unresponsive [sic] to stimuli, with secretions from her mouth. oxygen [sic] SAT was 30%, heart rate was 120, and breathing was 12-14/min. she [sic] was started on oxygen therapy by face mask, sunctioed [sic], 911 activated.O2 [sic] increased to 90%. HR [sic] was 70. all [sic] efforts to get on call doctor failed. Dr. Tewede was contacted. he [sic] eventually responded. Charge nurse was informed. at [sic] 3.50am, [sic] pt stopped breathing. no [sic] pulse and CPR was started. HR [sic] was 50 . . . .

Nurse Jamal wrote and signed a document on November 4, 2012, at an unspecified time. ECF 233-4 at 28. She recounted that she "was called by c/o to help . . . a patient in dorm three." Jamal stated that she "placed $0_2$ on the patient." *Id.*

According to a memorandum authored by Sergeant ("Sgt.") Carolyn Murray, Atta as well as Nurses Obadina and Jamal attempted to contact the "On-Call doctor" but the doctor "never answered the call or called the nurse[s] back." ECF 559-45. The medical record created by Atta indicated that "Dr. Kulam" was the on call doctor. ECF 550-6 at 29.[11] Sgt. Murray wrote that because Dr. Kulam could not be reached, the "nursing staff" subsequently contacted the regional nursing manager, "who gave permission to send [Ms. Neal] out to the hospital (via ambulance— 911)." ECF 559-45; *see also* ECF 559-29 (Murray Deposition) at 12 (Tr.at 38-39); ECF 550-6 (medical records) at 31.

Medical records "generated" by Atta and Obadina indicated that a 911 crew arrived at the Infirmary at 3:53 a.m. on November 4, 2012, and left with Ms. Neal two minutes later, at 3:55 a.m. ECF 550-6 at 29, 31. Ms. Neal was transported to Johns Hopkins Hospital ("JHH"). *See* ECF 550-5 (Autopsy Report) at 2, 11. When Ms. Neal arrived at JHH, she had "[n]o pulse" and "[n]o respirations." ECF 558-57 (JHH medical record) at 4. The JHH medical record further noted, *id.* at 5: "Cardiopulmonary arrest with long down time." Ms. Neal was pronounced dead at 4:31 a.m. on November 4, 2012. *See* ECF 559-28 at 10.

Doctor Theodore King, Jr., the Assistant Medical Examiner for the Office of the Chief Medical Examiner for the State of Maryland, conducted a postmortem examination of Ms. Neal, and wrote an Autopsy Report as to his findings. *See* ECF 550-5. He concluded that the cause of

---

[11] Dr. Kulam's full name is actually Sabapathippillai Kulathungam. *See, e.g.*, ECF 558-13 at 7. But, at the hearing, counsel indicated that the doctor uses the surname of "Kulam."

Ms. Neal's death was "intracerebral hemorrhage (stroke) with complications."  ECF 550-5 at 11.

The Autopsy Report contained a "Pathologic Diagnosis", which stated, *inter alia, id.* at 10:

I. [I]ntracerebral hemorrhage with complications

    A. Admission to institution infirmary with complaints of headache (11/1/12)

    B. In infirmary with institutional personnel supervision and detainees who reported that she walked with her right side slumped and dragging her right leg since 11/2/12

    C. [R]eceived acetaminophen for headache, at 0900 hrs. and 2100 hrs. 11/3/12

    D. [A]dditional complaints of headache at 0200 hrs. 11/4/12

    E. "[F]oaming from the mouth" and unresponsive with no pulse 0225 hrs. 11/4/12

    F. Emergency medical personnel transport to local Maryland hospital

    G. Additional care and pronounced dead approximately 0431 hrs. 11/4/12

    H. [A]ccute hemorrhage of the left parietal white matter

    I. [S]econdary infarct of the left occipital, and temporal cortices . . . .

The Autopsy Report also included a "Neuropathology Report."  *See* ECF 550-5 at 7-9. It revealed a 3/8 inch hemorrhage on Ms. Neal's medial right frontal subgaleal scalp, and a 3/8 inch hemorrhage on her lateral right frontal subgaleal scalp.  *Id.* at 3. An "opening" was "noted in the left posterior parietal region" of the brain, "through which it [was] possible to identify an intracerebral hematoma."  *Id.* at 7.  Additionally, a "4.5 × 3.0 × 3.0 cm" hematoma was observed in the "white matter of the left parietal lobe."  *Id.* The "significant mass" of the second hematoma had caused "left uncal herniation."  *Id.* The report also noted an "[a]cute hemorrhagic infarct . . . in the left occipital lobe and mesial temporal lobe." *Id.* The ventricular system of the brain "appear[ed] collapsed."  *Id.*  The "midbrain show[ed] marked

compression on the left side and the aqueduct [was] collapsed." ECF 550-5 at 7. Additionally, there was swelling of the left cerebral hemisphere, causing asymmetry between the cerebral hemispheres. *Id.*; *see also* ECF 559-31 (Affidavit of Dr. King, dated July 24, 2017).

Plaintiff submitted reports from various expert witnesses, each of whom determined that Ms. Neal initially suffered a stroke on November 1, 2012. They dispute that Ms. Neal "suffered a single catastrophic terminal event on November 4, 2012 . . . ." ECF 559-42 (Dr. Pedelty Supplemental Report) at 2.

For instance, plaintiff offered the Expert Report of Laura Pedelty, M.D., Ph.D., a board-certified neurologist with subspecialty certifications in vascular neurology, neurosonology, and behavioral neurology. *See* ECF 559-33 (Pedelty Report) at 2. Doctor Pedelty observed, *id.* at 5*:* "Fatima came to medical attention on the night of October 31-November 1, complaining of . . . severe headache and impaired vision, and as having difficulty walking.[ ] This is consistent with the initial left parietal hematoma, resulting in right-sided weakness and difficulty seeing or attending to the right side" of her body. According to Dr. Pedelty, the Autopsy Report "is explained by a sequence of events starting with a hemorrhagic stroke of the left brain hemisphere, followed by brain swelling leading to blockage of blood vessels supplying structures in the back of the brain resulting in ischemic strokes, and by ongoing swelling ultimately leading to brain herniation and death." ECF 559-33 at 4-5.

At her deposition, Dr. Pedelty confirmed that patients with "hemorrhagic strokes of the kind that Fatima Neal had" typically "have a good chance of survival." ECF 558-40 (Pedelty Dep.) at 43 (Tr. at 163). In Dr. Pedelty's view, Ms. Neal's "stroke itself was not fatal," but rather was "complicated . . . by a sequence of events leading to probable irreversible damage." *Id.* Further, she affirmed that if there had been "early intervention," it was "more likely than not" that

Ms. Neal would have survived. ECF 558-40 at 43 (Tr. at 163-64). Dr. Pedelty also indicated that if Ms. Neal had been "properly diagnosed and sent to Johns Hopkins University rather than continuing three days without treatment," the "possible outcomes" would have ranged from "[c]omplete recovery"; "recovery with some residual deficit, some weakness, some limping, some cognitive deficit"; and "recovery requiring assistance or unable to walk." *Id.* (Tr. at 164).

Peter Pytel, M.D. is a board-certified neuropathologist. ECF 558-52 (Pytel Report) at 3. He reviewed the findings set forth in the Autoposy Report and examined "virtual microscopy slides of the two histologic preparations available from the decedent's brain." *Id.*; *see* ECF 558-58. These slides revealed "scattered macrophages," which "typically appear at the site of an infarct after 48 hours." ECF 558-52 at 3. Further, Dr. Pytel noted that "the available clinical information also suggests that the decedent suffered from asymmetric neurologic deficits that can potentially be localized to the left side of the brain starting on 11/1/12 or 11/2/12." *Id.* Thus, he determined, *id.*: "This history and the early histologic changes including macrophage infiltration would both be consistent with or suggest that the decedent developed ischemic changes before the events of 11/4/12."

In addition, Dr. Pytel maintained, ECF 558-52 at 3: "A possible scenario besides that outlined by Dr. Pedelty would be one in which the decedent started to develop ischemic infarct(s) with possible hemorrhagic changes on 11/1/12," which would have presented as a stroke. And, he wrote, *id.* at 3-4: "A large intracerebral hemorrhage superimposed on such [ ] background of infraction could subsequently have led to the acute deterioration of the decedent's health status on 11/4/2012."

Doctor Pedelty provided a supplemental report in which she addressed Dr. Pytel's findings. ECF 559-42 (Pedelty Supp. Report) at 2-3. She reiterated that the autopsy report, as well as the

reported symptoms, suggest "a primary stroke (intracerebral bleed) occurring on or about Nov. 1, with decompensation due to edema (swelling) leading to secondary strokes, further swelling, and ultimately fatal brain hernination on Nov. 4." ECF 559-42 at 2. She added that the reviews conducted by Dr. King and Dr. Pytel confirmed that "an initial primary stroke" occurred "on or about Nov. 1." *Id.* at 2-3.

Further, Dr. Pedelty claimed that Ms. Neal might have survived her stroke if it had been "appropriately diagnosed and treated." *Id.* at 2. She opined that, "with appropriate diagnosis and treatment," there "would have [been] a range of possible outcomes short of death, including recovery with functional independence . . . ." *Id.* And, she explained that prompt neurological evaluation and imaging (CT or MRI) would have diagnosed the initial stroke, whether ischemic or hemorrhagic." *Id.*

Dr. Pedelty underscored that "early diagnosis and treatment are important, and thus medical providers are trained to be alert to signs and symptoms of stroke, and to err on the side of caution in seeking urgent neurological evaluation and neuroimaging." *Id.* To that end, Dr. Pedelty stated: "Diagnosis of primary intracerebral hematoma would be treated by identification and reversal of bleeding disorders, support of breathing and blood circulation, and management of medical issues that could worsen outcome." *Id.*

Further, Dr. Pedelty pointed to "[a] widely-used algorithm for predicting outcomes following intracerebral hemorrhage." *Id.* (footnote omitted). According to Dr. Pedelty, the algorithm "suggests that in Ms. Neal's case, given her age of <70, hematoma volume of <30cc (using the ABC/2 method of calculating volume: 4.5 cm × 3 cm × 3 cm diameters/2 = 20.25cc), lobar (rather than deep) bleed location, estimated Glasgow coma score >9, and absence of prior cognitive impairment, she would have been expected to have an 81–100% probability of functional

independence at 90 days. Even allowing for a worse Glasgow Coma score, [the] predicted likelihood of functional independence at 90 days is 61–80%." ECF 559-42 at 2.

Moreover, Dr. Pedelty explained that an "[a]cute ischemic stroke," of the kind that Dr. Pytel indicated Ms. Neal may have experienced, also "has a high likelihood of positive outcomes," at least where diagnosed and treated early. *Id.* She opined that such a neurological event can "be treated with tissue plasminogen activator . . . to open the occluded (blocked) arteries." *Id.*

Plaintiff also obtained an expert report from Nathaniel R. Evans, II, M.D., a board-certified internist and certified Correctional Health Care Provider. ECF 559-32. Dr. Evans opined, *id.* at 6-7: "By all clinical indications (sudden onset severe headache, drowsiness, weakness, confusion), a first stroke—a significant, serious neurological event—occurred no later than 11/01/2012 . . . . and the progressive effect of the bleed was to cause death of other parts of her brain (left occipital and left parietal) leading to her death." He also said that a "severe sudden onset of headache, . . . associated with weakness and confusion should signal [to] a medical provider that the patient may have an intracranial bleed and may need to be evaluated with brain imaging . . . . If a stroke or neurological crisis cannot be ruled out, the standard of care requires prompt . . . transfer to a hospital for evaluation." *Id.* at 4.

Wexford did not submit an expert report pertaining to the nature of Ms. Neal's medical occurrence. But, Bost submitted a report authored by defendant's expert witness, Neil Schwartz, M.D., Ph.D., as well as Dr. Schwartz's deposition testimony. ECF 558-51 (Schwartz Report); ECF 558-33 (Schwartz Dep.). He is a board-certified physician with specialties in neurology and vascular neurology. ECF 558-51 at 2.

Dr. Schwartz opined that "Ms. Neal's ultimate cause of death was herniation related to an intracerebral hemorrhage (ICH)." *Id.* at 4. In his view, "the initial timing of the onset of her

stroke(s) is not clear." ECF 558-51 at 4. But, in light of Dr. Pytel's observations he opined that "it is likely that there was brain injury occurring in the days prior to her demise." *Id.*; *see* ECF 558-33 at 10 (Tr. at 32-33) (testifying to the same effect).

**B.**

From June 2, 2005, to June 30, 2012, Wexford had a contract with DPSCS to provide utilization management services. ECF 559-10 (the "UM Contract") at 3. Another company, "Corizon," provided direct medical care to individuals within the custody of DPSCS.[12] Corizon and Wexford enjoyed a "cordial relationship," according to Christy Somner, Corizon's "state director of nursing" from 2010 to mid 2012. ECF 558-18 (Somner Dep.) at 3 (Tr. at 5), *id.* at 11 (Tr. at 37).

Jeffrey Keller, M.D., one of plaintiff's expert witnesses, provided an overview of utilization management services. ECF 537 ("Keller Report") at 6; *see* ECF 558-50 (same). He wrote, ECF 537 at 6: "Utilization Management (UM) is a program designed to reduce costs . . . usually by targeting unnecessary medical expenditures." According to Dr. Keller, "UM commonly develops medical formularies, protocols, guidelines, and policies and then monitors adherence to those written standards." *Id.* It also "typically requires certain high-cost procedures, test or medications to be approved in advance." *Id.*

Pursuant to Wexford's UM Contract, it was "responsible for utilization management for all clinical services" provided to inmates within the custody of DPSCS. ECF 559-10 at 144, § 2.2.5.1.1. For instance, the UM Contract required Wexford to "provide a pre-certification review

---

[12] The parties refer to "Corizon," without further specificity. *See*, *e.g.*, ECF 536-2 at 19; ECF 558 at 9. Corizon Health, Inc. is a "provider of correctional healthcare . . . ." *See About Corizon Health*, CORIZON HEALTH, http://www.corizonhealth.com/index.php/S=0/About-Corizon/Who-We-Are-History-and-Today (last accessed July 22, 2022).

program," pursuant to which Wexford was obligated to "review within 24 hours of admission all emergency room admissions and all infirmary admissions, which were not pre-certified, and make a determination if such admission was necessary." ECF 559-10 at 155-56, §§ 2.2.5.7.1, 2.2.5.7.4.

From approximately 2005 until 2012, Robert Smith, M.D. served as Wexford's "utilization management medical director," and had supervisory responsibility with respect to the UM Contract. *See* ECF 558-16 at 3 (Tr. at 7-8). He confirmed that, consistent with the terms of the UM Contract, Wexford "review[ed] requests for offsite care"; "review[ed] retrospectively patients who had been referred to the emergency room"; and "analyze[d] data that [Wexford] had received in order to . . . generate reports required by the contract." *Id.* at 6 (Tr. at 18). Through this work, Wexford was given access to relevant patient information, including "medical records . . . needed to make a determination about the necessity of ER runs." *Id.* at 19 (Tr. at 70-71).

Based on information made available to Wexford, defendant generated monthly reports that tracked the number of "ER Preventable Cases" in Maryland penal institutions. *See* ECF 559-20 (the "Preventable ER Reports"). The reports provided summary statistics regarding the number of "ER Cases" that occurred within a given month for each DPSCS institution and classified each case as either "Non Preventable" or "Preventable." *See*, *e.g.*, *id.* at 7. Plaintiff has submitted copies of many of the Preventable ER Reports for the months between January 2007 and November 2017.[13]

Given the information set forth in the Preventable ER Reports, defendant calculated the total number of ER referrals from DPSCS facilities that occurred in the years between 2010 and

---

[13] ECF 559-20 does not contain a report for February 2011, among other months. However, with the exception of December 2014, the number of ER trips in the months for which plaintiff did not submit a Preventable ER Report can be found elsewhere in plaintiff's filings. *See*, *e.g.*, ECF 559-77 at 107 (stating number of ER referrals across all DPSCS facilities in February 2011).

2016, which are set forth.  *See* ECF 579.[14]

| Year | Total Number of ER Cases |
|---|---|
| 2010 | 1264 |
| 2011 | 1256 |
| 2012 | 964 |
| 2013 | 884 |
| 2014 | 942+ |
| 2015 | 1209 |
| 2016 | 1122 |
| **Total** | **7641+** |

Plaintiff does not dispute the calculations.  But, plaintiff maintains that some of the ER referrals were made by correctional staff, not medical staff, and did not involve decisions made at a penal health center.  For example, plaintiff argued at the Motion hearing that an assault victim might be sent to the ER by correctional staff, without Wexford's involvement.  However, no evidence was presented to buttress the assertion.

Bost submitted a document titled "Maryland Department of Public Safety and Correctional Services Utilization Management Policies and Procedures."  *See* ECF 559-7 (the "Maryland UM Policy") at 3.  The top of the first page of the document states: "Wexford Health Sources Incorporated."  *Id.*  And, at the bottom of the title page, in smaller font, it states: "Wexford Health Sources, Inc. Utilization Management Department."  *Id.*  It also includes Wexford's address, phone numbers, and "Fax" number.  *Id.*  Further, the document contains various references to an approval date of May 16, 2005, and a revision date of June 11, 2009.  *See, e.g., id.* at 6, 8, 10, 11, 14, 15, 18, 19, 20, 22, 23.  During that time, Wexford had a contract with DPSCS to provide UM services.

The Maryland UM Policy included two provisions of import here: "After Hours

---

[14] The exhibit was presented to the Court during the Motion hearing held on August 8, 2022.

Notification Of Emergency/Hospital Admissions" (ECF 559-7 at 6-7, the "After Hours Provision") and "Emergency/Hospitalization Notification Forms." *Id.* at 8-9 (the "Notification Provision").

The After Hours Provision was approved by Dr. Smith on May 16, 2005, and subsequently revised on June 11, 2009. *Id.* at 6.[15] It stated, *id.*: "After hours notification of Emergency Room visits prompts the Wexford Utilization Management Department to intervene and review specific cases for medical necessity and appropriateness in a timely manner. If the patient is admitted, the Wexford UM Department will initiate concurrent review . . . ." And, it set forth, in relevant part, the following after hours procedure, *Id.* at 6:

1. The Site Medical Director or Physician on call determines that transport to the emergency room/hospital is necessary.

2. The Site Medical Director or Designee places a call to the Wexford UM Department After Hours Voice Mail (877-939-2884).

In the Notification Provision, Wexford indicated that it "requires timely notifications of all emergent off-site care (ER/Hospitalization/Urgent Office/Urgent Procedures/Radiology)." *Id.* at 8. To that end, the Notification Provision specified a procedure for such notifications. *Id.* at 8-9. First, "[t]he site personnel must complete Emergency/Hospitalization Notification Form (FORM UM-002A) . . . AS SOON AS POSSIBLE but no later than the next business day." *Id.* at 8. The Notification Provision continued, *id.* (emphasis added):

The Site Medical Director or Designee will document the emergency event in the inmate's medical record (EPHR). Emergent and urgent requests are defined as those situations in which a service is needed immediately, or within 48 hours of the request, as the inmates [sic] health and well-being would be affected with a delay in care. *Urgent and emergent referrals are automatic approval as to not delay any care.* These are reviewed on a retrospective basis for quality improvement purposes.

---

[15] The term "after hours" is not defined by the Maryland UM Policy. Nor was the term defined by the Revised Provision, discussed *infra*.

A sample form, UM-002A, appears at ECF 559-7 at 25. It is titled "Emergency/Hospitalization Notification Form." Towards the bottom of the form, it states: "After Hours Notified." And, there is one box for "Yes" and one box for "No."

As noted, from 2005 to mid 2012, while Wexford provided UM services to the State, Corizon was the direct medical provider for DPSCS.[16] Since 2008, Sharon Baucom, M.D. served as the "director of clinical services and chief medical officer for [the] Maryland Department of Corrections." ECF 558-15 (Baucom Dep.), at 4 (Tr. at 8).[17] At that time, Dr. Baucom began to oversee Corizon's provision of medical care to DSPCS inmates and detainees. *See id.* (Tr. at 9).

Corizon utilized a process known as Continuous Quality Improvement ("CQI"). As Dr. Keller explained, CQI "is a process used in many industries to improve the quality of services the industry provides" and, "[i]n the medical field, . . . CQI is done to improve the quality of medical care provided to patients." ECF 537 at 5. CQI processes begin by "identifying one particular aspect of medical care that may be problematic and tracking performance over a period of time (usually one to three months)." *Id.* Then, the "data is analyzed, usually by a committee of medical professionals, to identify opportunities for improvement." *Id.* Once such opportunities are identified, "a thorough action plan [must] be promptly implemented, and the action plan's effectiveness [must] be closely tracked." *Id.* at 5-6. According to Dr. Keller, "[c]ost considerations must play a minor role" in CQI efforts, and "proper CQI initiatives may actually increase costs . . . ." *Id.* at 6.

Between 2011 and July 2012, Donna James worked as the "Regional CQI director" for

---

[16] The record does not reflect the date on which Corizon began providing medical care.

[17] In context, Dr. Baucom appeared to be referring to the Maryland Division of Correction. *See* C.S. § 2-201(1) (recognizing the Division of Correction as a unit within the Department of Public Safety and Correctional Services).

Corizon. ECF 558-22 (James Dep.) at 6 (Tr. at 3).[18] She affirmed that CQI is a "proactive process for identifying opportunities for improvement," with the goal of "providing [care] in the most efficient manner." ECF 558-22 at 10 (Tr. at 29). James agreed that "a critical step" in a "corrective action plan" or "CAP" is to "identify[ ]some changes, but [also] making sure that progress is actually made --." *Id.* at 25 (Tr. at 90); *see id.* at 24 (Tr. at 88).

Plaintiff also submitted the deposition testimony of several individuals who worked as Corizon officials when Corizon provided direct medical care on behalf of DPSCS. They included Christy Somner, the former "state director of nursing," and Asresahegn Getachew, M.D., Corizon's "regional medical director for Baltimore." ECF 558-32 (Getachew Dep.) at 3 (Tr. at 8); ECF 558-18 (Somner Dep.) at 3 (Tr. at 15).[19] Dr. Getachew confirmed that both Wexford and Corizon employees had the same access to "all the same data" relevant to the medical care provided to individuals within the custody of DPSCS. ECF 558-32 at 11 (Tr. at 38-40).

In addition, plaintiff submitted a document titled "Central region Baltimore Annual performance improvement report 2012 Wexford Health" (the "Annual Report"). ECF 558-5 at 2. The Annual Report does not reflect the date on which it was prepared. In the "Introduction" section, it states, in part, *id.* at 5: "The goal of the Wexford CQI program in Baltimore is to continuously monitor, evaluate, and improve quality of healthcare services to the Central region Baltimore Correctional system of Maryland DPSCS."

The Annual Report contains a section titled the "Emergency Room Visit Reduction Program." *Id.* at 45-53 (the "Initiative"); *see also* ECF 559-5 (same). The goal of the Initiative

---

[18] James clarified that "although [her] title was regional CQI director, [she was] actually doing CQI statewide on the medical side[.]" ECF 558-22 at 6 (Tr. at 4).

[19] As discussed, *infra*, these officials became Wexford employees when Wexford began providing medical care for DPSCS.

was "to reduce utilization of emergency offsite services by increasing onsite capability to address emergency situations." ECF 558-5 at 45. The Initiative provided that this goal would be achieved by "Identify[ing] the most common reasons for transfers to ERs for conditions that can be managed on site by modifying work-up and management by minor increase in site capability" and "Develop[ing] onsite management protocol for selected patients who can be managed on site." *Id.*

The purpose of the Initiative was to "Reduce risk to the public"; "Minimize resource use"; and "Maximize availability of security for onsite use." *Id.* at 45. It was deemed "Achievable" by way of a physician on site for "16 [hours] per day." *Id.* In addition, nursing supervisors would be on call "24 hours, seven days/week," with a "Fully staffed on site Infirmary," on call physicians from midnight to 8 a.m., and on site surgeons and orthopedists. *Id.* at 46. Another objective was an "urgent care center at each region." *Id.* at 53.

The Initiative provided that it would be operationalized in five phases. *Id.* at 45-47. The "**Planning**" phase was to be "Initiated in August [of 2011] and completed in September, 2011[.]" *Id.* at 45 (emphasis in original). The "**Preparation**" phase would occur in September 2011 (ECF 558-5 at 46), to be followed by the "**Implementation**" phase between October 2011 and November 2011. *Id.* at 47 (emphasis in original). The "**Consolidation**" phase was set for December 2011. *Id.* (emphasis in original). And, the "**Maintenance**" phase of the Initiative would begin in January 2012 and continue "Onward." *Id.* (emphasis in original).

According to the Initiative, the "First group of Disorders to be managed on site" were: "1. Seizure disorders"; "2. Orthopedics disorders", and "3. DVT/Cellulitis." *Id.* Notably, the Initiative also indicated that other disorders would be "select[ed] . . . through the process . . . ." *Id.* at 46.

The Initiative also indicates that during the "**Maintenance**" phase, information relevant to

ER runs caused by "Trauma" and "Neurology" would be collected. ECF 558-5 at 47, 48 (boldface in original). And, as to the "Maintenance" phase, the Initiative provided, *inter alia*: "Establish back up gate keeper on call for all ER Trips." *Id.* at 53 (boldface omitted).

Wexford denies that it either created or implemented the Initiative. ECF 559-21 (Wexford Answer to Interrogatories), ¶ 16. On the other hand, James indicated that "the ER initiative to reduce ER runs . . . came out of UM . . . ." ECF 558-22 (James Dep.) at 27 (Tr. at 99). And, as noted, from 2005 until June 30, 2012, Wexford provided UM services to DPSCS.

## C.

On July 8, 2011, DPSCS issued a "Request for Proposals," titled "Inmate Medical Health Care and Utilization Services." ECF 559-63 at 25-188 (the "RFP"). The RFP specified that the winning contractor would be responsible for "provid[ing] all primary medical services, staff, equipment . . . and supplies (other than onsite medications), as well as all onsite specialists, transportation services for hospitalization, and other secondary care." *Id.* at 58, § 3.1.1. Significantly, the chosen provider would be required to complete "utilization review and management of all care rendered on and offsite." *Id.* In return, the RFP indicated that DPSCS would pay a "Monthly Price," calculated by multiplying a fixed amount per prisoner by the average monthly prisoner population. *See id.* at 62-64, §§ 3.3.1-3.3.5.

Further, the RFP specified: "The Department must approve the policies and procedures of the Contractor pertaining to the delivery of services under the Contract prior to implementation." *Id.* at 77, § 3.15.1. The RFP specified that "Policies and Procedures shall include, but are not limited to, direction regarding . . . Emergency Care." *Id.* at 78-79 §§ 3.15.5.6-3.15.5.6(18). Moreover, it required "[d]raft Policies and Procedures manuals [to] be submitted to the DPSCS Contract Manager electronically no less than forty (40) days after Contract Commencement." *Id.*

at 77, § 3.15.1.1.  And, the "DPSCS Contract Manager" would have "up to ten (10) days to review the manuals and provide comments," after which the contractor would have five days to "notify the DPSCS Contract Manager . . . that the Final Policies and Procedures manuals are electronically available."  ECF 559-63 at 77, § 3.15.1.1.

According to the RFP, "Policies and procedures shall be reviewed and updated" by the contractor at least "once in every twelve (12) month period."  *Id.* at 78 §§ 3.15.5-3.15.5.1.  To that end, "[a] statement signed by the Contractor's Statewide Medical Director in Maryland confirming that such a review has been conducted, along with any revisions, shall be submitted to the Department Contract Manager and Medical Director by the scheduled review date."  *Id.* § 3.15.5.2.

Of import here, the RFP also indicated that the contractor's "Policies and Procedures must be consistent with Department and Procedures."  *Id.* at 79, § 3.15.6.1.  "Disputes about conflicts between Department and Contractor policies and procedures will be considered by the DPSCS Contract Manager."  *Id.* § 3.15.7.  However, "the DPSCS Contract Manager's decision on any matters of policy and/or procedure shall be considered final."  *Id.*

The RFP included a section titled "Emergency Medical Care."  *Id.* at 104-05, §§ 3.32.2-3.32.3.  Among other things, it specified that the contractor must "treat and stabilize persons requiring emergent or urgent care including Inmates, employees and visitors."  *Id.* at 104, § 3.32.1.  Significantly, the RFP also required the contractor to make "[e]very effort . . . to render appropriate care to Inmates *onsite* for emergency events, so long as the onsite efforts are not contrary to the health and well being of the Inmate."  *Id.* § 3.32.2 (emphasis added).[20]  Moreover, the contractor

---

[20] It seems clear that Ms. Neal should have been sent to the ER before November 4, 2012. However, as noted, issues of medical malpractice and inadequate medical care are not at issue here.  The question is whether Ms. Neal's medical care was the product of a Wexford policy to delay or deny emergency care, within the meaning of *Monell*.  Although plaintiff casts blame on

"shall have Physicians on call 24 hours per day, seven days per week." ECF 559-63, § 3.32.2.1.

In addition, the RFP included specifications for the scope of the contractor's "Utilization Review/Utilization Management (UM)" services. *Id.* at 145-54, §§ 3.69-3.72. Relevant here, the RFP states that the contractor is mandated to "[i]mplement a system of utilization management services consistent with the Department Utilization Manual" and "develop and present to the Department Medical Director a hardcopy of its Utilization Management (UM) Manual, with chapters that shall include . . . Emergency Care." *Id.* at 145, 147-48, §§ 3.69.1.1, 3.69.1.3 (13). And, under the terms of the RFP, the contractor would be required to "submit a UM report to the Department Medical Director no later than the tenth of the month following the month to which the report pertains." *Id.* at 159, § 3.73.1.6. Such reports were required to include, among other things, "[p]opulation profile by illness type, age and disability." *Id.* § 3.73.1.6(1).

Significantly, the RFP also provides guidance as to how the contractor "shall manage the process for Continuous Quality Improvement (CQI) . . . ." *Id.* at 154, § 3.72.1. The contractor "shall chair a Quarterly State-wide mutlti-Contractor CQI Committee meeting"; "supply reports for discussion at these meetings"; and "supply utilization management data specific to the individual Service Delivery Area and its Clinicians to the various Service Delivery Area Medical Directors." *Id.* §§ 3.72.3- 3.72.3.1. Further, the "Contractor's Regional Medical Directors" were responsible for "chair[ing] quarterly DPSCS-Multi-Disciplinary Continuous Quality Improvement Committee meeting/reviews in their Service Delivery Areas to monitor health services provided, collect, trend, and disseminate data, develop and monitor corrective action plans, and to facilitate communication between disciplines." *Id.* § 3.72.4.

---

Wexford for its effort to reduce ER trips, the provider was contractually obligated to render care on site, *when medically feasible*.

Wexford responded to the RFP on December 13, 2011. ECF 558-60 (the "Proposal"). Among other things, Wexford agreed, *id.* at 214: "If the DPSCS is invoiced by any municipal or governmental jurisdiction for ambulance or Medivac services in conjunction with any emergency response relating to the health of an Inmate, including trauma events, we agree to be responsible for the invoice." Further, Wexford "agree[d] to pay in-state ambulance transportation costs up to a maximum of $315,000 per Contract Period . . . ." *Id.* at 215.

Nicholas Little served as one of Wexford's Rule 30(b)(6) designees. ECF 558-31 (Little Dep.) at 4 (Tr. at 7-8). As a Wexford official, he helped to negotiate the terms of the Proposal. *Id.* at 5 (Tr. at 10-11).[21] Little confirmed that, with an exception not relevant here, under the terms offered, Wexford was obligated to bear the entirety of costs associated with "off-site care," including emergency care. *Id.* at 9 (Tr. at 26); *see* ECF 559-63 at 104, § 3.32.2.3 ("The Contractor is fiscally responsible for emergency room services provided to Inmates."); ECF 558-60 at 96 (agreeing to this term). And, in Wexford's responses to plaintiff's interrogatories, defendant acknowledged that "Wexford was generally responsible for emergency care costs, subject to various exemptions . . . ." ECF 559-21 at 5. At his deposition, Dr. Smith confirmed that this was a change in practice; when Corizon served as the medical provider, DPSCS paid for off-site and emergency care. ECF 558-16 (Smith Dep.) at 20 (Tr. at 73-74).

Bon Secours Hospital is DPSCS's "primary secure hospital ward." ECF 559-63 at 105, § 3.33.2.[22] By letter of February 17, 2012, Wendelyn R. Pekich, Wexford's "Director of

---

[21] Mr. Little did not provide the title of his position at Wexford. But, he stated that he was "part of the negotiation staff" with respect to the UM Contract. ECF 558-31 at 5 (Tr. at 11).

[22] According to the RFP, "the only current secure hospital wards are at Bon Secours Hospital (14 secured hospital beds plus 20 to 30 patient waiting room [sic] for outpatient clinics) and University of Maryland Hospital (limited services)." ECF 559-63 at 105, § 3.33.2.

Marketing & Communications," wrote to Andrea Lockett, a "Procurement Officer" with the Maryland Department of Budget and Management. ECF 564-6 (the "Letter"). The subject line said: "Follow up to EHR Demonstration and Oral Presentation for RFP #DPSC Q0012013 Inmate Medical Health Care and Utilization Services." *Id.* at 2 (emphasis omitted). In the Letter, Wexford highlighted a "Reduced Transportation Cost Initiative," in which Wexford committed itself "financially to assist in reducing DPSCS transport costs" by paying "$100 for each non-Bon Secours transport that exceeds 90% of the average number of non-Bon Secours transports in FY10 and FY11." *Id.* at 9. But, the Letter also stated that Wexford did "not want to give the impression that [it was] offering financial incentives to deny Emergency Department care." *Id.* Indeed, "in the interest of risk management," Wexford "recommend[ed] not including Emergency Department visits in [its] Reduced Transportation Cost Initiative." *Id.*

On March 20, 2012, in response to the RFP, Wexford provided DPSCS with a "Second Best And Financial Offer (BAFO) Financial Proposal." ECF 559-8 (the "BAFO"). In the BAFO, Wexford reiterated its commitment "to reducing the need for offsite transports by at least 10% through the effective use of telemedicine, comprehensive training of [its] provider and nursing staff, and [its] infirmary and case management initiatives." *Id.* at 12. Moreover, Wexford indicated that it would "share in the Department's security and transportation costs for offsite care." *Id.* at 13. And, it claimed that "the savings in transportation and security costs with a 10% reduction in transportation and security coverage could save the DPSCS as much as $500,000 annually and $2,500,000 over the five year term of the contract." *Id.* To "put some 'skin in the game'" Wexford reiterated that it would pay an off-site transportation "Surcharge" of $100 on all transports that exceed 90% of the past two-year average number of "non-Bon Secours off-site transports." *Id.*

The BAFO did not expressly carve out "Emergency Department visits" from this commitment. ECF 559-8 at 13. However, Little confirmed at his deposition that Wexford's commitment to reduce transportation costs did not encompass "emergency department-related costs." ECF 558-31 at 31 (Tr. at 113-14). Little explained that Wexford intended to reduce transportation-related costs "[n]ot through emergency visits, but through training [its] physicians and nurses programming UM." *Id.* (Tr. at 114).

On May 16, 2012, Wexford was awarded the "Inmate Medical Health Care Services Contract." ECF 559-63 at 3-24 (the "Medical Contract"). "Time for Performance" began on July 1, 2012, and was scheduled to expire on June 30, 2017. *Id.* at 5, § 3.1. According to Little as well as Neil Fisher, M.D., who served as Wexford's "corporate director of utilization management" between August 2012 and September 2014, the Medical Contract was extended for an additional one-year period. ECF 558-31 (Little Dep.) at 10 (Tr. at 29-30); ECF 558-37 (Fisher Dep.) at 9 (Tr. at 26-27); *see also* ECF 558-37 at 4-5 (Tr. at 8-9) (specifying Dr. Fisher's role).[23] The Medical Contract provided that Wexford was obligated to perform in accordance with, among other things, the terms set forth in the RFP, the Proposal, and the BAFO. ECF 559-63 at 4, § 2.1.

Of relevance here, when Wexford began performance of the Medical Contract, it hired many of the same individuals who had previously worked as medical providers under Corizon. They included the Wexford health care providers who interacted with Ms. Neal. *See* ECF 225-45 (Obadina Dep.) at 18 (Tr. at 68-69); ECF 558-23 (El-Sayed Dep.) at 8 (Tr. at 22-23); ECF 558-24 (McNulty Dep.) at 20-21 (Tr. at 72-74); ECF 558-26 (Jamal Dep.) at 36 (Tr. at 378-80); ECF 558-

---

[23] At that juncture, "the contract went out for a bid because the term of the contract had been exhausted." ECF 558-15 (Baucom Dep.) at 16 (Tr. at 56). Although Wexford submitted a bid for the new contract, DPSCS selected another vendor. ECF 558-31 (Little Dep.) at 9 (Tr. at 27-28); ECF 558-37 (Fisher Dep.) at 9 (Tr. at 26-27).

27 (Ajayi Dep.) at 57-58 (Tr. at 219-22); ECF 558-28 (Atta Dep.) at 6 (Tr. at 15-16); ECF 558-30 (Afre Dep.) at 3-4 (Tr. at 6-11); ECF 559-65 (Graham Dep.) at 15-16 (Tr. at 50, 53-55); ECF 559-66 at (Ohaneje Dep.) at 12-13 (Tr. at 40-42).

Additionally, many of the supervisory staff members hired by Wexford had worked for Corizon before becoming Wexford employees. They included, among others, Wendy Riccitelli, the "health services administrator"; Isaias Tessema, M.D., the "regional medical director for Pretrial Facilities in Baltimore, Maryland"; Kara Hope, a "regional director of nursing"; Stacey Scott, a "regional director"; and Ms. Somner, Ms. James, and Dr. Getachew  ECF 558-18 (Somner Dep.) at 2-3 (Tr. at 5-6); ECF 558-20 (Riccitelli Dep.) at 2 (Tr. at 4);  ECF 558-22 (James Dep.) at 6 (Tr. at 3-4); ECF 558-25 (Hope Dep.) at 2-3 (Tr. at 4-5); ECF 558-32 (Getachew Dep.) at 3 (Tr. at 8); ECF 558-36 (Scott Dep.) at 9 (Tr. at 28); ECF 558-38 (Tessema Dep.) at 4 (Tr. at 7-8).

Mariann McKee was Wexford's "Director of operations." ECF 558-21 (McKee Dep.) at 5 (Tr. at 9).[24] It was her responsibility "to oversee the [Medical Contract] and make sure elements that were outlined in the contract were followed through and to oversee the team that was responsible for provision of care and services." *Id.* at 10 (Tr. at 31). To that end, McKee affirmed that Wexford "identif[ied] areas where policies were needed and . . . draft[ed] them in the first instance," for the purpose of "augment[ing] what DPSCS already had in place" and "with approval of the department . . . ." *Id.* (Tr. at 32).

On July 1, 2012, the day Wexford assumed responsibilities under the Medical Contract, a new provision titled "Utilization Management Policies and Procedure, Region: Maryland" went into effect. ECF 559-6 (the "Revised Provision") at 3, 4. The Revised Provision has a cover page

---

[24] Ms. McKee was previously known as Mariann Forkgen. ECF 558-21 at 4 (Tr. at 7). Some exhibits refer to her by that name. *See*, *e.g.*, ECF 558-41 at 2.

that bears Wexford's name, phone number, and address. ECF 559-6 at 3. The next page is titled "Corporate Authorization" and includes the following statement: "This Wexford Health Sources, Inc. Maryland Manual has been reviewed and approved by the Corporate Medical Advisory Committee[.]" *Id.* at 4. It includes signature lines for Dr. Thomas Lehman and Dr. Getachew, although only Dr. Lehman signed this page. *Id.* Dr. Getachew confirmed that the Revised Provision "was a Wexford policy that applied to all providers, doctors, nurses, and mid-levels." ECF 558-32 (Getachew Dep.) at 16 (Tr. at 58).

The Revised Provision includes two sections of import here: "UM-001: After-Hours Notification of Emergency/Hospital" (the "Revised After Hours Provision") and "UM-002: Emergency/Hospital Notification" (the "Revised Notification Provision"). ECF 559-6 at 7, 8. These provisions are largely identical to the provisions reviewed earlier. *Compare* ECF 559-6 at 7, 8 *with* ECF 559-7 at 6, 8. However, there are some notable differences.

As indicated, the After Hours Provision stated, in part ECF 559-7 at 6: "After hours notification of Emergency Room visit prompts the Wexford Utilization Management Department to intervene and review specific cases for medical necessity . . . . If the patient is admitted, the Wexford UM Department will initiate concurrent review . . . ." In contrast, the Revised After Hours Provision states, ECF 559-6 at 7 (emphasis added): "After hours notification of emergency room visits prompts the Wexford UM Department to intervene and review specific cases for medical necessity and appropriateness in a timely manner. If the patient is *then* admitted, the Wexford UM Department will attempt concurrent utilization review."

Additionally, in a section titled "Procedure," paragraph 1, the After Hours Provision stated that the "Site Medical Director or Physician determines that transport to a contracted emergency room/hospital is necessary." ECF 559-7 at 6. But, the Revised After Hours Provision, in Section

II, Paragraph A, states, ECF 559-6 at 7 (emphasis added): "The Site Medical Director or *designee* determines that transport to a contracted emergency room/hospital is necessary." And, in Section II B, the Revised After Hours Provision, states that it is "**mandatory**" that the "Site Medical Director or designee" provide notification to the UM Department of all "Emergency/Hospitalization" . . . . *Id.* at 7 (bold in original).

For comparison, each provision is depicted below, beginning with the After Hours Provision and followed by the Revised After Hours Provision.

**ECF 559-7 at 6 (After Hours Provision)**

**ECF 559-6 at 7 (Revised After Hours Provision)**



Similarly, the Revised Notification Provision is nearly identical to the Notification

Provision, described earlier.  Indeed, both provisions indicate that Wexford seeks to promote the

"timely notifications of all emergent off-site care."  ECF 559-6 at 8; ECF 559-7 at 8.  But, in contrast to the Notification Provision, the first step of the "Procedure" section in the Revised Notification Provision states: "The Site Medical Director or designee determines that transport to the emergency room/hospital is necessary."  ECF 559-6 at 8.  And, the second step of the "Procedure" requires Wexford's "site personnel [to] complete an *Emergency/Hospitalization Notification Form* and fax it to the Wexford UM Department AS SOON AS POSSIBLE but no later than 24 hours after the occurrence . . . ."  *Id.*

Further, as mentioned, the Notification Provision stated, ECF 559-7 at 8: "Urgent and emergent referrals are automatic approval as to not delay any care."  However, this statement is not included in the Revised Notification Provision.  *See* ECF 559-6 at 8.

A copy of the relevant portion of each version is set forth below, beginning with the Notification Provision and followed by the Revised Notification Provision.  *See id.* at 8; ECF 559-7 at 8.

**Wexford Health**
SOURCES INCORPORATED

UTILIZATION MANAGEMENT
POLICIES AND PROCEDURES

## UM-002 EMERGENCY/HOSPITALIZATION NOTIFICATION FORMS

FORM: UM-002A -- Emergency / Hospitalization Notification Form
FORM: UM-002B -- Medical Director QA Emergency Reporting Form

APPROVED BY:

Robert T. Smith, Utilization Management Medical Director

| | |
|---|---|
| Approved Date:: | May 16, 2005 |
| Revised Date: | June 11, 2009 |
| Annual Review Date: | June 11, 2009 |

SIGNATURE

### PURPOSE

Wexford Health Sources, Inc. requires timely notifications of all emergent off-site care (ER/Hospitalization/Urgent Office/Urgent Procedures/Radiology).

### PROCEDURE

1. The site personnel must complete **Emergency/Hospitalization Notification Form (FORM UM-002A)** and emailed via EPHR to pcasey2@dpscs.state.md.us and/or fax it to Wexford's UM Department (412 937-9151) AS SOON AS POSSIBLE but no later than the next business day.

   a. Call Wexford's voice mail (877-939-2884) for all emergent off-site care.

   b. **Every effort should be made to use contracted providers.** (Refer to Wexford's *Provider Contract Report* for specific contracted providers).

   c. This form is also to be used for any urgent Office/Urgent Procedures/Radiology.

   d. Always note the time of departure, time returned to site and the type of transportation.

   e. Incomplete or illegible referrals will be returned to the site.

2. A reference number is assigned to all approved requests and faxed back to the site within five (5) working days. The service is an automatic approval and reviewed on a retrospective basis.

3. The Site Medical Director or Designee will document the emergency event in the inmate's medical record (EPHR). Emergent and urgent requests are defined as those situations in which a service is needed immediately, or within 48 hours of the request, as the inmates health and well-being would be affected with a delay in care. Urgent and emergent referrals are automatic approval as to not delay any care. These are reviewed on a retrospective basis for quality improvement purposes.

4. If inmate status changes (examples may include Physician Office → ER, ER → Inpatient, Hospital → Hospital, etc.), call Wexford's Utilization Management and emailed via EPHR to pcasey2@dpscs.state.md.us and/or fax the updated **Emergency/Hospitalization Notification Form (FORM UM-002A)**.

3
DPSCS-001640

WEXDISC003607



Neil Fisher, M.D., a Wexford corporate designee, served as the assistant chief medical officer and corporate director for quality and pharmacy. ECF 558-37 (Fisher Dep.) at 4 (Tr. at 8). Dr. Fisher testified that a purpose of the UM policy was to "reduce the number of patients who require care off site," as part of a process to "develop[] further on-site care capabilities, so [patients] may not need an off-site-care visit." *Id.* at 14 (Tr. at 46-47). Moreover, Riccitelli

testified that Wexford "replac[ed] medical equipment in the exam rooms and [brought] in [a] telehealth machine and . . . new dental chairs." ECF 558-20 (Riccitelli Dep.) at 8-9 (Tr. at 28, 30).

On the other hand, Dr. Afre confirmed that Wexford did not provide additional "equipment or resources that [would have] expanded the services that could be provided in the infirmary." ECF 558-30 (Afre Dep.) at 4 (Tr. at 9-10). Likewise, Graham affirmed that "functionally nothing changed" when Wexford took over for Corizon under the Medical Contract. ECF 558-19 (Graham Dep.) at 3 (Tr. at 7). Similarly, Hope affirmed that Wexford did not conduct "additional training about the operations of the infirmary at the BCDC." ECF 558-25 (Hope Dep.) at 3 (Tr. at 7); *see also* ECF 558-24 (McNulty Dep.) at 24 (Tr. at 86-88) (similar).

As required by the Medical Contract, Wexford prepared monthly "Utilization Management Report[s]." ECF 559-74 at 2; *see* ECF 559-74 through ECF 559-77 (collectively, the "UM Reports"); *see also* ECF 559-63 (Medical Contract) at 158, § 3.73.1.6. Among other things, these reports included information pertaining to inmates in the custody of DPSCS who received medical care at inpatient facilities in a given month. ECF 559-74 at 4-9. These reports also tracked the number of monthly "ER referrals," broken down by "diagnostic categories." *Id.* at 82.

Moreover, consistent with the terms of the Medical Contract and the Proposal, Wexford assumed responsibility for performing CQI (Continuous Quality Improvement) services. *See* ECF 559-63 at 4, § 2.1; ECF 558-60 at 78-87 To that end, Wexford held regular meetings to discuss its CQI efforts across DPSCS's various facilities. It also prepared CQI Reports. *See*, *e.g.*, ECF 558-59 (CQI Report dated January 23, 2013); ECF 558-64 (CQI Report dated October 25, 2012 for the Baltimore Region). Among other things, many of the CQI Reports reviewed "adverse patient events" and "Emergency Responses." ECF 558-63 at 3; ECF 559-2 at 6; ECF 559-64 at 4. The CQI Reports, and the parties' exhibits refer to "Emergency Responses" in a variety of ways,

including "ED Runs" (*i.e.*, Emergency Department Runs) and "emergency department referrals." ECF 537-1 at 5.

The CQI Reports indicate that Wexford actively monitored its progress in minimizing the frequency of transporting inmates off-site. *See*, *e.g.*, ECF 558-7 at 5 (CQI Report of November 30, 2012); ECF 558-59 at 3 (CQI Report of January 23, 2013); ECF 558-62 at 7 (CQI Report dated December 21, 2012). In a report dated January 31, 2013, Wexford sought to "[m]inimize the number of Er runs for the month" and to "[h]ave emergent cases seen on site." ECF 558-8 at 3.

Further, Wexford staff were responsible for producing CAPs (Corrective Action Plans). *See* ECF 558-9 (CAP dated January 18, 2013); ECF 558-10 (CAP dated June 26, 2013). James, who worked for Wexford under the Medical Contract, testified: "The corrective action plans I was involved in were generally the result of audits that were completed, either the required ones through the corporate office or the ones that the sites identified as needs." ECF 558-22 (James Dep.) at 25 (Tr. at 91).

By way of example, plaintiff submitted a copy of a CAP dated November 1, 2012, regarding "Baltimore Pretrial (BCBIC, MDC, WDC)." ECF 558-14 (the "Pretrial CAP") at 2. It reflected, *inter alia*, that there was a need to "update nursing knowledge related to paralysis and neurological findings, gangrene, wound care, sepsis." *Id.* at 3. And, the Pretrial CAP specified, in part: "Mandatory education [was] provided to nursing with all current staff in attendance." *Id.*

Bost presented evidence that could be construed to support her claim that Wexford focused on reducing the number of monthly ED visits at the expense of delivering quality medical care. For instance, in an email dated August 16, 2012, Dr. Tessema sent a congratulatory email to many Wexford staff members, including Dr. Afre and Dr. El-Sayed. ECF 558-43 at 2-3. He wrote, in part, *id.* at 2 (underlining in original): "We had a record of 1 week with no ER runs [a] few months

ago and this month we had <u>NO ER run [sic] for the first half of August 15 days straight</u>. That has never happened in the history of Pre-Trial with over 70,000 intakes a year . . . ." Notably, Dr. Tessema attributed this success to "a tight network of nurses and providers . . . who have been working hard to fix weak links where patients used to fall thru the cracks due to high volume." ECF 558-43 at 2. He closed by saying, *id.* at 3: "We recognize and appreciate the whole team's strong dedication and will to seek higher and safer goals i.e. 'Raise the Standard.'"

On October 1, 2012, a DPSCS employee named Fasil Wubu sent an email to Wexford staff, stating: "I am pleased to announce that, there were no ER send out form [sic] BCBIC since 9/11/2012. . . . We have improved our record both in the number of days (20) without ER send out and the number of patients (6) sent to the ER." ECF 558-44 at 4. He "congratulat[ed]" the "team" on the "magnificent achievement." *Id.* In response, Stacey Scott, a Wexford supervisor, wrote, *id.* at 3-4: "I really appreciate all the efforts made in decreasing the ER runs for this facility." But, Christy Somner responded to "suggest" that Wexford "hold off a bit sending this congrats to the client since the investigation on [a recent] inmate death . . . includes questioning on why we waited so long to send him out." *Id.* at 2.

Additionally, plaintiff offered evidence showing that Wexford staff held regular discussions about the appropriateness of each trip to the emergency room. For instance, Dr. Tessema confirmed that on these calls, he would discuss "with the UM medical director ways that [Wexford] could reduce the number of unwarranted ER runs," where possible. ECF 558-35 (Tessema Dep.) at 32 (Tr. at 119). In turn, Dr. Tessema would relate information he learned during these calls to medical providers, to the extent that the information pertained to "a clinical situation that will benefit the provider that came from the UM medical director . . . so that [the provider will] improve himself or herself." *Id.* at 33 (Tr. at 122).

**D.**

Plaintiff has submitted the reports of two proposed expert witnesses: Jeffrey Keller, M.D., M.P.H (ECF 537, "Keller Report"); ECF 558-54 ("Supplemental Keller Report"), and Ryan Herrington, M.D. (ECF 537-1, "Herrington Report").[25]

Dr. Herrington is a board-certified physician with specialties in addiction medicine as well as general preventive medicine and public health. ECF 537-1 at 30. He holds a medical degree from the University of Virginia as well as a Master's Degree in Public Health from the Ohio State University. *Id.* at 32-33.

Dr. Herrington authored a twenty-seven-page report, based on his review of "multiple sets of medical records for patients incarcerated by" DPSCS "who suffered adverse health related outcomes while under the care of" Wexford and Corizon. *Id.* at 2. Specifically, Dr. Herrington provided an overview of "Individual Case Studies" for nineteen individuals who received purportedly inadequate medical care between January 2010 and June 2016. *Id.* at 6-19. Of those nineteen individuals, he identified seventeen who suffered adverse events as a result, among other things, of the "Failure to send to ED [emergency department]," "Failure to use offsite services," or both. ECF 537-1 at 6-19 (underlining omitted).[26]

As noted, Wexford became the health care provider for DPSCS in July 2012. So, some of the individuals identified by Dr. Herrington experienced adverse events while under the care of

---

[25] As discussed, *infra*, Wexford challenges the reliability and methodology of the defense experts. *See* ECF 536-2 at 16-18. However, defendant did not submit a motion under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the experts. And, at the hearing held on August 5, 2022, defense counsel conceded that, at least for purposes of resolving the Motion, the defense expert reports are properly before the Court.

[26] Dr. Herrington attributed the other two patients' adverse events to documentation issues, including "Failure in medical documentation relevant to patient care" and "Failure in communication of changes in condition." ECF 537-1 at 8, 18 (underlining omitted).

Corizon. However, at the time, Wexford was the UM provider for DPSCS. The parties vigorously disagree as to whether any adverse occurrences prior to July 2012 implicate are pertinent to the pattern and practice claim against Wexford.

In a supplementary report, Dr. Keller offered context regarding the number of cases reviewed by Dr. Herrington. Specifically, Dr. Keller explained that plaintiff was "given access by DPSCS to case-related materials for only 193 patients . . . ." ECF 558-54 at 3. Of that group, Bost "received medical records for only 47 patients." *Id.*; *see also* ECF 559-19 (Declaration of plaintiff's counsel, attesting to the same). Dr. Herrington reviewed the medical records of twenty-four of those patients and found concerns in nineteen cases. ECF 558-54 at 3.[27]

I pause here to review the occurrences involving two of the individuals considered by Dr. Herrington. They are referred to as C.R. and T.L. *See* ECF 537-1 at 10-11, 12-13.

According to Dr. Herrington, C.R., a "63-year old black male," had a "history of stroke, high blood pressure, aortic valvular disease, chronic obstructive, pulmonary disease, hepatitis C, and substance abuse." *Id.* at 12. Medical records reflect that in August 2012, C.R. was detained at BCDC. *See* ECF 537-6 at 54. Dr. Herrington wrote, in relevant part, ECF 537-1 at 12:

> [C.R.] presented on 08/22/12 with an unsteady gait, slurred speech and left sided weakness. He had been recently hospitalized for treatment of endocarditis and cerebrovascular accident. Documentation notes a blood pressure of 223/86 with a call to the physician at 0500 hrs. Follow-up blood pressures noted to be 215/68 and 222/82. Reference is also made to the patient being unresponsive. The physician ordered blood pressure medications to be given early and continued monitoring at the facility. A subsequent provider assessment is noted to be incomplete as patient was "sleeping." Documentation notes that the physician wanted to contact the medical director for authorization to send to the ED. Call made to 911 at 0726 hrs.

According to C.R.'s medical records, he was "sent out to JHH [Johns Hopkins Hospital] at

---

[27] In her surreply, plaintiff asserts that 47 cases were screened for Dr. Herrington's review, to exclude any cases relating to suicide, homicide, and age-related deaths. ECF 568 at 5.

8 a.m." on August 22, 2012.  ECF 550-3 at 52.  C.R. died two days later, on August 24, 2012, as a result of "septic cerebral embolus."  ECF 537-1 at 12.

Dr. Herrington states that C.R.'s blood pressure amounted to a "medical emergency that require[d] immediate referral to the ED."  *Id.* at 13.  He opines, *id.*: "The available records indicate a delay in contacting 911 that is over two hours in duration.  Authorization from a medical director for an ED referral in the context of an obvious emergency is a barrier and a significant deviation from the standard in care."

T.L. was a "39-year-old black female" who was incarcerated at the WDC.  *Id.* at 10; *see* ECF 537-6 at 193-95 (indicating facility of incarceration).  According to Dr. Herrington's review, T.L. "was admitted to her facility infirmary on 06/10/13 for complaints of weakness."  ECF 537-1 at 10.  The following day, on June 11, 2013, she was "unable to walk or get out of bed."  *Id.* And, on June 12, 2013, T.L. "was noted to be unable to lift her head, walk or tolerate any oral intake."  She was ultimately "sent to the hospital by 911 late on 06/12/13 and expired shortly thereafter," on June 13, 2013.  *Id.*  She died of "lung cancer with metastasis to the heart, specifically hemopericardium and hemothorax."  *Id.*

Dr. Herrington maintains that T.L.'s records "reflect erratic vital signs, and a number of red flags including weakness, lightheadedness, loss of appetite, and 10/10 pain."  *Id.* Further, he concluded that there were "numerous failures in [T.L.'s] care, including documentation deficiencies, and the failure to communicate to the doctor a number of changes in condition . . . ." *Id.*  He opines, *id.*: "Reviewed records document a significant deterioration of status that indicated a need for immediate offsite services to perform requisite diagnostics and testing and provide treatment."

Based on Dr. Herrington's review of the nineteen case studies, he maintains that "Wexford

had a pattern and practice of failing to meet the standard of care in treating patients in the infirmary, including by denying and delaying necessary ER and offsite care." ECF 537-1 at 5 (emphasis omitted). According to Dr. Herrington, the medical care provided to C.R. and T.L. exemplifies "several common themes [he] saw present and persistent throughout the evidence that [he] reviewed," including "a failure to identify and communicate changes in condition necessitating further action, documentation failures, and ultimately substandard care resulting from the failure to send patients to the ED when they needed to be sent out." *Id.* at 21. He also advises that his review "focused almost entirely on cases involving deaths" and posits that if he "had been able to review a large pool of cases that resulted in outcomes short of death," he "would have found many more failures that further support [his] findings." *Id.* at 19 n.1

Further, Dr. Herrington "observed a recurring pattern in which differential diagnoses were not conducted." *Id.* at 19. He explains that a "differential diagnosis" is "a process of identifying the cause of a patient's symptoms, and importantly, ruling out the most severe possible sources of the symptoms presented." *Id.* Consistent with that process, "[w]here more severe or urgent causes cannot be ruled out in the infirmary, emergency department or other offsite care becomes necessary to ensure potentially life-threatening conditions do not go untreated." *Id.* He asserts, *id.*: "Documentation and communication play critical roles in the process of performing differential diagnosis." And, "[i]n the many neurological or vascular related cases" that Dr. Herrington reviewed, he asserts that "the consistent pattern is a failure to conduct the necessary differential diagnosis to rule out acute neurological or vascular causes." *Id.*

Dr. Herrington also determined that "many of the CAPs [he] reviewed note deficiencies in documentation and communication," and he opines: "The failure to timely refer patients to the ED and for offsite care is a natural and foreseeable consequence of such deficiencies." ECF 537-1 at

22.  Dr. Herrington explains, *id.*: "[P]roper documentation is critical to identifying and tracking changes in a patient's condition; and medical documentation is not only a historical record of a patient's course of symptoms and treatment, but also one of the primary means of communicating between and among doctors and nurses."

By way of example, Dr. Herrington references the CAPs prepared by Wexford in the wake of the deaths of C.R. and T.L.  ECF 537-1 at 20; *see* ECF 558-13 ("C.R. CAP"); ECF 538-11 ("T.L. CAP").  In relevant part, Dr. Herrington notes that the CAP for C.R., dated November 6, 2012, reveals that "the nurse failed to communicate to the physician when the patient's blood pressure was critically high and should have been sent out to the hospital; . . . that the nurse failed to monitor [C.R.'s] blood pressure[;] that there were documentation failures; and that there was a failure to recognize and communicate a change in the patient's condition, and in particular, alteration of mental status."  ECF 537-1 at 20; *see* ECF 558-13 at 2-4.  And, because "the nurses failed to document critical changes in [C.R.'s] blood pressure, . . . the doctor in turn made decisions about [C.R.'s] care without knowledge of this critical red flag."  ECF 537-1 at 22.  In Dr. Herrington's view, "a patient who should have been immediately referred to the ED was not sent out, and then died."  *Id.*

According to Dr. Herrington, the CAP as to T.L., dated June 29, 2013, "identified critical failures including the failure to identify and communicate changes in the patient's condition, and the failure to send to the ED."  *Id.* at 20; *see* ECF 558-11 at 2.  And, Dr. Herrington maintains that the T.L. CAP determined that there were "serious documentation failures that contributed to the outcome, including inadequate documentation; missing nursing notes; and the failure to complete a head-to-toe assessment."  ECF 537-1 at 20-21; *see* ECF 558-11 at 3.

Dr. Herrington claims that the cases of C.R. and T.L. exhibit "several common themes [he]

saw present and persistent throughout the evidence that [he] reviewed." ECF 537-1 at 21. These include "failure to identify and communicate changes in condition necessitating further action, documentation failures, and ultimately substandard care resulting from the failure to send patients to the ED when they needed to be sent out." *Id.* He adds: "The other trend I see consistently in Wexford's CAPs and CQIs is a single, recurring proposal for addressing deficiencies: training. But such training either never occurred, or was wholly inadequate." *Id.* at 23-24. As a result, Dr. Herington found "recurring and persistent problems in areas as critical as ensuring timely ED care, and communicating critical information to and among providers." *Id.* at 24.

In the view of Dr. Herrington, Wexford's "policy initiative to significantly reduce ER and other offsite trips . . . likely contributed to its pattern and practice of delaying and denying emergency department and other offsite care." *Id.* (boldface omitted). In this regard, he points out that Wexford "was paid a fixed amount based on the average monthly inmate population, and then it was responsible for the vast majority of variable patient care costs, including nearly all costs for referrals to the ED and other offsite care." *Id.* at 24-25. He observes that "the more Wexford spent on ED and offsite care, the less profit it made on the contract, and vice versa." *Id.* at 25.

Nevertheless, Dr. Herrington concedes: "The existence of this financial incentive is . . . not, by itself, improper." *Id.* Yet, he cautions that where there exists a financial incentive to reduce variable patient costs, "extra care must be taken . . . to ensure the proper balance of quality, access and care." *Id.* at 25. And, according to Dr. Herrington, there was a "clear signal" that "cost considerations had taken primacy over quality and access," as "Wexford's UM department in effect subsumed the CQI function," as evidenced by testimony from Donna James as well as Wexford's CQI Reports. *Id.* And, Dr. Herrington maintains that "there was unquestionably a concerted campaign to reduce ED trips across Maryland facilities, and especially Baltimore, in

order to reduce costs."  ECF 537-1 at 26.

Moreover, Dr. Herrington found that Wexford's efforts to reduce emergency trips were of particular concern in light of "Wexford's own conclusion month after month after retrospectively reviewing ED trips . . . that very few ED referrals had not been necessary."  *Id.* at 27.  In his view, Wexford could have responsibly sought to reduce the use of off-site facilities to provide emergency care by providing "an expansion of services available in the infirmaries, either in the form of equipment or personnel," but he claims that no such expansion ever materialized.  *Id.*

According to Dr. Herrington, "there is a particularly acute risk of reducing ED trips in the context of neurological care," as there "are very few treatments for neurological conditions that can be treated in a typical infirmary . . . ."  *Id.*  He explains that "for many conditions such as stroke, even small delays in diagnosis and treatment can be catastrophic."  *Id.*  Yet, Dr. Herrington states, *id.*: "There was no indication in any of the documents and depositions I reviewed that there was ever an expansion of neurological services available in the infirmaries."  *Id.*

Dr. Herrington opines, *id.* at 28: "[I]t is my opinion that Wexford, in its efforts to successfully meet its cost cutting goals, permitted its access and quality goals to substantially deviate from the generally accepted standard of care."  He adds that "numerous individuals who were not referred to the ED when they should have been" had "negative patient outcomes."  *Id.*

Further, Dr. Herrington opines that Ms. Neal's "death was a product of Wexford's ED reduction initiative in place at the time . . . and the related pattern and practice of delaying and denying ED and other offsite care[.]"  *Id.*  He reasons, *id.*: "Ms. Neal should have been sent for an ED referral on numerous occasions in the days before her death, and if that had happened as it should have, her death could have been avoided."  And, he claims that Ms. Neal's records contain numerous deficiencies, including "documentation errors and communication failures that

prevented the necessary action from being taken"; "failures to recognize obvious symptoms of a possible neurological event"; and "documented efforts by the nurses to get physician approval before referring her to the ED that resulted in hours of additional and unacceptable delay." ECF 537-1 at 28.

Additionally, Dr. Herrington posits that "Wexford had ample knowledge of the failures in its policies and procedures, and the violations of the standard of care that routinely resulted," including in "a number of the cases . . . in which there a was a failure to timely refer patients to the ED for necessary care had already occurred." *Id.* at 28-29. Thus, he concludes that Wexford's "failure to act on that information to resolve the issues and prevent delays in ED referrals appears to have been the result of a deliberate policy choice to prioritize an overall reduction in ED visits over addressing failures in quality of care and access to care." *Id.* at 29.

Dr. Keller is a board-certified physician with a specialty in emergency medicine. ECF 537 at 24. He holds a medical degree from the University of Utah, and serves as the "Medical Director and CEO of Badger Correctional Medicine," which is a "jail medicine company providing medical and mental health services to inmates incarcerated in Idaho jails and juvenile facilities." *Id.* at 23-24. He issued a twenty-two-page report. ECF 537.

Dr. Keller "conduct[ed] an analysis of Wexford's policies and practices related to emergency department and other offsite referrals, including the 'Emergency Room Visit Reduction Program' initiated in August of 2011 in the Baltimore Region . . . ." *Id.* at 2. He states, *id.* at 16: "There is no question that Wexford's efforts to reduce ER trips was successful." Based on Dr. Keller's review of the Preventable ER Reports, he found that between "January 2010 until the Emergency Room Visit Reduction Program started in September of 2011, there was an average of 108 ER runs per month and an average of two (2) preventable ER runs per month." ECF 537 at

15. But, "[s]tarting in January 2012 through the end of December 2013, the average number of ER runs fell to an average of 64 a month," whereas the "average number of Preventable ER Runs was unchanged at 2.1 per month." *Id.* Thus, Dr. Keller asserts that, in percentage terms, "ER runs judged to be preventable actually increased from 2% of all ER runs to 3.2% of all ER runs after the initiation of the program." *Id.*

According to Dr. Keller, Wexford "documented its success in reducing the number of ER trips" through "monthly utilization management reports detailing the number of ER trips and offsite inpatient care each month, the trend of how those numbers changed over time, and the cost borne by Wexford as a result." *Id.* at 12; *see* ECF 559-74 through ECF 559-77. Based on data drawn from these reports and provided to him by plaintiff's counsel, Dr. Keller found, ECF 537 at 12; *see id.* at 12 n.1: "ER referrals and inpatient care began to substantially decrease as Wexford's desire to reduce the number of ER referrals took effect."

Based on these findings, Dr. Keller prepared charts reflecting the number of "Total ER Runs" and "Neuro ER Runs" between January 2011 and January 2014, as well as "ER Referrals Per 1000 Inmates" and "ER Referrals Per 1000 Inmates (Baltimore Jails ONLY)" between January 2011 and an unspecified date after January 2013. ECF 537 at 12. Across all four metrics, Dr. Keller found that ER referrals declined after Wexford took over the Medical Contract, as shown below, *id.*:



Even so, Dr. Keller found that "there was no apparent analysis of whether the reduction in ER runs included some (or many) patients with life threatening conditions who should have been sent to the ER but were not because of the program." ECF 537 at 16. And, based on his review of "data reported by Wexford's Maryland Region Death Logs," he states that in the "two years after Wexford took over in July 2012, deaths increased by an average of more than 28% statewide and more than 40% for the Baltimore pretrial region.[ ]" *Id.* at 17 & n.2; *see* ECF 537-3 (the "Death Logs"). According to Dr. Keller, the increase in deaths indicates "how dangerous Wexford's ER reduction initiative was . . . ." ECF 537 at 17.

A graphical representation of these findings, as set forth in the Keller Report, is captured below, *id.*:



Dr. Keller also reviewed the medical records associated with Ms. Neal's death and concludes that "the medical staff should have sent Ms. Neal to the hospital for emergent evaluation of her symptoms far sooner than they did." ECF 537 at 19. In his view, "[t]here is ample circumstantial evidence . . . that the Emergency Room Visit Reduction Program more likely than not did play a role in the inadequacy of Ms. Neal's medical treatment." *Id.* at 20.

Defendant has presented the report of its expert witness, Thomas D. Fowlkes, M.D., a board-certified physician with specialties in emergency medicine and addiction medicine. ECF 537-2 (the "Fowlkes Report") at 56. Dr. Fowlkes holds a medical degree from the University of Tennessee Medical School. *Id.* at 58. He is also a "Certified Correctional Healthcare professional." *Id.* at 56.

Dr. Fowlkes prepared a fifty-four-page report in which he considered the expert opinions of doctors Keller and Herrington, and evaluated the same materials that they considered. ECF 537-2 at 2-39. According to Dr. Fowlkes, plaintiff's experts rendered flawed opinions. *Id.* at 40-52.

As to Dr. Herrington's findings, Dr. Fowlkes contends that the number of case studies is "a very small sampling of the many serious medical events and deaths which one would expect to have occurred in the DPSCS during the years 2010-2016." ECF 537-2 at 41. Further, he asserts that the lion's share of the nineteen cases reviewed by Dr. Herrington have little, if anything, in common with the circumstances pertaining to Ms. Neal. *See id.* at 42-49. For instance, in three of the cases "Dr. Herrington did not find that referral to an ED played a role in theses [sic] death." *Id.* at 42. In light of the dissimilarities and the small number of cases in the sample, Dr. Fowlkes concludes, *id.* at 50: "One would expect in a health care system as large as the Maryland DPSCS one would be able to find a few examples of less than ideal care. Any such examples in these cases appear to be specific to the individual cases and not part of a wider pattern."

Dr. Fowlkes also addressed Dr. Keller's concerns with the Initiative. *Id.* at 52. Noting that the Initiative was "targeted at orthopedic injuries, patients in whom there was a concern for DVT or cellulitis and patients with seizure disorders," he asserts, *id.*: "Nothing in this program appears designed to discourage referral to the ER if there was an urgent orthopedic problem, a suspected PE [pulmonary embolus] or a new onset seizure disorder." *Id.* Further, he opines: "There is no evidence in the records or deposition testimony that I reviewed that indicates that nursing staff were prohibited or discouraged from calling an ambulance without consulting a provider for a known or suspected medical emergency." *Id.* He adds, *id.*: "In fact, they did just that in several of the sample cases."

Additional facts are discussed, *infra*.

## II. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; accord *Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted). Rather, "there must be evidence on which the jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

Pursuant to Fed. R. Civ. P. 56(c)(1), if the moving party bears the burden of proof on the issue at trial, it must support its factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing' that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

The district court's "function" is not "to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; accord *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations. *Brown v. Lott*, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). But, if testimony is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc*., 700 F. App'x 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, ___ F. 4th ___, 2022 WL 2901043, at *9 (4th Cir. July 22, 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v.*

*Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012). "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).

### III. 42 U.S.C. § 1983

### A. In General

Plaintiff has filed her *Monell* Claim pursuant to 42 U.S.C. § 1983. Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (*quoting Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48, (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*,

635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (Citations and internal quotation marks omitted).

To elaborate, § 1983 does not regulate "private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). But, in certain circumstances, a private actor's conduct may be regarded as State action, not private action. Section 1983 extends to private entities that operate under color of state law. *See, e.g.*, *West*, 487 U.S. at 49; *Polk Cty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999); *Shields v. Prince George's Cty.*, GJH-15-1736, 2016 WL 4581327, at *7 (D. Md. Sept. 1, 2016).

A state "will be held responsible for a private actor's decision when the state's engagement

or encouragement is so significant that 'the choice must in law be deemed to be that of the State.'"
*Peltier v. Charter Day School, Inc.*, 37 F.4th 104, 115 (4th Cir. 2022) (en banc) (citation omitted).
Put another way, "'pervasive entwinement of public institutions and public officials'" with a
private entity may lead to a finding of State action. *Id.* (citation omitted). To determine whether
the conduct of a private actor amounts to State action for the purpose of § 1983, a court must
consider whether "the alleged infringement of federal rights [is] fairly attributable to the State[.]"
*Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (internal quotation marks omitted).

Of import here, Wexford does not dispute that its conduct amounts to state action for
purposes of § 1983. *See* ECF 536-2 at 4-5.

The Supreme Court determined in *Monell v. Department of Social Services of the City of
New York*, 436 U.S. 658 (1978), that a local governmental body may be liable under § 1983 based
on the unconstitutional actions of individual defendants, but only where those defendants were
executing an "official municipal policy" that resulted in a violation of the plaintiff's rights. *Id.* at
691. "Official municipal policy includes decisions of a government's lawmakers, the acts of its
policymaking officials, and practices so persistent and widespread as to practically have the force
of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see Pembaur v. Cincinnati*, 475 U.S. 469,
479-80 (1986).

Thus, a viable *Monell* claim consists of two components: (1) the municipality had an
unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation
of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S.
397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 446, 451 (4th Cir. 2004); *Lytle v. Doyle*,
326 F.3d 463, 471 (4th Cir. 2003).

As the *Monell* Court said, 436 U.S. at 694, "when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). But, liability attaches "only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

However, a municipality cannot be held liable in a § 1983 action under a theory of vicarious liability or respondeat superior. *Monell*, 436 U.S. at 693-94. In *Connick*, 563 U.S. at 60, the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665-683). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691; *Canton*, 489 U.S. at 392; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997) (collecting cases).

Indeed, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___U.S.___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted).

Standards applicable to municipalities are applicable to private corporations acting under color of state law. *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal

liability "'apply equally to a private corporation'" acting under color of state law) (citation omitted). Thus, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 F. App'x 279, 282 (4th Cir. 2009); *Austin,* 195 F.3d at 727-28; *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir. 1982). To establish liability of a private corporation under *Monell*, there must be some "official policy or custom of the corporation" that caused "the alleged deprivation of federal rights." *Austin*, 195 F.3d at 728 (citing *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990); *Sanders v. Sears Roebuck & Co.*, 984 F.2d 972, 976 (8th Cir. 1993); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

And, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). Of relevance here, a policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 F. App'x at 799. In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that to establish a *Monell* claim, the plaintiff "must point to a 'persistent and widespread practice[ ] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

On the other hand, a policy or custom that gives rise to § 1983 liability will not "be inferred

merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

## B. Medical Care

The *Monell* Claim is predicated on the alleged violation of the constitutional rights of Ms. Neal and other inmates, as guaranteed by the Eighth or Fourteenth Amendments to the Constitution, with respect to the provision of medical care. ECF 56, ¶¶ 169-86. The right of pretrial detainees to adequate medical care is protected by the Due Process Clause of the Fourteenth Amendment. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001); *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992). In contrast, the Eighth Amendment applies to the rights of convicted prisoners. *See Brown v. Harris*, 240 F.3d at 388 ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977)); *see also Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990); *Hill*, 979 F.2d at 991-92.

As discussed in the Court's Memorandum Opinion of July 23, 2018 (ECF 430 at 46-48), the record is not entirely clear as to whether Ms. Neal qualified at the time of her death as a pretrial detainee or a postconviction prisoner. But, the parties agree that the distinction is immaterial for present purposes because, as to medical care, both detainees and convicted prisoners have the right to constitutionally adequate medical care. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Williamson*

*v. Stirling*, 912 F.3d 154, 177 (4th Cir. 2018); *see Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (pertaining to excessive force claims); *Mays v. Sprinkle*, 992 F.3d 295, 300-01 & n.4 (4th Cir. 2021) (recognizing circuit split as to application of *Kingsley* in the context of pretrial detainee claim of deliberate indifference as to medical care).

The Fourth Circuit has determined that the Eighth Amendment's deliberate indifference standard, applicable to convicted prisoners, applies by way of the Fourteenth Amendment to claims made by pretrial detainees asserting inadequate medical care. *Hill*, 979 F.2d at 991-92 ("[P]rison officials violate detainee's rights to due process when they are deliberately indifferent to serious medical needs.") (citations omitted); *see Young*, 238 F.3d at 575 ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause."); *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) ("Pretrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs."); *Belcher*, 898 F.2d at 34 ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee.") (citation omitted). Therefore, I turn to review the Eighth Amendment.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *DeLonta v. Angelone*, 330 F.3d 630,

633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates."  *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hixson*, 1 F.4th at 302; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

For a plaintiff to prevail in an Eighth Amendment suit as to the denial of adequate medical care, the defendant's actions or inaction must amount to deliberate indifference to a serious medical need.  *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228.

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety."  *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38); *see Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available.  *See Farmer*, 511 U.S. at 837; *see also Hixson*, 1 F.4th at 302; *Sprinkle*, 992 F.3d at 300; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219.  The Fourth Circuit has characterized the applicable standard as an "exacting" one.  *Lightsey*, 775 F.3d at 178.

As the Court explained in *Heyer*, 849 F.3d at 209-10, "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." Thus, proof of an objectively serious medical condition does not end the inquiry.

In the context of a claim concerning inadequate medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837.

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). Put another way, "it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*); *see Sprinkle*, 992 F.3d at 300 (observing that to satisfy the subjective element of a deliberate indifference claim, "the prison official must have acted with a 'sufficiently culpable state of mind'") (citation omitted);

*King*, 825 F. 3d at 219 ("The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'") (Citation omitted); *Young*, 238 F.3d at 575-76 ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Hixson*, 1 F.4th at 303; *see Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ."). "To find the prison officials liable, the treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hixson*, 1 F.4th at 303 (internal citation omitted).

As the Supreme Court said in *Estelle*, 429 U.S. at 106: "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *See also Hixson*, 1 F.4th at 303; *Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, 429 U.S. at 106). Nor does the Eighth Amendment "codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Further, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered

merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995).

Indeed, "[t]he necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor*, 739 Fed. App'x 745, 754 (4th Cir. 2017) (emphases in *Formica*). In addition, "State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in 'a course of treatment known to be ineffective'; or proof that the defendant's treatment decision departed so radically from 'accepted professional judgment, practice, or standards' that a jury may reasonably infer that the decision was not based on professional judgment[.]" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016) (internal citations omitted).

But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Hixson*, 1 F.4th at 302-03; *Scinto*, 841 F.3d at 225-26; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester*

*v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Indeed, "a disagreement among reasonable medical professionals is not sufficient to sustain a deliberate indifference claim." *Hixson*, 1 F.4th at 303. Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 Fed. App'x 860 (4th Cir. 2012).

The Fourth Circuit reiterated in *Scinto*, 841 F.3d at 226:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus must have known about it ...." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct. 1970). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown*, 240 F. 3d at 390 (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

As to a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014). Moreover, "[w]here a deliberate indifference claim is predicated on a delay in medical care, [the Fourth Circuit has] ruled that there is no Eighth Amendment violation unless 'the delay *results* in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical

condition or 'frequent complaints of severe pain.'" *Formica*, 739 Fed. App'x at 755 (internal citations omitted) (emphasis in *Formica*).

"There is no requirement . . . that a plaintiff alleging deliberate indifference present expert testimony to support his allegations of serious injury or substantial risk of serious injury." *Scinto*, 841 F.3d at 230. Instead, "when the seriousness of an injury or illness and the risk of leaving that injury or illness untreated would be apparent to a layperson, expert testimony is not necessary to establish a deliberate indifference claim." *Id*. In *Scinto*, the Fourth Circuit applied this principle to hold that a claim for denial of insulin to diabetic inmates by prison officials did not require expert testimony to "demonstrate an objectively serious deprivation," because "a jury is capable of understanding, unaided, the risks of failing to provide insulin to a diabetic and of a trained doctor's denial of a diabetic's known need for insulin." *Id*.

The proverbial guilt by association does not apply. Rather, the conduct of each party must be considered separately. *Odom v. S.C. Dep't. of Corr.*, 349 F.3d 765, 771-72 (4th Cir. 2003) (considering whether the individual conduct of each defendant amounted to deliberate indifference); *see Iqbal*, 556 U.S. at 676; *Wilcox*, 877 F.3d at 170.

In *Brown v. Harris*, 240 F.3d at 390, the Fourth Circuit explained: "In determining the substantiality of the risk that [one defendant officer, among several] knew, and the reasonableness of his response to it, we must consider everything that he was told and observed." *See Bishop v. Hackel*, 636 F.3d 757, 768 (6th Cir. 2011) ("[W]e must focus on whether each individual Deputy had the personal involvement necessary to permit a finding of subjective knowledge."); *Dale v. Poston*, 548 F.3d 563, 570 (7th Cir. 2008) (stating that a court must examine "what the officer knew and how he responded"); *Grieveson v. Anderson*, 538 F.3d 763, 777-78 (7th Cir. 2008) ("Vague references to a group of 'defendants,' without specific allegations tying the individual

defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants.").

## IV. Discussion

Wexford contends that the *Monell* Claim cannot proceed to trial under any theory of liability. In particular, defendant maintains that the record is devoid of any admissible evidence to establish that Wexford adopted a policy or engaged in a pattern or practice that resulted in Ms. Neal's death. ECF 536-2 at 10-28. Further, according to Wexford, Bost has failed to adduce evidence showing that Wexford failed to train adequately the health care medical providers who attended to Ms. Neal. *Id.* at 29-32.

As highlighted above, the parties have collectively submitted a mountain of evidence, a review of which reveals hotly contested factual disputes regarding Wexford's alleged policies, its alleged pattern and practice, and its alleged failure to train.

### A. Official Policy

Plaintiff's first theory of liability is rooted in a claim that Wexford had "two express policies that played a causal role in the violation of Ms. Neal's constitutional rights: (1) [Wexford's] UM policies UM-001 and UM-002, which governed ER referrals after hours; and (2) [Wexford's] across-the-board reduction in ER trips." ECF 558 at 53. With regard to the latter claim, Bost clarifies that this contention is "based on Wexford's policy to reduce ER visits across the board throughout DPSCS sites when it took over the contract in July 2012—a policy repeated over and over in CQIs, emails and other documents." *Id.* at 57. In other words, the policy is premised on the alleged broad-based efforts of Wexford to reduce off-site emergency care, exemplified by, but not necessarily "confine[d]" to, the Initiative. *Id.* at 56.

Wexford maintains that the *Monell* Claim cannot proceed to the extent it is predicated on

the theory that Wexford promulgated an official policy that deprived Ms. Neal of her constitutional rights. ECF 536-2 at 10-16. According to Wexford, plaintiff has failed to "identify an official Wexford policy or decision by a final policymaker that was the cause of, let alone moving force behind, Ms. Neal's death." *Id.* at 10.

### 1. Policymaking Authority

As a threshold issue, Wexford contends that it cannot be liable under *Monell* pursuant to an official policy theory because "neither Wexford nor its employees possessed final policymaking authority" with respect to emergency care services. ECF 536-2 at 11; *see* ECF 564 at 10-12 (arguing the same). That authority, Wexford asserts, "rested solely with the State of Maryland and [DPSCS's] director of clinical services and chief medical officer, Dr. Sharon Baucom[.]" ECF 536-2 at 11. Further, defendant argues that even if a document "represented an official [Wexford] policy that was in place at the time of Ms. Neal's death, Plaintiff would still be unable to satisfy the rigorous causation requirements under *Monell*." *Id.* at 15.

Bost counters that "the evidentiary record . . . would easily permit a reasonable jury to find that Wexford was not only able but affirmatively required to promulgate and implement policies for its employees to follow." ECF 558 at 73. To the extent other evidence shows that Wexford did not have this authority, Bost claims that such testimony "at best creates a dispute of fact that a jury must resolve at trial." *Id.* at 58. And, she contends that a jury could conclude that Wexford's policies "caused the denial and delay of an ER referral in Ms. Neal's own case," as there exists some evidence to show that "Ms. Neal required referral to an ER on November 1, when she was instead admitted to the infirmary for observation with a noted release date of November 5." *Id.* at 56.

An "official policy" is often a formal rule committed to writing.  But, "the concept 'of official policy' for purposes of Section 1983 extends beyond formal ordinances and policies," to include ad hoc policy choices and decisions.  *Hunter v. Town of Mocksville, N.C.*, 897 F.3d 538, 554 (4th Cir. 2018); *accord Spell*, 824 F.2d at 1385 (explaining that a municipal policy can be found "in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy").  A policy may be created "by making a single decision regarding a course of action in response to particular circumstances."  *Semple*, 195 F.3d at 712; *see Hunter*, 897 F.3d at 554 (stating that "'municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances'") (quoting *Pembaur*, 475 U.S. at 480).

In *Pembaur*, 475 U.S. at 481-84, the plurality recognized that "the authority to make municipal policy is necessarily the authority to make *final* policy."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (explaining *Pembaur*; emphasis in *Praprotnik*).  Thus, municipal liability based on this theory "'attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'"  *Lane v. Anderson*, 660 F. App'x 185, 197 (4th Cir. 2016) (quoting *Pembaur*, 475 U.S. at 479).  To qualify as a "final policy making official," the "'municipal official must have the responsibility and authority to implement final municipal policy with respect to a particular course of action.'"  *Lane*, 660 F. App'x at 197 (quoting *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)).  It is not sufficient that the relevant decisionmaker has "'discretionary authority in purely operational aspects of government.'"  *Lane*, 660 F. App'x at 197 (quoting *Spell*, 824 F.2d at 1386).

"'[W]hether a particular official has final policymaking authority is a question of state law.'"  *Starbuck v. Williamsburg James City County Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)) (alteration in *Starbuck*).

*Accord Hunter*, 897 F.3d at 555 ("'The question of who possesses final policymaking authority is one of state law.'") (quoting *Riddick*, 238 F.3d at 523). For instance, "power to make policy may be granted by legislative enactment or through delegation by someone who does possess such authority." *Fuller v. Carilion Clinic*, 382 F. Supp. 3d 475, 492 (W.D. Va. 2019) (citing *Pembaur*, 475 U.S. at 482).

The inquiry requires "review of 'the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law.'" *Fuller*, 382 F. Supp. 3d at 492 (quoting *Pembaur*, 475 U.S. at 482). "In the context of a private corporation, 'state law' includes relevant local ordinances, contracts, policies, and manuals." *Washington v. Brooks*, 3:20-cv-88–HEH, 2022 WL 89171, at *9 (E.D. Va. Jan. 7, 2022) (citing *Austin*, 195 F.3d at 729–30).

Although a municipality may delegate final policymaking authority, a district court cannot "assum[e] that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik*, 485 U.S. at 126. Thus, the central question is "not just who can make policy," but instead "in the scheme of things[,] who has the final say-so." *Riddick*, 238 F.3d at 524. To that end, where a corporation's "discretionary action 'is subject to review by the municipality's authorized policymakers,'" the corporation can be said to have "'retained the authority to measure the [corporation's] conduct for conformance with their policies.'" *Id.* at 523 (quoting *Praprotnik*, 485 U.S. at 127) (alteration added); *see also Hunter*, 897 F.3d at 555 (noting the difference between making policy and implementing final policy decisions).

Wexford points to *Charette v. Wexford Health Sources, Inc., et al.*, CCB-19-0033, 2021 WL 1102361 (D. Md. Mar. 23, 2021), to support its position that it lacked final policymaking authority as to ER matters. *See* ECF 536-2 at 13. In *Charette*, the plaintiff was an inmate at Jessup Correctional Institute and had several underlying health conditions, including Hepatitis B ("HBV")

and Hepatitis C ("HCV"). *Charette*, 2021 WL 1102361, at *2. He sued Wexford and various medical professionals employed by Wexford alleging, *inter alia*, constitutionally deficient medical care.[28]

As to Wexford, the plaintiff lodged a *Monell* claim, asserting that Wexford "maintain[ed] a policy and practice of interpreting guidelines for treatment of HBV to indicate treatment only in the presence of detectable viral loads, despite the fact that this is not the sole indicator of treatment." *Id.* (internal quotation marks omitted); *see id.* at *5. According to the plaintiff, "Wexford supervisors and individuals with policymaking authority instructed the medical defendants not to refer [the plaintiff] for follow-up treatment with an outside specialist" and thereafter "failed to provide" the prisoner, Miller "with treatment for HBV and HCV." *Id.* at *2. Wexford moved to dismiss this claim pursuant to Fed. R. Civ. P. 12(b)(6). *Id.* at *4

Judge Catherine Blake found that plaintiff's allegation, taken as true, could not create liability under *Monell* because the relevant Wexford supervisors did not act with final policymaking authority. *Id.* at *5-6. She explained that "the fact that an official 'has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.'" *Id.* at *5 (quoting *Pembaur*, 475 U.S. at 481-82). And, based on plaintiff's pleading, the "actions of" the relevant Wexford supervisors "appear[ed] to concern episodic exercises of discretion in the operational details of the organization and not a formal rule or understanding to determine whether to provide referrals or escalation of care." *Charette*, 2021 WL 1102361, at *6; *see also Whiting*, 839 F.3d at 664 (concluding that Wexford was not subject to *Monell* liability when the treating physician "had the final say" as to treatment, and thus was the

---

[28] The plaintiff died during the pendency of the suit, and the personal representative of his estate was substituted as the plaintiff.

final "decision-maker" as to medical care, but was not the "final policymaker" on particular issues).

This case is distinguishable from *Charette*, 2021 WL 1102361. For one, the case is well past the Rule 12(b)(6) stage. And here, the evidence shows that, under the Medical Contract, Wexford created provisions that related to "Infirmary Care" and "Emergency Care," which arguably constitute policies. ECF 559-63 at 78-79, §§ 3.15.6 (5), (18). To be sure, the Medical Contract required approval by DPSCS of any "policies and procedures of the Contractor pertaining to the delivery of services under the Contract prior to implementation." *Id.* at 77, ¶ 3.15.1. And, under the Medical Contract, Wexford's policies had to "be consistent with Department Policies and Procedures." *Id.* at 79, § 3.15.6.1. Moreover, to the extent that any discrepancies existed between Wexford's policies and the policies of DPSCS, the Medical Contract provided a mechanism pursuant to which DPSCS had the authority to resolve any discrepancies. *Id.* § 3.15.7. But, these requirements do not necessarily mean that Wexford did not create policies.

Dr. Baucom testified to the effect that DPSCS, not Wexford, is the relevant policymaker. She said, ECF 558-15 at 14 (Tr. at 48): "So what happens is when a contractor comes into the state, the expectation of the state is that you will adhere to DPSCS policies and procedures, unless we are missing a policy that you require." However, Dr. Baucom also said, *id*: "So if I don't have a policy related to optometry, and I've reviewed Wexford's policy then we will adopt that policy." On the other hand, Dr. Baucom also stated: "If they have a policy that they would like to put in place that is part of their company's policy, but we do not believe it comports with the spirit, outcome, and goals, we'll tell them to adhere to our policy, and we'll monitor that." *Id.* (Tr. at 49).

In addition, Dr. Baucom stated, *id.* at 20 (Tr. at 70): "Wexford would have been asked to

use our policy on emergency care." But, she also said, ECF 558-15 at 22 (Tr. at 79-80): "Any policy that the department does not have, that a contractor has, that we review and find worthy, we adopt, as we did with [the Revised Provision]."

As plaintiff notes, aspects of Dr. Baucom's testimony certainly cut in plaintiff's favor. Bost states: "Dr. Bacuom's view was that DPSCS's role was to set broad guidelines based on community standards of care, while Wexford was responsible for creating specific guidelines related to medical care in DPSCS facilities, without any need for DPSCS approval." ECF 558 at 58.

In other words, Bost argues that DPSCS delegated authority to Wexford to develop policies related to the provision of medical care, including emergency care. Dr. Baucom testified that a contractor's policies must "comport with [the] community standard of care," but otherwise DPSCS "would not get into direct clinical protocols of the approach." ECF 558-15 at 21 (Tr. at 74) (bold in original); *see also id.* at 34 (Tr. at 127). Further, according to Dr. Baucom, where a "process ha[d] a barrier," contractors could implement "work-arounds" to "get past that barrier, to achieve the same goal," even where not authorized to do so by DPSCS policy. *Id.* at 13 (Tr. at 44); *see id.* at 25-26 (Tr. at 93-95) (example of a work-around implemented by Wexford with respect to completing electronic records). Moreover, Dr. Baucom acknowledged that "most contractors will develop work-arounds and not always alert the state that they're doing it. It's very common." ECF 558-15 at 14 (Tr. at 46).

Wexford employees offered testimony consistent with the view that Wexford had authority to develop at least some policies pursuant to the Medical Contract. For instance, Kara Hope, Wexford's regional director of nursing, stated, ECF 558-20 at 8 (Tr. at 27): "So if the state of Maryland had a certain expectation, there would be a policy that was written to that expectation

on how to proceed."    But, according to Hope, Wexford was "actually . . . writing those policies to implement the expectations from . . . the state of Maryland[.]"  ECF 558-20 at 8 (Tr. at 27).

Likewise, Mariann McKee, Wexford's "director of operations" with respect to the Medical Contract, affirmed that Wexford was "required . . . to identify areas where policies needed to be created and to create those policies in the first instance," at least to the extent it was necessary "to augment what DPSCS already had in place."  ECF 558-21 at 10 (Tr. at 32).  To that end, McKee claimed that she would "create those policies in accordance with the upper level management team" and "Medical policies would go through the medical director."  *Id.* at 11 (Tr. at 33).[29]

As to the Revised Provision, it includes a cover page with Wexford's name, phone number, and address.  ECF 559-6 at 3.  On the following page, titled "Corporate Authorization," the Revised Provision states: "This Wexford Health Sources, Inc. Maryland Manual has been reviewed and approved by the Corporate Medical Advisory Committee[.]"  *Id.* at 4.  And, the Revised Provision was signed only by a Wexford employee.    In contrast, the earlier version, the Maryland UM Policy, was titled "Maryland Department of Public Safety and Correctional Services Utilization Management Policies and Procedures."  ECF 559-7 at 3.

Dr. Baucom recognized "the concern" regarding the labeling of the Revised Provision. Although I am not aware of any documentation in the record establishing that DPSCS formally approved the Revised Provision, Dr. Baucom stated that DPSCS "approved this manual for use." ECF 558-15 at 22 (Tr. at 80).  And, several Wexford officials indicated that the Revised Provision was a Wexford policy.  *See* ECF 558-32 (Getachew Dep.) at 16 (Tr. at 58); ECF 558-37 at (Fisher Dep.) at 11 (Tr. at 33).

---

[29] McKee did not identify the "medical director."  But, the Revised Provision was signed by Thomas Lehman, M.D., the "Corporate Medical Director, Clinical Services & Utilization Management."  ECF 559-6 at 4.

As indicated, the Medical Contract required DPSCS approval of any policies developed by Wexford. The State could have rejected a policy implemented by Wexford. But, it also could approve or adopt a Wexford policy. Viewing the evidence in the light most favorable to plaintiff, a reasonable juror could determine that DPSCS delegated at least some final policymaking authority to Wexford with respect to the provision of medical care. And, even if the Medical Contract did not permit Wexford to create a policy, it does not mean that Wexford did not do so. Indeed, substance prevails over form; Wexford cannot use the Medical Contract as a shield or hide behind it, so as to deny on the basis of the Medical Contract that its policies were not policies. *See Anderson v. Southern Health Partners, Inc.*, 4:20-cv-00095-M, 2022 WL 288223, 9 (E.D.N.C. Jan. 31, 2022) (finding that where State law required a county to "develop a plan for providing medical care for prisoners" within its jurisdiction, the State effectively delegated policymaking authority to the county with respect to the eventual medical care plan developed).

Therefore, Wexford's argument concerning the contractual scope of its policymaking authority does not necessarily defeat the *Monell* Claim. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017) (en banc) (concluding that a reasonable juror could determine that a State contractor acted with policymaking authority when it failed to adopt a policy to institute "protocols for coordinated, comprehensive treatment" for "chronically ill inmates").

### 2. Revised Provision

Defendant challenges plaintiff's theory of an official policy to the extent it is based on the Revised After Hours Provision and the Revised Notification Provision. According to Bost, these provisions barred Wexford employees from sending a patient offsite to receive emergency care, without prior approval. ECF 536-2 at 15-16; ECF 564 at 10-25.

Preliminarily, Bost complains that defendant did not raise any arguments pertaining to the

import of the provisions until its reply brief, and therefore the Court cannot consider the contention. ECF 558 at 54 n.15.  This is much ado about nothing.

"The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006).  Nonetheless, "a district court may consider an argument raised for the first time on reply under appropriate circumstances."  *De Simone v. VSL Pharmaceuticals*, 36 F.4th 518, 531 (4th Cir. 2022).

In particular, the Fourth Circuit has instructed that a district court may consider an argument raised for the first time in a reply brief where the "untimely argument [is] 'intimately related' to the original grounds for the motion . . . ."  *Id.* (quoting *Powell v. United States*, No. 16-cv-2960, 2017 WL 3172831, at *3 (D. Md. July 26, 2017).  Further, a "non-movant's opportunity to contest an untimely argument in a sur-reply supports a district court's decision to consider the untimely argument."  *De Simone*, 36 F.4th at 531 (citing *Clawson*, 451 F. Supp. 2d at 735).

Wexford was not required to present an argument in anticipation of an assertion in the opposition.  Instead, defendant was entitled to respond in its reply to contentions raised in the opposition.  In any event, plaintiff was permitted to file a surreply to respond to Wexford's arguments.  *See* ECF 568.

In the exercise of my discretion, I shall consider the substance of Wexford's challenge to Bost's reliance on the Revised Provision as a ground to support Bost's claim that Wexford had an official policy discouraging referrals to the emergency room.

As mentioned, Bost contends that the Revised After Hours Provision and the Revised Notification Provision are of particular significance in demonstrating an official Wexford policy concerning off-site emergency medical care.  ECF 558 at 11-13.  To review, the Revised After

Hours Provision stated, in part, ECF 559-6 at 7: "After hours notification of emergency room visits prompts the Wexford UM Department to intervene and review specific cases for medical necessity and appropriateness in a timely manner. If the patient is then admitted, the Wexford UM Department will attempt concurrent utilization review." Further, it outlined a three-step procedure, as follows, *id.* (emphasis in original):

> A.    The Site Medical Director or designee determines that transport to a contracted emergency room/hospital is necessary.
>
> B.    It is **mandatory** that the Site Medical Director or designee notifies the UM Department of all Emergency/Hospitalization at 1-877-939-2884. (If you need to contact the UM On-Call Nurse directly after hours, please call 412-897-4675).
>
> * * * * *
>
> C.    The site personnel complete an Emergency/ Hospitalization Notification and fax it AS SOON AS POSSIBLE, but no later than 24 hours after the occurrence to the Wexford UM Department. The fax number is 412-937-9151 (Refer to UM-002A, "Emergency/Hospitalization Notification").

Similarly, the Revised Notification Policy indicated that Wexford sought "[t]o ensure timely notifications of all emergent off-site care . . . ." *Id.* at 8. And, it delineated an eight-step procedure, which is reproduced, in relevant part, below, *id.*:

> A.    The Site Medical Director or designee determines that transport to the emergency room/hospital is necessary.
>
> B.    The site personnel complete an Emergency/ Hospitalization Notification Form and fax it to the Wexford UM Department AS SOON AS POSSIBLE but no later than 24 hours after the occurrence . . . .
>
> * * * * *
>
> E.    The Site Medical Director or designee must notify the hospital's emergency room that the inmate will be arriving for treatment. The Site Medical Director provides the clinical details and requests a call back to obtain the treatment plan, potential for discharge back to the infirmary or admission to acute care. Communication with the emergency room will occur until there is a resolution (return to infirmary or an admission).

F.      The Site Medical Director or the physician authorizing the ER visit submits the Medical QA Emergency Reporting Form to the Regional Medical Director detailing the event.  The Regional Medical Director contacts the Site Medical Director to discuss the case, as necessary.

G.      The Site Medical Director documents the emergency event in the inmate's medical record.

Bost maintains that these provisions, when read together, required that "a Site Medical Director or designated on-call physician had to first determine that an ER referral was necessary before the patient could be sent out" for emergency care.  ECF 558 at 11.  Wexford counters that plaintiff "selectively insert[s] words that do not appear in the actual record documents in order [to] advance the arguments she and her experts have lodged in this case."  ECF 564 at 13.  Specifically, defendant contends that the Revised After Hours Provision and the Revised Notification Provision do not use the term "'approval,'" nor do they suggest that "'physician approval'" was required "before sending a patient to the ER."  *Id.*

The parties' arguments require the Court to construe the text of the Revised Provision.  However, neither party has provided the Court with guidance as to what body of law governs this inquiry.

The Revised Provision was promulgated by Wexford in its capacity as a State contractor.  According to Dr. Getachew, the Revised Provision was disseminated to Wexford employees as "a part of their . . . orientation package," and it "applied to all providers, doctors, nurses, and mid-levels."  ECF 558-32 (Getachew Dep.) at 16 (Tr. at 58, 59).  In the absence of further direction from the parties, the Revised Provision is, in my view, analogous to an employee handbook that Wexford provided to its employees.  Principles of contract interpretation are apt.

Generally speaking, Maryland applies the law of the state where the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another

state.  *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

The parties have not indicated where Wexford executed the Revised Provision.  But, to the extent the Revised Provision concerned a contract with the State of Maryland, and governed Wexford's employees in Maryland, I will construe the Revised Provision in light of Maryland law.

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017).  "'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted).  To determine the parties' intention, courts look first to the written language of the contract.  *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement.").

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007); *W.F. Gebhardt & Co., Inc. v. American European Ins. Co.*, 250 Md. App. 652, 666, 252 A.3d 65, 73 (2021); *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract subjectively intended or personally thought it meant. *See Martz v. Day Development Co., L.C.,* 35 F.4th 220, 225 (4th Cir. 2022)*; Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

A court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)); *see Cochran,* 398 Md. 1, 919 A.2d at 710 ("Under the objective theory of contracts, [courts] look at what a

reasonably prudent person in the same position would have understood as to the meaning of the agreement."); *Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated.").

Notably, "the plain meaning is determined by 'focus[ing] on the four corners of the agreement.'" *Martz*, 35 F.4th at 225 (citation omitted) (alteration in *Martz*). "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted).

"'Traditionally, to supply contractual language with its ordinary and accepted meanings[,] this Court consults the dictionary definition of such terms.'" *W.F. Gebhardt*, 250 Md. App. at 668, 252 A.3d at 74 (quoting *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d 303, 311 (2019)) (alteration in *Credible Behavioral Health*). "Furthermore, 'simply because [a party] can point to several slightly different dictionary definitions of [a word] does not render that term ambiguous.'" *W.F. Gebhardt*, 250 Md. App. 667, 252 A.3d at 74 (quoting *Rigby v. Allstate Indem.*, 225 Md. App. 98, 110, 123 A.3d 592, 598-99 (2015)) (alterations in *W.F. Gebhardt*).

A contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). A contract is ambiguous "'if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning.'" *Martz*, 35 F.4th at 225 (citation omitted); *see also Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris v.*

*Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999); *W.F. Gebhardt*, 250 Md. App. at 667, 252 A.3d at 74.

The determination of whether a contract is ambiguous is a question of law. *Towson Univ*., 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Washington*, 376 Md. at 163, 829 A.2d at 544. Generally, "'ambiguities are resolved against the draftsman of the instrument.'" *John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co*., 415 Md. 313, 334, 999 A.2d 1066, 1078 (2010).

To ascertain whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co*., 302 Md. 383, 388, 488 A.2d 486, 488 (1985). But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc*., 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

A court may not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.,* 392 Md. 601, 624, 898 A.2d 472, 485 (2006). "It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris,* 353 Md. at 445, 727 A.2d at 368 (quoting *Canaras v. Lift Truck Servs.,* 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.,* 966 F.2d 1443 *Table), 1992 WL 145269, at *5 (4th Cir.1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

Consideration of extrinsic evidence is unnecessary when a contract is unambiguous. *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co*., 390 Md. 449, 459, 889 A.2d 387, 393 (2006). Conversely, if the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Cty. Commissioners of Charles Cty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted); *accord John L. Mattingly Const. Co.,* 415 Md. at 327, 999 A.2d at 1074; *see Point's Reach Condominium Council of Unit Owners v. Point Homeowners Ass'n, Inc*., 213 Md. 152, 157-58, 582 A.2d 493, 495 (1990). For example, if a contract is ambiguous, "'extrinsic evidence may be consulted to determine . . . whether the ambiguous language has a trade usage.'" *Mut. Fire Ins. Co. of Calvert Cty. v. Ackerman*, 162 Md. App. 1, 15, 872 A.2d 110, 118 (2005) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co*., 302 Md. 383, 404, 488 A.2d 486, 497 (1985)); *see Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc*., 38 Md. App. 119, 130, 380 A.2d 627, 635 (1977). But, extrinsic evidence may "not be used to contradict other, unambiguous language." *Calomiris*, 353 Md. at 441, 727 A.2d at 366.

If a court determines as a matter of law that the contract is ambiguous, "'it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.'" *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc*., 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp*., 7 F.3d 1123, 1126 (4th Cir. 1993)). On the other hand, if "'resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.'" *Washington Metro. Area*

*Transit Auth.*, 476 F.3d at 235 (quoting *Goodman*, 7 F.3d at 1126); *see Sheridan v. Nationwide Ret. Sols., Inc.*, 313 F. App'x 615, 619 (4th Cir. 2009). Moreover, the court may construe an ambiguous contract only "'if there is no factual dispute in the evidence.'" *CB Structures, Inc. v. Potomac Electric Power Co.*, 122 F. Supp. 3d 247, 251 (D. Md. 2015) (citation omitted); *see also Chorley Entrs. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015); *Pac. Indem. Co.*, 302 Md. at 389, 488 A.2d at 489.

In view of the foregoing principles, Wexford clearly has the better of the argument. Looking to the text of the Revised Provision, it simply does not require Wexford staff to obtain prior approval before sending a patient off-site to receive emergency care. Rather, both documents merely provide the process pursuant to which Wexford employees were required to notify the Wexford UM Department if a patient was sent off-site.

For example, the titles of both policies speak to "notification," not "approval." ECF 559-6 at 7, 8. Moreover, as Wexford notes, neither the Revised After Hours Provision nor the Revised Notification Provision uses the term "approval." Nor do the provisions otherwise specify that physician approval was required before a patient could be sent off-site to receive emergency medical care. ECF 564 at 13-15. Instead, the provisions required notification to Wexford's UM Department "AS SOON AS POSSIBLE but no later than 24 hours after the occurrence," which, by its plain terms, indicates that the relevant notification was not required until *after* the patient was sent off-site. ECF 559-6 at 7, 8. And, notice to UM is consistent with the function of UM.

Further, both provisions provided that a "Site Medical Director or *designee*" could make the determination to send a patient to the Emergency Room. ECF 559-6 at 7. Bost contends, without further explanation, that the term "designee" was necessarily limited to the physician on-call. ECF 558 at 12. But, the Revised Provision does not define the term "designee," let alone

- 87 -

expressly limit the authority to an on-call physician.

Bost also urges the Court to construe the Revised After Hours Provision and the Revised Notification in light of the text of the earlier Maryland UM Policy. *See* ECF 559-7. In this regard, plaintiff points out that the Revised Provision omitted a sentence that had been included in the earlier Notification Provision. The Notification Provision said, ECF 559-7 at 8: "Urgent and emergent referrals are automatic approval as to not delay any care." According to plaintiff, the omission of such critical language from the Revised Notification Provision indicates that Wexford's intent was to implement a policy requiring its staff to secure approval before sending an inmate off-site for health care. ECF 558 at 11-12.

As an initial matter, plaintiff does not cite any authority for the proposition that the Court can or should consider the Maryland UM Policy, which was promulgated pursuant to a different contract, to construe the Revised Provision, which is facially unambiguous. In short, there is no magic language that Wexford had to use to reword its provisions. Wexford was not required to include in the revision what it had said in an earlier version, *i.e.*, "Urgent and emergent referrals are automatic approval as to not delay any care." ECF 559-7 at 8.

Moreover, Bost cannot rely on a textual omission to alter the plain meaning of the Revised Provision. The omission is readily explained by other changes in the text. For example, the Revised After Hours Provision enlarged those with authority to send an inmate off site. In the earlier version, only the "Site Medical Director or *Physician on call* determines that transport to the emergency room/hospital is necessary." *Id.* at 6. In contrast, the revised procedure said: "Site Medical Director or *designee* determines that transport to the emergency room/hospital is necessary." ECF 559-6 at 7 (emphasis added). Further, the "Procedure" section of the Revised Notification Provision was altered to indicate that the determination to send a patient off-site

precedes notification to the Wexford UM Department.  *Compare* ECF 559-6 at 8 *with* ECF 559-7 at 8.

In sum, the language of the Revised Provision is unambiguous.  Both the Revised After Hours Provision and the Revised Notification Provision plainly prescribe the procedure by which Wexford medical staff were required to *notify* Wexford's UM Department that a patient had been sent to an off-site facility to receive emergency care.  There is no requirement in either document that obligated a health care provider to obtain prior approval before doing so.

Accordingly, Bost may not argue at trial that the Revised After Hours Provision and the Revised Notification Provision constitute official or express policies of Wexford, by which Wexford's medical providers were required to obtain permission before transferring a detainee or a prisoner to an off-site emergency room.

### 3.  Reducing Off-Site Emergency Care

Bost also rests her official policy contention on the intense efforts of Wexford to reduce off-site emergency care, as evidenced by the Initiative and other evidence.  *See* ECF 558 at 55-56.

The Initiative was contained within a document titled "Central region Baltimore Annual performance improvement report 2012 Wexford Health."  ECF 558-5 at 2.  As discussed, the Initiative articulated Wexford's "Goal" of "reduc[ing] the utilization emergency offsite services by increasing onsite capability to address emergency situations."  ECF 558-5 at 45.  And, there is evidence to support a finding that it was initiated by Wexford when it held the UM Contract.  *See* ECF 558-22 (James Dep.) at 27-28 (Tr. at 97-98, 101-02) (attributing the Initiative to Wexford UM staff).

Plaintiff points to the portion of the Initiative that indicated that Wexford would "establish" a "back up **gate keeper** on call for all ER Trips." ECF 558-5 at 53 (boldface in original).

According to plaintiff, this language indicated that Wexford required its medical staff to obtain prior permission before sending a patient off-site to receive emergency care. ECF 558 at 23, 52.

Wexford asserts that plaintiff's claim is misplaced, because the Initiative had expired by the time Wexford began work on the Medical Contract and, in any event, it never applied to the conditions from which Ms. Neal suffered. ECF 536-2 at 10-15. According to Wexford, the Initiative "had a lifespan of August 2011 to September 2011" and thus "expired approximately eight months before Wexford obtained the [Medical Contract] and more than a year prior to Ms. Neal's death." *Id.* at 10. Wexford also asserts that the "originators of the program sought to focus on treating three groups of disorders on-site," none of which is at issue in this case. *Id.* Further, Wexford claims that its employees were never instructed "to call a physician prior to sending a patient in urgent condition out for emergency medical treatment" or otherwise to "delay or deny emergency care." *Id.* at 15.

In my view, Wexford misreads the Initiative's terms.

As discussed above, the "**Planning**" phase of the Initiative ended in September 2011. However, the Initiative did not include a specific end date. ECF 558-5 at 45. To the contrary, the "**Maintenance**" phase of the Initiative was scheduled to begin in January 2012 and continue "Onwards." *Id.* at 47. Regarding the disorders covered by the Initiative, defendant is correct that the Initiative listed three conditions that do not appear to be relevant to this suit. But, it also said that the Initiative would be "Adaptable" and that these disorders were the "First group" covered. *Id.* at 46. It expressly indicated that other disorders would be "select[ed] . . . through the process . . . ." *Id.* Moreover, the Initiative indicated that Wexford began to monitor the "data of ER run break down" related to "Trauma" and "Neurology" during the "**Maintenance**" phase. *Id.* at 47-48.

In addition, some Wexford employees recalled that the Initiative continued beyond July 2012, when the Medical Contract commenced. For instance, Riccitelli, Wexford's health service administrator, testified that she was aware of the "initiative at. . . the jail." ECF 558-20 at 10 (Tr. at 34). Riccitelli indicated that, to her knowledge, the Initiative remained operative in 2014, when she terminated her employment with Wexford. *Id.* at 15 (Tr. at 54-55).

Ms. James, the Wexford Regional CQI Director, testified that the Initiative sought to "figure out what the [ER] runs were about and were they appropriate ER runs," meaning whether "they warranted a higher level of care rather than the level of care [Wexford] had in the infirmary or at the sites." ECF 558-22 at 27 (Tr. at 97-98). She confirmed that "the emphasis on ER runs was, in particular, about whether or not somebody could be treated in the infirmary rather than needing to go to the emergency room." *Id.* (Tr. at 99).

Apart from the Initiative, Bost asserts that there is ample other evidence to support the claim of an official policy to reduce off-site emergency care.

For example, Bost has provided minutes of a "DPSCS Monthly Regional Medical Advisory Council Meeting" that was held on August 16, 2012. ECF 558-61. The minutes reflect that Stacey Scott and Kara Hope presented information at the meeting, advising that, as to "pretrial," the "ER, Reduction initiatives for Pretrial are looking well" and that "[i]n the past 15 days there have been no ER runs." *Id.* at 2-3.[30]

Dr. Tessema sent a congratulatory email to other Wexford staff on August 16, 2012. ECF 558-43. He wrote, in part, *id.* at 2-3 (underlining in original): "We had a record of 1 week with no ER runs few months ago and this month we had <u>NO ER run for the first half of August 15 days</u>

---

[30] There is no indication in the minutes that the State raised any concern regarding the report provided by Wexford.

straight  . . . . We recognize and appreciate the whole team's strong dedication and will to seek higher and safer goals . . . ."  He attributed this success to "MTC infirmary," which had been "instrumental in the successes of the ER reduction program since its implementation in October 2011." *Id.*

A State employee sent an email to Wexford staff on October 1, 2012, stating: "I am pleased to announce that, there were no ER send out form [sic] BCBIC since 9/11/2012. . . . We have improved our record both in the number of days (20) without ER send out and the number (6) sent to the ER."  ECF 558-44 at 4.  In response, Scott, a Wexford employee, wrote, *id.* at 3: "I really appreciate all the efforts made in decreasing the ER runs for this facility."[31]

On October 10, 2012, Dr. Tessema sent an email to a number of Wexford employees and DPSCS officials, including Dr. Baucom.  ECF 558-72 at 2.  The subject line of the email stated, *id.*: "Another Record Low ER run for BCBIC with 25 days with No ER runs."[32]  In the body of the email, Dr. Tessema indicated that there had been "25 days with no ER runs" between September 11, 2012, and October 7, 2012.  *Id.*  And, he stated, *id.*:

> [W]e would like to recognize the BCBIC site medical Director Dr. Wubu and ADON Scarlett Chambers along with their team of charging nurses, providers & custodial leadership for their relentless pursuit of perfection to significantly raise the standard & quality of care as evidenced by their achievement of this unbelievable record.

Dr. Baucom responded promptly to Dr. Tessma, stating, *id.*: "Congratulations indeed!"  She noted that other DPSCS officials had asked her "what changed" and inquired as to whether this trend was attributable to the fact that "Wexford is paying for services[.]"  *Id.*  And, she asked:

---

[31] As indicated earlier, Somner responded to "suggest" that Wexford "hold off a bit sending this congrats to the client since the investigation on [a recent] inmate death . . . includes questioning on why we waited so long to send him out."  ECF 558-44 at 2.

[32] BCBIC is an acronym for "Baltimore City Booking and Intake Center." *See Watkins v. Baltimore City*, CCB-20-208, 2021 WL 4342089, at *3 (D. Md. Sept. 23, 2021).

"[I]s there a meeting that is routinely held by your team that I could attend to ask a number of questions regarding the details of this success?" ECF 558-72 at 2. Dr. Tessema responded later that afternoon, stating: "Thank you Dr. Baucom. We will talk to you after the all vendors meeting this afternoon for detailed answers." *Id.*

The CQI Reports frequently indicated that Wexford actively monitored the progress in minimizing the frequency of transporting inmates off-site. *See*, *e.g.*, ECF 558-7 at 5 (CQI Report dated November 30, 2012); ECF 558-59 at 3 (CQI Report dated January 23, 2013); ECF 558-62 at 7 (CQI Report dated December 21, 2012). In the report of January 31, 2013, Wexford highlighted that it sought to "[m]inimize the number of Er runs for the month" and to "[h]ave emergent cases seen on site." ECF 558-8 at 3.

Additionally, plaintiff has submitted testimony showing that Wexford staff held regular calls to discuss the appropriateness of each "ER trip." *See* ECF 558-32 (Getachew Dep.) at 7 (Tr. at 23-24). Dr. Tessema confirmed that during these calls, he would discuss "with the UM medical director ways that [Wexford] could reduce the number of unwarranted ER runs," where possible. *Id.* (Tr. at 119). In turn, Dr. Tessema would relate information he learned during these calls to medical providers, to the extent that the information pertained to "a clinical situation that will benefit the provider that came from the UM medical director . . . so that [the provider will] improve himself or herself." *Id.* at 33 (Tr. at 122). Wexford's efforts apparently caused some of its medical staff to fear that they would be penalized for calling 911. ECF 558-47 at 2 (email dated November 4, 2012).

Other exhibits show that when physicians sent patients off-site, they were questioned by their supervisors for making those decisions. For example, on October 31, 2013, Dr. Afre transmitted an email to Dr. Tessema, Ms. Riccitelli, and Ms. Scott, among others, notifying them

that he had referred a patient off-site to receive emergency care. ECF 558-45 at 2-3. Dr. Tessema replied the following day, stating, *id.* at 2: "How is this patient doing? [D]o you think we could prevent this if we send the patient for imaging instead of ER?"

Bost has also shown that Wexford considered the cost-effectiveness of its direct medical providers when reviewing their performance. For instance, Dr. Tessema completed a performance review of Dr. Afre, dated August 7, 2013. ECF 558-2 at 6. He rated Dr. Afre's cost effectiveness as "Exceeds Expectations" and noted that he had "very low ER referral[.]" *Id.* at 4; *see also* ECF 558-4 (Dr. Afre performance evaluation dated October 8, 2015).

The reduction in E.R. visits is not explained by improvements on site at the various penal institutions, so as to reduce the need for off site treatment. Dr. Afre confirmed that Wexford did not provide additional "equipment or resources that [would have] expanded the services that could be provided in the infirmary." ECF 558-30 (Afre Dep.) at 4 (Tr. at 9-10). Likewise, Graham affirmed that "functionally nothing changed" when Wexford began work under the Medical Contract. ECF 558-19 (Graham Dep.) at 3 (Tr. at 7); *see also* ECF 558-25 (Hope Dep.) at 3 (Tr. at 7) (affirming that Wexford did not hold "additional training about the operations of the infirmary at the BCDC"); ECF 558-24 (McNulty Dep.) at 24 (Tr. at 86-88) (similar).

According to plaintiff's experts, Wexford's efforts to reduce off-site emergency visits were the product of the Initiative. Dr. Herrington determined, in part, that "Fatima Neal's death was a product of Wexford's ED reduction initiative in place at the time . . . ." ECF 558-49 at 28. He also found, *id.* at 26: "Put simply, there was unquestionably a concerted campaign to reduce ED trips across Maryland facilities, and especially Baltimore, in order to reduce costs."[33]

And, there is some evidence that at least one Wexford staff member was aware that Ms.

_____

[33] As discussed, *infra*, the admissibility of these statements is not before me this time.

Neal expected to be released from BCDC on November 5, 2012. *See* ECF 550-4 at 2 (medical record dated October 23, 2012, stating that Ms. Neal reported that "she is scheduled for court on 11/05/12" and indicated that "she will be released at that time"). Because Wexford was, generally speaking, responsible for costs associated with emergency room care for inmates (ECF 559-21 at 5; ECF 558-60 at 214-15), a reasonable juror could infer that Wexford had a financial motive to delay sending Ms. Neal off-site, given that she was about to be released from DPSCS custody.

To be sure, several Wexford employees denied that medical staff were required to obtain approval from a physician before sending a patient off-site for emergency care. Dr. Getachew stated, ECF 558-32 at 6 (Tr. at 18): "[I]f the patient has [a] life- or limb-threatening condition, the nurse who's available on-site, or if the nurse is not available, custody even can make a decision. They call 911, and the patient is transferred to [the] emergency room." He reiterated: "If a doctor is on-site, it doesn't require prior authorization. If . . . the doctor is not on-site, they call the on-call doctor, it doesn't require pre-authorization. [T]he thing I want you to understand is, people can go to [the] emergency room, there is no pre-authorization when I worked for Wexford." *Id.* (Tr. at 19).

Similarly, Dr. Tessema maintained that "anybody can send anybody to the ER at any time for whatever reason that they feel uncomfortable keeping the patient on site." ECF 558-35 (Tessema Dep.) at 45 (Tr. at 169). He also said that there was "no gatekeeper for anybody to go to the ER. Somebody needs to go to the ER, all they have to do is call 911, the patient is gone." *Id.* at 36 (Tr. at 135). Moreover, he stated, *id.* at 42 (Tr. at 157-58): "If somebody doesn't feel comfortable to make a decision, you have several people that can advise you, including the on-call physician . . . . So all those people are your tools to help you decide if you want to send somebody out or not. And those, they're not gatekeepers."

Other Wexford nurses corroborated the testimony of Dr. Tessema and Dr. Getachew. For instance, Nurse Ajayi confirmed that "as an RN working at WDC in the fall of 2012," she was "able to call 911 without any further authorization," so long as "there was a need." ECF 558-27 at 69 (Tr. at 266). Nurse Obadina also affirmed that she had "the ability to call 911 without any further authorization . . . if it's really an emergency," such as "[t]o save a life." ECF 564-3 (Obadina Dep.) at 3. *See also* ECF 558-26 (Jamal Dep.) at 18 (Tr. at 307-08).

However, some Wexford employees indicated that they were required to obtain prior approval before sending patients off-site. For instance, Nurse McNulty explained, ECF 558-24 (McNulty Dep.) at 35 (Tr.at 132): "[I]n an emergency situation, of course, we would notify the provider. The doctor, PA, whoever was available. And, of course, they would have to notify the correctional staff, because they would have to set up as far as ambulance coming in, so they would have to be notified. But we . . . would have to notify, but as far as immediate, we could take appropriate nursing actions before even that was done to help the patient." Nurse McNulty affirmed that "when there's a need to send someone outside . . . [she] would have to have the approval of either a doctor or a physician's assistant." *Id.* (Tr. at 133). Other Wexford employees testified similarly. *See* ECF 558-22 (James Dep.) at 20-21 (Tr. at 72-73); ECF 558-23 (El-Sayed Dep.) at 12 (Tr. at 38-39).

Some testimony was seemingly inconsistent on this point. For instance, Ms. James testified that "nurses would, in fact, get doctor approval before they'd send someone out to the emergency room" and that "part of the policy was that a doctor had to be notified of any send-off." ECF 558-22 at 21 (Tr. at 73). But, she also said, *id.* at 22 (Tr. at 80): "I just want to share with you that if a nurse felt that there was such an egregious medical emergency, they would just on their own send someone out."

The evidence may well be contradictory or inconsistent. But, it is the role of the factfinder to resolve any discrepancies in the testimony and to decide what testimony to credit, if any.

Wexford also argues that plaintiff's official policy theory cannot succeed because one of Bost's expert witnesses, Dr. Pedelty, "testified that she could not say to a reasonable degree of medical probability that had Ms. Neal been taken to the ER at any time after midnight, November 4, 2012, she would have survived." ECF 536-2 at 27. At Dr. Pedelty's deposition, defense counsel asked, ECF 558-40 (Pedelty Dep.) at 39 (Tr. at 145): "Do you have an opinion with reasonable medical probability that had this patient gone to the hospital at any time after midnight on November 4th, would she have survived?" Dr. Pedelty responded, *id.*: "I can't say." Thus, in defendant's view, "[b]ecause the alleged unconstitutional conduct—requiring a call to a physician to release a patient from the infirmary to the ER—did not affect Ms. Neal's medical course, her Estate cannot recover under *Monell* on that theory of liability." ECF 536-2 at 27.

As mentioned, plaintiff has provided the Court with evidence establishing that, more likely than not, Ms. Neal would have survived her stroke had she received prompt medical treatment. *See* ECF 558-40 (Pedelty Dep.) at 43-44 (Tr. at 163-65); ECF 559-42 (Pedelty Supp. Report) at 2-3. Indeed, defendant's expert witness provided testimony indicating that strokes of the kind Ms. Neal suffered are, generally speaking, not fatal, provided that they are treated with appropriate and timely medical care. ECF 558-33 (Schwartz Dep.) at 26, 27, 33, 34, 35-36, 37 (Tr. at 94-95, 97-98, 100, 122, 123, 128, 132-33, 138). The defendant's argument ignores plaintiff's claim that Ms. Neal should have been sent to the hospital after she was assessed at the Infirmary on November 1, 2012, and certainly well before November 4, 2012.

The contention also misconstrues plaintiff's theory of the case. Bost's claim is not merely that Wexford required its medical staff to obtain prior approval before sending an inmate off-site

for emergency care. Rather, Bost contends that Wexford waged a campaign to reduce the use of off-site emergency services, and its policy to require medical staff to obtain prior approval before sending a patient off-site was just one component the larger effort to avoid the use of off-site emergency services. *See* ECF 558 at 57; *see also Pembuar*, 475 U.S. at 480-81 (explaining that *Monell* encompasses "formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time").

Dr. Evans observed that Ms. Neal's medical records "include multiple comments of normality, interspersed with contradictory findings (but even then without any treatment or action)." ECF 559-32 (Evans Report) at 8. He also noted Ms. Neal's "only medical intervention outside of her usual medication was administration of a narcotic pain reliever to cover up the headache pain." *Id.* According to Dr. Evans, such care was substandard, as "medical personnel failed to consider the most obvious and serious possibility that [Ms. Neal's] symptoms were compatible with and, in fact, suggestive of an intracranial bleed," which required emergency care. *Id.* at 7.

Similarly, Dr. Pedelty opined that the medical records pertaining to Ms. Neal's stay in the Infirmary indicated that "Ms. Neal should have been under close observation and monitoring based on her presentation to the infirmary" and "observation of any of the many other symptoms reported by the other detainees should have triggered" the staff "to immediately seek medical intervention," by transferring Ms. Neal "to a medical facility where further testing and treatment could be provided." ECF 559-33 (Pedelty Report) at 6. Dr. Pedelty attributed Ms. Neal's death to a "failure to consider, investigate, and obtain appropriate medical care for a diagnosis of stroke over the course of her initial evaluation on admission to and throughout her stay in the BCDC infirmary."

ECF 559-33 at 7.

A reasonable juror could determine that the egregious failure of Wexford's medical staff to send Ms. Neal to the ER in a timely manner was the product of an official Wexford policy to delay or deny the referral of a patient for emergency room care. Whether Wexford had such a policy is an issue that falls squarely within the purview of the jury. *See Anderson*, 477 U.S. at 247-48; *See*, *e.g.*, *United States v. Bates*, 784 F. App'x 312, 326 (6th Cir. 2019).

### B. Custom and Practice

Defendant challenges the *Monell* claim to the extent it rests on the theory that Wexford had a widespread custom, pattern, and practice to delay or deny emergency care, and that the practice resulted in Ms. Neal's death.

As discussed earlier, a municipal entity, or in this case a corporation acting under color of State law, violates § 1983 if it "fail[s] 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). To assert a plausible *Monell* claim on this basis, a plaintiff must allege "a 'persistent and widespread practice[ ] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386-1391). Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391). However, only "'widespread or flagrant'" misconduct is sufficient. *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387). In contrast, "[s]poradic or isolated" misconduct is not. *Owens*, 767 F.3d at 403.

Initially, Wexford challenged this theory to the extent that Bost relied on the reports of her expert witnesses, Dr. Herrington and Dr. Keller. ECF 536-2 at 16-28. Wexford argued that the

expert reports are "replete with misleading statements that incorrectly cite various records and depositions, as well as entirely manufactured and uncited statements of fact." *Id.* at 18. It faulted the review of other incidents involving other inmates, and claimed that the expert reports were inadmissible pursuant to Fed. R. Evid. 702. *Id.*

Generally speaking, parties may challenge expert testimony pursuant to Rule 702 via a so called *Daubert* motion. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). However, district courts have also addressed challenges to the admissibility of expert testimony in the context of a motion for summary judgment. *See, e.g., Selective Ins. Co. v. Empire Comfort Systems,* WMN-03-0178, 2007 WL 7681251, at *2-3 (D. Md. Mar. 21, 2007); *Heaps v. General Motors Corp.,* RDB-05-1500, 2006 WL 2456231, at *3-5 (D. Md. Aug. 22, 2006); *see also Campbell v. Fawber,* 975 F. Supp. 2d 485, 489–90 (M.D. Pa. 2013).

In particular, in some instances, a party challenging expert testimony at the summary judgment stage will present, in addition to the summary judgment motion, a motion to strike or exclude the expert testimony at issue. *See, e.g., Morris v. Biomet, Inc.*, 491 F. Supp. 3d 87, 94 (D. Md. 2020); *Casey v. Geek Squad ® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 337-38 (D. Md. 2011). But, defendant did not do so in this case. Nonetheless, in its briefing, defendant disputed the methodology of the plaintiff's experts and the reliability of their opinions.

However, at the Motion hearing held on August 5, 2022, Wexford abandoned its challenge to reliability and methodology for purposes of resolving the Motion.[34] Instead, Wexford argues that the expert reports do not show a custom, pattern, or practice of deliberate indifference.

In general, Wexford challenges the relevance of the examples cited by Dr. Herrington along

---

[34] Defendant sought to preserve its right to lodge such challenges at a later time.

three lines.  First, Wexford maintains that some of the incidents considered by Dr. Herrington occurred when Corizon was the provider, *i.e.*, prior to the time when Wexford began performing work under the Medical Contract, and therefore those occurrences "cannot be attributable to Wexford to show a custom[.]"  ECF 536-2 at 24-25.  Second, Wexford claims that factual circumstances presented by the other incidents are not comparable to the circumstances in Ms. Neal's case.  *Id.* at 25-26.  In particular, Wexford contends that the cases examined by Dr. Herrington are factually too dissimilar to Ms. Neal's case, such that they cannot be used to establish a "persistent and widespread practice."  ECF 536-2 at 23.  Moreover, Wexford contends that the sample of comparators is too small.  In its view, "the identification of nineteen cases is hardly sufficient to establish a custom or practice . . .", given that Wexford "treated thousands of patients in Maryland during its contract for direct patient services."  *Id.*

Not surprisingly, plaintiff rejects these contentions.  ECF 558 at 42-53.  Bost maintains that she has "adduced a wealth of evidence that would permit a reasonable jury to conclude that Wexford maintained a widespread" custom and practice of denying and delaying necessary and emergency offsite care.  ECF 558 at 43.  In particular, she highlights that Dr. Herrington "found 19 separate cases (in addition to Ms. Neal's case) in which the patients' care was woefully inadequate."  *Id.* at 44.  Further, Bost claims that "Wexford's own documents and emails betray its widespread practice of intentionally denying ER care, despite the known and obvious risk" of doing so.  *Id.* (italics omitted).  Based on this evidence, Bost asserts: "A jury could easily conclude that Wexford's response to the known risks posed by its practices evinced deliberate indifference."  *Id.* at 47.

To begin, the fact that Wexford did not provide direct medical services prior to July 1, 2012, does not necessarily render incidents that occurred prior to that date irrelevant for purposes

of a custom and practice claim. Critically, Wexford came to the Medical Contract with a long history of working with DPSCS, in a related capacity. *See* ECF 559-10 (UM Contract). From 2005 to mid 2012, Wexford was "responsible for utilization management for all clinical services" provided to inmates within the custody of DPSCS. *Id.* at 144, § 2.2.5.1.1. Moreover, there is evidence in the record that suggests Wexford drafted and began to operationalize the Initiative prior to beginning work under the Medical Contract, pursuant to which Wexford sought to reduce the incidence of ER care. *See* ECF 558-5 at 45-53.

Further, Corizon provided Wexford with at least some access to information relating to the provision of health care, including emergency care. Dr. Smith confirmed that between 2005 and 2012, Wexford "review[ed] requests for offsite care"; "review[ed] retrospectively patients who had been referred to the emergency room"; and "analyze[d] data that [Wexford] had received in order to . . . generate reports required by the contract." ECF 558-16 at 6 (Tr. at 18). Through this work, Wexford was given access to relevant patient information, including "medical records . . . needed to make a determination about the necessity of ER runs." ECF 558-16 at 19 (Tr. at 70-71); *see* ECF 558-32 (Getachew Dep.) at 11 (Tr. at 38-40) (confirming that Wexford and Corizon employees had the same access to "all the same data" relevant to the medical care provided to individuals within the custody of DPSCS).

It is also noteworthy that Wexford hired many of the same health care providers who had previously worked for Corizon. ECF 558 at 52. Although their employer changed, their work remained the same.

*Corbitt v. Baltimore City Police Dep't*, RDB-20-3431, 2022 WL 846209 (D. Md. Mar. 22, 2022), provides guidance. In that case, the plaintiff was "struck by a stray bullet as Baltimore City Police officers pursued a vehicle through the streets of Baltimore City and exchanged gunfire with

a suspect." *Corbitt*, 2022 WL 846209, at *1. In the suit that followed, plaintiff asserted a § 1983 claim for the deprivation of his due process rights as guaranteed by Fourteenth Amendment. He sued fourteen police officers in their individual capacity; Kevin Davis, the former Commissioner of the Baltimore Police Department ("BPD"); former BPD Police Chief T.J. Smith, under a theory of supervisory liability; and the BPD, under a theory of municipal liability. *Id.*

Of relevance here, Judge Richard Bennett observed that "public officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Id.* at *11. Rather, the plaintiff must show, among other things, that "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff" and that "the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices." *Id.* (cleaned up). Notably, Judge Bennett found that the plaintiff had adequately alleged that Davis and Smith had actual or constructive knowledge of the failure of BPD officers to adequately respond to emergency pursuits, based on "five prior instances in which bystanders were killed as a result of BPD's practice of engaging in unreasonable vehicular chases." *Id.*

Davis argued that "five of the six examples occurred before or after Davis's tenure as BPD Commissioner." *Id.* at *12 (citation and internal quotation marks omitted). But, Judge Bennett rejected the argument. He reasoned that "the incidents alleged need not occur during the Defendants' tenure," as the "Fourth Circuit has never held that the widespread or pervasive wrongdoing must originate from the same source as the plaintiff's alleged injury." *Id.* at *13 (internal quotation marks and citations omitted). Rather, it was sufficient that "Davis and Smith had knowledge of [an] ongoing pattern and failed to take action to correct it—regardless of whether

all of the instances alleged occurred while Davis and Smith were in office."  *Corbitt*, 2022 WL 846209, at *12.

The same reasoning applies here.  As recounted above, there is evidence showing that Wexford and its staff had access to information pertaining to Corizon's delivery of health care, including delays in sending patients off site for emergency care.  Further, as discussed in more detail below, there is evidence showing that, while Wexford held the UM Contract, medical providers employed at DPSCS facilities failed to transport inmates off-site to receive emergency care.  *See*, *e.g.*, ECF 537-1 at 9, 14-15, 15-16.

For purposes of *Monell*, Wexford cannot draw a line in the sand on the date of July 1, 2012. I am persuaded that, in the light most favorable to Bost, a reasonable juror could determine that, even before Wexford became the actual medical provider, Wexford had constructive notice of issues concerning the provision of emergency medical care at DPSCS facilities.  The consideration of incidents from the time period included in the analysis is not inherently flawed.

This is not to suggest that the incidents that occurred prior to July 1, 2012, standing alone, would necessarily give rise to a viable, freestanding pattern and practice claim against Wexford for the denial of appropriate medical care.  But, that is not the relevant inquiry.  Rather, the question at this juncture is whether the incidents that occurred before July 1, 2012, while Corizon was the medical provider, are part of a pattern of denial of off-site emergency care to inmates, of which defendant had constructive notice, and which persisted through the time of Ms. Neal's death. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *Huthnance v. District of Columbia*, 793 F. Supp. 2d 183, 210 (D.D.C. 2011) (same), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013).

In addition, Wexford argues that the nineteen medical incidents described by Dr. Herrington are factually inapposite. ECF 536-2 at 22-23. Thus, defendant claims that these cases cannot form the basis of a pattern and practice claim.

In particular, defendant points out that three of the nineteen cases on which Dr. Herrington relies do not involve a failure to transport a patient to the ER; one case concerns a patient "who was detained in a mental health unit and was treated by healthcare professionals who were not Wexford employees"; three cases concern "patients who were in fact sent to the ER on multiple occasions in the days and weeks prior to their deaths, but they were returned from the hospital to the facility"; and some of the incidents do not involve neurological events. ECF 536-2 at 24.

Bost does not assert *Monell* liability based on a generic claim of substandard medical care to prisoners. As I explained in my Memorandum Opinion of April 15, 2020, ECF 499 at 23: "Since the inception of this litigation . . . , plaintiff has steadfastly pressed the claim that Neal died due to defendants' failure to obtain timely emergency medical care." Moreover, I observed that, according to plaintiff, "Neal's death was not caused by a lapse in routine medical care that, for example, allowed a hidden malignancy to spread undetected, such as a melanoma that masqueraded as a freckle." *Id.* at 25. Instead, plaintiff contended that "Ms. Neal died because, despite presenting allegedly obvious symptoms of a stroke—an acute, life-threatening condition— she languished in the infirmary for days and was not transported to the hospital." *Id.*

Therefore, to the extent that the Herrington Report is predicated on cases that do not involve Wexford's failure to provide timely, off-site emergency care, they are not relevant. And, it is readily apparent that at least three of the cases described in the Herrington Report do not fit the bill. These cases involve patients I shall refer to as M.G., R.A., and J.M, respectively. ECF 537-1 at 8, 14, 18.

M.G. was detained at the BCBIC, had a "history of high blood pressure and opioid addiction," and was "referred to medical for continuity of treatment for his hypertension." ECF 537-1 at 8. However, M.G. "was not seen by medical, and then was found unresponsive and suffered [a] cardiac arrest on 06/22/13." *Id.* Dr. Herrington noted that "no vital signs [were] taken during [G.M.'s] incarceration" and there was "no intake documentation (including missing blood pressure and vital signs) in the medical record." *Id.*; *see also* ECF 558-10 at 2-3 (M.G. CAP, dated June 26, 2013, noting the same). In the absence of any indication that M.G. was seen by Wexford's medical staff, let alone any finding that medical staff delayed or denied him access to necessary off-site emergency care, it is unclear how M.G.'s case has relevance here.

With respect to R.A., Dr. Herrington describes "a 29-year-old black male with a history of seizures, high blood pressure, cardiomyopathy and mental illness who was incarcerated on 5/22/13." ECF 537-1 at 14. On March 12, 2014, while R.A. was attending a court hearing, he "developed seizure like activity and arrested." *Id.*; *see also* ECF 537-6 at 14-24 (records pertaining to R.A. "Death Review Summary" and "Morbidity and Mortality Report"). Dr. Herrington posits, ECF 537-1 at 14: "[T]he DPSCS investigator's death review summary identified a number of shortcomings including failures to follow up on known medical conditions, failure in discontinuing medication . . ., and ultimately concludes that while the patient's mental health issues were considered, 'pt's medical issues were not addressed.'" But, as with M.G., there is no indication that R.A. presented Wexford's medical staff with an acute medical emergency that should have prompted Wexford to send him offsite to receive emergency care. Consequently, it does not appear that the occurrence involving R.A. has any relevance to the analysis here.

Concerning J.M., Dr. Herrington notes that the cause of death is a "presumed drug overdose" on July 25, 2013. ECF 537-1 at 18. Dr. Herrington writes that J.M. was a "24-year-old

white male . . . who presented with several complaints on 07/24/13 including shortness of breath, lower back pain, abdominal pain, chest pain, and then abdominal tenderness . . . ." ECF 537-1 at 18. Later that day, J.M. "was evaluated twice for acute sick call, and briefly observed in infirmary before being sent back to cell without further work-up." *Id.* The following day, J.M. "arrested . . . and was pronounced dead at the facility." *Id.* Based on these circumstances, Dr. Herrington indicates that J.M.'s care did not "include involvement of a physician . . . despite [J.M.'s] change in status." *Id.* But, Dr. Herrington did not determine that J.M. presented Wexford staff with an obvious medical emergency that warranted sending him off-site for care. In the absence of such a contention, the Court does not see how J.M.'s case could be used to establish a pattern or practice of delaying or denying emergency care.

These three cases appear sufficiently distinct from the facts pertaining to Ms. Neal, and thus are not probative of the kind of deficiency that is at the heart of plaintiff's case. *Howell*, 987 F.3d at 657-68 (finding that prisoner who sought to bring a *Monell* claim based on a medical provider's collegial review process could not rely upon evidence from other inmates' complaints about deficient medical care that did not involve the collegial review process). But, Dr. Herrington considered sixteen other cases. And, in the current posture of the case, plaintiff's efforts to distinguish them from Ms. Neal's case are unavailing.

As noted, defendant observes that only a few of the cases discussed by Dr. Herrington involve emergencies precipitated by neurological events. ECF 536-2 at 24. But, the issue here is whether Wexford had a pattern and practice of failing promptly to procure off-site emergency care for an inmate whose symptoms suggested such care was medically necessary. For this claim, it makes no difference whether the patient's need for emergency care was the result of a heart attack, a stroke, or some other medical condition.

Likewise, I see no reason to distinguish cases on the ground that the patient had previously been admitted to a hospital but discharged by the time of the occurrence at the penal facility. *See, e.g.,* ECF 550-3 at (C.R. medical records, indicating that C.R. was admitted to Bon Secours hospital on August 18, 2012, discharged on August 21, 2012, and died at a penal facility approximately three days later). Defendant offers no explanation as to why the circumstances of a prior hospitalization render irrelevant the fact that Wexford allegedly failed to promptly send the inmate off-site when he exhibited signs of a medical emergency while at the penal facility. *See* ECF 538-13 at 2-3 (C.R. CAP, dated November 6, 2012, noting that Wexford staff did not immediately send C.R. to the ER after finding him unresponsive).

In addition, Wexford contends that the case of F.R. is irrelevant because, at the time of his death, he was "detained in a mental health unit and was treated by healthcare professionals who were not Wexford employees." ECF 536-2 at 24. Under the terms of the Medical Contract, DPSCS "has separate contracts for mental health, dental and pharmacy services." ECF 559-63 at 58, § 3.1.2. Thus, defendant claims that another vendor provided "specialized delivery of . . . Mental Health . . . services to Inmates under the jurisdiction of the Department." *Id.* at 40, § 1.2.75. But, that is a limited presentation of the relevant circumstances.

According to the medical records, while F.R. was at IMHU, "[a]t about 1am [he] was noted to be having shallow and noisy respiration while lying on his back." ECF 550-17 at 13.[35] The "Nurse on duty in the medical clinic [was] notified of pt's respiratory concern and marked change in inmate's mental status." ECF 550-17 at 13. Thereafter, the "MDC nurse came to [IMHU] . . . assessed him again then notif[ied] Dr. El-Bedawi, who gave [an] order" to monitor F.R.'s vital

---

[35] "IMHU" refers to Inpatient Mental Health Unit, a location in BCDC that houses Inmates who require inpatient psychiatric care." ECF 559-63 at 38, § 1.2.52.

signs every four hours. ECF 550-17 at 13.[36] Dr. El-Bedawi also stated that "if Psych Dr wants to send Inmate out to ER Medical will then initiate it." *Id.* Thereafter, at about 1:50 a.m., a nurse in the IMHU informed "the nurse on duty at MDC" that F.R. "should be sent out via 911." *Id.* F.R. was subsequently transported to "Mercy medical center" and "pronounced dead at 4:35 PM" on the same date. *Id.* at 8. The cause was suspected sepsis. ECF 537-1 at 13 (listing cause of death).

Dr. Herrington determined that, given F.R.'s symptoms, this "Delay in referring to the emergency department . . . for a definitive evaluation [was] inappropriate." ECF 537-1 at 13. It is apparent that the thrust of Dr. Herrington's criticism of F.R.'s case is rooted in Wexford's decision to delay sending F.R. off-site for emergency care. That F.R. was not in the Infirmary is of no moment, because the staff at the Infirmary had been contacted about F.R.

Dr. Fowlkes acknowledged that in at least six cases, Wexford staff failed to send a patient to receive emergency care off-site in a timely manner. ECF 558-34 at (Tr. at 275-76, 92-94, 318-21, 321, 323, 330-31). But, in the light most favorable to Bost, the pool consists of sixteen cases that are arguably comparable. Wexford is free to argue at trial that the sixteen cases are factually distinct from the circumstances pertaining to Ms. Neal, and therefore do not equate to a pattern or practice of unconstitutional medical care. But, such contentions are for the jury to resolve.

Wexford also contends that "the identification of nineteen cases is hardly sufficient [in size] to establish a pattern or practice indicative of custom[,] as Wexford treated thousands of patients during its contract for direct patient services." ECF 536-2 at 22-23. Defendant observes, ECF 536-2 at 23: "The nineteen exemplars provided in Dr. Herrington's report involved care

---

[36] The records do not define the term "MDC." But, in context, the reference appears to refer to "Men's Detention Center." At the relevant time, it was a building within the BCDC. *See Church v. Maryland*, 180 F. Supp. 2d 708, 715-16 (D. Md. 2002).

provided from 2009 to 2016 in correctional facilities throughout the entire State of Maryland."[37] And, Wexford observes that in "one single year (between 7/1/2010-6/30/2011) there were 2,057 infirmary admissions, 5,664 off-site specialty referrals, 1,806 on-site specialty referrals and 1,442 ER runs." ECF 536-2 at 23 (citing ECF 537-2 at 5-6).

The Fourth Circuit has instructed that a "meager history of isolated incidents" does not approach the "widespread and permanent practice necessary to establish [a] custom." *Carter*, 164 F.3d at 220; *see Owens*, 767 F.3d at 403. A plaintiff cannot rely upon "scattershot accusations of unrelated constitutional violations" to establish liability under *Monell*. *Carter*, 164 F.3d at 218. Instead, a plaintiff must establish "'numerous particular instances' of unconstitutional conduct . . . ." *Lytle*, 326 F.3d at 473 (quoting *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991)).

However, there are no "bright-line rules defining a widespread custom or practice" and "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three[.]" *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (internal quotation marks and citations omitted)); *see also McLennon v. City of New York*, 171 F. Supp. 3d 69, 95 (E.D.N.Y. 2016) (collecting cases for the proposition that "[t]here is no set number of incidents that make a practice 'widespread,'" and "courts have found a wide range of instances insufficient to plausibly allege a municipal custom"). Moreover, a plaintiff's "comparator need not be perfect." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021). And, "[f]air comparability often

---

[37] It appears that the reference to care rendered in 2009 pertains to the case of "S.P.," who first presented to medical staff in May 2009 with a "worsening headache." ECF 537-1 at 11. But, the focus of Dr. Herrington's review of S.P.'s case concerned the care that was provided between 2011 and 2012. *Id.* at 11-12.

presents a jury question," namely "whether the similarities show a widespread practice that supports a finding of an unconstitutional custom or practice." *Howell*, 987 F.3d at 657.

Some courts have found that three to five prior, similar incidents do not amount to a custom or practice within the meaning of *Monell*. *See Hildreth v. Butler*, 960 F.3d 420, 428 & n.6 (7th Cir. 2020) (collecting cases); *see also Black Lives Matter D.C. v. Trump,* 544 F. Supp. 3d 15, 51-52 (D.D.C. 2021) (finding that plaintiff failed to state a claim under *Monell*, where plaintiff relied on five prior use-of-force incidents over the course of two decades, coupled with a news article asserting that use-of-force incidents had increased over time); *Peters v. City of Mount Ranier*, GJH-14-00955, 2014 WL 4855032, at *6 (D. Md. Sept. 29, 2014) (concluding that "three solitary examples" of false arrests were "insufficient, as a matter of law, to demonstrate the existence of an official municipal custom or policy"); *McDonnell v. Hewitt-Angleberger*, WMN-11-3284, 2012 WL 1378636, at *3 (D. Md. Apr. 9, 2012) ("[T]he existence of a total of three isolated incidents (including Plaintiff's incident) does not demonstrate sufficient duration or frequency to impute constructive knowledge of a custom of brutality to the County.").

Other courts have found that summary judgment against the plaintiff is inappropriate where the plaintiff has adduced evidence of at least a dozen prior incidents as to one person. *See Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (finding that a *Monell* claim could proceed beyond summary judgment where the plaintiff had presented "at least a dozen instances of Corizon denying or delaying consultations, biopsies, and radiation treatment for his prostate cancer over the course of almost a year"); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 927 (N.D. Ill. 2014) (determining *Monell* claim was adequately supported to survive summary judgment based on expert testimony that there were incidents of constitutionally deficient medical care involving nine other detainees).

And, of relevance here, "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual . . . ." *Oyenik*, 696 Fed. App'x at 794. Thus, a jury could conclude that, even when only one person's medical care is at issue, "delay tactics amount to a . . . custom or practice of deliberate indifference to prisoners' serious medical needs." *Id.* at 794-95.

The recent decision in *Cohn v. Wexford Health Sources, Inc.*, 3:19-cv-00376-NJR, 2022 WL 2802304 (S.D. Ill., July 18, 2022), provides guidance. In *Cohn*, the plaintiff was an inmate at an Illinois correctional center who brought a *Monell* claim, arguing that the defendant had condoned a pattern or practice of denying appropriate medical care by delaying and denying inmates access to prescribed medications. *See id.* at *1. The defendant moved for summary judgment, contending that the plaintiff could not establish a *Monell* claim "based solely on his experience with a disruption in his lithium prescription." *Id.* at * 5.

The district court disagreed. In particular, the court noted a disputed fact as to whether "Wexford made a conscious policy choice *not* to implement a policy" to assure dispensing "desperately needed medication." *Id.* at *2. Moreover, the court determined that the plaintiff presented evidence that the defendant had "disrupted his lithium prescription *on more than three occasions*" between July 2018 and October 2018. *Id.* at *7 (italics in *Cohn*). Further, the court observed that plaintiff had pointed to three other inmates who each complained that Wexford delayed or denied them access to their prescribed medications. *Id.* at *6. Based on this evidence, the *Cohn* Court found: "[T]here is a genuine dispute as to whether Wexford has a widespread practice or custom of disrupting inmates' prescribed medication, and summary judgment must be denied." *Id.* at *7.

Bost has presented sixteen arguably viable examples of purportedly deficient medical care,

covering a period of several years, in support of her claim that Wexford had widespread pattern or practice of deliberate indifference in regard to off-site emergency medical care. Defendant has not pointed to any authority to suggest that sixteen case studies, coupled with Ms. Neal's own case, are inadequate to establish a pattern or practice within the meaning of *Monell*.

To the contrary, Dr. Fowlkes, defendant's expert witness, suggested that the cases examined by Dr. Herrington amounted to "an adequate sampling." ECF 558-34 (Fowlkes Dep.) at 56 (Tr. at 214). Moreover, Dr. Fowlkes conceded that Dr. Herrington need not have engaged in further "statistical analysis" to determine if the cases examined were representative of a broader pattern. *Id.* at 49 (Tr. at 187). Rather, in Dr. Fowlkes's view, it is sufficient to examine a "case series" and determine "if a pattern emerges." *Id.* In other words, defendant's expert witness took no issue with the size of the sample that Dr. Herrington employed to complete his review. He merely disagreed with Dr. Herrington's conclusion that the case studies demonstrated a pattern of deficient medical care.

It is worth noting that Dr. Herrington opined that if he "had been able to review a large pool of cases that resulted in outcomes short of death," he believed that he "would have found many more failures that further support [his] findings." ECF 537-1 at 19 n.1. Dr. Keller corroborated Dr. Herrington's contention, explaining, ECF 558-54 at 4: "Plaintiffs [sic] were given access by DPSCS to case-related materials for only 193 patients (medical records, death reviews, or both)" and plaintiff "received medical records for only 47 patients." *Id.*[38] Dr. Keller posited, *id.*: "Dr. Herrington found significant problems in care in 19 . . . of 193 cases in which some form

---

[38] At the Motion hearings, plaintiff asserted that it had limited access to DPSCS medical records, which is why it only identified nineteen relevant case studies. Wexford asserts that it lacked access to the records of other inmates, as requested by plaintiff, because the Medical Contract expired. It claims that the medical records of the inmates belong to the State, not Wexford. For the purpose of the Motion, I need not address the issue further.

of medical-related documentation was provided," or approximately 9.8%. ECF 558-54 at 4. Thus, in Dr. Keller's view, "apply[ing] the 9.8% problem rate to all of the many medical events and deaths . . . which Plaintiff's experts were not allowed to review," suggests that "potentially thousands of problematic cases might [have been] identified." *Id.*

In any event, the pattern and practice claim does not depend solely on the case studies of other inmates. I have already reviewed evidence that, in the light most favorable to Bost, supports a claim that Wexford implemented an official policy to delay or deny offsite emergency care, and some of the same evidence would show a pattern or practice. I need not repeat that evidence here.

As set forth above, Dr. Keller explained that Wexford's focus on reducing the incidence of sending patients off-site for emergency care can be an appropriate target of utilization management. ECF 537 at 6-8. But, he also wrote, *id.* at 7: "Those efforts must then be the subject of an independent CQI study that ensures that patient care is not impacted as a result of the UM Initiative." And, Dr. Keller contends that "when Wexford took over direct patient care in July 2012, it subordinated the CQI process to UM," which had the effect of prioritizing "cost-cutting goals, including ER trips." *Id.* at 8.

Wexford's various CQI Reports reflect a consistent emphasis on reducing ER runs. For example, Dr. Keller cited a CQI report dated October 25, 2012, which stated: "The emergency run rate for the Baltimore region Sentenced Facilities continues to decline." ECF 558-7 at 5; *see* ECF 537 at 8. A CQI report of November 29, 2012, stated: "ER numbers are trending well. Management must re-educate staff on managing preventable ER runs, and proper notification." ECF 559-70 at 4.

A jury could infer that Wexford's utilization management efforts took primacy over its CQI strategies. Ms. James confirmed at her deposition that "UM played a much larger role than

CQI once Wexford took over," as utilization management "was brought front and center."  ECF 558-22 at 10-11 (Tr. at 32-33); *see* ECF 537 at 8.  James sent an email on July 23, 2012, to several DPSCS and Wexford officials, stating, ECF 559 at 2: "I am aware that regions/sites are stressed, in a state of turmoil and CQI is not a top priority."

Ms. James also sent an email to Dr. Smith and Dr. Getachew on September 18, 2012, which Dr. Keller referenced (ECF 537 at 8), in which she said, ECF 559-68 at 2: "I am starting a 'road show' across the state to discuss contract CQI expectations and Regional office outcome studies," which were based "on UM data," such as "ER runs for inmates with chest pain and hypertension . . . ."  At her deposition, she explained, ECF 558-22 at 44 (Tr. at 165): "I was taking [UM data] and trying to make, you know, taking the data and then training on the medical side from that data was basically what I was trying to do."  She confirmed that this was "an example of the ways in which [she was] being essentially asked to incorporate UM's work into [her] CQI work."  *Id.*

Dr. Keller determined that according to Wexford's own reporting, ER runs decreased when Wexford began work under the Medical Contract.  He found that Wexford's "Total ER Runs" and "Neuro ER Runs" decreased between January 2011 and January 2014.  ECF 537 at 11.  And, he found that "ER Referrals Per 1000 Inmates" across all DPSCS facilities as well as in "Baltimore Jails ONLY" also decreased across approximately the same time period.  *Id.*

Further, Dr. Keller observed that, according to Wexford officials, "ER trips deemed unnecessary were always very low, even before the Emergency Room Visit Reduction Program."  ECF 537 at 15; *see* ECF 558-32 (Getachew Dep.) at 8 (Tr. at 25-27) (testifying that the number of preventable ER trips was consistently "very low"); ECF 558-16 (Smith Dep.) at 17 (Tr. at 62-63) (explaining that the number of preventable ER trips "were few in number").  In light of Wexford's

successful efforts to "reduce ER trips," Dr. Keller expressed concern that "there was no apparent analysis of whether the reduction in ER runs included some (or many) patients with life threatening conditions who should have been sent to the ER but were not because of the program." ECF 558-16 at 17. He added, *id.*: "This is actually the first question that should have been asked by a functioning CQI program when this initiative exceeded its original objective of a 10% reduction in ER runs."

And, Dr. Keller found that at the same time ER runs decreased, deaths increased. He wrote that, based on "data reported by Wexford's Maryland Region Death Logs," in the "two years after Wexford took over in July 2012, deaths increased by an average of more than 28% statewide and more than 40% for the Baltimore pretrial region.[ ]" *Id.* at 17 & n.2; *see* ECF 537-3 (the "Death Logs"). According to Dr. Keller, the increase in deaths demonstrated "how dangerous Wexford's ER reduction initiative was . . . ." ECF 537 at 17.

Moreover, in the Supplemental Keller Report, Dr. Keller contends that data from the Department of Justice ("DOJ") bolsters his findings. ECF 558-54 at 4-5; *see also* ECF 559-11 (DOJ report, "Mortality in Local Jails, 2000-2018—Statistical Tables"); ECF 559-12 (DOJ Report, "Mortality in State and Federal Prisons, 2001-2018—Statistical Tables") (collectively, the "DOJ Reports"). In particular, Dr. Keller asserts that between 2013 and 2015, "[a]fter accounting for the fact that DPSCS had a mixed prison and jail population, Wexford's mortality rate in Maryland was actually higher than the national mortality rate." ECF 558-54 at 5.

According to Dr. Keller's analysis of the data contained in the DOJ Reports, the average rate of deaths per 100,000 inmates rose by approximately 26% in the three-year period after Wexford began working on the Medical Contract, as compared to the preceding three-year period, *i.e.*, between 2009 and 2012. *Id.* He concludes, *id.* at 6: "Isolating for Maryland-specific factors,

the analysis of Maryland death rates over time strongly supports my prior opinions that Wexford's ER reduction efforts were reckless . . . and ultimately led to an increase in patient deaths and other negative outcomes."

Defendant challenges the Keller Report for failure to consider evidence that, in its view, weighed in its favor. ECF 536-2 at 20-22. For instance, Wexford maintains that Dr. Keller's conclusions regarding the rate at which deaths increased between January 2010 and April 2014 "purposefully eschews the necessary context." *Id.* at 20. According to Wexford, the analysis is misleading because "the death totals for 2010 and 2011 were aberrantly low" and thus the death totals in 2012 and 2013 appear "elevated" by comparison. *Id.* Wexford points out that the death totals in 2007, 2008, and 2009 were higher, which would have made plain that the relative increase in deaths between 2012 and 2013 was illusory. *Id.* And, Wexford has provided evidence showing that although ER cases generally fell between 2010 and 2014, a longer time horizon reveals that ER runs rose above their 2010 levels by 2015. *See* ECF 579.

However, Wexford previously adopted the position that any time period outside of the years between 2010 and 2014 has little bearing on the circumstances presented by plaintiff's suit. *See* ECF 477-26 at 21. (Wexford's opposition to Bost's motion to compel discovery material). And, the Court agreed with Wexford, setting the "relevant time period for discovery" as 2010 through 2014. ECF 480 at 2; *see* ECF 499 at 26-28. Although Dr. Keller had access to Preventable ER Reports and Death Logs pertaining to the time period between 2007 and 2009, his failure to analyze this information does not compel rejection of his analysis. Rather, this is fertile ground for cross-examination.

Wexford also notes that at Dr. Keller's deposition, he declined to say whether there existed a causal relationship between the reduction of ER runs and Ms. Neal's death. Dr. Keller stated,

ECF 536-11 at 119 (Tr. at 46): "There are some ambiguities in interpreting this death data." He also stated that "there is an Emergency Room Reduction Program" and "[w]e know of at least some cases where delayed transfer to the ER was a factor in deaths." *Id.* Thus, he concluded, *id.*: "And it's possibl[e] in Ms. Neal's case—she might be one of them." Dr. Keller offered a more definitive assertion on this point in his expert reports, as set forth above. *See* ECF 537 at 20-22; ECF 558-54 at 6.

At bottom, Wexford can certainly argue to a jury that the facts do not establish that Wexford had a widespread custom or practice of delaying or denying off-site emergency care. Among other things, transporting a prisoner may implicate public safety concerns. But, the record does not compel the conclusion urged by Wexford. The dispute is quintessentially one for the jury to resolve.

Accordingly, I shall deny the Motion with respect to the *Monell* Claim, to the extent it is predicated on the theory that there existed a widespread custom and practice of delaying and denying off-site emergency care.

### C. Failure to Train

Bost's *Monell* Claim also rests on the theory that Ms. Neal's death was the result of Wexford's failure to train its medical staff to send patients off-site to receive timely emergency care. ECF 558 at 60-62.

Wexford challenges the failure to train theory on the ground that plaintiff's experts failed to adduce evidence "specify[ing] what training would be a priority" in the four months between July 2012, when Wexford began work under the Medical Contract, and Ms. Neal's death in November 2012. ECF 536-2 at 29. Further, Wexford contends that plaintiff did not show "how long it would take for Wexford to implement that training statewide in that time frame." *Id.* And,

according to Wexford, plaintiff's experts "do not purport to make a direct link between what training might have been necessary and Ms. Neal's death." ECF 535-2 at 29.

Bost counters that, prior to Ms. Neal's death, there had been multiple incidents where individuals were not timely transported to the ER. ECF 558 at 60-62; *see* ECF 537-1 at 9, 11-12, 12-13, 14-15, 15-16, 18-19. She asserts that these prior incidents provided notice to Wexford that training was necessary to avoid adverse health consequences. ECF 558 at 60-62. And, she maintains that Wexford's failure to provide appropriate training amounts to deliberate indifference. *Id.* at 61-62.

According to Bost, Wexford served DPSCS in a UM role since 2005, ECF 558 at 44-45, and "was aware that going back to 2010, medical providers were failing to recognize neurological symptoms and timely send patients to the ER." *Id.* at 60. Yet, despite this notice, and "the obvious associated risk," Wexford "did nothing." *Id.* at 61. Thus, she asserts that "there is evidence from which a reasonable jury could conclude that Wexford failed to train its providers to recognize neurological emergencies and send those patients to the emergency room, both as a matter of practice and based on the obviousness of the need for training." *Id.* at 60.

Plaintiff relies, *inter alia*, on the deposition transcript of Alfred Joshua, M.D., a defense expert witness. *See* ECF 558-17 (Joshua Dep.) at 5 (Tr. at 7-8). According to plaintiff, Dr. Joshua "admitted that four months is more than enough time to implement necessary changes *if* the company considers them a high enough priority." ECF 558 at 62 (citing ECF 558-17 (Joshua Dep.) at 29 (Tr. at 104-05) (italics in ECF 558).

In *Canton*, 489 U.S. at 389, the Supreme Court said that "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is

actionable under § 1983." Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U.S. at 410. A municipality may be deemed deliberately indifferent "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61.

A municipal entity's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision . . . to violate the Constitution." *Id.* at 62-61 (quoting *Canton*, 489 U.S. at 395) (O'Connor, J., concurring in part and dissenting in part)). Indeed, "[i]naction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action.'" *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citation omitted). And, the manner in which a municipality trains its employees is "necessarily a matter of 'policy.'" *Spell*, 824 F.2d at 1389.

A plaintiff who seeks to establish *Monell* liability based on inadequate training must demonstrate "(1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the [official's] conduct resulted from said training." *Lewis v. Simms*, AW-11-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014) (per curiam). "Training policy deficiencies can include (1) 'express authorizations of unconstitutional conduct,' (2) 'tacit authorizations' of such unconstitutional conduct, and (3) failures to adequately 'prohibit or discourage readily foreseeable conduct in light of known exigencies'" of the relevant profession. *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020) (quoting *Spell*, 824 F.2d at 1390).

The policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Bryan Cty.*, 520 U.S. at 407. But, in the absence of notice "that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Even if "a particular [employee] may be unsatisfactorily trained," that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. Indeed, "proving an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Connick,* 563 U.S. at 68 (cleaned up). The *Canton* Court explained, 489 U.S. at 391:

> Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained [employees] occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Bryan Cty.*, 520 U.S. at 409). Moreover, "the training deficiency 'must be closely related to the ultimate injury,' meaning it must cause the incident." *Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 951 F.3d 661, 672 (4th Cir. 2020) (quoting *Canton*, 489 U.S. at 391).

The Supreme Court's decision in *Connick*, 563 U.S. 51, illustrates the challenge a plaintiff faces when seeking to prevail on a failure to train claim. In that case, Thompson was convicted of

murder. *Connick,* 563 U.S. at 54. However, his conviction was overturned when it was discovered that, in connection with an earlier armed robbery case, the prosecution had failed to disclose the existence of an exculpatory crime lab report, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). And, as a result of that robbery conviction, Thompson chose not to testify at his murder trial. *Connick*, 563 U.S. at 55.

Thereafter, Thompson filed a § 1983 suit against Connick, in his official capacity as the Orleans Parish District Attorney. He also sued the district attorney's office, the prosecutor, and others. *Id.* at 56. Thompson alleged, *inter alia*, a "deliberate indifference to an obvious need to train the prosecutors in [the] office to avoid such constitutional violations." *Id.* at 57.

Thompson did not prove a pattern of similar *Brady* violations. But, Connick conceded that the failure to produce the crime lab report constituted a *Brady* violation. *Id.* at 57. And, the plaintiff showed that, in the decade preceding his trial, four convictions had been overturned because of other *Brady* violations committed by prosecutors in Connick's office. *Id.* at 62.

The trial court determined that a pattern of violations was not necessary to prove deliberate indifference when the need for training is "'so obvious.'" *Id.* at 58. The district court instructed the jury that the sole issue "was whether the nondisclosure was caused by either a policy, practice, or custom of the district attorney's office or a deliberately indifferent failure to train the office's prosecutors." *Id.* at 57. The jury found in favor of Thompson on the basis of a failure to train. *Id.* at 57. An evenly divided Fifth Circuit, sitting en banc, affirmed. *Id.* at 54, 59 (citing 578 F.3d 293 (5th Cir. 2009) (per curiam)). The Supreme Court reversed.

The Supreme Court considered whether a "district attorney's office may be held liable under § 1983 for failure to train its prosecutors based on a single *Brady* violation." *Id.* at 54. In a five to four decision, the Court held that it could not. *Id.*

The Court noted that *Canton* did not foreclose "the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64.  The *Connick* Court said, *id.* at 61 (emphasis added):

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. *A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' "is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

The Court indicated that Thompson, as the plaintiff, had the burden to prove 1) that Connick, the policymaker for the office, "was deliberately indifferent to the need to train the prosecutors about their *Brady* disclosure obligation with respect to evidence of this type and 2) that the lack of training actually caused the *Brady* violation in this case." *Id.* at 59.  The Court was of the view that the plaintiff did not prove that Connick "was on actual or constructive notice of, and therefore deliberately indifferent to, a need for more or different *Brady* training."  *Id.*

According to the Court, and of relevance here, the four prior reversals due to *Brady* violations, which occurred in the preceding ten years, could not have put Connick on notice that *Brady* training was inadequate "with respect to the sort of *Brady* violation at issue [in the case]. None of those [earlier] cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind." *Id.* at 62-63.  In other words, just any *Brady* violation would not do.  It had to be a *Brady* violation comparable to the one in Thompson's case.

Thompson relied on the "'single-incident'" theory, rather than a pattern of similar *Brady* violations.  *Id.* at 63.  He maintained that the *Brady* violation was the "'obvious' consequence of failing to provide" appropriate training, and asserted that the "'obviousness' can substitute for the

pattern of violations ordinarily necessary to establish municipal culpability." *Connick*, 563 U.S. at 63.

The Court rejected the contention. It noted that lawyers "are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment," and must obtain a law license, and satisfy other "threshold requirements." *Id.* at 64. The Court reasoned, *id.* at 66: "In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." Therefore, Connick was "entitled to rely on [the] prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations. . . ." *Id.* at 67. And, the Court added that "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Id.* at 68.

Bost posits that by the time Wexford began work on the Medical Contract on July 1, 2012, Wexford had notice that training was needed to improve patient care within DPSCS facilities and, in particular, as to the timeliness of recognizing and responding to emergency medical events and sending patients off-site to receive emergency care. ECF 558 at 60-61. Yet, according to Bost, Wexford failed to take sufficient steps after it became responsible for the provision of medical care to remedy the deficiencies reflected in earlier incidents, thereby rendering it liable under the failure to train theory. *Id.* at 61-62.

The Herrington Report recounts six incidents that occurred prior to Ms. Neal's death, involving a delay in or failure to send a patient off-site for emergency care. *See* ECF 537-1 at 9-19. The cases involve C.R., A.S., S.P., R.G., C.A., and E.A. *Id.* Two of the cases occurred between the time that Wexford began work on the Medical Contract and Ms. Neal's death. *Id.* at

11-12, 18-19.  And, the cases of S.P., C.R., and E.A. involved neurological episodes.  ECF 537-1 at 11-12, 12-13, 15.

The case of C.R. is of particular import because of its temporal proximity to Ms. Neal's death.  ECF 537-1 at 12-13.  C.R. died on August 24, 2012, at the age of 63, from "septic cerebral embolus."  *Id.* at 12.  He had a history of numerous medical conditions, including stroke, high blood pressure, aortic valvular disease, hepatitis C, COPD, and substance abuse.  *Id.*  A nurse failed to inform a physician that C.R.'s blood pressure was dangerously high, nor did the nurse effectively monitor C.R.'s condition.  *Id.* at 12-13, 20.  Medical records associated with C.R.'s case indicate that at 6:55 a.m. Dr. Kulam was "made aware," although the record does not specify as to what, and he allegedly stated that he "wanted to contact [the] Medical Director for authorization before sending patient to ER."  ECF 550-3 at 52.  Further, the record indicates that 911 was called at 7:26 a.m., and the patient was sent to the hospital at 8:00 a.m.  Dr. Herrington opines that, as a result of these failures, C.R. did not receive necessary emergency care and ultimately died.  *Id.* at 22.

Wexford contends (ECF 564 at 34) that a review of the CAP issued by Wexford on November 6, 2012, in the wake of C.R.'s death, contradicts this account.  *See* ECF 558-13 at 7.  Wexford explains, *id.*: "During the CAP process a concern was raised that the medical records may indicate that Dr. Kulam might believe he needed to seek approval of the medical director before sending a patient to the ER."  ECF 564 at 34.  In light of this concern, "the team met with Dr. Kulam and discovered that the medical records were incorrect and that 'he did not state that he needs to inform first and get approval.'"  (Quoting ECF 558-13 at 7).  To the contrary, Dr. Kulam "advised to call 911."  ECF 558-13 at 7.  The CAP concluded: "[I]t is our understanding that the physician clearly understands the policy and there is no confusion on this issue."  *Id.*

Notably, four people involved in the investigation of C.R.'s care signed this portion of the

CAP. ECF 558-13 at 7. They included Dr. G. Luka, the Regional Medical Director; Christina Oliyide, the Director of Nurses; as well as Dr. Kulam. In contrast, the medical record cited by plaintiff, attributing a statement to Dr. Kulam to the effect that he had to get approval to transfer C.R. to the emergency room, was neither made by Dr. Kulam nor signed by him.

Even assuming that there are competing accounts as to what Dr. Kulam said at the time concerning the need for prior approval before sending an inmate off-site to receive emergency care, the discrepancy is of no moment in the context of a failure to train claim. What matters is that Wexford conducted an investigation of the incident, which included the Director of Nurses, who is in charge of the "boots-on-the-ground" caregivers. Wexford concluded that its physician did not labor under the mistaken impression that he needed permission to send the prisoner off site to obtain emergency care, and thus did not require training as to the emergency transfer protocol. The investigation itself refutes a claim of deliberate indifference.

Dr. Herrington maintains that other case studies he reviewed exhibit consistent "failure[s] to identify and communicate changes in condition necessitating further action, documentation failures, and ultimately substandard care . . . ." ECF 537-1 at 21. He opines that "these themes repeat throughout the CAPs that [he] reviewed, going all the way back to 2010 and continuing through 2014 and beyond without resolution." *Id.*

In other words, Dr. Herrington attributes Wexford's failure to send patients timely to the ER, at least in part, to deficiencies in documentation and communication between medical staff. Indeed, Dr. Herrington states that "many of the CAPs [he] reviewed note deficiencies in documentation and communication," and he opines that "[t]he failure to timely refer patients to the ED and for offsite care is a natural and foreseeable consequence of such deficiencies." *Id.* at 22.

To elaborate, Dr. Herrington notes that "[d]ocumentation and communication play critical roles in the process of performing differential diagnosis," pursuant to which medical providers are required to consider the patient's symptoms and attempt to "rul[e] out the most severe possible sources" of them. ECF 537-1 at 19. He states that, in the event that "more severe or urgent causes cannot be ruled out in the infirmary, emergency department or other offsite care becomes necessary . . . ." *Id.* Significantly, he claims that "[i]n the many neurological or vascular related cases" that he reviewed, including those that preceded Ms. Neal's death, there was a consistent "failure to conduct the necessary differential diagnosis to rule out acute neurological or vascular causes." *Id.*; *see*, *e.g.*, *id.* at 9, 15-16 (discussing similar in case of R.G. and C.A.).

Moreover, according to the Herrington Report, the common deficiencies he identified in his analysis more likely than not contributed to the death of Ms. Neal. ECF 537-1 at 28-29. Specifically, Dr. Herrington asserts that Ms. Neal's case exhibited many of the same failures as those present in other cases, including "documentation errors and communication failures that prevented the necessary action from being taken" as well as "repeated failures to recognize obvious symptoms of a possible neurological event that required immediate ED referral[.]" *Id.* at 28.

But, as indicated earlier, the *Monell* claim is predicated on the contention that Wexford implemented a policy designed to delay, discourage, or deny emergency care, so as to avoid the expense, and to that end, it required approval to send an inmate off site for medical care. Bost also claims a widespread custom or practice to the same effect. And, the failure to train claim rests on that contention.

Yet, Bost argues that Wexford's medical record keeping and communication were so defective as to lead to substandard medical care. However, the negligence claim has been resolved. Likewise, the claim that Ms. Neal received constitutionally inadequate medical care has been

resolved.  The injection of a claim of poor record keeping and inadequate communication as an explanation for the delay in referrals to the E.R. alters the landscape.  It cannot serve as the basis for the claim of failure to train.

However, Bost presented other evidence that, in her view, shows that between the time Wexford assumed responsibility for the delivery of health care services on July 1, 2012, and Ms. Neal's death on November 4, 2012, Wexford did not provide training to its medical providers with respect to recognizing and responding appropriately to medical emergencies.  For example, Graham testified that she did not "receive any additional training when Wexford took over the contract[.]"  ECF 559-65 (Graham Dep.) at 16 (Tr. at 55).  McKees confirmed that she could not recall whether "[i]n 2012 . . . Wexford train[ed] its medical staff at the BCDC on admitting decisions to the infirmary."  *See* ECF 558-21 (McKee Dep.) at 69 (Tr. at 266-67).  Similarly, Jamal denied  receipt of training from Wexford other than "small in-services for anything that would come up."  ECF 558-26 (Jamal Dep.) at 36 (Tr. at 379-80); *see also* ECF 559-66 (Ohaneje Dep.) at 22 (Tr. at 78) (stating that she did not remember whether she had received "any training about how to respond to calls about patients who needed medical attention"); ECF 558-25 (Hope Dep.) at 3 (Tr. at 7) (affirming that Wexford did not conduct "additional training about the operations of the infirmary at the BCDC").  And, several Wexford employees could not recall whether Wexford disciplined its nursing staff "at the BCDC for specific nursing performance issues[.]"  ECF 558-18 (Somner Dep.) at 9 (Tr. at 35); *see also* ECF 558-27 (Ajayi Dep.) at 57 (Tr. at 218-20).

A CQI Report signed on September 30, 2012, indicated that there was a  "Time Delay in responding to Emergencies" and that "Medical needs to become more efficient in emergency responses."  ECF 559-64 at 3.  A CQI Report dated October 25, 2012, referenced the case of C.R. and stated: "Nursing staff must be educated . . . on proper nursing documentation."  ECF 558-64

at 6.  Moreover, in the Pretrial CAP dated November 1, 2012, Wexford indicated that its nursing staff required an "Update" with respect to their knowledge of "paralysis, neurological findings, gangrene, wound care, [and] sepsis."  ECF 558-14 at 3.  And, a CAP dated January 18, 2013, submitted by Hope, noted that "there was is [sic] a continuous failure by nursing to follow through on basic nursing tasks such as obtaining weights, follow up with providers and appropriate documentation."  ECF 558-9 at 2.  These largely contemporaneous reports reflect that Wexford recognized areas of medical care in need of improvement.  But, for the most part, the areas of concern are about matters unrelated to emergency care or neurological events.  And, to the extent that they reflect issues with emergency care and neurological occurrences, they indicate that, in the four months from July 2012 to November 2012, Wexford was attempting to address the issues that surfaced on its watch.

Wexford also argues that plaintiff's failure to train theory is unavailing, as the "Supreme Court has recognized that a training theory of liability is different in the context of licensed professionals than it is where the alleged wrongdoer is a municipal police officer."  ECF 536-2 at 30-31.  As discussed, the Supreme Court examined this issue in *Connick*, 563 U.S. 51.  In that case, the Court considered whether a municipal agency could be held liable for its failure to train prosecutors with respect to their legal obligation under *Brady* to disclose exculpatory evidence. *Id.* at 54.  Of import here, the *Connick* Court indicated that a municipal entity should be able to rely on its attorneys' legal training and education to properly perform their duties.

The Supreme Court observed that attorneys "are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment"; they "must satisfy character and fitness standards to receive a law license"; and attorneys "are personally subject to an ethical regime designed to reinforce the profession's

standards" at the risk of "professional discipline, including sanctions, suspension, and disbarment." *Connick*, 563 U.S. at 64-65. In light of this framework, the Court reasoned that "recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* at 66 (citation omitted). And, in its view, "[a] licensed attorney making legal judgments, in his capacity as a prosecutor about *Brady* material simply does not present [a] 'highly predictable' constitutional danger . . . ." *Id.* at 67 (quoting *Canton*, 589 U.S. at 391).

According to Wexford, "Courts have applied the *Connick* reasoning to healthcare providers who, like lawyers, are trained professionally and demonstrate their competence through licensure and are subject to discipline by state boards." ECF 536-2 at 31; *see Graham v. Hodge*, 69 F. Supp. 3d 618, 632 (S.D. Miss. 2014) ("Constitutionally deficient medical care is simply not the obvious consequence of a county jail's failure to provide an experienced, licensed practical nurse with additional in-house training.") (internal quotation marks and citation omitted); *see also Britt v. Hamilton Cty.*, 531 F. Supp. 3d 1309, 1342 (S.D. Ohio Mar. 30, 2021); *Rosario v. Doe*, CV-08-5185 (RMB), 2013 WL 3283903, at *9 (D.N.J. Mar. 29, 2011); *but see Est. of Walker by and through Klodnicki v. Correctional Healthcare Cos., Inc.*, 232 F. Supp. 3d 1157, 1165-66 (D. Colo. 2017) (finding failure-to-train theory could survive a motion to dismiss where plaintiff alleged that medical staff did not receive adequate training with respect to managing mental health emergencies).

*McGee v. Macon Cty. Sheriff's Dep't*, 473 F. Supp. 3d 818 (C.D. Ill. 2020), is noteworthy. In that case, a pretrial detainee, Michael Carter, died of preventable diabetes-related complications at the age of 35, after being held in the Macon County Jail (the "Jail") for five days without proper medical care. *Id.* at 824. A private contractor, Decatur Memorial Hospital ("DMH"), provided

medical services at the Jail on behalf of the Macon County Sheriff's Department (the "Sheriff's Department"). *McGee*, 473 F. Supp. at 824.

Carter disclosed his diabetic status when he was first detained on July 13, 2015. *Id.* Nonetheless, Jail officials failed to monitor Carter's blood sugar levels in the days that followed. *Id.* And, on July 16, 2015, Carter began to complain of nausea and vomiting, at which point he was given an anti-nausea medication and transferred to the Jail's medical unit for observation. *Id.* at 830. In the following two days, Carter's condition continued to deteriorate. *Id.* at 830-32. Nevertheless, on the morning of July 18, 2015, Jo Bates, the on-duty nurse and a DMH employee, instructed correctional officers to return Carter to the Jail's general population. *Id.* at 832. The correctional officers determined that Carter was being "'uncooperative'" and instead placed him in one of the Jail's segregation cells. *Id.* at 833.

Later that morning, another correctional officer noted that Carter was not eating and became concerned that Carter was exhibiting symptoms of serious, diabetes-related complications. *Id.* Bates then tested Carter's blood sugar levels, which indicated that they were dangerously high. *Id.* Accordingly, the nurse contacted the on-call physician, Dr. Robert Braco, also a DMH employee. He advised Nurse Bates to administer insulin to Carter. *Id.* One hour later, Carter's blood sugar level remained high. *Id.* At that juncture, a correctional officer, Corporal Austin, became concerned that Carter was experiencing a medical emergency and told Nurse Bates to send Carter to the hospital. *Id.* Nurse Bates responded that she was not authorized to do so and that she needed to call Dr. Braco first. *Id.* at 834. At Corporal Austin's urging, Nurse Bates then called Dr. Braco. *Id.* He advised that Nurse Bates could send Carter to the hospital if the situation amounted to an emergency, but otherwise that it would not be worth the cost. *Id.* Nurse Bates

then authorized Carter to go to the hospital via "squad car but not by ambulance." *McGee*, 473 F. Supp. at 834. Ultimately, "Carter was pronounced dead upon his arrival at the hospital." *Id.*

The administrator of Carter's estate brought suit against a host of defendants, including DMH and the Sheriff's Department. Of import here, the plaintiff asserted a § 1983 claim against the defendants under *Monell*, 436 U.S. 658, based on a theory of failure to promulgate appropriate policies regarding the need to send patients to a hospital when a medical emergency occurs and failure to train the staff of the same. *Id.* at 843.

The district court found that there was no established diabetes protocol. *Id.* at 828. As a result, there was confusion among the healthcare team as to "who was responsible for what in the care and management of diabetic inmates." *Id.* The court concluded that the plaintiff had adduced sufficient evidence such that the *Monell* claim could survive summary judgment on the basis of failure to train and to promulgate appropriate policies for emergency transport. *Id.* at 843. The court explained, *id.*:

> Specifically, plaintiff presented evidence that confusion was rampant among the jail staff and medical staff about who was authorized to call an ambulance. Dr. Braco also communicated to Nurse Bates about the cost of an ambulance ride and stated that the sheriff warned him to not call an ambulance, but to let his staff decide how to transport inmates.

> Accordingly, Plaintiff points to this as evidence that Defendants inappropriately encouraged medical staff to take cost into consideration when determining appropriate treatment. [The Corporate Health director for DMH] testified that she had previously counseled Dr. Braco that she would worry about the budget and he should focus on providing the best medical care.

Given the evidence, detailed at length in the *McGee* opinion, the court there concluded that a reasonable juror could find that medical staff did not have the necessary tools to "address medical situations that they will inevitably encounter at the jail . . . ." *Id.* And, this "predictably led to violations of the constitutional rights of detainees." *Id.*

In my view, *McGee* is factually distinguishable. Wexford had been providing direct medical care on behalf of DPSCS for a period of four months at the time of Ms. Neal's death. ECF 536-2 at 28. Unlike in *McGee*, there is no evidence that confusion was "rampant."

And, drawing on *Connick*, the staff here were professionals who were licensed and trained in their occupations. Wexford's trained medical professionals made the decisions as to medical care. They should have recognized the gravity of Ms. Neal's symptoms and the urgency of the situation. But, there is no evidence of a "continued adherence to an approach" by Wexford that condoned tortious conduct by medical providers as to stroke victims. *Bryan Cty*, 520 U.S. at 407. As *Connick* made plain, 563 U.S. at 62-63, the failure to train claim must pertain to the conduct at issue. The decisions made in regard to the care of Ms. Neal, however flawed those decisions may have been, were not the product of Wexford's failure to train people who were trained in their fields.

The CAPs cited by plaintiff demonstrate that Wexford actively monitored the performance of its staff and provided at least some training to remedy outstanding deficiencies. ECF 564 at 33-35. For instance, the Pretrial CAP on November 1, 2012, indicated that "[m]andatory education [was] provided to nursing with all current staff in attendance" in order to "update" the knowledge of its nursing staff with respect to "neurological findings." ECF 558-14 at 2, 3. Likewise, the C.R. CAP, dated November 6, 2012, specified that it had addressed ongoing documentation issues, *inter alia*, by providing an "[i]n-service . . . to nurses on SBAR communication 8/27/2012" and posting a "large copy of SBAR . . . in all clinical areas[.]" ECF 558-13 at 2.[39]

Thus, as defendant argues, plaintiff cannot both "criticize[ ] Wexford's CQI processes" while also "attempt[ing] to use those same processes as a sword to allege that Wexford and the

---

[39] The parties do not explain the term "SBAR."

DPSCS were aware of criticisms and concerns raised during the CQI efforts to identify and improve the provision of correctional health care in Maryland." ECF 564 at 33.

Accordingly, I am persuaded that plaintiff's failure to train theory is without merit.

### IV. Conclusion

In light of the foregoing, I shall deny the Motion.  An Order follows.


Date:  September 16, 2022                        _____/s/_____
                                                Ellen Lipton Hollander
                                                United States District Judge