## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SHARON BOST, in her individual capacity
and as personal representative of the
ESTATE OF FATIMA NEAL,

     *Plaintiff,*

     *v.*

WEXFORD HEALTH SOURCES, INC.,

     *Defendant*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Case No. 1:15-cv-03278-ELH

Judge Ellen L. Hollander,

## PLAINTIFF'S MOTION *IN LIMINE* NO. 1
## TO BAR CERTAIN TESTIMONY BY DEFENDANTS' EXPERTS

Plaintiff SHARON BOST, by her attorneys, in her individual capacity and as personal representative of the Estate of Fatima Neal, respectfully moves *in limine* to bar certain opinions and testimony by Wexford's experts.[1] In support of her motion, Plaintiff states as follows:

### DISCUSSION

Federal Rule of Evidence 702 permits testimony by qualified expert witnesses based on "knowledge, skill, experience, training, or education" if:

> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] Throughout Plaintiff's motions *in limine* filed today, Plaintiff asks the Court to bar Wexford from advancing various arguments and evidence. When Plaintiff refers to "Wexford" in her motions, she means Wexford and its employees, agents, attorneys, and witnesses.

FED. R. EVID. 702. "[D]ue to the difficulty of evaluating their testimony, expert witnesses have

the potential to be both powerful and quite misleading." *Cooper v. Smith & Nephew, Inc.*, 259

F.3d 194, 199 (4th Cir. 2001) (internal quotation marks omitted) (quoting *Daubert v. Merrell*

*Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 595 (1993). As such, courts are required to act as

"gatekeepers" to weed out inadmissible opinion testimony by proffered experts. *Bresler v.*

*Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017). The district court's gatekeeping role is

"indispensable" to the administration of fair trials. *See Sardis v. Overhead Door Corp.*, 10 F. 4th

268, 284 (4th Cir. 2021). Courts use a two-pronged analysis to ensure the reliability and

relevance of proffered expert testimony.

> Expert testimony is admissible … if it concerns (1) scientific,
> technical, or other specialized knowledge that (2) will aid the jury
> or other trier of fact to understand or resolve a fact at issue. The first
> prong of this inquiry necessitates an examination of whether the
> reasoning or methodology underlying the expert's proffered opinion
> is reliable—that is, whether it is supported by adequate validation to
> render it trustworthy. The second prong of the inquiry requires an
> analysis of whether the opinion is relevant to the facts at issue. Thus,
> an expert's testimony is admissible under Rule 702 if it rests on a
> reliable foundation and is relevant.

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260–61 (4th Cir. 1999)) (quoting *Kumho Tire*

*Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert*, 509 U.S. at 590-92.

*Prong 1: Reliability of Expert Methodology*

To assess an expert's qualifications, courts must determine whether the expert has

"sufficient knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire*

*Co.*, 526 U.S. at 156. An expert must "explain how [their] experience leads to the conclusion

reached, why [their] experience is a sufficient basis for the opinion, and how [their] experience is

reliably applied to the facts." *Karn v. PTS of Am., LLC*, No. GJH-16-3261, 2022 WL 743944, at

*9 (D. Md. Mar. 11, 2022) (quoting *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)).

To assess the reliability of an expert's opinion, courts use a series of non-exhaustive factors, including whether the expert's technique or theory can be or has been tested; whether the technique or theory has been subject to peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence and maintenance of standards and controls; and whether the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593. Here, several of Defendant's experts offer opinions that are outside their expertise or based on speculation and conjecture, and thus unreliable.

*Prong 2: Relevance of Expert's Opinions to Facts at Issue*

As part of the *Daubert* analysis, courts also act as "gatekeepers" to "ensure that a proffered expert opinion is 'sufficiently relevant and reliable when it is submitted to the jury.'" *Sardis*, 10 F.4th at 282 (citation omitted). Pursuant to Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and concerns a fact of consequence to the matter. FED. R. EVID. 401. By contrast, Federal Rule of Evidence 403 states that courts may exclude evidence if its probative value is "substantially outweighed" by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

"When the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 144 (4th Cir. 1994). Likewise, the factfinder should not be presented with expert opinion that is not relevant to determining whether the elements of the claims at issue are met. *See United States v. Basham*, 561 F.3d 302, 327 (4th Cir. 2009). Defendant's experts violate these principles in several instances.

I.      **Defendant's Experts Cannot Offer Opinions Outside Their Expertise**

        A.      **Dr. Fowlkes and Dr. Joshua Are Not Statisticians, and So They Cannot Critique the Sample Size of Medical Records Consulted by Dr. Herrington**

Experts cannot testify outside of their expertise. "Part of the court's gatekeeping function is to ensure that an expert witness is qualified to testify about each component of his testimony." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1005 (4th Cir. 2020). "Allowing an expert witness to testify outside the areas in which he is qualified leads to the admission of testimony that has the potential to be 'both powerful and quite misleading'" to a jury. *Id.* at 1007 (quoting *Daubert*, 509 U.S. at 595). Expert testimony, "simply by being designated as such, may 'assume a posture of mystic infallibility in the eyes of the jury of laymen.'" *Ruark v. BMW of N. Am., LLC*, No. CIV.A. ELH-09-2738, 2014 WL 351640, at *11 (D. Md. Jan. 30, 2014) (quoting *United States v. Addison*, 498 F.2d 741, 744 (D.C. Cir. 1974)). As such, experts cannot offer seemingly informed opinions beyond their expertise. *Id.*

Defendant experts' "knowledge, skills, experiences, training, and education" place guardrails on their permitted testimonies. FED. R. EVID. 702. Dr. Fowlkes is a medical doctor retained by Defendants to review jail medical records and assess whether Wexford had a pattern and practice of denying medical care to prisoners. Ex. A (Fowlkes Report) at 1. He is a physician, and Plaintiff does not dispute his qualifications as a medical professional. But he is not a statistician, and he does not claim to have any statistical or data analysis expertise. *Id.* at WEXFORD EXPERTS 58-62; Ex. B (Fowlkes Dep)(167:7-168:13). Therefore, he does not have the knowledge, skills, experiences, training, or education to opine that the sample of medical records Plaintiff's experts consulted was a "very small sampling of the many serious medical events and deaths which one would expect to have occurred in the DPSCS during the years

2010–2016." *Id.* at WEXFORD EXPERTS000043. Dr. Fowlkes engaged in no statistical

analysis, or comparison to the pool of available files, or any other type of data analysis to support

his conclusory statement that it was a "very small sampling"; nor could he, because he is a

doctor, and claims no statistical background from which to make such claims.

Dr. Joshua oversteps in the same way. Dr. Joshua is also a physician, and the former

administrator of the San Diego County Sheriff's Medical Services Division. He, too, does not

claim to have any statistical or data analysis expertise. Ex. C (Joshua Dep.) at 137:22-138:3;

138:11-139:12 (never offered statistical critique in any other case, except where statistician also

retained); Ex. D (Joshua Report) at 1-2 & WEXFORD EXPERTS 80-88. He was retained by

Defendants to determine whether Defendants systemically denied prisoners medical care for

profit-driven motives. Without regard for these limits, Dr. Joshua opines that Dr. Herrington

relied on a "miniscule sample of patients" to generate his opinion. Ex. D (Joshua Report) at 10.

But again, he offers no statistical analysis, or explanation of what an appropriate sample size

would be, based on the application of statistical expertise, and thus his conclusory opinion is far

beyond the scope of his expertise as a medical doctor.

Neither expert can make these claims. Courts routinely limit expert testimony to subjects

for which they are deemed to be qualified. *E.g.*, *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194,

198 (4th Cir. 2001) ("Dr. Alexander is an expert in the field of biomedical engineering. He is not

a medical doctor. For this reason, Dr. Alexander was found unqualified in the multidistrict

litigation to opine as to causation in any individual plaintiff or to testify outside the area of

orthopedic bioengineering."); *United States v. Blair*, No. CR ELH-19-00410, 2021 WL 5040334,

at *21 (D. Md. Oct. 29, 2021) ("Dr. Thomas does not own a pharmacy and is not a licensed

pharmacist. No evidence was elicited from him regarding 'industry standards' or the basis for his

knowledge that certain conduct is 'outside industry standards for the owner of a pharmacy.'");

*see also In re Titanium Dioxide Antitrust Litig.*, No. CIV.A. RDB-10-0318, 2013 WL 1855980,

at *4 (D. Md. May 1, 2013) (citing Eleventh Circuit case where court found expert testimony

inadmissible where it fell "outside his competence as a statistician."). This court should prohibit

Defendant's experts from opining about statistical evidence outside of the purview of their

expertise.

Finally, it would also be profoundly unfair to permit Defendant's medical experts from

offering statistics-based criticisms of the set of medical files Plaintiff reviewed *given that*

*Defendant refused to produce a single medical file in this matter*. This is because Defendant

spoliated them. They had access to the medical files in their entirety while this case was in

discovery, then moved to bifurcate Plaintiff's *Monell* claims; upon succeeding in that effort,

Defendants proceeded to relinquish access to the medical files before the *Monell* phase of

discovery, without any effort to preserve relevant medical records related to this litigation. In

other words, by its discovery violation, Defendants have disclosed (and relied on) zero medical

records of their own. Plaintiff then sought as many death-related records as she could get from

the State of Maryland, which resulted in the 25 sets of medical records provided to Plaintiff's

experts. For Wexford to then turn around and claim that Plaintiff's chart review is insufficient (as

a result of Wexford's discovery violation) is audacious. *See* Plaintiff's Motion *in Limine* No. 2.

**B.      Defendant Experts Cannot Piggyback On One Another's Opinions**

Expert testimony must be based on the expert's own scientific, technical, or other

specialized knowledge. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017). When

an expert's proffered opinion "merely parrots information" provided by a party or other expert,

that opinion is generally excluded." *Brightview Group, LP v. Teeters*, No. SAG-19-2774, 2021

WL 2627960, at *6 (D. Md. Feb. 8, 2021). By contrast, expert testimony is only admissible

where it "adequately consider[s] or add[s] to the other expert's methodology." *In re Zetia*

*(Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2022 WL 3337796 (E.D. Va. Aug. 3, 2022)

(citing *Mamani v. Sanchez Berzain*, No. 07-22459-CIV, 2018 WL 1090546, at *4 (S.D. Fla. Feb.

28, 2018) (excluding expert who "openly conceded on more than one occasion that he assumed

the accuracy of [another expert's] opinions."). At several points in their expert reports,

Defendant's experts simply parroted claims offered by Defendants' other experts.

First, Dr. Joshua devotes a portion of his report to simply repeating Dr. Schwartz's

conclusion that "more likely than not, there was no particular intervention in this case that can be

identified that would have prevented [Ms. Neal's death]." Ex. D (Joshua Report) at 8. But that is

not an appropriate opinion from Dr. Joshua, based on his qualifications or his methodology.

Unlike Dr. Schwartz, he is not a neurosurgeon or neurologist, and does not perform neurological

interventions. Thus he does not have expertise in making determinations about specific

neurological diagnoses, or the appropriate interventions based on those conditions. Ex. C (Joshua

Dep.) at 62:16-19. Indeed, when it comes to "assess[ing] the likelihood of success of various

stroke treatments," he "defer[s] that expertise to a neurologist." *Id*. at 68:9-13. And unlike Dr.

Schwartz, he did not conduct a detailed analysis of the pathology and sequence of events that

resulted in Ms. Neal's strokes, and he did not rely on research or emergency room experience

regarding the probabilities associated with various outcomes based on Ms. Neal's presentation.

*Id.* at 287:11-288:25 (describing his "cursory review" and conceding he "did not look at the case

in that [way]"); 289:1-7 (not familiar with FUNC score, which is issued to predict functional

outcomes in patients with intracranial hemorrhage, because he "defers to the neurosurgeon or a

neurologist on that"). He simply voices his agreement with Dr. Schwartz.

Second, and likewise, Dr. Joshua parrots Dr. Fowlkes's assertion that Dr. Herrington's report "has a narrative about delay in care and Emergency department transfers that are simply unsupported by the evidence." Ex. D (Joshua Report) at 9. But Dr. Fowlkes's opinions in that regard (like Plaintiff expert Dr. Herrington's opinions to which they were a response) were based on a review of medical and investigative files related to more than two dozen deaths. Ex. E (Herrington Report) at 2; Ex. A (Fowlkes Report) at 6-38. Dr. Joshua conducted no such analysis. Ex. C (Joshua Dep.) at 135:17-22 ("I will defer to [Dr. Fowlkes]" regarding the 19 cases reviewed). His role was different—to respond to the opinions of Plaintiff's expert Dr. Keller regarding the "business" and "administration" of correctional medicine, and the various forms that takes. Ex. D (Joshua Report). Without reviewing the underlying files Dr. Fowlkes (and Dr. Herrington did), he simply repeats Dr. Fowlkes's conclusion that the medical files reviewed in this case do not contain evidence of delays in emergency room care.

Courts routinely prohibit expert testimony when the expert's opinion relies on another person's analysis rather than the expert's. For example, in *United States v. Willock* the defendants sought to exclude the testimony of an expert witness who proffered testimony that cartridge casings found at two different crime scenes likely came from the same gun. *Id.* at 545. But the expert did not personally examine the cartridges; rather, he relied on an examination of a different firearms examiner to offer his opinions. *Id.* at 573. The court limited the expert's testimony, prohibiting him from offering any characterization as to his degree of certainty that the cartridges matched and noting that the expert's opinion "for lack of a more elegant expression, piggyback[ed] on those of [a different firearms examiner]," and thus created "a real danger of misleading the jury." *Id.*

Defendant's experts attempt the same here. The particular opinions of Defendant's experts discussed above—those that are not based on their own expertise and analysis, but instead based on the work of other experts—should be excluded.

II.     **Dr. Joshua's Irrelevant Opinions Attacking a Strawman Argument Not Made by Plaintiff's Experts Should be Barred**

Dr. Joshua repeatedly attributes to Plaintiff's experts, Dr. Herrington and Dr. Keller, an opinion that "every complaint can only be treated in the Emergency Department." Ex. D (Joshua Report) at 10, 11 ("Correctional facilities cannot send every inmate to the Emergency department for every complaint"; and even more explicitly, "Dr. Herrington's and Dr. Keller's assertion for indiscriminate transport of every individual who needs any level of healthcare to the local emergency department is not realistic"). The problem is, neither Dr. Herrington nor Dr. Keller offer such an absurd opinion. To the contrary, they both acknowledge that there are certain treatments that can be provided on-site; and furthermore, that reductions in ER care may be appropriate *if there is a commensurate increase in equipment and resources available on-site*. Ex. E (Herrington Report) at 26; Ex. F (Keller Report) at 13-14. In other words, in order to attack Plaintiff's experts' opinions, Dr. Joshua has created a strawman argument that no expert in this case is actually making. This is clever, but improper: it is likely to—and in fact, intended to— mislead and confuse the jury. Dr. Joshua is welcome to offer his opinions about the circumstances in which detainees should and should not be transported to the emergency department, and he should stick to offering those opinions, not attributing nonsensical opinions to Plaintiff's experts and then criticizing those unoffered opinions.

9

III.    **The Court Should Bar Dr. Fowlkes' Opinions Regarding Mortality Rates in States Prisons Based on DOJ Data for 2001-2014 Because Those Opinions Are Unreliable and Irrelevant**

Based entirely on Bureau of Justice Statistics data for 2001-2014, Dr. Fowlkes opines that the average mortality rate in the Maryland facilities in which Wexford was responsible for medical care was below the national averages. Ex. A (Fowlkes Report) at 40. This opinion is unreliable and irrelevant and should be barred.

First and foremost, Dr. Fowlkes uses data regarding the mortality rate *in state prisons* to compare against Wexford's mortality rate in its Maryland facilities, without accounting for the fact that Wexford's contract included not just state prisons but also pre-trial jails and detention facilities. As he later acknowledged, the mortality rate in jails is generally much lower, because of the younger and more temporary nature of the detainee population. Ex. B (Fowlkes Dep.) at 351:20-352:13. Yet, he failed to account for this critical fact. What's worse, such data for jail facilities was readily available, but he chose not to use it or account for it in any way (lo and behold, those figures are not helpful to Wexford, *see* Ex. G (Keller Rebuttal Report) at 4).

In addition, after Wexford insisted on limiting Plaintiff in discovery to records related to the 2010 to 2014 timeframe (*see* Plaintiff's Motion *In Limine* No. 3 to Bar Arguments About the 2010-2014 Timeframe), Dr. Fowlkes cites to an overall national mortality rate for the period from *2001* through 2014, without explaining why he chose such a skewed and unfairly prejudicial timeframe in relation to this chase. He then compares those 2001 through 2014 national prison averages to the Maryland averages (across jails and prisons) for 2012 through 2014, and without accounting for the fact that Corizon—not Wexford—was the direct care provider for half of 2012. There is no explanation offered for these willy-nilly, apples-to-oranges

comparisons. As Defendants' own expert acknowledges, this is inappropriate. Ex. C (Joshua

Dep.) at 83:11-16. Because Dr. Fowlkes's opinions rely on an inapplicable data set related to

prisons only, and an inconsistent application of that data set to this case, his opinions are

unreliable and would merely serve to confuse and mislead the jury, and for those reasons should

be barred.

IV.     **Dr. Joshua's Conjecture That Wexford Could Not Have Provided Deficient Care Because if it Did it Would Have Been Fired Should be Barred**

Dr. Joshua offers the following opinion: "For a group of clinical providers to conspire or

engage in a pattern or practice to deny inmates medical care in order to risk their professional

medical license and subvert their responsibility with no know incentive, is neither supported by

the evidence, nor does not [sic] make logical sense." Ex. D (Joshua Report) at 9. In other words:

this would never happen. This circular opinion is pure conjecture, of no relevance to the facts at

issue in this case, calls upon zero expertise, is unhelpful to the jury, and improperly invades the

province of the jury.

This opinion from Dr. Joshua contains two premises: (a) that Wexford's clinical

providers in Maryland faced an actual risk of losing their professional medical licenses or were

animated by such a fear; and (b) that there was "no known incentive" to deny inmates medical

care. Both premises reveal why this opinion is improper.

The first premise is based on nothing more than Dr. Joshua's say-so. *See Gen. Elec. Co.

v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of

Evidence requires a district court to admit opinion evidence that is connected to existing data

only by the *ipse dixit* of the expert."). He is not a member of the Maryland Board of Physicians

or the Maryland Board of Nursing, boasts no knowledge or expertise in the licensing and

disciplinary practices of those licensing Boards. In fact, he has never worked for a private

correction's healthcare provider, Ex. C (Joshua Dep.) at 129:17-19, so he cannot possibly opine about the motivations and thought processes of such companies or their providers. Moreover, Dr. Joshua has no idea whether Wexford ever disciplined any of its medical providers in Maryland, let alone whether any of them ever had their license revoked or suspended. *Id.* at 230:6-13, 234:17-235:9. Put simply, his claims about what the doctors and nurses would and would not do is pure conjecture, and thus inadmissible. *See Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 470 (D. Md. 2000) (proffered opinions based on speculation or conjecture are neither relevant nor instructive to the jury in its fact-finding mission); *see also Nease*, 848 F.3d at 229 (4th Cir. 2017) (same).

This is also improper opinion testimony because it invades the province of the jury. It is not for Dr. Joshua to proclaim, but for a jury to decide, whether the policies and practices at issue in this case could and did cause Ms. Neal's death. *United States v. Perkins*, 470 F.3d 150, 157-58 (4th Cir. 2006) (opinions that "merely tell the jury what result to reach" is not helpful to the jury and therefore not admissible under Rule 702); *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002); *United States v. Cone*, 714 F.3d 197, 227-28 (4th Cir. 2013) (It "is axiomatic that . . . issues of fact are reserved for the jury.").

The second premise is equally problematic because it is an irrelevant opinion that does not aid the jury in resolving the facts at issue. *See Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."). It presents an inapplicable hypothetical: no known incentives to deny care. But as the summary judgment record shows, the jury in this case will be presented with ample evidence of incentives to deny care, including performance evaluations referencing a doctor's number of ER runs, emails

congratulating staff on days and weeks without ER runs, unvarnished communications reflecting

fear of reprisal for sending patients out, and the ER reduction program itself. The jury will

ultimately determine whether it finds this evidence convincing, and whether it serves to satisfy

the elements of the claim. Dr. Joshua's claim—that there is no such evidence (or that the

evidence of an incentive is inadequate or unpersuasive)—serves merely to substitute his opinion

for that of the jury, effectively putting his thumb on the scale. That is improper.

> **V.**     **The Court Should Bar Certain of Dr. Schwartz's Opinions Concerning Ms. Neal's Likelihood of Survival**

> **A.**     **The Court Should Bar Dr. Schwartz's Opinion That One Cannot Say With Certainty That Ms. Neal Would Have Survived**

To prove her *Monell* claim, Ms. Neal need only prove that there was an unconstitutional

policy or practice, and that it caused a violation of her rights. ECF No. 582 (Order Denying

Wexford's Mot. for Summary Judgment) at 58. To the extent the jury is assessing damages, the

relevant question is whether it was *more likely that not* that Ms. Neal would have survived if she

had been transported to the emergency room earlier.[2] But Dr. Schwartz does not aid the jury in

answering that question, because on that issue he has no opinion. Ex. H (Schwartz Dep.) at

119:19-22, 204:19-22, 251:20-252:9 (repeatedly acknowledging that he could not offer any

opinion on whether Ms. Neal's likelihood of survival if she had been transport to the emergency

room earlier was above or below 50%).

Instead, Dr. Schwartz's primary opinion in this case is simply this: while there are many

treatments that may have saved Ms. Neal's life, one cannot identify a specific intervention that

---

[2] Even this is a simplification, because Ms. Neal experienced compensable damages in the form of prolonged pain and suffering—in the form of days of agony and begging for her life—as a result of the failure to timely send her out for treatment.

would have saved her life *with certainty*. Or, as Dr. Schwartz put it in his own words at his

deposition:

> Q. So in this case would it be fair to say that your primary opinion is we cannot
> say that there is a treatment that would have *definitely* saved Fatima Neal's life?
> A. That's correct.

Ex. H (Schwartz Dep.) at 204:2-7 (emphasis added); *see also* Ex. I (Schwartz Report) at 5-6.

(while there are many interventions that "*may* have helped, we simply cannot say that they *would*

have helped."). This opinion is not at all relevant to whether Ms. Neal can prove the elements of

her Monell claim, or to the appropriate damages. To the contrary, it would serve only to confuse

and mislead the jury, because it falsely implies a higher burden of proof related to damages (and

arguably causation) than the law requires.

**B.      The Court Should Bar Dr. Schwartz from Opining About the Likelihood
or Percentage Chance of Ms. Neal's Survival**

As discussed above, Dr. Schwartz proffered no opinion on whether it was more likely

than not Ms. Neal would have survived if she had been transported earlier. That is not surprising,

because Dr. Schwartz did not conduct a review of literature or studies to analyze the question of

how likely it was Ms. Neal would have survived, and with what level of physical and cognitive

functioning.[3] *See, e.g.*, *id.* at 100:13-21 (ischemic), 105:17-24 (stroke size), 245:6-246:7. So

unlike Dr. Pedelty, he did not use the tools available in his field to assess Ms. Neal's likelihood

of survival. Accordingly, he should not be permitted to come to trial and offer new, undisclosed

---

[3] On the other hand, perhaps "no opinion" was inevitably the only opinion Dr. Schwartz could offer without completely undermining Wexford. That is because when questioned about each possible sequence of events that could have resulted in Ms. Neal's brain herniation and death, Dr. Schwartz indicated that the rate of survival was greater than 50%. *See, e.g.*, Ex. H (Schwartz Dep.) at 99:5-9, 100:13-18, 111:3-6, 115:6-116:3, 122:2-123:5, 124:25-125:8, 132:13-19. Thus the thrust of his opinions was that she would have survived virtually every possible sequence of brain injury she could have suffered.

opinions on this topic. *Bresler*, 855 F.3d at 190 (when a party fails to fulfill its obligations, it cannot introduce the undisclosed expert opinion at trial).

### VI.    Bar Wexford's Experts From Making Credibility Determinations

Whether or not a witness is telling the truth, or whether or not the witness' statements are corroborated by other evidence, are inquiries well within the common abilities of jurors. Accordingly, experts in federal court may not testify about the credibility of other witnesses. *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013); *United States v. Smith*, 30 F.3d 568, 572 (4th Cir. 1994) ("[t]he credibility of witnesses is the jury's province."); *see also United States v. Fuertes*, 805 F.3d 485, 495 (4th Cir. 2015) (absent "unusual circumstances" courts must exclude expert testimony about witness credibility); *United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995) (witness credibility is "usually within the jury's exclusive purview"). Wexford's experts should therefore be barred from opining about other witnesses' credibility, or making credibility determinations themselves.

This is not just a hypothetical concern. The reports and depositions of Wexford's experts indicate a willingness to credit or discredit the testimony of various witnesses. By way of example, Dr. Joshua openly admits that he discounted the testimony of Donna James, a former Wexford employee in Maryland who revealed that financial interests overtook quality of care concerns when Wexford took over the direct patient care contact in July 2012. Ex. D (Joshua Report) at 10; Ex. C (Joshua Dep.) at 257:5-260:14 (among other things, Dr. Joshua asserting that James "didn't really understand" and discounting her testimony because she did not blow the whistle "to the feds"). This, and other testimony like it opining about witness credibility, should be barred. *See Elat v. Ngoubene*, 993 F. Supp. 2d 497, 513 (D. Md. 2014) (expert opinion about whether a witness' "story holds together" was an inadmissible credibility determination); *Wagoner v. Lewis Gale Med. Ctr., LLC*, 2016 WL 7183162, at *5 (W.D. Va. Dec. 8, 2016)

(credibility determinations by experts "create a serious danger of confusing or misleading the jury, causing it to substitute the expert's credibility assessment for its own common sense determination").

<b>CONCLUSION</b>

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves this Court for an order barring Drs. Joshua, Schwartz, and Fowlkes from offering certain testimony in this case, as set forth above.

RESPECTFULLY SUBMITTED,

/s/ Anand Swaminathan
*Attorneys for Plaintiff*

/s/ Steven Art
*Attorneys for Plaintiff*

/s/ Rachel Brady
*Attorneys for Plaintiff*

Michael Kanovitz
Anand Swaminathan
Steven Art
Rachel Brady
Megan Porter*
LOEVY & LOEVY
311 North Aberdeen St.
Chicago, IL 60607
(312) 243-5900
*Pro hac vice motion forthcoming


Masai D. McDougall
Fareed Nasoor Hayat
Norrinda Hayat
THE PEOPLE'S LAW FIRM
14908 Notley Avenue
Silver Spring, MD 20905

**CERTIFICATE OF SERVICE**

I, Rachel Brady, an attorney, hereby certify that, on November 18, 2022, I filed the foregoing Plaintiff's Motion *in Limine* No. 01 to BAR CERTAIN TESTIMONY OF DEFENDANT'S EXPERTS using the Court's CM-ECF system, which effected service on all counsel of record.

/s/ Rachel Brady
Attorney for Plaintiff

17