IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SHARON BOST, in her individual capacity and as personal representative of the ESTATE OF FATIMA NEAL, | * * * | |
| *Plaintiff*, | * | Case No. 1:15-cv-03278-ELH |
| v. | * | Hon. Ellen L. Hollander, District Judge |
| WEXFORD HEALTH SOURCES, *et al.*, | * | |
| *Defendants*. | * * | Hon. A. David Copperthite, Magistrate Judge |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 1 TO
TO BAR CERTAIN TESTIMONY BY DEFENDANTS' EXPERTS**

Wexford's response to Plaintiff's Motion *in Limine* No. 1, which seeks to bar certain opinions of Defendants' experts that do not satisfy the *Daubert* requirements, is a scattershot of arguments and commentary that are often irrelevant to the specific opinions Plaintiff seeks to bar. Wexford's response also at times appears to concede an issue, and then suggest in the next paragraph that the very same issue is disputed. In this reply, Plaintiff seeks to refocus the discussion on the specific opinions at issue, and explain why Wexford's opposition is without merit.

> **I.A[1]:   Wexford all but concedes that Dr. Fowlkes and Dr. Joshua are not statisticians, and so they cannot offer statistical critiques, such as challenging the "sample size" of the medical records reviewed by Dr. Herrington.**

---

[1] Wexford has given different numbering and lettering to the topics in its response, and combined with the confusion in its topic headers (see footnote 2), creating unnecessary confusion. Plaintiff has identified each specific opinion it is seeking to bar by the numbering and lettering in the initial motion.

At various points in its response, Wexford appears to concede that its experts cannot make statistical critiques of the set of the medical records reviewed by Dr. Herrington. Dkt. 624 at 3 (Dr. Fowlkes' review "is not a statistical criticism of the sample size"), 4 (noting that Dr. Fowlkes' report outlines his opinions regarding the quality of care in each set of medical records, which it concedes "is not a criticism of the size of the sample").

But at other points, Wexford asserts that its experts are merely opining that "nineteen cases of possible delay in emergency room care are not sufficient to prove a custom, pattern or practice." Dkt. 624, at 3. But that is simply another way of making the same statistical claim: 19 cases is not a sufficient sample. Worse, it invades the province of the jury, because it is for the jury to decide whether nineteen instances can establish a widespread practice. And it is an opinion that would confuse the jury because it is contrary to established law, which is clear that 19 examples can establish a widespread practice. *See Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir. 2003) (citing *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991); *see also Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 403 (4th Cir. 2014).

Ultimately, Wexford's response contains no argument that Dr. Fowlkes or Dr. Joshua have any statistical expertise, or applied any reliable statistical method to their analysis. That is, Wexford concedes that their medical expertise does not qualify them to make statistical claims. Accordingly, they cannot be permitted to talk about statistical concepts of conclusions, like whether a particular sample size is sufficient for reaching particular conclusions.

Finally, Wexford's response does not address the severe prejudice from its failure to preserve relevant medical records, as a result of which it refused to produce a single medical file (other than Ms. Neal's) in this case. *See* Dkt. 611 (Pl.'s MIL No. 2). Wexford now seeks to gain

an advantage from that discovery misconduct. It should not be permitted to do so, and that it refuses to address this aspect of Plaintiff's motion is telling.

### I.B: Wexford concedes that Dr. Joshua cannot piggyback on the opinions of Dr. Schwartz and Dr. Fowlkes.[2]

First, Wexford agrees that it will not rely on Dr. Joshua to parrot Dr. Schwartz's opinions about the available medical interventions. Dkt. 624, at 7. Accordingly, Dr. Joshua cannot adopt and parrot Dr. Schwartz's opinion that "more likely more likely than not, there was no particular intervention in this case that can be identified that would have prevented [Ms. Neal's death]."

Similarly, regarding Dr. Joshua's opinions parroting the opinions of Dr. Fowlkes, Wexford concedes (in a roundabout fashion) that it will not rely on Dr. Joshua to offer such opinions. Wexford asserts that he should be permitted to offer opinions about Wexford's policies and practices based on his "review of numerous records in this case," including "over 10,000 pages of medical records and documents." That is true; Plaintiff agrees that Dr. Joshua can opine based on the records he reviewed, and Plaintiff has not argued to the contrary. Instead, Plaintiff has asked this Court to prevent Dr. Joshua from opining about records he did **not** review—the two-dozen individual medical files considered by Dr. Herrington (Plaintiff's expert) and Dr. Fowlkes (Wexford's expert)—by simply parroting Dr. Fowlkes' conclusions. Wexford provides no response on this particular point, and so it is conceded. Dr. Joshua cannot adopt and parrot Dr. Fowlkes' opinion that the medical files from the more than two dozen deaths reviewed by Dr. Herrington and Dr. Fowlkes (but not Dr. Joshua) do not contain evidence of delays in emergency room care.

---

[2] Confusingly, Wexford's response places this discussion under the unrelated heading "Dr. Joshua's Opinion Related to the Purpose of the ER Reduction Program is not a Strawman Argument."

3

### II. Wexford simply ignores the subject and reasoning of Plaintiff's request to bar Wexford's experts from attacking strawman arguments not made by Plaintiff's experts.

Again, Wexford fails to address the subject at issue, meandering into irrelevant and disjointed topics. Plaintiff's motion makes clear that she is seeking to bar a very particular avenue of attack that Dr. Joshua employs out in his report: attributing (falsely) to Dr. Herrington and Dr. Keller the opinion that "every complaint can only be treated in the Emergency Department." Dkt. 591, at 9. Plaintiff's experts offer no such opinion, and thus it is inappropriate for Dr. Joshua to put such opinions in their mouths, and then attack those strawman opinions. This would be obviously confusing to the jury, and both irrelevant and unhelpful to the jury's determination.

Wexford has not identified any point in Dr. Keller or Dr. Herrington's reports or depositions at which they adopt such a silly opinion. Instead, it responds with a non sequitur about Dr. Joshua's opinion that the ER Reduction Program was only about three specific categories of care, and that Dr. Keller is wrong to say that it morphed into something bigger. But this argument has nothing to do with the relief Plaintiff has requested. Plaintiff is not seeking to bar Dr. Joshua from opining that the ER Reduction Program applied only to three categories of care (in fact, Plaintiff can't wait for him to make this argument, which is demonstrably false in light of the evidence, discussed at length at summary judgment); that is clearly a battle of experts that should play out through vigorous cross-examination. What Wexford does not address, however, is the actual substance of Plaintiff's motion: that Dr. Joshua should not be able to falsely attribute absurd opinions to Dr. Keller and Dr. Herrington that they do not hold. Accordingly, Wexford has conceded this portion of Plaintiff's motion.

### III. Wexford's cursory response does not address the methodological flaws in Dr. Fowlkes' use of DOJ data on mortality rates in state prisons from 2001-2014, rendering his opinions unreliable.

4

Plaintiff points out several fundamental, methodological flaws in Dr. Fowlkes' analysis: he used state prison data, ignoring the less favorable pre-trial jail data that was clearly the relevant comparator for this case; he arbitrarily used a baseline average mortality rate from 2001-2014; he compared 2001-2014 national averages to 2012-2014 Maryland data; and he failed to account for the fact that the 2012 data included half a year in which Corizon was the direct medical provider. In other words, he used the wrong data set (prisons), from which he took the wrong baseline mortality rate (2001-2014), and then compared it to Maryland averages from a different time period (2012-2014). Dkt. 591 at 10-11.

Wexford's response does not address any of this. It simply acknowledges that Dr. Fowles admitted that he should have used the pre-trial jail mortality rates in his calculations (though he never submitted a corrected report), and then simply asserts that Dr. Fowlkes should not be barred because Plaintiff can simply cross-examine Dr. Fowlkes on these issues. Although Plaintiff agrees that is often how a battle of experts is appropriately addressed, that is not the case here.

It is true that it is common for parties' experts to have different views about the appropriate methodology, or even the conclusions to be drawn from the same methodology, and that these disputes are appropriately resolved through cross-examination at trial. But there must be *some* methodological underpinnings for each expert's opinions in the first instance, before they can simply be spouted to a jury. That is the very purpose of *Daubert's* gatekeeper function. Wexford offers none. Its response consists of an admission as to the unreliability of one aspect of Dr. Fowlkes' analysis, and no defense of any of the other flaws in his analysis that Plaintiff identified. Because Wexford fails to identify any support for the reliability of Dr. Fowlkes' apples-to-oranges analysis, this opinion should be barred.

**IV.    Wexford fails to defend Dr. Joshua's qualifications to offer an opinion that the medical providers would never deny inmates medical care because they would have risked losing their professional license, and therefore it should be barred.**

Wexford's perfunctory response on this point contains no discussion of any specific research, studies, investigations, audits, literature, or anything else from which Dr. Joshua can offer an opinion that medical providers would never deny an inmate care because they would lose their licenses. Wexford does not demonstrate that he considered a single item of evidence related to the State of Maryland's processes for disciplining doctors or nurses, or whether they result in any meaningful discipline of providers. And Wexford's response does not identify a single document Dr. Joshua reviewed in this case related to Wexford's own disciplinary practices or history of disciplining doctors or nurses who fail to provide adequate care.

Wexford simply says that he is relying on his "background as an emergency room physician" (in California). Dkt. 624 at 8. But that in no way suffices to establish a basis to offer such rampant speculation. Dr. Joshua's opinion is clearly based on nothing more than his say-so, and thus should be excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

**V.    Wexford's response regarding Ms. Neal's chance of survival had she been sent to the ER earlier is so non-sensical and confusing that it demonstrates exactly why this opinion must be barred: it will completely confuse the jury.**

Respectfully, Plaintiff can hardly make any sense of Wexford's response regarding Plaintiff's chance of survival had she been sent to the ER sooner. On the one hand, Wexford's very topic header is "Dr. Schwartz Will Not Opine on Ms. Neal's Chance of Survival." But then in the next breath it says he will opine that "no one can say more likely than not Ms. Neal would have survived had she received earlier treatment." Dkt. 624 at 10.

6

Plaintiff deliberately broke her motion to bar Dr. Schwartz's opinions regarding Ms. Neal's likelihood of survival into two sections, which Wexford has confusingly morphed together in its response. To try to bring some clarity to the issue, Plaintiff begins with Section V.B of her motion, seeking to bar Dr. Schwartz from opining about the percentage chance of Ms. Neal's survival. Dkt. 591 at 14-15.

**V. B** (Dkt. 591, at 14-15): Plaintiff's motion notes that there are studies and literature that analyze the likelihood of survival, and level of physical and cognitive function, based on the particular circumstances in Ms. Neal's case (*e.g.*, size, location and type of stroke). Plaintiff's expert, Dr. Pedelty, considered those studies and literature, along with her experience, and opined that the chances of survival were greater than 50%. Dr. Schwartz did not review those (or other) studies or literature, did not disclose an opinion about the chances of survival, and admitted at his deposition that the likelihood of survival for virtually every sequence of events that could have caused Ms. Neal's death was greater than 50%. Dkt. 591 at 14. Wexford does not dispute any of this, or respond to it (other than to concede that "Dr .Schwartz will not opine on Ms. Neal's chance of survival"). This portion of Plaintiff's motion should therefore be granted.

**V.A** (Dkt. 591, at 13-14): The other portion of Plaintiff's motion seeks to bar Dr. Schwartz from opining that it is impossible to say **with certainty** that Ms. Neal would have survived if she had been given a particular treatment. As Plaintiff notes, that is not at all relevant or helpful to the jury, which need only assess whether it was more likely than not that Ms. Neal would have survived had she been transported to the emergency room earlier. Dkt. 591 at 13. Dr. Schwartz's thoughts on whether Ms. Neal "certainly" would have survived would confuse the jury, by creating the impression of a different, higher standard. *Id.*

Wexford's response does not explain how Dr. Schwartz's opinion is relevant or helpful to the jury, or address the confusion it would cause. Instead, it launches into a bizarre discussion of whether there were "treatment modalities" that could've moved Ms. Neal from "the 40% category of those who did not survive their ICH into the 60% or more who did." Dkt. 624 at 10. Yeah: send her to the hospital sooner! Perhaps after the first stroke she suffered at least two days earlier (which Wexford no longer disputes). Plaintiff does not mean to be flippant, but this is really an outrageous, confusing opinion. First, where does the 60% versus 40% come from? Wexford has already admitted Dr. Schwartz is not opining on the chances of survival, nor did he review the studies or literature to place the chances at 60% (see above). Second, Wexford's proffered opinion is completely circular: "Question: If we assume she died, what are the chances she would not have died? Answer: Not good." There is no basis to offer this irrelevant, confusing opinion to a jury, nor does Wexford's response provide one. It should be barred.

### VI.   Credibility determinations (Dkt. 591 at 15-16)

Wexford concedes that its experts will not make credibility determinations at trial, and thus the motion can be granted without opposition.

Respectfully submitted,

/s/ Anand Swaminathan
*Attorneys for Plaintiff*

/s/ Rachel Brady
*Attorneys for Plaintiff*

Arthur Loevy
Michael Kanovitz
Anand Swaminathan
Steven Art
Rachel Brady
Megan Porter
LOEVY & LOEVY

    311 North Aberdeen St.
    Chicago, IL 60607
    (312) 243-5900

    Masai D. McDougall
    Fareed Nassor Hayat
    Norrinda Hayat
    THE PEOPLE'S LAW FIRM
    14908 Notley Avenue
    Silver Spring, MD 20905

## CERTIFICATE OF SERVICE

I, Anand Swaminathan, an attorney, hereby certify that, on February 3, 2023, I filed the foregoing Reply using the Court's CM-ECF system, which effected service on all counsel of record.

/s/ Anand Swaminathan
Attorney for Plaintiff